1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5   - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA              18-CR-6094(G)
6
    vs.
7                                         Rochester, New York
    CARLOS JAVIER FIGUEROA,               April 28, 2021
8              Defendant.                 11:05 a.m.
    - - - - - - - - - - - - -X
9

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11              UNITED STATES DISTRICT CHIEF JUDGE

12

13

                    JAMES P. KENNEDY, JR., ESQ.
14                  United States Attorney
                    BY: ROBERT A. MARANGOLA, ESQ.
15                      CASSIE M. KOCHER, ESQ.
                    Assistant United States Attorneys
16                  500 Federal Building
                    Rochester, New York 14614
17                  Appearing on behalf of the United States

18

                    PAUL J. VACCA, JR., ESQ.
19                  One East Main Street, Suite 1000
                    Rochester, New York 14614
20                  Appearing on behalf of the Defendant

21

22   ALSO PRESENT:        Nicolas Penchaszadeh, Spanish Interpreter
                          James Hontoria, Spanish Interpreter

23

24   COURT REPORTER:      Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                          Christimacri50@gmail.com
25                        Kenneth B. Keating Federal Building
                          100 State Street, Room 2640
                          Rochester, New York 14614

2

1

2                           **I N D E X**

3    **WITNESS FOR THE GOVERNMENT**

4    Joseph Briganti
          Direct examination by Mr. Marangola       Page 3
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*   \*   \*

1

2

3            **(WHEREUPON**, the defendant is present; the jury is

4  present).

11:05:06AM 5        <u>**GOVERNMENT'S WITNESS, JOSEPH BRIGANTI, SWORN**</u>

6                    <u>**DIRECT EXAMINATION**</u>

7            **THE CLERK:** Please state your name for the record

8  and spell your last name.

9            **THE WITNESS:** Joseph Briganti, B-R-I-G-A-N-T-I.

11:05:44AM 10        **THE REPORTER:** Thank you.

11            **THE CLERK:** Have a seat up there.

12            **MR. MARANGOLA:**  As the Court had directed, I'll be

13  conducting my examination seated?

14            **THE COURT:** That's correct.

11:06:16AM 15        **MR. MARANGOLA:**  May Investigator Briganti take off

16  his mask while he's answering questions?

17            **THE COURT:** Yes, he may.  He's behind Plexiglass,

18  we're allowing that.

19            **THE WITNESS:** Thank you, Your Honor.

11:06:25AM 20  **BY MR. MARANGOLA:**

21  Q.   Good morning, sir.

22  A.   Good morning.

23  Q.   Please introduce yourself to the jury.

24  A.   Yes, my name is Joseph Briganti, I'm an investigator with

11:06:35AM 25  the Rochester Police Department.

1    Q.    How long have you been with the Rochester Police

2    Department?

3    A.    So I've been with the Rochester Police Department for 24

4    years.  Prior to that I had three years with the Niagara Falls

11:06:47AM 5    Police Department, so I have a total of 27 years.

6    Q.    Are you currently assigned to any particular unit in the

7    Rochester Police Department?

8    A.    Yes.  I'm assigned to the ATF's Violent Crimes Task Force.

9          **THE COURT:** Investigator, pull the microphone maybe

11:07:02AM 10   a little closer.

11          **THE WITNESS:** Yes.

12   **BY MR. MARANGOLA:**

13   Q.    You indicated you're assigned to the ATF Violent Crimes

14   Task Force?

11:07:12AM 15   A.    Yes.

16   Q.    All right, now we got you.  Can you describe for the jury

17   what is the ATF Violent Crimes Task Force?

18   A.    So it's a task force sponsored by ATF.  It's made up of

19   federal, state and local law enforcement agencies.  The focus

11:07:31AM 20   of the investigations are firearms related offenses, that's

21   like firearms trafficking, violence where violent crimes --

22   where firearms are present.

23          And we also investigate larger scale drug

24   trafficking organizations where violence and firearms are

11:07:53AM 25   present.  The task force also assists local law enforcement

1  with investigation of violent crimes like murders, assaults,

2  robberies where firearms are involved in those crimes.

3  Q.   How long have you been a member or assigned to the ATF

4  Violent Crimes Task Force?

11:08:13AM 5  A.   Since 2015.

6  Q.   Do you have a partner that you work with in the Violent

7  Crimes Task Force?

8  A.   Yes, currently my partner is ATF Special Agent Patrick

9  Hoffmann.   Prior to -- prior to that it was retired

11:08:29AM 10  Rochester Police Investigator David Swain.

11  Q.   All right.   Can you tell the jury a little bit about your

12  background your education and your training?

13  A.   Yes.   I graduated from Alfred State College.   I was hired

14  by the Niagara Falls Police Department in 1995.

11:08:50AM 15          I went through a law enforcement academy there

16  where it was just generally penal law sections, criminal

17  procedure law sections, vehicle and traffic law, firearms,

18  policies and procedures of the Niagara Falls Police

19  Department.

11:09:04AM 20          After I graduated from that academy I went into

21  their Patrol Division and I served in their Patrol Division

22  until I transferred to the Rochester Police Department in

23  1997.

24          I went to a brief academy here in Rochester.   It

11:09:18AM 25  was basically Rochester Police Department's policies and

1    procedures.  And then I went into the Patrol Division.  I was

2    in patrol for four years on the southwest side of the city

3    which is referred to as the Genesee Section.

4           After approximately four years I was reassigned to

11:09:38AM 5    the Special Investigation Section in the Narcotics Unit.  The

6    Narcotics Unit the investigations were focused mainly on

7    street level narcotics, so that was writing search warrants

8    for drug houses, executing search warrants for drug houses,

9    surveillance details, working with confidential informants,

11:10:01AM 10   doing undercover buys, things like that.

11          After a short period of time I was transferred to a

12   unit called Project Safe Neighborhoods and the idea behind

13   Project Safe Neighborhoods was they would compile a list of

14   the most violent areas of the City of Rochester and then our

11:10:22AM 15   team would go into those areas and we would attempt to

16   identify who was causing the violence, target those

17   individuals in an attempt to take those individuals off the

18   street.

19          I then went to the Intel Unit.  I served in the

11:10:36AM 20   Intel Unit for a short period of time.  That was basically

21   like motorcycle gang investigations.  It was -- it was -- we

22   would investigate crimes that were being conducted by city

23   employees.

24          I then went to what's called VEST.  VEST stood for

11:10:57AM 25   the Violent Enforcement and Suppression Team.  The idea behind

1  VEST was the Monroe County Analysis Unit would compile a list
2  of the ten most violent individuals in the city.  We would
3  receive that list and we would target those individuals and
4  attempt to get them off the street.
11:11:16AM 5        When VEST ended I had an opportunity to either go
6  to GRANET or to go back to narcotics.  I was offered a
7  position with the ATF Violent Crimes Task Force but there
8  wasn't an opening yet, so I decided to go back to narcotics
9  for that period of time.  And somewhere -- I believe it was
11:11:38AM 10 when I was working for VEST -- I was promoted to investigator
11  from patrol officer.
12  Q.   And you're still with the Violent Crimes Task Force; is
13  that right?
14  A.   Yes.
11:11:50AM 15 Q.   Okay. Can you describe some of your training related to
16  investigating drug cases as a Special Investigation Section
17  investigator?
18  A.   Yes.  So I had training, both formal and informal,
19  on-the-job training in writing narcotics search warrants,
11:12:09AM 20 working with confidential informants, performing undercover
21  buys, and some longer term investigations involving
22  wiretapping telephones.
23  Q.   All right.  What types of drugs have you been involved in
24  in investigating in your 20 plus career in law enforcement?
11:12:28AM 25 A.   Most commonly it's cocaine, heroin, fentanyl and

1    marijuana.   Those are the most common ones.

2    Q.    You indicated you had training related to wiretap

3    investigations.   Have you worked on wiretap investigations in

4    your capacity as a member of law enforcement?

11:12:45AM 5   A.    Yes.

6    Q.    Including the case that you're being asked to testify

7    about here today, approximately how many wiretap

8    investigations have you worked on?

9    A.    Approximately 30.

11:12:57AM10   Q.    Have you been in charge or a lead investigator on any of

11   those?

12   A.    Yes, five of them.

13   Q.    All right.   During the course of that work on wiretaps can

14   you estimate for the jury how many individual phone lines that

11:13:14AM15   you participated in investigating or listening to in those

16   wiretaps?

17   A.    I would say at least 100.

18   Q.    All right.   And do most of those wiretap investigations

19   relate to narcotics trafficking?

11:13:28AM20   A.    Yes, most of them do, yes.

21   Q.    All right.   As part of your work as a Special

22   Investigation Section officer with the Violent Crimes Task

23   Force, did you become involved in a narcotics trafficking

24   investigation that eventually led to the arrest of Carlos

11:13:45AM25   Figueroa?

1   A.    Yes.

2   Q.    I'd like to show you on your screen there what's not yet

3   in evidence as Government's Exhibit 28.  Is that shown on your

4   screen there?

11:13:59AM 5   A.    It is, yes.

6   Q.    That's a photograph; is that right?

7   A.    Correct.

8   Q.    Do you recognize the individual shown in Government's

9   Exhibit 28?

11:14:06AM 10                 **MR. VACCA:** Objection, Your Honor, no foundation.

11                 **THE COURT:** Overruled.

12                 **THE CLERK:** The interpreters have a question.

13                 **THE COURT:** Go ahead.

14                 **THE INTERPRETER:** I'm having difficulties again with

11:14:21AM 15   the equipment.

16                 **THE COURT:** Is this one not working okay?

17                 **THE INTERPRETER:** Yes.

18                 **THE COURT:** Thank you.

19                 **THE INTERPRETER:** It's working.  Thank you.

11:15:30AM 20                 **THE COURT:**  You may continue.

21                 **MR. MARANGOLA:** Thank you, Your Honor.

22   **BY MR. MARANGOLA:**

23   Q.    Investigator, I believe -- I believe my last question was

24   if you recognize the individual shown on your screen there in

11:15:41AM 25   Government's Exhibit 28?

1 | A.   Yes.  It's Carlos Javier Figueroa.

2 | Q.   And does that photograph fairly and accurately depict the

3 | individual you recognize as Carlos Javier Figueroa?

4 | A.   Yes, it does.

11:15:53AM 5 |         **MR. MARANGOLA:** At this time, Your Honor, I'd offer

6 | Government's Exhibit 28.

7 |         **MR. VACCA:** Objection, Your Honor, insufficient

8 | foundation, plus there's been no basis or allegation as to why

9 | his photo needs to be identified.

11:16:05AM 10 |         **THE COURT:** Overruled.  Exhibit 28 will be received.

11 |         (**WHEREUPON**, Government's Exhibit 28 was received

12 | into evidence).

13 | **BY MR. MARANGOLA:**

14 | Q.   Investigator, do you see the individual shown in

11:16:29AM 15 | Government's Exhibit 28 in court here today?

16 | A.   Yes, I do.

17 | Q.   Would you point to him and describe what he's wearing for

18 | the record?

19 | A.   Yes.  He's sitting over there, he has a white buttoned up

11:16:40AM 20 | shirt with a tie on.

21 |         **MR. MARANGOLA:** Your Honor, may the record reflect

22 | Investigator Briganti's identification of the defendant Carlos

23 | Figueroa?

24 |         **THE COURT:** Yes, the record will note the

11:16:52AM 25 | identification of the defendant Carlos Figueroa.

1    **BY MR. MARANGOLA:**

2    Q.    Investigator, when did you first become involved in the

3    investigation?

