1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5  - - - - - - - - - - - - - -X
   UNITED STATES OF AMERICA              18-CR-6094(G)
6
   vs.
7                                        Rochester, New York
   CARLOS JAVIER FIGUEROA,               April 29, 2021
8              Defendant.                8:30 a.m.
   - - - - - - - - - - - - - -X
9

10                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE FRANK P. GERACI, JR.
11             UNITED STATES DISTRICT CHIEF JUDGE

12

13

                       JAMES P. KENNEDY, JR., ESQ.
14                     United States Attorney
                       BY: ROBERT A. MARANGOLA, ESQ.
15                         CASSIE M. KOCHER, ESQ.
                       Assistant United States Attorneys
16                     500 Federal Building
                       Rochester, New York 14614
17                     Appearing on behalf of the United States

18

                       PAUL J. VACCA, JR., ESQ.
19                     One East Main Street, Suite 1000
                       Rochester, New York 14614
20                     Appearing on behalf of the Defendant

21  ALSO PRESENT:      Nicolas Penchaszadeh, Spanish Interpreter
                       James Hontoria, Spanish Interpreter
22

23

    COURT REPORTER:    Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
24                     Christimacri50@gmail.com
                       Kenneth B. Keating Federal Building
25                     100 State Street, Room 2640
                       Rochester, New York 14614

1                              **I N D E X**

2     **WITNESS FOR THE GOVERNMENT**

3     Joseph Briganti
          Direct examination by Mr. Marangola          Page 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                      *    *    *

3              **(WHEREUPON**, the defendant is present).

4              **THE COURT:** Good morning.

07:52:13AM 5              **MR. MARANGOLA:** Good morning.

6              **MS. KOCHER:** Good morning.

7              **MR. VACCA:** Good morning.

8              **THE COURT:** Ready to proceed?

9              **MR. MARANGOLA:** Yes, Your Honor.

08:53:02AM 10              **THE COURT:** Okay, bring the jury out.

11              Investigator Briganti, I remind you you're still

12   under oath.

13              **THE WITNESS:** Yes, sir.

14              **(WHEREUPON**, the jury is present).

08:55:05AM 15              **THE COURT:** Good morning, ladies and gentlemen.

16   We're ready to proceed, go ahead, Mr. Marangola.

17              **MR. MARANGOLA:** Thank you, Your Honor.

18   **BY MR. MARANGOLA:**

19   Q.   Good morning, Investigator Briganti.

08:55:50AM 20   A.   Good morning.

21   Q.   I'd first like to just revisit a couple of the areas

22   before we left your examination yesterday.  Do you recall the

23   testimony regarding the search warrant at Conkey Avenue?

24   A.   Yes.

08:56:04AM 25   Q.   On February 2nd, 2017?

4

1   A.   Yes.

2   Q.   Do you see Government's 302 on your screen yet?  That's in

3   evidence.   Is it up on your screen?

4   A.   It is, yes.

08:56:38AM 5   Q.   All right.   The drugs that you seized from that location,

6   I think you referred to a certain number of bags of cocaine

7   and a certain number of decks of heroin.  Do you recall that?

8   A.   Yes, I do.

9   Q.   And can you describe the difference between a bag and a

08:56:56AM 10   deck?

11   A.   Yes.   Oftentimes heroin is referred to as decks, and

12   that's a wax paper envelope where heroin is contained inside

13   of it and it's commonly referred to as a deck.   And ten decks

14   would make a bundle of heroin.

08:57:18AM 15   Q.   All right.   So is heroin also -- I'm sorry, is cocaine

16   packaged in decks?

17   A.   No, it's packaged in ziplock baggies.

18   Q.   And how much was seized from the search warrant at Conkey

19   Avenue on February 2nd, 2017?

08:57:32AM 20   A.   So I believe there were 67 decks of heroin and 22 bags of

21   cocaine.

22   Q.   Okay.

23           **MR. MARANGOLA:** Judge, if I could display to the

24   jury, I put Exhibit 317 on the ELMO here, and if we could just

08:57:53AM 25   display that to the jury rather than ask them to hold it and

1    pass it around?

2              **THE COURT:** Yes, 317 has been received.  You can

3    display it.

4              **MR. MARANGOLA:** Thank you.

08:58:05AM 5  **BY MR. MARANGOLA:**

6    Q.   Investigator, do you see Government's -- this is

7    Government's 317.  Is it visible on your screen there?

8    A.   It is, yes.

9    Q.   All right.  I'm going to try to zoom in, or not.  There we

08:58:20AM10  go.  Do you see what I'm pointing at here?

11   A.   Yes, I do.

12   Q.   Can you identify what that is?

13   A.   Yes.  That's a plastic ziplock baggie and inside of it is

14   ten decks of heroin.

08:58:36AM15  Q.   All right.

16   A.   Or a bundle of heroin.

17             **THE COURT:** You pointed to the item just left of the

18   mark with the numbers on it?

19             **MR. MARANGOLA:** Thank you, Judge.

08:58:47AM20  **BY MR. MARANGOLA:**

21   Q.   Investigator, the black bag, is that what you're referring

22   to as a bundle?

23   A.   No.

24   Q.   What are you referring to as the bundle?

08:59:00AM25  A.   There's blue envelope type decks inside of that ziplock

1    baggie that are rubber banded together and that's what I'm

2    saying is a bundle.  That's a bundle.

3    Q.   All right.  I'm not sure if that's visible.  Those are the

4    individual bags that you're referring to as decks?

08:59:22AM 5    A.   Yes.

6    Q.   The blue?

7    A.   Yes.

8    Q.   All right, thank you.  Investigator, one of the

9    individuals that you testified was present inside of 12 Conkey

08:59:48AM 10   Avenue on February 2nd, 2017, was Iris Carmona I believe?

11   A.   Yes.

12   Q.   I'm going to ask you to take a look at what's not yet in

13   evidence as Government's 39.  Do you see a photo on your

14   screen marked Government's 39?

09:00:06AM 15   A.   Yes, I do.

16   Q.   Do you recognize the person shown in that photograph?

17   A.   Yes.  That's Iris Carmona.

18   Q.   Does that photograph fairly and accurately depict the

19   individual -- face shot of the individual Iris Carmona that

09:00:18AM 20   you took into custody at the search warrant at 12 Conkey

21   Avenue on February 2nd, 2017?

22   A.   Yes, it does.

23          **MR. MARANGOLA:** At this time I'd offer Government's

24   39, Your Honor.

09:00:28AM 25          **MR. VACCA:** No objection, Your Honor.

1          **THE COURT:** Exhibit 39 will be received.

2          (**WHEREUPON**, Government's Exhibit 39 was received

3 into evidence).

4 **BY MR. MARANGOLA:**

09:00:38AM 5 Q.   All right. And the individual Iris Carmona shown in

6 Government's 39, that was the individual shown handcuffed on

7 the floor in the kitchen I believe initially; is that right?

8 A.   Yes.

9 Q.   And then later on in the chair?

09:00:51AM 10 A.   Yes.

11 Q.   One of those search warrant photos?

12 A.   Yes.

13 Q.   All right.  We ended yesterday where you discussed the

14 controlled purchases of cocaine from Roberto Figueroa.  Do you

09:01:07AM 15 recall that testimony?

16 A.   I do.

17 Q.   All right.  And what did -- in terms of the investigation,

18 what did making controlled purchases of larger quantities of

19 cocaine from Roberto Figueroa allow you to do?

09:01:28AM 20 A.   It allowed us to obtain a telephone number for a mid-level

21 member of the group and to ultimately get authorization to

22 wiretap that telephone.

23 Q.   All right.  When did you and the investigative team seek

24 court authorization to wiretap phones in connection with this

09:01:50AM 25 investigation?

1  A.    The first wiretap was signed on December 21st of 2017.

2  Q.    The first wire that happened, that was a court order to

3  wiretap phones that day?

4  A.    Yes, it was.

09:02:04AM 5  Q.    Or a particular phone?

6  A.    Yes.

7  Q.    Did you wiretap just one phone line in connection with

8  this investigation or multiple phone lines?

9  A.    We progressed on to multiple phone lines.

09:02:15AM 10  Q.    Can you describe generally how you decide in an

11  investigation what phone line to begin wiretapping or seeking

12  authorization to wiretap?

13  A.    Yes.  So first we have to obtain the telephone number and

14  we have to get authorization to wiretap the phone.

09:02:32AM 15        We have to determine who is actually using the

16  phone, if they're using the phone for criminal activities.

17  Once we establish that, then it's -- I'm trying to think of

18  the easiest way to tell you how we do it.

19        Can you ask me the question one more time?

09:03:02AM 20  Q.    Sure.  I think you started talking about after you start

21  wiretapping an initial phone, can you explain how you progress

22  from wiretapping one phone line to wiretapping additional

23  phone lines?

24  A.    Yes.  So if we're on a target telephone number and let's

09:03:21AM 25  say that target telephone number is contacting someone else or

1    somebody else is contacting them for illegal activities, we

2    may look into that other telephone number that they're talking

3    to to attempt to get authorization for that phone.

4              In addition to that, if you're listening to a phone

09:03:39AM 5   and the target is talking to somebody else and they will tell

6    you call me on a different number or my number is changed,

7    call me on this phone, that may give us an indication that

8    there is illegal activity being conducted by that person on

9    another telephone, and we may attempt to get authorization for

09:03:56AM10   that telephone.

11              In addition, low level drug dealers oftentimes have

12    to call somebody higher than them in order to get their drugs

13    so --

14              **MR. VACCA:**  Your Honor, I'd object to this.  I think

09:04:13AM15   he's given a general statement.

16              **THE COURT:**  Yes, sustained at this point.

17    **BY MR. MARANGOLA:**

18    Q.    Investigator Briganti, can you describe -- you said you

19    obtained authorization to -- eventually for multiple

09:04:27AM20   wiretaps?

21    A.    Yes.

22    Q.    In this case; is that right?

23    A.    Yes.

24    Q.    All right.  Whose phones did you apply for and obtain

09:04:33AM25   authorization for in connection with Operation Burbank

1 Bust?

2 A.   They were phones to be utilized or believed to be utilized

3 by Roberto Figueroa, Leitscha Poncedeleon, Carlos Javier

4 Figueroa, and Orlando Yelder.

09:04:50AM 5         **MR. VACCA:** Again, Your Honor, no basis to come to

6 this conclusion.

7         **THE COURT:** Overruled.

8 **BY MR. MARANGOLA:**

9 Q.   Some of the individuals you mentioned are shown in

09:05:01AM 10 Government's 26.  Do you see that on your screen?

11 A.   Yes.

12 Q.   Can you identify individuals shown in Government's

13 Exhibit 26 who you obtained authorization for?

14 A.   In terms of wiretap?

09:05:15AM 15 Q.   Yes.

16 A.   So the individual at the top, Carlos Javier Figueroa.

17 Directly below him to the left, Leitscha Poncedeleon.  And to

18 the right of Leitscha Poncedeleon is Roberto Figueroa.

19 Q.   All right.  And you also mentioned an individual named

09:05:38AM 20 Orlando Yelder?

21 A.   Yes.

22 Q.   Is Orlando Yelder's photograph on Government's Exhibit 26?

23 A.   No.

24 Q.   All right. At this time I'd like to show you what's not in

09:05:49AM 25 evidence as Government's Exhibit 35.  Do you recognize that?

1  A.   Yes.

2  Q.   Who is shown in the photograph marked Government's

3  Exhibit 35?

4  A.   That's Orlando Yelder.

09:06:03AM 5  Q.   Does that photograph fairly and accurately depict the

6  individual you identified as Orlando Yelder in connection with

7  your investigation?

8  A.   Yes.

9          **MR. MARANGOLA:** At this time I'd offer Government's

09:06:13AM 10  35.

11          **MR. VACCA:** No objection, Your Honor.

12          **THE COURT:** Exhibit 35 will be received in evidence.

13          (**WHEREUPON**, Government's Exhibit 35 was received

14  into evidence).

09:06:20AM 15  **BY MR. MARANGOLA:**

16  Q.   All right. I'd like to show you, Investigator Briganti,

17  what's not in evidence yet as Government's Exhibit 10.

18  Actually, I'm sorry, I want to show you a different one.

19          Government's 12, do you see that on your screen

09:06:56AM 20  there?

21  A.   I do.

22  Q.   All right. Have you seen that chart that's marked

23  Government's Exhibit 12 before?

24  A.   Yes, I have.

09:07:02AM 25  Q.   Does the chart marked Government's Exhibit 12 accurately

1    reflect the information concerning some of the wiretap

2    authorizations that the investigative team eventually obtained

3    in this case?

4    A.    Yes.

09:07:17AM 5    Q.    And it's a four column chart; is that right?

6    A.    Correct.

7    Q.    With number, user, start date, and end date; is that

8    right?

9    A.    Yes.

09:07:27AM 10   Q.    Did you review the wiretap authorization orders for each

11   of the phone lines identified in Government's Exhibit 12

12   before you testified?

13   A.    Yes, I did.

14   Q.    And is the information contained on this chart marked

09:07:38AM 15   Government's Exhibit 12 true and accurate based upon your

16   review of those wiretap orders and knowledge of this case?

17   A.    Yes, it is.

18   Q.    All right.

19              **MR. MARANGOLA:** At this time I would offer

09:07:49AM 20   Government's Exhibit 12.  I would note that the user column

21   next to two particular numbers has been redacted based on

22   conversation with counsel, Your Honor, and we will not seek to

23   remove those blocks until we have further testimony.  At this

24   time I would offer Government's Exhibit 12.

09:08:08AM 25              **MR. VACCA:** Objection, Your Honor.

1        **THE COURT:** Objection?

2        **MR. VACCA:** Yes, Your Honor.

3        **THE COURT:** Basis?

4        **MR. VACCA:** Your Honor, there's no foundation.

09:08:15AM 5        **THE COURT:** Overruled.  Subject to connection.

6        (**WHEREUPON**, Government's Exhibit 12 was received

7   into evidence).

8        **MR. MARANGOLA:** Thank you, Your Honor.

9   BY MR. MARANGOLA:

09:08:34AM 10   Q.   Investigator Briganti, let's go through each of the

11   columns in this chart.  Can you identify what each of the

12   columns represent starting with the left column?

13   A.   Yes, the left column is the target telephone number and

14   that's the number that we received authorization to wiretap.

09:08:49AM 15   Q.   Okay.

16   A.   The next column that says user is the person that was

17   utilizing that telephone.  The next column is the start date,

18   that's the first day that we began listening to that

19   particular telephone.  And the end date is the date that we --

09:09:17AM 20   that we weren't listening to it any longer.

21   Q.   The end date is what?  Sorry.

22   A.   End date is when we stopped listening to the telephone.

23   When the --

24   Q.   -- wiretap?

09:09:29AM 25   A.   -- when the disk was pulled from the system.

1  Q.   Okay.  All right. Can you explain to the jury how a

2  wiretap works, meaning let's start with where does a wiretap

3  happen?

4  A.   So at the Rochester Police Department there's wire rooms.

09:09:45AM 5  And the wire rooms consist of two rooms.  Each of those rooms

6  contain monitors and computers and monitoring stations where

7  monitors will sit to actually listen to telephone calls.

8          In addition, there's large screen televisions that

9  are on the walls and those televisions allow us to view pole

09:10:07AM 10  camera footage in connection with the investigation.

11          There's also a room that's called a pen room.  The

12  pen room is where the system's hard drive is and that's where

13  all of the information is collect ed, the data is collected,

14  and the audio recordings are collected until the end of the

09:10:25AM 15  wiretap.

16  Q.   All right.  Are the -- what you referred to as the pen

17  room and then the wire or monitor rooms, are those areas

18  secure areas in the Rochester Police Department?

19  A.   Yes, they are.

09:10:40AM 20  Q.   And who has access to those areas?

21  A.   So the wire rooms are -- law enforcement that are assigned

22  to the investigation; and the pen room is a technician from

23  the Rochester Police Department that is assigned to that

24  particular investigation.

09:10:56AM 25  Q.   So those are the only officers that have -- from the

1  Rochester Police Department that have access to those areas;

2  is that right?

3  A.   Yes.  The technician, the supervisor for the technicians

4  also have access to the pen room.  But there's only one

09:11:13AM 5  technician that's assigned to the investigation plus the boss

6  that have authorization to that pen room.

7  Q.   So I can't just walk into that pen room and listen to

8  wiretaps?

9  A.   No.

09:11:25AM 10  Q.   All right.  Who actually listens to the calls in a wiretap

11  investigation?

12  A.   So it's law enforcement that's assigned to the

13  investigation.

14  Q.   All right.  Was there anything with regard -- that was

09:11:38AM 15  unique with regard to monitoring the wiretap calls or

16  listening to the wiretap calls in this particular case?

17  A.   Yes.  We used -- we used individuals that were translators

18  because many of the conversations came through in Spanish.

19  Q.   All right.  You don't speak Spanish?

09:12:00AM 20  A.   No.

21  Q.   Okay. Do you listen to calls 24 hours a day if you're

22  wiretapping a phone?

23  A.   No.

24  Q.   Can you explain to the jury why not?

09:12:11AM 25  A.   Generally because we can't get funding to authorize 24

1    hours a day.

2    Q.    Okay.  Are you able to go back and listen to calls that

3    may have occurred during hours of the night where there was

4    nobody listening?

09:12:28AM 5    A.    No.

6    Q.    Can you explain why not?

7    A.    Yes.  So when a monitor begins to monitor the calls they

8    have to log into the system.  Once they log into the system,

9    they're able to click onto a telephone call as it comes in.

09:12:42AM 10           Multiple phone lines -- if there's multiple phone

11   lines, they will be on their screen and if a call comes in

12   they can click on that individual phone line to allow them to

13   listen to it.

14           If there's nobody monitoring the call or nobody

09:12:53AM 15   signed on, the system will give the data for the call, it will

16   tell the time and the telephone number that called, but you

17   won't get any audio and the audio wouldn't be recorded.  So

18   you'll never be able to go back and hear that call.

19   Q.    Are you familiar with the term minimization?

09:13:12AM 20   A.    Yes.

21   Q.    Can you describe that term as it relates to wiretap

22   investigations?

23   A.    Yes.  So when we make an application for a telephone we

24   have to assert to a judge that there are certain crimes that

09:13:26AM 25   we believe are being committed using a telephone.  And so in

1    the affidavit we're telling the judge that it's these crimes

2    that we believe are being committed.

3            When a judge authorizes us to listen to a phone,

4    they're authorizing us to listen to crimes connected to those

09:13:49AM 5  individual offenses that we've put into the affidavit.

6            So, for example, if we're listening to -- if it's a

7    drug affidavit and we have drug crimes that are in the

8    affidavit, when we're listening to calls if it appears that

9    there's drug talk or drug activity on the phone we can listen

09:14:06AM 10 to those calls.

11           If it's not, the system has -- there's a button on

12   the screen that says minimize and what the monitor will do is

13   they will click onto that button.  Once they click onto that

14   button the call no longer records and you can't hear it any

09:14:25AM 15 longer.  The call's continuing to go through, but the system

16   won't record it.

17           If it's a long call, the monitor can go back into

18   the call by clicking the button again and begin to hear the

19   audio again, the system will record it again to see if the

09:14:41AM 20 conversation may have changed, that something that's

21   contained in the application for the wiretap.  If it does you

22   can listen to the call.  If it doesn't you have to minimize it

23   again.

24           There's also calls that are privileged calls; these

09:14:55AM 25 are calls that need to be minimized from the time -- from the

1   inception of the call and that's calls to or from clergy, from

2   attorneys, from physicians, and oftentimes from a spouse

3   unless you can prove that the spouse is involved in the

4   criminal activities in some way.

