1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF NEW YORK

3

4

5   - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA              18-CR-6094(G)
6
    vs.
7                                         Rochester, New York
    CARLOS JAVIER FIGUEROA,               April 30, 2021
8            Defendant.                   8:30 a.m.
    - - - - - - - - - - - - -X
9

10                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE FRANK P. GERACI, JR.
11            UNITED STATES DISTRICT CHIEF JUDGE

12

                    JAMES P. KENNEDY, JR., ESQ.
13                  United States Attorney
                    BY: ROBERT A. MARANGOLA, ESQ.
14                      CASSIE M. KOCHER, ESQ.
                    Assistant United States Attorneys
15                  500 Federal Building
                    Rochester, New York 14614
16                  Appearing on behalf of the United States

17

                    PAUL J. VACCA, JR., ESQ.
18                  One East Main Street, Suite 1000
                    Rochester, New York 14614
19                  Appearing on behalf of the Defendant

20
    ALSO PRESENT:      Nicolas Penchaszadeh, Spanish Interpreter
21                     James Hontoria, Spanish Interpreter

22
    COURT REPORTER:    Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
23                     Christimacri50@gmail.com
                       Kenneth B. Keating Federal Building
24                     100 State Street, Room 2640
                       Rochester, New York 14614
25

1                    **I N D E X**

2   **WITNESS FOR THE GOVERNMENT**

3   Joseph Briganti
         Direct examination by Mr. Marangola          Page 274

4

5

6   **EXHIBIT**              **RECEIVED**

7   Government 10              276
    Government 105             282
8   Government 100             300
    Government 367-370         323
9   Government 1-145-655       330
    Government 1-146-657       330
10  Government 1-154-1511      334
    Government 1-155-1513      334
11  Government 99              339
    Government 77              341
12  Government 672             358
    Government 672A            360
13  Government 672B            360

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*    \*    \*

**(WHEREUPON**, the defendant is present).

**THE COURT:** Good morning.

**MR. MARANGOLA:** Good morning.

**MS. KOCHER:** Good morning.

**MR. VACCA:** Good morning, Judge.

**THE COURT:** Before we begin a couple housekeeping matters.  First of all, a couple jurors do have some appointments that we want to obviously provide them with consideration for.

One of the jurors has an appointment at 9 a.m. on May 6th.  If that's the case, I think we might be able to start by 10 a.m., but I'm going to have Ms. Rand check to see if that time works for her.  So it would be we'd start at 10 a.m. on May 6th if that works.

The second juror has an appointment in the afternoon of August 11th.  I'm hoping we're not going to be here, but in case we are, we would go 8:30 to 12:30 that day.  Okay?

Third thing is there's a lawsuit filed by the defendant Carlos Javier Figueroa against a number of individuals, including Ms. Kocher and Mr. Marangola, the witness Mr. Briganti, Agent Hoffmann, the U.S. Attorney James Kennedy, the Monroe County District Attorney Sandra Dorley and

1  David Swain, a retired investigator.

2          I don't think that has any impact on this case.  I

3  wanted to make the parties aware of that.  One thing it does

4  appears to be noted in here is that it's signed by a

09:02:13AM 5  Christopher Thurston.

6          And, Mr. Vacca, you asked me to add that name to

7  the witness list.  Is that the same person, do you know?

8          **MR. VACCA:** I would assume, Your Honor, I know

9  nothing about this lawsuit.

09:02:24AM 10          **THE COURT:** Okay.  I don't even know if anybody has

11  been served.

12          **MR. VACCA:** I think that Christopher Thurston is a

13  paralegal.  I spoke to him.  He's a paralegal and he indicated

14  that he could not help on the case because he's going in for

09:02:39AM 15  back surgery.  That's what he told me.

16          **THE COURT:** Is he on the witness list or not on the

17  witness list?

18          **MR. VACCA:** He's coming here today, so I guess he

19  still is on the list.

09:02:48AM 20          **THE COURT:** If he's on the witness list he cannot be

21  coming in here today.  He'll be sequestered.

22          **MR. VACCA:** Okay, yeah.

23          **MR. MARANGOLA:** Judge, I believe he was in court

24  yesterday I believe we found out.

09:02:57AM 25          **THE COURT:** I didn't know that.

5

1          **MR. MARANGOLA:** We didn't know until afterward.

2          **MR. VACCA:** I didn't know until after I walked out

3 there.

4          **THE COURT:** If Christopher Thurston is on the

09:03:06AM 5 witness list, then he is like any other witness to be

6 sequestered from the course of this trial.

7          **MR. MARANGOLA:** Judge, I haven't seen a copy of the

8 lawsuit, but I agree with the Court, it should have no bearing

9 on us proceeding with the trial.

09:03:22AM 10          **THE COURT:** Mr. Vacca, do you have anything to add

11 on that?

12          **MR. VACCA:** No, Your Honor, other than this is the

13 first I'm hearing of it.

14          **THE COURT:** Okay.  All right, thank you, bring the

09:03:35AM 15 jury out.

16          **MR. VACCA:** Thank you, Judge.

17          (**WHEREUPON**, the jury is present).

18          **THE COURT:** Good morning, ladies and gentlemen. We

19 have a couple adjustments to the calendar I want to make.

09:09:02AM 20 First of all, for next Thursday, May 6th, again to accommodate

21 a juror's appointment we will begin at 10 a.m. that day.  So

22 we'll be in session from 10 a.m. until 1:30 p.m..

23          I previously made the adjustment on May 25th, we'll

24 be in session from 8:30 until 12 p.m..

09:09:29AM 25          Another adjustment will be -- and I hope we're not

1   here then, but August 11th we'll be in session on that date

2   from 8:30 until noon.  8:30 a.m. until 12 o'clock on

3   August 11th if we're still in session then.

4           One other date I really meant to take off the

09:09:53AM 5   calendar, should have before, is May 28th, the Friday before

6   Memorial Day, we will not be in session on that day as well.

7           Okay?  We're ready to begin.  You may continue,

8   Mr. Marangola.

9           **MR. MARANGOLA:** Thank you, Your Honor.

09:10:08AM10   **BY MR. MARANGOLA:**

11   Q.   Good morning.

12   A.   Good morning.

13   Q.   Good morning, Investigator.  Would you please take a look

14   at your screen?  I'd like to show you what's not yet in

09:10:20AM15   evidence as Government's Exhibit 10.  Do you see that on your

16   screen?

17   A.   Yes, I do.

18   Q.   Can you identify what Government's Exhibit 10 is?

19   A.   Yes, it's a telephone list of phones connected to this

09:10:41AM20   investigation.

21   Q.   All right.  Is that a chart with three columns -- one

22   phone number, one user, and then one exhibit number?

23   A.   Yes.

24   Q.   Are the phone numbers that are on that chart, were those

09:10:56AM25   phone numbers that were either intercepted on the wiretap or

1    obtained in phones seized in connection with this wiretap

2    investigation?

3    A.    Yes.

4    Q.    And are the users that are associated with those numbers

09:11:09AM 5    accurately listed based on your wiretap investigation?

6    A.    Yes, they are.

7    Q.    And there's a column next to the third column is exhibit

8    number; is that right?

9    A.    Yes.

09:11:27AM 10    Q.    And those are for phones that were actually seized during

11    the wiretap investigation; is that correct?

12    A.    Yes.

13    Q.    All right. Not all the phones listed on Government's 10

14    were, in fact, seized?

09:11:39AM 15    A.    That's correct.

16    Q.    And, finally, there's asterisks next to some of the

17    numbers and on the bottom of the chart it indicates wiretap

18    phone.  Are the numbers with asterisks accurately listed as

19    phones that were subject to the wiretap authorizations you

09:11:53AM 20    received in connection with this case?

21    A.    Yes.

22    Q.    And for the record, the top three in the center of user

23    column, the user for the first three numbers is blacked out;

24    is that correct?

09:12:08AM 25    A.    Yes.

1 Q.   All right.

2          **MR. MARANGOLA:** Your Honor, at this time I would

3 offer Government's Exhibit 10.

4          **MR. VACCA:** I would object to that, Your Honor.

09:12:14AM 5 This has no relevancy at this point -- up to this point with

6 respect to my client.

7          **THE COURT:** Okay.  Exhibit 10 will be received again

8 subject to connection.

9          **MR. MARANGOLA:** Thank you, Your Honor.

09:12:25AM 10          (**WHEREUPON**, Government's Exhibit 10 was received

11 into evidence).

12 **BY MR. MARANGOLA:**

13 Q.   All right. Investigator, we were -- when we finished

14 yesterday we were talking about surveillance on January 19th,

09:12:43AM 15 2018.  Do you recall that?

16 A.   Yes, I do.

17 Q.   All right.  If we could, I think we ended last with the

18 pole camera footage from approximately 12:10 in the afternoon

19 that day.  If we could pull that up?

09:13:10AM 20          If we could start that about halfway through?  This

21 is the footage that you watched yesterday.  Do you recall

22 that?

23 A.   Yes.

24 Q.   If you can take a note of the time that this clip ends

09:14:07AM 25 after the defendant has pulled out of the driveway at

1  59 Fernwood Avenue.  Did you see the approximate time that

2  ended?

3  A.   Yes.   12:13 and 40 seconds p.m..

4  Q.   All right.   Now, at the time this is being observed on the

09:15:04AM 5  pole camera monitors in the wire room, are you also able to

6  observe the activities that at other locations where the pole

7  cameras are set up?

8  A.   Yes.   The system has the ability to change the tiles.  So,

9  for example, if there's five cameras, you can put five tiles

09:15:22AM 10  up and watch five different locations; or you can change that

11  and watch one location on each -- you can just change it for

12  the amount of cameras that you have up to be able to view them

13  all or be able to view one at a time.

14  Q.   All right.   If we could play the clip from that same day

09:15:41AM 15  January 19th at 12:25?  Do you recognize the location in this

16  clip?

17  A.   Yes.   It's 292 Barrington Street.

18  Q.   Can you tell us what just occurred there?

19  A.   Yes.   The GMC pick-up just pulled into the driveway and

09:16:06AM 20  parked behind the Acura TL.

21  Q.   And this was approximately ten minutes after the prior

22  clip ended?

23  A.   Yes.   It looks like approximately 13 minutes after.

24  Q.   Did you see anything there?

09:18:05AM 25  A.   Yes.   It appears Carlos Javier Figueroa exited the

1  driver's side of the vehicle and is approaching 292 Barrington

2  Street, appears he's on the porch of 292 Barrington Street.

3  It appears --

4  Q.    Then what happened?

09:18:33AM 5  A.    Appears he just entered into the location.

6  Q.    All right.  Now, can you point to who we just saw in those

7  two pole camera footage clips at 12:10 and 12:25 on January

8  19th in Government's Exhibit 26?

9  A.    Yes.  The individual at the top.

09:19:23AM 10  Q.    All right.  And the last clip we saw the defendant walked

11  into 292 Barrington Street; is that correct?

12  A.    Yes.

13  Q.    And 292 Barrington Street was the residence of who during

14  the wiretap investigation?

09:19:38AM 15  A.    Leitscha Poncedeleon and Roberto Figueroa.

16  Q.    And where are they on Government's Exhibit 26?

17  A.    They're the line below him.  This is Leitscha Poncedeleon

18  to the left, and this is Roberto Figueroa to the right of her.

19  Q.    You made circles on the second row; is that correct?

09:20:00AM 20  A.    Yes.

21  Q.    All right.  If we can go now back to the pole camera

22  footage for 12:30 on that same day January 19th?  Let me pause

23  it there.  Investigator, during your -- the investigation --

24  in the course of your surveillance activities, both in person

09:20:36AM 25  and watching pole camera footage, did you become familiar with

1 the appearances of Roberto Figueroa and Leitscha Poncedeleon?

2 A.   Yes.

3 Q.   Can you tell the jury approximately how many times you saw

4 Roberto Figueroa and Leitscha Poncedeleon in the course in

09:20:53AM 5 person surveillance?   We'll start there.

6          MR. VACCA:  Object, Your Honor, this is repetitive.

7 We went through this yesterday, the same questions.

8          THE COURT:  No, overruled.   Go ahead.

9          THE WITNESS:  So I've seen Roberto Figueroa I would

09:21:08AM10 say at least 25 times in live surveillance; over the pole

11 camera I'm certain I've seen him at least 50 times on the pole

12 camera.

13 BY MR. MARANGOLA:

14 Q.   All right.   How about Leitscha Poncedeleon?

09:21:21AM15 A.   Leitscha probably between 15 and 20 times live; and then

16 again at least 50 times on the pole camera footage.

17 Q.   Based on those observations are you familiar with the

18 general size and shape of Roberto Figueroa and

19 Ms. Poncedeleon?

09:21:41AM20 A.   Yes.

21 Q.   All right.   Can you tell the jury in this clip here that

22 we have paused on January 19th, 2018, at 292 Barrington Street

23 who is shown in that clip at 12:30 and 40 seconds?

24          MR. VACCA:  Objection, Your Honor, repetitive.   We

09:21:57AM25 did this yesterday.

1          **THE COURT:** I don't believe so.  Overruled.

2          **THE WITNESS:** That's Roberto Figueroa.

3    **BY MR. MARANGOLA:**

4    Q.   All right. Could we keep going?  Thank you.  What do you

09:22:30AM 5    see Roberto Figueroa doing?

6    A.   He's retrieving something from the back of the GMC and

7    it's the U.S. Postal box that was placed in the back.

8    Q.   What's he doing with it?

9          **MR. VACCA:** Objection, Your Honor.

09:22:44AM 10         **THE COURT:** Overruled.

11         **MR. VACCA:** We don't know it's the same box.

12         **THE COURT:** He didn't say it was the same box.  He

13   said it was a Postal box.  Overruled.

14   **BY MR. MARANGOLA:**

09:22:56AM 15   Q.   What did Roberto Figueroa just do with the box that he

16   retrieved from the silver GMC pick-up truck?

17   A.   He walked in the front door of 292 Barrington Street

18   carrying the box.

19   Q.   All right.  Now, we talked about intercepted calls

09:23:18AM 20   yesterday on January 19th -- I'm sorry, intercepted text

21   messages with respect to tracking numbers for packages that

22   were to be delivered on January 19th and January 20th.  Do you

23   remember those?

24   A.   Yes.

09:23:29AM 25   Q.   And we just viewed footage from January 19th, 2018.  Was

1   there surveillance activities also on January 20th, 2018,

2   based on those text messages that we showed the jury

3   yesterday?

4   A.   Yes.

09:23:48AM 5   Q.   All right.  What -- can you describe what type of

6   surveillance was conducted on January 20th?

7   A.   Again, there was both live surveillance and pole camera

8   surveillance.

9   Q.   All right.  I'd like to show you what is not in evidence

09:24:06AM 10   as Government's 105.  Do you recognize what's shown in

11   Government's Exhibit 105?

12   A.   Yes.

13   Q.   Can you describe what's shown in Government's Exhibit 105?

14   A.   Yes.  It's an aerial view of the apartments at William

09:24:38AM 15   Warfield Drive.

16   Q.   All right.  Is that a location in the City of Rochester?

17   A.   Yes, it is.

18   Q.   Are you familiar with the area shown in the aerial photo

19   marked Government's Exhibit 105?

09:24:50AM 20   A.   Yes.

21   Q.   How are you familiar with it?

22   A.   I've conducted several investigations in this general

23   area.  I've been in this area numerous times.