4    A.    Very early 2015.

11:17:02AM 5    Q.    Can you tell the jury what agencies in law enforcement

6    participated in the investigation?

7    A.    Yes.  So it was originally the Rochester Police

8    Department, ATF and the Monroe County Sheriff's Department.

9               But then the DEA, FBI and the United States Postal

11:17:21AM 10   Service became involved in the investigation once we sought

11   and obtained OCDETF designation in the case.

12   Q.    What's OCDETF?

13   A.    So OCDETF stands for the Organized Crime Drug Enforcement

14   Task Force.  What it is is it's a federal initiative that

11:17:38AM 15   focuses on the detection and dismantling of drug trafficking

16   organizations and the violence.  That's the textbook

17   definition.

18               What it is is federal funding that assists multiple

19   law enforcement agencies to work together to investigate large

11:17:55AM 20   drug scale organizations and their violence.

21   Q.    All right.  When you sought to make this investigation

22   part of the OCDETF, did you refer to it as anything, the

23   investigation?

24   A.    Yes, it was Operation Burbank Bust.

11:18:18AM 25   Q.    All right.  Can you describe for the jury what was the

1  goal of Operation Burbank Bust?

2  A.   So the goal was to stop the distribution of heroin and

3  cocaine and the violence associated with it primarily in the

4  area of Burbank Street and North Clinton Avenue in Rochester.

11:18:37AM 5  Q.   All right, Ms. Rand, if you could take photo 28 off?

6               Investigator Briganti, I'd like to show you on your

7  screen there Government's Exhibit 237, which is not in

8  evidence.  Can you tell the jury, do you recognize -- first

9  can you identify what that is Exhibit 237?

11:19:03AM 10  A.   Yes, aerial photo of the area of North Clinton Avenue,

11  Burbank Street and the surrounding streets.

12  Q.   All right. And if you could, maybe slide your microphone

13  over if you're looking at the screen.  I know it's hard to

14  look at the screen and speak into the microphone, but it will

11:19:21AM 15  help Ms. Macri as she's taking down what you say, okay?

16  A.   I apologize, I'm sorry.

17  Q.   You indicated Government's 237 is an aerial photo of

18  Burbank Street and some of the surrounding streets?

19  A.   Yes.

11:19:34AM 20  Q.   Are you familiar with that area based on your experience

21  as a member of the Rochester Police Department?

22  A.   Yes.  I've been in that area thousands of times.  I have

23  had investigations in this general area.

24  Q.   All right.  Are you familiar with the streets and the

11:19:51AM 25  direction of the streets in that area?

1    A.    I am, yes.

2    Q.    And the addresses in that area?

3    A.    Yes, I am.

4    Q.    Are the street names and the arrows identifying the

11:20:03AM 5    direction of traffic accurately listed in the Government

6    Exhibit 237?

7    A.    Yes, they are.

8    Q.    And are the addresses for locations on Burbank Street and

9    Leo Street accurately listed?

11:20:24AM 10    A.    Yes.

11    Q.    As well as the addresses -- I believe there's one address

12    on North Clinton Avenue that's listed there as well?

13    A.    Yes, that's correct.

14    Q.    Are all of the addresses and street names on Government's

11:20:39AM 15    Exhibit 237 accurately listed based on your experience and

16    familiarity with that neighborhood?

17    A.    Yes, they are.

18              **MR. MARANGOLA:** At this time I'd offer Government's

19    Exhibit 237.

11:20:49AM 20              **MR. VACCA:** Objection, Your Honor, there's been no

21    basis as to why this needs to be admitted and what role it

22    plays in this case.

23              **THE COURT:** Objection is overruled.

24              Government Exhibit 237 will be received.

11:21:03AM 25              (**WHEREUPON**, Government's Exhibit 237 was received

1   into evidence).

2           **MR. MARANGOLA:** If Ms. Rand could publish that for

3   us?  Thank you.

4           **MR. VACCA:** His headphones aren't working.

11:23:05AM 5           **THE COURT:** Hold on, ladies and gentlemen. We're

6   getting some new equipment.

7           **THE INTERPRETER:** We're okay, Your Honor.

8           **THE COURT:** Okay, thank you.

9           **MR. MARANGOLA:** Thank you, Judge.

11:24:53AM 10  BY MR. MARANGOLA:

11  Q.   Investigator Briganti, do you see Government's 237 on your

12  screen?

13  A.   Yes, sir, I do.

14  Q.   Does that show the area that Operation Burbank Bust was

11:25:03AM 15  targeting?

16  A.   Yes, it does.

17  Q.   Can you tell the jury what was your role in the

18  investigation?

19  A.   So I was considered a co-case agent.

11:25:17AM 20  Q.   With who?

21  A.   With ATF Special Agent Patrick Hoffmann and retired

22  Investigator David Swain.

23  Q.   When you say retired Investigator David Swain, I assume he

24  wasn't retired when he was one of the co-case agents; is that

11:25:32AM 25  right?

1  A.    Correct.

2  Q.    He's retired now?

3  A.    Yes.

4  Q.    Can you explain to the jury what co-case agent means and

11:25:40AM 5  what was your role as a co-case agent in the investigation?

6  A.    Yeah, it's -- you're basically in charge of the

7  investigation.  So you're basically the lead investigator on

8  the investigation.

9  Q.    Okay. And who were the targets of the investigation?

11:25:56AM 10  A.    The targets were Carlos Javier Figueroa and those that

11  might be part of his drug organization.

12             **MR. VACCA:** Objection, Your Honor.

13             **THE COURT:** The last part of the answer will be

14  stricken at this time.

11:26:15AM 15             **MR. VACCA:** Thank you.  And instruction to the jury,

16  Your Honor.

17             **THE COURT:** Yes.  Please disregard the last part of

18  the answer of the witness.  Thank you.

19  **BY MR. MARANGOLA:**

11:26:23AM 20  Q.    At this time I'd like to show you what has not been

21  received into evidence yet as Government's Exhibit 26.  Do you

22  see on your screen Government's Exhibit 26?

23  A.    Yes, I do.

24  Q.    Can you describe what Government's Exhibit 26 is

11:26:44AM 25  generally?

1    A.   Yeah, it's -- there's numerous photographs of individuals

2    from this case.

3    Q.   All right.   It's a document with photographs of the faces

4    of a number of individuals; is that right?

11:26:56AM 5    A.   Yes.

6              MR. VACCA: Objection, Your Honor, it's not in

7    evidence yet.

8              THE COURT: Correct.   He's just trying to identify

9    it.   Go ahead.

11:27:04AM 10    BY MR. MARANGOLA:

11    Q.   Investigator Briganti, are you familiar with any of those

12    individuals?

13    A.   I'm familiar with all of them, yes.

14    Q.   And can you describe for the jury how you're familiar with

11:27:17AM 15    all those individuals?

16    A.   Each one of these individuals were part of this

17    investigation in one way or another.

18              MR. VACCA: Objection, Your Honor, as to his

19    generalization and not pointing to any one individual.

11:27:34AM 20              THE COURT: Thank you.   Overruled.

21    BY MR. MARANGOLA:

22    Q.   Have you identified each of these individuals then as part

23    of your investigation?

24    A.   Yes.

11:27:40AM 25    Q.   And do each of these photographs fairly and accurately

1  depict these individuals that you identified as part of your

2  investigation?

3  A.   Yes, they do.

4          **MR. MARANGOLA:** At this time I'd offer Government's

11:27:50AM 5  Exhibit 26.

6          **MR. VACCA:** Objection, Your Honor.

7          **THE COURT:** Overruled.   26 will be received.

8          (**WHEREUPON**, Government's Exhibit 26 was received

9  into evidence).

11:27:58AM 10          **MR. MARANGOLA:** If we could publish that?   Thank

11  you.

12  **BY MR. MARANGOLA:**

13  Q.   Investigator Briganti, starting at the top, if you could

14  identify each of the individuals in Government's Exhibit 26

11:28:13AM 15  for the jury?

16  A.   So the top is Carlos Javier Figueroa.

17          The next line down is Leitscha Poncedeleon.

18  Q.   I'm sorry to interrupt you.   Do you mind -- I believe if

19  you touch your screen there will be a mark that will be placed

11:28:32AM 20  on it, so as you get to lines where there are multiple

21  individuals if you can identify which person you're referring

22  to either by touching the screen or by identifying where their

23  photograph is in the exhibit, that would be helpful.

24  A.   Okay.

11:28:46AM 25  Q.   Thank you.

1   A.   So this is Carlos Javier Figueroa.

2            **THE COURT:** Indicating the top photograph; is that

3   right?

4            **THE WITNESS:** Yes, Your Honor.

11:29:00AM 5            **THE COURT:** Just for the record.

6            **THE WITNESS:** Yes, Your Honor.  I'm sorry.

7            The next line down to the left is Leitscha

8   Poncedeleon, also known as La Flaca.

9            The photograph next to her is Roberto Figueroa.

11:29:20AM 10  That's Carlos Figueroa's brother.

11           The next line down from the right -- or I'm sorry,

12  from the left is Obed Torres.

13           Next to him is Axel Aponte Camacho.

14           Victor Nunez next to him.

11:29:45AM 15           Then Xavier Torres.

16           That is Jean Karlos DeJesus, also known as Yankee.

17           That is Jonathan Cruz-Carmona, also known as Tapon.

18           The next line down from the left that's Raphael

19  Rodriguez, also known as Rafi.

11:30:19AM 20           Next to him is Jonathan Gonzalez, also known as

21  Flaco.

22           Next to him is Bernardino Burgos, also known as

23  Dino.

24           Then the next line down from the left is Karina

11:30:40AM 25  Lopez.

1        Next to her is Ingrid Mercado.

2        Next to her is Anthony Williams.

3        Next to him is Mickael Grant, also known as CJ.

4        And the last photograph is Jose Olivencia, also

11:31:03AM 5  known as Bacalao Tito.

6  **BY MR. MARANGOLA:**

7  Q.   All right, Investigator, I think if you touch the top

8  right corner of your screen I believe it will clear any marks

9  that are visible on it.

11:31:28AM 10       Okay, Investigator Briganti, can you describe to

11  the jury how you conducted Operation Burbank Bust?

12  A.   Yes.  So we started out buying drugs from street level

13  dealers.  So these were dealers that were either selling on

14  the street or out of drug houses.

11:31:49AM 15       And then we began to execute search warrants in

16  that general area.  So that's executing search warrants on

17  drug houses that were there.

18       We would interview the individuals that were inside

19  the drug houses.  We would interview the informants in the

11:32:03AM 20  case.  Concerned citizens and other law enforcement, patrol

21  officers that were patrolling in those areas to attempt to get

22  some intelligence on what was happening in the area, how it

23  was happening.

24       Then in 2016 we installed a pole camera in the area

11:32:22AM 25  so that we can view the activities, targets of the activities.

1          In 2017 we began to buy larger quantities of

2     cocaine from an upper-level member of the organization.  We

3     were buying 31 grams and 62 grams from Roberto Figueroa, the

4     brother of Javier Figueroa.

11:32:48AM 5          We used a DEA informant to actually make these

6     buys.  The DEA informant was able to actually obtain Roberto

7     Figueroa's telephone number and conversations were had over

8     the telephone with the CI regards to drug sales.

9          We were able to use that information to get

11:33:08AM 10    authorization to wiretap Roberto Figueroa's telephone and that

11    was the first telephone that we wiretapped in this case.

12    Q.   All right.  If we could put Exhibit 237 back up for the

13    jury?  Investigator Briganti, let's talk about some of those

14    different steps that you just mentioned.  During the

11:33:31AM 15    investigation you talked about controlled buys.  Can you

16    describe for the jury what is a controlled buy?