09:15:13AM 5   Q.   When you say you have to minimize those calls, those

6   privileged calls, what do you do?

7   A.   Again, you click onto the minimization button and again

8   the call is no longer recorded and you can't hear it.  And you

9   can never go back and actually listen to the call.  The system

09:15:31AM10   doesn't record the audio portion of the call.

11   Q.   All right.  So each time you minimize a call you no longer

12   hear the audio; is that right?

13   A.   And it's not recorded.

14   Q.   And it's not recorded?

09:15:41AM15   A.   Yes.

16   Q.   Okay. Now you said you, Investigator Swain, and Special

17   Agent Hoffmann were the co-case or lead case agents and

18   investigators in this wiretap; is that right?

19   A.   Yes.

09:15:54AM20   Q.   What were some of your responsibilities as the co-case

21   agent as it relates to the wiretap portion of this

22   investigation?

23   A.   So we would have to review calls that were monitored in

24   the case.  We would also have to request additional affidavits

09:16:08AM25   for additional phones.

1          We have to keep the judge that signed the

2    affidavits up-to-date on the progress of the wiretap.  We also

3    have to oversee any of the surveillance operations that are

4    going on, make determinations as to whether to do live

09:16:26AM 5    surveillance or just view pole camera footage.

6          So basically it's just keeping up on all aspects of

7    the investigation.

8    Q.    All right.  When you're in the midst of a wiretap

9    investigation and telephone calls are made either to or from a

09:16:42AM 10    particular number you're wiretapping, what type of information

11    is received into the computer system in those rooms, those

12    secure rooms at the RPD?

13    A.    So there's call data and there's call content.

14    Q.    Can you describe what call data is and what call content

09:17:03AM 15    is?

16    A.    Yes.  Call data is the information that's stored directly

17    into the system when a call is received, that's the date, the

18    time, the target telephone number, whether the call was an

19    incoming or outgoing telephone call, and the telephone number

09:17:21AM 20    that either called the target telephone or the target

21    telephone called.

22          The call content is the audio, that's what you

23    hear, that's the conversation that you hear that comes over

24    the wiretap.

09:17:37AM 25    Q.    All right.  In applying for wiretaps in this case did you

1 seek authorization to intercept any text messages that were

2 sent over these wiretap lines?

3 A.   Yes.

4 Q.   And were you, in fact, authorized to intercept text

09:17:51AM 5 messages as well?

6 A.   Yes.  They're also considered data.

7 Q.   And can you explain to the jury why you consider

8 intercepted text messages data as opposed to the content?

9 A.   Yes, because it's automatically recovered and stored in

09:18:08AM 10 the computer.  So when a text message is actually sent out the

11 exact text message that somebody sent from their cell phone is

12 what's recorded on the screen, it's automatically recorded and

13 stored.

14 Q.   All right. And once -- let's talk about the call data.

09:18:22AM 15 Once that information is received into the system, tell us

16 what happens with it.

17 A.   It stays into the system unless the call is minimized

18 so --

19 Q.   When you say stays, what do you mean?

09:18:40AM 20 A.   It's recorded onto a -- onto a hard drive in the pen room.

21 So all that information is recorded along with the call

22 content.

23 Q.   That information, is that something that somebody has to

24 arrange or is that automatically done by the system?

09:18:58AM 25 A.   It's automatically done by the system.

```
 1  Q.    When does the system record that data automatically?
 2  A.    When it comes in.  As soon as it comes in the system
 3  automatically records it.
 4  Q.    All right.  And does that occur with the audio portion,
09:19:13AM 5  the call content as well as the call data?
 6  A.    It does with the call content unless the call -- the call
 7  has been minimized, yes.
 8  Q.    Okay.  And the call audio, if it has not been minimized.
 9  That also is recorded as well, correct?
09:19:28AM10  A.    Yes.
11  Q.    Once the information is recorded on that system can it be
12  altered or edited by an individual on the system?
13  A.    No.
14  Q.    What's the system called, by the way?  Is there a name for
09:19:43AM15  the computer collection system that houses all this wiretap
16  information?
17  A.    Yes.  The Rochester Police Department uses the SYTECH
18  system to conduct wiretap investigations.
19  Q.    How do you spell that for Ms. Macri?
09:19:56AM20  A.    It's S-Y-T-E-C-H.
21  Q.    All right, thank you.  As an investigator assigned to this
22  wiretap are you able to search the information that's stored
23  on the SYTECH system with respect to particular numbers that
24  have been wiretapped?
09:20:15AM25  A.    Yes.
```

1  Q.   All right.  How can you do that?

2  A.   You can search by the target telephone number.

3  Q.   All right.  And if you do search by the target telephone

4  number what kind of information do you obtain from searching

09:20:28AM 5  the SYTECH system under a particular target telephone number?

6  A.   You can get the frequency of calls that the target

7  telephone made, the frequency of calls that it made to a

8  particular telephone number or received from a particular

9  telephone number, the date and times of those calls and the

09:20:55AM 10  amount of text messages compared to audio calls that the

11  target telephone made.

12  Q.   All right. Again you've referred to the phrase target

13  telephone on a number of occasions.  Just so we're clear,

14  target telephone is a phrase you use to describe what?

09:21:11AM 15  A.   That's the telephone we're authorized to wiretap.

16  Q.   Okay.

17            **MR. MARANGOLA:** If I can approach the witness, Your

18  Honor, with a couple of exhibits?

19            **THE COURT:** Yes.

09:21:26AM 20            **MR. MARANGOLA:** Thank you.

21  **BY MR. MARANGOLA:**

22  Q.   All right, Investigator, I've handed you a number of CDs.

23  Do you see those?

24  A.   Yes.

09:21:47AM 25  Q.   Do you recognize those disks?

A.   Yes.

Q.   All right.  I'd like to go through each one of them and before we do that and I have you identify them, can you tell me are those collectively the Government's 2 through 7?  Do you see Government's 2 through 7?  I think four are on one side.

A.   Yes, yes.

Q.   All right.  Are Government's 2 through 7 DVDs containing all of the audio and pen data for the specific line that's listed on that particular disk that you are actively wiretapping?

A.   Yes.

Q.   Have you personally reviewed those DVDs, meaning actually gone in and observed what's actually contained on them?

A.   Yes.

Q.   And it's all the content and data intercepted over that particular line?

A.   Yes.

Q.   Those disks were created by being downloaded from the SYTECH system; is that right?

A.   Yes.

Q.   Pulled directly from the computer system?

A.   Yes.

Q.   And they've been -- they have now an exhibit sticker on them for court; is that right?

1  A.   Correct.

2  Q.   Anything been added or deleted to them since they were

3  burned by the SYTECH system onto those DVDs other than the

4  exhibit sticker being placed on the disk?

09:23:15AM 5  A.   No.

6  Q.   All right.   At this time I'd like to go through each one

7  of them.   Can you first start with Government's Exhibit 2 and

8  identify what that is for the record?

9  A.   Yes.   It's a disk that contains the call data and the

09:23:38AM 10  audio for telephone number 485-9741, a telephone that was

11  utilized by Roberto Figueroa.

12  Q.   All right.

13          **THE COURT:** Is that 2 ?

14          **THE WITNESS:** So 3, Your Honor, sorry, Government

09:24:01AM 15  Exhibit 3.

16  **BY MR. MARANGOLA:**

17  Q.   Can you start with Exhibit 2?

18  A.   Yes.   That's the -- that's a disk that contains the call

19  data and the audio recordings for 585-743-0005.   Again that

09:24:24AM 20  was utilized by Roberto Figueroa.

21  Q.   All right.   What was the first line that you wiretapped in

22  connection with of these lines shown in Government's

23  Exhibit 12 here?

24          **MR. VACCA:** Objection, Your Honor.

09:24:43AM 25          **THE COURT:** Overruled.   Go ahead.

1          **THE WITNESS:** Was telephone number 585-743-0005.

2   BY MR. MARANGOLA:

3   Q.   Can you identify -- I think you started to, I might have

4   asked you to go back to number 2.  Can you identify Government

09:24:58AM 5   Exhibit 3 up there for us?

6   A.   Yes.  It's the audio and the data for 585-485-9741.  Again

7   that was utilized by Roberto Figueroa.

8   Q.   And that's reflected on the chart marked Government's

9   Exhibit 12?

09:25:17AM 10   A.   Yes.

11   Q.   Can you identify Government's Exhibit 4?

12   A.   Yes.  Again the audio and data collected from the system

13   for 585-685-4661 and that was utilized by Leitscha

14   Poncedeleon.

09:25:41AM 15   Q.   Okay. And do you have Government's Exhibit 5?

16   A.   I do.

17   Q.   Can you identify -- oh, I'm sorry.  Let's go to

18   Government's Exhibit 7.  Do you have 7 on there?

19   A.   I do.

09:25:55AM 20   Q.   Can you identify what Government's Exhibit 7 is?

21   A.   Yes.  It's the data and the audio collected from the

22   wiretap for the telephone number 585-732-8902, and that was

23   utilized by Orlando Yelder.

24   Q.   All right.  Were wiretap authorizations eventually sought

09:26:19AM 25   for any other phones -- phone numbers other than the ones you

1   identified in the disks in front of you?

2   A.   Yes.

3   Q.   And what were those phone numbers?

4   A.   766 --

09:26:34AM 5          MR. VACCA: Objection, Your Honor, no foundation,

6   incompetent, irrelevant and immaterial.

7          THE COURT: Overruled.  You may proceed.

8          THE WITNESS: 585-766-8057.

9   BY MR. MARANGOLA:

09:26:51AM 10   Q.   Which is Government's Exhibit what?

11   A.   5.  And Government's Exhibit 6, 585-662-8156.

12          MR. VACCA: Again, Your Honor, objection.

13          THE COURT: Overruled.

14   BY MR. MARANGOLA:

09:27:06AM 15   Q.   And are Government's Exhibit 5 and 6 all of the call

16   content and data intercepted over those particular lines that

17   are listed on those disks?

18   A.   Yes.

19   Q.   All right.  And they're also reflected in Government's

09:27:24AM 20   Exhibit chart here; is that right?  Exhibit 12?

21   A.   Yes, sir.

22   Q.   All right.  And the user for those is blacked out; is that

23   right?

24   A.   Yes.

09:27:32AM 25   Q.   Okay. All right?

1          **MR. MARANGOLA:** At this time, Your Honor, I'd offer

2    Government's 2, 3, 4, 5, 6 and 7.

3          **MR. VACCA:** Objection, Your Honor, grounds of

4    relevancy, foundation, incompetent, irrelevant and immaterial.

09:27:49AM 5          **THE COURT:** Overruled.  Exhibits 2, 3, 4, 5, 6, and

6    7 will be received.

7          (**WHEREUPON**, Government's Exhibits 2-7 were received

8    into evidence).

9    **BY MR. MARANGOLA:**

09:28:01AM 10   Q.   Do you have Government's Exhibit 1-A up there?

11   A.   Yes.

12   Q.   Do you recognize what Government's 1-A is?

13   A.   Yes.

14   Q.   What is 1-A?

09:28:13AM 15   A.   It's a compilation disk that contains the audio portions

16   of select number of calls from that are contained in this

17   wiretap.

18   Q.   It contains a number of calls from where?

19   A.   From the wiretap.

09:28:31AM 20   Q.   All right.  The wiretap that you just testified about, it

21   is contained in Government's 2 through 7?

22   A.   Yes.

23   Q.   All right.  So the Exhibit 1-A that contains just the

24   calls, the audio portion?

09:28:43AM 25   A.   Yes.

1  Q.   From Government's -- from the select number of calls from

2  Government's 2 through 7; is that right?

3  A.   Yes.

4  Q.   Is there a particular reason why certain audio calls were

09:28:52AM 5  moved onto a separate disk marked Government's 1-A as opposed

6  to playing them from the original DVDs?

7  A.   Yes.  Because the individual DVDs are in an HTML format,

8  so the audio has to be downloaded from each one of those and

9  it's very time consuming, so it's just more efficient to

09:29:11AM10  listen to the audio call that's on the compilation disk that's

11  already been downloaded on to the compilation disk.

12  Q.   Can you explain to the jury how it was that compilation CD

13  was created?

14  A.   Yes, the disk was placed into the SYTECH system, it was

09:29:26AM15  burned directly from the SYTECH system on to the disk.

16  Q.   So the calls came directly from the computer system onto

17  that disk?

18  A.   Yes.

19  Q.   All right. And does then the compilation CD marked

09:29:36AM20  Government's Exhibit 1-A contain exact copies of those audio

21  files for the subject telephone lines that were identified in

22  Government's 2 through 7?

23  A.   Yes.

24          MR. MARANGOLA: At this time I offer Government's

09:29:49AM25  1-A.

1          **MR. VACCA:** Again, Your Honor, same objection.

2          **THE COURT:** Overruled.  Exhibit 1-A will be

3    received.

4          (**WHEREUPON**, Government's Exhibit 1-A was received

09:29:57AM 5    into evidence).

6    BY MR. MARANGOLA:

7    Q.   Investigator Briganti, if you can, there's a binder

8    there -- I know there's two large binders up in front of you.

9    Can you -- do you see one of them marked Government's

09:30:07AM 10   Exhibit 1?

11   A.   Yes.

12   Q.   All right. Can you take that and I'd like to ask you some

13   questions about Government's Exhibit 1.  First of all, can you

14   tell us what Government's Exhibit 1 is?

09:30:26AM 15   A.   Yes, it's a binder that contains transcripts for the calls

16   contained in this wiretap.

17   Q.   All right.  They're transcripts that were prepared for the

18   calls for the trial; is that right?

19   A.   Yes.

09:30:43AM 20   Q.   All right.  And that binder has got separate tabs in it;

21   is that correct?

22   A.   Yes.

23   Q.   All right. The binder itself is marked Exhibit 1 and then

24   there's tabs that are sequentially marked after that; is that

09:30:58AM 25   right?  1-1, and then there's a number, 1-2, and then a

1  number; is that right?

2  A.   Yes.

3  Q.   Following sequentially all the way to the end?

4  A.   Yes.

09:31:07AM 5  Q.   All right.  Can you describe for the jury what's followed

6  by each of those tabs?

7  A.   So it's a piece of paper that contains the data portion of

8  the call and the audio portion of the call has been

9  transcribed on to it in English.

09:31:28AM 10  Q.   All right.  So there's a page that reflects call data and

11  that's where on the page?

12  A.   That's the first page, at the top.

13  Q.   At the top of the page?

14  A.   Yes.

09:31:39AM 15  Q.   All right.  Then there's a transcript of a call.  Where is

16  that in relation to the call data?

17  A.   It's below the call data.

18  Q.   And if there's no transcript below a page of call data,

19  what does that indicate?

09:31:53AM 20  A.   That the call didn't connect.  There was no connection

21  made.

22  Q.   All right.  There's no audio then to transcribe?

23  A.   Correct.

24  Q.   Have you personally reviewed each of the exhibits that are

09:32:03AM 25  tabbed in Government's Exhibit 1?

1  A.   Yes, I reviewed the data portions of each of these

2  exhibits, yes.

3  Q.   All right.  And how do you know that you've reviewed each

4  of the data portions behind each of the tabs in Government's

09:32:18AM 5  Exhibit 1?

6  A.   Because I placed my initials next to the data portion.

7  Q.   And by placing your initials next to the data portion of

8  those transcripts, what were you indicating?

9  A.   That the data that's reflected on each one of these

09:32:34AM 10  transcripts is correct.

11  Q.   Meaning what?

12  A.   That it's exactly what came into the SYTECH system.

13  Q.   All right.  And the data portion of the transcript has

14  what on it?

09:32:50AM 15  A.   So it's the date, that's the date the call was received;

16  the time the call was received; the target telephone number,

17  again that's the telephone number that we're authorized to

18  listen to; a reference number which is automatically assigned

19  by the SYTECH system, when a telephone call comes in it's

09:33:11AM 20  assigned a reference number; and then whether the call was

21  incoming or outgoing; and then the telephone number that

22  either called into the target telephone or called out from the

23  target telephone.

24          If there's a text message that's also data.

09:33:27AM 25  Q.   All right.  The -- the transcript s for -- are the

1  transcripts of all the calls that are contained on the

2  compilation CD Government's 1-A, are the transcripts for all

3  the calls on that disk contained in Government's Exhibit 1 the

4  binder?

09:33:46AM 5  A.   Yes.

6  Q.   All right.  And vice versa?  Do all the transcripts that

7  reflect calls are they reflected in calls that are in

8  Government's 1-A?

9  A.   Yes, other than one.

09:34:00AM 10  Q.   All right.  Can you explain why?  Which call that is?

11  A.   Yes.  So I believe it's under tab 1-72A.  And the call was

12  identified after the compilation disk was prepared and the

13  initials were placed on it.

14           So the call was later transcribed and placed into

09:34:24AM 15  the binder.  And then the audio portion of the call is

16  contained on the individual disk Exhibit 5.

17  Q.   All right.  So the transcript behind tab 1-72A that's the

18  only call that's not on compilation CD 1-A; is that right?

19  A.   Yes.

09:34:53AM 20  Q.   But, nonetheless, the audio portion of that call and the

21  data would be on the main disk for that line which is

22  Government's Exhibit 5?

23  A.   Yes.

24  Q.   All right.  So to play that call we would have to use the

09:35:10AM 25  Government's Exhibit 5 as opposed to 1-A; fair to say?

```
 1  A.    Yes.
 2  Q.    All right.
 3              MR. MARANGOLA: Judge, as we had discussed
 4  previously, when we go to play calls we have downloaded the
09:35:21AM 5  content of 1-A and Government's Exhibit 5 on to the trial
 6  laptop and will play through the Court's audio and computer
 7  system and facilitate that for the jury when we get to the
 8  playing.
 9              THE COURT: Thank you.
09:35:33AM 10              MR. MARANGOLA: Thank you.
11              Judge, we passed out binders for the jurors and
12  they're underneath their chairs, a binder of transcripts.  If
13  I could just ask the jury -- with the Court's permission -- if
14  they would be allowed to get their binder and look at the
09:35:53AM 15  first transcript so -- as an example, so Investigator Briganti
16  can walk them through it to identify the date and time, that
17  type of --
18              THE COURT: Ladies and gentlemen, I'd ask you when
19  you refer to that binder you only refer to the particular
09:36:06AM 20  transcript that's being referred to in the testimony and not
21  look through other items.
22              MR. VACCA: I would object to that, Your Honor, it's
23  not in evidence.
24              THE COURT: It's just for demonstrative purposes.  I
09:36:20AM 25  think it's okay.  Do not consider the substance of what's
```

1  behind that first tab.

2          **MR. MARANGOLA:** Judge, for the Court's information

3  we will be later offering this -- this call through other

4  witnesses as well as the transcript.

09:36:34AM 5          This is merely to -- as the Court said, for

6  demonstrative purposes for the investigator to explain what he

7  did in terms of initialing certain portions of each

8  transcript.

9  **BY MR. MARANGOLA:**

09:36:52AM 10  Q.   Investigator, can you flip to the first tab which is

11  1-1-326?

12  A.   Yes.

13  Q.   All right.  Do you see your initials on that?

14  A.   Yes, I do.

09:37:12AM 15  Q.   Your initials are JB?

16  A.   Yes.

17  Q.   And they're placed at the top portion; is that right?

18  A.   Yes.

19  Q.   All right.  And can you explain what the date, time,

09:37:20AM 20  target, reference and incoming call number lines mean for

21  demonstrative purposes for this transcript?