24   Q.   All right.  In the course of your career as a police

09:25:03AM 25   officer?

1  A.   Yes.

2  Q.   This aerial photo also shows listed Joseph Avenue and

3  Upper Falls Boulevard in addition to William Warfield Drive;

4  is that right?

09:25:12AM 5  A.   Yes, sir.

6  Q.   Are the streets that are labeled on this aerial photograph

7  accurately labeled based on your familiarity with the area?

8  A.   Yes.

9  Q.   And then there's one location marked 99.  Do you see that?

09:25:24AM 10  A.   Yes, I do.

11  Q.   Do you know what that designates?

12  A.   Yes.  That's the address at 99 William Warfield Drive.

13  Q.   All right.  Is that an apartment building?

14  A.   Yes.

09:25:36AM 15  Q.   And does the 99 accurately reflect the location of the

16  apartment building at 99 William Warfield Drive based on your

17  familiarity with the area?

18  A.   Yes, it does.

19              **MR. MARANGOLA:** At this time I'd offer Government's

09:25:47AM 20  105.

21              **MR. VACCA:** Objection, Your Honor, grounds of

22  relevancy.

23              **THE COURT:** Overruled.  Exhibit 105 will be

24  received.

09:25:53AM 25              (**WHEREUPON**, Government's Exhibit 105 was received

1  into evidence).

2  **BY MR. MARANGOLA:**

3  Q.   Investigator, is what's shown in Government's 105 part of

4  the area that you conducted surveillance activities on January

09:26:10AM 5  20th, 2018?

6  A.   Yes, they were.

7  Q.   All right.  Now, you indicated I think there was both pole

8  camera surveillance and live surveillance on the 20th?

9  A.   Yes.

09:26:24AM 10  Q.   All right.  What was -- what type of surveillance did you

11  personally conduct on January 20th?

12  A.   I was involved in the live surveillance on that day.

13  Q.   All right. Nonetheless, have you reviewed the footage of

14  the pole camera surveillance that was conducted while you were

09:26:40AM 15  on the street?

16  A.   Yes, I did.

17  Q.   All right.  When you say live, you're talking about in

18  person surveillance?

19  A.   Yes.

09:26:48AM 20  Q.   Like physically being in a car and driving around?

21  A.   Yes.

22  Q.   Okay. Can you tell the jury about the surveillance

23  activities that were conducted on January 20th, 2018?

24  A.   Yes.  So I asked officers to assist me with live

09:27:10AM 25  surveillance again at 59 Fernwood Avenue.  So we went into the

1    area of 59 Fernwood Avenue while other officers were viewing

2    the pole camera footage.

3    Q.    Was there a particular time that you went to the area of

4    59 Fernwood Avenue on January 20th, 2018?

09:27:31AM 5    A.    Yes.  I believe we arrived in the area sometime around 11

6    a.m. in the morning.

7    Q.    And why that particular time did you go to the area of 59

8    Fernwood Avenue that day?

9    A.    Because we knew that the Postal delivery truck would be

09:27:42AM 10   dropping off a package sometime between 11 and 11:30 a.m. to

11   59 Fernwood Avenue.

12   Q.    All right.  And did you after -- so you and a couple of

13   other officers, a team of officers went out to the area of 59

14   Fernwood Avenue?

09:28:01AM 15   A.    Yes.

16   Q.    Did you park right next to 59 Fernwood Avenue?

17   A.    No.

18   Q.    Did you park across the street from 59 Fernwood Avenue?

19   A.    No.

09:28:07AM 20   Q.    Why not?

21   A.    Well, two reasons.  One is because we had a pole camera to

22   be able to capture any events that happened at 59 Fernwood.

23   And, number two, we didn't want anyone to see us sitting

24   there, so we were on side streets.

09:28:25AM 25   Q.    Now, while you were on side streets in the area of

1   Fernwood Avenue were you in communication with both -- other

2   surveillance officers in the Fernwood Avenue area?

3   A.   Yes.

4   Q.   What about individuals watching the pole camera footage

09:28:40AM 5   back in the monitor rooms in the Rochester Police Department?

6   A.   Yes, we were all speaking on the same police channel.

7   Q.   All right.  Can you explain the purpose of that?

8   A.   So that we can communicate between the two of us the

9   activities that are happening and they can relay to us what's

09:29:00AM 10   happening at the location and then we can perform our

11   surveillance operations from that point.

12   Q.   When you say they can relay to us, who are you referring

13   to as the --

14   A.   I'm sorry, the law enforcement that's actually watching

09:29:13AM 15   the pole camera footage from the wire room.  In this

16   particular case it was ATF Special Agent Patrick Hoffmann.

17   Q.   Okay. Can we play the footage for January 20th at 11:22?

18   What did we see here so far?

19   A.   So the U.S. Postal truck just parked along the curb in

09:30:29AM 20   front of 59 Fernwood Avenue.

21   Q.   Can you tell us what are you seeing?

22   A.   Yes.  The Postal carrier is taking a package from his

23   truck up towards the front of 59 Fernwood Avenue on a cart and

24   bringing it up on to the porch of 59 Fernwood Avenue.

09:32:50AM 25   Q.   What's happening now?

1   A.   He's going back to his truck, the Postal carrier is going

2   back to his truck.

3   Q.   Without the package?

4   A.   Correct.  Appears he left the package on the porch.

09:33:21AM 5   Q.   All right.  I'd like you to take a look at the time that

6   this clip ends here.  Did you see that?

7   A.   Yes.  11:26 and 8 seconds a.m.

8   Q.   Now, were there any calls intercepted over the wiretap

9   after this Postal delivery?

09:33:42AM 10   A.   Yes.

11   Q.   Investigator Briganti, I'd like you to pull out

12   Government's Exhibit 1, the wiretap binder, and flip to tab

13   1-92.  Do you see that?

14   A.   Not yet.

09:34:17AM 15   Q.   Okay.

16   A.   Okay.

17   Q.   All right.  Does the -- does the transcript behind tab

18   1-92 -- 1-92-350 reflect a call that was intercepted over the

19   wiretap?

09:34:50AM 20   A.   Yes.

21   Q.   Are your initials next to the call data at the top of that

22   indicating that they're accurate?

23   A.   Yes.

24   Q.   Can you tell us the date and time of that call?

09:35:00AM 25   A.   Yes, it was January 20th of 2018 at 11:26:31.

```
 1   Q.   11:26 and 31 seconds?

 2   A.   Yes.

 3   Q.   A.m.?

 4   A.   Yes.

 5   Q.   That's approximately how long after the end of the pole

 6   camera clip we just saw?

 7   A.   Approximately 20 seconds.

 8   Q.   Can you tell the jury what's the target telephone number

 9   that this call was intercepted over?

10   A.   585-766-8057.

11   Q.   And is this an incoming or outgoing call?

12   A.   It's an incoming call.

13   Q.   To that target telephone number you just mentioned?

14   A.   Yes.

15   Q.   And what's the number that called in to the target

16   telephone number 766-8057?

17   A.   585-351-3834.

18   Q.   All right.  I'd like you to look on your screen -- if we

19   could put -- you see Government's 10 on your screen?

20   A.   Yes, I do.  Now I don't.

21   Q.   It's coming back.  We're getting it back.  Is that it on

22   now?

23   A.   It is, yes.

24   Q.   Okay.  Is the target telephone number listed on

25   Government's Exhibit 10?
```

09:35:10AM (line 5)
09:35:37AM (line 10)
09:35:53AM (line 15)
09:36:24AM (line 20)
09:36:41AM (line 25)

1  A.    Yes, it is.

2  Q.    Where is it listed?

3  A.    It's in black five from the bottom.

4  Q.    No, is the target telephone number listed?

09:36:55AM 5  A.    Oh, I'm sorry.  Yes, the target telephone number is

6  listed.

7  Q.    Where is it?

8  A.    It's at the top of the list.

9  Q.    Can you -- and what color is it in?

09:37:04AM 10  A.    Red.

11  Q.    Which number in the list is it?

12  A.    It's the first line -- 766-8057 is the first line.

13  Q.    Okay. And do you see -- if you can clear that?  Do you see

14  the number that dialed in to 766-8057 during that call on

09:37:30AM 15  January 20th at 11:26 and 31 seconds?

16  A.    Yes, I do.

17  Q.    And can you circle that number on Government's Exhibit 10?

18  A.    Yes.  It's in black, it's five from the bottom.

19  Q.    And whose number was that?

09:37:44AM 20  A.    Ingrid Mercado.

21  Q.    And that's 351-3834; is that correct?

22  A.    Yes.

23  Q.    All right.  Now, if you could, I'd like you to flip back

24  to the call from yesterday behind tab 1-72?  It's

09:38:25AM 25  1-72-273,0,0.

1  A.    Okay.

2  Q.    Is that the call that you identified yesterday in

3  connection with the surveillance on January 19th?

4  A.    Yes.

09:38:36AM 5  Q.    Can you tell the jury are the -- is the target telephone

6  number for this call the same or different than the target

7  telephone number we just looked at behind tab 1-92-350?

8  A.    It's the same number.

9  Q.    And how about the call -- the number that called into the

09:38:58AM 10  target telephone number?

11  A.    Again it's the same number.

12  Q.    And that's 351-3834?

13  A.    Yes.

14  Q.    Used by Ingrid Mercado?

09:39:07AM 15  A.    Yes.

16  Q.    All right.  If we can now go to pole camera footage back

17  to the 20th -- where we were on January 20th?  And go to the

18  next clip I think at 12:01.  And what location is this

19  showing, Investigator Briganti, at 12:01?

09:39:43AM 20  A.    It's 292 Barrington Street.

21  Q.    Can you identify the individuals who just exited 292

22  Barrington Street at approximately 12:01?

23  A.    In this clip I can tell you that Leitscha Poncedeleon is

24  in the front.

09:40:03AM 25  Q.    All right.  Can we keep playing it?  Can you identify the

```
      1  people by their clothing?
      2  A.   Yes.  It's Leitscha Poncedeleon getting in the driver's
      3  side and Roberto Figueroa getting in the passenger side of the
      4  Nissan Altima.
09:40:22AM  5  Q.   And Roberto Figueroa is wearing the white tank top again
      6  with the red shorts?
      7  A.   Yes.
      8  Q.   What just happened there?
      9  A.   They both got into the Nissan Altima and the Nissan Altima
09:40:42AM 10  backed out of the driveway.
     11  Q.   All right.  That was at approximately 12:01?
     12  A.   Yes.
     13  Q.   All right. Go to the next clip.  What's the start time for
     14  this clip?
09:40:53AM 15  A.   12:13 and 12 seconds.
     16  Q.   And this is showing what area?
     17  A.   59 Fernwood Avenue.
     18  Q.   Can you tell us what just happened at 12:13?
     19  A.   Yes, the Nissan Altima just pulled into the driveway of 59
09:41:10AM 20  Fernwood Avenue and parked behind the black Kia.
     21  Q.   Is that the same or different location than the defendant
     22  parked in his silver GMC the day before?
     23  A.   That's the same location.
     24  Q.   What just happened here at 12:13?
09:41:35AM 25  A.   Roberto Figueroa is on the porch knocking on the front
```

1  door of 59 Fernwood Avenue.

2  Q.   What just happened here?

3  A.   He's exiting the location carrying a Postal box on his

4  shoulder.

09:41:56AM 5  Q.   Now, as he was walking from the location carrying that

6  box, did you also see something else?

7  A.   Yes.  Leitscha Poncedeleon passed him going up towards 59

8  Fernwood Avenue.

9  Q.   All right.  Maybe we can pull that back a little bit maybe

09:42:18AM 10  about halfway?  Can you tell us when you're watching it when

11  you see that and we'll pause it?

12  A.   Right there.

13  Q.   And we just saw Leitscha Poncedeleon walking up the

14  stairs?

09:42:39AM 15  A.   Yes.  She's standing -- she's standing on the stairway

16  right now.

17  Q.   Do you see what she -- was she carrying anything?

18  A.   She had a black backpack on.

19  Q.   All right.  And that was as Roberto Figueroa was walking

09:42:54AM 20  back from the location with the box to the car?

21  A.   Yes.

22  Q.   All right.  What just happened there?

23  A.   Roberto Figueroa is placing the box in the trunk of the

24  Nissan Altima and he just got back in the passenger side of

09:43:34AM 25  the Nissan Altima.

1  Q.    What just happened there?

2  A.    Leitscha Poncedeleon is coming from the location, she

3  still has the black backpack and she just entered the driver's

4  side of the Nissan Altima.

09:44:01AM 5  Q.    If we can pause it here?  Investigator Briganti, are you

6  continuing your live or in person surveillance with other

7  members of the team as this activity is occurring on January

8  20th, 2018?

9  A.    Yes.

09:44:20AM 10  Q.    And you're already being relayed what's being observed by

11  other individuals on these pole cameras as you're conducting

12  that surveillance?

13  A.    Yes.

14  Q.    If we can keep going?  What just happened there?

09:44:53AM 15  A.    They just backed out of the driveway of 59 Fernwood Avenue

16  and they're heading westbound towards Portland Avenue.

17  Q.    That's at 12:15?

18  A.    Yes.

19  Q.    Now, did you and your surveillance team pick up that

09:45:10AM 20  Nissan Altima at some point and follow them?

21  A.    Yes.

22  Q.    Where did you follow them to?

23  A.    292 Barrington Street.

24  Q.    If we can go to the next clip at 12:26?  What's shown in

09:45:23AM 25  this location in this pole camera clip?

1  A.    The Nissan Altima pulling into the driveway of 292

2  Barrington Street.

3  Q.    And that's at 12:26 p.m.?

4  A.    Yes.

09:45:33AM 5  Q.    Tell us what just happened there.

6  A.    Roberto Figueroa just exited the passenger side of the

7  vehicle.

8  Q.    What's he doing now?

9  A.    He's removing the Postal box from the trunk of the Nissan

09:46:02AM 10  Altima.

11  Q.    What did he do there?

12  A.    He just carried the Postal box into 292 Barrington Street

13  through the front door.

14  Q.    All right.  If we can pause that there?  Okay, now,

09:46:58AM 15  when -- after surveilling Leitscha Poncedeleon and Roberto

16  Figueroa drive back to 292 Barrington Street, what did you do?

17  A.    I stayed in the area of 292 Barrington Street.

18  Q.    All right.  And were you waiting to be relayed additional

19  info from police officers or Agent Hoffmann in the wire room?

09:47:23AM 20  A.    Yes.

21  Q.    All right.  What happened next in connection with your

22  surveillance?

23  A.    So I -- I understood that they were going to be leaving

24  again very shortly, so I stayed in the area.

09:47:51AM 25  Q.    All right.  Can we go to the next clip at 12: -- I think

1   our next clip is actually 12:36.  Actually, no, I think we

2   need to jump back one.  12:26, let's go back to the 12:26

3   clip.  That's the one we saw them pull in?

4   A.   Yes.

09:48:19AM 5   Q.   Can we fast forward to the last quarter of that clip

6   maybe?  Can you tell us what's happening here at approximately

7   12:27?

8   A.   Yes, Roberto Figueroa just exited the front door of 292

9   Barrington Street and he's entering the passenger side of the

09:49:05AM 10   Nissan Altima.