17    A.   Yes.  A controlled buy is using a confidential informant

18    to make a buy, whether it be narcotics or guns.

19    Q.   What are the procedures that you follow when you engage in

11:33:51AM 20    a controlled buy?

21    A.   So when we meet with a CI we search the CI, make sure they

22    don't have any guns or drugs or money on them.

23          Then we debrief them, tell them what they're going

24    to be doing, who we want them to attempt to buy from.  After

11:34:10AM 25    that we give them money, send them to a location or -- if it's

1  inside of a house or if it's out on the street, and we watch

2  them, we keep constant surveillance on them; if they go inside

3  of a residence we keep constant surveillance on that residence

4  until they come back to the car.

11:34:26AM 5          Once they come back to the car they give us

6  whatever they've purchased.  We debrief them as far as what

7  they've heard or what they saw during the buy.  Then we search

8  them again to make sure there's no additional money or drugs

9  on their person.

11:34:40AM 10  Q.   When you say buys, you're talking about purchasing drugs;

11  is that right?

12  A.   Yes.

13  Q.   Okay.  During the initial part of this investigation

14  describe the people that you bought or that you made

11:34:52AM 15  controlled buys from.

16  A.   They were street level dealers and drug houses.

17  Q.   And why did you do that?

18  A.   Because we gather intel from doing that.  We start -- the

19  beginning stages of the investigation we start to understand

11:35:08AM 20  the patterns and we get information on who is selling the

21  drugs, what drug houses they're using, where they may be

22  getting the drugs, individuals that are involved, houses that

23  they stash drugs in, and then who they may have called to get

24  drugs to sell to the CI.

11:35:25AM 25          So we do it to gather intelligence in the case.

1  Q.   After doing CI buys from houses, what does that lead you
2  to do as part of the investigation?
3  A.   I'm sorry, I didn't understand your question, sir.
4  Q.   In addition to the CI buys from the drug houses or the
11:35:44AM 5  street level dealers, what were some of the other steps that
6  you take in the investigation after that?
7  A.   I'm not understanding your question.
8  Q.   Did you engage in the execution of any search warrants at
9  any of those drug houses that you had the CIs buy from?
11:36:02AM 10  A.   Oh, yes.  Yes, so after the CIs made purchases we used
11  those buys to obtain authorization for search warrants at
12  certain locations.
13  Q.   Are the locations of any of the search warrants from those
14  drug houses shown on Government's Exhibit 237?
11:36:24AM 15  A.   Yes.
16  Q.   In the initial stages of the investigation can you
17  identify where in Government's Exhibit 237 locations of search
18  warrants were executed?
19  A.   Yes.  So on April 22nd of 2015 there was a search warrant
11:36:47AM 20  conducted at 14 Burbank Street.  And April (sic) 12th of 2015
21  there was a search warrant executed at 11 Burbank Street.
22  Q.   I'm sorry, the first one was in April.  When was the
23  second search warrant, the one at 11 Burbank?
24  A.   August.
11:37:11AM 25  Q.   On August what?

1  A.    August 12th of 2015.

2  Q.    And is that at the location where there's 11 listed next

3  to the Burbank Street in Exhibit 237?

4  A.    Yes, sir.

11:37:22AM 5  Q.    All right.  Were you present for the execution of any of

6  those search warrants?

7  A.    Yes, I was.

8  Q.    All right.  Can you tell the jury approximately how many

9  search warrants have you executed in your career?

11:37:35AM 10  A.    Hundreds.

11  Q.    All right.  And before we talk about these particular

12  search warrants, can you describe for the jury generally the

13  process of executing a search warrant at a drug house?

14  A.    Yes.  So we typically ask a judge for authorization for

11:37:56AM 15  what's considered a no-knock search warrant.  A no-knock

16  search warrant just means that we don't have to

17  knock-and-announce our presence before entering a location.

18  Q.    Who authorizes you to do that?

19  A.    The judge does.

11:38:12AM 20  Q.    All right.  What do you have to do to demonstrate -- what

21  do you have to demonstrate to get a judge to authorize a

22  no-knock search warrant?

23  A.    So you have to demonstrate that evidence may be destroyed;

24  or there's a danger to law enforcement entering a location by

11:38:28AM 25  knocking and announcing your presence.

1  Q.   Can you describe generally the process of actually

2  executing a no-knock search warrant at a drug house?

3  A.   Yes.

4  Q.   Or just in general a no-knock search warrant?

11:38:40AM 5  A.   Yes.  So after we receive authorization to enter a

6  location, we assemble an entry team.  Those are the members

7  that are actually going to enter the location.  And then we

8  request the assistance of uniformed patrol officers.

9           Their task is to control the outside of the

11:38:57AM 10  location at the perimeter, the location for two reasons:  So

11  that evidence isn't thrown from the location or discarded from

12  windows or doors; or nobody flees from the location through

13  windows or doors.

14           Once we arrive at a location we use a battering ram

11:39:15AM 15  to make entry into the front door.  Some of the officers will

16  have a full mask over their face and that's because they work

17  in an undercover capacity and they don't want their identities

18  to be known.

19           Once we enter a location we search inside for

11:39:30AM 20  suspects.  If we locate any, those suspects are handcuffed and

21  secured.

22           Once everyone is secured in a location we take

23  photographs of the interior and exterior of the location and

24  then a search is conducted for evidence.

11:39:48AM 25           If evidence is located the officer whose warrant it

1    is will photograph and collect those pieces of evidence.   Once

2    the evidence has been located, we're ready to leave,

3    photographs are taken of the interior of the location again

4    before we leave.

11:40:07AM 5   Q.   All right.   You mentioned the search warrant at 14 Burbank

6    on April 22nd, 2015?

7    A.   Yes.

8    Q.   That was the location searched in connection with this

9    investigation; is that right?

11:40:18AM 10  A.   Yes, it was.

11   Q.   I'd like to show you a photograph which is not yet in

12   evidence, Government's Exhibit 78.   Can you tell us, do you

13   recognize any of the houses in the photograph marked

14   Government's Exhibit 78?

11:40:40AM 15  A.   Yes, I do.

16   Q.   Where are those houses?

17   A.   The house in the middle is 14 Burbank Street.

18   Q.   All right.   How do you recognize the house in the middle

19   as 14 Burbank Street?

11:40:52AM 20  A.   Because it looks like 14 Burbank Street other than the

21   fact that there was a fire at the location since.   So there's

22   burn marks and boards over the doors and windows.

23   Q.   All right.

24   A.   Other than that it's 14 Burbank.

11:41:10AM 25  Q.   In the course of your involvement in this investigation

1  between 2015 and 2018, did you observe 14 Burbank on

2  occasions?

3  A.   Yes.

4  Q.   And you're familiar with its appearance during that time

11:41:24AM 5  period?

6  A.   Yes, I am.

7  Q.   Do you recall approximately when it was that the

8  appearance of 14 Burbank became as it is in Government's

9  Exhibit 78, meaning the burn marks you testified about?

11:41:38AM 10  A.   Yes, it was in October of 2015 there was a fire at the

11  residence.

12  Q.   Okay.  And after 2015 does that photograph accurately show

13  the condition of that residence?

14  A.   Yes, it does.

11:41:52AM 15  Q.   With the exception of the burn marks, does it show the

16  residence as it exists generally during the time before

17  October 2015?

18  A.   Yes.

19        **MR. MARANGOLA:** At this time I'd offer Government's

11:42:03AM 20  Exhibit 78.

21        **MR. VACCA:** Objection, Your Honor, again no

22  foundation.

23        **THE COURT:** Overruled.  Exhibit 78 will be received.

24        (**WHEREUPON**, Government's Exhibit 78 was received

11:42:10AM 25  into evidence).

**BY MR. MARANGOLA:**

Q.   Investigator, if we can, just so we're clear, the house that's number 14 that's shown in the center of Government's Exhibit 78; is that right?

11:42:27AM A.   That is correct, yes.

Q.   And let's, if we could, flip back to Government's 237 in evidence?  Can you circle on Government's 237 where the house is that you just identified in Government's 78?

A.   It's not making a circle mark on here.

11:42:56AM Q.   Are the numbers -- is the number 14 there?

A.   Yes, it is.

Q.   That you were trying to circle around; is that right?

A.   Yes.

Q.   Okay. Were you present for the search warrant that day?

11:43:08AM A.   No, I was not.

Q.   Are you familiar with what happened during the search warrant at 14 Burbank on April 22nd, 2015?

A.   Yes, I am.

Q.   Was anyone arrested?

11:43:19AM A.   Yes.

Q.   Who was arrested?

A.   Raphael Rodriguez also known as Rafi; and Eric Arroyo Cruz.

Q.   If we could put back up 26 in evidence?  You indicated

11:43:45AM person named Rafi was arrested at the 14 Burbank search

1   warrant on April 22nd, 2015; is that right?

2   A.   Yes.

3   Q.   Can you identify whether or not the person Rafi is shown

4   in Government's Exhibit 26?

11:43:59AM 5   A.   Yes, he is.

6   Q.   Can you point to him for us?  For the record you've marked

7   the individual on the second to last line from the bottom

8   wearing a blue sweatshirt; is that right?

9   A.   Yes.

11:44:18AM 10   Q.   All right. Was there any evidence recovered from the raid

11   at 14 Burbank on April 22nd, 2015?

12   A.   Yes.

13   Q.   What was that?

14   A.   There were 169 decks of heroin; 32 bags of cocaine; and

11:44:35AM 15   miscellaneous paperwork.

16   Q.   Now, you indicated a search warrant was conducted at 11

17   Burbank a few months later?

18   A.   Yes.

19   Q.   What was the date of that?

11:44:43AM 20   A.   It was August 12th of 2015.

21   Q.   Were you present for the search of August -- I'm sorry, 11

22   Burbank on August 12th, 2015?

23   A.   Yes, I was.

24   Q.   At this time I'd like to show just Investigator Briganti

11:44:58AM 25   Exhibit 79, which is not yet in evidence.  Investigator

1 | Briganti, do you see Exhibit 79 on your screen?

2 | A.   Yes, sir, I do.

3 | Q.   Do you recognize any of the houses shown in Government's

4 | Exhibit 79?

11:45:17AM 5 | A.   Yes.  11 Burbank Street is the house in the middle of the

6 | three houses that are shown.

7 | Q.   What color is it in this photograph?

8 | A.   It's like a light green at the top and white at the

9 | bottom.

11:45:31AM 10 | Q.   Does Government's Exhibit 79 fairly and accurately show 11

11 | Burbank Street as it existed during your investigation?

12 | A.   Yes, it does.

13 | **MR. MARANGOLA:** At this time I'd offer Government's

14 | Exhibit 79.

11:45:43AM 15 | **MR. VACCA:** Again, Your Honor, insufficient

16 | foundation.  Object to it.

17 | **THE COURT:** Overruled.  Exhibit 79 will be received.

18 | (**WHEREUPON**, Government's Exhibit 79 was received

19 | into evidence).

11:45:52AM 20 | **BY MR. MARANGOLA:**

21 | Q.   I think you identified 11 Burbank as the center of that

22 | exhibit?

23 | A.   Yes.

24 | Q.   All right.  If we could go back to Government's

11:46:06AM 25 | Exhibit 237 in evidence?  Is the house that you just

1  identified in the center of Government's Exhibit 79 the house

2  marked number 11 on Government's 237?