22  A.   Yes.  So again the date is the date that this call was

23  intercepted; the time is the time that the call was

24  intercepted; the target telephone number again is the

09:37:40AM 25  telephone number that we were authorized to wiretap; the

1   reference number is the number that the system automatically

2   assigns to every telephone call; and underneath that is

3   whether the call was an incoming call or an outgoing call and

4   this one was an incoming call; and the telephone number next

09:38:01AM 5   to that is the telephone number that called the target

6   telephone number.

7   Q.   All right.  What's the difference -- I know it's probably

8   self-explanatory.  What's the difference between incoming and

9   outgoing calls?

09:38:15AM 10   A.   Outgoing call is a call that a target number made to

11   another telephone; incoming call is a call that the target

12   number received from another telephone.

13   Q.   And on these transcripts the phone number listed next to

14   either incoming or outgoing, that would be the number that

09:38:31AM 15   either dialed in or was dialed by the target telephone; is

16   that correct?

17   A.   Yes.

18   Q.   All right.  Below that, those top five lines, there's --

19   for example, in this transcript there's two initials and then

09:38:46AM 20   there's names listed.  Do you see that?

21   A.   Yes.

22   Q.   And that would be for participants; is that correct?

23   A.   Yes.

24   Q.   Now, in initialing the data portion of each of these

09:38:58AM 25   transcripts were you identifying the participants in these

1    calls?

2    A.    No.

3    Q.    Okay. We'll save that for other witnesses?

4    A.    Yes.

09:39:08AM 5    Q.    All right.  Now, for example, let's talk about the

6    transcript -- you indicated if there's a data portion of a

7    call and no transcript there or no audio, there would be

8    nothing on the transcript following it; is that right?

9    A.    Correct.

09:39:23AM 10    Q.    So let's go to Exhibit -- I'd like to offer 1-8.

11    Investigator Briganti, do you see 1-8?

12    A.    I do.

13    Q.    Are your initials reflected next to that?

14    A.    Yes.

09:39:48AM 15    Q.    All right.  And that means that the date, time and other

16    call data set forth next to it is accurate as reflected on the

17    SYTECH system; is that right?

18    A.    Yes.

19           **MR. MARANGOLA:** For the record, Judge, I would offer

09:40:00AM 20    Government's 1-8.

21           **THE COURT:** It's 1-8 --

22           **MR. MARANGOLA:** -- -822 are the final three

23    reference numbers, yes.

24           **MR. VACCA:** Objection, Your Honor.

09:40:17AM 25           **THE COURT:** Overruled.  That will be received

1   transcript regarding 1-8-822.

2             (**WHEREUPON**, Government's Exhibit 1-8-822 was

3   received into evidence).

4             **MR. MARANGOLA:** Your Honor, may the jury be

09:40:30AM 5   permitted to flip to that tab?

6             **THE COURT:** I thought they already did.  Yes, they

7   can.

8             **MR. MARANGOLA:** Thank you, I didn't know if they

9   had.

09:40:37AM 10   BY MR. MARANGOLA:

11   Q.    Investigator, what is the transcript behind tab 1-8

12   indicates what?

13   A.    Indicates the data portion of the call, but then there is

14   no call.  The call wasn't connected.

09:40:50AM 15   Q.    So there's no --

16   A.    There's no audio.

17   Q.    All right. Now, what happens if a call is connected but

18   like to a voicemail, for example?

19   A.    So the call data will be there and then the automated

09:41:04AM 20   message that the voicemail that you get when you get

21   somebody's voicemail, that will be transcribed on the -- on

22   the transcript.

23   Q.    All right.  And are there any of those such calls in the

24   binder as well?

09:41:23AM 25   A.    Yes.

1    Q.   All right.  And for calls where there was a voicemail

2    greeting, did you -- are your initials indicating the computer

3    voicemail greeting is accurate?  The transcript for that is

4    accurate as well?

09:41:38AM 5    A.   Yes.

6    Q.   All right. At this time, Judge, I'd ask Investigator

7    Briganti if you could flip to 1-9-62?  Are your initials on

8    that transcript as well?

9    A.   Yes.

09:41:58AM 10   Q.   All right.

11           MR. MARANGOLA: At this time I'd offer tab 1-9-62,

12   Your Honor, the call behind tab 1-9-62.

13           MR. VACCA: Objection, Your Honor.

14           THE COURT: At this time sustain that.  I think you

09:42:13AM 15   need a little more.

16   BY MR. MARANGOLA:

17   Q.   Investigator Briganti, is the transcript behind tab 1-9 an

18   example of a call where there was no conversation but the call

19   went to a voicemail greeting?

09:42:27AM 20   A.   Yes, it is.

21   Q.   And is the voicemail greeting and the call data that are

22   on that page accurate as received from the system based on

23   your initials that are present on that page?

24   A.   Yes.

09:42:37AM 25           MR. MARANGOLA: At this time I'd offer -- renew my

1  offer for 1-9-62.

2          **MR. VACCA:** Again objection, Your Honor.

3          **THE COURT:** Overruled.  Are you offering these as

4  separate exhibits received?

09:42:49AM 5          **MR. MARANGOLA:** Just for the -- right now, just for

6  the call data portion that's on there that he's authenticated.

7          **THE COURT:** So that will be Exhibit 1-8-822 and

8  Exhibit 1-9-62?

9          **MR. MARANGOLA:** Yes.

09:43:05AM 10          **THE COURT:** Okay.  That will be received.  Thank

11  you.

12          (**WHEREUPON**, Government's Exhibits 1-8-822 and

13  1-9-62 were received into evidence).

14  **BY MR. MARANGOLA:**

09:43:12AM 15  Q.   Investigator Briganti, and I think the jury's already

16  flipped to 1-9-62, Investigator, in addition to reviewing the

17  accuracy for the call data portion of these transcripts, did

18  you -- can you describe what happened when calls came in that

19  were in Spanish?

09:43:36AM 20  A.   Yes, they were transcribed by translators in the case.

21  Q.   All right.  Now, you said that text messages were

22  considered data as well; is that right?

23  A.   Yes.

24  Q.   What happens if a text message comes in and that's in

09:43:51AM 25  Spanish?  Is that also recorded by the system?

40

```
 1   A.    Yes.
 2   Q.    And are there transcripts of Spanish text messages that
 3   are contained in Government's Exhibit 1?
 4   A.    Yes.
 5   Q.    And I think you previously testified that in initialing
 6   the call data as being accurate, that referred to also the
 7   specific text message that was intercepted as well; is that
 8   correct?
 9   A.    Yes.
10   Q.    Does that apply for Spanish text messages as well?
11   A.    Yes.
12   Q.    Now, you indicated that you don't speak Spanish?
13   A.    Correct.
14   Q.    So for portions of transcripts where there are Spanish
15   text messages what are your initials indicating?
16   A.    That what's contained on the transcript is exactly what's
17   on the SYTECH system.  So as far as capital letters,
18   punctuation, everything, it's exactly the way it came over and
19   was recorded by the SYTECH system.
20   Q.    And on the transcripts in Government's Exhibit 1, are
21   there also translations from those text messages?
22   A.    Yes.
23   Q.    Your initials aren't signifying the accuracy of those
24   translations; is that right?
25   A.    Correct.
```

09:44:03AM (line 5)
09:44:16AM (line 10)
09:44:28AM (line 15)
09:44:47AM (line 20)
09:44:58AM (line 25)

1   Q.    Okay.  And, again, we'll leave those to other witnesses.

2            Now, you mentioned reference number earlier?

3   A.    Yes.

4   Q.    On these tabs after the exhibit number listed there's

09:45:15AM 5   reference numbers; is that right?

6   A.    Yes.

7   Q.    Can you describe what a reference number is?

8   A.    Yes, again a reference number is a number that's

9   automatically assigned by the system when a call is connected

09:45:26AM 10   into the system.  So it automatically gives an independent

11   reference number to each call.

12   Q.    Now, there are certain tabs in this binder, for example,

13   tab 1-78 and 1-79 that have zeros after the exhibit number --

14   well, I think just 1-78, let's look at that one.  Can you

09:45:56AM 15   explain how a reference number could be zero in the system?

16   A.    Yes.  So the system wasn't able to match the call data to

17   the call content and time.  When it does, when that happens,

18   the system automatically by default gives it a zero reference

19   number.

09:46:18AM 20   Q.    Now, it still captures the information in the system; is

21   that right?

22   A.    Yes.

23   Q.    All right.  It just doesn't assign it a unique number, it

24   zeros it -- it assigns it that zero number?

09:46:30AM 25   A.    Correct.

1   Q.   All right.   Are there other times where the direction or

2   the incoming or outgoing telephone number are not listed in

3   particular transcripts in the binder?

4   A.   Do you want me to find the call?

09:46:45AM 5   Q.   No, no.   I'm just asking if there are calls in the binder

6   where that's the case where that direction or the number

7   calling in or out is not listed in a particular transcript?

8   A.   Yes.

9   Q.   Can you explain why?

09:46:57AM 10   A.   Again, it's because the system wasn't able to match the

11   data to the recording and time.   So some of the data won't be

12   reflected.   It just doesn't get recorded by the system.

13   Q.   Okay.   And then finally there's a tab 1-72 that has three

14   numbers following it.   It says it's 1-72, then 273, 0, 0.   Can

09:47:24AM 15   you explain how that occurred and why there's three numbers

16   listed for that -- for the transcript for those -- for that

17   particular call?

18   A.   Yes.   So with this call the call dropped and then it

19   connected again, dropped and connected again.   So the system

09:47:49AM 20   saw this call as three separate pieces of data and it

21   attempted to give it three separate reference numbers, but it

22   was -- again, it was too quick for it to do.   It was one call,

23   but because the call dropped and reconnected in the same call,

24   again the system saw it as three separate pieces of data.

09:48:10AM 25   Q.   And it also -- did it also break it into three separate

1  audio files as well?

2  A.   There's one audio -- one transcript, one audio for it.

3  Q.   One audio, but there were three audio files that were put

4  together in that one transcript?

09:48:30AM 5  A.   Yes, yes.

6  Q.   Okay. All right.

7         **MR. MARANGOLA:** Judge, I don't believe I have

8  further questions with respect to the transcript binder right

9  now.  So I guess we could --

09:48:44AM 10         **THE COURT:** Thank you.  I'd ask that you return the

11  binder beneath your chairs and, again, do not consider any of

12  the substance in any of the calls that were -- or transcripts

13  that were referred to today at this point.

14  **BY MR. MARANGOLA:**

09:49:13AM 15  Q.   Investigator, you searched SYTECH -- you can search SYTECH

16  with respect to specific target numbers in connection with a

17  wiretap; is that right?

18  A.   Yes.

19  Q.   I'd like you to look at -- which is not yet in evidence --

09:49:26AM 20  as Government's Exhibit 11.  Do you recognize what's

21  Government's Exhibit 11?

22  A.   I do.

23  Q.   What is it?

24  A.   It's a frequency chart for numbers that were intercepted

09:49:43AM 25  over the wiretap and the frequency of calls from those numbers

1  to two telephone numbers that we were authorized to wiretap in

2  this case.

3  Q.   When you say frequency of contacts, can you tell the jury

4  what you mean by contacts?

09:50:03AM 5  A.   Yes.   So it's all of the incoming and outgoing calls and

6  texts.

7  Q.   Between the identified numbers on the chart?

8  A.   Yes, between the identified numbers on the chart and the

9  two telephone numbers that we were authorized to listen to.

09:50:18AM 10  Q.   Where did the information, that is these numbers, come

11  from?

12  A.   I reviewed the system and took them directly from the

13  SYTECH system.

14  Q.   All right.   So you calculated the number of contacts for

09:50:33AM 15  these numbers?

16  A.   Yes.

17  Q.   Based directly off the SYTECH system?

18  A.   Yes.

19  Q.   All right.   Now, what about missed calls?   Are those

09:50:40AM 20  reflected as contacts in Government's Exhibit 11?

21  A.   No.

22  Q.   All right.   So if a target number called but there was no

23  answer you didn't count that as a contact; is that right?

24  A.   Correct.

09:50:53AM 25  Q.   Have you reviewed the data on the SYTECH system and

1   compared it with exactly what's written on Government's

2   Exhibit 11?

3   A.   Yes.

4   Q.   Is Government's Exhibit 11 an accurate statement of the

09:51:11AM 5   data contained in the SYTECH system with respect to the

6   frequency of contacts as you've described it during the

7   wiretap for first the phone number 766-8057?

8   A.   Yes, it is.

9   Q.   The contact with that number and the phone numbers listed

09:51:29AM 10   on the left side of the chart?

11   A.   Yes.

12   Q.   And have you also reviewed the information on the SYTECH

13   system and is that accurate as you've set forth here in

14   Government's Exhibit 11 listing the contacts between telephone

09:51:43AM 15   number 662-8156 and the listed numbers on the left side of the

16   chart?

17   A.   Yes, it is.

18         **MR. MARANGOLA:** At this time, Your Honor, I would

19   offer Government's --

09:51:53AM 20   **BY MR. MARANGOLA:**

21   Q.   -- well, first, Investigator, at the top portion of this

22   chart there's a blacked out portion next to the word contacts;

23   is that right?

24   A.   Yes.

09:52:04AM 25   Q.   Okay.

1          **MR. MARANGOLA:** Your Honor, at this time I would

2    offer Government's Exhibit 11.

3          **MR. VACCA:** Objection, Your Honor, grounds of

4    relevancy.

09:52:11AM 5          **THE COURT:** Well, that objection is overruled.  But

6    I want to be clear, you used the SYTECH system to prepare this

7    chart; is that correct?

8          **THE WITNESS:** Yes, Your Honor.

9          **THE COURT:** And you determined particular numbers on

09:52:26AM10   the left side, the number of calls made to the two numbers in

11   the top column; is that right?

12         **THE WITNESS:** Yes, Your Honor.

13         **THE COURT:** Okay.  Overruled.  Exhibit 11 will be

14   received.

09:52:36AM15         (**WHEREUPON**, Government's Exhibit 11 was received

16   into evidence).

17   **BY MR. MARANGOLA:**

18   Q.   All right, Investigator Briganti, if we can walk through

19   this.  The numbers that you were focusing on are columns in

09:52:54AM20   the middle of the chart 766-8057 and then 662-8156?

21   A.   Yes.

22   Q.   All right.  And if you could, can you start with the

23   number on the top left 743-0005 used by Roberto Figueroa?

24   A.   Yes.

09:53:12AM25   Q.   And identify the number of contacts for each of the two

1 numbers.

2 A.   So there were 51 contacts between 743-0005 and 766-8057.

3 The first contact came on -- we intercepted on 12/22 and the

4 last contact we intercepted on 1/27.  There was zero contacts

09:53:48AM 5 between 743-0005 and 662-8156 during the time period of

6 December 21st to January 29th of 2018.

7 Q.   All right.  And how about the next column?

8 A.   So telephone number 673-6756, user is Obed Torres Garcia,

9 there's 45 contacts between 673-6756 and 766-8057.

09:54:31AM 10          The first contact came in on January 12th and the

11 last contact was made on January 29th of 2018.

12          There's zero contacts between 673-6756 and 662-8156

13 between the time period of 1/13, January 13th and January 29th

14 of 2018.

09:54:59AM 15 Q.   Now, can you explain why the -- in that column you just

16 read under time period why the first date is only listed as

17 January 13th and not back in December like December 21st as

18 the line immediately above it?

19 A.   Can you ask your question again?  I'm sorry, I didn't get

09:55:22AM 20 it.

21 Q.   Yes.  So the -- on the right side the time period

22 column --

23 A.   Yes.

24 Q.   -- the second entry that states 1/13 to 1/29, why is the

09:55:37AM 25 first number 1/13 different than the number of the column

1 | right above it that starts 12/21?

2 | A.    It's when the wiretap began for that particular telephone.

3 | Q.    Which particular telephone number?

4 | A.    For 662-8156.

09:55:58AM 5 | Q.    Okay. So that's why the first time period for 12/21 starts

6 | there because you began wiretapping 743-0005 before you

7 | started wiretapping 662-8156?

8 |    **MR. VACCA:** Objection, leading.

9 |    **THE COURT:** Overruled.  Go ahead.

09:56:23AM 10 |    **THE WITNESS:** Yes, correct.

11 | **BY MR. MARANGOLA:**

12 | Q.    Okay.  All right.

13 |    **MR. MARANGOLA:** Judge, I'm going to switch to

14 | another topic with the investigator.  I don't know if the

09:56:36AM 15 | Court wishes to keep going or take a break now.

16 |    **THE COURT:** Do you need a break?  Let's go.  Yes?

17 | Okay, let's take a recess.  Ladies and gentlemen, at this time

18 | we'll take a recess for approximately 15, 20 minutes.  In the

19 | meantime, I'd ask you not discuss the matter or allow anybody

09:56:49AM 20 | to discuss the matter with you.  The jury may step down.

21 |    (**WHEREUPON**, there was a pause in the proceeding).

22 |    (**WHEREUPON**, the defendant is present).

23 |    **THE COURT:** Ready to proceed?  Bring the jury out .

24 | You can retake the stand.

10:31:22AM 25 |    (**WHEREUPON**, the jury is present).

1          **THE COURT:**  You may continue, Mr. Marangola.

2          **MR. MARANGOLA:** Thank you, Your Honor.

3  BY MR. MARANGOLA:

4  Q.    Investigator Briganti, in addition to monitoring and

10:33:28AM 5  listening to the calls on the wiretap, what do officers

6  assisting in the investigation do?  What other duties do they

7  have?

8  A.    Primarily surveillance.  So it's either they're conducting

9  live surveillance or they're reviewing pole camera footage.

10:33:47AM 10  Q.    Can you describe how the surveillance was conducted in

11  connection with this wiretap investigation?

12  A.    Yes.  So we did both in this investigation, we did live

13  surveillance, which is officers out on the street actually

14  following individuals to certain locations; and then we did

10:34:05AM 15  pole camera and pole camera is actually viewing the activities

16  of targets of the investigation through cameras that are

17  placed in designated areas and the footage is sent back to the

18  Rochester Police Department; it's viewed in the wire rooms

19  there.

10:34:28AM 20  Q.    How is the live surveillance conducted in connection with

21  the monitoring of calls?

22  A.    So if a monitor gets a call from a target telephone number

23  or to a target telephone number where, for example, the target

24  is going to meet someone, it's a drug-related call, the

10:34:46AM 25  monitor will contact surveillance officers that are in the

1   field, those surveillance officers will follow the target to

2   whatever location they're going to try to determine where the

3   locations are, maybe who they're meeting with, license plates,

4   try to make identifications of co-conspirators, so things like

10:35:07AM 5   that.

6   Q.   All right.  Now, these are police officers that are doing

7   this type of surveillance?

8   A.   Yes.

9   Q.   I assume they're not in marked patrol cars and wearing

10:35:17AM 10   uniforms; is that right?

11   A.   That's correct.

12   Q.   Are they in plain clothes and unmarked vehicles; is that

13   right?

14   A.   Yes.

10:35:23AM 15   Q.   Okay.  I know it's probably obvious, but can you tell the

16   jury why?

17   A.   So they can't be detected by the targets of the

18   investigation.

19   Q.   Okay. Did you or Investigator Swain or Special Agent

10:35:37AM 20   Hoffmann yourselves participate in live surveillance

21   activities as part of your work on this investigation?

22   A.   Yes.  Not always, but there were times where we did, yes.

23   Q.   All right. We'll get to that in a little bit.  Let's talk

24   about pole camera surveillance.  Can you explain to the jury

10:35:55AM 25   what is a pole camera?

1   A.   A pole camera is camera set up in designated areas.  Those

2   areas are normally determined by the investigation.  It's to

3   view the activities of members of the group through video

4   camera.