11   Q.   Now, again were you sitting in front of 292 Barrington

12   Street?

13   A.   No.

14   Q.   Where were you in the area?

09:49:30AM 15   A.   I was down the street.  I was on Barrington Street but I

16   was down the block a little bit.

17   Q.   Okay.  Can you tell us what happened there?

18   A.   Yes, the vehicle just backed down the driveway.

19   Q.   And then one more time.  Now, after the Nissan Altima left

09:50:10AM 20   292 Barrington Street there at approximately 12:28 or 12:29

21   did you surveil it anywhere?

22   A.   Yes.

23   Q.   Where did you surveil it?

24   A.   100 Baden Street, the parking lot at 100 Baden Street.

09:50:22AM 25   Q.   All right.  If we can go to the clip on the same day

1   January 20th at 12:55?  Can you tell us what's shown in this

2   clip?

3   A.   Yes, it's the parking lot of 100 Baden Street and the

4   Nissan is parked and there's a red Mustang that's pulling up

09:50:43AM 5   next to the Nissan where it's parked.

6   Q.   Hold on.  I clipped a clip.  We saw them leave at

7   approximately 12:29 from Barrington?

8   A.   Yes.

9   Q.   Can we show the 12:36 clip?  This is approximately seven

09:51:12AM 10   minutes later.  It's showing the area of Baden Street; is that

11   right?

12   A.   Yes.

13   Q.   Can you tell us what you just observed there?

14   A.   There's two vehicles pulling into the parking lot.  The

09:51:21AM 15   first one is the Nissan Altima and it's parking in one of the

16   parking slots up towards the building.

17   Q.   That was at 12:36?

18   A.   Yes.

19   Q.   P.m.?

09:51:36AM 20   A.   Yes.

21   Q.   All right.  And you followed the vehicle into the

22   location?

23   A.   Yes.  We didn't follow it into the complex, but we

24   followed it until it turned into the complex.

09:51:49AM 25   Q.   Okay. Now, if we can go to the next clip at 12:55?  Is

1    this the same area, the apartment complex at Baden?

2    A.    Yes.

3    Q.    What just happened there?

4    A.    Red Mustang just pulled into the parking lot and it's

09:52:07AM 5    pulling into a spot next where the Nissan Altima is parked.

6    Q.    What do you see there?

7    A.    Roberto Figueroa is actually in the passenger side of the

8    Nissan Altima and he has a backpack in his hand.

9    Q.    What just happened there?

09:52:39AM 10    A.    The driver of the red Mustang, Orlando Yelder, just exited

11    and they're both at the rear of the red Mustang.

12    Q.    All right.

13    A.    With the trunk open.

14    Q.    And Orlando Yelder just exited the driver's side of the

09:52:56AM 15    Mustang?

16    A.    Yes.

17    Q.    All right.  What just happened there?

18    A.    Orlando Yelder took a backpack from the trunk of the red

19    Mustang.  Roberto Figueroa still had the black backpack that

09:53:13AM 20    he exited the Nissan with and Roberto Figueroa got into the

21    passenger side of the Mustang and Orlando Yelder got into the

22    driver's side of the Mustang.

23    Q.    While this is occurring are you in the area with your

24    surveillance team?

09:53:46AM 25    A.    Yes.

1    Q.    But, again, you're not in parking spaces right next to

2    these guys?

3    A.    No.

4    Q.    At some point do you have to make a plan to decide which

09:54:15AM 5    of these two vehicles to follow?

6    A.    Yes.  During this process we were doing -- I was doing

7    that.  I was communicating to officers what we needed to

8    follow.

9    Q.    What did you decide to do?

09:54:30AM 10    A.    I asked a few of the officers to follow the Nissan and

11    then the rest of us -- I wanted us to follow the red Mustang

12    to see where Orlando Yelder went.

13    Q.    All right.  So you followed the red Mustang and other

14    officers followed the Nissan Altima?

09:54:45AM 15    A.    Yes.

16    Q.    After this event here?

17    A.    Yes.

18    Q.    I would ask to fast forward it, but I know as soon as I do

19    I'll miss what I want to see and I'll have to ask Ms. McCreedy

09:56:47AM 20    to pull it back, so just bear with me.

21             Investigator Briganti, of the three people in this

22    clip here -- Leitscha Poncedeleon in the Nissan Altima,

23    Orlando Yelder and Roberto Figueroa in the Mustang -- at the

24    time of this clip the investigative team is wiretapping all

09:58:46AM 25    three of their phones; is that correct?  On January 20th?

1 A.    Yes.  There's four phones.

2 Q.    Four phones.  When you say four phones, explain that.

3 A.    There were two of Roberto Figueroa's phones, Orlando

4 Yelder had one phone, and Leitscha Poncedeleon we were on one

09:59:09AM 5 phone.

6 Q.    Okay. When you say had one phone, you mean you were just

7 wiretapping one phone?

8 A.    Yes, we were only listening to one of the phones, yes.

9 Q.    A wiretap authorization order, Investigator Briganti,

09:59:37AM 10 authorizes you to listen to a particular phone number,

11 correct?

12 A.    Yes.

13              **MR. VACCA:** Objection.

14              **THE COURT:** Overruled.  Go ahead.

09:59:45AM 15 **BY MR. MARANGOLA:**

16 Q.    Does it allow you to -- does it authorize you to listen to

17 every phone used by a person?

18 A.    No.

19 Q.    It's limited to just the phone number that you seek

09:59:59AM 20 authorization for?

21              **MR. VACCA:** Objection, leading.

22              **THE COURT:** It is leading, but I'm going to overrule

23 at this time.  It's pretty fundamental.  Go ahead.

24              **THE WITNESS:** Only the phone that's contained in the

10:00:11AM 25 application for the wiretap.

**BY MR. MARANGOLA:**

Q.   Okay.  Can you tell us what's happening here at 1:05?

A.   Yes.  Roberto Figueroa just exited the passenger side of the red Mustang and he's talking to Orlando Yelder or someone in the car through the passenger side.  He has the black backpack in his hand still and he's walking back over to the passenger side of the Nissan Altima and entering the Nissan Altima.

Q.   And you said it appeared to be -- Roberto Figueroa appeared to be talking to someone in the Mustang.

Did you see anyone other than Orlando Yelder get in or out of that car besides Roberto Figueroa?

A.   We didn't see anyone else in the vehicle, no.

Q.   Okay.  What's happening there?

A.   The red Mustang is leaving out towards Joseph Avenue and so is the Nissan Altima.

Q.   And what happened there?

A.   The Nissan Altima went north on Joseph Avenue and the red Mustang went south.

Q.   All right.  Where did you follow -- you and your surveillance team follow that red Mustang being driven by Orlando Yelder after it turned onto Joseph from Baden?

A.   We followed it out to 2519 Brighton Henrietta Townline Road.

Q.   Let me show you what's not in evidence as Government's

1  Exhibit 100.  Do you see that on your screen?

2  A.   Yes, I do.

3  Q.   What's shown on your screen as Government's Exhibit 100?

4  A.   That's 2519 Brighton Henrietta Townline Road.

10:04:39AM 5  Q.   Is that the location that you surveilled Orlando Yelder

6  drive his Mustang back to after what we just observed on

7  January 20th at the Baden Street complex?

8  A.   Yes.

9  Q.   Does the photograph Government's 100 fairly and accurately

10:04:57AM 10  show 2519 Brighton Henrietta Townline Road as it existed that

11  day?

12  A.   Yes.

13  Q.   All right.

14       MR. MARANGOLA: At this time I'd offer Government's

10:05:06AM 15  100.

16       MR. VACCA: Objection, Your Honor, on grounds of

17  relevancy.

18       THE COURT: Overruled.  Exhibit 100 will be

19  received.

10:05:12AM 20       (WHEREUPON, Government's Exhibit 100 was received

21  into evidence).

22  BY MR. MARANGOLA:

23  Q.   Now, you indicated that while your team was following

24  Yelder to 2519 -- those are in evidence here, right, Judge?

10:05:31AM 25       THE COURT: 100 is in evidence.

1          **MR. MARANGOLA:** Thank you.

2    **BY MR. MARANGOLA:**

3    Q.   While your team was following Yelder to this location

4    here, other members followed the Nissan Altima?

10:05:40AM 5    A.   Yes.

6    Q.   All right.  If we could go to the next pole camera clip?

7    At 1:12 p.m., we can pause it here.  What area are we seeing

8    on this camera on this clip at 1:12 p.m.?

9    A.   This is Burbank Street and the first white house on the

10:06:14AM 10   left side of the screen is 6 Burbank Street.

11   Q.   All right.  Let's play it.  Can you tell us what you see

12   there?

13   A.   Yes, the Nissan Altima is pulling into the driveway of 6

14   Burbank Street and it pulled up into the driveway.

10:06:36AM 15   Q.   That's the residence of who?

16   A.   Carlos Javier Figueroa and Nisharya Gutierrez and their

17   children.

18   Q.   Go to the next clip at 1:20 on January 20th.  This is from

19   what area?

10:07:11AM 20   A.   6 Burbank Street or Burbank Street, and it's a photograph

21   of 6 Burbank Street or it's in the image.

22   Q.   What do you see there?

23   A.   Seeing the Nissan Altima backing out of the driveway of 6

24   Burbank Street onto Burbank Street.

10:07:36AM 25   Q.   And that's ending at approximately what time?

1   A.    Looked like 1:20:43.

2   Q.    If we can go to the next clip at 1:32 p.m.?  What location

3   is this?

4   A.    292 Barrington Street.

10:07:54AM 5   Q.    What just happened there?

6   A.    The Nissan Altima parked in the driveway, Roberto Figueroa

7   is exiting the passenger side of the Nissan Altima and

8   Leitscha Poncedeleon exited the driver's side, walked around

9   the vehicle and are walking to the front door of 292

10:08:32AM 10   Barrington Street.

11   Q.    What just happened there?

12   A.    Leitscha Poncedeleon and Roberto Figueroa entered the

13   front door of 292 Barrington Street.

14   Q.    All right.  We'll pause that clip there.  If we can go to

10:09:07AM 15   the next clip at 1:33, which is approximately the same time as

16   we ended that last clip; is that right?

17   A.    Yes.

18   Q.    And what clip is shown here -- what area is shown here

19   starting at 1:33?

10:09:20AM 20   A.    This is the area of Burbank Street.

21   Q.    Can you tell us what you see here coming down the street?

22   Pause it there.  Did you see anything occurring at the

23   defendant's driveway at 6 Burbank at approximately 1:34?

24   A.    Yes, the GMC -- the silver GMC pick-up is backing out of

10:10:12AM 25   the driveway.

1   Q.   All right.  Let's keep going.  Can you tell yet what's

2   coming down Burbank Street?

3   A.   Yes, it appears to be two marked patrol cars, Rochester

4   Police Department patrol cars.

10:10:28AM 5   Q.   Can you describe their speed?

6   A.   Slow, they're traveling slowly down the street westbound

7   on Burbank Street.

8   Q.   That's toward which intersection?

9   A.   Toward North Clinton Avenue and Burbank Street.

10:10:46AM10   Q.   What do you see happening here at approximately 1:35?

11   A.   The GMC pick-up is backing out of the driveway of 6

12   Burbank Street and headed westbound towards North Clinton

13   Avenue on Burbank Street.

14   Q.   And it comes out of view heading towards North Clinton

10:11:39AM15   Avenue approximately 1:35?

16   A.   Yes.

17   Q.   If we can go to the next clip at 1:59?  What area is shown

18   in this pole camera?

19   A.   292 Barrington Street.

10:11:57AM20   Q.   What did you just see happen at 1:59?

21   A.   Silver GMC pick-up pulled on to where the grass

22   portion of like the front lawn of 292 Barrington Street and

23   parked.

24   Q.   Parked on the snow there?

10:12:16AM25   A.   Yes.

1  Q.   Did you see there what just happened with the clip?  Is

2  that one of those glitches you were referring to earlier?

3  A.   Yes.

4  Q.   What do you see there?

10:12:40AM 5  A.   Carlos Javier Figueroa exited the driver's side of the GMC

6  pick-up and is walking up towards the front of 292 Barrington

7  Street.  He's on the porch of 292 Barrington Street.  And he

8  just entered into the front door of 292 Barrington Street.

9  Q.   All right.  Now, after you surveilled Orlando Yelder drive

10:13:22AM10  to 2519 Brighton Henrietta Townline Road while other team

11  members were surveilling the Nissan Altima, where did you go?

12  A.   I went back into the area of Barrington Street.

13  Q.   All right.  And what, if anything, happened while you were

14  conducting in person surveillance in the area of Barrington

10:13:47AM15  Street after returning there from following Orlando Yelder out

16  to Brighton Henrietta Townline Road?

17  A.   There were calls that were intercepted over the wiretap.

18  Q.   All right.  And did you make any surveillance observations

19  while you were on surveillance in person in the area of

10:14:10AM20  Barrington in that timeframe in the afternoon shortly after

21  the defendant walked into 292 Barrington Street?

22  A.   I eventually followed the Nissan that left 292 Barrington

23  Street.

24  Q.   All right.  And that clip that we just saw the defendant

10:14:29AM25  entered at approximately a little bit after -- a few minutes

1  after 2 o'clock?

2  A.   Yes.

3  Q.   All right.  Can we go to the next clip?  And this is at

4  2:29 p.m.  What location is this showing?

10:14:45AM 5  A.   292 Barrington Street.

6  Q.   Can you pause it?  Do you see the defendant's silver GMC

7  pick-up?

8  A.   Yes, I do.

9  Q.   Does that appear to be in the same or different location

10:14:59AM 10  than it was when we just saw him pull it in a few minutes

11  after 2?

12  A.   It appears to be in the same place.

13  Q.   All right.  Who did you just observe exit 292 Barrington

14  Street?

10:15:11AM 15  A.   Leitscha Poncedeleon.

16  Q.   If we can play?  Can you tell if she's carrying anything?

17  A.   She has a backpack on, a black backpack and she's entering

18  the driver's side of the Nissan Altima.

19  Q.   And this is at approximately 2:30.  What's happening?

10:15:47AM 20  A.   The Nissan Altima is backing out of the driveway of 292

21  Barrington Street.

22  Q.   After that occurred did you engage in surveillance

23  observations of the Nissan Altima after it left 292 Barrington

24  Street at approximately 2:30?

10:16:05AM 25  A.   Yes.

1  Q.   Can you describe for the jury where you observed Leitscha

2  Poncedeleon go in the Nissan Altima after she left 292

3  Barrington Street at approximately 2:30?

4  A.   Yes.  So myself and Investigator Myron Moses followed the

10:16:26AM 5  Nissan Altima from 292 Barrington Street directly to the area

6  of William Warfield.  I observed the Nissan pull into the

7  complex at 99 William Warfield and I passed the complex on

8  Joseph Avenue.

9       I then went back into the complex and observed the

10:16:49AM 10  Nissan Altima parked in front of 101 to 107 -- the building of

11  101 to 107, and observed Leitscha Poncedeleon walking down the

12  sidewalk in front of 101 to 107 carrying the backpack.

13  Q.   Can you show us -- now that we have Government's 105, the

14  aerial photo of the William Warfield Drive apartments, can you

10:17:17AM 15  show us where you observed Leitscha Poncedeleon?

16  A.   She came in from Joseph Avenue here.  Came in, the vehicle

17  was parked here and I observed her walking down the sidewalk

18  here.