3  A.   Yes, it is.

4  Q.   All right.  Can you -- I'd like to show you what has not

11:46:27AM 5  been received yet as Government's Exhibit 141.  Do you see

6  Government's Exhibit 141?

7  A.   Yes, sir, I do.

8  Q.   And can you identify what Government's Exhibit 141 is?

9  A.   It's a photograph of the front of 11 Burbank Street during

11:46:49AM 10  the time of day of the execution of the search warrant.

11  Q.   141 is a photograph that was taken on the date of the

12  execution of the search warrant?

13  A.   Yes.

14  Q.   Does that photograph fairly and accurately reflect the

11:47:00AM 15  location as it existed at the time of the search warrant?

16  A.   Yes, it does.

17  Q.   Is there a police officer actually shown displayed in the

18  bottom of that photograph?

19  A.   Yes, sir, there is.

11:47:10AM 20          **MR. MARANGOLA:** At this time I'd offer Government's

21  Exhibit 141.

22          **MR. VACCA:** Objection, Your Honor, insufficient

23  foundation.

24          **THE COURT:** Overruled.  Exhibit 141 will be

11:47:19AM 25  received.

1                  (**WHEREUPON**, Government's Exhibit 141 was received

2  into evidence).

3  **BY MR. MARANGOLA:**

4  Q.   All right. Can you describe generally what 11 Burbank was,

11:47:32AM 5  the condition of it?

6  A.   Yes.  It appeared to be -- it didn't appear anybody lived

7  there.  Looked like people might have stayed overnight there,

8  but looked primarily like a location --

9              **MR. VACCA:** Objection, Your Honor, giving an opinion

11:47:47AM 10  without a foundation.

11              **MR. MARANGOLA:** He was there for the warrant.

12              **THE COURT:** Sustain that objection.

13  **BY MR. MARANGOLA:**

14  Q.   Investigator, were you present for the search warrant?

11:47:54AM 15  A.   Yes, I was.

16  Q.   Did you observe the conditions of the residence at the

17  time of the search warrant?

18  A.   Yes.

19  Q.   Can you describe the condition of the residence at the

11:48:02AM 20  time of the search warrant?

21  A.   Yes, there was not much furniture inside; there was a

22  mattress on the floor.  Very little food in the cabinets.

23  Didn't give the appearance anybody lived at the residence.

24  Appeared that it was -- appeared nobody lived there.

11:48:21AM 25  Q.   Can you describe for the jury, Investigator Briganti, what

1  happened during the execution of the search warrant at 11

2  Burbank on August 12th, 2015?

3  A.   Yes.  So when we arrived at the location we went up the

4  driveway to a door in the rear, we were going to enter the

11:48:43AM 5  door in the rear.  When we arrived at the rear of the

6  residence the door was open, there's a small porch that goes

7  up to that, there was a gentleman standing in the doorway we

8  later identified as Rinaldo Figueroa.

9            As we went up on to the stairs Rinaldo Figueroa

11:49:01AM 10  fled into the house, and he had a black and blue fanny pack in

11  his hand he threw on to the floor.

12            We took Rinaldo Figueroa into custody along with

13  Raphael Rodriguez, again also known as Rafi; Jonathan

14  Gonzalez, known as Flaco; and Jose Figueroa, also known as

11:49:22AM 15  Che Che.

16            Once we secured those individuals inside again

17  photographs were taken of the interior and the exterior of the

18  location, then we began to search for evidence inside.

19  Q.   Is the -- can you describe the area that you approached to

11:49:37AM 20  enter 11 Burbank for the execution of that search warrant

21  shown in Government's Exhibit 79?

22  A.   Yes.  Do you want me to show you on the --

23  Q.   Yes, if you could?

24  A.   So we went up this driveway to a door in the rear.

11:49:57AM 25  Q.   You're indicating for the record the driveway to the left

1  of 11 Burbank; is that correct?

2  A.   Yes.

3  Q.   All right.  Was there evidence seized during the execution

4  of that search warrant?

11:50:10AM 5  A.   Yes.

6  Q.   And are you familiar with that evidence?

7  A.   Yes, I am.

8  Q.   Can you describe what was obtained during the execution of

9  that search warrant?

11:50:17AM 10  A.   Yes.  There were over 100 bags of cocaine; over 150 decks

11  of heroin; there was $1160 in cash; there were drug ledgers;

12  and a flip cellular phone.

13  Q.   All right.  Investigator, do you see there's a binder in

14  front of you, that extremely large white binder?

11:50:43AM 15  A.   Yes, I do.

16  Q.   All right.  I'm going to ask you if you could would you

17  open it up and flip to Exhibit No. 142?

18  A.   I'm sorry, 142?

19  Q.   Yes.  That's a binder with exhibits that are marked.

11:51:00AM 20  We're going to ask you to find Government's Exhibit 142.  And

21  if you could review Government's 142 through 159?

22  A.   Okay.

23  Q.   Have you reviewed Government's 142 to 159?

24  A.   Yes.

11:52:21AM 25  Q.   Can you describe generally what those photographs are?

1    A.    Yes, they're search warrant photographs that were taken

2    during the execution of the search warrant at 11 Burbank

3    Street.

4    Q.    Do those photographs fairly and accurately depict the

11:52:34AM 5    individuals and evidence that were obtained during the search

6    of 11 Burbank on August 12th, 2015?

7    A.    Yes, they do.

8            **MR. MARANGOLA:** At this time I offer Government's

9    142 to 159.

11:52:48AM 10           **MR. VACCA:** Objection, Your Honor, grounds of

11    relevancy.

12           **THE COURT:** The objection is overruled subject to

13    obviously connection with this case.

14           **MR. MARANGOLA:** Thank you.

11:52:58AM 15           **THE COURT:** Exhibits 142 through and including 159

16    will be received in evidence.

17           (**WHEREUPON**, Government's Exhibits 142-159 were

18    received in evidence).

19    **BY MR. MARANGOLA:**

11:53:10AM 20    Q.    If we could start with 142?  Do you see that on your

21    screen?  You can look either on your screen or at the -- in

22    the binder, Investigator, whichever is easier.

23    A.    Okay.

24    Q.    Can you tell the jury what's shown in Government's

11:53:24AM 25    Exhibit 142?

1  A.   Yes.  It's a photograph of the front room of 11 Burbank

2  Street and Jonathan Gonzalez sitting on the floor and then an

3  officer standing in the doorway.

4  Q.   Is that doorway shown in that photo the entry photo that

11:53:45AM 5  the team made on that day?

6  A.   No, it's not.

7  Q.   All right.  That's a different photo -- a different door?

8  A.   Yes, this is the door that was the front of the residence.

9  Q.   Okay. The individual you identified as John Gonzalez on

11:53:59AM 10  Government's 142, I'd like to show you Government's 26 and ask

11  you if you can tell us if the individual who is shown in

12  Government's 142 in Government's Exhibit 26?

13  A.   Yes, he is.

14  Q.   Where is he?

11:54:21AM 15  A.   He is the fourth line down, he's the photograph in the

16  middle of the fourth line.

17  Q.   If you can touch your screen?  All right, for the record

18  you've touched the screen over the individual wearing a red

19  T-shirt in the second line from the bottom?

11:54:37AM 20  A.   Yes.

21  Q.   Is that correct?

22  A.   Yes.

23  Q.   All right.  If we can go back to Government's 142?  That's

24  the front of the house, correct?

11:54:51AM 25  A.   Yes, it is.

1   Q.   All right.  Can we go to the next photograph 143?  Can you

2   describe what's shown in this photograph for the jury?

3   A.   Yes.  So this is the kitchen at 11 Burbank Street and

4   that's the rear door that we made entry through.  And then

11:55:10AM 5   that's Raphael Rodriguez, also known as Rafi, handcuffed on

6   the floor in the kitchen.

7   Q.   All right.  The person in this photograph that you

8   identified as Rafi, is he the person you previously identified

9   in Government's Exhibit 26 as Rafi?

11:55:29AM10   A.   Yes, sir, he is.

11   Q.   All right.  Can we go to the next photograph 144?  Can you

12   describe what's shown in this photograph?

13   A.   Yes.  This is what's considered a bedroom and that's the

14   fanny pack that was thrown by Rinaldo Figueroa.  It's laying

11:55:54AM15   on the floor.

16   Q.   All right.  And, again, if you touch your screen you'll be

17   able to identify what you're referring to.  Thank you.  And

18   you made a mark over the fanny pack at the bottom of the door

19   shown in the center of that photograph for the record?

11:56:08AM20   A.   Yes.

21   Q.   All right.  Can we go to 145?  Can you describe what's

22   shown in that photograph?

23   A.   Yes.  That's a bedroom, had a mattress on the floor and

24   that's again Raphael Rodriguez sitting in the chair, Rafi.

11:56:30AM25   Q.   He was placed in that chair after he was initially

1  secured?

2  A.   Yes.

3  Q.   Can you describe what's shown in that photograph on Rafi's

4  legs?

11:56:41AM 5  A.   Bandages wrapping both of his legs.

6  Q.   Were you able to ascertain -- were you able to see

7  anything in connection with those bandages?

8  A.   Yes, he had open wounds on his legs, on both legs.

9  Q.   Okay. Can we go to the next photograph 146?  Can you

11:57:06AM10  identify what's shown in this photograph?

11  A.   Yes.  It's money, U.S. currency and drugs in a bag behind

12  it that were located on Raphael Rodriguez during the search of

13  the -- at the search warrant.

14  Q.   And the tan shorts and red belt they're on who in this

11:57:31AM15  photograph?

16  A.   Raphael Rodriguez.

17  Q.   Okay.  Can we go to the next photograph?  Actually, I'm

18  sorry, can we go back to 146?  Can you tell us what was

19  removed from Rafi's pocket?

11:57:52AM20  A.   Yes, again it was United States currency and drugs.  I'm

21  not certain the amount of drugs, but it was drugs and

22  U.S. currency.

23  Q.   Okay.  All right. Let's go to 147.  Do you recognize

24  what's shown in that photograph?

11:58:11AM25  A.   Yes, I can see it, but I don't know what that is.

1   Q.   Is that -- can you describe the area that's shown in that

2   photograph?

3   A.   Yes, it's on the floor near where the bed -- where the

4   mattress was flipped up on to the -- in that room.

11:58:27AM 5   Q.   All right.  And it appears to be a plastic bag in the

6   center of that photograph; is that right?

7   A.   Yes.

8   Q.   All right.  Can we go to Government's 148?  Can you

9   identify what's shown in Government's Exhibit 148?

11:58:40AM 10   A.   Yes.  Those are two pieces of paper with names and -- I

11   believe names and numbers on them.

12   Q.   All right.  If we could -- is it possible to enlarge this?

13   It's a brand new system we've asked Ms. McCreedy to get ahold

14   of, so thank you for your patience, Judge.

11:59:08AM 15            Now, that's a blow up of the items that were in the

16   house during the search warrant; is that correct?

17   A.   Yes.

18   Q.   Okay. All right, can we go to the next photograph 149?

19   Can you describe what's shown in 149?

11:59:30AM 20   A.   Yes, it's the kitchen counter and there's a cap to a

21   hyperdermic needle and then two baggies that contained white

22   residue.

23   Q.   And that's on the kitchen counter of the location; is that

24   right?

11:59:46AM 25   A.   That's correct.

1    Q.    Can we go to the next photograph number 150?  Can you

2    describe what's shown in 150?

3    A.    Yes, it's another bedroom where the mattress has been

4    flipped up.

12:00:01PM 5    Q.    All right.  And how -- can you tell us -- do you see a

6    cord coming out of the window there?