10:36:13AM 5          The camera records -- it's actually put in a

6   location where it's very -- it would be very difficult for

7   targets to make an identification of the camera so they

8   wouldn't be able to see it.

9          It records the footage 24 hours a day, seven days a

10:36:30AM 10  week so we can actually go back and view footage that maybe

11  happened the day before, the week before, as long as the

12  camera's been up.

13          But it only has video, it doesn't have any audio to

14  the camera.  And it's only installed in areas that are

10:36:43AM 15  exterior locations, so public locations.

16  Q.   Only installed did you say exterior locations?

17  A.   Exterior locations.  Just public streets basically.

18  Q.   All right.  So it records 24 hours a day, seven days a

19  week at the exterior of a location?

10:37:01AM 20  A.   Yes.

21  Q.   Without recording audio?

22  A.   Correct.

23  Q.   All right.  How is the video footage that the pole cameras

24  capture, how is that displayed to the officers in the

10:37:16AM 25  investigation?

1  A.   So the footage is sent back to a server at the Rochester

2  Police Department and then from the server it's put onto these

3  large televisions that are in the wire room.

4          So the officers are watching the activities in real

10:37:31AM 5  time, so as it's happening they're watching it.

6  Q.   All right.  Now, let me take a step back.  Why do you

7  refer to these cameras as pole cameras?  Are they always

8  placed on poles?

9  A.   Well, yes, that's -- originally that was the reason why

10:37:49AM 10  they were -- we referred to them as pole cameras because they

11  were put on telephone poles.  They're not always put on

12  telephone poles.

13  Q.   Okay.  Now, as the video -- as officers are watching a

14  particular monitor in the wire room, displaying footage from

10:38:09AM 15  one of these cameras, are they able to zoom in or out or move

16  the camera at all as they're seeing activities being displayed

17  from the footage?

18  A.   Yes.

19  Q.   Can you describe how that works?

10:38:23AM 20  A.   Yes.  So the system has a function that allows officers to

21  zoom in, so if they want to actually identify a license plate

22  or somebody's face or an address they can zoom in.  They can

23  always zoom out -- if they want a wider view of what's

24  happening in the area, they can zoom out.

10:38:43AM 25          The camera will also give them the ability to pan,

1    it will pan left or right.  And that depends on each camera,

2    the degree that it will pan, but it will allow officers to be

3    able to pan left or right to maybe view something that's not

4    on the screen or that they couldn't see.

10:39:01AM 5   Q.    And that would be dependent on an officer actually

6    watching it in real time whether it could be moved?  I mean --

7    A.    Yes.

8    Q.    -- if it were moved?

9    A.    Yes.  They can only -- they can only move the camera in

10:39:13AM10  real time.  If it's archived you can't move the camera.

11   Q.    All right.  Can you explain how well the zoom and pan

12   function works usually when officers are trying to zoom in on

13   a particular -- focus on a particular object or place?

14          MR. VACCA:  Objection, Your Honor, no foundation.

10:39:34AM15         THE COURT:  Overruled.  Go ahead.

16          THE WITNESS:  It's different for all of the cameras.

17   So some of the cameras if you just touch the button it will

18   zoom way in, lose focus; or it will pan way left or way right

19   if you do it.

10:39:51AM20         So sometimes it comes down to officers being

21   familiar with that particular camera in order to do it.

22   Sometimes it works great, it will pan like it's supposed to,

23   you'll be able to view stuff on it.  Other times it's touchy.

24          So there are also technical problems with it where

10:40:11AM25  it will flicker in and out.  Those are just technical issues

1    that it has.

2    **BY MR. MARANGOLA:**

3    Q.   And your testimony, is that based on your actually using

4    the zoom function on some of these pole camera videos?

10:40:23AM 5    A.   Yes, I -- I use the zoom function on all of these cameras.

6    Q.   Okay. Now, when you zoom in or out with a particular

7    camera or turn it one way or another, is that footage

8    recorded?

9    A.   Yes.

10:40:39AM 10   Q.   Okay.  And I think you testified that if the camera isn't

11   moved then whatever -- it only records what it's pointed at;

12   fair to say?

13   A.   Yes.

14   Q.   Okay.  What happens to all of that video footage?

10:40:54AM 15   A.   So it's stored in a server at the Rochester Police

16   Department and either when the server is full or when the

17   investigation is completed, it's downloaded onto a hard drive

18   and that hard drive is given to the case agents as evidence in

19   the case.

10:41:10AM 20   Q.   All right.  Why do you set up a pole camera in the first

21   place in a wiretap investigation?

22   A.   Because we want to view the activities of the targets and

23   we don't want them to see us doing that.

24   Q.   All right.  How do you determine which locations to set up

10:41:26AM 25   pole cameras as an investigation progresses?

1  A.   So the investigation will dictate a lot of the locations

2  that we install cameras.  So it's locations where activities

3  are being conducted by members of the group and those are

4  determined prior to the cameras going up.

10:41:45AM 5         Also, there's locations where it's very difficult

6  to do live surveillance without being seen.  6 Burbank Street

7  is an example of one of those locations.  It's a one-way

8  street, small foot traffic on the street; there's also

9  individuals that are selling drugs on the street and there are

10:42:08AM 10  individuals that work with them that their sole purpose is to

11  look for law enforcement; they're called lookouts.

12         So they see law enforcement and they will advise

13  people dealing on the street that law enforcement is in the

14  area.  So it's a very difficult place.  It's just an example

10:42:25AM 15  of a very difficult place to actually do live surveillance

16  without being seen.

17  Q.   Now, do you decide at the beginning of the investigation

18  all the locations that you're going to use to install pole

19  cameras?

10:42:38AM 20  A.   No.  They're dictated throughout the investigation.  As we

21  determine other locations, we'll install cameras in other

22  locations.

23  Q.   Okay. What were some of the locations of pole cameras that

24  were installed in this case?

10:42:58AM 25  A.   So 292 Barrington Street, that was the residence of

1    Leitscha Poncedeleon and Roberto Figueroa during the -- during

2    the investigation.  Also, it was the residence of Jean Karlos

3    DeJesus Pizarro prior to the wiretap.

4            6 Burbank Street, which is owned by Carlos Javier

10:43:27AM 5    Figueroa and the residence of Carlos Javier Figueroa and his

6    girlfriend Nisharya Gutierrez and their children.

7            59 Fernwood Avenue, which is also owned by Carlos

8    Javier Figueroa, and Ingrid Mercado lives at the residence.

9            820 East Main Street, that was a building that was

10:43:54AM 10    being used by members of the group.

11            And then 100 Baden Street, the apartment complex

12    there, camera was installed in the rear parking lot of that

13    area.

14    Q.   All right.  I'd like to show you first on Government's 237

10:44:15AM 15    we see -- I think you're already identified the location of

16    one pole camera, that's the black camera; is that right?  In

17    the middle of Burbank -- I'm sorry, on the left side of the

18    photo?

19    A.   Yes.

10:44:30AM 20    Q.   And that's facing toward the area of 6 Burbank?

21    A.   Yes.

22    Q.   And is the house that has the 6 on it, does that

23    accurately reflect 6 -- the location of 6 Burbank?

24    A.   Yes, it does.

10:44:41AM 25    Q.   Okay.  At this time -- you mentioned 292 Barrington.  If I

1  could pull up what's not in evidence as Government's

2  Exhibit 70?  Do you see that photograph, Investigator,

3  Government's Exhibit 70?

4  A.    Yes, I do.

10:45:01AM 5  Q.    Do you recognize what's shown in that photograph?

6  A.    Yes, that's 292 Barrington Street.

7  Q.    All right.  Was that a location that a pole camera was

8  installed in this investigation?

9  A.    Yes.

10:45:14AM 10  Q.    Is that a fair and accurate depiction of 292 Barrington

11  Street as it existed during the location -- I'm sorry, during

12  the investigation?

13  A.    Yes, it is.

14              **MR. MARANGOLA:** At this time I'd offer Government's

10:45:26AM 15  70.

16              **MR. VACCA:** Objection, Your Honor, grounds of

17  relevancy.

18              **THE COURT:** Overruled.  Exhibit 70 will be received.

19              (**WHEREUPON**, Government's Exhibit 70 was received

10:45:34AM 20  into evidence).

21  **BY MR. MARANGOLA:**

22  Q.    Investigator, I'd like to show you what's not in evidence

23  now as Government's 17.  Do you recognize what's shown in

24  Government's 17?

10:45:57AM 25  A.    Yes.

58

1  Q.    Can you describe what's shown in Government's 17?

2  A.    Yes.  It's a photograph of 292 Barrington Street along

3  with a Nissan Altima parked in the driveway and an Acura TL in

4  the driveway.

10:46:15AM 5  Q.    Is Government's Exhibit 17 a still photo from the pole

6  camera set up at 292 Barrington during the investigation?

7  A.    Yes.

8  Q.    And does Government's Exhibit 17 fairly and accurately

9  show what was captured and the angle of the pole camera facing

10:46:35AM 10  292 Barrington Street?

11  A.    Well, the camera could pan.  So this is a still photo of

12  one of the locations it could view, but it could pan left or

13  right also or zoom in.  So this is a reflection of maybe one

14  of the images that the camera would have captured.

10:46:57AM 15  Q.    Okay. And you recognize the two vehicles in that

16  photograph?

17  A.    Yes.  There's a Nissan Altima that was utilized by

18  Leitscha Poncedeleon, and there's a silver Acura TL that was

19  utilized by Roberto Figueroa.

10:47:17AM 20  Q.    All right.  Does Government's Exhibit 17 fairly and

21  accurately capture the angle of the still photo -- I'm sorry,

22  the angle of the pole camera at 292 Barrington -- one of those

23  angles as they existed during the course of the wiretap

24  investigation?

10:47:34AM 25  A.    Yes.

1  Q.    Does it also accurately reflect the two vehicles that you

2  identified?

3  A.    Yes, it does.

4            **MR. MARANGOLA:** At this time I'd offer Government's

10:47:41AM 5  17.

6            **MR. VACCA:** Objection, Your Honor, relevancy.

7            **THE COURT:** Exhibit 17 will be received.  The

8  objection is over ruled.

9            (**WHEREUPON**, Government's Exhibit 17 was received

10:47:50AM 10  into evidence).

11  **BY MR. MARANGOLA:**

12  Q.    Now, Investigator, first of all, if you touch your screen,

13  can you identify which car is the Nissan Altima and which car

14  is the Acura TL?

10:48:05AM 15  A.    Yes.  So the -- this vehicle is the dark color, dark gray

16  blue Nissan Altima; and this vehicle is the Acura TL, the

17  silver colored Acura TL.

18            **THE COURT:** Distinguish them in the photographs.

19            **THE WITNESS:** Yes.  So the Nissan Altima is parked

10:48:31AM 20  closer to the street and the Acura TL is backed up into the

21  driveway with the rear -- the rear of the vehicle facing the

22  location.

23            **THE COURT:** Thank you.

24  **BY MR. MARANGOLA:**

10:48:50AM 25  Q.    And 292 Barrington was the residence of who during the

1  wire as shown on Government's Exhibit 26?

2  A.   Leitscha Poncedeleon, who is on the second row to the

3  left; and Roberto Figueroa, who is on the same row to the

4  right ,he has a muscle shirt on and tattoos.   And Leitscha

10:49:18AM 5  Poncedeleon has longer dark hair and a white jacket on.

6  Q.   Now, Roberto Figueroa and Leitscha Poncedeleon lived here

7  you indicated?

8  A.   Yes.

9  Q.   Was Roberto Figueroa an individual whose wiretap -- whose

10:49:47AM 10  phones you wiretapped?

11  A.   Yes, he was the first telephone we wiretapped.

12  Q.   And what were the phone numbers of the phones utilized by

13  Roberto Figueroa that were wiretapped?

14  A.   So it was 743-0005 and 485-9741.

10:50:11AM 15  Q.   All right.   And Leitscha Poncedeleon, was she a person

16  whose phones were wiretapped as part of the investigation?

17  A.   Yes, she was.

18  Q.   And what was her phone number?

19  A.   It was 685-4661.

10:50:29AM 20  Q.   Do you recall what was the -- you said Roberto Figueroa

21  was the first person whose phones were wiretapped?

22  A.   Yes.

23  Q.   What was Leitscha Poncedeleon?

24  A.   Leitscha Poncedeleon was the second telephone that was

10:50:45AM 25  wiretapped.

1   Q.    Okay. You indicated that someone else lived at this

2   residence shown in Government's Exhibit 17, 292 Barrington?

3   A.    Yes, Jean Karlos Pizarro, also known as Yankee.

4   Q.    All right.  And did he live there during the wiretap

10:51:04AM 5   investigation?

6   A.    No.  He lived there prior to the wiretap investigation

7   while the investigation was going on, but prior to the wiretap

8   and had moved to Puerto Rico when we began to wiretap

9   telephones.

10:51:21AM 10   Q.    All right.  Do you see the individual you referred to also

11   known as Yankee in Government's Exhibit 26?

12   A.    Yes, I do.

13   Q.    Can you identify his photo?

14   A.    Yes.  So he's in the third row down and he's second from

10:51:36AM 15   the right, he's got a beard, black shirt, and what appears to

16   be a black hoodie on.

17           **MR. MARANGOLA:** Your Honor, may the record reflect

18   the investigator's identification of the individual on the

19   third row second from the left?

10:51:55AM 20           **THE COURT:** I'm a little confused.  When you say

21   Yankee, who are you speaking of?

22           **THE WITNESS:** Jean Karlos DeJesus.

23   **BY MR. MARANGOLA:**

24   Q.    I think I misspoke.  The third row from the top, second in

10:52:07AM 25   from the right; is that correct?

62

1  A.    Yes, he's second from the right, yes.

2  Q.    All right.

3  A.    And just to be clear, his full name is Jean Karlos Pizarro

4  DeJesus.

10:52:24AM 5        THE COURT: Thank you.

6  BY MR. MARANGOLA:

7  Q.    Investigator, what were the dates, if you know, that a

8  pole camera was installed at 292 Barrington?

9  A.    So June of 2017 until the takedown on January 29th of

10:52:39AM10  2018.

11  Q.    All right.

12        MR. MARANGOLA:   If we can, Judge, ask the

13  investigator to -- I'd like him to mark on the hard copy of

14  this photo that's up in that binder there the date of the pole

10:52:58AM15  camera installed at this particular location.

16  BY MR. MARANGOLA:

17  Q.    So there's a marker that's up on the shelf there,

18  Investigator, I'd ask you if you could flip to the hard copy

19  binder and find Exhibit 17?  If you could write down on the

10:53:25AM20  bottom of that -- that photograph the date -- the dates that

21  the pole camera was installed at 292 Barrington as part of

22  this investigation?  And then put your initials next to it.

23        THE COURT:   Just for the record, what did you

24  write?

10:53:55AM25        THE WITNESS: I wrote June of 2017 to January 29th

1    of 2018, and then placed my initials under that.

2           **THE COURT:** Thank you.

3    **BY MR. MARANGOLA:**

4    Q.   And if you could, Investigator, would you take that out of

10:54:09AM 5    the binder?

6           And, Judge, since -- I'm going to ask him to do

7    that with a couple photographs.  I'll wait until he's done it

8    on a few of the photographs, I'll approach the witness and ask

9    to display them on the ELMO.

10:54:28AM 10          In addition to 292 Barrington, what was another

11   location you placed a pole camera on in connection with this

12   investigation?

13   A.   6 Burbank Street.

14   Q.   You see Government's Exhibit 69, which is in evidence, on

10:54:44AM 15   your screen?

16   A.   Yes, I do.

17   Q.   That was the location you've testified there was a pole

18   camera at.  Can you tell the jury when a pole camera was

19   installed at that location?

10:55:05AM 20   A.   Yes.  April of 2016 until the takedown on January 29th of

21   2018.

22   Q.   All right.  And for the record Government's 69 shows 6

23   Burbank in the center of that photograph?

24   A.   Yes, it does.

10:55:22AM 25   Q.   And that was Carlos Figueroa's residence during the

1  investigation?

2  A.    Yes.

3  Q.    Now, you said there was a pole camera up from April 2016

4  until the takedown?

10:55:33AM 5  A.    Correct.

6  Q.    Is there footage for the entire time period from April

7  2016 until the takedown at the end of January 2018?

8  A.    No.

9  Q.    Can you explain when there is footage from the camera that

10:55:49AM 10  was installed facing 6 Burbank?

11  A.    Yes.  So we have footage from September 12th of 2016 and

12  then we have footage from October 28th of 2017 to the takedown

13  on January 29th of 2018.

14  Q.    Can you explain why there are -- there's footage only from

10:56:13AM 15  those dates even though a camera was installed initially

16  beginning in April 2016?

17  A.    Yes.  Because on September 12th of 2016 Walter Ross was

18  murdered at the corner of North Clinton Avenue and Burbank

19  Street.  I advised investigators from the Major Crimes Unit

10:56:33AM 20  that there was camera up in the area of Burbank Street and

21  North Clinton Avenue if they wanted to review footage from

22  that camera.

23          They did and they downloaded a portion of that

24  video from the date of September 12th.  In October we realized

10:56:54AM 25  that the server had filled on this particular camera.

1  Q.   I'm sorry, October of when?

2  A.   October 28th.

3  Q.   Of what year?

4  A.   Of 2017.  We observed the camera and realized the server

10:57:12AM 5  had looped.  So what it did was it erased all of the footage

6  from April until October 28th and then started over again

7  capturing all the footage from October 28th of 2017 until the

8  takedown on January 29th of 2018.

9       So the portion of September 12th, 2016 that was

10:57:38AM 10  preserved by the Major Crimes Unit, we have for that date.

11  And then everything from October 28th of 2017 to January 29th

12  of 2018 is also -- we also have that.

13  Q.   Okay. I'd like you to look at what's not in evidence as

14  Government's 19.  Can you identify what's shown in

10:58:06AM 15  Government's Exhibit 19?

16  A.   Yes.  It's a still photo from -- it's captured from the

17  pole camera of the area of Burbank Street and shows 6 Burbank

18  Street.

19  Q.   All right.  Does Government's Exhibit 19 fairly and

10:58:23AM 20  accurately show a still photo from the pole camera facing 6

21  Burbank Street during the course of the wiretap investigation?

22  A.   Yes, it does.

23  Q.   All right.

24       **MR. MARANGOLA:** At this time I'd offer Government's

10:58:38AM 25  Exhibit 19.

1          **MR. VACCA:** Objection, Your Honor.

2          **THE COURT:** Objection is overruled.   Exhibit 19 will

3    be received.

4          (**WHEREUPON**, Government's Exhibit 19 was received

10:58:49AM 5    into evidence).

6    **BY MR. MARANGOLA:**

7    Q.   Investigator, I'm not sure if you can see on your view, do

8    you see the very bottom of this photograph there's a time and

9    a date?  Is it visible on your screen?

10:59:19AM10   A.   Yeah, there's something that's covering the minutes, but I

11   can see the date and the time.

12   Q.   All right.  And the date's listed there on the right?

13   A.   Correct.

14   Q.   All right.  And that would be listed for -- on all of the

10:59:32AM15   pole camera footage; is that right?

16   A.   Yes.

17   Q.   The date and time, all right. Now, if you could take

18   Government's -- the hard copy of Government's Exhibit 19 out

19   of that binder and on the bottom right again as you did with

10:59:48AM20   the prior still photo, write down the dates that we have

21   footage from the pole camera facing that particular location,

22   6 Burbank.  Then if you could tell us what you've written on

23   there?