19  Q.   All right.  Where did you go and where were you as you

10:17:43AM 20  made those observations of her driving down William Warfield

21  Drive and park it?

22  A.   Well, I didn't observe her park.

23  Q.   What did you observe her do?

24  A.   I observed her walking.  I observed her vehicle already

10:17:57AM 25  parked and then I observed her walking on the sidewalk

1   carrying a backpack.

2   Q.   And she was walking toward what location?

3   A.   99.

4   Q.   All right.  And after she went toward 99, what did you do?

10:18:14AM 5   A.   I circled back and went back out onto Joseph Avenue.

6   Q.   Okay. And what time was it that you observed her arrive

7   approximately at the area near 99 William Warfield Drive on

8   January 20th?

9   A.   It was approximately 2:40 p.m..

10:18:35AM 10   Q.   All right.  So that would be about ten minutes after we

11   observed her depart 292 Barrington Street?

12   A.   Yes.

13   Q.   You indicated there were calls intercepted at around this

14   time over the wiretap; is that correct?

10:18:48AM 15   A.   Yes.

16   Q.   If you could flip to tab 1-100-347.

17   A.   Okay.

18   Q.   All right.  Before we get to that call, can you tell

19   us did there come a time where you observed Leitscha

10:19:21AM 20   Poncedeleon or her vehicle leave the area of 99 William

21   Warfield Drive?

22   A.   Yes.

23   Q.   Approximately what time was that?

24   A.   That was approximately 2:52 p.m..

10:19:34AM 25   Q.   All right.  Now, the call behind tab 1-100-347, do you see

1 that?

2 A.   Yes.

3 Q.   Can you tell us the date and time of that call?

4 A.   Yes.  It's January 20th, 2018, at 2:46:31 p.m. -- 31

10:19:55AM 5 seconds p.m..

6 Q.   All right.  And that time you said you saw her arrive at

7 approximately 2:40?

8 A.   Yes.

9 Q.   And depart at approximately 2?

10:20:07AM 10 A.   2:52.

11 Q.   Okay.   And this call is right in between those two times

12 at 2:46?

13 A.   Yes.

14 Q.   What's the target number listed for this call, the one at

10:20:21AM 15 1-100-347?

16 A.   585-662-8156.

17 Q.   And is it an incoming call to the target number or

18 outgoing call?

19 A.   It's an incoming call to the target number.

10:20:49AM 20 Q.   All right.  And the target number for this call at -- on

21 January 20th at 2:46 p.m., do you see it listed on

22 Government's Exhibit 10?

23 A.   Yes.

24 Q.   Where is it?

10:21:01AM 25 A.   It's the second one from the top in red.

1  Q.    Is there an asterisk next to it?

2  A.    Yes.

3  Q.    And what does that designate?

4  A.    It designates that that was one of the telephones that was

10:21:12AM 5  wiretapped in this case.

6  Q.    Okay. All right. Let's go back to William Warfield Drive.

7  You were conducting this surveillance on January 20th you

8  indicated with other surveillance team members; is that right?

9  A.    Yes.

10:21:36AM 10  Q.    All right.  And who did that include that day?

11  A.    At the William Warfield Drive complex it was myself and

12  Investigator Myron Moses.

13  Q.    All right.  Did you follow Ms. Poncedeleon's vehicle after

14  she left William Warfield Drive area at 2:52?

10:21:58AM 15  A.    Yes.

16  Q.    Can you describe for the jury where you followed her

17  vehicle?

18  A.    Yes.  Followed her vehicle back to 292 Barrington Street.

19  Q.    If we can show the next pole camera clip at 2:59?  I'm

10:22:23AM 20  sorry, yeah, that's right.  No, that's the 2:29.

21        The time of this clip is 2:59; is that right?

22  A.    Yes.

23  Q.    And what area is this clip showing?

24  A.    292 Barrington Street.

10:22:40AM 25  Q.    What did you just observe on the pole camera at 2:59 at

1  the Barrington pole camera?

2  A.   The Nissan Altima arrived and parked in the driveway.

3  Q.   Tell us what you just observed there.

4  A.   Leitscha Poncedeleon just exited the driver's side of the

10:22:59AM 5  Nissan Altima and she's walking up towards the front of 292

6  Barrington Street carrying that black backpack.  She just

7  entered the front door of 292 Barrington Street.

8  Q.   All right.  That was -- you observed her arrive there at

9  approximately 2:59?

10:23:21AM 10  A.   Yes.

11  Q.   How long after she had departed the 99 William Warfield

12  Drive area was that?

13  A.   About seven minutes.

14  Q.   All right.  Did you still stay on surveillance of the area

10:23:34AM 15  of Barrington Street after Leitscha Poncedeleon arrived there?

16  A.   Yes.

17  Q.   If we can go to the next clip?  All right, if we can pause

18  here?  Do you see the start of this clip, Investigator

19  Briganti?

10:23:49AM 20  A.   Yes.

21  Q.   What's the time on it?

22  A.   3 o'clock and 54 seconds p.m.

23  Q.   Can you tell us about how long it was since we just

24  observed Leitscha Poncedeleon enter 292 Barrington Street?

10:24:04AM 25  A.   Approximately a minute.

1  Q.   All right.   If we can play it?   What are we seeing from

2  this clip at approximately 3:01 now at 292 Barrington Street?

3  A.   Leitscha Poncedeleon exited the front door of 292

4  Barrington Street carrying the black backpack.   She's entering

10:24:27AM 5  the driver's side of the Nissan Altima.

6  Q.   Do you see the defendant's silver GMC in this paused video

7  at 3:01?

8  A.   Yes, it's still up on the grass.   It's parked in the same

9  place.

10:24:47AM 10  Q.   All right.   Can we play it?   What just occurred there?

11  A.   The Nissan Altima backed out of the driveway of 292

12  Barrington Street.

13  Q.   And that was at approximately 3:01?

14  A.   Yes.

10:25:00AM 15  Q.   Did you pick up surveillance of the Nissan Altima after it

16  departed 292 Barrington Street at -- shortly after 3:01 p.m.

17  on January 20th?

18  A.   Yes.

19  Q.   Where did you follow Leitscha Poncedeleon and the Nissan

10:25:15AM 20  Altima after it left 292 Barrington Street?

21  A.   We followed it directly from 292 Barrington Street back to

22  the William Warfield Drive complex.

23  Q.   All right.   And now that you have Government's 105, the

24  aerial photo of the William Warfield Drive area on your

10:25:58AM 25  screen, can you tell the jury where you followed Leitscha

1  Poncedeleon the second time you followed her to William

2  Warfield Drive?

3  A.   Again, we followed her to William Warfield Drive, I

4  observed her turn in to William Warfield Drive from Joseph

10:26:15AM 5  Avenue, I went past the location again.  I didn't turn with

6  her.

7  Q.   When you say went past --

8  A.   I continued -- I continued northbound on Joseph Avenue.

9  Q.   After observing her turn left down William Warfield

10:26:31AM 10 Drive?

11 A.   Yes.

12 Q.   All right.  What did you next observe?

13 A.   I turned around on Joseph Avenue and I came back into

14 William Warfield Drive and went around this bend -- went

10:26:49AM 15 around this bend.

16 Q.   Yes.

17 A.   And I could view her vehicle parked in the same location

18 as the previous time I observed it parked in the same

19 location.

10:27:00AM 20 Q.   All right.  And can you circle the area where you observed

21 her vehicle parked?

22 A.   It was right here in this area here.

23 Q.   All right.

24          THE COURT:  When the witness says this bend, he's

10:27:12AM 25 talking about a bend in the road at the left -- upper left

1  portion of the photograph.

2          **MR. MARANGOLA:** Thank you, Your Honor.

3  **BY MR. MARANGOLA:**

4  Q.   That bend in the road, that's part of William Warfield

10:27:24AM 5  Drive; is that right?

6  A.   Yes.

7  Q.   Can you explain, Investigator Briganti -- well, first of

8  all, you see all the green trees in this photograph?

9  A.   Yes.

10:27:35AM 10  Q.   Were the trees that thick and lush in January of 2018 when

11  you followed Ms. Poncedeleon?

12  A.   No.   It was winter.

13  Q.   Okay.   So they weren't obstructing your view of where she

14  and her vehicle were going?

10:27:51AM 15  A.   No, I could see her vehicle.

16  Q.   All right.   After you rounded that curve there observing

17  her vehicle parked in the area, where did you go?

18  A.   I went to the circular area and then I went back out onto

19  Joseph Avenue.   So I went -- I continued to the circular area

10:28:15AM 20  and then I followed the same route that I came into William

21  Warfield Drive back out to Joseph Avenue.

22  Q.   All right.   Approximately what time was it that you saw

23  Ms. Poncedeleon's vehicle parked in that same area near 99

24  William Warfield Drive the second time?

10:28:33AM 25  A.   It was approximately 3:10 p.m.

1  Q.    And what happened next?

2  A.    At 3:15 p.m. I observed her vehicle come back out onto

3  Joseph Avenue and leave the location.

4  Q.    All right.  And did you continue to follow her after she

10:28:57AM 5  left the William Warfield Drive area and turn down Joseph

6  Avenue?

7  A.    Yes.

8  Q.    Where did you follow her?

9  A.    To 292 Barrington Street.

10:29:05AM 10  Q.    Approximately what time was it that she left the William

11  Warfield Drive area?

12  A.    It was approximately 3:15 p.m.

13  Q.    Now, I've asked you some of the times here that you made

14  these observations back on January 20th, 2018.  Did you take

10:29:27AM 15  notes or make any -- memorialize these times of these

16  observations on this day?

17  A.    There were notes made on surveillance log sheets, yes.

18  Q.    Okay.  And you reviewed those obviously before testifying?

19  A.    Yes, I did.

10:29:45AM 20  Q.    Okay. At 3:15 then you followed Leitscha Poncedeleon out

21  of the William Warfield Drive back to where?

22  A.    292 Barrington Street.

23  Q.    All right.  And if we could show the next pole camera clip

24  at 3:25?  Or 3:26?  This is approximately 11 minutes later; is

10:30:11AM 25  that right?

1  A.    Yes.

2  Q.    What location is this showing?

3  A.    292 Barrington Street.

4  Q.    What did we just observe at 3:26?

10:30:18AM 5  A.    The Nissan Altima parked in the driveway.

6  Q.    Do we observe it pull into the driveway?

7  A.    It arrived and parked in the driveway.

8  Q.    Tell us what you see there.

9  A.    Yes, Leitscha Poncedeleon exited the driver's side

10:30:31AM 10 carrying the black backpack and she's walking up towards the

11 front door of 292 Barrington Street.  She just entered the

12 front door of 292 Barrington Street.

13 Q.    All right.  And the last thing I'm going to ask you to do

14 with respect to this, Investigator Briganti, is flip to the

10:31:02AM 15 exhibit binder marked and find that hard copy of the aerial

16 photo of William Warfield.

17          I'm going to ask you to write down the date and

18 those times you observed Leitscha Poncedeleon in that area.

19          **THE COURT:** What exhibit number is that?

10:31:25AM 20          **MR. MARANGOLA:** It's 105, I believe.  Yes.

21 **BY MR. MARANGOLA:**

22 Q.    So please write down those surveillance observations that

23 were made of Leitscha Poncedeleon.  You can write at the -- as

24 you're looking at the aerial photo on the bottom right, write

10:32:07AM 25 the date you made those observations.  If you need to take it

1   out, go ahead and take it out of the binder.

2          The date and then the times of the arrival and

3   departure and then after that put your initials and then just

4   let us know what you've written on Government's 105.

10:32:52AM 5   A.   Okay, so I placed at the bottom of the page January 20th,

6   2018, 2:40 p.m.-2:50 p.m.; 3:10 p.m.-3:15 p.m.; and then I

7   placed my initials under that.

8   Q.   What do those -- so we're clear, what do those times

9   represent?

10:33:18AM 10   A.   Those are the times that I observed Leitscha Poncedeleon

11   arrive and leave William Warfield Drive.

12   Q.   Okay. All right. Thank you, Investigator.

13          **THE COURT:** I think it's a good time for a recess.

14   Ladies and gentlemen, we'll take a recess approximately 20

10:33:34AM 15   minutes.  In the meantime, I'd ask you not discuss the matter

16   or allow anybody to discuss the matter with you.  The jury may

17   step down.

18          (**WHEREUPON**, the jury was excused).

19          **MR. MARANGOLA:** Judge, may Investigator Briganti

10:34:24AM 20   step down?

21          **THE COURT:** Yes.

22          **MR. MARANGOLA:** Thank you.

23          (**WHEREUPON**, there was a pause in the proceeding.)

24          (**WHEREUPON**, the defendant is present).

10:59:51AM 25          **THE COURT:** Bring the jury out.

1                    (**WHEREUPON**, the jury is present).

2                    **THE COURT:**  You may proceed.

3                    **MR. MARANGOLA:** Thank you, Your Honor.

4    BY MR. MARANGOLA:

11:20:07AM 5    Q.   Investigator Briganti, we showed a number of pole camera

6    clips at 292 Barrington Street?

7    A.   Yes.

8    Q.   During the course of your investigation obviously you

9    became very familiar with that location?

11:20:23AM 10   A.   Yes.

11   Q.   All right.  If we could show the pole camera clip again

12   off of Government's Exhibit 22 for January 20th at 1:59?  Now,

13   if we could pause it there?  You saw the defendant's silver

14   GMC pick-up pull up on the snow next to the driveway; is that

11:20:47AM 15   right?

16   A.   Yes.

17   Q.   Can you tell the jury are you familiar with the length of

18   the driveway at 292 Barrington Street based on your

19   observations of it during the investigation?

11:21:01AM 20   A.   Well, I can't tell you how long it is, but I can tell you

21   that I've observed three vehicles parked in that driveway on

22   several occasions.

23   Q.   All right.  And specifically what three vehicles had you

24   observed parked in that vehicle on multiple occasions?

11:21:16AM 25   A.   Well, it was always the Acura TL, the Nissan Altima, and

1    then the third vehicle was always a different vehicle, but at

2    times it was Javi's GMC pick-up.

3    Q.   All right.   The same pick-up that's shown on the snow

4    here?

11:21:37AM 5    A.   Yes.

6    Q.   So on the occasions that you saw that silver GMC pick-up

7    as the third vehicle parked at 292 Barrington Street, there

8    were occasions where it was parked in the driveway and not on

9    the snow?

11:21:51AM10    A.   Yes.

11    Q.   In other words, it could fit in the -- all three of those

12    vehicles could fit on the driveway?

13    A.   Yes, the back end of it was towards the sidewalk but it

14    was -- it would fit, yes.

11:22:06AM15    Q.   Okay. Was there another vehicle behind the Nissan Altima

16    in this -- in the driveway of 292 Barrington Street at the

17    time Javi's truck pulled in at 2 o'clock on January 20th,

18    2018?

19    A.   No.

11:22:23AM20    Q.   All right.   And then if we could go to the clip at 3:25

21    approximately an hour and 26 minutes later.   That was a clip

22    you testified earlier that Leitscha Poncedeleon arrived in the

23    Nissan Altima; is that right?

24    A.   Yes.

11:22:42AM25    Q.   And between the clip that we first saw at 1:59 when the

1    defendant's truck pulled in and this clip here at 3:26, does

2    this truck appear to be in the same or different position?