7    A.    Yes, I do.

8    Q.    Can you identify what that cord is?

9    A.    I believe that cord was cable, was television cable.

12:00:19PM 10    Q.    Okay. Can we go to the next photograph No. 151?  And

11    that's another photograph of one of the bedrooms there in the

12    house; is that right?

13    A.    Yes.

14    Q.    And finally Government's 152.  Can you tell us what's

12:00:34PM 15    shown in that photograph?

16    A.    Yes, it's just another empty room inside of 11 Burbank

17    Street.

18    Q.    All right.  You indicated there was evidence seized from

19    that location; is that right?

12:00:48PM 20    A.    Yes.

21    Q.    All right.

22              **MR. MARANGOLA:**  Judge, I have Government's

23    Exhibit 161 and 162, which are bags.  With the Court's

24    permission, if I could put my mask on and approach the witness

12:01:04PM 25    and hand him just to identify --

1          **THE COURT:** Yes.

2          **MR. MARANGOLA:** Thank you.

3    **BY MR. MARANGOLA:**

4    Q.   Investigator, I'm going to hand you Government's Exhibits

12:01:29PM 5    161, 162 and 164.  I'll return to the table and ask you some

6    questions.

7          Investigator, can you tell us -- can you identify

8    what Government's Exhibit 161 and 162 are?

9    A.   Yes.   161 is the fanny pack and the drugs that were

12:02:08PM 10   contained in the fanny pack.  And 162 are the drugs that were

11   taken from -- during the search of Rafi.

12   Q.   All right.  Do you know the number or the items that were

13   specifically recovered from either the fanny pack or from

14   Rafi?

12:02:34PM 15   A.   You mean the quantity?

16   Q.   Yes.

17   A.   I don't know the individual quantities, no.

18   Q.   Okay. Do you know what type of drugs were recovered?

19   A.   Yes.  It was cocaine and heroin.

12:02:45PM 20   Q.   Okay.

21          **MR. VACCA:** Object to that, Your Honor.  There's no

22   foundation or basis for him the investigator in the case to

23   testify as to what kind of drugs.

24          **THE COURT:** Mr. Marangola?

12:02:57PM 25          **MR. MARANGOLA:** Judge, I can ask follow-up

1    questions.

2              **THE COURT:** Yes, sustained.

3    **BY MR. MARANGOLA:**

4    Q.   Investigator Briganti, did you conduct any field tests on

12:03:04PM 5  any of the substances seized during the investigation during

6    this particular search warrant?

7    A.   I'm not certain if I did or if another investigator did.

8    Q.   Were field tests conducted?

9    A.   Yes.

12:03:19PM 10 Q.   And what were they positive for?

11             **MR. VACCA:** Objection, Your Honor.

12             **THE COURT:** Yes, sustained.

13             **MR. MARANGOLA:** That's fine, Judge.  We can circle

14   back with a chemist on these drugs.

12:03:31PM 15            **THE COURT:** Thank you.

16   **BY MR. MARANGOLA:**

17   Q.   All right. Investigator, the content of those drugs --

18   those bags appear to be in the same or similar condition as

19   when they were recovered from the search warrant that day with

12:03:44PM 20 the exception of exhibit stickers or lab stickers that are

21   placed on them?

22   A.   Yes.

23             **MR. VACCA:** Leading question, Your Honor.

24             **THE COURT:** Overruled.  Go ahead.

12:03:53PM 25 **BY MR. MARANGOLA:**

42

1   Q.   How do you recognize them as being the items seized from

2   the execution of the search warrant that day?

3   A.   Because the bag was filled out, it gives the date, the

4   time and the individual, and it also has a crime report number

12:04:15PM 5   on it significant to this case.

6   Q.   When you say the date and the time and the crime report

7   number, those are related to the date and time and crime

8   report of what?

9   A.   Of the search warrant at 11 Burbank Street.

12:04:31PM 10   Q.   Okay.  I'd like to show you Government's 146 on the

11   screen.  Are either of the exhibits on the lectern there shown

12   in Government's Exhibit 146?

13   A.   Yes.  It would be Exhibit 162.

14   Q.   All right.  Government's Exhibit 162 is what's shown in

12:05:06PM 15   the photograph 146?

16   A.   Yes.

17   Q.   All right.  And then I'd like to show you Government's

18   Exhibit 154.  Do you recognize Government's -- I'm sorry, I

19   don't believe -- I'm sorry, we didn't get to this one yet.

12:05:35PM 20            Can we go back to Government's Exhibit 153?  All

21   right. That was another room at what location?

22   A.   At 11 Burbank Street.

23   Q.   During the search?

24   A.   Yes.

12:05:52PM 25   Q.   All right.  If we could go to Government's Exhibit 154?

1  Can you describe what's in that photograph for the jury?

2  A.   Yes.   It's the black and blue fanny pack and the drugs

3  that were inside of it.

4          **MR. VACCA:** Objection, Your Honor, characterization

12:06:12PM 5  of drugs.

6          **MR. MARANGOLA:** Judge, I think the investigator's

7  laid the foundation for that opinion.

8          **THE COURT:** Overruled.

9  **BY MR. MARANGOLA:**

12:06:23PM 10  Q.   And can we go to Government's 155?   Can you identify

11  what's shown in that photograph?

12  A.   Yes, that's U.S. currency that was in the black and blue

13  fanny pack.

14  Q.   All right.   Can we go to the next photograph?   What's

12:06:43PM 15  shown in Government's 156?

16  A.   It's a drug ledger that was inside the fanny pack.

17          **MR. VACCA:** Object to characterization drug ledger,

18  Your Honor, there's no foundation.

19          **THE COURT:** Sustained.

12:06:56PM 20  **BY MR. MARANGOLA:**

21  Q.   All right. Can we go to Government's 157?   What's

22  Government's Exhibit 157?

23  A.   It's the flip cell phone that was located in 11 Burbank

24  Street.

12:07:10PM 25  Q.   Where in the photo is the flip cell phone you're referring

1  to?

2  A.    It's on a mattress that was on the floor.

3  Q.    All right.  Can we go to -- first of all, do you see the

4  cell phone in Government's Exhibit 157?

12:07:29PM 5  A.    I see the cell phone, yes.

6  Q.    All right.  Is that on your lectern?

7  A.    Yes.  It's Exhibit 164.

8  Q.    How do you recognize the cell phone in Government's

9  Exhibit 164 as the same cell phone shown in the photograph

12:07:42PM 10  Government's Exhibit 157?

11             MR. VACCA:  Objection, Your Honor.  Comparing two

12  things, there's no foundation.

13             THE COURT:  No, overruled.  You can answer the

14  question.

12:07:52PM 15             THE WITNESS:  Because the cell phone -- I identified

16  the cell phone as the same cell phone, and then the

17  information contained on the evidence bag with the names and

18  the crime report number, the date and the time I can identify

19  that as being the cell phone from 11 Burbank Street.

12:08:14PM 20  BY MR. MARANGOLA:

21  Q.    And specifically what is Exhibit 164 that cell phone?  Can

22  you identify it for the record?

23  A.    Yes, it's a flip -- it's a flip phone, flip cellular

24  phone.

12:08:25PM 25  Q.    What kind?  Does it say?

1    A.    Kyocera.

2    Q.    Say again.

3    A.    It's a Kyocera.

4            THE COURT: Can you spell that?

12:08:57PM 5            THE WITNESS: K-Y-O-C-E-R-A.

6    BY MR. MARANGOLA:

7    Q.    Kyocera?

8    A.    Kyocera.

9    Q.    That photograph -- that phone is the same phone seized

12:09:08PM 10   from the search warrant and it's shown in Government's

11   Exhibit 157; is that correct?

12   A.    Yes.

13   Q.    Does it appear to be in the same condition as when it was

14   recovered from the search warrant on that day?

12:09:19PM 15   A.    Yes.

16   Q.    All right.

17            MR. MARANGOLA:  Judge, at this time I'd offer

18   Government's 161 and 162 subject to connection from the

19   chemist as well as Government's 164.

12:09:32PM 20            MR. VACCA: Objection, Your Honor.  Could I have

21   *voir dire* on this, please?

22            THE COURT: Sure.

23            MR. VACCA: Investigator, as far as Exhibit 164 is

24   concerned, the flip phone, did you at any point in time during

12:09:49PM 25   the execution of the search warrant have contact with that

46

```
 1  flip phone?
 2              THE WITNESS: Yes, sir, I did.
 3              MR. VACCA: Did you -- were you the one who
 4  retrieved the cell phone?
 5              THE WITNESS: No, I don't believe I was, no.
 6              MR. VACCA: Okay.  And did you open the flip phone
 7  to see if it was operational when you had contact with it on
 8  that day?
 9              MR. MARANGOLA: Objection, Judge, beyond the scope
10  of voir dire.
11              THE COURT: Yes, sustained.
12              MR. VACCA: Did you have in your possession at any
13  point in time that flip phone?
14              THE WITNESS: No, sir, I did not.
15              MR. VACCA: Okay.  Did you know what the phone
16  number was on that flip phone?
17              THE WITNESS: No, I did not.
18              MR. VACCA: Okay.  And you indicated that you took
19  it and put it into custody?
20              THE WITNESS: No, sir.
21              MR. VACCA: Somebody else did?
22              THE WITNESS: Yes.
23              MR. VACCA: Okay.  Under what circumstances did you
24  come in contact with that flip phone?
25              THE WITNESS: I was at the execution of the search
```

12:10:02PM (line 5)
12:10:14PM (line 10)
12:10:25PM (line 15)
12:10:38PM (line 20)
12:10:46PM (line 25)

1  warrant so the cell phone was there and I observed the cell

2  phone when it was lying on the bed at the location.

3              **MR. VACCA:** Okay.  And did you take any photographs

4  of it?

12:10:59PM 5              **THE WITNESS:** I didn't, no.

6              **MR. VACCA:** As far as Exhibit 161 is concerned, did

7  you come in contact with the bag of suspected drugs?

8              **THE WITNESS:** Yes.

9              **MR. VACCA:** Okay.  And did you put them into

12:11:17PM 10  evidence at all?

11              **THE WITNESS:** No, sir.

12              **MR. VACCA:** Okay.  Who put them into evidence, do

13  you know?

14              **THE WITNESS:** Yes, Investigator David Swain.

12:11:23PM 15              **MR. VACCA:** Okay.  And the same for 162?  Is he the

16  one that had it and put it into custody?

17              **THE WITNESS:** Yes, sir.

18              **MR. VACCA:** Okay, thank you.  Your Honor, I'd object

19  to the admission of 161, 162 and 164.

12:11:39PM 20              **THE COURT:** Thank you.  161, the objection is

21  overruled.  161 will be received subject to connection.

22              162 will be received subject to connection.

23              And 164 will be received.

24              (**WHEREUPON**, Government's Exhibits 161, 162 and 164

12:11:48PM 25  were received into evidence subject to connection).

1      **THE COURT:**  Might be a good time to take a recess.

2  Ladies and gentlemen, at this time we're going to take a

3  recess approximately 20 minutes.  In the meantime, I'd ask you

4  not discuss the matter or allow anybody to discuss the matter

12:12:02PM 5  with you.  Jury may step down, we'll stand in recess for 20

6  minutes.

7      (**WHEREUPON**, there was a pause in the proceeding.)

8      (**WHEREUPON**, the defendant is present).

9      **THE COURT:**  You may bring the jury out.

12:46:24PM 10      (**WHEREUPON**, the jury is present).

11      **THE COURT:**  You may proceed, Mr. Marangola.

12      **MR. MARANGOLA:** Thank you, Your Honor.