24   A.   Okay.  So I've written September 12th of 2016.  Underneath

11:00:28AM25   that I wrote October 28th, 2017 to January 29th of 2018, and I

1   placed my initials under that.

2   Q.   Thank you.   I'd like to show you what's not in evidence as

3   Government's Exhibit 71.   That should be on your screen there.

4   A.   Yes.

11:00:57AM 5   Q.   Do you recognize what's shown in Government's Exhibit 71?

6   A.   Yes, that's 59 Fernwood Avenue, the residence of Ingrid

7   Mercado, location is also owned by Carlos Figueroa.

8   Q.   Is Government's 71 a fair and accurate depiction of

9   59 Fernwood Avenue as it existed during your investigation?

11:01:21AM10   A.   Yes, it is.

11             **MR. MARANGOLA:** Offer Government's Exhibit 71.

12             **MR. VACCA:** Objection, Your Honor, relevancy.

13             **THE COURT:** Overruled.   Exhibit 71 will be received.

14             (**WHEREUPON**, Government's Exhibit 71 was received

11:01:31AM15   into evidence).

16   **BY MR. MARANGOLA:**

17   Q.   Investigator Briganti, is the house shown in Government's

18   71 a location where you had installed a pole camera in

19   connection with your investigation?

11:01:50AM20   A.   Yes.

21   Q.   I'd like to show you what's not in evidence as

22   Government's 21.   Do you recognize what's shown in

23   Government's Exhibit 21?

24   A.   Yes.

11:02:10AM25   Q.   What is it?

1  A.   It's a still photo from the camera that was installed on

2  Fernwood Avenue facing 59 Fernwood Avenue.

3  Q.   Does Government's Exhibit 21 fairly and accurately show

4  the view from the pole camera installed at 59 Fernwood during

11:02:29AM 5  the course of this investigation?

6  A.   Yes, it does.

7          **MR. MARANGOLA:** At this time I'd offer Government's

8  Exhibit 21.

9          **MR. VACCA:** Objection, Your Honor, relevancy.

11:02:40AM 10          **THE COURT:** Overruled.   Exhibit 21 will be received.

11          (**WHEREUPON**, Government's Exhibit 21 was received

12  into evidence).

13  **BY MR. MARANGOLA:**

14  Q.   Investigator Briganti, you said 59 Fernwood was the

11:02:52AM 15  residence of Ingrid Mercado.  Is she shown in Government's

16  Exhibit 26?

17  A.   Yes, she is.

18  Q.   Could you identify which photograph is Ingrid Mercado?

19  A.   Yes.  So she's the last line down, second photograph from

11:03:09AM 20  the left, she has dark hair and a shirt that has a blue collar

21  on it.

22  Q.   All right.  I think she's identified on the photograph.

23  In Government's Exhibit 21 is that on your monitor, Agent?  Or

24  Investigator?

11:03:39AM 25  A.   Yes.

1  Q.    Can you orient us to the street and where 59 Fernwood is

2  in this particular still photo?

3  A.    Yes.  So where this vehicle is, this dark colored vehicle,

4  it's the house right next door to it, it's the yellow house

11:04:01AM 5  right here next to it.  So it's the yellow house that's next

6  to the black vehicle and has a white railing coming down from

7  the porch.

8            THE COURT: You're indicating the left center of the

9  photograph or left -- left side of the photograph; is that

11:04:20AM10  correct?

11            THE WITNESS: Yes, Your Honor.

12            THE COURT: Thank you.

13  BY MR. MARANGOLA:

14  Q.    Does that help you see the house at 59 Fernwood a little

11:04:27AM15  clearer?

16  A.    It does.

17  Q.    All right.  If you want to touch that area again so we

18  know?

19  A.    The yellow house next to that house.

11:04:39AM20  Q.    And, again, you've touched the left side of the --

21  A.    The black vehicle.

22  Q.    You've touched the left side of the photograph; is that

23  correct?

24  A.    Yes.

11:04:46AM25  Q.    All right.  And what's the street on the right of this

1    photograph?

2    A.    Fernwood Avenue.

3    Q.    Was Ingrid Mercado one of the individuals whose phones you

4    wiretapped in this investigation?

11:05:05AM 5    A.    No, but conversations with her were intercepted over

6    Carlos Figueroa's telephone.

7              **MR. VACCA:** Objection, Your Honor.

8              **THE COURT:** Yes, sustained.   That will be stricken.

9    **BY MR. MARANGOLA:**

11:05:18AM 10    Q.    Okay.   Can we go to Government's -- what's not in

11    evidence -- as Government's Exhibit 72?   Do you have

12    Government's Exhibit 72, Investigator?

13    A.    Yes.

14    Q.    All right.   Do you recognize what's shown in that

11:05:42AM 15    location?

16    A.    Yes, that's 820 East Main Street.

17    Q.    And that's -- is that the front of 820 East Main Street?

18    A.    Yes.

19    Q.    Is that a location that a pole camera was installed in

11:05:54AM 20    connection with this wiretap investigation?

21    A.    Yes, it is.

22    Q.    Does Government's Exhibit 72 fairly and accurately show

23    the exterior of the front of 820 East Main as it existed

24    during this wiretap investigation?

11:06:08AM 25    A.    Yes, it does.

1          **MR. MARANGOLA:** I'd offer Government's Exhibit 72.

2          **MR. VACCA:** Objection, Your Honor, relevancy.

3          **THE COURT:** Overruled.   Exhibit 72 will be received.

4          (**WHEREUPON**, Government's Exhibit 72 was received

11:06:23AM 5   into evidence).

6   **BY MR. MARANGOLA:**

7   Q.   I'd like to show you what's not in evidence as

8   Government's 73.  Do you recognize what's shown in

9   Government's 73?

11:06:40AM 10  A.   Yes, that's the parking lot behind 820 East Main Street

11  and the rear of 820 East Main Street.

12  Q.   Does Government's Exhibit 73 fairly and accurately show

13  those areas as they existed during the wiretap investigation?

14  A.   Yes, they do.

11:06:57AM 15  Q.   Does that also show the area where you had a pole camera

16  installed in connection with this investigation?

17  A.   Yes.

18          **MR. MARANGOLA:** I'd offer Government's 73.

19          **MR. VACCA:** Objection, Your Honor.

11:07:12AM 20          **THE COURT:** Overruled.   Exhibit 73 will be received.

21          (**WHEREUPON**, Government's Exhibit 73 was received

22  into evidence).

23  **BY MR. MARANGOLA:**

24  Q.   I show you what's not in evidence as Government's 701.  Do

11:07:43AM 25  you recognize what's shown in that photograph, Investigator

1   Briganti?

2   A.   Yes, that's the photograph of the rear of 820 East Main

3   Street.

4   Q.   Is that a closer up photograph than the one you previously

11:07:55AM 5   had just seen?

6   A.   Yes.

7   Q.   Does that fairly and accurately show the rear of 820 East

8   Main Street along with the entrance into 820 East Main Street

9   as they existed during the course of this investigation?

11:08:08AM 10  A.   Yes, it does.

11            **MR. MARANGOLA:** Offer Government's 701.

12            **MR. VACCA:** Objection, Your Honor.

13            **THE COURT:** Overruled.   Exhibit 701 will be

14   received.

11:08:16AM 15            (**WHEREUPON**, Government's Exhibit 701 was received

16   into evidence).

17   **BY MR. MARANGOLA:**

18   Q.   Can we publish 701?   Thank you.   All right, Investigator,

19   let me show you what's not in evidence as Government's 23.

11:08:58AM 20  Investigator, can you identify what Government Exhibit 23 is?

21   A.   Yes.   It's a still photograph from the pole camera of the

22   rear -- the rear parking lot of 820 East Main Street and 820

23   East Main Street, the rear of 820 East Main Street.

24   Q.   I'm sorry, the what?

11:09:17AM 25  A.   The rear parking lot of 820 East Main Street and the rear

1 | of 820 East Main Street, the location itself.

2 | Q.   All right.   Is Government's Exhibit 23 a fair and accurate

3 | still photo of the video footage obtained from the pole camera

4 | installed facing the rear of 820 East Main Street during the

11:09:35AM 5 | course of this investigation?

6 | A.   Yes.

7 | **MR. MARANGOLA:** At this time I'd offer Government's

8 | Exhibit 23.

9 | **MR. VACCA:** No objection.

11:09:41AM 10 | **THE COURT:** Exhibit 23 will be received.

11 | (**WHEREUPON**, Government's Exhibit 23 was received

12 | into evidence).

13 | **BY MR. MARANGOLA:**

14 | Q.   Investigator, do you see the portion magnified on your

11:10:08AM 15 | monitor?

16 | A.   Yes, I do.

17 | Q.   And do you see the entry door into the rear of 820 East

18 | Main in that magnified image?

19 | A.   Yes, I do.

11:10:19AM 20 | Q.   Can you identify it for the jury?

21 | A.   Yes.   It's the blue door in the middle of the building.

22 | Q.   All right.   For the record you've circled the center of

23 | that magnified area; is that correct?

24 | A.   Yes.

11:10:35AM 25 | Q.   Can you tell the -- can you tell the jury when a pole

1  camera was installed at facing the rear of 820 East Main

2  Street?

3  A.   Yes, it was on January 17th of 2018 and it went until

4  January 29th of 2018, the date of the takedown.

11:10:59AM 5  Q.   Do you remember the approximate time it was installed?

6  A.   Yes, it was installed at 11:23.

7  Q.   If I could ask you to take out of the binder there the

8  hard copy of Government's Exhibit 23 and write down on the

9  bottom of that photograph the date and time that pole camera

11:11:31AM 10  was installed facing 820 East Main Street?  And can you tell

11  us what you wrote on there when you're done?

12  A.   Okay, so I wrote January 17th, 2018 to January 29th, 2018,

13  at 11:23 a.m., and then I placed my initials underneath that.

14  Q.   Thank you.  I'd like to show you what is in evidence as

11:12:24AM 15  Government's Exhibit 26 and ask you can you identify the

16  individual you know as Obed Torres Garcia in Government's 26?

17  A.   Yes.  He's on the third row down, he's the last picture to

18  the left here.

19  Q.   All right.

11:12:49AM 20  A.   He's got short dark hair and a dark shirt on.

21  Q.   And where did he stay on occasion during the

22  investigation?

23  A.   On occasion he stayed at 820 East Main Street.

24  Q.   Was Obed Torres a person whose phones you wiretapped as

11:13:22AM 25  part of the investigation?

1  A.   No, but conversations with Obed Torres were intercepted

2  over telephones believed to be used by Carlos Figueroa.

3           **MR. VACCA:** Objection, Your Honor.

4           **THE COURT:** Sustained to the last part of the

11:13:40AM 5  answer.  The answer was simply no.

6  **BY MR. MARANGOLA:**

7  Q.   All right. Can we go to Government's -- what's not in

8  evidence yet -- as Government's Exhibit 74?  Investigator, can

9  you identify what's shown in Government's Exhibit 74?

11:13:59AM 10  A.   Yes, this is an aerial view of the area of 100

11  Baden Street apartments.

12  Q.   Does Government's Exhibit 74 fairly and accurately show

13  that area as it existed during the wiretap investigation?

14  A.   Yes, it does.

11:14:17AM 15  Q.   Was that an area that you installed or that a pole camera

16  was installed during the course of the investigation?

17  A.   Yes, it was.

18           **MR. MARANGOLA:** At this time I'd offer Government's

19  Exhibit 74.

11:14:31AM 20           **MR. VACCA:** No objection.

21           **THE COURT:** Exhibit 74 will be received.

22           (**WHEREUPON**, Government's Exhibit 74 was received

23  into evidence).

24  **BY MR. MARANGOLA:**

11:14:56AM 25  Q.   Investigator, I'd like to show you what's not in evidence

1    as Government's Exhibit 24.  Can you identify what's shown in

2    Government's Exhibit 24?

3    A.   Yes, that's a still photograph from the pole camera at the

4    rear of 100 Baden Street as a location that the -- that the

11:15:28AM 5    group used to sell drugs to Orlando Yelder.

6    Q.   Does Government's Exhibit 24 fairly and accurately reflect

7    a still photo from the pole camera installed in the area at

8    100 Baden Street during the course of the wiretap

9    investigation?

11:15:45AM10    A.   Yes.

11    Q.   Do you recall what the dates were that the pole camera --

12    I'm sorry, let me first offer Government's Exhibit 24.

13              I'd offer Government's Exhibit 24.

14              **THE COURT:** Mr. Vacca?  Mr. Vacca?

11:16:11AM15              **MR. VACCA:** No objection, Your Honor.

16              **THE COURT:** I thought you fell asleep.  Exhibit 24

17    is received.

18              (**WHEREUPON**, Government's Exhibit 24 was received

19    into evidence).

11:16:24AM20    **BY MR. MARANGOLA:**

21    Q.   Investigator, can you show us the -- on Government's --

22    Government's Exhibit 74 the area that's shown in Government's

23    24, the pole camera still photo?

24    A.   Yes.  So in the middle of the screen, these parking areas

11:16:50AM25    right here, just to the left of the row of buildings that are

1  to the right of the image.

2  Q.   All right.   For the record, you've made a circle in

3  approximately the center of the photograph just over the

4  parking spaces just in front of that sort of circular turned

11:17:15AM 5  around area; is that correct?

6  A.   Yes.

7  Q.   All right.   What were the dates that the pole camera was

8  set up facing that area that you've just circled?

9  A.   January 19th of 2018 to January 29th, 2018.

11:17:31AM 10  Q.   If you could, I'd ask you to take the hard copy out of

11  Government's 24, the still photo from the pole camera, and

12  write down the dates that the pole camera was placed at 100

13  Baden Street.   And then if you could tell us what you wrote

14  down.

11:18:10AM 15  A.   So I wrote January 19th, 2018 to January 29th, 2018 and

16  placed my initials under that.

17  Q.   Thank you.   Can you tell us why it was that you set up a

18  pole camera at this particular location shown in Government's

19  24?

11:18:33AM 20  A.   Yes.   Because there were intercepted calls and

21  surveillance that followed members of the group to that

22  location previously where there were meetings with Orlando

23  Yelder.   It became a location where it was difficult again to

24  do live surveillance because it was a parking lot behind a

11:18:52AM 25  building.   So we decided to install a pole camera --

1  Q.   All right.

2  A.   -- to view the activities back there.

3  Q.   I'd like to show you what's in evidence as Government's

4  35.  And that's the individual you previously identified as

11:19:04AM 5  Orlando Yelder; is that correct?

6  A.   Yes, that's Orlando Yelder.  He bought drugs from the

7  group.

8          **MR. VACCA:** Objection, Your Honor, non-responsive.

9          **THE COURT:** Sustained.  That will be stricken.

11:19:18AM 10  **BY MR. MARANGOLA:**

11  Q.   Investigator, was Orlando Yelder a person whose phones you

12  wiretapped or whose phone you wiretapped?

13  A.   Yes.

14  Q.   Can you explain why you wiretapped Orlando Yelder's cell

11:19:37AM 15  phone?

16          **MR. VACCA:** Objection, Your Honor.

17          **THE COURT:** Overruled.  Go ahead.

18          **THE WITNESS:** Because Orlando Yelder was a customer.

19          **MR. VACCA:** Objection, Your Honor, no foundation.

11:19:50AM 20          **THE COURT:** Sustained to that.  Maybe ask some more

21  questions.

22  **BY MR. MARANGOLA:**

23  Q.   Investigator, what were some of the reasons that you

24  intercepted or that you sought to wiretap Orlando Yelder's

11:20:05AM 25  phone?

1           **MR. VACCA:** Objection, Your Honor.

2           **THE COURT:** Overruled.  Go ahead.

3           **THE WITNESS:** He was purchasing narcotics from

4  Roberto Figueroa and there were telephone conversations

11:20:17AM 5  between him and Roberto Figueroa.

6           **MR. VACCA:** Objection, Your Honor, unresponsive.

7           **THE COURT:** Overruled.

8  **BY MR. MARANGOLA:**

9  Q.   Did members of the team surveil meetings with Orlando

11:20:26AM10  Yelder and other individuals related to the investigation at

11  100 Baden Street?

12  A.   Yes.

13  Q.   All right.  Now, why would you seek authorization to

14  wiretap the phone of a purchaser of drugs as opposed to a

11:20:54AM15  person selling drugs?

16           **MR. VACCA:** Objection, Your Honor, insufficient

17  foundation for him to come to that conclusion.

18           **THE COURT:** No, overruled.  You can state that based

19  upon his experience.

11:21:05AM20           **THE WITNESS:** So generally the reason we would do

21  that is because a customer is not part of the actual group.

22  So if the group -- the hierarchy of the group decided to get

23  rid of their telephones or dump their telephones, if we were

24  listening to a customer who is a good customer, somebody from

11:21:25AM25  that group would contact that customer again and give him a

1   new telephone number, which would then allow us to get

2   authorization for the new telephone numbers instead of

3   starting from scratch again with doing buys from individuals.

4   **BY MR. MARANGOLA:**

11:21:40AM 5   Q.   Okay.  If I could approach and show the investigator

6   Government's Exhibit 22?  Investigator, do you recognize what

7   Government's Exhibit 22 is?

8   A.   Yes.  It's a USB disk that contains certain number of pole

9   camera clips from the pole camera images.

11:22:26AM 10   Q.   All right.  Does Government's Exhibit 22 just show

11   selected clips from the pole cameras that you've just

12   identified?

13   A.   Yes.

14   Q.   All right.  It doesn't contain all of the pole camera

11:22:41AM 15   footage from every pole camera throughout the entire

16   investigation; is that right?

17   A.   Correct, that's thousands and thousands of hours of video

18   footage.

19   Q.   All right.  Is there a particular reason why certain pole

11:22:54AM 20   camera video footage were copied and placed onto the USB drive

21   that's identified as Government's 22?

22   A.   Yes.  Again, because there was so much footage on all of

23   the hard drives and, again, SYTECH system -- you have to

24   download it from the SYTECH system, it's time consuming to do

11:23:19AM 25   that.  So those video clips were taken from the SYTECH system

1  and put onto this compilation disk.

2  Q.   So we can play those in court here?

3  A.   Yes.

4  Q.   Now, have you reviewed each of the video clips contained

11:23:33AM 5  on Government's Exhibit 22?

6  A.   Yes, I have.

7  Q.   And have compared them to the clips that were saved on the

8  hard drives from the pole camera footage that was downloaded

9  and secured as part of the investigation?

11:23:49AM 10  A.   Yes.

11  Q.   And are the clips that are contained on Government's

12  Exhibit 22 exact copies of that footage that was downloaded

13  from the hard drives of the pole cameras in this case?

14  A.   Yes, it is.

11:24:07AM 15  Q.   Okay.

16          **MR. MARANGOLA:** At this time I would offer

17  Government's Exhibit 22.

18          **MR. VACCA:** *Voir dire* on the agent, Your Honor?

19          **THE COURT:** Sure.

11:24:15AM 20          **MR. VACCA:** Investigator, the compilation of the

21  thumb drive, did you create the compilation?

22          **THE WITNESS:** No, sir, I did not.

23          **MR. VACCA:** Who created the compilation?

24          **THE WITNESS:** Compilation was created by technicians

11:24:33AM 25  from the Rochester Police Department.  I was present when they

1   did it.

2          MR. VACCA: So would it be fair to say that some of

3   the video or some of the coverage was left on the cutting

4   floor and only certain portions were selected for purposes of

11:24:50AM 5   the compilation?

6          THE WITNESS: There are only certain portions that

7   are on this disk, correct, sir.

8          MR. VACCA: Who edited that?

9          THE WITNESS: I'm not familiar with who edited it.

11:25:03AM 10          MR. VACCA: What were the standards on it?  In other

11   words, what was the rubric as to what the compilation should

12   include or not include?