3    A.    It appears to be in the same position.

4    Q.    All right.  Thank you.  All right, let's move on from

11:23:11AM 5    January 20th.  During the course of the investigation in

6    addition to the wiretaps and the earlier part of the

7    investigation that you testified about with the buys and the

8    initial search warrants, did you conduct or use any other

9    investigative techniques to obtain evidence in the case?

11:23:34AM 10    A.    Yes.

11    Q.    What additional investigative techniques did you employ?

12    A.    We did a trash pull at 292 Barrington Street.

13    Q.    And when was that?

14    A.    That was on the 25th -- January 25th of 2018.

11:23:53AM 15    Q.    So that would be five days after the events that you just

16    testified about earlier this morning?

17    A.    Yes.

18    Q.    Can you tell the jury what is a trash pull and why would

19    you do that?

11:24:08AM 20    A.    Well, trash pull is exactly that.  When they take the

21    garbage can to the curb, we go and take their garbage.  Then

22    we look through their garbage to see -- we do that to see if

23    there's anything related to criminal activity, drug-related

24    activity in the garbage.

11:24:32AM 25    Q.    So you removed garbage bags from a garbage container?

1   A.    Yes.

2   Q.    And searched through it?

3   A.    Yes.  We removed the garbage bags from the container

4   overnight and then took them back to the Public Safety

11:24:50AM 5   Building and tore them up and looked at the contents of the

6   bags.

7   Q.    Sounds like a pretty grizzly job.

8   A.    It's fantastic.

9   Q.    Can you tell us what, if anything, occurred when you

11:25:06AM 10   conducted the trash pull at 292 Barrington Street on January

11   25th, 2018?

12   A.    In the overnight hours of January 25th my partner David

13   Swain and I observed that the trash bin for 292 Barrington

14   Street had been placed out at the curb.  I went in and took

11:25:30AM 15   the bags out of the garbage bin, I placed them in my car and

16   then drove to the Public Safety Building where Investigator

17   Swain and I searched through the bags.

18   Q.    All right.  Can you describe some of the items that you

19   observed when you went through the garbage bags that you had

11:25:50AM 20   collected from 292 Barrington Street?

21   A.    Yes.  There were three Postal labels that were in the bag

22   along with Postal tracking stickers.  There was also some

23   bubble wrap, some other items.

24   Q.    All right.  At this time I'd ask you to -- if we could

11:26:14AM 25   put up Government's -- which is not in evidence, Government's

1   367?  I'd ask you to take a look at that.  And then 368.  And
2   then 369.  And, finally, 370.
3           Did you recognize what was shown in Government's
4   367 through 370?
11:27:01AM 5   A.   Yes.  Those were the labels that we removed from the trash
6   at 292 Barrington Street.
7   Q.   All right.  And with respect to those labels were they
8   placed on pieces of paper and then photographs taken of them?
9   A.   Yes.
11:27:14AM 10  Q.   And is that what's contained in Government's 367 to 370
11  that you just looked at?
12  A.   Yes.
13  Q.   Do Government's Exhibits 367 through 370 fairly and
14  accurately show the labels that you retrieved from the trash
11:27:32AM 15  at 292 Barrington Street on January 25th, 2018?
16  A.   Yes, they do.
17           **MR. MARANGOLA:** At this time I'd offer Government's
18  367 to 370.
19           **MR. VACCA:** *Voir dire*, Your Honor?
11:27:42AM 20           **THE COURT:** Sure.
21           **MR. VACCA:** Thank you.  Sir, when you look at this
22  exhibit it says 100.20.
23           **THE COURT:** Which exhibit?
24           **MR. VACCA:**  Is that correct, sir?
11:27:58AM 25           **THE COURT:** Which exhibit?

1          **MR. VACCA:** 370.

2          **THE COURT:** Thank you.

3          **THE WITNESS:** I'm sorry, I didn't hear the question,

4   sir.

11:28:04AM 5          **MR. VACCA:** Investigator, it indicates $100.20; is

6   that correct?

7          **THE WITNESS:** Yes.

8          **MR. VACCA:** Is there any date on this document?

9          **THE WITNESS:** Yes, there is.

11:28:15AM 10          **MR. VACCA:** Where is it?

11          **THE WITNESS:** It's in the middle, delivery date.

12          **MR. VACCA:** Right.  Kind of blurry?

13          **THE WITNESS:** 1/23 of 2018.

14          **MR. VACCA:** What date is on it?

11:28:26AM 15          **THE WITNESS:** It's in the middle here, delivery date

16   1/23/2018.  It's underneath where it says priority mail 3-day.

17          **MR. VACCA:** Right.  And, Investigator, does it

18   indicate an address?

19          **THE WITNESS:** No, sir, it does not.

11:28:50AM 20          **MR. VACCA:** Your Honor, I would object to that one

21   on the grounds of relevancy, the fact that we don't know what

22   address it comes from and we're really unclear and don't know

23   the timeframe regarding it.

24          **THE COURT:** Okay.  Overruled.  Exhibit 370 will be

11:29:09AM 25   received.

1          How about the other ones?

2              **MR. VACCA:** No, Your Honor.

3              **THE COURT:** No objection to the other ones?

4              **MR. VACCA:** No.

11:29:19AM 5         **THE COURT:** 367, 368 and 369 will be received.

6              (**WHEREUPON**, Government's Exhibits 367-370 were

7    received into evidence).

8    **BY MR. MARANGOLA:**

9    Q.   If we could publish starting at 367?  Investigator, with

11:29:43AM 10   respect to 367, do you see that?

11   A.   Yes, I do.

12   Q.   What's the -- what is that label -- who is that label

13   addressed to and what's the address?

14   A.   Karina Lopez Del Valle, 268 Garson Avenue, Rochester, New

11:30:04AM 15   York 14609.

16   Q.   And where -- the return address, where does it state it's

17   from?

18   A.   Mayaguez, Puerto Rico.

19   Q.   All right.  And do you see Government's Exhibit 796 there?

11:30:35AM 20   A.   Yes.

21   Q.   Can you count the number of packages that are on that

22   chart addressed to 286 Garson Avenue from Puerto Rico?

23   A.   Yes, there are seven.

24   Q.   Okay. And then can we go back to Government's 368?  Can

11:31:02AM 25   you tell us the -- who the package or who that label is

1   addressed to and the address?

2   A.   Yes.  It's addressed to Edgardo A. Rosario Alvarado, 157

3   Depew Street, Rochester, New York.  And you can't see the zip

4   code.

11:31:24AM 5   Q.   And what about where that label is from, what's the return

6   location on that label?

7   A.   Mayaguez, Puerto Rico.

8   Q.   And do you see the address from that label that you

9   removed from 292 Barrington Street on January 25th on

11:31:51AM 10   Government's Exhibit 796, the chart of the records from Postal

11   packages from Puerto Rico?

12   A.   Yes.

13   Q.   Where is it?

14   A.   It's the second one from the bottom in purple.

11:32:03AM 15   Q.   And what's the delivery date?

16   A.   1/22 of 2018.

17   Q.   All right.  And then if we could go to 369?  Can you make

18   out a portion of the who this priority mail label is addressed

19   to?

11:32:25AM 20   A.   Yes.  The last name Olivencia Cruz.

21   Q.   What about the address?  What's visible for the address?

22   A.   It says Paul Street, Apartment 1003, Rochester, New York

23   New York 14605.

24   Q.   And what's the return -- where is the return label

11:32:54AM 25   indicate it was from?

1  A.    Puerto Rico.

2  Q.    All right.  If we could go to 796?  Can you tell us how

3  many packages were delivered to 360 St. Paul Street

4  Apartment 1003 that are reflected in the chart 796?

11:33:20AM 5  A.    So there's four packages that are addressed to 360

6  St. Paul Street, apartment 1003.

7  Q.    And there are an additional how many that don't have an

8  apartment number listed that just say 360 St. Paul Street?

9  A.    There's four additional packages that don't have the

11:33:37AM 10  apartment number in this.

11  Q.    And, finally, if we can go back to 370?  If we could try

12  to blow up the portion underneath the tracking number?  Do you

13  see the tracking number there?

14  A.    Yes.

11:33:59AM 15  Q.    Do you see the last six digits?

16  A.    Yes.

17  Q.    I'd like you to now take a look at Government's 796.  Tell

18  us if you see the last six digits in that chart anywhere?

19  A.    Yes.

11:34:29AM 20  Q.    Can you circle or touch the line next to where you see

21  those.  All right, and can you tell us -- read us the

22  tracking number for that package, the delivery date, and the

23  location?

24  A.    Yes.  Tracking number is 9505 5109 7718 8020 1671 46; the

11:35:04AM 25  date of delivery is 1/22 of '18; destination address is 286

1  Garson Avenue.

2  Q.   Is that the same or different tracking number that is on

3  Government's 370?

4  A.   It's the same tracking number.

11:35:27AM 5  Q.   Government's 370 was the portion of the label found during

6  the trash pull we just showed you?

7  A.   Yes.

8  Q.   Okay. Now, these labels that were placed on paper and

9  photographed, were they on boxes?  Had you ripped them off

11:35:55AM 10  when you found them?

11  A.   No.

12  Q.   How were they found in the trash?

13  A.   They were found -- other than the white piece of paper

14  behind them, that's how they were found.  They were just the

11:36:06AM 15  actual label themselves in the trash.

16  Q.   So the label had already been ripped off of something and

17  placed in the trash?

18  A.   Yes.

19  Q.   Okay. All right. Can you, Investigator, explain how the

11:36:22AM 20  wiretap investigation progressed generally?

21  A.   Yeah.  So we attempt to identify the people, the

22  co-conspirators in the case and then any locations that may be

23  being used -- that's locations where they live, locations

24  where drugs are being sold from, where they were being stored,

11:36:40AM 25  where they were being packaged, and then where money was being

1    stored.

2            We also attempt to identify the vehicles, so the

3    vehicles that they operate or the vehicles that are

4    transporting money or drugs.

11:36:55AM 5            And then we attempt to identify the patterns of the

6    organization to determine what they're doing, how they're

7    doing it, from the time they get their drugs to the time they

8    sell it on the street.

9    Q.    All right.   Once you identify co-conspirators, locations,

11:37:15AM 10   vehicles and patterns of the organization, do you immediately

11   arrest people?

12   A.    No.

13   Q.    Why not?

14   A.    Because if we arrested people individually, then the

11:37:26AM 15   others that are involved would -- may find out they've been

16   arrested and evidence could be destroyed and we like to time

17   the takedowns around the delivery of cocaine.

18   Q.    All right.   When you say takedown, can you explain what is

19   a takedown?

11:37:45AM 20   A.    A takedown is a coordinated effort between multiple

21   agencies to execute a number of search warrants, collect

22   evidence and to arrest individuals that are involved in the

23   crimes.

24   Q.    Was there a takedown for Operation Burbank Bust?

11:38:02AM 25   A.    Yes.

1  Q.    Can you tell us when that occurred?

2  A.    Yes, it occurred on January 29th of 2018.

3  Q.    Why did you choose January 29th of 2018 for the takedown?

4  A.    Because it was an indication that packages were going to

11:38:17AM 5  be delivered on January 27th from Puerto Rico to locations in

6  Rochester being 4 Ritz Street and 15 Harwood Street.

7          So we wanted to take the investigation down at the

8  time that the packages were delivered.  So we asked Postal to

9  hold one of the packages for us and then to do what's called a

11:38:43AM 10  controlled delivery on the other package.  And that just means

11  that one of the law enforcement officials from the U.S. Postal

12  Service would actually deliver the package.

13          And then we could see if the patterns were the same

14  for the takedown as they were throughout the investigation and

11:39:01AM 15  that just means somebody goes to pick it up and takes it to a

16  location.

17  Q.    Then what was going to be your plan after Postal conducted

18  the controlled delivery of that second package?

19  A.    We were going to follow the individual that actually

11:39:17AM 20  picked up the package and then once they arrived at whatever

21  their destination was we were going to execute all of the

22  search warrants for the entire investigation.

23  Q.    Why were you going to execute search warrants all at once?

24  A.    Because again if you -- if you execute one search warrant

11:39:39AM 25  or arrest one individual, then if others find out about that

1   they could destroy evidence or they could flee.

2              At the times that we would execute search warrants

3   and they already knew about it they could attempt to arm

4   themselves against the police that were entering the location.

11:39:55AM 5   So it's a better operation to do it all at one time.

6   Q.   All right.  How were you -- how did you become aware that

7   those packages for 15 Harwood Street and 4 Ritz Street were

8   going to be or were scheduled to be delivered from Puerto Rico

9   to those addresses on January 27th?

11:40:15AM 10   A.   Initially it was text messages over the telephones.

11   Q.   When you say over the telephones, you're talking about

12   over the telephones that were intercepted on the wiretap?

13   A.   Yes.

14   Q.   All right.  I'd like you to take a look at your

11:40:29AM 15   Government's Exhibit 1.  Do you have that, the transcript

16   binder in front of you?

17   A.   Yes.

18   Q.   Flip to 1-145.  And do you see the -- what's behind that

19   tab 1-145-655?  Still getting there?  1-145.

11:41:17AM 20   A.   Sorry, I was behind the wrong one.

21   Q.   There are a lot of tabs.

22   A.   Okay, I'm there.

23   Q.   All right.  Is there a transcript of a text message behind

24   tab 1-145?

11:41:41AM 25   A.   Yes.

1  Q.   All right.  Are your initials on that?

2  A.   Yes.

3  Q.   All right.  And I'd like you to look at the next tab,

4  1-146.  Is that also a text message?

11:41:54AM 5  A.   Yes.

6  Q.   And are your initials on that?

7  A.   Yes.

8  Q.   Signifying that the data is accurate?

9  A.   Yes.

11:41:59AM 10            **MR. MARANGOLA:** At this time I'd offer the Exhibits

11  1-145-655 as well as 1-146-657.

12            **MR. VACCA:** Objection, Your Honor, relevancy.

13            **THE COURT:** Overruled.  Exhibit 1-145-655 and

14  1-146-657 will be received.

11:42:38AM 15            (**WHEREUPON**, Government's Exhibits 1-145-655 and

16  1-146-657 were received into evidence.)

17            **MR. MARANGOLA:** Thank you, Your Honor.  May the jury

18  be permitted to pull out their transcript binders and flip to

19  those tabs?

11:42:47AM 20            **THE COURT:** Yes, they can.

21            **MR. MARANGOLA:** I'm sorry, Judge, I think juror 10

22  has a question.

23            **THE JUROR:** Which one?

24            **THE COURT:** 1-45-655.  That's the first one.

11:43:33AM 25            **THE JUROR:** Thank you.

1          **THE COURT:** 1-45-655.

2    **BY MR. MARANGOLA:**

3    Q.   Investigator, can you tell the jury the date and time and

4    target number for that text message behind tab 1-145?

11:43:58AM 5    A.   Yes.  The date is 1/25/2018; time is 12:06 and 20 seconds

6    p.m.

7    Q.   What's the target number that this text message was

8    intercepted over?

9    A.   585-766-8057.

11:44:15AM 10   Q.   And do you see that on Government's Exhibit 10?

11   A.   Yes.

12   Q.   What number is it listed?

13   A.   It's the first number at the top of the list.

14   Q.   All right.  Is the tab -- is the text message here an

11:44:31AM 15   incoming or outgoing?

16   A.   It's an incoming text message to the target number.

17   Q.   All right.  And the -- can you tell us the area code that

18   it's -- that texted the target telephone number?