13  **BY MR. MARANGOLA:**

14  Q.   Investigator Briganti, you mentioned that part of the goal

12:47:28PM 15  of Operation Burbank Bust was to investigate and stop violence

16  associated with the heroin and trafficking in the Burbank and

17  North Clinton Avenue areas?

18  A.   Yes.

19  Q.   As the investigation progressed from 2015 into 2016, did

12:47:51PM 20  you investigate any particular violent crimes in the area as

21  part of that investigation?

22  A.   Yes.  We investigated multiple shootings and murders.

23  Q.   Are any of the locations of those shown in Government's

24  Exhibit 237?

12:48:13PM 25  A.   Yes.

1    Q.    Can you state what your -- what some of those violent

2    crimes were and identify their location on Government's 237?

3    A.    Yes.  So on January 20th of 2016 --

4              THE COURT: Pull the microphone a little closer.

12:48:35PM 5          THE WITNESS: I'm sorry, Your Honor.

6              THE COURT: That may work better.  Thank you.

7              THE WITNESS: So on January 20th of 2016 Luis Garcia

8    Pizarro was murdered at 15 Burbank Street, which is here --

9    I'm sorry, 15 Leo Street, that's here on the screen.

12:48:59PM 10   BY MR. MARANGOLA:

11   Q.    For the record, you've made a red circle around the 15

12   next to Leo Street in Government's Exhibit 237?

13   A.    Yes.

14   Q.    Okay.

12:49:10PM 15   A.    So March 31st of 2016 Caesar Lopez Quinones, also known as

16   Gargola, G-A-R-G-O-L-A, he was murdered on Burbank Street near

17   North Clinton Avenue, the corner of North Clinton Avenue.

18   Generally in that location where his vehicle was parked.

19   Q.    For the record you've drawn a red circle around the area

12:49:55PM 20   on Burbank Street just partially covering the icon of the

21   black camera shown in Government's 237; is that accurate?

22   A.    Yes.

23   Q.    All right.  Please continue.

24   A.    On September 12th of 2016 Walter Ross was murdered in his

12:50:11PM 25   vehicle at the corner of North Clinton Avenue and Burbank

1  Street right -- I'm sorry, right there, right in front --

2  there's a store right here and it's right in front of it.

3  Q.   For the record you've drawn another red circle at the

4  corner of North Clinton and Burbank just to the left of the

12:50:36PM 5  prior circle you drew, correct?

6  A.   Yes.

7  Q.   All right.  Were there any others?

8  A.   Yes, there was a shooting of Obed Torres at 54 Miller

9  Street on December 8th of 2016.

12:50:52PM 10  Q.   You investigated that as part of Operation Burbank Bust?

11  A.   Yes.

12  Q.   Is that location 54 Miller Street shown in Government's

13  Exhibit 237?

14  A.   No, sir, it's not.

12:51:04PM 15  Q.   Okay. All right, if you can clear those, Investigator?

16  Thank you.  Now, you've mentioned the street level buys, some

17  of the search warrants on drug houses in 2015 and these

18  shootings in the Burbank area in 2016.

19        When did the pole cameras that you testified about

12:51:24PM 20  earlier go up in connection with this investigation?

21  A.   In April of 2016 and they went up in response to the

22  murder on January 20th and the murder on March 31st.

23  Q.   When you say they, how many cameras went up in April 2016?

24  A.   One, one single camera on Burbank Street.

12:51:50PM 25  Q.   Can you tell the jury where that camera was?  Where it was

1  facing the pole camera?

2  A.   Yes.  It was installed at the southeast corner of Burbank

3  Street and it faced 6 Burbank Street.

4  Q.   All right.  Is the area or approximate area of that pole

12:52:10PM 5  camera where it was placed reflected on Government's

6  Exhibit 237?

7  A.   Yes.

8  Q.   And can you circle that for the jury?

9  A.   Yes.

12:52:26PM 10  Q.   You've circled the black icon of a camera?

11  A.   Yes.

12  Q.   In this exhibit?

13  A.   Yes, sir.

14  Q.   Okay. And that was facing 6 Burbank I believe you

12:52:37PM 15  testified to?

16  A.   Yes.

17  Q.   If we could show the witness what is not yet in evidence

18  as Government's 69?  Investigator, do you see what's shown on

19  your screen as Government's Exhibit 69?

12:53:02PM 20  A.   Yes, I do.

21  Q.   And what is it?

22  A.   It's 6 Burbank Street.

23  Q.   And is that the house in the center of the photograph

24  behind the tree?

12:53:12PM 25  A.   Yes, sir.

1   Q.   Does Government's Exhibit 69 fairly and accurately show 6

2   Burbank Street?

3   A.   Yes.

4           MR. MARANGOLA: At this time I'd offer Government's

12:53:21PM 5   69.

6           MR. VACCA: No objection, Your Honor.

7           THE COURT: Exhibit 69 will be received.

8           (WHEREUPON, Government's Exhibit 69 was received

9   into evidence).

12:53:28PM 10   BY MR. MARANGOLA:

11   Q.   Investigator, who owns 6 Burbank Street?

12   A.   Carlos Javier Figueroa.

13   Q.   And who lived there during Operation Burbank Bust?

14   A.   During the majority of the investigation it was Carlos

12:53:43PM 15   Javier Figueroa, his girlfriend Nisharya Gutierrez and their

16   children.

17   Q.   All right.  And when you say majority, can you give us

18   approximate timeframe you're talking about?

19   A.   Yes, some time in early 2015 that they moved into that

12:54:02PM 20   residence.

21   Q.   And straight through then until when they lived there?

22   A.   The takedown January 29th of 2018.

23   Q.   All right.  We'll talk more about specific pole cameras

24   later.  I'd like to go to some of the search warrants that you

12:54:24PM 25   testified were executed at drug houses at different times.

1          Investigator Briganti, were you present for the

2    execution of a search warrant at 12 Conkey Avenue?

3    A.   Yes, sir, I was.

4    Q.   And when did that occur?

12:54:55PM 5    A.   That occurred on February 2nd of 2017.

6    Q.   All right.  Were you present for the search warrant at

7    that location?

8    A.   Yes.

9    Q.   If we could show the investigator what's not yet in

12:55:09PM 10   evidence as Government's Exhibit 302?  Investigator, do you

11   recognize what's shown in Government's 302?

12   A.   Yes, it's 12 Conkey Avenue.

13   Q.   All right.  Does that photograph fairly and accurately

14   reflect 12 Conkey Avenue as it existed on the day of the

12:55:32PM 15   execution of that search warrant in February of 2017?

16   A.   Yes.

17   Q.   And is there an individual -- well, let me offer it into

18   evidence here first.

19          At this time I'd offer Government's 302.

12:55:46PM 20          **MR. VACCA:** Objection, Your Honor, insufficient

21   foundation.

22          **THE COURT:** No, overruled.  Exhibit 302 will be

23   received.

24          (**WHEREUPON**, Government's Exhibit 302 was received

12:55:57PM 25   into evidence).

1  BY MR. MARANGOLA:

2  Q.   Investigator Briganti, again you were present for the

3  search of this location; is that right?

4  A.   Yes, I was.

12:56:06PM 5  Q.   Can you identify the individual shown in the bottom left

6  corner of that photograph?

7  A.   Yes.   That's Investigator David Swain.

8  Q.   Okay. At this time I'd ask you to -- you see the exhibit

9  binder there of the photographs?  I'd ask you if you could

12:56:26PM 10  flip through starting with Exhibit 303 and go through 315 and

11  let me know when you've had a chance to review those.

12  A.   Okay.

13  Q.   All right. Are what are Government's Exhibits 303 to 315?

14  A.   They're photographs taken during the execution of the

12:57:35PM 15  search warrant at 12 Conkey Avenue.

16  Q.   Do those photographs 303 to 315 fairly and accurately

17  reflect the people, the location and the evidence that was

18  obtained during the execution of the search at 12 Conkey

19  Avenue on February 2nd, 2017?

12:57:52PM 20  A.   Yes.

21           MR. MARANGOLA: At this time I'd offer Government's

22  303 to 315.

23           MR. VACCA: Objection, Your Honor, on grounds of

24  relevancy.

12:58:01PM 25           THE COURT: Overruled.  Exhibits 303 through and

1  including 315 will be received in evidence.

2          (**WHEREUPON**, Government's Exhibits 303-315 were

3  received into evidence).

4  **BY MR. MARANGOLA:**

12:58:17PM 5  Q.   Investigator Briganti, prior to executing the search

6  warrant at 12 Conkey Avenue -- well, let me ask you this: Is

7  the location at 12 Conkey Avenue shown in Government's 302, is

8  that visible on the aerial photograph you saw before of

9  Burbank Street and Leo Street and North Clinton Avenue?

12:58:40PM 10  A.   No, sir.

11  Q.   Was the search warrant at this location part of Operation

12  Burbank Bust?

13  A.   Yes.

14  Q.   Can you explain to us why?

12:58:51PM 15  A.   Because the individual that was selling drugs from 12

16  Conkey Avenue we had also investigated selling drugs in the

17  Burbank Street area and the LaForce Street area, but primarily

18  in the Burbank Street area.

19  Q.   And who was that individual?

12:59:10PM 20  A.   Bernardino Burgos.

21  Q.   All right.  And if we can go back to Government's

22  Exhibit 26?  Is Dino Burgos Morales's photograph in

23  Government's Exhibit 26?

24  A.   Yes, sir.

12:59:33PM 25  Q.   Can you touch the screen and identify the photograph?

1  A.   Yes.  So it's the fourth line down to the right, that

2  individual.

3  Q.   All right.  And you've circled the individual wearing a

4  white T-shirt on the fourth line down from the top; is that

12:59:55PM 5  correct?

6  A.   Yes.

7  Q.   All right, thank you.  Prior to executing the search

8  warrant at 12 Conkey, did you make any observations about how

9  the operation was being run at that location?

01:00:12PM 10  A.   Yes.

11  Q.   Can you describe those observations to the jury?

12  A.   Yes.  So we made several buys of narcotics from the

13  location.  During two of the buys -- as shown, there's an

14  enclosed front porch and then after that enclosed front porch

01:00:35PM 15  is another door.

16         The informant would go on to the porch and then

17  someone would come out from the interior door to sell to them.

18  On two occasions I observed Bernardino Burgos exit the

19  interior door, and he had a 2 by 4 in his hand, would sell

01:00:53PM 20  drugs to the informant on both of those occasions.

21         When I saw the 2 by 4 that indicated to me that 2

22  by 4 was possibly being used to barricade the interior door.

23  When I say barricade, I mean metal brackets that are bolted

24  into the frame of the door, and then a 2 by 4 that goes over

01:01:14PM 25  that which makes it very difficult for law enforcement to

1   enter a location before evidence gets destroyed.

2   Q.   Investigator Briganti, first if you could clear the red

3   mark on your screen.   I don't know if it's still visible -- I

4   can see it on mine here.   Thank you.

01:01:29PM 5          The -- what impact, if any, did it have on your

6   plan for executing the search warrant at 12 Conkey Avenue that

7   you had seen Burgos Morales with a 2 by 4 and suspected the

8   possible presence of barricades at that location?

9   A.   So what we decided to do was to execute the search warrant

01:01:55PM 10  while the informant was at the location.   This way here the

11  door wasn't secured.   It would be dealing with Mr. Burgos

12  during the time that we entered the location.

13  Q.   All right.   And --

14  A.   I went over that with the CI and they seemed to be fine

01:02:10PM 15  with that.

16  Q.   Okay. So again were you -- you were present for the

17  execution of this search warrant?