13          MR. MARANGOLA: Objection, beyond the scope of the

14   *voir dire*, Judge.

11:25:15AM 15          THE COURT: No, I'll allow it.  Overruled.

16          THE WITNESS: I believe those were decisions that

17   Mr. Marangola made, the prosecution team made.

18          MR. VACCA: Okay.  So did you come to Mr. Marangola

19   with all of the video and then reviewed it with him and

11:25:35AM 20   selected only certain portions?

21          THE WITNESS: No.  Once the video was placed on to

22   the disk I viewed everything that was on the disk.

23          MR. VACCA: But there was a lot more before that

24   that ended up on the cutting floor, correct?

11:25:47AM 25          THE WITNESS: Oh, yes, thousands of hours of video.

1          **MR. VACCA:** Right.  Who made that decision as to

2    what is kept and what is cut?

3          **THE WITNESS:** Again I would have to say that the

4    prosecution did, Mr. Marangola did.

11:25:59AM 5          **MR. VACCA:** What were the standards, though?  In

6    other words, what did you keep and why and what did you get

7    rid of and why?

8          **THE WITNESS:** I don't know.  I mean, there were

9    certain clips that they wanted downloaded onto this disk and

11:26:15AM 10   that's what we did.

11          **MR. VACCA:** Your Honor, I would object to the

12   admission of this.  It's clear that there was editing done on

13   it.  We don't know what the standard was for the editing.  So

14   I would ask the Court to note my objection.

11:26:30AM 15          **THE COURT:** The objection is noted.

16          Investigator, you indicated that you compared

17   Exhibit 22 and determined it was accurate depictions from the

18   pole cameras; is that correct?

19          **THE WITNESS:** Yes, Your Honor.

11:26:44AM 20          **THE COURT:** Okay.  Objection is overruled.

21   Exhibit 22 will be received.

22          (**WHEREUPON**, Government's Exhibit 22 was received

23   into evidence).

24   **BY MR. MARANGOLA:**

11:26:54AM 25   Q.   Investigator, follow-up for clarifying purposes here.

1  Mr. Vacca asked you about things that were left on the cutting

2  room floor and edited?

3  A.   Yes.

4  Q.   Was there any editing of the footage from the pole camera

11:27:07AM 5  before it was placed on the compilation USB marked

6  Government's Exhibit 22?

7  A.   No, it wasn't edited, no.

8  Q.   So tell the jury what's the difference between -- is there

9  anything on Government's Exhibit 22 that is different than

11:27:24AM10  what's on the original hard drives and secured servers?

11  A.   No, it's the same footage.  It's just clips of that

12  footage.  So it's not the entirety of the entire day, maybe a

13  clip of a certain event that happened on that day, but the

14  footage is exactly the same footage as the system has.

11:27:43AM15  Q.   And can you tell the jury how you know that it's the exact

16  same footage that the footage on Government's 22 is the exact

17  same footage that was on those hard drives?

18  A.   Because I viewed the footage on this disk and I compared

19  it to the footage for -- from the overall hard drives that

11:28:01AM20  were taken from the pole cameras.

21  Q.   And you did that for some of the clips on Government's 22

22  or all of the clips that are on 22?

23  A.   No, all of them.

24  Q.   Okay.  And so we're also clear, are there images that are

11:28:16AM25  distorted or changed at all in images contained on

1  Government's 22?

2  A.   That we distorted?

3  Q.   That anyone distorted.

4  A.   No, they're exactly the way that they were from the hard

11:28:32AM 5  drives.  So exactly what's on the hard drive is exactly what's

6  on this disk.

7  Q.   So you didn't like black out somebody and then put it on

8  the compilation CD?

9  A.   No.

11:28:44AM 10  Q.   You didn't add somebody in an image?

11  A.   No.

12  Q.   Didn't take away a vehicle or add a vehicle?

13  A.   No.

14  Q.   Okay. Investigator, can you tell the jury are there date

11:29:00AM 15  and time stamps -- I think you already testified to it -- date

16  and time stamps for the data coming into the SYTECH system as

17  part of the wiretap; is that right?

18  A.   Yes.

19  Q.   And there's also -- we saw one of the images, the still

11:29:12AM 20  photos from the pole camera.  Are there date and time stamps

21  on the pole cameras as well?

22  A.   Yes, there are.

23  Q.   And are those date and time stamps accurate on the pole

24  camera footage as well as on the wiretap data?

11:29:26AM 25  A.   Yes, they are and they match.  The SYTECH data matches the

1   pole camera data.

2   Q.   When you say matches, what do you mean?

3   A.   Same date and time.

4   Q.   Okay. Investigator, as the wiretap progressed I think you

11:29:49AM 5   mentioned earlier yesterday you enlisted the assistance of

6   investigators and agents from the United States Postal

7   Service?

8   A.   Yes.

9   Q.   Can you describe in what ways you asked agents or

11:30:04AM 10   investigators from the U.S. Postal Service to assist you in

11   your investigation?

12   A.   Yes.  So we asked them to flag or alert us when packages

13   from Puerto Rico were being sent to certain addresses in

14   Rochester and give us an alert prior to those packages being

11:30:22AM 15   delivered.

16        We also asked them to check their history to give

17   us a history of the packages from Puerto Rico being sent to

18   those locations.

19        We also asked them to seize packages for us and

11:30:39AM 20   write and execute search warrants for some of those packages.

21   Q.   On the search warrant why -- why did you ask agents from

22   the Postal Service to assist with search warrants for those

23   packages?

24   A.   Because it was in the custody of the Postal Service.  So

11:30:57AM 25   we asked them to -- instead of changing custody to someone

1  else, we just asked them to write the search warrants and

2  execute them.

3  Q.   All right.  What were some of the locations that you asked

4  for the authorities from Postal -- United States Postal

11:31:18AM 5  Service to either flag or for information concerning in

6  connection with the investigation?

7  A.   59 Fernwood Avenue, the residence of Ingrid Mercado; 360

8  St. Paul, residence of Jose Olivencia, that was

9  Apartment 1003; 4 Ritz Street, which is the address of Mickael

11:31:45AM 10  Grant, also known as CJ; 15 Harwood Street, that was the

11  residence of Anthony Williams; and 286 Garson Avenue and that

12  was the residence of Karina Lopez.

13  Q.   I'm sorry, what was the address on Garson Avenue for

14  Karina Lopez?

11:32:06AM 15  A.   286 Garson Avenue.

16  Q.   286.  Are the individuals that you just mentioned shown in

17  Government's Exhibit 26?

18  A.   Yes.  So the last row all the way to the bottom, all the

19  way to the left, starting from the left the lady with the red

11:32:32AM 20  shirt on and her hair is in a bun, that's Karina Lopez.

21  Q.   And any of the others?

22  A.   Yes.  Moving to the right, the woman next to her is Ingrid

23  Mercado.  The right of Ingrid Mercado is Anthony Williams.

24  Q.   Whose address was what?

11:33:01AM 25  A.   His address was 15 Harwood.  Harwood Street in Rochester.

1           To the right of him is Mickael Grant, his address

2   was 4 Ritz Street; he's also known as CJ.

3           To the right of Mickael Grant is Jose Olivencia,

4   also known as Bacalao Tito, his address was 360 St. Paul

11:33:31AM 5   Street, Apartment 1003.

6   Q.   All right. I'd like to show you what's not in evidence as

7   Government's Exhibit 88.  Do you recognize what's shown in

8   Government's Exhibit 88?

9   A.   Yes, that's 360 St. Paul Street.  That's the residence of

11:33:56AM10  Jose Olivencia, also known as Bacalao Tito.

11  Q.   Does Government's Exhibit 88 fairly and accurately show

12  360 St. Paul as it existed during your investigation?

13  A.   Yes, it does.

14  Q.   And I'd like to show you also what's not yet in evidence

11:34:15AM15  as Government's 89.

16  A.   Again that's another view of 360 St. Paul Street.

17  Q.   This is which portion of the building?  Do you need to see

18  the other photograph to orient you?

19  A.   Well, no.  I know where it is.  I don't know how you want

11:34:43AM20  me to tell you.  It's -- if you're looking at the front of the

21  building, it's to the left.  It's the area to the left.

22  Q.   Okay. Does it show the rear and left portion of the

23  building as you're facing it from the front?

24  A.   Yes.

11:35:02AM25  Q.   All right. Does it fairly and accurately show that area as

```
 1   it existed during the wiretap investigation?
 2   A.   Yes.
 3                MR. MARANGOLA: I'd offer Government's 88 and 89.
 4                MR. VACCA: Objection on grounds of relevancy, Your
11:35:11AM 5 Honor.
 6                THE COURT: Overruled.  Exhibits 88 and 89 will be
 7   received.
 8                (WHEREUPON, Government's Exhibits 88-89 were
 9   received into evidence).
11:35:24AM10  BY MR. MARANGOLA:
11   Q.   I'd like to show you what's -- did we publish the other
12   ones yet?  Thank you.  Investigator, let me show you what's
13   not in evidence as Government's 97.  Can you identify what's
14   shown in that photograph?
11:35:56AM15  A.   Yes.  15 Harwood Street and it shows some of Monroe
16   Avenue.
17   Q.   That's the intersection of Monroe Avenue and Ritz Street?
18   A.   No, it's Monroe and Harwood Street.
19   Q.   I'm sorry, Harwood Street.  Thank you.  Does Government's
11:36:16AM20  Exhibit 97 fairly and accurately show that area as it existed
21   during the course of the wiretap investigation?
22   A.   Yes, it does.
23                MR. MARANGOLA: Offer Government's Exhibit 97.
24                MR. VACCA: Objection, Your Honor, relevancy.
11:36:27AM25                THE COURT: 97 will be received.
```

1           (**WHEREUPON**, Government's Exhibit 97 was received

2    into evidence).

3    **BY MR. MARANGOLA:**

4    Q.    And, Investigator, who lived at 15 Harwood Street?

11:36:38AM 5    A.    Anthony Williams.

6    Q.    He's which photo in Government's Exhibit 26?

7    A.    So he's on the last row all the way to the bottom, he's

8    the middle photograph, he's the gentleman with the gray and

9    white T-shirt on and a beard, short dark hair.  I'm pointing

11:37:11AM 10   to him right now.

11   Q.    All right. Can you tell us where the apartment is in 15

12   Harwood Street is in Government's 97?

13   A.    I can't tell you where it's located in the building, no.

14   Q.    Or how you enter the apartment?

11:37:33AM 15   A.    Yes.  On the Harwood Street side there's a door there that

16   you can enter into and there's a secure door on the inside of

17   that.  That's how you would enter into the apartments.

18   Q.    Can you show us Harwood Street and which street is Harwood

19   and where the entrance is you're referring to?

11:37:55AM 20   A.    So this is Harwood Street where the white car is in the

21   middle of the street.  And then to the left where I made the

22   mark, there's doors right here, that's how you enter into the

23   building.  So the doors are in the middle of the building just

24   a little bit to the right of where the fire escape is.

11:38:26AM 25   Q.    All right.  For the record, you've made sort of a

1    horseshoe mark over the door and just to the right of the

2    center of that photograph; is that right?

3    A.    Yes.

4    Q.    And that reflects the entrance to 15 Harwood?

11:38:38AM 5    A.    Yes, it does.

6    Q.    And then the line to the right of that on the street

7    toward the right portion of that photograph, you've made that

8    line designating the street itself of Harwood?

9    A.    Yes.

11:38:59AM 10    Q.    All right.  Let's go to what's not in evidence as

11    Government's Exhibit 86.  Investigator, do you recognize

12    what's shown in Government's 86?

13    A.    Yes, that's 4 Ritz Street, the residence of Mickael Grant.

14    Q.    Does Government's Exhibit 86 fairly and accurately show 4

11:39:20AM 15    Ritz Street as it existed during the investigation?

16    A.    Yes, it does.

17          **MR. MARANGOLA:** At this time I'd offer Government's

18    86.

19          **MR. VACCA:** Objection, Your Honor.

11:39:29AM 20          **THE COURT:** Exhibit 86 will be received, the

21    objection is overruled.

22          (**WHEREUPON**, Government's Exhibit 86 was received

23    into evidence).

24    **BY MR. MARANGOLA:**

11:39:40AM 25    Q.    If we can publish that?  And can you point to the

1  photograph of the person who lived at 4 Ritz Street in

2  Government Exhibit 26?

3  A.   Yes.  So the last line down, the second photograph from

4  the right and I'm pointing to it now.  The gentleman with a

11:40:13AM 5  gray shirt on, short dark hair, that's Mickael Grant, short

6  beard, short moustache.

7  Q.   What was he also known as?

8  A.   CJ.

9  Q.   All right.  Now, you testified that -- before we move on,

11:40:35AM 10  I'd like to show you what's not in evidence as Government's

11  92.  Can you tell us what's shown in Government's 92?

12  A.   Yes, that's 286 Garson Avenue, the residence of Karina

13  Lopez.

14  Q.   Does Government's 92 fairly and accurately show 286 Garson

11:40:58AM 15  Avenue as it existed during the course of this investigation?

16  A.   Yes, it does.

17         **MR. MARANGOLA:** At this time I'd offer Government's

18  92.

19         **MR. VACCA:** Objection, Your Honor, relevancy.

11:41:08AM 20         **THE COURT:** Objection is overruled.  Exhibit 92 will

21  be received.

22         (**WHEREUPON**, Government's Exhibit 92 was received

23  into evidence).

24  **BY MR. MARANGOLA:**

11:41:30AM 25  Q.   Thank you.  Investigator, these addresses that we've just

1    talked about -- 59 Fernwood, 286 Garson Avenue, 360 St. Paul

2    Street, 15 Harwood Street, 4 Ritz Street -- are those

3    addresses in the City of Rochester?

4    A.    Yes.

11:41:52AM 5    Q.    All of them?

6    A.    Yes.

7    Q.    And Monroe County?

8    A.    Yes.

9    Q.    Okay. And these are some of the addresses that you asked

11:42:04AM10   Postal to flag for information about during your

11   investigation?

12   A.    Yes.

13   Q.    How did you determine what addresses to ask for

14   information from Postal about?

11:42:15AM15   A.    Because we followed some of the members to pick up

16   packages at some of these locations.  And that was 4 Ritz

17   Street, 360 St. Paul Street, 286 Garson Avenue, those are

18   examples.

19           We also intercepted a text message, it was a

11:42:39AM20   picture text message from Leitscha Poncedeleon's phone to

21   Puerto Rico area code and what the photograph was, it was an

22   envelope that had a number of addresses handwritten on the --

23   on the envelope, some of which were the locations that the

24   individual had picked up packages before.  So we asked Postal

11:43:09AM25   to flag those locations.

1  Q.   All right.  And you said that was a text message

2  intercepted off Leitscha Poncedeleon's phone?

3  A.   Yes, there were two of them.  There were two separate ones

4  from her phone to a Puerto Rico area code.

11:43:30AM 5  Q.   Were the addresses written in a text or was it a

6  photograph of addresses that came over the wire?

7  A.   No, it was a photograph of an envelope that the addresses

8  were handwritten on the envelope.

9  Q.   All right.  If we could, Judge, I would ask the

11:43:49AM 10  investigator, would you get Government's Exhibit 1, the

11  wiretap binder?

12          THE COURT: Before you do that let's take a break.

13          MR. MARANGOLA: Okay.

14          THE COURT: Ladies and gentlemen, let's take a

11:43:58AM 15  recess approximately 20 minutes.  In the meantime, I'd ask you

16  not discuss the matter or allow anybody to discuss the matter

17  with you.  Jury may step down, we'll stand in recess.

18          (WHEREUPON, there was a pause in the proceeding).

19          (WHEREUPON, the defendant is present; the jury is

12:19:33PM 20  present).

21          THE COURT:  You may continue, Mr. Marangola.

22          MR. MARANGOLA: Thank you, Your Honor.

23  BY MR. MARANGOLA:

24  Q.   I just need Ms. Rand to publish something.

12:22:03PM 25          THE CLERK:  I'm sorry, just one second.

**BY MR. MARANGOLA:**

Q.   Investigator, you see Government's 21 on your -- which is
in evidence, you see that on your screen?

A.   Yes, I do.  That's the still photo from 59 Fernwood.

12:22:28PM Q.   I forgot to ask you to take the hard copy and write down
the dates on the hard copy of that exhibit, which is in the
binder, which is Government's 21.  What are the dates from the
pole camera on 59 Fernwood?

A.   It was installed October of 2017 until the takedown on
12:22:45PM January 29th of 2018.

Q.   All right.  Can you find Government's 21, the hard copy
there in the binder?  And let us know what you've written on
it when you're done.

A.   So October of 2017 to January 29th of 2018 and I wrote my
12:23:35PM initials under that.

Q.   That's on Government's 21; is that correct?

A.   Yes.

Q.   All right.  Investigator, I think you wrote down on some
of the pole camera stills that the end date you have being the
12:23:50PM date of the takedown January 29th, 2018; is that right?

A.   Yes.

Q.   Were all the pole cameras taken off on that specific date
on the takedown January 29th, 2018 or did some of the pole
cameras remain up in the days after that?

12:24:09PM A.   No, they actually remained up after that.  Technicians --

1  are you asking me if the technicians took them down?

2  Q.   Yes.

3  A.   No, they didn't take them down on the 29th.  They take

4  them down on the days after that.

12:24:22PM 5  Q.   All right.  So there would have been some footage of those

6  days after that?

7  A.   Yes.  We asked them to take them down on the 29th.  It's

8  whenever they get to it they take it down.

9  Q.   Okay. I placed up with you three hard drives marked

12:24:38PM 10  Government's Exhibit 16, 18 and 20.  I'd ask you to take a

11  look at those and tell us first if you recognize them and if

12  you do, what do you recognize them to be?

13  A.   Yes, these are the original hard drives that contain all

14  of the pole camera footage from the cameras that were

12:25:04PM 15  installed for this investigation.  So it's all of the footage

16  from the time it was put up until the time it was taken down.

17  Q.   All right. Can you tell us, identifying first by exhibit

18  number, what's the pole camera footage contained on the

19  particular hard drive with that exhibit number?

12:25:23PM 20  A.   Yes, so Exhibit No. 16 contains the pole camera footage

21  that was captured for 292 Barrington Street.

22  Q.   Okay.

23  A.   Government Exhibit 18 is the footage that was captured for

24  6 Burbank Street.  And Government Exhibit 20 is the footage

12:25:53PM 25  that was captured for 100 Baden Street, 820 East Main Street

1  and 59 Fernwood Avenue.

2  Q.   All right.   And are the DVDs there you just identified --

3  Government's 16, 18 and 20 -- the complete copy of the footage

4  from the pole cameras that you've identified during this

12:26:16PM 5  investigation?

6  A.   Yes.   Other than 6 Burbank Street, which there was a

7  portion of it that wasn't -- that returned and I don't -- and

8  September 12th is not on here, but the portion from

9  October 28th until the takedown on January 29th is on this

12:26:37PM 10  hard drive.

11  Q.   All right.   And you compared the footage from those hard

12  drives to the compilation USB that was marked Government's 22?

13  A.   Yes.

14  Q.   All right.   So if anyone wants to see footage that's not

12:26:56PM 15  on the compilation but that was from the identified pole

16  cameras, it would be on Government's 16, 18 or 20; is that

17  right?

18  A.   Yes.

19           MR. MARANGOLA: At this time I'd offer Government's

12:27:07PM 20  16, 18 and 20.

21           MR. VACCA: A few questions, Your Honor, please,

22  *voir dire*.