19   A.   Yes, 787.

11:44:48AM 20   Q.   And is that the same or different phone number that texted

21   the text messages to the line that we've showed the jury

22   yesterday?

23   A.   It's the same number.

24   Q.   That's an area code from where?

11:45:03AM 25   A.   Puerto Rico.

1   Q.   Do you see the content of the text message beginning 9505?

2   A.   Yes, I do.

3   Q.   All right.  I'd like you to take a look at that text

4   number -- I'm sorry, the number in the text beginning 9505 and

11:45:18AM 5   then take a look at Government's 795 and tell us if -- maybe

6   you can clear -- if you can clear it first on your screen?

7   A.   I'm sorry.

8   Q.   Tell us if you see in Government's 795 the number texted

9   to 766-8057 on January 25th?

11:45:44AM 10   A.   Yes, I do.

11   Q.   Can you touch on the screen where you see it?

12   A.   This line here.

13   Q.   All right.  And that's addressed to 4 Ritz; is that

14   correct?

11:45:56AM 15   A.   Yes.

16   Q.   And that package has no delivery date according to this

17   chart; is that right?

18   A.   Correct.

19           THE COURT: That's the last item on Exhibit 795; is

11:46:08AM 20   that right?

21           THE WITNESS: Yes, Your Honor.

22           THE COURT: Thank you.

23           MR. MARANGOLA: Thank you.

24   BY MR. MARANGOLA:

11:46:11AM 25   Q.   There's no delivery date for that package; is that

1   correct?

2   A.   Correct.

3   Q.   And can you tell us why not?

4   A.   Yes, because we asked the U.S. Postal to seize that

11:46:20AM 5   package after they executed a search warrant on it.

6   Q.   So this was one of the text messages for packages believed

7   to be -- initially going to be delivered on January 27th?

8   A.   Yes.

9   Q.   Then if you can flip to the next tab 1-146 that's in

11:46:38AM 10   evidence?  And this text message was received over the same

11   target telephone number, correct?  766-8057?

12   A.   Yes.

13   Q.   And it reflects an incoming text message from that same

14   number from Puerto Rico; is that correct?

11:47:08AM 15   A.   Yes.

16   Q.   Do you see the content of that text message in

17   Government's 1-146 anywhere in the Postal records chart marked

18   Government's Exhibit 795?

19   A.   Yes.

11:47:23AM 20   Q.   Can you tell us where?

21   A.   Yes, it's the second from the bottom in red.

22   Q.   And the delivery address and delivery date for that

23   package is what?

24   A.   The delivery address is 15 Harwood Street.  And the date

11:47:44AM 25   of the delivery is 1/29 of 2018.

1  Q.   And that's the date of the takedown that you testified

2  about?

3  A.   Yes.

4  Q.   Was this the package that there was a controlled delivery

11:47:56AM 5  by Postal on?

6  A.   Yes.

7  Q.   All right.  Now, I'd like you to -- keep your hand sort of

8  in that portion of the binder that we're just at by 1-145 and

9  1-146, I'd like you to flip to 1-154 and 1-155.  Are those

11:48:42AM10  text messages behind 1-154 and 1-155?

11  A.   Yes.

12  Q.   Are your initials on each of those transcripts indicating

13  the accuracy of the data reflected on those transcripts?

14  A.   Yes.

11:48:53AM15          **MR. MARANGOLA:** At this time I'd offer Government's

16  1-154-1511 and 155-1513.

17          **MR. VACCA:** Objection, Your Honor, irrelevant, lack

18  of foundation.

19          **THE COURT:** Overruled.  Exhibit 1-154-155 and

11:49:33AM20  1-155-1513 will be received.

21          (**WHEREUPON**, Government's Exhibits 1-154-1511 and

22  1-155-1513 were received into evidence).

23          **MR. MARANGOLA:** If the jury could be permitted to

24  flip to those tabs 1-154 and 1-155?

11:49:49AM25          **THE COURT:** Yes.

1          **MR. MARANGOLA:** May the jury be permitted --

2          **THE COURT:** Yes, 1-154-1511.

3   BY MR. MARANGOLA:

4   Q.    Investigator, I'd like you to tell us the -- with respect

5   to 1-154, can you tell us the date and time of that text?

6   A.    Yes.  The date is January 25th of 2018, the time was 5:12

7   and 22 seconds p.m..

8   Q.    All right.  What's the target telephone that the

9   text message behind tab 1-154 and 1-155 were intercepted over?

10  A.    585-685-4661.

11  Q.    Do you see that target telephone number listed on

12  Government's Exhibit 10?

13  A.    Yes.

14  Q.    And where is it on Government's Exhibit 10?

15  A.    It's the fourth line down, it's the first one in purple.

16  Q.    Who is the user of that phone?

17  A.    Leitscha Poncedeleon.

18  Q.    Now, can you tell us the number that texted Leitscha

19  Poncedeleon at 5:12:22 behind tab 1-154?

20          Is that the same or different number from

21  Puerto Rico that texted the tracking number you previously

22  testified about to 766-8057 that's behind tabs 1-145 and

23  1-146?

24  A.    It's the same number.

25  Q.    Same Puerto Rico number?

1  A.    Yes.

2  Q.    For all four of those text messages?

3  A.    Yes.

4  Q.    Can you tell us is the content of the text message behind

11:52:21AM 5  tab 145 the same or different than the content behind the

6  text message for tab 1-154?

7  A.    Well, it's the same number.

8  Q.    That's the tracking number that you previously identified?

9  A.    Yes.

11:52:57AM 10  Q.    And then how about the content of the text message behind

11  tab 1-146 and 1-155?

12  A.    It's the same number.

13  Q.    All right.  And what's the time difference between the

14  text sent from the Puerto Rico number to 766-8057 behind tab

11:53:37AM 15  1-145 and 1-146 and those same numbers texted to Leitscha

16  Poncedeleon's line 685-4661 behind tabs 154 and 1-155?  What's

17  the time difference?

18  A.    So behind 1-145 it's 12:06:20 p.m.  And behind 146 it's

19  12:07:08 p.m.

11:54:25AM 20          On 1-154 it's 5:12:22 p.m..  And behind 1-155 it's

21  5:13:16 p.m..

22  Q.    All right. So approximately five hours between those two

23  pairs of texts?

24  A.    Yes.

11:54:55AM 25  Q.    So you had the same text messages intercepted over two

```
 1  different lines on the wiretap then?
 2  A.   Yes.
 3  Q.   Approximately five hours apart?
 4  A.   Yes.
```
11:55:08AM 5  Q.   From the same number from Puerto Rico?
```
 6  A.   Yes.
 7  Q.   All right.  Now, before the takedown occurred on January
 8  29th, 2018, were any search warrants obtained?
 9  A.   Yes.
```
11:55:23AM 10  Q.   Can you describe when and where or what you obtained
```
11  search warrants for generally?
12  A.   Yes.  So I obtained six search warrants for locations and
13  five search warrants for vehicles.  So there was a search
14  warrant for 6 Burbank Street was one of the first ones.
```
11:55:48AM 15  Q.   All right.  Did you obtain those before January 29th,
```
16  2018?
17  A.   Yes.
18  Q.   Search warrants?
19  A.   Yes.
```
11:55:53AM 20  Q.   Who issued those search warrants?
```
21  A.   Honorable Victoria Argento, Monroe County Court judge.
22  Q.   And what type of search warrants did Judge Argento issue
23  you in connection with the takedown of Operation Burbank Bust?
24  A.   No-knock search warrants.
```
11:56:15AM 25  Q.   All right.  And let's talk specifically about first the

1   locations that you obtained search warrants to execute on

2   January 29th.  What was -- I think you mentioned one already,

3   the location --

4   A.   6 Burbank Street.

11:56:36AM 5   Q.   All right.  And that's the white house on the far left in

6   Government's Exhibit 19 shown on your screen; is that right?

7   A.   Yes.

8   Q.   The first house shown on the left of that photograph?

9   A.   Yes.

11:56:46AM 10   Q.   Investigator, are there -- I'll withdraw that.

11         You had a search warrant -- a no-knock search

12   warrant for that location for January 29th, 2018?

13   A.   Yes.

14   Q.   All right.  And that was the defendant's residence,

11:57:02AM 15   correct?

16   A.   Yes, it was.

17   Q.   What other locations did you obtain search warrants for in

18   preparation for the takedown on January 29th?

19   A.   292 Barrington Street, the residence of Leitscha

11:57:16AM 20   Poncedeleon and Roberto Figueroa.

21   Q.   That's shown here in Government's 70?

22   A.   Yes.

23   Q.   And where we saw a number of pole camera clips yesterday

24   and today; is that right?

11:57:34AM 25   A.   Yes.

1   Q.   All right.   You had a no-knock search warrant for that

2   place.   Where else?

3   A.   60 Malling Drive.

4             **THE COURT:** Can you spell that?

11:57:49AM 5             **THE WITNESS:** M-A-L-L-I-N-G.

6             **THE COURT:** Thank you.

7   **BY MR. MARANGOLA:**

8   Q.   What's 60 Malling Drive?

9   A.   Residence of Carlos Javier Figueroa's mother during the

11:58:00AM 10   time of the investigation.

11   Q.   Let me show you what's not in evidence as Government's

12   Exhibit 99.   Do you recognize what's shown in Government's

13   Exhibit 99?

14   A.   Yes, it's 60 Malling Drive.

11:58:18AM 15   Q.   Does that photograph marked Government's Exhibit 99 fairly

16   and accurately show 60 Malling as it existed during this

17   investigation?

18   A.   Yes.

19             **MR. MARANGOLA:** At this time I'd offer Government's

11:58:29AM 20   99.

21             **MR. VACCA:** No objection, Your Honor.

22             **THE COURT:** Exhibit 99 will be received.

23             (**WHEREUPON**, Government's Exhibit 99 was received in

24   evidence).

11:58:37AM 25   **BY MR. MARANGOLA:**

1  Q.   That was the location that you obtained a no-knock search

2  warrant for?

3  A.   Yes.

4  Q.   All right.  What other locations did you obtain a no-knock

11:58:52AM 5  search warrant for in preparation for the takedown?

6  A.   820 East Main Street, the location where drugs were stored

7  and packaged and some of the members of the group would stay

8  the night there, including Obed Torres.

9  Q.   All right.  You see Government's Exhibit 701?

11:59:14AM 10  A.   Yes.

11  Q.   Is that the location that you obtained a no-knock search

12  warrant for one of the apartments inside that location?

13  A.   Yes, that's the rear of the building and the apartment was

14  apartment 14.

11:59:33AM 15  Q.   All right.  Any other locations that you obtained a

16  no-knock search warrant for?

17  A.   Yes.  15 Burbank Street, location the drugs were being

18  sold from.

19  Q.   All right.  I'd like to show you what's not in evidence as

11:59:51AM 20  Government's Exhibit 77.  Do you see -- do you recognize any

21  locations in this photograph?

22  A.   Yes, 15 Burbank Street.

23  Q.   Which of the houses shown in Government's Exhibit 77 is 15

24  Burbank Street?

12:00:11PM 25  A.   It's the gray house in the middle of the photograph with

1 the Puerto Rican flag in the window at the top of the

2 residence.

3 Q.   Does the house you just identified in Government's

4 Exhibit 77 fairly and accurately show 15 Burbank as it existed

12:00:33PM 5 during this investigation?

6 A.   Yes.

7 Q.   Is that one of the locations that you obtained a no-knock

8 search warrant for in preparation for the takedown on January

9 29th, 2018?

12:00:41PM 10 A.   Yes.

11               **MR. MARANGOLA:** Offer Government's 77.

12               **MR. VACCA:** No objection, Your Honor.

13               **THE COURT:** Exhibit 77 will be received.

14               (**WHEREUPON**, Government's Exhibit 77 was received

12:00:51PM 15 into evidence).

16 **BY MR. MARANGOLA:**

17 Q.   Investigator, do you see Government's 237 on your screen?

18 A.   Yes.

19 Q.   Does the locations -- are the locations for the

12:01:18PM 20 defendant's house at 6 Burbank and the drug house at 15

21 Burbank, are they accurately reflected on Government's 237?

22 A.   Yes, sir.

23 Q.   So you had obtained no-knock search warrants for two

24 locations to be executed on that same day on the same street?

12:01:38PM 25 A.   Yes.

1    Q.    All right.  Finally, any other locations for no-knock

2    search warrants that you obtained in preparation for the

3    takedown?

4    A.    Yes.  2519 Brighton Henrietta Townline Road, the residence

12:01:52PM 5    of Orlando Yelder.

6    Q.    That's shown here in Government's 100?

7    A.    Yes.

8    Q.    All right.  What was your role and responsibility in

9    connection with this takedown on January 29th, 2018?

12:02:07PM 10   A.    On the day of the takedown?

11   Q.    Yes.

12   A.    So my responsibilities on that day were to brief all of

13   the teams, all of the law enforcement personnel that was going

14   to assist in the execution of the search warrants.

12:02:19PM 15          So I briefed all of the officers or agents that

16   were going to execute those warrants.  That's over 100 law

17   enforcement officers.

18          And in the briefing I spoke about the location they

19   were going to be going to, who should be at the locations,

12:02:40PM 20   what were authorized in the search warrants to search for at

21   the locations, vehicles.

22          And then let them know about any violence that may

23   have been involved with any of the members of the group so

24   that they were aware of that before they made entry into those

12:02:58PM 25   locations.

1  Q.   All right.   Prior to the date of the takedown what were

2  some of your responsibilities?

3  A.   Well, initially once -- once the text messages came

4  through, I made a determination along with the other agents

12:03:17PM 5  that we were going to take this investigation down when the

6  packages were delivered.

7          So we contacted Postal and asked for their

8  assistance in holding one of the packages and doing a

9  controlled delivery on the other.

12:03:31PM 10          And the packages were supposed to be delivered on

11  the weekend on the 27th.  We asked they would hold the

12  packages until the 29th until we could prepare our teams for

13  search warrants and the execution of the search warrants.

14  They agreed to do that.

12:03:44PM 15  Q.   Who decided what locations search warrants would be

16  requested for?

17  A.   The agents that were in charge of the investigation:

18  Myself, Investigator Swain, and Special Agent Patrick

19  Hoffmann.

12:04:00PM 20  Q.   In addition to briefing other officers in connection with

21  the search warrants on January 29th, 2018 what, if any,

22  additional responsibilities did you have on that day?

23  A.   So I had to write the search warrants and get the search

24  warrants signed for particular locations.  Once that happened,

12:04:21PM 25  I coordinated the times with the U.S. Postal, what date they

1  would actually assist us with delivering the packages.

2              I then met with the other case agents and the

3  supervisors from the Rochester Police Department, we

4  coordinated all the teams.  We got all the resources together

12:04:42PM 5  from all the different agencies to assist in the takedown of

6  the investigation.

7  Q.   When you say teams, how are different teams organized?

8  A.   So there's entry teams for every one of the search

9  warrants.  That means those are the teams that are actually

12:04:57PM10  going to enter the locations.

11              There's also uniform support.  So uniform support

12  again are on every one of the search warrants and they control

13  the perimeter of the search warrants.

14              And then it's surveillance officers.

12:05:15PM15              Then it was members of the Postal Service that were

16  assisting us.

17              Yeah, I think that was pretty much everybody that

18  was involved.