18  A.   Yes, sir, I was.

19  Q.   All right.   Describe for the jury what happened during the

01:02:21PM 20  execution of the search warrant at 12 Conkey Avenue on

21  February 2nd, 2017.

22  A.   So investigators sent the informant to the location.   Once

23  the door -- once we observed the door, interior door opened,

24  the CI was in the enclosed porch, we made entry up the steps

01:02:42PM 25  and into the enclosed porch.

1            At that time Bernardino Burgos attempted to flee

2    back into the residence closing the door.  I used a battering

3    ram to hit the door before he was able to get the 2 by 4 on to

4    the door.

01:02:55PM 5    Q.   What happened when you did that?

6    A.   The door hit him and knocked him on to the floor.  He was

7    secured in the living room.  And then two other individuals

8    were secured in the location: Omar Negron Mejias and Iris

9    Carmona.

01:03:12PM 10            Once everyone was secured inside, photographs were

11   taken of the interior and exterior of the location, then we

12   began to look for evidence.

13   Q.   Can you describe the interior condition of 12 Conkey

14   Avenue at the time of the search warrant?

01:03:27PM 15   A.   Yes.  Again it didn't have very much furniture in it.  It

16   had a mattress on the floor in one of the bedrooms and there

17   were -- was no food in the house.  There was clothes strewn

18   out about the residence.

19   Q.   All right.  Was evidence collected from 12 Conkey Avenue

01:03:49PM 20   during the search warrant?

21   A.   Yes.

22   Q.   Can you tell us what it was?

23   A.   Yes.  It was 67 decks of heroin, 22 bags of cocaine, $348

24   in cash, there were numerous rounds of.22 ammunition, and a

01:04:10PM 25   drug ledger.

1    Q.    When you say .22 ammunition, what do you mean?

2    A.    .22 caliber ammunition.

3    Q.    Okay. If we could go now to Government's 303?  Can you

4    identify what's shown in this photograph?

01:04:34PM 5    A.    Yes. That's the entry door into the apartment of 12

6    Conkey.  So the area before that door would be the enclosed

7    porch.

8    Q.    Okay. Is this the area where you used the battering ram to

9    hit the door?

01:04:51PM 10    A.    Yes, it is.

11    Q.    Is the door shown in this photograph that you hit with the

12    battering ram?

13    A.    Yes, it is.

14    Q.    And that's the door that knocked Burgos Morales over?

01:05:02PM 15    A.    Yes.

16    Q.    All right.  Can we go to the next photograph?  Can you

17    identify what's shown in Government's 304?

18    A.    Yes, that's the living room, the first room that you would

19    come into when you entered the residence.

01:05:18PM 20    Q.    All right.  Can you describe where you -- after you

21    entered the residence, did you have a chance to actually look

22    at that entry door?

23    A.    Yes.

24    Q.    And that door frame?

01:05:30PM 25    A.    Yes.

1  Q.   And is that shown in Government's 304?

2  A.   Yes.

3  Q.   Were there, in fact, barricades over that door as you

4  suspected there might be?

01:05:40PM 5  A.   There was a bracket -- two brackets on each side of the

6  door, metal brackets.

7  Q.   Okay.  All right. Can we go to Government's 305?  Can you

8  identify what's shown in Government's Exhibit 305?

9  A.   Yes, that's the kitchen and the individuals that were

01:06:02PM 10  located inside of the residence.  The individual leaning up

11  against the stove is Bernardino Burgos with the light green

12  shirt on.  The individual with his back to the photo, has a

13  gray-ish and black shirt on is Omar Negron Mejias, and the

14  lady laying on the floor is Iris Carmona.

01:06:29PM 15  Q.   All right.  And these were the individuals that were

16  secured inside the location?

17  A.   Yes.

18  Q.   All right.  Can we go to the next photograph?  Can you

19  identify what's shown in Government's 306?

01:06:42PM 20  A.   Yes.  It's U.S. currency and a drug ledger that was on the

21  sink in the kitchen.

22  Q.   All right.  And what -- let's go to 307.  What's shown in

23  Government's 307?

24  A.   U.S. currency on the floor in the kitchen.

01:07:07PM 25  Q.   That's next to who?

1   A.   Iris Carmona.

2   Q.   All right.  Can we go to 308?  What's shown in

3   Government's Exhibit 308?

4   A.   Iris Carmona sitting in a chair in the living room.

01:07:24PM 5   Q.   At 12 Conkey?

6   A.   Yes.

7   Q.   All right.  She was moved out of the kitchen?

8   A.   Yes.  She was -- she mentioned she was pregnant, so we put

9   her into a chair.

01:07:36PM 10   Q.   Okay. Can we go to Government's Exhibit 309?  Can you

11   identify what's shown in this photograph?

12   A.   Yes.  It's the cocaine and heroin that were seized from

13   Omar Negron Mejias at 12 Conkey Avenue.

14   Q.   All right.

01:08:03PM 15        **MR. MARANGOLA:** Judge, if I can put my mask on and

16   approach the witness with a couple of exhibits?

17        **THE COURT:** Yes.

18        **MR. MARANGOLA:** Thank you.

19   **BY MR. MARANGOLA:**

01:08:40PM 20   Q.   Investigator, I've handed you a couple of exhibits.  Do

21   you see Government's Exhibit 317?

22   A.   Yes.

23   Q.   Can you identify what Government's Exhibit 317 is?

24   A.   Yes.  It's the cocaine and heroin that was seized during

01:08:59PM 25   the execution of the warrant at 12 Conkey Avenue.

1  Q.    And how do you recognize Government's 317 as the cocaine

2  and heroin seized during the execution of the search warrant

3  at 12 Conkey Avenue?

4  A.    Because I filled out the bag that the evidence is in, and

01:09:15PM 5  I wrote the date, time and the location of 12 Conkey Avenue

6  that it was recovered from.

7  Q.    All right.  What did you do with that evidence after you

8  collected it?

9  A.    I photographed it, placed it in an evidence bag, it was

01:09:34PM 10  tested, and then it was sealed and turned into the Property

11  Clerk's Office at the Rochester Police Department.

12  Q.    What type of information did you mark on that evidence

13  bag?

14  A.    So it's the case number, the number of the bag, which

01:09:51PM 15  number of evidence it is, the type of offense, then a general

16  description of the evidence contained in the bag, the suspect,

17  the victim, date and time that we recovered the items, the

18  location it was recovered, and who recovered it.

19  Q.    And initially I think you said case number?

01:10:12PM 20  A.    Yes.

21  Q.    When you say case number, is that the same or different

22  than a crime report number?

23  A.    That's the same number.

24  Q.    So a crime report number -- case number is another word

01:10:22PM 25  for crime report number?

1  A.   Yes, that's what I was referring to is the crime report

2  number, case number.

3  Q.   You mentioned earlier in describing the bags from one of

4  these search warrants in 2015 that the crime report number had

01:10:35PM 5  been on the bag.  Do you recall that?

6  A.   Yes.

7  Q.   Can you explain to the jury what is a crime report number?

8  A.   Yes.  So every incident gets a crime number assigned to it

9  so you can identify that case by crime number.

01:10:54PM 10          So every time the police are called, there's a

11  crime report done, every search warrant that we do has a

12  specific crime report number, every incident that we

13  investigate has a crime report number.

14  Q.   Okay. So even though this search warrant and the search

01:11:12PM 15  warrant in 2015 that you testified about earlier were part of

16  Operation Burbank Bust, there were different crime report

17  numbers associated with the evidence collected from each of

18  those --

19  A.   Yes.

01:11:24PM 20  Q.   -- locations?

21  A.   Yes, there was.

22  Q.   Okay. And those crime report numbers are assigned only to

23  that particular incident?

24  A.   Yes.

01:11:37PM 25  Q.   Okay. You see Government's Exhibit 309 on your screen?

1   A.   Yes.

2   Q.   Is Government's 317 that you have in front of you the

3   items that were collected and shown in Government's

4   Exhibit 309?

01:11:53PM 5   A.   Yes.  The items in 309 are contained in the evidence bag

6   that's marked 317.

7   Q.   And specifically what was it that was collected out of the

8   pants of this individual that's in Government's Exhibit 317?

9   A.   It's a purple pop top container that contained cocaine;

01:12:15PM 10   and then a dark black ziplock style bag that contained heroin.

11   Q.   Do you know how many bags of cocaine and heroin were in

12   those items?

13   A.   Yes.  There were 22 bags of cocaine in the flip top

14   container; and there's ten bags of -- ten decks of heroin

01:12:41PM 15   contained in that black -- dark colored ziplock baggie.

16   Q.   So how many -- approximately how many total bags of heroin

17   were there?

18   A.   There were only ten in this photograph.

19   Q.   Okay. How many total bags of heroin did you collect from

01:12:59PM 20   the search warrant itself?

21   A.   67.

22   Q.   Okay. Is that what's contained in Government's 317 the bag

23   in front of you?

24   A.   Yes.

01:13:08PM 25   Q.   All right.  Does the bag contained in that heroin and

1  cocaine appear to be in the same condition as it was after you

2  logged it into property other than the lab sticker and the

3  Government's exhibit sticker?

4  A.   Yes, it does.

01:13:21PM  5        **MR. MARANGOLA:** At this time I offer Government's

6  317.

7        **MR. VACCA:** Could I just see the exhibit for a

8  moment, please?

9        **MR. MARANGOLA:** Sure.  Court's permission I can --

01:13:32PM 10        **THE COURT:** Yes.

11        **MR. MARANGOLA:** Thank you.

12        **MR. VACCA:** Investigator, on this exhibit you have

13  the name Omar Negron Mejias; is that correct?

14        **THE WITNESS:** Yes, sir.

01:14:07PM 15        **MR. VACCA:** That is the suspect?

16        **THE WITNESS:** Yes, that is him.

17        **MR. VACCA:** No objection, Your Honor.

18        **THE COURT:** Exhibit 317 will be received.

19        (**WHEREUPON**, Government's Exhibit 317 was received

01:14:16PM 20  into evidence).

21  **BY MR. MARANGOLA:**

22  Q.   Investigator, who is the individual shown in Government's

23  Exhibit 309?

24  A.   Omar Negron Mejias.

01:14:33PM 25  Q.   And that was who the heroin and cocaine was removed from;

```
 1  is that right?
 2  A.   Yes.
 3  Q.   Is that why you wrote his name on the evidence bag?
 4  A.   Yes.
 5  Q.   Okay. Can we go to the next photograph Government's 310?
 6  Do you see what's shown in Government's 310?
 7  A.   Yes.
 8  Q.   Can you describe what Government's Exhibit 310 is?  Do you
 9  need us to zoom in a little?  I think Ms. McCreedy can do it.
10  A.   No, I can see it.  It's a spiral notebook that contains
11  numbers, initials and it appears U.S. currency and a date at
12  the top.
13  Q.   All right.  Did you collect that as evidence in this case?
14  A.   Yes.
15  Q.   Can you tell the jury why you collected that as evidence
16  in this case?
17  A.   Yes.  Because it -- I've seen these and they appear to be
18  a drug ledger.
19  Q.   All right.  Now, can you tell the jury -- you see
20  Government's Exhibit 319 in front of you?
21  A.   I do, yes.
22  Q.   And what is Government's 319?
23  A.   It appears to be the drug ledger that's shown in
24  Exhibit 310.
25  Q.   All right.  And did you collect Government's 319 the
```

1  notebook?

2  A.   Yes, I did.

3  Q.   And that was collected from the search warrant at 12

4  Conkey Avenue; is that right?

01:16:31PM 5  A.   Yes, sir.

6  Q.   And after you collected it did you place it in an evidence

7  bag?