23           THE COURT: Sure, go right ahead.

24           MR. VACCA: Investigator, Exhibit 22 is the

12:27:15PM 25  compilation of the thumb drive of the pole camera, correct?

1          THE WITNESS: Yes, 22 is the compilation for the

2    pole camera footage, yes.

3          MR. VACCA: Was that created from Exhibit No. 16,

4    No. 18, No. 20?  Was that how they were made?

12:27:46PM 5          THE WITNESS: No, I don't believe they were taken

6    off the hard drives.  I believe they were taken off the

7    server.  To be honest with you, I can't -- I don't know the

8    answer to that.

9          MR. VACCA: Okay.  So these were not taken off of

12:28:02PM10   the individual pole cameras that were listed here as

11   Exhibit 16, 18 and 20?

12         THE WITNESS: They were taken from the pole camera

13   footage from those locations, but I don't know if they were

14   taken from the these particular hard drives.

12:28:20PM15         MR. VACCA: Where else had it been taken from?

16         THE WITNESS: The RPD has a server that records all

17   this data.  I'm not sure if it was taken from the server or

18   these hard drives.

19         MR. VACCA: So the server has this information on it

12:28:33PM20   as well?

21         THE WITNESS: The server is where the information is

22   taken into originally and then it's downloaded from the server

23   on to these hard drives.

24         MR. VACCA: Then the compilation is made from the

12:28:43PM25   hard drives?

1          THE WITNESS: Again, I can't testify to that, sir.

2   I don't know the answer to that.

3          MR. VACCA: I just -- this compilation, it's a three

4   step process then?

12:28:53PM 5          THE WITNESS: I don't understand your question.  I'm

6   sorry, sir.

7          MR. VACCA: Well, the compilation is made from the

8   hard drives, correct?  And the hard drives are made from the

9   server?

12:29:04PM 10          THE WITNESS: The hard drives are definitely made

11   from the server, yes.

12          MR. VACCA: And then the compilation is made from

13   the hard drive?

14          THE WITNESS: Again I don't know if the compilation

12:29:14PM 15   disk was taken from the server because you can still download

16   stuff from the server or if it was taken from the hard drives

17   that were made.  So it's the same footage.  I just don't know

18   where it was taken from.

19          MR. VACCA: Your Honor, I would object.  I think we

12:29:33PM 20   need to know where it was taken from.  A two-step process?  A

21   three-step process?  Depending on how you look at it.

22          MR. MARANGOLA: The offer is on the hard drives,

23   which he's authenticated came from the server.  Government's

24   22 is already in.

12:29:44PM 25          THE COURT: Yes, the objection is overruled.  Have

1 | you moved the exhibits?  You haven't yet?

2 |      **MR. MARANGOLA:** I offered 16, 18 and 20.  They had

3 | not.  That was what the pending offer was.

4 |      **THE COURT:** All right. What's your --

12:30:00PM 5 |      **MR. VACCA:** Your Honor, I objected.

6 |      **THE COURT:** Okay.  Exhibits 16, 18 and 20 will be

7 | received.  The objection is overruled.

8 |      (**WHEREUPON**, Government's Exhibit 16, 18, 20 were

9 | received into evidence).

12:30:10PM 10 | **BY MR. MARANGOLA:**

11 | Q.  When you just testified you weren't sure the clips on 22

12 | came from the hard drives in front of you or from the server,

13 | is there any difference in the footage from the hard drives

14 | and the server?

12:30:20PM 15 | A.  No, it's exactly the same footage.  Everything that's on

16 | the server on these hard drives.

17 | Q.  Okay. What's on the compilation CD is the same thing

18 | that's either on the hard drive or the server?

19 | A.   Yes.

12:30:44PM 20 | Q.   Okay. I think where we were at was -- before the break was

21 | the addresses that you had asked Postal, the U.S. Postal

22 | Service to flag for information during the wire and you

23 | indicated that was based on either surveillance observations

24 | as well as an intercepted text message from one of the wiretap

12:31:07PM 25 | lines in this case; is that right?

1    A.    There were two.  There were two picture text messages that

2    were intercepted from the line -- from this line.

3    Q.    All right.  I'd ask you to flip to, in Government's

4    Exhibit 1, tab 135 -- 1-35-7, and the tab immediately

12:31:41PM 5    following it 1-35-8.  1-35?

6    A.    Okay.

7    Q.    Are you on tab 1-35 --

8    A.    Yes, sir, I am.

9    Q.    -7?  Do you recognize the data shown on the transcript

12:32:31PM 10   behind tab 1-35-7?

11    A.    Yes.

12    Q.    Are your initials on it?

13    A.    Yes, they are.

14    Q.    And same thing with the following tab 1-36-8?

12:32:46PM 15    A.    Yes.

16    Q.    Can you identify what's on those two -- what's behind

17    those two tabs?

18    A.    Yes.  So it's the text message photograph image of the top

19    portion, the first one, which is Exhibit 1-35-7 is the top

12:33:13PM 20    portion of the envelope that contains the addresses and names

21    that was sent from Leitscha Poncedeleon's phone to a

22    Puerto Rico area code.

23    Q.    All right.  And for the record this exhibit 1-35-7 and

24    1-36-8, those contain data; is that right?

12:33:44PM 25    A.    They contain data, yes.

1   Q.   All right.  And you authenticated the data on both of

2   those two exhibits?

3   A.   Yes.

4   Q.   As reflected by your initials on there; is that correct?

12:33:53PM 5   A.   Yes, that's correct.

6          MR. MARANGOLA: At this time I'd offer the

7   transcripts behind tabs 1-35-7 and 1-36-8 and ask that the

8   jury be permitted to view them.

9          MR. VACCA: No objection, Your Honor.

12:34:12PM 10          THE COURT: Exhibit 1-35-7 and 1-36-8 are received

11   in evidence.

12          (WHEREUPON, Government's Exhibits 1-35-7 and 1-36-8

13   were received into evidence).

14          MR. MARANGOLA: Your Honor, may the jury flip to

12:35:09PM 15   1-35-7.

16          THE COURT: Yes, you may review 1-35-7.

17   BY MR. MARANGOLA:

18   Q.   Investigator, can you tell us the date and time of the

19   first of these two picture text messages?

12:35:44PM 20   A.   Yes, the first one was on January 12th of 2018 at 11:28:09

21   a.m.

22   Q.   That's 1-35-7?

23   A.   Yes.

24   Q.   What's the -- is this an incoming or outgoing text as

12:36:03PM 25   reflected in the transcript?

1  A.    It's an outgoing text.

2  Q.    Meaning that the target number texted this image to

3  another number?

4  A.    Yes.

12:36:13PM 5  Q.    What's the number that the target number 4661 -- ending in

6  4661, what's the target number -- what is the number that this

7  photograph was sent to?

8  A.    787-297-9357.

9  Q.    What area code is 787?

12:36:38PM 10  A.    It's a Puerto Rico area code.

11  Q.    All right.  Can you read the -- in your copy can you read

12  each of the names and addresses that are shown in the picture

13  that was texted from the 4661 number to the Puerto Rico area

14  code on January 12th, 2018?

12:36:57PM 15  A.    Yes.  So the one marked number one it says Karina Lopez

16  Del Valle, 286 Garson Avenue, Rochester, New York, 14609.

17          Number two, Ingrid V. Mercado, 59 Fernwood Avenue,

18  Rochester, New York, 14621.

19          Number three, Edgardo A. Rosario Alvarado, 157

12:37:34PM 20  Depew Street, Rochester, New York, 14608.

21  Q.    If you could flip to the 1-36-8?  And what is the date and

22  time of this picture message?

23  A.    January 12th, 2018 at 11:29 a.m.

24  Q.    All right.  And what's the difference in time between

12:38:08PM 25  these two photographs being sent ?

1 A.   It's a little less than one minute.

2 Q.   Okay. And is it the same or different number that target

3 number texted this photograph to as in the prior message?

4 A.   It's the same number as Exhibit 1-35-7.

12:38:50PM 5 Q.   All right.  To the same Puerto Rico area code?

6 A.   Yes.

7 Q.   Can you make out any of the names and addresses in the

8 image behind tab 1-36-8?

9 A.   Yes.  So the top one is cut off, it only says Rochester,

12:39:06PM 10 New York, 14608.

11           Underneath that is number four, Anthony Williams,

12 15 Harwood Street, apartment 6, Rochester, New York, 14620.

13           Underneath that looks like something was scribbled

14 out, and then underneath that is number five, Mickael Grant, 4

12:39:33PM 15 Ritz Street, Rochester, New York, 14605.

16 Q.   Okay. All right. The -- some of the addresses that you

17 just read from the text message intercepted over the -- the

18 text messages intercepted over the wiretap on January 12th,

19 did you obtain any records from the United States Postal

12:40:03PM 20 Service relative to deliveries to those particular addresses?

21 A.   Yes, they sent us historical records for packages that had

22 been delivered to those addresses.

23 Q.   All right.  And specifically packages from where delivered

24 to those addresses?

12:40:17PM 25 A.   From Puerto Rico.

1    Q.   Can you tell us how far back those records went that they

2    were able to provide you?

3    A.   Yes, they went back to October of 2017.

4    Q.   Did you ask for records earlier than October of 2017?

12:40:35PM 5    A.   We asked for records as far back as they would go.

6    Q.   And that's what you were provided for October 2017?

7    A.   Yes.

8    Q.   I'm sorry, October of 2017?

9    A.   Yes.

12:40:46PM 10    Q.   Okay. I'm going to ask you to take a look at in the binder

11   next to you Government's 793 -- actually, I'll first offer

12   these.

13            **MR. MARANGOLA:**  Judge, Government's 793 and 794 are

14   certified records from the United States Postal Service.

12:41:10PM 15   There's a certification on them.  I can read it into the

16   record and then offer them or I can simply offer them.  I've

17   previously provided those to defense counsel as well as the

18   certification pursuant to 902(11) of the Federal Rules of

19   Criminal Procedure.

12:41:29PM 20            **MR. VACCA:** No objection, Your Honor.

21            **THE COURT:** Does somebody have my exhibit book?

22   Where did it go? Christi, do you have one?

23            **THE REPORTER:**  No, Judge.

24            **THE COURT:** Mr. Vacca, regarding 793 and 794?

12:42:24PM 25            **MR. VACCA:** Yes, Your Honor, no objection.

106

1          **THE COURT:** Okay.  Exhibit 793 and 794 will be

2 received.

3          (**WHEREUPON**, Government's Exhibits 793-794 were

4 received into evidence).

12:42:36PM 5 **BY MR. MARANGOLA:**

6 Q.   All right. If I could show, Investigator, what's not in

7 evidence as Government's Exhibit 795 and 796?  Investigator,

8 you see 795 there?

9 A.   Yes.

12:43:42PM 10 Q.   Can you take a look at that?  And then Exhibit 796.

11 A.   Yes, I see them both.

12 Q.   All right.  Before I ask you more questions about those,

13 I'm going to ask you did you review the Postal records of

14 deliveries that you received going back as far as October of

12:44:09PM 15 2017?

16 A.   Yes, I did.

17 Q.   Okay. And specifically Government's 793 and 794?

18 A.   Yes.

19 Q.   And 793 and 794 are certified copies of the -- regarding

12:44:55PM 20 some of the deliveries that you asked for records of in this

21 case; is that right?

22 A.   Yes.

23 Q.   All right. With respect to 795 that's on your screen, can

24 you identify what Government's 795 is?

12:45:18PM 25 A.   Yes, this is the -- this is the chart that reflects the

107

1  packages that were delivered to these locations that we asked

2  Postal to give us the history of.

3  Q.   All right.  And if we could have you look at 796?  And

4  identify what 796 is?

12:45:43PM 5  A.   Again, that's another chart that reflects the packages

6  that were delivered to those locations and the dates that they

7  were delivered that we requested from Postal.

8  Q.   Is the information contained in Government's 795 and 796,

9  is that based on the contents of the records from Postal that

12:46:03PM 10 are certified and received into evidence as Government's 793

11 and 794?

12 A.   Yes.

13 Q.   All right. It's an accurate -- 795 and 796 are accurate

14 reflections of those records?

12:46:20PM 15 A.   Yes, they are.

16 Q.   The only difference between 795 and 796 is the way in

17 which the data is grouped?

18 A.   Yes.

19 Q.   All right.

12:46:27PM 20         **MR. MARANGOLA:** At this time I'd offer Government's

21 795 and 796.

22         **MR. VACCA:** No objection, Your Honor.

23         **THE COURT:** Exhibit 795 and 796 will be received.

24         (**WHEREUPON**, Government's Exhibits 795-796 were

12:46:41PM 25 received into evidence).

1  BY MR. MARANGOLA:

2  Q.   You see 795 on your screen, Investigator?

3  A.   Yes, I do.

4  Q.   Can you go through this with us and tell us what's in --

12:46:51PM 5  what information is contained in each of these columns?

6  A.   Yes, so the first column it's labeled package label

7  number.  That's the United States Postal Service tracking

8  number for that particular package.

9          The next column is it says delivery date.  That's

12:47:15PM10  the date that that package was delivered.

11          And the last column that says delivery address, is

12  the address that package was delivered to.

13  Q.   All right.  Now, on the bottom of Government's 795 there's

14  no date listed for the last package that has the delivery

12:47:38PM15  address of 4 Ritz Street.  Do you see that?

16  A.   Yes.

17  Q.   Can you explain why there's no delivery date listed for

18  that particular address?

19  A.   Yes, because we asked the Postal Service to seize that

12:47:49PM20  package for us and a search warrant was executed on that

21  package.  So it was never delivered to that location.

22  Q.   All right.  But that tracking number corresponds to the 4

23  Ritz Street address?

24  A.   Yes.

12:48:03PM25  Q.   All right.  And this is -- 795 is organized

1  chronologically; is that right?

2  A.    Yes.

3  Q.    The earliest date is at the top and the most recent is at

4  the bottom?

12:48:15PM 5  A.    Yes.

6  Q.    And there's different colors corresponding to each

7  address; is that right?

8  A.    Yes.

9  Q.    Can we go to 796?  Can you tell us how this chart of --

12:48:30PM 10  the summary chart of the Postal records is organized?

11  A.    Yes, this is organized by location.  So do you want me to

12  go column by column?

13  Q.    Sure.

14  A.    Okay.  So again the first column is the package label

12:48:50PM 15  number.  And that's the tracking number from the United States

16  Postal Service.

17         The delivery date is the date that the package was

18  delivered.

19         And the last column is the destination address, and

12:49:03PM 20  that's the location where the package was delivered.  The

21  location was -- the locations and the dates and the label

22  numbers that are in blue at the top, those packages went to

23  360 St. Paul Street.

24         In the middle where the package label delivery date

12:49:27PM 25  and location are in pink, those went to 286 Garson Avenue.

1          The label number, the delivery date and the

2     location that are in black went to Fernwood Avenue,

3     59 Fernwood Avenue.

4          There's one underneath that that's in green and

12:49:52PM 5     that went to Rosedale Street.

6          Underneath that the two columns -- two rows

7     underneath that in brown went to 4 Ritz Street.

8          Underneath that one --

9     Q.   I'm sorry to interrupt you.  Went to 4 Ritz Street?

12:50:11PM 10    A.   I'm sorry, they were addressed to 4 Ritz Street.  One went

11    to 4 Ritz Street.  The other one was seized.

12         Underneath that in purple was a package that was

13    delivered to 157 Depew Street.

14         And underneath the last one on this list in red was

12:50:32PM 15    delivered to 15 Harwood Street.

16    Q.   All right.  You testified earlier about -- you testified

17    earlier about conducting or about participating in live and

18    pole camera surveillance yourself in this investigation.  Do

19    you recall that?

12:51:00PM 20    A.   Yes.

21    Q.   I'd like to ask you about a couple of those instances

22    during the investigation.  First let me direct your attention

23    to January 19th of 2018.  Well, let me ask you this generally:

24    On January 20th, 2018, did you engage in live surveillance

12:51:22PM 25    that day?

A.   Yes.

Q.   Can you describe generally where some of the locations you went on January 20th and then we'll get into some more specifics regarding January 19th.

A.   So the locations that I was at were 59 Fernwood Avenue, 292 Barrington Street, 100 Baden Street, and then 99 William Warfield Drive, the complex.  Throughout the day those were different areas that I conducted surveillance.

Q.   Okay. Let's -- let me direct your attention to the day before January 19th.  Did you conduct any surveillance on that day either live or by watching pole cameras?

A.   Yes.

Q.   Can you tell us about that on the 19th?

A.   Yes.  I was in the room conducting pole camera surveillance.

Q.   Was there a specific pole camera that you were focused on on January 19th, 2018?

A.   Yes, it was the camera that was installed showing the area of 59 Fernwood Avenue.

Q.   And that's shown here on Government's 21?

A.   Yes.

Q.   Why were you focused on the Fernwood camera on that particular day January 19?

A.   Because we had indication from the U.S. Postal Service and through the wiretap text messages that came in from the

1  wiretap that a package was going to be delivered to

2  59 Fernwood Avenue on that date.

3  Q.   When you say from the wiretap, what had you received, do

4  you recall, from the wiretap?

12:52:59PM  5  A.   We received text messages from the United States Postal

6  Service with the tracking numbers of the packages that were

7  going to be delivered on Leitscha Poncedeleon's telephone.

8  Q.   And they were for packages that were to be delivered on

9  the 19th?

12:53:16PM 10  A.   Yes, yes.

11  Q.   All right.  Let me ask you to flip to -- in Government's

12  1, the transcript binder, tab 1-64.

13          **MR. MARANGOLA:**   At this time I would offer, Your

14  Honor, the transcripts behind tab 1-64-500 and 1-65-502.

12:54:07PM 15          **MR. VACCA:** What's that again?  1-64-500?

16          **MR. MARANGOLA:** Yes.  And 1-65-502.

17          **MR. VACCA:** 1-65-502, okay, let me look at these.

18  Your Honor, as to 1-64-500 no objection.  As to 1-65-502 no

19  objection.

12:54:47PM 20          **THE COURT:** Based upon that 1-64-500 --

21          **MR. VACCA:** That's the first one.  And the second

22  one --

23          **THE COURT:** I know that.  You have no objection,

24  that's received.  And 1 -65-502 without any objection is also

12:55:04PM 25  received.

113

1          (**WHEREUPON,** Government's Exhibits 1-64-500 and

2   1-65-502 were received into evidence).

3          **MR. MARANGOLA:** May the jury flip to those tabs,

4   Your Honor?

12:55:10PM 5          **THE COURT:** Yes.

6   **BY MR. MARANGOLA:**

7   Q.   Investigator, can you flip to 1-64-500?

8   A.   Yes.

9   Q.   That's data that was intercepted over the wiretap; is that

12:55:52PM 10   right?

11  A.   Yes.

12  Q.   Can you tell us the date, the time, target number and

13  identify whether it's incoming or outgoing and where the

14  incoming or outgoing number is from?

12:56:09PM 15  A.   Yes.  So it's on 1/16/2018.  The time was 12:32:39 p.m.

16  The target number is 585-685-4661.  It was an incoming text

17  from 787-297-9357.  And then a number at the bottom that was

18  part of the text.

19  Q.   And so this reflects that that 787 Puerto Rico area code

12:56:49PM 20  texted the target number the numbers that are contained on the

21  transcript?

22  A.   Yes.

23  Q.   All right.  I'd ask you to look at Government's 796 on

24  your screen.  Tell us if you see the numbers on Government's

12:57:07PM 25  796 that were texted from the Puerto Rico area code to the

1  target number ending 4661 on January 16th, 2018.

2  A.   Yes, I see it.

3  Q.   And where on Government's 796 is the -- are the numbers

4  that were texted on Government's 1-64-500?