19  Q.   All right.  When you -- you mentioned earlier in

12:05:29PM20  describing the execution of no-knock warrants that members of

21  the entry team often cover -- their faces are covered?

22  A.   Yes.

23  Q.   When officers enter or attempt to enter a residence

24  pursuant to a no-knock warrant, are those -- are the members

12:05:49PM25  of the entry team different than the uniform support?

1  A.   The members of the entry teams are different than uniform

2  support, yes.  The members of the entry team are dressed in

3  what's considered raid gear: That's a large vest, they have --

4  their faces are covered, they have -- they utilize the

12:06:09PM 5  battering ram, they exit from the same vehicle, from a van

6  that approaches in front of the location.

7       Uniformed officers approach a vehicle -- approach a

8  location from their vehicles, they drive their marked patrol

9  vehicles to the locations.  At times we'll ask them to assist

12:06:26PM 10  in blocking off streets while we're executing search warrants

11  also.

12  Q.   Do the -- are the uniform vehicles, do they proceed before

13  the van or after the van that's going to the location to

14  execute a no-knock search warrant?

12:06:40PM 15  A.   Oftentimes they're in front of the van for two reasons.

16  One reason is that we don't want to get in traffic.  The van

17  doesn't have emergency lights, we don't want to get caught in

18  traffic.  So if we're approaching a location, they will block

19  traffic for us so we can pull on to the street.

12:06:56PM 20       And then oftentimes if they approach before us they

21  can get out and position themselves around the location before

22  entry is made into the front door.

23  Q.   Are there occasions where the patrol -- the uniform

24  support are behind the raid van?

12:07:13PM 25  A.   Yes.

1  Q.    Can you describe what circumstances those occur?

2  A.    Yes.  There's both.  There's sometimes they will be in

3  front of us and sometimes when we leave they'll be behind us.

4  We'd rather have them in front of us, but it just depends on

12:07:28PM 5  how it happens at the time and the search warrant is

6  executed.

7          Whoever gets their first.  If we get there before

8  they do, sometimes they will pull up right in behind us and

9  delay and then go up to the residence.

12:07:46PM 10  Q.    All right.  Did you yourself -- what did you yourself do

11  on the day of the takedown?  What were your responsibilities?

12  A.    So again after briefing -- after briefing all the

13  personnel I let everybody know where to stage their vehicles

14  before we executed the warrants.

12:08:05PM 15          The staging areas are somewhere near where the

16  warrants are being executed.  Enough of a distance so they

17  can't be noticed, but close enough that when a command is

18  given to execute the search warrants it's a very short period

19  of time before they arrive at the location and execute the

12:08:20PM 20  search warrants.

21  Q.    So --

22  A.    After that briefing I spoke with the U.S. Postal Service,

23  some of the Postal inspectors, the actual Postal inspector

24  that was going to do the controlled delivery for us.

12:08:37PM 25          We had already decided that we wanted them to

1  deliver the package for 15 Harwood Street.  So I coordinated

2  with them the approximate time they would be delivering that

3  package so we could have all of our teams in place at the time

4  it was picked up.

12:08:58PM 5  Q.   The package that was destined for 4 Ritz, what did you ask

6  Postal to do in connection with that package?

7  A.   I asked Postal to hold that package -- seize it and hold

8  it and then eventually write a search warrant for it.

9  Q.   All right.  So the plan was for Postal to do a controlled

12:09:19PM 10  delivery to 15 Harwood?

11  A.   Yes.

12  Q.   All right.  That's shown here in Government's 97?

13  A.   Yes, it is.

14  Q.   What did you do once the controlled delivery was arranged?

12:09:43PM 15  A.   After all the teams were put in place and the delivery was

16  arranged I went out and did live surveillance at 15 Harwood.

17  Q.   And you say live, you're talking about in person you went

18  to that location?

19  A.   Yes, I was on the street.  I was in the area watching the

12:09:57PM 20  location.

21  Q.   All right.  And were you also in communication with other

22  officers?

23  A.   Yes.

24  Q.   Who were you in communication with?

12:10:05PM 25  A.   Every officer that was on this takedown, every law

1  enforcement officer on the takedown.

2  Q.   They would be where?

3  A.   They would be at their respective locations and some would

4  be at the wire room, but everyone was on the same channel so

12:10:22PM 5  we could hear each other.

6  Q.   Okay. Tell us what happened in connection with the

7  controlled delivery at 15 Harwood on January 29th, 2018.

8  A.   So I observed the Postal vehicle arrive at 15 Harwood, the

9  package exit the Postal van and go into the door on the

12:10:44PM 10  Harwood side of the building.

11       I then observed the Postal inspector leave the

12  building and leave the location.  I advised that the package

13  had been delivered over the radio.

14       Not long after that I observed the Nissan Altima

12:11:02PM 15  arrive and park on the street next to the building.

16  Q.   When you say the Nissan Altima, what Nissan Altima are you

17  referring to?

18  A.   The Nissan Altima that Leitscha Poncedeleon drove.

19  Q.   The one we previously observed in pole camera clips

12:11:17PM 20  yesterday and today?

21  A.   Yes.

22  Q.   All right.

23  A.   Leitscha exited her vehicle but didn't approach the

24  residence.  A male came from the residence carrying a Postal

12:11:29PM 25  box.  She opened the trunk and he placed it in the trunk and

1   went back inside.

2   Q.   She went back inside what?

3   A.   No.   The male went back inside the location and she got

4   back into the Nissan Altima and she left the location.

12:11:46PM 5   Q.   All right.   Can you tell us who the male was?   Were you

6   able to?

7   A.   I wasn't able to -- I was not able to identify who he was

8   at the time.

9   Q.   Okay.   What happened after the male returned to 15

12:11:58PM 10   Harwood?

11   A.   So Leitscha was parked on the street and she went around

12   the block.   The way that Harwood Street goes is it dead ends

13   into another street and it comes around and goes to LaBurnam

14   Crescent, comes back out to Monroe Avenue, which is the route

12:12:17PM 15   she took.

16   Q.   Why did you -- of the two packages that were scheduled to

17   be delivered, the 4 Ritz Street and the 15 Harwood, why did

18   you pick the 4 Ritz Street to be held instead of the 15

19   Harwood?

12:12:35PM 20   A.   Because based on the investigation the packages were

21   going -- primarily they were going back to 292 Barrington

22   Street, which was much closer to Harwood Avenue than it was to

23   Ritz Street.   So it wouldn't be as far to have to follow if

24   that's ultimately where they went.

12:12:56PM 25   Q.   All right.   So that's why you chose to do the controlled

1  delivery to the Harwood address?

2  A.   Yes.

3  Q.   Okay.

4  A.   It's -- it's -- it's not very far at all from 292

12:13:05PM 5  Barrington Street.

6  Q.   Okay. Tell us what happened after Leitscha Poncedeleon

7  left in the Nissan Altima with the package.

8  A.   So again she went around the block to LaBurnam Crescent

9  and then came back out on Monroe Avenue.  I was on Monroe

12:13:24PM 10  Avenue and I attempted to time her coming out onto Monroe

11  Avenue to get behind her.

12          Unfortunately, traffic was heavy and she ended up

13  coming out and getting behind my vehicle.  So she was the car

14  directly behind my vehicle.

12:13:41PM 15          So I decided to drive directly to 292 Barrington

16  Street and her vehicle stayed behind me the entire time as I

17  approached 292 Barrington Street.

18          As we were approaching 292 Barrington Street, I let

19  the other teams know to prepare to actually execute the search

12:14:00PM 20  warrants and I would give them that command once her vehicle

21  pulled into the driveway.

22  Q.   So you're pulling along Barrington Street in front of her

23  Nissan Altima?

24  A.   Yes.  Her car was directly behind my car.

12:14:15PM 25  Q.   What happens as you approach 292 Barrington Street with --

1    ahead of the Nissan Altima and Leitscha Poncedeleon?

2    A.   So as I'm halfway down Barrington Street again I radioed

3    to the other teams to prepare to execute their search warrants

4    and let them know where we were and that I would give the

12:14:37PM 5    command once she pulled into the driveway.

6               I drove past 292 Barrington Street and I observed

7    her vehicle behind me pull into the driveway of 292 Barrington

8    Street.  It was at that time that I gave the order to execute

9    the search warrants.

12:15:01PM 10   Q.   All right.  If we can, let's go to -- from Government's

11   Exhibit 22, the pole camera compilation, USB and play from

12   January 29th -- January 29th folder, the clip at 11:31.  This

13   reflects January 29th, 2018 at 11:31 at 292 Barrington Street;

14   is that right, Investigator?

12:15:33PM 15   A.   Yes.

16   Q.   This is the takedown?

17   A.   Yes.

18   Q.   If you can pause it?  At the time this car pulled into 292

19   Barrington Street, where did you go?

12:15:48PM 20   A.   I drove just past her driveway and I parked on the

21   street -- on Barrington Street, so just where the house is

22   next to hers, I parked right in front of that house on the

23   street.

24   Q.   And then she was behind you and she turned into 292

12:16:04PM 25   Barrington Street as we see here?

1  A.   I observed her through my rearview mirror pull into the

2  driveway.

3  Q.   All right.  After you observed her pull in, what did you

4  direct?

12:16:17PM 5  A.   Once she made the turn into the driveway I directed

6  everyone to execute their search warrants.

7  Q.   Can you tell us what's happening here at 11:32?

8  A.   Yeah, the raid van pulled in behind the Nissan Altima,

9  officers exited the van and approached the location and other

12:16:49PM 10  officers approached the Nissan Altima and took Leitscha

11  Poncedeleon into custody inside the vehicle.  She was the only

12  person inside the vehicle.

13  Q.   And do you see Leitscha Poncedeleon in this clip here?

14  A.   Yes.  She's standing at the driver's side of the Nissan

12:17:06PM 15  Altima with uniformed officers that are securing her along the

16  side of the vehicle.

17  Q.   Are you in this clip at all?

18  A.   I am now.  I'm standing next to the Nissan Altima walking

19  up towards the residence next to the Nissan Altima.

12:17:40PM 20  Q.   In between the two other officers next to the Altima?

21  A.   Yes.  I have a black hooded sweatshirt on and jeans.

22  Q.   All right.  You can play it.  Investigator Briganti, were

23  you still in communication with the other officers from the

24  other teams as the team executed the search warrant at 292

12:18:12PM 25  Barrington Street?

1    A.    Yes.

2    Q.    What, if anything, happened after that clip we just saw

3    where the team entered the house and Ms. Poncedeleon was

4    escorted from her vehicle in handcuffs?

12:18:28PM 5    A.    There's a communication by the entry officers at 6 Burbank

6    Street that shots were fired, so it came over shots fired 6

7    Burbank Street.

8    Q.    It came over what?

9    A.    It came over the police radio.

12:18:41PM 10   Q.    Was that just your radio that heard that?

11   A.    No, we were all on the same channel, we could all -- we

12   were all on the same channel so -- everybody should have been

13   on the same channel.

14   Q.    Can you describe what happened after you and the other

12:18:53PM 15   officers heard shots fired 6 Burbank over your police radios?

16   A.    Yes.  We requested some of our uniform support at

17   Barrington Street go to Burbank Street and assist with that

18   scene at Barrington -- at Burbank Street.  They did, they left

19   Barrington Street and went to Burbank Street.

12:19:17PM 20   Q.    So some officers left the Barrington search warrant?

21   A.    Only uniformed officers.  The members of the entry team

22   for Barrington Street remained at Barrington Street and some

23   of the uniformed officers also.

24   Q.    Why did you send some of the uniformed officers from the

12:19:39PM 25   search at Barrington to 6 Burbank?

1   A.   The indication of shots fired, I sent uniformed officers

2   because I've been at shots fired scenes before and the street

3   needs to be blocked off, there has to be an enormous amount of

4   uniform support for something like that.

12:19:58PM 5          So we knew they would be looking for resources, so

6   immediately we requested that some of our uniform support

7   assist them, although we still had people in custody at our

8   location and we couldn't let everybody go.

9          So we just split them up.  We asked some to go and

12:20:13PM 10   some stayed with us.

11  Q.   All right.  What happened after that?

12  A.   After that the team went on to take photographs of the

13  location and our search warrant continued to be conducted.  At

14  some point my attention was brought to the patrol vehicle that

12:20:33PM 15   Leitscha Poncedeleon was in.

16  Q.   What happened?

17  A.   I walked over to the vehicle and she asked me if I would

18  contact the people that -- the parents of the little girl she

19  baby sat.  During the investigation she baby sat a child in

12:20:55PM 20   Penfield and apparently that day had dropped the child off at

21  the YMCA in Penfield and was concerned that the child wouldn't

22  be picked up.  So she asked if she could call the parents.

23          I told her that she couldn't call, but I would call

24  for her.  And at that time she reached into her pocket and

12:21:16PM 25   handed me a wallet type -- it was a -- it was a wallet, but

1    inside the wallet was a cell phone.  It was like a wallet case

2    for a cell phone.

3    Q.    Like a flip phone or like a smart phone?

4    A.    No, it was a smart phone, but it was in like a wallet

12:21:32PM 5    container.  So I asked her if she would show me their

6    telephone numbers and how to get into the phone she did, she

7    assisted me in actually contacting the mother first.  I called

8    the mother's phone and the mother's phone went right to

9    voicemail.

12:21:51PM 10          Then she showed me the father's phone number.  I

11    contacted the father and I requested that he go pick up his

12    daughter and advised him that Leitscha wouldn't be able to do

13    that today.

14    Q.    All right.  If we can play the January 29th at 11:41?

12:22:30PM 15    Investigator Briganti -- if you can pause it here -- can you

16    tell us what you saw here?

17    A.    Yes.

18    Q.    What's going on here -- I'm sorry, what was happening here

19    was my question.

12:22:41PM 20    A.    So that was me coming into the screen talking on Leitscha

21    Poncedeleon's cellular telephone, I'm talking to the young

22    child's father asking him to pick her up.

23          This is Investigator Myron Moses.

24    Q.    When you say this, can you touch the screen to show who

12:23:03PM 25    is -- who is who?

1  A.   I'm sorry.  The person at the back of the Nissan Altima is

2  Investigator Myron Moses and he's taking photographs of the

3  interior of the Nissan Altima and the contents of the trunk.

4  Q.   And was Investigator Moses assigned any particular role

12:23:32PM 5  with respect to the execution of the search warrant at 292

6  Barrington Street?

7  A.   Yes, he was the evidence custodian.  So he would

8  collect -- he would photograph and collect any evidence

9  located inside.

12:23:43PM 10  Q.   All right.  If you can clear your screen for us, please,

11  and then we'll keep playing this clip.  All right, after you

12  talked to the father of the child at Leitscha Poncedeleon's

13  request over her cell phone, what did you do with it?

14  A.   I brought it inside 292 Barrington Street and gave it to

12:24:32PM 15  Investigator Moses to photograph and collect.

16  Q.   All right.  Was that phone collected as evidence?

17  A.   Yes, it was.

18  Q.   All right.  If I can show you -- Judge, may I approach the

19  witness?

12:24:52PM 20          **THE COURT:** Yes.

21          **MR. MARANGOLA:** Thank you.

22  **BY MR. MARANGOLA:**

23  Q.   Investigator, I just handed you a evidence bag.  Do you

24  see that?

12:25:13PM 25  A.   Yes.