8  A.   Yes.

9  Q.   And does it appear to be in the same condition as when you

01:16:40PM 10  collected it from 12 Conkey Avenue on February 2nd, 2017?

11  A.   Yes, other than the exhibit sticker, yes.

12  Q.   Yes.   It was removed from the evidence bag and the exhibit

13  sticker placed on it; is that right?

14  A.   Yes.

01:16:55PM 15          **MR. MARANGOLA:** At this time I offer Government's

16  317 -- I'm sorry, 319.

17          **MR. VACCA:** No objection, Your Honor.

18          **THE COURT:** Exhibit 319 will be received.

19          (**WHEREUPON**, Government's Exhibit 319 was received

01:17:05PM 20  into evidence).

21  **BY MR. MARANGOLA:**

22  Q.   And can we go to the next photo 311?   Can you describe

23  what's shown in 311?

24  A.   Yes.   That's one of the rooms inside 12 Conkey Avenue.

01:17:29PM 25  Q.   Does that accurately show the room as it existed during

1  the time of the search warrant?

2  A.   Yes.

3  Q.   And can we go to 312?  Can you describe what's shown in

4  Government's Exhibit 312?

01:17:45PM 5  A.   Yes.  That's -- that's the same room, but a different view

6  of it.  And items along the floor.

7  Q.   All right.  And Government's Exhibit 313.  Does

8  Government's Exhibit 313 show a close-up of what was in the

9  prior photograph 312?

01:18:08PM 10  A.   Yes.

11  Q.   Can you identify any items of evidence in Government's

12  Exhibit 313?

13  A.   Yes.  There's a -- there's .22 caliber ammunition on the

14  floor, all over the floor.  That came from the bag.

01:18:27PM 15  Q.   All right.  And any other items of evidence in

16  Government's Exhibit 313?

17  A.   Just the cellular telephone.

18  Q.   Cell phone on the bottom of that photograph?

19  A.   Yes.

01:18:38PM 20  Q.   All right.  And can we go to Government's 314?  That's the

21  bathroom at 12 Conkey I assume; is that correct?

22  A.   Yes.

23  Q.   And Government's 315?

24  A.   Can you tell us what that is?

01:18:54PM 25  A.   Yes.  That's a room that had a mattress on the floor and

1  some clothing on top of it.

2  Q.   All right.   Now, Investigator, after the controlled buys

3  from the street level dealers, search warrants at these drug

4  houses between 2015 to 2017, pole camera installation, you

01:19:27PM 5  mentioned controlled buys from Roberto Figueroa.   Do you

6  recall that testimony earlier?

7  A.   Yes.

8  Q.   When did those controlled buys from Roberto Figueroa

9  occur?

01:19:39PM 10  A.   They occurred between September of 2017 until January of

11  2018.

12  Q.   All right.   Can you point to Roberto Figueroa for us on

13  Government's Exhibit 26?

14  A.   Yes.   He's in the second row down to the right and he has

01:20:03PM 15  a muscle shirt on and tattoos.

16  Q.   All right.

17          **MR. MARANGOLA:** Your Honor, may the record reflect

18  the investigator's circled the photo in the second row of the

19  individual on the right; is that correct?

01:20:20PM 20          **THE WITNESS:** Yes, sir.

21          **THE COURT:** Yes, the record will so note.

22          **MR. MARANGOLA:** Thank you.

23  **BY MR. MARANGOLA:**

24  Q.   Now, in making the controlled purchases of narcotics from

01:20:31PM 25  Roberto Figueroa, did you use the same or different CIs than

1    you used in making the controlled purchases of drugs from the

2    street level sellers or at the drug houses?

3    A.   No, we used different CIs on both occasions.  To buy from

4    the street level dealers and the locations we were using CIs

01:20:56PM 5   that would be buying for personal use or very small

6    quantities.  To buy from an upper-level dealer or a mid-level

7    dealer you're using someone that would buy a larger quantity

8    that they would break down and sell either in houses or on the

9    street.

01:21:14PM 10          So in this particular case we used a DEA informant

11   that was buying larger quantities.

12   Q.   All right.  Can you contrast the quantities that were

13   purchased by the CIs buying drugs from the street sellers or

14   the drug houses versus the quantities that the DEA informant

01:21:41PM 15  purchased from Roberto Figueroa?

16   A.   Yes.  So the street level quantities that we were buying

17   was -- cocaine would weigh approximately .2 grams and it

18   was -- it was $5 a bag.

19          Heroin was would range from between .02 and .03

01:22:06PM 20  grams and again would be $5 a bag.

21          The larger quantities that we were doing were 62

22   grams that we were paying between $2300 and $2200 for.

23          And then 31 gram amounts that we were paying

24   approximately $1200 for.

01:22:26PM 25  Q.   And when you're saying 62 and 31 gram, those are

1   quantities of heroin or cocaine?

2   A.   I'm sorry, they're cocaine.

3   Q.   And when you said the .2 grams, those weights for the

4   cocaine and heroin, were those the weights of the cocaine per

01:22:45PM 5   bag?

6   A.   Yes.

7   Q.   Okay. Approximately how much in total did you purchase --

8   let me ask you this: Did you purchase cocaine, heroin or both

9   from Roberto Figueroa using the DEA informant to make the

01:23:07PM 10   controlled buys?

11   A.   No.   We only purchased cocaine.

12   Q.   How much cocaine in total did the DEA informant purchase

13   through the controlled buys from Roberto Figueroa?

14   A.   So they purchased 62 grams on four separate occasions and

01:23:29PM 15   31 grams on one occasion.   I think the total came to 280 grams

16   total.

17        The last buy on January 2nd were two individual

18   buys on the same day back-to-back.   They were 31 grams and 31

19   grams again.   So there were two buys back-to-back equaling 62

01:23:49PM 20   grams.

21   Q.   Okay.

22        **MR. MARANGOLA:** May I approach again, Your Honor,

23   with some exhibits?

24        **THE COURT:** Sure.   And I think we're going to break

01:24:00PM 25   in a minute so --

1        **MR. MARANGOLA:** Thank you.

2    **BY MR. MARANGOLA:**

3    Q.   All right. Investigator, if you could, I've handed you

4    Government's Exhibit 327 through 332.  Can you identify what

01:25:28PM 5    Government's 327 is?

6    A.   Yes it's the cocaine we purchased from Roberto Figueroa on

7    9/20 of '17.

8    Q.   And how much cocaine did you purchase that day from

9    Roberto Figueroa?

01:26:16PM 10   A.   This is 62 grams.

11   Q.   62 grams on September 20th, 2017?

12   A.   Yes.

13   Q.   All right.  And that's Government's Exhibit 327?

14   A.   Yes.

01:26:28PM 15   Q.   Can you identify what Government's Exhibit 328 is?

16   A.   Yes.  This is the cocaine that we purchased from Roberto

17   Figueroa on October 25th of 2017.

18   Q.   And how much cocaine was purchased from Roberto Figueroa

19   that day?

01:26:52PM 20   A.   This is also 62 grams.

21   Q.   All right.  And that's Exhibit 328?

22   A.   Yes.

23   Q.   Can you -- do you see Exhibit 329?

24   A.   Yes.

01:27:03PM 25   Q.   Can you identify what Government's Exhibit 329 is?

1   A.   Yes.  It's the cocaine that we purchased from Roberto

2   Figueroa on November 20th of 2017.

3   Q.   And how much cocaine did you purchase from Roberto

4   Figueroa that day?

01:27:22PM 5   A.   I believe -- I believe it's 31 grams on that day.

6   Q.   All right.  Do you have Government's Exhibit 330?

7   A.   Yes.

8   Q.   Can you identify what Government's Exhibit 330 is?

9   A.   Yes.  It's the cocaine that we purchased from Roberto

01:27:55PM 10   Figueroa on December 13th of 2017.

11   Q.   And how much cocaine did you purchase from Roberto

12   Figueroa on December 13th, 2017?

13   A.   62 grams.

14   Q.   All right.  And do you see Government's 331 and 332?

01:28:14PM 15   A.   Yes, sir, I do.

16   Q.   Can you identify what those exhibits are?

17   A.   Yes.  Those are the two purchases of cocaine from Roberto

18   Figueroa that were conducted on January 2nd of 2018.

19   Q.   And how much cocaine is contained in each of those

01:28:33PM 20   exhibits?

21   A.   31 grams in each one.

22   Q.   All right.  Now, did you participate in the controlled

23   buys from Roberto Figueroa?

24   A.   Yes.

01:28:43PM 25   Q.   Can you describe your participation in those?

1  A.   Yes.   I worked with DEA Agent Billy Reichard to -- we sent

2  the CI to the location, we debriefed the CI and on some

3  occasions the DEA provided the money and on other occasions we

4  provided the money, Rochester Police Department provided the

01:29:08PM 5  money.

6  Q.   When you say the money, you're talking about the buy

7  money?

8  A.   Yes.

9  Q.   That the CI presented to Roberto Figueroa?

01:29:14PM 10  A.   Yes.

11  Q.   What was done with the quantities of cocaine that were

12  purchased from Roberto Figueroa by the CI?

13  A.   Well, if the DEA used their money to purchase the cocaine,

14  then it stayed in DEA custody.   If the Rochester Police

01:29:34PM 15  Department used the money to purchase the narcotics, it went

16  into the Rochester Police Department custody.

17         So the ones that I took into custody were placed in

18  an evidence bag, sealed, and sent to the Property Clerk's

19  Office.

01:29:53PM 20  Q.   All right.   And is that why some of those exhibits are in

21  one type of bag and some of those exhibits, meaning between

22  327 and 332, are in different kind of bags?

23  A.   Yes.

24  Q.   All right.   Do the contents -- let me ask you this: Even

01:30:11PM 25  when Bill Reichard from DEA took custody of the cocaine, were

1  you there based on your observations and participation in the

2  controlled buy?

3  A.   Yes.

4  Q.   All right.  And are the contents of those bags there,

01:30:24PM 5  Government's 327 through 332, do they appear to be the same

6  items that were purchased from Roberto Figueroa on the dates

7  you've identified?

8  A.   Yes, they do.

9  Q.   Other than the lab stickers on those bags do they appear

01:30:37PM 10  to be in the same condition?

11  A.   Yes, they do.

12  Q.   All right.

13         **MR. MARANGOLA:** At this time I'd offer Government's

14  327 to 332.

01:30:47PM 15         **MR. VACCA:** No objection, Your Honor.

16         **THE COURT:** Exhibits 327, 328, 329, 330, 331 and 332

17  will all be received.

18         (**WHEREUPON**, Government's Exhibits 327-332 were

19  received into evidence).

01:31:03PM 20         **THE COURT:** At this time, ladies and gentlemen,

21  we'll recess until 8:30 tomorrow morning.  Please do not

22  discuss this case or allow anybody to discuss the case with

23  you.  The jury may step down until 8:30 tomorrow morning.

24  Thank you.  Have a good night.

01:31:45PM 25         (**WHEREUPON**, the jury was excused).

1          **THE COURT:** All set, thank you.  We'll stand in

2   recess.

3          **MR. MARANGOLA:** Thank you, Judge.

4          (**WHEREUPON**, proceedings adjourned at 1:31 p.m.)

5                      *    *    *

6                **CERTIFICATE OF REPORTER**

7

8          In accordance with 28, U.S.C., 753(b), I certify that

9   these original notes are a true and correct record of

10  proceedings in the United States District Court for the

11  Western District of New York before the Honorable Frank P.

12  Geraci, Jr. on April 28th, 2021.

13

14  S/ Christi A. Macri

15  Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter

16

17

18

19

20

21

22

23

24

25