12:57:43PM 5  A.   So they're in black, they're the first --

6  Q.   If you want to touch the screen it may be easier.

7  A.   Okay.  This one.  It's between where I put the two marks.

8  Q.   You placed the two marks at the -- from the top, the first

9  numbers written in black; is that correct?

12:58:06PM 10  A.   Yes.

11  Q.   And what is the delivery date for those for that package?

12  A.   1/19 of 2018.

13  Q.   And what's the destination address?

14  A.   59 Fernwood Avenue.

12:58:20PM 15  Q.   All right.  And so we're clear then, the text message on

16  Government's 1-64-500 is a tracking number then?

17  A.   Yes.

18  Q.   All right.  And if you can take a look at the next tab

19  1-65-502.  Can you tell us do you see the numbers that were

12:58:51PM 20  texted from the Puerto Rico area code to the target telephone

21  number ending in 4661 on January 16th, 2018?  Do you see those

22  anywhere on Government's Exhibit 796?

23  A.   Yes.

24  Q.   And where are they in relation to the tracking number you

12:59:09PM 25  previously identified on 796?

1  A.    Again they're in black, they're directly below the

2  tracking number and date and address that I previously spoke

3  about at 59 Fernwood Avenue.

4  Q.    All right.  Based on the interception of these text

12:59:32PM 5  messages in Government's 1-64 and 1-65, what surveillance

6  activity did you conduct in connection with 59 Fernwood?

7  A.    Well, I conducted pole camera surveillance.  There were

8  other --

9  Q.    Which day?  I'm sorry.

12:59:52PM 10  A.    I'm sorry, on the 19th.  And I requested that other

11  officers perform live surveillance.

12  Q.    All right.  Can you tell us what happened while you were

13  performing the pole camera surveillance?  And for the record,

14  describe what performing the pole camera surveillance, what

01:00:09PM 15  you mean by that?

16  A.    So I was viewing the activities on Fernwood Avenue --

17  generally at 59 Fernwood Avenue from the pole camera from the

18  wire room.

19  Q.    Okay. Can you tell us what happened when you were doing

01:00:23PM 20  that on January 19th, 2018?

21  A.    Yes.  So I observed a silver GMC pick-up truck that I

22  had -- I identified earlier in the investigation being Carlos

23  Figueroa's pick-up truck, pass down Fernwood Avenue, turn

24  around in the parking lot at the end of Fernwood Avenue, then

01:00:54PM 25  come back by Fernwood Avenue again, then turn and go back --

1 go back down the street again before coming back and parking

2 in the driveway.

3 Q.   All right.  Let me first direct your attention to January

4 19th at approximately 11:37.  And I'm going to --

01:01:32PM 5         MR. MARANGOLA: -- Judge, at this time I would offer

6 or ask to publish from Government's Exhibit 22, the pole

7 camera clip on January 19th from 59 Fernwood Avenue beginning

8 at 11:37 a.m.

9         THE COURT: Did we receive 22?

01:01:59PM 10         MR. MARANGOLA: Yes.

11         THE COURT: Yes, based upon that that can be

12 displayed.

13 BY MR. MARANGOLA:

14 Q.   Investigator, can you tell us what you observe on the

01:02:25PM 15 camera here?

16 A.   Yes.  The U.S. Postal truck is parking in front of -- on

17 the street in front of 59 Fernwood Avenue.

18 Q.   And this is on January 19th, 2018; is that right?

19 A.   Yes.

01:02:43PM 20 Q.   Were you able to watch this from the wire room that day?

21 A.   Yes.

22 Q.   Were those adjustments to the focus made by you?

23 A.   No, they were made by ATF Special Agent Patrick Hoffmann

24 who was with me at the time we were viewing this video.

01:03:35PM 25 Q.   Can you tell us what you see in the video now or at

117

1  approximately 11:39?

2  A.   Yes, the Postal carrier removed the package from the

3  Postal truck and he wheeled the package up to the front steps

4  of 59 Fernwood Avenue.  He appears to be scanning the package.

01:04:46PM 5  Now he's bringing the package up on to the porch of

6  59 Fernwood Avenue.  It appears he left the package on the

7  porch of 59 Fernwood Avenue.

8  Q.   All right.  And that clip ended at what time, did you

9  notice?

01:05:33PM 10  A.   I didn't notice, no.

11  Q.   Were you able to see that -- the end time?

12  A.   It looked like 11:40:25.

13  Q.   11:40 a.m. and 25 seconds?

14  A.   Yes.

01:06:06PM 15  Q.   Okay. Did you intercept any calls over the wiretap around

16  the time of that Postal delivery that we just observed at

17  59 Fernwood on January 19th?

18  A.   Yes.

19  Q.   Let me ask you to flip to tab 1-72 and this tab is

01:06:38PM 20  1-72-273,0,0.  Do you see that?

21  A.   Yes.

22  Q.   All right.  And that's one of those ones you testified

23  about earlier where the data was pulled in in three occasions?

24  A.   Yes.

01:06:52PM 25  Q.   All right.  Is the call that's behind tab 1-72 one of the

118

1    calls that you intercepted around the time of this Postal

2    delivery?

3    A.    Yes.

4    Q.    And you verified the date and time of the call behind tab

01:07:08PM 5    1-72; is that right?

6    A.    Yes.

7    Q.    And we're not going to play this call for the jury, but

8    since you've testified to the accuracy of the call data for

9    it, I'd like you to tell the jury the date and time of the

01:07:21PM10    call behind tab 1-72.

11    A.    So it was January 19th of 2018 at 11:40:46.

12    Q.    So this call is approximately how long after the end of

13    the clip we just saw?

14    A.    Approximately 20 seconds.

01:07:46PM15    Q.    Okay. After the clip we saw where the Postal carrier

16    arrived back at his truck, based on that and the intercepted

17    call here behind tab 1-72 approximately 20 some seconds later,

18    what did you do?

19    A.    Again I continued to view the pole camera footage and then

01:08:12PM20    I requested that officers that were assisting in the

21    investigation conduct live surveillance in the area of

22    59 Fernwood Avenue.

23    Q.    All right.  Now, were you still able to observe pole

24    cameras at other locations in the wire room in addition to the

01:08:31PM25    footage being displayed from 59 Fernwood Avenue?

1  A.   Yes.

2  Q.   All right.   At this time I'd like to publish from

3  Government's 22 a clip on January 19th beginning at 11:46 at

4  292 Barrington.   Can you pause it?

01:09:21PM 5            Investigator, first, I can't remember if we

6  clarified this for the record, Judge, in addition to the

7  wiretap -- because we downloaded the USB, Government's 22 into

8  the court laptop to play through the court system and that's

9  what we're playing it off of.   With respect to the image here

01:09:42PM 10  on your screen at 11:46:18.

11            Do you see that, Investigator?

12  A.   Yes.

13  Q.   Had you observed two individuals walk from 292 Barrington

14  immediately before this was paused?

01:09:56PM 15  A.   Yes.

16  Q.   All right.   Now, I'd like to ask you, during the course of

17  your investigation which you said lasted how many years?

18  A.   Since 2015.

19  Q.   All right.   And between that and 2018, the takedown of the

01:10:12PM 20  investigation, did you have occasion to observe the defendant

21  Carlos Javier Figueroa?

22  A.   Yes.

23  Q.   Can you describe for the jury how many times you had

24  occasion to view him during the years of this investigation?

01:10:26PM 25  A.   I would say live I've probably seen him between 30 and 40

1   times.  And then in addition to pole camera footage, I would

2   say I'd seen him at least two dozen times on the pole camera

3   at minimum.  It may be more than that, but at least two dozen

4   times.

01:10:45PM 5   Q.   All right. Based on those observations, both in person and

6   on the pole camera, are you familiar with the appearance of

7   the defendant?

8   A.   Yes.

9   Q.   Are you familiar with his size?

01:10:55PM 10  A.   Yes.

11  Q.   All right.  Have you been able to identify him in previous

12  pole camera observations?

13  A.   Yes.

14  Q.   All right.  Have you confirmed your observations of him in

01:11:03PM 15  pole camera footage and by observing him live?

16  A.   Yes.

17  Q.   All right.  Can you tell the jury with respect to Leitscha

18  Poncedeleon, did you have occasion during the course of the

19  investigation to observe Leitscha Poncedeleon?

01:11:21PM 20  A.   Yes.

21  Q.   Can you describe for the jury how many times you had

22  occasion to observe Ms. Poncedeleon?

23  A.   From 2015 probably maybe 20 to 30 times live.  And then in

24  addition, on pole camera footage, often; I would say at least

01:11:46PM 25  40 times.

1   Q.   All right.  And, again, during those live observations as

2   well as the observations of Ms. Poncedeleon on the pole camera

3   did you become familiar with her appearance?

4   A.   Yes.

01:11:58PM 5   Q.   As well as her size?

6   A.   Yes.

7   Q.   And approximate shape?

8   A.   Yes.

9   Q.   Just like Mr. Figueroa's?

01:12:05PM 10   A.   Yes.

11   Q.   And when you say live, seeing the defendant or

12   Ms. Poncedeleon live, do you mean seen on the camera live or

13   seen in person?

14   A.   Seen in person.

01:12:18PM 15   Q.   Okay. So in between the in person and on the camera

16   footage observations of the defendant and Ms. Poncedeleon,

17   were you able to identify them from observations on the pole

18   camera clips that we have here for court?

19   A.   Yes.

01:12:36PM 20   Q.   All right.  Do you have an opinion as to who we just

21   observed exit 292 Barrington on the pole camera on January

22   19th, 2018, at approximately 11:46 a.m.?

23   A.   Yes, that was Carlos Javier Figueroa.

24        **MR. VACCA:** Objection, Your Honor.

01:12:51PM 25        **THE COURT:** Overruled.  You can answer.

1            **THE WITNESS:** That was Carlos Javier Figueroa and

2    Leitscha Poncedeleon.

3    **BY MR. MARANGOLA:**

4    Q.   And I think we can only see one of them in the pause right

01:13:04PM 5    here; is that right?

6    A.   Yes.

7    Q.   Can you tell us who you see and what clothing they're

8    wearing?  What color?

9    A.   Yes.  I'm sorry, that's Leitscha Poncedeleon.  She has a

01:13:13PM10   white coat on, appears she might have a scarf -- appears she

11   has a scarf around her neck.

12   Q.   All right.  If we can just back it up a little bit?  Do

13   you see the defendant Carlos Javier Figueroa at 11:46:11 on

14   this clip?

01:13:37PM15   A.   Yes, I do.

16   Q.   And if you touch your screen can you circle him for us?

17   And for the record you've circled the center of that

18   photograph; is that right?

19   A.   Yes.

01:13:48PM20   Q.   All right.  If you can clear it?  And we'll play it.  What

21   color clothing is Mr. Figueroa wearing?

22   A.   He has a bright red hooded sweatshirt on.

23   Q.   All right.  Do you see the vehicles in the driveway?

24   A.   Yes.

01:14:10PM25   Q.   Can you identify those vehicles for us?

1  A.   Yes.  So the first car in the driveway closest to the

2  residence is the silver Acura TL.  The car -- or the truck

3  behind it is a GMC pick-up truck.  And the vehicle behind that

4  is the dark gray colored Nissan Altima.

01:14:37PM 5  Q.   All right.  And who did you observe during the course of

6  your investigation driving those vehicles you just identified?

7  A.   So the Acura TL I observed Roberto Figueroa drive that

8  vehicle.  The silver pick-up truck I observed Carlos Javier

9  Figueroa drive that vehicle.  And the Nissan Altima I observed

01:14:59PM 10  Leitscha Poncedeleon driving that vehicle.

11  Q.   Okay. Who did you just see there?

12  A.   That was Leitscha Poncedeleon.

13  Q.   Did you see the defendant after he walked past these

14  vehicles?

01:15:49PM 15  A.   I saw him walk to the driver's side of the silver GMC

16  pick-up truck and then I didn't see him anymore after that.

17  Q.   All right.  What do you see the silver GMC pick-up doing

18  now at approximately 11:48?

19  A.   Backing out of the driveway of 292 Barrington Street.

01:16:21PM 20  Q.   All right.  At this time I'd like to publish clips from

21  that same day, January 19th, 2018 at 12 o'clock at

22  59 Fernwood.

23          **THE COURT:** This is from Exhibit 22?

24          **MR. MARANGOLA:** Yes, I'm sorry, Judge.

01:16:42PM 25          **THE COURT:** Thank you.

124

1          **MR. MARANGOLA:** Thank you.

2    **BY MR. MARANGOLA:**

3    Q.   Investigator, I'd like you to tell us in watching this

4    clip when you see the defendant's silver GMC pick-up.

01:17:06PM 5    A.   Okay.  I see it now.

6    Q.   Can you circle it on the screen there?  All right, for the

7    record you've circled the top right portion --

8    A.   Yes.

9    Q.   -- of the photo or of the clip?

01:17:34PM 10   A.   Yes.

11   Q.   All right.  Before observing the defendant's vehicle

12   turning back did you observe it pull into that area, turn

13   right off Fernwood into that area?

14   A.   I observed it traveling westbound on Fernwood Avenue until

01:17:57PM 15   it reached that parking lot.

16   Q.   Okay. All right.

17   A.   The first time I viewed it live I viewed it from coming

18   west on Fernwood Avenue.

19   Q.   Okay.  If you can clear that?  And we'll keep playing the

01:18:14PM 20   video.  Where do you see the defendant's silver GMC going now?

21   A.   Traveling eastbound on Fernwood Avenue.  It's now passing

22   59 Fernwood Avenue.

23   Q.   That was at what time?

24   A.   You asked me the question after you took it off.

01:18:47PM 25   Q.   I'm sorry.  I'll put it back on.  What time was it?

1  A.   It was 12 o'clock and 30 seconds.

2  Q.   All right.  I'd like to publish from the same Exhibit 22

3  the clip on January 19th, 2018, at 12:03 p.m..  Investigator,

4  can you identify the defendant's silver GMC truck in this

01:19:34PM 5  video clip?

6  A.   Yes.

7  Q.   Can you circle it on the photo or on the still?  Thank

8  you.  You've circled the silver pick-up shown on the right

9  side of that image; is that correct?

01:19:47PM 10  A.   Yes.

11  Q.   All right.  And what time is this?

12  A.   12:03:56.

13  Q.   Now, the previous clip we just saw you said that you first

14  observed the defendant's vehicle traveling in which direction?

01:20:04PM 15  A.   Westbound.

16  Q.   Is that the same or different direction than it's

17  traveling right now?

18  A.   The same.

19  Q.   Okay. So this is the second time and this is -- I'm asking

01:20:14PM 20  you on that day while you were watching this live, this is the

21  second time that you saw the defendant's vehicle travel past

22  59 Fernwood westbound?

23  A.   It's the third time I saw it pass by 59 Fernwood, but it's

24  the second time I saw it pass by westbound.

01:20:30PM 25  Q.   You saw westbound, and eastbound which we just saw?

1  A.    Yes.

2  Q.    And then this is heading?

3  A.    Westbound again.

4  Q.    Okay. We can keep going.  Did the defendant's vehicle go

01:21:00PM 5  in the same driveway and turn around in this clip?

6  A.    No, it did not.

7  Q.    Where did it go?

8  A.    It turned northbound on Portland Avenue.

9  Q.    Then it goes out of sight of the camera?

01:21:13PM 10  A.    Yes.

11  Q.    And that was at approximately 12:04?

12  A.    Yes.

13  Q.    Okay. I'd like to now move to the clip on that same day

14  January 19th, 2018 at 59 Fernwood at 12:10 p.m..  If we can

01:21:38PM 15  pause it one second?

16        Now, Investigator, before 12:10 p.m. you saw the

17  defendant's vehicle drive past 59 Fernwood how many times in

18  total?

19  A.    Three times in total.

01:21:55PM 20  Q.    Okay. Before January 19th, 2018, were you -- I think you

21  testified to this earlier, who owned and who owns 59 Fernwood

22  Avenue?

23  A.    Carlos Javier Figueroa.

24  Q.    Okay. So this clip here is at -- beginning at 12:10.  You

01:22:14PM 25  see that?

1    A.    Yes.

2    Q.    And this is after the defendant has driven past the

3    location three times?

4    A.    Yes.

01:22:22PM 5    Q.    All right.  We play here at 12:10.  What do you see

6    happening here?

7    A.    The GMC pick-up truck pulling into the driveway of

8    59 Fernwood Avenue and parking behind the black Kia that's in

9    the driveway.

01:22:43PM 10    Q.    What did you observe there?

11    A.    I observed Carlos Javier Figueroa exit the GMC pick-up

12    truck and walk around to the passenger side of the pick-up

13    truck.

14    Q.    What did you observe there?

01:23:16PM 15    A.    Carlos Javier Figueroa goes up on to the porch of

16    59 Fernwood Street and he's standing at the front door of the

17    residence.  Appeared he knocked on the door.

18    Q.    All right.

19    A.    He enters in the front door of 59 Fernwood Avenue.

01:23:41PM 20    Q.    If we can pause it here?  Investigator, what did you just

21    observe at 12:12 -- shortly before 12:12:24 where we paused

22    it?

23    A.    Carlos Javier Figueroa exiting the front door of

24    59 Fernwood Avenue carrying a box -- U.S. Postal box on his

01:24:25PM 25    shoulder.

1  Q.   Can you slide one of those microphones a little bit closer

2  to you?  I'm sorry.  Thank you.  Can you tell us -- I don't

3  know if you took a look how long he was in the house before he

4  came out carrying that box.  If you didn't notice the time, we

01:24:39PM 5  can rewind it.

6  A.   I honestly didn't notice the time.

7  Q.   Okay.  If you can pause it?  I think that was about

8  12:11:53 the defendant entered 59 Fernwood Avenue; is that

9  right?

01:25:21PM 10  A.   Yes.

11  Q.   All right.  All right, if you can pause it?  Approximately

12  how long was the defendant inside 59 Fernwood Avenue before

13  exiting carrying the box?

14  A.   Less than a minute.

01:26:00PM 15  Q.   All right.  Let's keep playing it.  What do you see now?

16            **MR. VACCA:** Objection, Your Honor, the

17  characterization as a Postal box.

18            **THE COURT:** Overruled.

19            **THE WITNESS:** He carries the box to the GMC pick-up

01:26:21PM 20  truck and appears to put it in the back seat of the pick-up

21  truck.

22            He's now walking around to the driver's side of the

23  GMC pick-up and he's entering the driver's side of the GMC

24  pick-up, and the GMC pick-up truck is backing out of the

01:26:41PM 25  driveway of 59 Fernwood and it goes westbound away from the

1  location.

2          **MR. MARANGOLA:** Judge, I was going to move into

3  another area.  I'm not sure if the Court wishes to stop for

4  today.

01:27:29PM 5          **THE COURT:** This is a good time to break.

6          Ladies and gentlemen, at this time we're going to

7  recess for the day until tomorrow morning at 8:30.  Appreciate

8  your patience and your cooperation.  The jury may step down.

9  Please do not discuss the matter or allow anybody to discuss

01:27:40PM 10 the matter with you.  Have good evening.

11          (**WHEREUPON**, proceedings adjourned at 1:28 p.m.)

12                    *   *   *

13              **<u>CERTIFICATE OF REPORTER</u>**

14

15          In accordance with 28, U.S.C., 753(b), I certify that

16  these original notes are a true and correct record of

17  proceedings in the United States District Court for the

18  Western District of New York before the Honorable Frank P.

19  Geraci, Jr. on April 29th, 2021.

20

21  <u>S/ Christi A. Macri</u>

22  Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter
23

24

25