1  Q.   Do you see Exhibit 672 in that bag?

2  A.   Yes.

3  Q.   And what is marked as Exhibit 672?

4  A.   It's the cell phone, Samsung cell phone that Leitscha

12:25:32PM 5  Poncedeleon had, it's the one that I talked to the child's

6  parents on.

7  Q.   You recognize it as the same phone?

8  A.   Yes.

9  Q.   And was that phone secured by Investigator Moses and taken

12:25:44PM 10  into custody?

11  A.   Yes.

12  Q.   Can you tell us what the phone number of that phone is?

13  A.   Yes.  685-4661.

14  Q.   That's the phone that you were holding on the video clip

12:26:04PM 15  we just saw?

16  A.   Yes.

17  Q.   All right.  Does that appear to be in the same condition

18  other than there being an exhibit sticker on it now and it not

19  being in a wallet anymore?

12:26:13PM 20  A.   Yes.

21            **MR. MARANGOLA:** At this time I offer Government's

22  672.

23            **MR. VACCA:** Objection, Your Honor.

24            **THE COURT:** Overruled.  Exhibit 672 will be

12:26:20PM 25  received.

1          (**WHEREUPON**, Government's Exhibit 672 was received

2    into evidence).

3    **BY MR. MARANGOLA:**

4    Q.   Investigator, do you see the phone number for Government's

12:26:37PM 5    672 on Government Exhibit 10 here?

6    A.   Yes.

7    Q.   What number from the top is it?

8    A.   It's the fourth line down from the top, it's the first one

9    in purple.

12:26:50PM 10   Q.   And was that the same phone number that you intercepted

11   the incoming text messages from Puerto Rico with the tracking

12   numbers you testified about earlier?

13   A.   Yes.

14   Q.   And that was handed to you by Leitscha Poncedeleon?

12:27:06PM 15   A.   Yes.

16   Q.   All right.  Investigator, you mentioned that when

17   Ms. Poncedeleon handed you that phone it was in some type of

18   wallet case; is that right?

19   A.   Yes.

12:27:27PM 20   Q.   And is that wallet case in the evidence bag as well?

21   A.   Yes, it is.

22   Q.   At some point did you search the wallet that Government's

23   672, that phone was in?  Did you search that wallet?

24   A.   Yes.

12:27:41PM 25   Q.   When did you search that wallet?

1    A.    In the days after the search warrants, so on the days

2    after January 29th.

3    Q.    What, if anything, did you find in searching the wallet

4    from which that cell phone was taken?

12:28:00PM 5    A.    So two pieces of paper in the wallet.  One was a piece of

6    paper with a number of tracking numbers on it and next to each

7    of tracking numbers there was initials.  And then there was a

8    receipt from RG&E for services at 15 Burbank Street during the

9    month of January of 2018.

12:28:25PM 10    Q.    All right.  I'd ask you to open that property bag there

11    and tell us are either of those two pieces of paper that you

12    just mentioned in there and are they marked?

13    A.    Yes.

14    Q.    First with respect to the paper with the U.S. Postal

12:28:53PM 15    tracking numbers on it, what's the exhibit number for that?

16    A.    That's 672A.

17    Q.    Is Government's 672A the piece of paper you removed from

18    Leitscha Poncedeleon's phone wallet?

19    A.    Yes.

12:29:09PM 20    Q.    Does it appear to be in the same condition as at the time

21    you removed it other than having the exhibit sticker on it?

22    A.    Yes.

23    Q.    And then what's the other item marked?

24    A.    The other item is Exhibit 672B.  And that's a receipt from

12:29:28PM 25    RG&E for service s at 15 Burbank Street during the month of

1  January of 2018.

2  Q.   And is that receipt Government's 672B, is that in the same

3  condition as when -- well, first, is that the actual receipt

4  that you removed from her wallet?

12:29:49PM 5  A.   Yes, it is.

6  Q.   And other than the exhibit sticker being on there is it in

7  the same condition as when you removed it from her wallet?

8  A.   Yes.

9         **MR. MARANGOLA:** At this time I'd offer Government's

12:29:58PM 10  672A and 672B.

11         **MR. VACCA:** Objection, Your Honor.

12         **THE COURT:** Exhibit 672A and 672B will be received.

13         (**WHEREUPON**, Government's Exhibit 672A and 672B were

14  received into evidence).

12:30:14PM 15         **MR. MARANGOLA:** Judge, if I could take those pieces

16  of paper and place them on the lectern to display for the

17  jury?

18         **THE COURT:** Yes.

19         **MR. MARANGOLA:** Thank you.

12:30:29PM 20  **BY MR. MARANGOLA:**

21  Q.   Investigator, do you see on your screen Government's 672A?

22  A.   Yes.

23  Q.   All right.  So do you recognize those tracking numbers --

24  any of those tracking numbers on there?

12:31:11PM 25  A.   Yes.

1    Q.   All right.  Are some of those numbers on Government's --

2    I'm sorry, 796 --

3              MR. MARANGOLA:  -- Ms. Rand, can we flip to our

4    trial computer?

12:31:26PM 5              THE CLERK: Yes, sorry.

6              MR. MARANGOLA: Thank you.  Can we split the screen?

7              THE COURT: I'm sorry?

8              MR. MARANGOLA: Do you know can we split the screen?

9              THE CLERK: Yes, I do know.  No, we cannot.

12:31:45PM 10              MR. MARANGOLA: Okay.

11   BY MR. MARANGOLA:

12   Q.   Maybe an easier way to do it is, Investigator Briganti, I

13   think you still have the hard copy, the binder of photographs.

14   Do you have it up there?  It might be on the ground.

12:32:01PM 15   A.   It's here, yes.

16   Q.   Can you pull it out?  I know I told you I probably

17   wouldn't show you again, but I'm sorry.  Can you flip to 672A?

18   I'm sorry, 796, the chart.  May not be able to flip them all

19   at the same time.  796.

12:33:48PM 20   A.   Okay.

21   Q.   Do you have the chart there on your monitor?  I'm sorry,

22   do you have the chart in the hard copy?

23   A.   I have the chart in the hard copy, yes.

24   Q.   And on your monitor there do you have the piece of paper

12:34:00PM 25   from Ms. Poncedeleon's wallet marked Government's 672A?

94

1   A.   Yes, sir.

2   Q.   All right.  Can you tell us starting with the top tracking

3   number, do you see that tracking number on the Postal chart

4   marked Government's 796?

12:34:18PM 5   A.   Yes.

6   Q.   What's the delivery date of the top package that's

7   contained on the tracking number on 672A?

8   A.   January 2nd of 2018.

9   Q.   What about the next tracking number on Government's

12:34:38PM 10   672A -- I'm sorry, let's go back to the first one.  First one,

11   what's the address?

12   A.   4 Ritz Street.

13   Q.   And who lived at 4 Ritz Street?

14   A.   Mickael Grant also known as CJ.

12:34:52PM 15   Q.   What are the initials next to that tracking number?

16   A.   CJ.

17   Q.   Let's go to the next package listed on Government's 672A.

18   Do you see that on the Postal chart marked Government's 796?

19   A.   Yes.

12:35:07PM 20   Q.   Where is it?

21   A.   It's --

22   Q.   Sorry, what's the address and the delivery date?

23   A.   The delivery date is 1 -- January 2nd, 2018.  And the

24   address is 282 Rosedale.

12:35:25PM 25   Q.   All right.  And on the second -- on the second tracking

1    number on Government's 672A, what are the handwritten letters

2    next to the tracking number?

3    A.    ANT.

4    Q.    Okay. Let's go to the third tracking number on

12:35:41PM 5    Government's 672A.  Do you see that on the Postal chart?

6    A.    Yes, I do.

7    Q.    And what's the delivery date and address for that package?

8    A.    January 5th, 2018.

9    Q.    What's the address?

12:36:00PM 10    A.    286 Garson Avenue.

11    Q.    And who lived at 286 Garson Avenue?

12    A.    Karina Lopez Del Valle.

13    Q.    What are the initials next to the tracking number on 672A?

14    A.    It appears to be KNA.

12:36:18PM 15    Q.    All right.  Let's go to the tracking number below that

16    one.  Is that on the Postal records chart marked 796?

17    A.    Yes.

18    Q.    What's the delivery date and address for that package?

19    A.    January 19th, 2018.  59 Fernwood Avenue.

12:36:46PM 20    Q.    What are the initials next to the tracking number on

21    Government's 672A?

22    A.    ING.

23    Q.    Who lived at 59 Fernwood Avenue?

24    A.    Ingrid Mercado.

12:36:56PM 25    Q.    Let's go to the next tracking number on 672A.  Do you see

1    that on the Postal records chart?

2    A.    Yes, sir.

3    Q.    And what's the date of delivery and address for that

4    package?

12:37:10PM 5    A.    January 20th, 2018.  And what's the delivery address?

6    A.    59 Fernwood Avenue.

7    Q.    What are the initials on 672A next to that tracking

8    package?

9    A.    ING.

12:37:26PM 10   Q.    Let's go to the next tracking number.  Do you see that on

11   Government's 796?

12   A.    Yes, sir.

13   Q.    What's the delivery date and address for that tracking

14   number?

12:37:45PM 15   A.    January 22nd, 2018.  286 Garson Avenue.

16   Q.    What are the initials next to that tracking number on

17   672A?

18   A.    KNA.

19   Q.    And who lived there at 286 Garson?

12:38:03PM 20   A.    Karina Lopez.

21   Q.    Let's go to the next tracking number on 672A.  Is that on

22   Postal chart marked Government's 796?

23   A.    Yes.

24   Q.    What's the delivery date and address for that package?

12:38:20PM 25   A.    January 22nd, 2018.

1  Q.    What's the delivery address?

2  A.    157 Depew Street.

3  Q.    All right.  Are there initials next to that tracking

4  number?

12:38:34PM 5  A.    No.

6  Q.    Let's go to the one below it.  Is that tracking number on

7  the Postal records chart marked Government's 796?

8  A.    Yes.

9  Q.    What's the delivery date and address for that tracking

12:38:48PM 10  number?

11  A.    January 22nd, 2018.

12  Q.    Go ahead, I was going to ask the address.

13  A.    360 St. Paul Street.

14  Q.    And who lived there?

12:39:02PM 15  A.    Jose Olivencia also known as Bacalao Tito.

16  Q.    Let's go to the tracking number below that.  Is that on

17  the Postal records chart marked Government's 796?

18  A.    Yes.

19  Q.    And what's the address and delivery date for that package?

12:39:28PM 20  A.    So there is no delivery date, but the address is 4 Ritz

21  Street.

22  Q.    All right.  That was the package that was held by Postal?

23  A.    Yes.

24  Q.    What are the initials next to that tracking number on

12:39:44PM 25  Government's 672A?

1 A.   CJ.

2 Q.   And who lived at 4 Ritz Street during the wiretap

3 investigation?

4 A.   Mickael Grant also known as CJ.

12:39:54PM 5 Q.   And, finally, the last tracking number on Government's

6 672A, is that on the Postal records chart marked 796?

7 A.   Yes.

8 Q.   What's the delivery date and address for that package?

9 A.   January 29th, 2018.   15 Harwood Street.

12:40:12PM 10 Q.   Who lived at that address during the wiretap

11 investigation?

12 A.   Anthony Williams.

13 Q.   And what are the initials next to that tracking number?

14 A.   ANT.

12:40:23PM 15 Q.   So how many total packages are there listed on

16 Government's 672A?

17 A.   Appears to be ten.

18 Q.   And every single one of those was also on the Postal

19 records chart marked Government's 796?

12:40:40PM 20 A.   Yes.

21 Q.   All right.

22           **MR. MARANGOLA:** Paula, can you flip the monitor for

23 us so we can put --

24           **THE CLERK:** Back to you?

12:40:58PM 25           **MR. MARANGOLA:** Yeah, back to us.   Thanks.

1   **BY MR. MARANGOLA:**

2   Q.   Investigator, do you see Government's 26?

3   A.   Yes, I do.

4   Q.   Are any of the initials or names that you just saw listed

12:41:08PM 5   on 672A, the handwritten piece of paper with tracking numbers

6   and initials, are any of those individuals listed on

7   Government's Exhibit 26?

8   A.   Yes.

9   Q.   Can you identify where they are first?  Generally where

12:41:23PM 10   are they on this photo?

11   A.   They're in the last row of the photo.  So the bottom.

12   Q.   The bottom row?

13   A.   Yes.

14   Q.   And can you point them out for us?

12:41:33PM 15   A.   Yes.  So from the left is Karina Lopez.  Next to her

16   photograph is Ingrid Mercado.  Next to Ingrid Mercado's

17   photograph is Anthony Williams.  Next to Anthony Williams'

18   photograph is Mickael Grant also known as CJ.  And next to

19   Mickael Grant's photograph is Jose Olivencia also known as

12:42:04PM 20   Bacalao Tito.

21           **MR. MARANGOLA:** Judge, I can keep going into another

22   section unless the Court wishes to stop.  I'm fine either way.

23           **THE COURT:** Sidebar.

24           (**WHEREUPON**, a discussion was held at side bar out

12:42:20PM 25   of the hearing of the jury.)

1          **THE COURT:**  I thought this might be a good time to

2 break for the weekend.  Any objection to that?

3          **MR. MARANGOLA:** No.

4          **MR. VACCA:** No.

12:42:40PM 5          **THE COURT:** Okay, thank you.

6          (**WHEREUPON**, end of side bar discussion.)

7          **THE COURT:** Ladies and gentlemen, at this point I

8 think we're going to recess for the weekend, give you a little

9 break.  We went a long session this last time, therefore, I

12:42:57PM 10 think it would be appropriate to break until Monday at 8:30.

11          You've heard a lot of evidence over this week.

12 It's not the time to make up your mind.  It's clearly not the

13 time to discuss the matter with anybody or allow anybody to

14 discuss the matter with you.  That would be wholly

12:43:13PM 15 inappropriate.

16          We certainly appreciate the attention to this case

17 you've given.  I know some of the testimony has dragged on a

18 little bit, but it's important to get the details, but you've

19 paid attention.  We appreciate that.

12:43:27PM 20          So with that understanding the jury may step down

21 until Monday 8:30 a.m.  Have a great weekend and, again,

22 please do not discuss the matter or allow anybody to discuss

23 the matter with you.  You may step down.

24          (**WHEREUPON**, the jury was excused).

12:43:47PM 25          **THE COURT:**  You may step down.

1          **THE WITNESS:** Thank you.

2          (**WHEREUPON**, the witness stepped down).

3          **THE COURT:** Anything before we recess?

4          **MR. VACCA:** No, Your Honor.

12:44:25PM 5          **MR. MARANGOLA:** No, thank you, Judge.

6          **THE COURT:** Thank you.  Have a good weekend.

7          **MR. MARANGOLA:** Have a good weekend.

8          (**WHEREUPON**, proceedings adjourned at 12:44 p.m.)

9                        *   *   *

10                 <u>**CERTIFICATE OF REPORTER**</u>

11

12          In accordance with 28, U.S.C., 753(b), I certify that

13 these original notes are a true and correct record of

14 proceedings in the United States District Court for the

15 Western District of New York before the Honorable Frank P.

16 Geraci, Jr. on April 30th, 2021.

17

18 <u>S/ Christi A. Macri</u>

19 Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
   Official Court Reporter

20

21

22

23

24

25