```
 1                    UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF NEW YORK

 3

 4

 5   - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA            18-CR-6094(G)
 6
     vs.
 7                                       Rochester, New York
     CARLOS JAVIER FIGUEROA,             May 3, 2021
 8             Defendant.                8:30 a.m.
     - - - - - - - - - - - - -X
 9

10                   TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE FRANK P. GERACI, JR.
11             UNITED STATES DISTRICT CHIEF JUDGE

12
                     JAMES P. KENNEDY, JR., ESQ.
13                   United States Attorney
                     BY: ROBERT A. MARANGOLA, ESQ.
14                       CASSIE M. KOCHER, ESQ.
                     Assistant United States Attorneys
15                   500 Federal Building
                     Rochester, New York 14614
16                   Appearing on behalf of the United States

17
                     PAUL J. VACCA, JR., ESQ.
18                   One East Main Street, Suite 1000
                     Rochester, New York 14614
19                   Appearing on behalf of the Defendant

20
     ALSO PRESENT:      Nicolas Penchaszadeh, Spanish Interpreter
21                      Barbara Considine, Spanish Interpreter

22
     COURT REPORTER:    Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
23                      Christimacri50@gmail.com
                        Kenneth B. Keating Federal Building
24                      100 State Street, Room 2640
                        Rochester, New York 14614
25
```

1                          **I N D E X**

2     **WITNESS FOR THE GOVERNMENT**

3     Joseph Briganti
            Direct examination by Mr. Marangola          Page    3
4           Cross-examination by Mr. Vacca               Page   75
            Redirect examination by Mr. Marangola        Page  111
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>**P R O C E E D I N G S**</u>

2                         *    *    *

3              **(WHEREUPON**, the defendant is present).

4              **THE COURT:** Good morning.

08:10:56AM 5   **MR. MARANGOLA:** Good morning.

6              **MS. KOCHER:** Good morning.

7              **MR. VACCA:** Good morning.

8              **(WHEREUPON**, Barbara Considine was sworn as an

9    interpreter).

08:55:32AM 10          **THE COURT:** Before we begin there was a motion filed

11   by the Government that was not filed under seal, right?

12              **MR. MARANGOLA:** It was not filed under seal, no.

13              **THE COURT:** A motion *in limine* to preclude the

14   defense from cross-examining Government witnesses regarding

08:56:04AM 15  issues with anxiety and/or depression.  Did you get to see

16   this yet, Mr. Vacca?

17              **MR. VACCA:** I did, Your Honor.  I've reviewed it.  I

18   had an opportunity to review it with my client as well.

19              **THE COURT:** Okay.  What's your position?

08:56:15AM 20           **MR. VACCA:** My position, Your Honor, is I would

21   strenuously object to it.  In any criminal case a defendant

22   has an absolute right to confront witnesses against him.  This

23   is open-ended.  They don't give any specific dates.  Even if

24   they did give names, to preclude the defense from

08:56:33AM 25  cross-examining witnesses flies in the face of our entire

1  judicial system.  So I would object to it, Your Honor, and I

2  would even object to it on a case-by-case or

3  witness-by-witness decision by the Court.

4          **THE COURT:** Okay.  I know the Government has cited

08:56:49AM 5  two different cases, one in the Southern District in which

6  they apparently did allow some preclusion; and one in the

7  Eastern, which they did not.

8          I'm going to deny the motion at this time.  I think

9  it's way too general without any indication of any particular

08:57:06AM 10  individuals.  I do believe the Government could submit

11  information *in camera* to the Court to examine on an individual

12  basis if there's a particular situation with a witness that

13  they feel could be precluded and I can determine whether or

14  not it should be disclosed to the defense and then hear

08:57:25AM 15  further argument.

16          So at this time it's denied.

17          **MR. MARANGOLA:** Judge, may I provide some additional

18  information to the Court with respect to one of the witnesses

19  because one of them may be this afternoon or I guess later

08:57:36AM 20  this morning.

21          It's Kristin Trewer.  Ms. Trewer collected casings.

22  She's a civilian technician from the Rochester Police

23  Department, she collected casings at two crime scenes that

24  will be heard about during this case.  One is the Walter Ross

08:57:53AM 25  murder scene in 2016; and she also collected evidence at the

1  shooting at the defendant's house at the takedown in January

2  of 2018.

3          Ms. Trewer after the events of this case, both the

4  2016 and 2018, was working as a technician collecting casings

08:58:16AM 5  at a particular scene one day and an individual came by and

6  shots rang out; they fired shots in the area where she was.

7  As a result of that, she has suffered from anxiety and

8  post-traumatic stress syndrome.

9          Those issues with her developed after her work in

08:58:38AM 10  this case.  She was not taking medication at the time of her

11  work in this case.  And I think the case law supports the idea

12  that having anxiety and depression do not go to a witness's

13  ability to recall events and are not proper subject for

14  impeachment as to their credibility, especially in the event

08:59:03AM 15  they did not have those conditions at the time of the events

16  to which they're testifying, or taking medication that would

17  effect their ability to recall those events.

18          **THE COURT:** That's exactly -- one of the cases said

19  the opposite, didn't it?  The Eastern District?

08:59:18AM 20          **MR. MARANGOLA:** I think that case was -- involved a

21  witness who was taking medication while the events about which

22  they were testifying occurred.

23          This is not that case.  As I mentioned, Ms. Trewer

24  didn't have these issues until well after her work as a

08:59:35AM 25  technician at the Walter Ross scene and at the shooting of

Obed Torres.

And we have another witness who after his arrest in this case has developed anxiety and depression and based on that, Your Honor, again it wasn't -- they weren't conditions the witness suffered or took medication from during the events about which they're going to testify, but something that occurred after those events.  And there's no indication that having anxiety or depression makes a witness's ability to recall incidents at a time when they didn't have anxiety or depression any greater or lesser.

So that's the -- essentially the thrust of the motion.  We didn't want to outline those issues in a public filing as the Court can understand and I appreciate the opportunity to put down some of that additional information for the Court, but that's essentially what we have with Ms. Trewer and with another cooperating witness, anxiety and depression that developed after the events about which they'll be called to testify.

**THE COURT:** Both on medications currently?

**MR. MARANGOLA:** Yes, both currently on medications, that's correct.

**THE COURT:** All right. I think with those details -- obviously I can do some research on the issue.  We need to give Mr. Vacca an opportunity as well to dwell on that now that we have more specific information.  I'll make a ruling

1  before the witness testifies if we have time to do that.

2           **MR. VACCA:**  First of all, Judge, I don't know who

3  these witnesses are, potential witnesses.

4           **THE COURT:** He just told you.

09:01:10AM 5           **MR. VACCA:** He said there are other individuals.

6           **THE COURT:** Another individual.

7           **MR. VACCA:** Another individual.  But they must have

8  known this a long time ago and under *Jencks* they should have

9  furnished that information.  Now when we're in our sixth day

09:01:22AM 10 of trial --

11          **THE COURT:** Okay, all right.  I'll give you a

12 chance to respond obviously.  Ready to proceed?

13          **MR. MARANGOLA:** Yes, Judge.  The only other thing I

14 was going to raise is I let Mr. Vacca know, just as a matter

09:01:33AM 15 of kind of a head's up for the Court, I plan to finish with

16 Investigator Briganti this morning, probably I would imagine

17 it would be shortly after our first break, but I did want to

18 let the Court know it will probably be after that break, but I

19 did plan to play one call from the wiretap with Investigator

09:01:54AM 20 Briganti and I wanted to let the Court know it's a call --

21 normally I ask the investigator to identify individuals'

22 voices, and we will have cooperating witnesses and other folks

23 that are going to do that.

24          However, he actually would be able to do that with

09:02:10AM 25 respect to this defendant and others, but one particular call

1   which is at tab -- I can just describe it for the Court first.

2   If the Court wishes to flip to it, we can certainly have more

3   discussion, but there is a call -- it's at the end of the

4   wire -- actually right during the takedown in which ADT, the

09:02:29AM 5   alarm company, calls the defendant's phone number, the

6   766-8057, about an alarm and they ask who they're speaking to

7   or they ask for the name of the person they're speaking to and

8   the defendant identifies himself by name, he says Carlos

9   Figueroa.

09:02:48AM 10           So based on that, Judge, I think that's more than

11   enough to allow the call to be admitted based on the voice

12   identification of the participant in the call identifying

13   himself as Carlos Figueroa, but nonetheless, Investigator

14   Briganti will say that he's reviewed that call and the person

09:03:09AM 15   who identified himself as Carlos Figueroa Investigator

16   Briganti heard during wiretaps in this case on hundreds of

17   occasions and that Investigator Briganti spoke to the

18   defendant at the time of his arrest and when he did the voice

19   of the defendant, the voice of the person he spoke to in

09:03:28AM 20   person is the same voice that he heard identify himself as

21   Carlos Figueroa in this call and the same that he heard

22   throughout the hundreds of wiretap calls that he listened to

23   in the case.

24           **THE COURT:**  That's the only substance of the

09:03:41AM 25   conversation is the name Carlos Figueroa?

1          **MR. MARANGOLA:** Yes.  They just -- it's -- they call

2     up and ask is everything okay at a particular address and he

3     says yes, everything is okay.  It's tab 1-1-192.  I won't be

4     asking the investigator any, like, interpretation questions or

09:04:15AM 5     anything like that.  I think it's a self-explanatory call and

6     it is in English.

7          So I did want to let the Court know that I would be

8     offering that based on the defendant's identification of his

9     own voice as the person making that call.

09:04:37AM 10          **MR. VACCA:** Your Honor, first of all, as far as that

11     is concerned there's been no establishment that that is the

12     voice of Carlos.

13          **THE COURT:** They have to lay a foundation obviously

14     before they could do that.

09:04:48AM 15          **MR. VACCA:** Right.  And I think this is immaterial.

16     They're talking about an alarm going off.  I think it's

17     irrelevant, immaterial and incompetent because it has

18     nothing -- this one has really nothing to do with this case.

19          There's nothing in there where he incriminates

09:05:04AM 20     himself or anything, but they're going to use that as

21     identification that Carlos Figueroa is attached to that phone

22     number.

23          **THE COURT:** Makes it relevant, doesn't it?  Okay.

24     So we'll see if the foundation is properly laid.  It sounds

09:05:22AM 25     like it's -- possibly there's another person speaking on that

1 | line as well?

2 | **MR. MARANGOLA:** Yeah, Judge, there's actually three

3 | folks.  There's an ADT person who self-identifies.  There's

4 | the defendant who self-identifies.  And then there's one line

09:05:34AM 5 | from the defendant's wife Nisharya Gutierrez at the very end

6 | of the call.

7 | And Investigator Briganti will also say that he

8 | heard her voice during the course of the wiretap, that he had

9 | spoken to her in person and that the person is listed as NG

09:05:49AM 10 | responding to Nisharya -- or corresponding to Nisharya

11 | Gutierrez, that's the person he spoke to, so recognizes her

12 | voice.

13 | **MR. VACCA:** Same objection on that, there's no

14 | foundation right now.

09:06:03AM 15 | **THE COURT:** Absolutely.  He's just proffering the

16 | foundation at this point.  You also have to lay the foundation

17 | through the witness.  All right, we can bring the jury out.

18 | (**WHEREUPON**, the jury is present).

19 | **THE COURT:**  Good morning, members of the jury.

09:09:30AM 20 | We're ready to proceed.

21 | **MR. MARANGOLA:** Thank you, Your Honor.

22 | **BY MR. MARANGOLA:**

23 | Q.   Good morning, Investigator Briganti.

24 | A.   Good morning.

09:09:40AM 25 | Q.   I'd like to pick up where we left off last week.  I think

1    we were at the events that occurred at 292 Barrington Street

2    on January 29th, 2018.

3              I'd like right now to publish the -- from

4    Government's Exhibit 22 the pole camera clip.  I believe we

09:10:02AM 5    saw this at some point late in our session Friday and I'd ask

6    you if we could go ahead and play that?  Thank you.

7              Investigator Briganti, can you describe -- pause it

8    here one second -- just generally what had occurred right

9    before the Nissan Altima pulled into 292 Barrington Street as

09:10:26AM 10   shown in this video clip?

11   A.   Yes, I observed the Nissan Altima arrive at 15 Harwood

12   Street.  A male came out of 15 Harwood Street and placed a box

13   in the trunk of the Nissan Altima and I observed Leitscha

14   Poncedeleon enter back into the driver's seat of the vehicle

09:10:48AM 15   and the vehicle proceeded -- well, left the location and then

16   I observed the vehicle drive directly to the area of 292

17   Barrington Street.

18             When we got out to the street on Barrington Street

19   I radioed to the other teams to prepare to execute their

09:11:06AM 20   search warrants and I let them know that once I observed the

21   vehicle pull into the driveway that I would give the order to

22   execute search warrants.

23             I observed -- I drove past the driveway and then I

24   observed the Nissan Altima pull into the -- into the driveway,

09:11:23AM 25   at which time I gave the order to execute all the search

12

1  warrants.

2  Q.   And when you observed the Nissan pull into the driveway

3  how did you observe it?

4  A.   I observed it through my rearview mirror.  Her vehicle was

09:11:34AM 5  behind my vehicle.

6  Q.   All right.  And then if we can continue here playing this?

7  And this is at 11:31; is that correct?

8  A.   Yes.

9  Q.   You see the members of the entry team approach the door

09:12:20AM 10  there?

11  A.   Yes, sir, I do.

12  Q.   Can you tell us about what time they appear to make entry

13  into that residence?

14  A.   It was approximately 11:32.

09:12:51AM 15  Q.   All right.  That's Leitscha Poncedeleon in the white coat?

16  A.   Yes.

17  Q.   All right. And that clip ends at approximately 11:33 and

18  change; is that right?

19  A.   Yes.

09:13:10AM 20  Q.   Can you tell us after Ms. Poncedeleon was taken into

21  custody was the residence at 292 Barrington Street searched?

22  A.   Yes.

23  Q.   And was that vehicle, that Nissan Altima that we just saw

24  Ms. Poncedeleon being taken into custody at, was that vehicle

09:13:32AM 25  also searched?

1  A.    Yes.

2  Q.    And were you present for the searches of 292 Barrington

3  Street and that Nissan Altima?

4  A.    Yes.

09:13:41AM 5  Q.    What, if anything, did you see in the trunk of that Nissan

6  Altima?

7  A.    There was a brown package with that Postal label from

8  Puerto Rico.  Inside the package was several boxes of candy,

9  and inside two of the boxes of candy were wrapped in black

09:14:05AM 10  carbon paper -- an item that was wrapped in black carbon

11  paper.

12  Q.    All right.  As officers searched the Nissan Altima and 292

13  Barrington Street, other officers were searching other

14  locations that you had directed them to search; is that right?

09:14:20AM 15  A.    Yes.

16  Q.    Let's talk about the search at 292 Barrington Street and

17  the Nissan Altima.  If I can show you first Government's --

18  what's not in evidence as Government's 565.  Is that up on

19  your screen there?

09:14:54AM 20  A.    Yes.  565?

21  Q.    Yes.

22  A.    Yes.

23  Q.    Can you tell the jury do you recognize what's shown in

24  Government's 565?

09:15:00AM 25  A.    Yes, it's the front of -- the front of the location at 292

1  Barrington Street.

2  Q.   Does Government's Exhibit 565 fairly and accurately show

3  the front of 292 Barrington Street as it existed at the time

4  of that search warrant on January 29th, 2018?

09:15:17AM 5  A.   Yes.

6  **MR. MARANGOLA:** At this time I'd offer Government's

7  565.

8  **MR. VACCA:** Objection, Your Honor.

9  **THE COURT:** Basis?

09:15:22AM 10  **MR. VACCA:** Relevancy.

11  **THE COURT:** Overruled.  Exhibit 565 will be

12  received.

13  (**WHEREUPON**, Government's Exhibit 565 was received

14  into evidence).

09:15:31AM 15  **BY MR. MARANGOLA:**

16  Q.   And before we get into the evidence seized inside 292

17  Barrington Street, I'd like you to look at what's not in

18  evidence as Government's 634.  I'm going to show you a few

19  photos.  635.  636.  And 637.

09:16:06AM 20  Can you describe generally what are contained in

21  Government's Exhibit 634 through 637?

22  A.   Yes.  It's the Nissan Altima and then the Postal package

23  that was in the trunk of the Nissan Altima.

24  Q.   Do Government's 634 through 637 show those areas at the

09:16:29AM 25  time of the search on January 29th, 2018?

1  A.    Yes.

2  Q.    Are they -- do they fairly and accurately reflect items

3  that you observed on that day?

4  A.    Yes.

09:16:39AM 5            **MR. MARANGOLA:** At this time I'd offer 634 to 637.

6            **MR. VACCA:** No objection, Your Honor.

7            **THE COURT:** Exhibits 634, 635, 636 and 637 will be

8  received in evidence).

9            (**WHEREUPON**, Government's Exhibits 634-637 were

09:17:01AM 10  received in evidence).

11  **BY MR. MARANGOLA:**

12  Q.    Investigator, can you tell us what's shown in 634?

13  A.    Yes, it's a photo of the rear of the Nissan Altima.

14  Q.    Is that the same vehicle that you observed Leitscha

09:17:12AM 15  Poncedeleon at from 15 Harwood Street all the way to 292

16  Barrington Street?

17  A.    Yes.

18  Q.    If we could go to 635?  Can you describe what's in 635?

19  A.    Yes, it's a photo of the contents of the trunk including

09:17:30AM 20  the Postal package in the trunk.

21  Q.    All right.  And can you show us 636?  Can you tell us

22  what's in Government's 636?

23  A.    Yes, it's a photograph of the tracking label on the

24  package that was in the trunk of the Nissan Altima.

09:17:51AM 25  Q.    And what is the expected delivery day of that package?

1   A.   1/27/2018.

2   Q.   And if you could, can you tell us the last six digits of

3   the tracking number below the bar code there?

4   A.   Yes.   1504 05.

09:18:16AM 5   Q.   Now, take a look at Government's 795.  Tell us, do you see

6   the last six digits of the tracking code that you just

7   mentioned anywhere on Government's 795?

8   A.   Yes.

9   Q.   Can you touch the screen where you see those?

09:18:31AM 10   A.   Yes.   The second one from the bottom, putting a line next

11   to it, it's in red.

12   Q.   That reflects the same tracking number that was on that

13   package; is that right?

14   A.   Yes.

09:18:43AM 15   Q.   And the delivery date states January 29th, 2018?

16   A.   Yes.

17   Q.   And what's the delivery address?

18   A.   15 Harwood Street.

19   Q.   All right.   If we can go back to 637?  Can you tell us

09:18:58AM 20   what's shown in Government's 637?

21   A.   It's a photograph of the mailing label on the box that was

22   in the trunk of the Nissan Altima.

23   Q.   Can you make out the name and the address on that label?

24   A.   I can make out a portion of the name and the address, yes.

09:19:20AM 25   Q.   Can you tell us what you can make out?

1   A.   Anthony Williams, 15 Harwood, apartment -- and then I

2   can't make out the rest of that.  Rochester, New York.  14620.

3   Q.   All right.  And now if I can show you what's not in

4   evidence as Government's -- we'll start at Government's 638.

09:19:48AM 5   Show you Government's 639.  And Government's 640.  Do you

6   recognize what's shown in those three photographs?

7   A.   Yes.

8   Q.   Can you describe generally what's shown in those three

9   photographs?

09:20:04AM 10   A.   Yes.  It's the contents of the Postal box which were

11   individual boxes of candy, and in two of the boxes of candy

12   were items wrapped in carbon paper that were later identified

13   as kilos of cocaine.

14           MR. VACCA: Objection, Your Honor.

09:20:28AM 15           THE COURT: Yes, sustained, the last part of the

16   answer will be stricken.

17   BY MR. MARANGOLA:

18   Q.   Investigator Briganti, do Government's 638 through 640

19   fairly and accurately show the contents of the Postal box at

09:20:41AM 20   the time you observed it being opened on January 29th, 2018?

21   A.   Yes.

22           MR. MARANGOLA: At this time I'd offer Government's

23   638 to 640.

24           MR. VACCA: Objection on grounds of relevancy, Your

09:20:53AM 25   Honor.

1          **THE COURT:** Overruled.  Exhibit 638, 639, 640 will

2    be received.

3              (**WHEREUPON**, Government's Exhibits 638-640 were

4    received into evidence).

09:21:03AM 5   **BY MR. MARANGOLA:**

6    Q.   If we could publish 638?  Is that a photograph of the box

7    when it was first opened?

8    A.   Yes.

9    Q.   Let's go to 639.  Can you identify what's shown in

09:21:22AM 10   Government's 639?

11   A.   Yes.  It's a box of peanut M&Ms and an item wrapped in

12   carbon paper inside that box.

13   Q.   All right.  And can you show -- can we go to 640?  Can you

14   tell us what's shown in Government's 640?

09:21:43AM 15   A.   Yes, it's a box containing Skittles candies and inside

16   that box is an item wrapped in carbon paper.

17   Q.   All right.  And did you see the items in carbon paper

18   after they were unwrapped or no?

19   A.   Yes.

09:22:01AM 20   Q.   Can you describe what you saw when the items from those

21   two candy boxes that were wrapped in carbon paper were

22   unwrapped?

23   A.   Yes, they were 2 kilograms of cocaine.

24          **MR. VACCA:** Objection, Your Honor.

09:22:16AM 25          **THE COURT:** Sustained.

**BY MR. MARANGOLA:**

Q.   Investigator, can you tell the jury was there anyone inside 292 Barrington Street at the time the officers entered to search it?

09:22:29AM A.   Yes.

Q.   Who?

A.   Roberto Figueroa and his child.

Q.   What happened after officers entered the residence at 292 Barrington Street?

09:22:41AM A.   After Mr. Figueroa was secured inside photographs were taken of the location along with the Nissan Altima and then a search was conducted for evidence inside.

Q.   Did you yourself enter and observe evidence found during the search at 292 Barrington Street?

09:22:58AM A.   Yes, sir, I did.

Q.   Did you physically participate in the search as well?

A.   No.

Q.   All right.  But you're familiar based on your observations of what was found inside 292 Barrington Street during the

09:23:09AM search?

A.   Yes, I was there when items of evidence were located.

Q.   All right. If you could describe some of the items that members of the team found during the search at 292 Barrington Street?

09:23:21AM A.   So there was a box that contained approximately $230,000

1   in cash, it was divided up into bundles and those bundles were

2   vacuum sealed.

3          There were also eight firearms located inside;

4   there were six long guns and two handguns.

09:23:44AM 5          There was a Home Depot bucket that contained

6   approximately 720 grams of cocaine.

7              **MR. VACCA:** Objection, Your Honor.

8              **THE COURT:** Sustained to the last part of the

9   answer.

09:23:57AM 10             **THE WITNESS:** The items in the bucket were divided

11  into -- there was a 500 gram piece and then there were three

12  62 gram pieces and then one --

13             **MR. VACCA:** Objection, Your Honor.

14             **THE COURT:** Sustained.

09:24:16AM 15 **BY MR. MARANGOLA:**

16  Q.   Can you describe the items that you're describing?  What

17  did they look like to you?

18  A.   What they appeared to be?

19  Q.   No, no.  What they physically looked like.

09:24:27AM 20 A.   Oh, yes.  The larger item was in a block shape.  The three

21  items were like a ball shape.  And the last item was in -- was

22  packaged in a small bundle shape.

23  Q.   What color were the items that you're describing in these

24  shapes and bags?

09:24:54AM 25 A.   White powder.

1            **MR. VACCA:** Objection, Your Honor, to the

2   characterization of powdery.

3            **THE COURT:** Overruled.

4   **BY MR. MARANGOLA:**

09:25:00AM 5   Q.   Investigator, have you seen in your over -- I think it was

6   24 years as a police officer?

7   A.   27 years.

8   Q.   27 years as a police officer have you observed cocaine

9   during your experience as a narcotics investigator?

09:25:13AM 10   A.   Yes, thousands of times.

11   Q.   How many times?

12   A.   Thousands of times.

13   Q.   Are you familiar with its appearance?

14   A.   Yes.

09:25:20AM 15   Q.   Are you familiar with its texture?

16   A.   Yes.

17   Q.   Are you familiar with its color?

18   A.   Yes.

19   Q.   Have you been trained in conducting field tests of items

09:25:29AM 20   that are suspected to be cocaine?

21   A.   Yes.

22   Q.   Are you -- have you field tested yourself items suspected

23   to be cocaine?

24   A.   Yes.

09:25:37AM 25   Q.   And are you trained in how to conduct those field tests?

1  A.   Yes.

2  Q.   Can you compare the items that you observed in the

3  Home Depot bucket to items you have previously identified as

4  cocaine in your thousands of times observing cocaine as a

09:25:54AM 5  narcotics investigator?

6  A.   Yes.  It appeared to be the same.

7  Q.   All right.

8          MR. VACCA: Objection, Your Honor.

9          THE COURT: Overruled.

09:26:03AM 10  BY MR. MARANGOLA:

11  Q.   Similarly, with the items that were wrapped in carbon

12  paper that we showed you in Government's 639 and shown here in

13  Government's 640, can you compare the items you previously

14  observed as cocaine in your career to the items that were

09:26:16AM 15  removed from the carbon paper as shown in Government's 639 and

16  640?

17          MR. VACCA: Objection, Your Honor.

18          THE COURT: Overruled.  He can answer the question.

19          MR. VACCA: He's making a comparison of two items.

09:26:28AM 20          THE COURT: He's talking about white powder.  He

21  cannot testify it's cocaine or not, but he's indicating it's

22  white powder consistent with what he's seen before.

23  Overruled.

24          THE WITNESS: Yes, it appeared to be the same.

09:26:39AM 25  BY MR. MARANGOLA:

1  Q.   All right. In addition to the bags of white powder in the

2  Home Depot bucket, what other evidence did you observe

3  yourself at 292 Barrington Street?

4  A.   There was a large amount of ammunition located inside.

09:26:58AM 5          **MR. VACCA:** Objection, Your Honor.

6          **THE COURT:** Overruled.

7          **THE WITNESS:** There were also beakers, scales,

8  packaging materials, walkie-talkies, there were also cell

9  phones, there's also documentary materials -- it was like

09:27:22AM 10 notebooks, organizers and folders with paperwork inside, there

11 were numerous boxes of candy, and there were also the Postal

12 boxes in the basement and in the garage.

13 **BY MR. MARANGOLA:**

14 Q.   All right. If I can show you what is not in evidence as

09:27:47AM 15 Government's 610.  You see Government's Exhibit 610?

16 A.   Yes, I do.

17 Q.   Do you recognize what's shown in Government's 610?

18 A.   Yes.

19 Q.   What is that?

09:28:07AM 20 A.   It's a box containing U.S. currency.

21 Q.   Did you observe that box at the time of the execution of

22 the search at 292 Barrington Street on January 29th, 2018?

23 A.   Yes, I was there when it was located.

24 Q.   Does Government's 610 fairly and accurately show that box

09:28:27AM 25 and the cash as it existed at the time of the search on

1  January 29th, 2018?

2  A.  Well, the box was closed.  The investigators opened the

3  box and the bubble wrap was removed from the top prior to the

4  photograph being taken, but the box was closed when it was

09:28:46AM 5  initially observed.

6  Q.  Okay. So Government's 610 shows the box after it was

7  opened by investigators?

8  A.  Yes.  Shows the box and the contents inside the box but

9  that was not the way it was found originally.

09:28:57AM 10  Q.  Right.  Does Government's 610 fairly and accurately show

11  the contents of the box after it was opened by investigators?

12  A.  Yes, it does.

13          **MR. MARANGOLA:** At this time I offer Government's

14  610.

09:29:08AM 15          **MR. VACCA:** No objection, Your Honor.

16          **THE COURT:** Exhibit 610 will be received.

17          (**WHEREUPON**, Government's Exhibit 610 was received

18  in evidence).

19  **BY MR. MARANGOLA:**

09:29:19AM 20  Q.  Investigator, can you point to the -- you previously

21  testified there were vacuum sealed packages of money?

22  A.  Yes.

23  Q.  Ms. Rand can publish that for us?  Thank you.

24          Can you identify the vacuum sealed packages of

09:29:36AM 25  money shown in Government's 610?

1    A.    Yes.  Would you like me to circle it?

2    Q.    Please.

3    A.    And there's a piece of paper on top of the vacuum sealed

4    cash; is that correct?

09:29:56AM 5    A.    Yes.

6    Q.    Are you able to tell us what's written on that piece of

7    paper?

8    A.    Yes.

9    Q.    What is it?

09:30:06AM 10   A.    230.  And then there's 1-24-18 underneath that.

11   Q.    All right.

12   A.    Then there appears to be another little piece of paper

13   that says 35 on it underneath that.

14   Q.    All right.  If we can now show you what is not yet in

09:30:26AM 15   evidence as Government's 592.  I'd ask you to take a look at

16   592.  593.  And 594.  Do you recognize what's shown in

17   Government's 592 through 594?

18   A.    Yes.

19   Q.    Can you describe what's shown in each of those photos?

09:30:57AM 20   A.    Yes.  The block of white powdery substance.

21            **MR. VACCA:** Objection, Your Honor.

22            **THE COURT:** Overruled.

23            **THE WITNESS:** The three balls of white powdery

24   substance, and then the smaller ball of white powdery

09:31:19AM 25   substance contained in ziplock bags and then in the Tupperware

1 container.

2 **BY MR. MARANGOLA:**

3 Q.   And those items were located where?

4 A.   In the basement -- in the Home Depot bucket in the

09:31:35AM 5 basement.

6 Q.   Do Government's 592 through 594 fairly and accurately show

7 those items when they were discovered during the search at 292

8 Barrington Street on January 29th, 2018?

9 A.   Yes.

09:31:49AM 10           **MR. MARANGOLA:** At this time I'd offer Government's

11 592 through 594.

12           **MR. VACCA:** Objection, Your Honor.

13           **THE COURT:** Overruled.  Exhibits 592, 593 and 594

14 will be received.

09:32:00AM 15           (**WHEREUPON**, Government's Exhibits 592-594 were

16 received in evidence).

17 **BY MR. MARANGOLA:**

18 Q.   You see 592, Investigator?

19 A.   Yes.

09:32:15AM 20 Q.   All right.  Let's go to 593.  Can you tell us what's in

21 593?

22 A.   Yes.  It's the contents of the Home Depot bucket.

23 Q.   And is that before they had been moved or disturbed by

24 investigators?

09:32:31AM 25 A.   Yes.

1  Q.   And 594.  Can you tell us what's in that photograph?

2  A.   Yes, again, it's the contents of the Home Depot bucket but

3  just a view of all of the items.

4  Q.   All right.  And you mentioned -- you said there was some

09:32:54AM 5  smaller bags of white powder; is that right?

6  A.   Yes.

7  Q.   Then there was a larger bag?

8  A.   Yes.  There were four smaller bags and one larger bag.

9  Q.   Can you describe the shape of the larger bag?

09:33:06AM 10  A.   It was a square -- yeah, it was a square, cube.

11  Q.   Do you see that shown in Government's 594?

12  A.   Yes.

13  Q.   Can you circle that one?  For the record you've made a

14  circle inside the orange bucket shown in Government's 594?

09:33:27AM 15  A.   Yes.

16  Q.   And some of the smaller bags of the white powder can you

17  circle those?  All right. I'd like to show you now what is not

18  in evidence as Government's 605.  Do you recognize what's

19  shown in Government's 605?

09:33:59AM 20  A.   Yes.

21  Q.   And do you also -- I'd like to show you Government's 612.

22  Do you recognize generally the items in Government's 605 and

23  612?

24  A.   Yes.

09:34:15AM 25  Q.   Can you describe the items in 605 and 612?

1  A.   Yes.   In the bin were several unused ziplock style baggies

2  and packaging materials.   And then in the suitcase there was a

3  coffee grinder and some other packaging items in there.

4  Q.   All right.   With respect to Government's 605, let's

09:34:49AM 5  talk -- let me show you that one first.   Does Government's 605

6  fairly and accurately show items of evidence you observed

7  inside 292 Barrington Street during the search?

8  A.   Yes.

9            **MR. MARANGOLA:** At this time I'd offer Government's

09:35:05AM 10  605.

11            **MR. VACCA:** Objection, Your Honor.

12            **THE COURT:** Overruled.   Exhibit 605 will be

13  received.

14            (**WHEREUPON**, Government's Exhibit 605 was received

09:35:18AM 15  into evidence).

16  **BY MR. MARANGOLA:**

17  Q.   Can you circle some of the bags that you mentioned inside

18  the black tote there marked -- in the photo marked

19  Government's 605?

09:35:30AM 20  A.   Yes.

21  Q.   Did you have occasion to look inside the white plastic bag

22  and the black plastic bag shown in the right side of that

23  black tote in Government's 605?

24  A.   I did, yes.

09:35:51AM 25  Q.   Can you describe generally what you observed inside those

1  two plastic bags?

2  A.    I can't recall what was in either one of those.

3  Q.    All right.    If I can then show you Government's 612 that's

4  not in evidence.    If you can clear your screen there?    Thank

09:36:13AM 5  you.    And describe what's shown in this photograph.

6  A.    Again that's a coffee grinder and some other items of

7  packaging material underneath it.

8  Q.    They're contained in a suitcase; is that right?

9  A.    Yes.

09:36:30AM 10  Q.    Does Government's 612 fairly and accurately show those

11  items after the suitcase was opened on January 29th, 2018, at

12  292 Barrington Street?

13  A.    Yes.

14          **MR. MARANGOLA:** At this time I'd offer Government's

09:36:43AM 15  612.

16          **MR. VACCA:** Your Honor, relevancy as to my client.

17          **THE COURT:** Overruled.    Exhibit 612 will be

18  received.

19          (**WHEREUPON**, Government's Exhibit 612 was received

09:36:52AM 20  into evidence).

21  **BY MR. MARANGOLA:**

22  Q.    Investigator, could you circle the grinder that you

23  mentioned?    By the way, you characterized that as a coffee

24  grinder.    Do you recall that?

09:37:12AM 25  A.    Yes.

1  Q.   Did you observe any coffee in that grinder?

2  A.   No, sir, I did not.

3  Q.   All right.  And can you tell the jury what's in the white

4  plastic bag at the other end of the suitcase?

09:37:28AM 5  A.   Yes.  They're like little capsules.

6  Q.   And can you give the jury an idea of approximately how

7  many capsules are in that plastic bag in that suitcase?

8  A.   There's thousands.

9  Q.   Are those plastic bags -- sorry, plastic capsules, are

09:37:47AM 10  they filled with anything or were they empty?

11  A.   They were empty.

12  Q.   If I can show you now Government's -- what's not in

13  evidence as Government's 601.  And 602.  Can you describe

14  generally what's shown in Government's 601 and 602?

09:38:14AM 15  A.   Yes, they're United States Postal boxes.

16  Q.   And were those Postal boxes found inside 292 Barrington

17  Street during the search warrant?

18  A.   Yes.

19  Q.   Do photograph 601 and 602 fairly and accurately show those

09:38:30AM 20  items as they existed during the search of 292 Barrington

21  Street on January 29th?

22  A.   Yes.

23          **MR. MARANGOLA:** At this time I'd offer Government's

24  601 and 602.

09:38:41AM 25          **MR. VACCA:** Relevancy and foundation objections,

1    Your Honor, as to my client.

2                 **THE COURT:** Overruled.  Exhibit 601 and 602 will be

3    received.

4                 (**WHEREUPON**, Government's Exhibit 601-602 were

09:38:52AM 5    received into evidence).

6    **BY MR. MARANGOLA:**

7    Q.   Investigator, can you tell us how many boxes you see in

8    that photograph?

9    A.   Three.

09:39:07AM 10   Q.   All right.  And you see the red priority mail stickers

11   going across the top of the top one?

12   A.   Yes.

13   Q.   Do you also see those on the bottom box as well?

14   A.   Yes.

09:39:18AM 15   Q.   All right.

16                 **THE COURT:** That's Exhibit 601.

17                 **MR. MARANGOLA:** Yes.  Thank you, Judge.

18   **BY MR. MARANGOLA:**

19   Q.   If we could go to 602?  Is that another photograph of

09:39:26AM 20   those boxes?

21   A.   Yes.

22   Q.   All right.  Finally you mentioned documentary evidence,

23   notebooks and organizers.  Do you recall that?

24   A.   Yes.

09:39:39AM 25   Q.   At this time I'd like to show you what's not in evidence

1   as Government's 606.  Do you recognize what's shown in photo

2   marked Government's 606?

3   A.   Yes.

4   Q.   Can you describe it for us?

09:40:00AM 5   A.   Yes.  They're organizers and notebooks and folders that

6   were located with items inside of them.

7   Q.   Inside of 292 Barrington Street?

8   A.   They were located inside of 292 Barrington Street and

9   there's also paperwork located in each of these items.

09:40:22AM 10   Q.   All right. Were these items collected as evidence?

11   A.   Yes.

12   Q.   Do Government's Exhibit 606 -- does Government's 606

13   fairly and accurately reflect those items as they existed at

14   the time of the search warrant on January 29th, 2018 at 292

09:40:41AM 15   Barrington Street?

16   A.   Yes.

17             **MR. MARANGOLA:** Offer Government's 606.

18             **MR. VACCA:** Relevancy and foundation objections as

19   far as my client is concerned, Your Honor.

09:40:49AM 20             **THE COURT:** Thank you.  Overruled.  Exhibit 606 will

21   be received.

22             (**WHEREUPON**, Government's Exhibit 606 was received

23   in evidence).

24   **BY MR. MARANGOLA:**

09:41:10AM 25   Q.   Finally, Investigator, you mentioned a number of firearms

1  being collected at 292 Barrington Street during the search

2  warrant?

3  A.   Yes.

4  Q.   Did you observe some of those firearms while you were

09:41:19AM 5  present at 292 Barrington Street?

6  A.   Yes, I did.

7  Q.   I'd like to show you Government's 614, which is not in

8  evidence.  Can you tell us do you recognize what's shown in

9  that photograph?

09:41:39AM 10  A.   Yes.  It's a bag -- zip up bag that contains six long

11  guns.

12  Q.   Did you observe that bag and those firearms during the

13  execution of the search warrant at 292 Barrington Street on

14  January 29th, 2018?

09:41:59AM 15  A.   Yes, I did.

16  Q.   Are those all of the firearms that you observed during the

17  search of 292 Barrington Street?

18  A.   Yes, they are.

19  Q.   That's all of the firearms that were observed at 292

09:42:15AM 20  Barrington Street?

21  A.   Those are not all of the firearms that were located, but

22  they're all the firearms I observed.

23  Q.   Okay. So there were other firearms located, but you didn't

24  observe the other firearms?

09:42:25AM 25         **MR. VACCA:** Objection, leading.

1          **THE COURT:** Overruled.

2          **THE WITNESS:** That's correct, sir.

3   BY MR. MARANGOLA:

4   Q.   Okay.  But the firearms shown in Government's 614 you did

09:42:34AM 5   observe at 292 Barrington Street?

6          **MR. VACCA:** Objection, leading.

7          **THE COURT:** Overruled.  The answer will stand.

8          **THE WITNESS:** Yes.

9   BY MR. MARANGOLA:

09:42:41AM 10   Q.   Does Government's 614 fairly and accurately show those

11   firearms at the time they were discovered during the search at

12   292 Barrington Street on January 29th, 2018?

13   A.   Yes.

14          **MR. MARANGOLA:** At this time I'd offer Government's

09:42:56AM 15   614.

16          **MR. VACCA:** Objection, Your Honor, relevancy and

17   foundation as to my client.

18          **THE COURT:** Overruled.  Exhibit 614 will be

19   received.

09:43:06AM 20          (**WHEREUPON**, Government's Exhibit 614 was received

21   into evidence).

22   BY MR. MARANGOLA:

23   Q.   If we could go back for a minute.  Investigator, these

24   firearms, can you tell us -- did you say how many were in that

09:43:23AM 25   bag?

1    A.   Yes, there were six.

2    Q.   All right.  Now, you mentioned earlier that -- I think it

3    was on Friday's testimony at the end, that you searched the

4    wallet case for Leitscha Poncedeleon's smart phone in the days

09:43:45AM 5   after the execution of the search warrant?

6    A.   Yes.

7    Q.   And why was it that you searched that wallet case in the

8    days after the search warrant as opposed to that very same

9    day?

09:43:57AM 10   A.   Because we hadn't gotten around to it yet.  There was so

11   much evidence that we were going through, it wasn't until a

12   couple days after that we were able to actually get to that

13   and search that.

14   Q.   All right.  If we could show you Government's 606?  Do you

09:44:19AM 15   remember examining the contents of any of the items shown in

16   Government's 606 in the days following the search warrant?

17   A.   Yes.  I examined the contents of all of these items.

18   Q.   And specifically let me ask you, did you examine any of

19   the contents of that red plastic file organizer?

09:44:38AM 20   A.   Yes, I did.

21   Q.   Can you describe what, if anything, you observed inside

22   that red file organizer?

23   A.   Yes.  There was paperwork inside along with a white and

24   pink thumb drive.  It was a white thumb drive with a pink top

09:44:57AM 25   on it.

1    Q.   What, if anything, did you do with the white and pink

2    thumb drive that was inside the red file organizer at 292

3    Barrington Street?

4    A.   I placed it in my computer and I viewed the contents.

09:45:08AM 5    Q.   And we'll get to the contents in a minute, but can you

6    describe after you finished viewing the contents of that thumb

7    drive on your computer what, if anything, did you do with it?

8    A.   I placed it in an evidence bag, filled out the evidence

9    bag and I turned it into the Rochester Police Department's

09:45:26AM10    Property Clerk's Office.

11    Q.   All right.  At the time you turned that thumb drive in the

12    evidence bag into the Rochester Police Department Property

13    Clerk's Office, was it in the same condition as when you first

14    removed it from the file organizer shown in Government's

09:45:43AM15    Exhibit 606?

16    A.   Yes, it was.

17    Q.   Can you describe what you saw on the white and pink thumb

18    drive when you opened up the contents and viewed them on your

19    computer?

09:45:54AM20    A.   Yes.  There were numerous files on it.  One of the files

21    was labeled -- it was either Culver thumb drive or thumb drive

22    Culver.  In that folder was -- were two files, video files.

23    The first video file was a video of Axel Aponte Camacho and

24    another male on a fire escape.

09:46:24AM25              And the second one was video --

1  Q.   I'm sorry, if I could slow you down one second?  So you

2  viewed the two files under the Culver Road label file in the

3  white and pink thumb drive?

4  A.   Yes, sir.

09:46:46AM 5  Q.   All right.  First -- the first file, was there a date and

6  time listed on that, do you recall, of the video?

7  A.   Yes, there was a date and time, yes.

8  Q.   Do you recall the approximate date and time?

9  A.   I believe it was December 7th of 2016.

09:47:05AM 10  Q.   All right.  And you indicated -- what did you observe in

11  that first folder, I'm sorry, in that first file?

12  A.   It was a video of Axel Aponte Camacho and another male

13  standing on a fire escape.

14  Q.   All right.  And if we could show you what's in evidence as

09:47:22AM 15  Government's 26.  Do you see Axel Aponte Camacho in

16  Government's Exhibit 26?

17  A.   Yes, I do.

18  Q.   I believe you previously identified him, but if you could

19  touch the screen and show us which individual you're referring

09:47:40AM 20  to?

21  A.   Yes, he's in the third line down, he's the second

22  individual from the left.

23  Q.   All right.  And you've placed a circle around that

24  photograph?

09:47:51AM 25  A.   Yes.

1  Q.   That's the individual who you observed in the video shown

2  on the thumb drive seized from 292 Barrington Street?

3  A.   Yes.

4  Q.   All right.  How many files were in that Culver Road folder

09:48:09AM 5  in the white and pink thumb drive?

6  A.   Two.

7  Q.   Did you observe the second file?

8  A.   Yes.

9  Q.   Can you describe what you observed when you searched the

09:48:21AM 10  second file?

11  A.   Two males running through the rear parking lot of 899

12  Culver Road carrying backpacks.

13  Q.   So obviously these two files that you watched they were

14  videos?

09:48:32AM 15  A.   Yes, they were videos, yes.

16  Q.   Can you tell the jury the date on the second video?

17  A.   Yes, it was December 7th of 2016.

18  Q.   All right.  Do you recall the times on either of those

19  video clips?

09:48:46AM 20  A.   I believe the first time was 5 a.m.  And the second one

21  was 5:25 p.m. -- or a.m., I'm sorry.

22  Q.   All right.  And in the second video were you able to

23  identify any of these -- any of the two individuals that you

24  saw running?

09:49:04AM 25  A.   No.

```
 1  Q.   But you were able to identify the location?
 2  A.   Yes.
 3  Q.   I'd like to show you what's in evidence as Government's
 4  95.  I'm sorry.  What's not in evidence.  Thank you.  Do you
09:49:32AM 5  recognize what's shown in Government's 95?
 6  A.   Yes, it's 899 Culver Road.
 7  Q.   And is that the front or rear of the building at 899
 8  Culver Road?
 9  A.   That's the front.
09:49:44AM10  Q.   I'd like you to take a look at Government's 96 and what's
11  shown in Government's 96?
12  A.   That's the rear of 899 Culver Road.
13  Q.   There are two buildings shown in Government's 96; is that
14  right?
09:50:02AM15  A.   Yes.
16  Q.   Which is the building that's the rear of 899 Culver Road?
17  A.   The taller one.
18  Q.   I'm sorry?
19  A.   The taller one.
09:50:10AM20  Q.   Which side of the photograph?
21  A.   To the right side where the vehicles are parked behind.
22  Q.   All right.  Do Government's Exhibits 95 and 96 fairly and
23  accurately show 899 Culver Road, those areas that you've
24  identified as they existed during the course of your
09:50:25AM25  investigation?
```

A.   Yes.

    **MR. MARANGOLA:** I'd offer Government's 95 and 96.

    **MR. VACCA:** Objection, Your Honor, grounds of foundation and relevancy as to my client.

09:50:33AM     **THE COURT:** Exhibit 95 and 96 will be received.

    (**WHEREUPON**, Government's Exhibit 95-96 were received in evidence).

    **THE COURT:** Objection is overruled.

**BY MR. MARANGOLA:**

09:50:44AM Q.   Investigator, have you personally been to 899 Culver Road?

A.   Yes.

Q.   And observed the front and rear of the building?

A.   Yes.

Q.   All right.  And on multiple occasions during the course of

09:50:55AM this investigation?

A.   Yes.

Q.   All right.  The -- is the area that you observed on those two video clips from the thumb drive at 292 Barrington Street, is the area shown from either of those two videos on

09:51:15AM Government's 95?

A.   The first one I don't know where it is on the building, but the second one is the rear parking lot of 899.

Q.   Is that shown in Government's 95?

A.   No.

09:51:29AM Q.   All right.  If we could go to 96?  Is the area on either

1  of the two videos you observed from the thumb drive at 292

2  Barrington Street shown in Government's 96?

3  A.   Yes.

4  Q.   Which area?

09:51:45AM 5  A.   The rear parking lot.

6  Q.   All right.  If you can, just so we're clear, can you

7  circle 899 Culver Road on the screen in Government's 96?  And

8  you circled the large red brick building to the right -- or

9  center and right of that photograph; is that correct?

09:52:04AM 10  A.   Yes.

11  Q.   Investigator, in the course of your investigation you

12  indicated you went to 899 Culver Road; is that right?

13  A.   Yes.

14  Q.   At this time I'd like to show you what is not in evidence

09:52:23AM 15  as Government's Exhibit 43.  Do you recognize this individual?

16  A.   Yes.

17  Q.   Who is that?

18  A.   His name is Bishmillah Holloway.

19  Q.   And does Government --

09:52:42AM 20           THE COURT: Can you spell that for us?

21           THE WITNESS: You want Holloway?

22           THE COURT: How about B-I-S-H-M-I-L-L-A-H, sound

23  right?

24           THE WITNESS: Sounds correct, Your Honor.

09:53:00AM 25           THE COURT: Holloway, H-O-L-L-O-W-A-Y?

1              **THE WITNESS:** Yes, sir.

2              **THE COURT:** Thank you.

3    **BY MR. MARANGOLA:**

4    Q.   Who is the individual that you identified as -- what was

09:53:09AM 5    the first name again?

6    A.   Bishmillah.

7    Q.   Bishmillah Holloway?

8    A.   That's shown in Government's Exhibit 43?

9    A.   Yes.

09:53:18AM 10   Q.   Who is that individual?

11   A.   He's the building manager at 899 Culver Road.

12   Q.   All right.  And did you speak to him in the course of your

13   investigation?

14   A.   Yes.

09:53:29AM 15   Q.   Is he the manager of any other apartment buildings that

16   you investigated as part of this case?

17   A.   Yes.

18   Q.   And what buildings?

19   A.   699 East Main Street.

09:53:40AM 20   Q.   All right.  Does Government's Exhibit 43 here show --

21   fairly and accurately show the person Mr. Holloway that you

22   identified a few minutes ago?

23   A.   Yes.

24              **MR. MARANGOLA:** At this time I'd offer Government's

09:53:53AM 25   43.

1          **MR. VACCA:** Objection, Your Honor, as to foundation

2 and relevancy as to my client.

3          **THE COURT:** Overruled.  Exhibit 43 will be received.

4          (**WHEREUPON**, Government's Exhibit 43 was received in

09:54:03AM 5 evidence).

6 **BY MR. MARANGOLA:**

7 Q.   So we're clear, did you, in fact, speak to Mr. Holloway in

8 the course of your investigation?

9 A.   Yes, sir.

09:54:18AM 10 Q.   Did you observe him in person as well?

11 A.   Yes.

12 Q.   All right.  You indicated he was the manager of the

13 building at 899 Culver Road, correct?

14 A.   Yes.

09:54:27AM 15 Q.   And 699 East Main Street?

16 A.   Yes.

17 Q.   At this time I'd like to show you what's not in evidence

18 as Government's 94.  Do you recognize what's shown in

19 Government's Exhibit 94?

09:54:44AM 20 A.   Yes.

21 Q.   What's that?

22 A.   It's 699 East Main Street.

23 Q.   Which building in the photograph is 699 East Main Street?

24 A.   It's the brown building with the brown front doors.

09:55:04AM 25 Q.   All right.  You've circled the large building in the

1    center of that photograph; is that right?

2    A.    Yes.

3    Q.    Does Government's Exhibit 94 fairly and accurately show

4    Government's -- I'm sorry, show the building at 699 East Main

09:55:18AM 5    Street as it existed during the course of your investigation?

6    A.    Yes, it does.

7    Q.    Have you yourself personally been to 699 East Main Street

8    during the course of your investigation?

9    A.    Yes.

09:55:28AM 10    Q.    And you have observed it on those occasions?

11    A.    Yes.

12          **MR. MARANGOLA:** All right. I'd offer Government's

13    94.

14          **MR. VACCA:** Objection, Your Honor, grounds of

09:55:36AM 15    foundation and relevancy as to my client.

16          **THE COURT:** Exhibit 94 will be received objection is

17    overruled.

18          (**WHEREUPON**, Government's Exhibit 94 was received in

19    evidence).

09:55:45AM 20          **MR. MARANGOLA:** At this time if I could approach the

21    witness with an exhibit at this time, Your Honor?

22          **THE COURT:** Yes.

23    **BY MR. MARANGOLA:**

24    Q.    Investigator, I've handed you a evidence bag and I'd ask

09:56:11AM 25    you to take a look inside that evidence bag and tell us if you

1    recognize the contents of it?

2    A.    Yes, I do.

3    Q.    And what is it?

4    A.    It's the white thumb drive with the pink top that I

09:56:27AM 5    previously mentioned I found in the organizer at 292

6    Barrington Street.

7    Q.    All right.  And is the thumb drive that's contained in

8    that bag, does that appear to be in the same condition as when

9    you found it in the red binder shown in Government's

09:56:48AM 10    Exhibit 606?

11    A.    Yes.

12    Q.    Anything appear different about the condition of that

13    white and pink thumb drive today as it existed when you

14    recovered it from the red organizer as shown in Government's

09:57:05AM 15    606?

16    A.    No, not the thumb drive, no.

17    Q.    All right.  And, in fact, the evidence bag, was that

18    opened in my office in preparation for this trial with you?

19    A.    Yes.

09:57:16AM 20    Q.    All right.  And other than --

21              **MR. MARANGOLA:** -- at this time I'd offer

22    Government's 674 -- I'm sorry, 676.  676 I would offer, Judge,

23    not 674.

24              **MR. VACCA:** I would object to that, Your Honor,

09:57:37AM 25    based on grounds of foundation and relevancy as to my client.

1          **THE COURT:** Exhibit 676 will be received.  The

2  objection is overruled.

3          (**WHEREUPON**, Government's Exhibit 676 was received

4  in evidence).

09:57:50AM 5          **MR. MARANGOLA:** Judge, in preparation of the trial

6  we, as with the other hard exhibits and electronic exhibits,

7  have uploaded those to the trial laptop to play with the

8  Court's computer system.

9          At this time I would ask to publish the two files

09:58:13AM 10  within the thumb drive marked Government's 676.

11  BY MR. MARANGOLA:

12  Q.   I first ask you, Investigator Briganti, what was the name

13  of the folder again that you viewed these two files under?

14  A.   Again I'm not certain if it was Culver thumb drive or

09:58:31AM 15  thumb drive Culver.  It was one of the two.

16  Q.   The word Culver was in there?

17  A.   Thumb drive and Culver were both in there.  I'm not sure

18  which one was first.

19  Q.   All right. At this time I'd like to play the first folder

09:58:44AM 20  from that Culver Road thumb drive folder and ask you to take a

21  look at it, Investigator.  If we could pause it?

22          Investigator, did you just see two individuals

23  appear in that video?

24  A.   Yes.

09:59:29AM 25  Q.   The individual that first appeared on the left, did you

1  see that person?

2  A.   Yes.

3  Q.   Can you tell us were you able to identify that person from

4  just observing him on that video the person on the left?

09:59:46AM 5  A.   Not yet, no.

6  Q.   All right.  How about the person on the right?

7  A.   No.

8  Q.   All right.  If we can keep playing?  Did you see the

9  person on the right?

10:00:04AM 10  A.   I just saw the person on the right, yes.

11  Q.   I believe you testified earlier that one of the

12  individuals you observed in this video was Axel Aponte

13  Camacho?

14  A.   Yes.

10:00:23AM 15          **MR. VACCA:** Objection, Your Honor.

16          **THE COURT:** Overruled.

17  **BY MR. MARANGOLA:**

18  Q.   Which of the individuals that you observed in this video

19  are Axel Aponte Camacho?

10:00:33AM 20  A.   He was the individual that was to the right of the screen.

21  Q.   Was that the person wearing a hoodie or not wearing a

22  hoodie?

23  A.   Not wearing a hoodie.

24  Q.   And, Investigator, the date and time stamp at the top of

10:00:58AM 25  this video reflects what date and time?

1  A.    December 7th, 2016.  And the time now is 5:04 a.m..

2  Q.    All right.  If we can go back to the beginning of this

3  clip?  Can you point out, Investigator, if we can play it and

4  you can point out to us when you're able to identify the

10:01:22AM 5  person as -- in the clip as Axel Aponte Camacho?

6  A.    Yes.  Right now.

7  Q.    All right.  The person on the right of the photo shown at

8  approximately 36 seconds in who is looking up at the top of

9  the door area; is that right?

10:02:07AM 10  A.    Yes, he's looking up, yes.

11  Q.    All right.  If we can keep playing?  All right. Thank you.

12  Investigator, we're going to play that second clip that's on

13  the thumb -- the Culver Road thumb drive folder.  If we can

14  pause it?  Can you tell us first the date and time of this

10:02:38AM 15  clip?

16  A.    Yes, it's December 7th, 2016 at 5:25 a.m. and 57 seconds.

17  Q.    All right.  And what's shown in this clip right here?

18  A.    It's the rear parking lot of 899 Culver Road.

19  Q.    All right.  If we can play it?  Can you tell us what you

10:03:35AM 20  saw at approximately 40 seconds into the video?

21  A.    Yeah, there were two males that were running away from the

22  camera through the parking lot, both were carrying backpacks.

23  Q.    All right.  We can pause it there.  If we can go back to

24  Government's Exhibit 26?  And the person that we saw in that

10:04:18AM 25  first video clip on the bottom right portion, can you touch

1  the screen and show us him in Government's Exhibit 26 again?

2  All right, you've again circled the third row, second from the

3  left?

4  A.    Yes.

10:04:35AM 5  Q.    Okay. And that's Axel Aponte Camacho?

6  A.    Yes.

7  Q.    At this time I'd like to show you Government -- what's not

8  in evidence as Government's 103.  Do you recognize what's

9  shown as -- in this photograph marked Government's

10:04:51AM 10  Exhibit 103?

11  A.    Yes.

12  Q.    And what's shown in Government's Exhibit 103?

13  A.    150 Van Aucker Street, the apartment complex.

14  Q.    And who lived there during the course of this

10:05:02AM 15  investigation?

16  A.    Axel Aponte Camacho.

17  Q.    Have you been to the apartment building shown at -- shown

18  in Government's Exhibit 103 during the course of your

19  investigation?

10:05:18AM 20  A.    Yes.

21  Q.    And are you familiar with its appearance based on being at

22  that location or on that street and observing the building?

23  A.    Yes.  Can I clarify?

24  Q.    Sure.

10:05:36AM 25  A.    I haven't been to this location during the course of this

1  investigation.  But I've been to this location hundreds of

2  times over my career.

3  Q.   Okay. So you weren't at this location specifically during

4  the investigation?

10:05:50AM 5  A.   Correct.

6  Q.   But you've been there on -- did you say hundreds of times?

7  A.   This was a car beat that I worked when I was in Patrol

8  Division, so --

9  Q.   Okay. So based on that you're familiar with the building

10:06:03AM 10  here shown in Government's 103?

11  A.   Yes, sir.

12  Q.   Does Government's 103 fairly and accurately show it as it

13  existed during the time you've patrolled that area?

14  A.   Yes, in a sense I've had investigations at this location

10:06:19AM 15  since being at SIS, but not particularly on this

16  investigation.

17  Q.   Okay. So both before and after this investigation you've

18  been to this building?

19  A.   Yes.

10:06:29AM 20  Q.   Does Government's Exhibit 103 fairly and accurately show

21  the building as it existed both before and after the building

22  after the investigation?

23  A.   Yes, it does.

24            MR. MARANGOLA: Offer Government's 103.

10:06:40AM 25            MR. VACCA: Objection, Your Honor, on grounds of

1    foundation and relevancy as far as my client is concerned.

2    **THE COURT:** Exhibit 103 will be received the

3    objection is overruled.

4    (**WHEREUPON**, Government's Exhibit 103 was received

10:06:54AM 5    into evidence).

6    **BY MR. MARANGOLA:**

7    Q.   All right. Investigator, you testified I believe Friday

8    that one of the search warrants that was executed was at 6

9    Burbank; is that correct?

10:07:31AM 10    A.   Yes.

11    Q.   And that's the residence of who?

12    A.   Carlos Figueroa.

13    Q.   And?

14    A.   Nisharya Gutierrez and their children.

10:07:42AM 15    Q.   Can you point to Carlos Figueroa on Government's

16    Exhibit 26?

17    A.   Yes, he's the single photograph at the top.

18    Q.   All right.  And if we could put -- you said 6 Burbank was

19    the residence of Carlos Figueroa as well as Nisharya

10:07:59AM 20    Gutierrez?

21    A.   Yes.

22    Q.   At this time I'd ask to show what's not in evidence as

23    Government's 48.  Do you recognize the person shown in

24    Government's Exhibit 48?

10:08:21AM 25    A.   Yes, that's Nisharya Gutierrez, also known as Nishy.

1  Q.   And during the course of your investigation was she an
2  individual that lived at 6 Burbank with the defendant?
3  A.   Yes.
4  Q.   Did you observe her at that location during the course of
10:08:37AM 5  your investigation?
6  A.   Yes.
7  Q.   How many times -- are you familiar with her appearance
8  based on your investigation?
9  A.   Yes.
10:08:49AM 10  Q.   And does Government's Exhibit 48 fairly and accurately
11  show the individual you know as Nisharya Gutierrez a/k/a Nishy
12  as she existed during the course of your investigation?
13  A.   Yes.
14              MR. MARANGOLA:  Offer Government's Exhibit 48.
10:09:06AM 15              MR. VACCA: Objection, Your Honor, on grounds of
16  foundation and relevancy as to my client.
17              THE COURT: Overruled.  Exhibit 48 will be received.
18              (WHEREUPON, Government's Exhibit 48 was received
19  into evidence).
10:09:18AM 20  BY MR. MARANGOLA:
21  Q.   Investigator Briganti, the defendant and Ms. Gutierrez
22  they were taken -- they surrendered to the police here at 6
23  Burbank; is that right?
24  A.   Yes.
10:09:44AM 25  Q.   And that was at -- on January 29th, 2018?

1  A.   Yes.

2  Q.   All right.  Were you present at that location for the

3  search of 6 Burbank?

4  A.   No, I was not.

10:10:00AM 5  Q.   All right.  And I think earlier you testified in watching

6  the pole camera clip starting at 11:31 at 292 Barrington

7  Street on January 29th, 2018, that officers made entry into

8  292 Barrington Street at approximately 11:32 or so a.m.?

9  A.   Yes.

10:10:23AM 10  Q.   On January 29th, 2018?

11  A.   Yes.

12  Q.   All right.  If we could pull back up Government's 565?

13  Now, after the team entered 292 Barrington Street here they

14  went to other locations; is that correct?  Or not the team

10:10:46AM 15  that went into 292, but other teams went to other locations?

16  A.   Other teams went to other locations, yes.

17  Q.   And that included 6 Burbank?

18  A.   Yes.

19  Q.   As well as 60 Malling Drive?

10:11:01AM 20  A.   Yes.

21  Q.   That's the residence of who?

22  A.   60 Malling Drive?

23  Q.   Yes.

24  A.   Carlos Figueroa and Roberto Figueroa's mother.

10:11:10AM 25  Q.   All right.  In Government's 565 do you see a blue sign at

1  the bottom of that photograph?

2  A.   Yes, sir.

3  Q.   Can you tell us what it says?

4  A.   Yes, it says ADT Security -- Secured by ADT.

10:11:27AM 5  Q.   Can you circle that blue ADT sign for us?

6  A.   At the bottom of the photograph.

7  Q.   All right.  And if we could show you what's in evidence as

8  Government's 99.  If you can clear your screen?  Do you see

9  the blue sign in front of the door -- I'm sorry, in front of

10:11:53AM 10  the stairs at 60 Malling Drive?

11  A.   Yes.

12  Q.   And what is on that sign?

13  A.   Again it's another sign that says Secured by ADT.

14  Q.   All right.  And if you could circle that for us?

10:12:15AM 15  Investigator, as the takedown was occurring at these different

16  locations did the monitoring of the wiretap -- the wiretaps on

17  the cell phones in this case, did that continue or did that

18  stop?

19  A.   No, it continued.

10:12:30AM 20  Q.   And during that time as the takedown is occurring, were

21  additional calls intercepted over the wiretaps?

22  A.   Yes, there were calls and texts.

23  Q.   Were any calls intercepted from ADT during that time?

24  A.   Yes.

10:12:47AM 25  Q.   Were there calls and text messages intercepted from ADT

1   over the wiretaps during the time of the takedown?

2   A.   Yes.

3   Q.   Do you recall, were they over one line or were they

4   intercepted over multiple lines?

10:13:06AM 5   A.   Multiple lines.

6   Q.   Do you recall specifically which lines?

7   A.   Yes.   685-4661 and 766-8057.

8   Q.   And those lines are reflected in Government's Exhibit 10;

9   is that right?

10:13:30AM 10  A.   Yes.

11  Q.   And the first one is the very first number in red that you

12  mentioned?

13  A.   Yes.

14  Q.   Are where the user is blacked out?

10:13:39AM 15  A.   Correct.

16  Q.   And the second one is the first purple number; is that

17  correct?

18  A.   Yes.

19  Q.   And the user of that phone was Leitscha Poncedeleon?

10:13:47AM 20  A.   Yes.

21  Q.   All right.

22          **MR. MARANGOLA:**  Judge, I'm going to ask the

23  investigator at this time to start looking through some tabs

24  on the wiretap binder.   I don't know if the Court wishes to

10:14:02AM 25  keep going or at this point take a break.

1          **THE COURT:** How long are you going to be with that?

2          **MR. MARANGOLA:** We're going to have him look through

3    some tabs and then play calls, so it's going to be a few

4    minutes.

10:14:13AM 5          **THE COURT:** Okay.  All right, might be a good time

6    for a break then.  Ladies and gentlemen, at this time we'll

7    take a recess approximately 20 minutes.  In the meantime I'd

8    ask you not discuss the matter or allow anybody to discuss the

9    matter with you.  Jury may step down we'll stand in recess.

10:42:54AM 10          (**WHEREUPON**, there was a pause in the proceeding.).

11          (**WHEREUPON**, the defendant is present).

12          **THE COURT:** Bring the jury out.

13          (**WHEREUPON**, the jury is present).

14          **THE COURT:**  You may continue.

10:47:55AM 15          **MR. MARANGOLA:** Thank you, Your Honor.

16    **BY MR. MARANGOLA:**

17    Q.   Investigator Briganti, did you mention to me on one of the

18    breaks last week in your testimony at the end of the week that

19    you believe there was a mistake on Government's Exhibit 12,

10:48:16AM 20    the wiretap cell phone chart there?

21    A.   Yes.

22    Q.   All right.  And can you tell us what you noticed about two

23    of the dates on the chart?  And if you want to circle the ones

24    on the screen there so we can see what you're talking about

10:48:33AM 25    and let us know what you had observed that was not accurate.

1  A.   Yes.  Under start date the second line down, this is

2  incorrect.  And the second line from the bottom also under

3  start date.

4  Q.   All right.  With respect to the start date for the number

10:49:02AM 5  662-8156, the top circle there, what should the start date, in

6  fact, be instead of January 14, 2018?

7  A.   1/13.

8  Q.   January 13th?

9  A.   Yes, 2018.

10:49:14AM 10  Q.   And then for the start date next to the 485-9741, what

11  should the start date for the wiretap for that line be instead

12  of January 7th?

13  A.   January 6th, 2018.

14  Q.   All right.  And at this time I'd ask you to take out the

10:49:39AM 15  hardcover -- I'm sorry, the hard copy of Government's

16  Exhibit 12 and if you could make those two changes and put

17  your initials next to them?

18  A.   So I used the pen to cross out the 14 under start date on

19  the second line and I put a 13 underneath that, and I put my

10:50:19AM 20  initials next to that.  The fifth line down I put -- crossed

21  out the 7 and put a 6 and again put my initials next to that.

22          **MR. MARANGOLA:**  If I could, Your Honor, take the

23  hard copy of Government's Exhibit 12 from the investigator and

24  show the jury what changes he made?

10:50:47AM 25          **THE COURT:**  Yes, you may.

1          **MR. MARANGOLA:** Thank you.  I'm going to show

2    counsel, Judge.

3    **BY MR. MARANGOLA:**

4    Q.   And you made those two changes as you described on

10:51:43AM 5    Exhibit 12?

6    A.   Yes.

7    Q.   Thank you.  If we could now -- if we could show you

8    Government's Exhibit 11.  This was the frequency chart that

9    you testified about earlier.  Do you recall that?

10:52:00AM10    A.   Yes.

11   Q.   Now, I noticed in the middle column the last three lines

12   that start with January 13th, do you see that?

13   A.   Yes.

14   Q.   Those columns indicate zero contacts between the 766-8057

10:52:22AM15   number and then the last four numbers actually on the left

16   column; is that correct?

17   A.   Yes.

18   Q.   Now, staying with just the last three where the time

19   period is January 13th to January 29th.  Do you see that?

10:52:37AM20   A.   Yes.

21   Q.   For the 766-8057 wiretap I think we just saw from the

22   prior chart -- well, maybe we can ask Ms. Rand to display that

23   for us one more time?

24          **THE CLERK:** What am I doing?

10:52:54AM25          **MR. MARANGOLA:** The ELMO.

**BY MR. MARANGOLA:**

Q.   The start date for the 766-8057 wiretap line is what?

A.   January 10th, 2018.

Q.   All right.  And if we could go back to the monitor, the computer?

A.   Now you can see the time period for the 766-8057 number and these last four numbers on the left side of the page.  Do you see that?

A.   Yes.

Q.   Can you explain first regarding the January 13 dates, were there calls between the 766-8057 number and any of those three bottom numbers on the left between January 10th and January 13th?

A.   No, there were not.

Q.   Okay. And then if we can go back to the ELMO one more time, please?  Thank you.  485-9741 number.  Do you see that?

A.   Yes.

Q.   It starts a start date of January 6 now after you changed it?

A.   Yes.

Q.   That was a line used by Roberto Figueroa?

A.   Yes.

Q.   And finally the last switch.

     **THE CLERK:**  Thank you.

**BY MR. MARANGOLA:**

1    Q.   That's reflected as the start -- the time period for that

2    line is -- starts at January 6th as reflected in the third box

3    underneath the time period column; is that right?

4    A.   Yes.

10:54:40AM 5    Q.   Now, that's because you started the wiretap on the 9741

6    Roberto Figueroa line before the 766-8057 line?

7    A.   Yes, that's correct.

8    Q.   Okay. Thank you for bringing that mistake on our part on

9    the chart to my attention.

10:55:06AM 10          Now, if we can go back to the time of the takedown

11   that we were discussing at the break on January 29th, 2018, I

12   believe you testified that around the time of the takedown at

13   11:32 or so there were calls that were intercepted from ADT

14   and texts intercepted from ADT over the wiretap; is that

10:55:31AM 15   right?

16   A.   Yes.

17   Q.   Can I ask you to get the wiretap binder there,

18   Government's Exhibit 1, and flip to almost the end.  Tabs

19   1-188 and 1-189.

10:56:16AM 20          **MR. MARANGOLA:** At this time, Your Honor, I would

21   offer both Exhibits 1-188 and 1-189.

22          **MR. VACCA:** I would object, Your Honor, on the

23   grounds of foundation.  I don't think they've had a sufficient

24   foundation for them to show any relevancy of these two

10:56:36AM 25   entries.

1          **THE COURT:** I think previously testified regarding

2    the foundation of these particular entries which do not

3    contain any conversations, therefore, 1-188-784 and 1-189-1955

4    will be received.

10:56:58AM 5          (**WHEREUPON**, Government's Exhibits 1-188-784 and

6    1-189-1955 were received into evidence.

7          **MR. MARANGOLA:** Your Honor, may the jury be

8    permitted to open their binders and flip to those tabs?

9          **THE COURT:** Yes, it will be 1-188-784 and then

10:57:13AM 10   1-189-1955.

11          **THE JUROR:** I didn't hear you.

12          **THE COURT:** The numbers are 1-188-784 and the second

13   one is 1-189-1955.  Thank you.

14   **BY MR. MARANGOLA:**

10:57:49AM 15   Q.   Investigator, do you have those two exhibits in front of

16   you?

17   A.   Yes, I do.

18   Q.   And can you tell the jury the date and time -- first of

19   all, were those calls intercepted over the wire from ADT --

10:58:04AM 20   I'm sorry, those text messages?

21   A.   Yes, they were.

22   Q.   All right.  And what's the time -- what's the date and

23   time listed for both of the text messages at 1-188 and 1-189?

24   A.   January 29th, 2018, 188 is 11:33 a.m. and 20 seconds.  And

10:58:35AM 25   189 is January 29th, 2018, again at 11:33 a.m. and 20 seconds.

1   Q.    So the exact same date and time for both of those text

2   messages?

3   A.    Yes.

4   Q.    And that's approximately the -- within a minute or so of

10:58:56AM 5   the time of the entry team made entry at 292 Barrington

6   Street?

7   A.    Yes.

8   Q.    How about the direction of these two text messages?

9   A.    They're both incoming texts.

10:59:15AM 10   Q.    And what about the number -- the phone number that sent

11   these incoming texts over the wiretap?

12   A.    Well, the number that sent the text is 65895 for both.

13   Q.    All right.  So for each of these texts the date, the time,

14   the direction and the number that sent the text is identical?

10:59:46AM 15   A.    Yes.

16   Q.    Were these two text messages intercepted over the same

17   line?

18   A.    No.

19   Q.    What line was each of these text messages intercepted

11:00:00AM 20   over?

21   A.    Exhibit 1-188-784 was intercepted over target telephone

22   number 585-766-8057.  And Exhibit 1-189-1955 was intercepted

23   over target telephone number 585-685-4661.

24   Q.    And are both of those lines shown here on Government's

11:00:44AM 25   Exhibit 10?

1    A.    Yes.

2    Q.    The target telephone number intercepted the text message

3    from -- behind 1-188 is listed at the top of Government's

4    Exhibit 10; is that correct?

11:01:00AM 5    A.    Yes.

6    Q.    And then the target telephone number that lists -- that

7    received the incoming text message at -- behind tab 1-189 is

8    the first purple phone number next to Leitscha Poncedeleon; is

9    that right?

11:01:15AM 10   A.    Yes.

11   Q.    Can you read -- I'm sorry.  Before I ask you to read, can

12   you tell us the content of these two text messages?  Is it the

13   same or different?

14          MR. VACCA:  Objection, Your Honor.  They're in

11:01:29AM 15   evidence, they speak for themselves.

16          THE COURT:  Overruled.  You can answer that

17   question.

18          THE WITNESS:  They're the same.

19   BY MR. MARANGOLA:

11:01:43AM 20   Q.    Can you read the content of the identical text messages

21   sent to the 766-8057 line and the 685-4661 line reflected in

22   tabs 1-188 and 1-189?

23          MR. VACCA:  Objection, Your Honor.  I mean, the jury

24   has this right in front of them.  I don't see the necessity of

11:02:06AM 25   him testifying to that.

| | |
|---|---|
| 1 | **THE COURT:** Okay, thank you.  Overruled.  Go ahead. |
| 2 | **THE WITNESS:** ADT Pulse alert.   Leitscha Poncedeleon |
| 3 | home.  1/29 11:33 a.m. burglary alarm.  Proceed with caution. |
| 4 | Sensors FRO... |
| 11:02:32AM 5 | **BY MR. MARANGOLA:** |
| 6 | Q.   All right. Those were text messages intercepted from ADT. |
| 7 | There were also calls intercepted from ADT at the time of the |
| 8 | takedown? |
| 9 | A.   Yes. |
| 11:02:48AM 10 | Q.   I'd ask you can you look at tabs 1-190 through 1-192. |
| 11 | Were each of those three calls incoming calls that were |
| 12 | intercepted over the wire? |
| 13 | A.   Yes. |
| 14 | Q.   On January 29th, 2018? |
| 11:03:41AM 15 | A.   Yes. |
| 16 | Q.   And were they from the same 800 number? |
| 17 | A.   Yes. |
| 18 | Q.   All right.  And then I'd like you to flip to tab 1-192. |
| 19 | A.   I'm sorry, 1-192? |
| 11:04:15AM 20 | Q.   Yes.  Now, Investigator, have you reviewed the call that |
| 21 | corresponds to the transcript set forth at 1-192? |
| 22 | A.   Yes, I have. |
| 23 | Q.   And before we get to the call tell us what the date and |
| 24 | time of this call is. |
| 11:04:36AM 25 | A.   January 29th, 2018 at 11:44 a.m. and one second. |

1    Q.   Now, at that time is the takedown of this investigation

2    still ongoing?

3    A.   Yes.

4    Q.   And Government's 1-192 is an incoming call; is that

11:04:59AM 5    correct?

6    A.   Yes.

7    Q.   Now, you reviewed the transcript and listened to the call

8    that corresponds to that transcript?

9    A.   Yes.

11:05:06AM 10   Q.   Is that right?

11   A.   Yes.

12   Q.   Does the transcript accurately set forth the contents of

13   the call?

14   A.   Yes.

11:05:13AM 15   Q.   In other words, what's actually being spoken by

16   individuals during the call?

17   A.   Yes.

18   Q.   Is the call, first of all, in English or Spanish?

19   A.   English.

11:05:25AM 20   Q.   During the call can you tell the jury how many separate

21   speakers spoke during the call?

22   A.   Three.

23   Q.   How -- do the speakers identify themselves in the call?

24   A.   Yes.

11:05:38AM 25   Q.   How many?

1  A.   Two.

2  Q.   Who are the speakers that identified themselves in the

3  call?

4           MR. VACCA: Objection, Your Honor, no foundation.

11:05:48AM 5           THE COURT: Overruled.

6           THE WITNESS: The representative from ADT and Carlos

7  Figueroa.

8  **BY MR. MARANGOLA:**

9  Q.   Now, had you heard the voices of any of the individuals in

11:06:05AM 10  this call in the course of your investigation?

11  A.   Yes.

12  Q.   Who have you heard in this call in the course of your

13  investigation?

14           MR. VACCA: Objection, Your Honor.

11:06:18AM 15           THE COURT: Overruled.

16           THE WITNESS: Carlos Figueroa and Nisharya

17  Gutierrez.

18  **BY MR. MARANGOLA:**

19  Q.   And starting with Carlos Figueroa, approximately how many

11:06:27AM 20  times have you heard -- had you heard the -- let me ask you

21  this: Did you hear the voice of the person who identified

22  themselves in this call as Carlos Figueroa?

23  A.   Yes.

24  Q.   And at the time you heard that voice that identified

11:06:44AM 25  himself as Carlos Figueroa, was that -- when was that in

1  relation to the wiretap investigation?

2  A.   I'm sorry, I don't understand your question.

3  Q.   Let me ask this: You heard the person identify themselves

4  as Carlos Figueroa in this call?

11:07:04AM 5  A.   Yes.

6  Q.   Had you heard that person's voice who identified

7  themselves as Carlos Figueroa in this call prior to hearing

8  the call?

9  A.   Yes.

11:07:12AM 10            **MR. VACCA:** Objection, Your Honor.

11            **THE COURT:** Overruled.  Go ahead.

12            **MR. VACCA:** There's no foundation that the voice

13  that he heard prior to this was Carlos Figueroa.

14            **THE COURT:** He asked if he had heard this voice

11:07:24AM 15  prior.  So overruled.  Go ahead.

16  **BY MR. MARANGOLA:**

17  Q.   Can you tell us how many times you had heard that voice

18  prior to listening to the recording and listening to the voice

19  of the person stating he was Carlos Figueroa?

11:07:37AM 20            **MR. VACCA:** Objection, Your Honor.

21            **THE COURT:** Overruled.

22            **THE WITNESS:** Hundreds of times.

23  **BY MR. MARANGOLA:**

24  Q.   When had you heard it hundreds of times?

11:07:44AM 25            **MR. VACCA:** Objection.

1          **THE COURT:** Overruled.  Go ahead.

2          **THE WITNESS:** Over the course of the wiretap.

3  BY MR. MARANGOLA:

4  Q.    All right. And was that years earlier or was that close in

11:07:53AM 5  time to the time you heard this call here marked Government's

6  1-192?

7  A.    It was just -- just prior to this telephone call.

8  Q.    How many weeks had you been listening to phone calls where

9  the same voice that identified himself as Carlos Figueroa in

11:08:10AM 10  this call spoke on those other calls?

11          **MR. VACCA:** Objection.

12          **THE COURT:** Overruled.

13          **THE WITNESS:** At least three weeks.

14  BY MR. MARANGOLA:

11:08:18AM 15  Q.    All right. And I believe you indicated it was hundreds of

16  calls?

17  A.    Yes.

18          **MR. VACCA:** Objection, Your Honor, leading again.

19          **THE COURT:** Overruled.  Answer will stand.

11:08:24AM 20  BY MR. MARANGOLA:

21  Q.    At any point, Investigator, did you ever speak to the

22  defendant in court who you previously identified as Carlos

23  Figueroa?  Did you ever speak to him in person?

24  A.    Yes.

11:08:35AM 25  Q.    Can you tell the jury when you spoke to him in person?

1  A.    On the date of his arrest.

2  Q.    Did he make any statements to you in person on the date of

3  his arrest?

4            **MR. VACCA:** Objection, Your Honor.

11:08:46AM 5            **THE COURT:** Overruled about the substance of the

6  statements.

7            **THE WITNESS:** Yes, he did.

8  **BY MR. MARANGOLA:**

9  Q.    At the time he made those statements -- the defendant, who

11:08:55AM 10  is sitting in court here today, at the time he made those

11  statements to you in person, did you recognize that voice?

12            **MR. VACCA:** Objection, Your Honor.

13            **THE COURT:** Overruled.

14            **THE WITNESS:** Yes, I did.

11:09:04AM 15  **BY MR. MARANGOLA:**

16  Q.    Was it the same or different voice than introduced himself

17  as Carlos Figueroa in the call behind tab 1-192?

18            **MR. VACCA:** Objection, Your Honor, no foundation.

19            **THE COURT:** Overruled.

11:09:17AM 20            **THE WITNESS:** It was the same voice.

21  **BY MR. MARANGOLA:**

22  Q.    Was it the same or different voice that you had heard in

23  the hundreds of calls while listening to the wiretap in the

24  weeks leading up to the date that you spoke to the defendant

11:09:28AM 25  in person?

1          **MR. VACCA:** Objection, Your Honor.

2          **THE COURT:** Overruled.

3          **THE WITNESS:** It was the same voice.

4   BY MR. MARANGOLA:

11:09:33AM 5   Q.   All right.  Now, let's talk with respect to Nisharya

6   Gutierrez.  Did you have occasion to listen to wiretap calls

7   in which Nisharya Gutierrez was a participant during the

8   course of the investigation?

9   A.   Yes.

11:09:50AM 10  Q.   Approximately how many calls did you listen to in which

11  Nisharya Gutierrez was a participant?

12  A.   I would say dozens of calls.

13  Q.   Did there come a time that you spoke to Ms. Gutierrez in

14  person?

11:10:06AM 15  A.   Yes.

16  Q.   And when was that?

17  A.   It was on again the date of the takedown and then days

18  following the takedown.

19  Q.   And did Ms. Gutierrez make statements to you on those

11:10:17AM 20  occasions?

21  A.   Yes.

22  Q.   While she was in person in front of you?

23  A.   Yes.

24  Q.   And did the person who spoke to you in person who you knew

11:10:29AM 25  was Nisharya Gutierrez sound the same or different than the

1  person you intercepted over the wiretap who was Nisharya

2  Gutierrez?

3  A.    Sounded the same.

4  Q.    All right.  Now, with respect to the transcript at

11:10:42AM 5  Government's 1-192, you indicated that the content of the

6  transcript accurately reflects the contents of the call; is

7  that right?

8  A.    Yes.

9  Q.    And based on your testimony here and your familiarity with

11:10:55AM 10  the voices of the defendant as well as Nisharya Gutierrez, are

11  the participants accurately identified in the call at tab

12  1-192?

13          **MR. VACCA:** Objection.

14          **THE COURT:** Overruled.

11:11:06AM 15          **THE WITNESS:** Yes.

16  **BY MR. MARANGOLA:**

17  Q.    And are the voices -- well, are the initials for Carlos

18  Javier Figueroa -- let me withdraw that.

19          What are the initials next to the voice of the

11:11:23AM 20  defendant as set forth in this transcript?

21  A.    CF.

22  Q.    And what are the initials for Nisharya Gutierrez in this

23  transcript?

24  A.    NG.

11:11:33AM 25  Q.    And each of the entries next to CF and NG accurately

1    reflect words spoken by either Carlos Figueroa or Nisharya

2    Gutierrez?

3    A.   Yes.

4              MR. VACCA: Objection, Your Honor, leading.

11:11:46AM 5              THE COURT: Overruled.

6    BY MR. MARANGOLA:

7    Q.   I'm sorry, I didn't hear your answer.

8    A.   Yes.

9              MR. MARANGOLA: At this time, Your Honor, I'd offer

11:11:54AM10   Government's 1-192 and ask that we be permitted to play that

11   for the jury.

12             MR. VACCA: I'd object to that, Your Honor,

13   strenuously.  There's been no foundation.  It involves a coded

14   conversation as well as it's voice identification which has

11:12:09AM15   not been established in this matter and I would ask the Court

16   to strike the testimony of the investigator relating to that.

17             THE COURT: Thank you.  Objection is overruled.

18   1-192-788 will be received.

19             (WHEREUPON, Government's Exhibit 1-192-788 was

11:12:28AM20   received in evidence).

21             THE COURT: Yes, this call is in English; is that

22   right?

23             MR. MARANGOLA: Yes, Your Honor.

24             THE COURT: You're going to hear -- the call is the

11:12:38AM25   evidence.  The transcript is an aid to assisting your hearing

1    the call, but the call itself is the evidence and you

2    determine what the actual words are.

3                  You may proceed.

4                  **MR. MARANGOLA:** Thank you, Your Honor.

11:12:55AM 5    **BY MR. MARANGOLA:**

6    Q.    Investigator Briganti, the phone line that this call was

7    intercepted over was what number?  What was the target

8    telephone?

9    A.    585-766-8057.

11:13:48AM 10    Q.    And who was the person that answered this call and said

11    hello?

12                  **MR. VACCA:** Objection, Your Honor.

13                  **THE COURT:** Overruled.

14                  **THE WITNESS:** Carlos Figueroa.

11:13:56AM 15    **BY MR. MARANGOLA:**

16    Q.    And who was the person that identified himself as Carlos

17    Figueroa on this call?

18                  **MR. VACCA:** Objection, Your Honor.

19                  **THE COURT:** Overruled.

11:14:05AM 20                  **THE WITNESS:** Carlos Figueroa.

21    **BY MR. MARANGOLA:**

22    Q.    Can you point to -- do you see the person in court here

23    today who identified himself as Carlos Figueroa in the call

24    that we just heard?

11:14:14AM 25    A.    Yes.

1  Q.   Would you point to him and describe what he's wearing for

2  the record?

3  A.   Yes, he's sitting over there, he has a white dress shirt

4  on, a tie and a blue mask on.

11:14:24AM 5        **MR. MARANGOLA:** Your Honor, may the record reflect

6  Investigator Briganti's in-court identification of the

7  defendant Carlos Javier Figueroa?

8        **THE COURT:** Yes, the record will note the

9  identification of the defendant Carlos Figueroa.

11:14:35AM 10        **MR. MARANGOLA:** And, Your Honor --

11  **BY MR. MARANGOLA:**

12  Q.   -- Investigator Briganti, I'd like to show you what's in

13  evidence now as Government's 10.  Do you see that,

14  Investigator Briganti?

11:15:03AM 15  A.   Yes, I do.

16  Q.   And next to the phone number 766-8057, underneath the user

17  column for that number is blacked out; is that right?

18  A.   Yes.

19  Q.   And for the record, the call that we just heard this over

11:15:18AM 20  in which the defendant identified himself on, it is the same

21  phone number listed in the top of that chart marked

22  Government's Exhibit 10; is that right?

23  A.   Yes.

24  Q.   Who was, in fact, the user for that 766-8057 as reflected

11:15:33AM 25  in this call?

1  A.   Carlos Figueroa.

2           **MR. MARANGOLA:** Your Honor, with the Court's

3  permission I'd like to redact the top box for user next to

4  766-8057.

11:15:45AM 5           **THE COURT:** You mean unredact?

6           **MR. MARANGOLA:** I'm sorry, yes, unredact.

7           **THE COURT:** Mr. Vacca?

8           **MR. VACCA:** I object, Your Honor.

9           **THE COURT:** Overruled.  The top number can be

11:15:58AM 10  unredacted.

11           **MR. MARANGOLA:** And similarly I'd like to display

12  Government's Exhibit 12 and ask that the user next to 766-8057

13  be unredacted based on the testimony in this call.

14           **THE COURT:** Mr. Vacca?

11:16:33AM 15           **MR. VACCA:** I would object to that as well, Your

16  Honor.

17           **THE COURT:** Okay.  Overruled.  That can be

18  unredacted at well.

19           **MR. MARANGOLA:** Thank you, Investigator Briganti.

11:16:53AM 20           Your Honor, I have no further questions of

21  Investigator Briganti at this time.

22           **THE COURT:** Thank you.

23                          <u>**CROSS-EXAMINATION**</u>

24  BY MR. VACCA:

11:17:11AM 25  Q.   Investigator, you indicated on your direct testimony on

1  the first day that you testified that you started an

2  investigation in 2015; is that correct?

3  A.    Yes.

4  Q.    And there were search warrants issued at that time; is

11:17:28AM 5  that correct?

6  A.    Yes, sir, there were, yes.

7  Q.    Okay. Now, when is the first date of activity with respect

8  to this case?

9  A.    The exact date I'm -- I don't recall the exact date that

11:17:43AM10  we first started.

11  Q.    But it was in 2015, correct?

12  A.    Yes.

13  Q.    And did you execute -- obtain a search warrant and execute

14  a search warrant on April 22nd of 2015?

11:18:00AM15  A.    There was a search warrant executed, yes.  I wasn't there

16  at that one, but there was one executed, yes.

17  Q.    Okay. But that was the first activity on this case?

18  A.    No, there was activity prior to that.

19  Q.    Prior to that.  And that's 2015, right?

11:18:15AM20  A.    Yes, sir.

21  Q.    Okay.  And who was in charge of the operation at that

22  time?

23           **MR. MARANGOLA:** Objection, operation, what he's

24  referring to.

11:18:26AM25           **MR. VACCA:** The investigation.

1        **MR. MARANGOLA:** Thank you.

2        **THE WITNESS:** At that time it was myself,

3 Investigator Swain, and Special Agent Pat Hoffmann.

4 **BY MR. VACCA:**

11:18:35AM 5 Q.   Okay. And tell us what happened regarding the search

6 warrant of April 22nd, 2015.

7 A.   We learned that other investigators had -- had known about

8 that location and we learned that they had a search warrant

9 for it after they had obtained the search warrant for it.

11:18:56AM 10 Q.   Okay. Was a search warrant executed there?

11 A.   It was, yes.

12 Q.   And were there any individuals present when that search

13 warrant was executed?

14 A.   Yes, sir, there was.

11:19:05AM 15 Q.   And who was there?

16 A.   Raphael Rodriguez, also known as Rafi, and Erick Arroyo

17 Cruz.

18 Q.   Were they arrested?

19 A.   Yes, they were.

11:19:15AM 20 Q.   Were they charged?

21 A.   Yes.

22 Q.   Okay. And as far as that was concerned what, if anything,

23 did you confiscate from the premises?

24 A.   There were drugs and paperwork.

11:19:29AM 25 Q.   What was the premise address?

```
 1  A.   It was 14 Burbank Street.

 2  Q.   Okay. And as far as 14 Burbank Street is concerned, did

 3  you then have any other activity involving this matter at

 4  Burbank Street, 14 Burbank Street?

 5  A.   Not at 14 Burbank Street.

 6  Q.   So this was the only activity there was, correct?

 7  A.   To my recollection, yes.

 8  Q.   And Carlos was not present at that time of the execution

 9  of the search warrant?

10  A.   No, sir, he was not.

11  Q.   He was not charged with anything, correct?

12  A.   No, sir.

13  Q.   And as far as the individuals that were involved in this

14  case, you indicated that they were charged with this, correct?

15  A.   Yes, sir.

16  Q.   All right.  So this had nothing to do with Carlos?

17  A.   I wouldn't say that, no.

18  Q.   But you didn't charge him, right?

19  A.   Correct.

20  Q.   He wasn't there?

21  A.   He was not there, yes.

22  Q.   Okay. And did you ever speak to him about this incident?

23  A.   No, sir.

24  Q.   All right.  So when is the first time you ever heard

25  Carlos speak?
```

11:19:49AM (line 5)
11:20:03AM (line 10)
11:20:17AM (line 15)
11:20:26AM (line 20)
11:20:39AM (line 25)

1    A.    The first time I heard him speak was when we began to

2    wiretap his telephone.

3    Q.    You didn't speak to him directly or in person.  You did it

4    through the wiretap?

11:20:51AM 5    A.    I spoke to him after the wiretap in person, but never

6    before it.

7    Q.    Never before the wiretap?

8    A.    No, sir.

9    Q.    Okay. And after the search warrant of April 22nd,

11:21:06AM 10    2014 (sic), was there a -- what amount of drugs did you

11    confiscate there?

12             **MR. MARANGOLA:** I'm sorry, what was the question?

13    Objection, Judge.

14             **THE COURT:** Sustained because I think the date may

11:21:17AM 15    be wrong.  You said April 22nd, 2014.

16             **MR. VACCA:** No, it's 2015.

17             **THE COURT:** Do you want to reask the question,

18    please?

19             **MR. VACCA:** Sure.

11:21:27AM 20    **BY MR. VACCA:**

21    Q.    Sir, when is the next activity that you had involving this

22    investigation after the April 22nd, 2015 search warrant?

23    A.    Well, there was activity throughout.  I mean, there was

24    activity -- some activity every day.

11:21:46AM 25    Q.    All right.  And what was -- was there a search warrant

1  that was executed on August 12th of 2015?

2  A.    Yes, sir, there was.

3  Q.    And what address was that at?

4  A.    That was at 11 Burbank Street.

11:22:02AM 5  Q.    What, if anything, did you confiscate at that time?

6  A.    There was over 100 bags of cocaine, over 150 bags of

7  heroin, there was $1160 in cash, there was a cell phone, and

8  some ledgers.

9  Q.    All right.  And who did you charge -- did you charge

11:22:24AM 10  anybody with respect to those items?

11  A.    Yes, sir.

12  Q.    And who did you charge?

13  A.    Rinaldo Figueroa and Raphael Rodriguez, also known as

14  Rafi.

11:22:33AM 15  Q.    And they were charged in what?  State court?

16  A.    Yes, sir.

17  Q.    All right.  So you confiscated those items from them,

18  correct?

19  A.    Yes.

11:22:40AM 20  Q.    And Mr. Figueroa was not there?

21  A.    He was not at the time of the search warrant, no.

22  Q.    Okay.  And he was not charged with anything; is that

23  correct?

24  A.    Correct.

11:22:49AM 25  Q.    And did you confiscate these packages of drugs?

1   A.   Yes, we did, yes.

2   Q.   And was there any money involved?

3   A.   Yes.

4   Q.   And where did you confiscate the money?

11:23:00AM 5   A.   I'm sorry, I didn't hear your question.

6   Q.   Where did you confiscate the money?

7   A.   At 11 Burbank Street.

8   Q.   At 11 Burbank Street?

9   A.   Yes.

11:23:09AM 10   Q.   Any of these items that you took into your custody during

11   2015, okay?  Did you test any of these items?

12   A.   I'm not certain if I field tested them or if another

13   investigator field tested them.

14   Q.   Okay.  And did you do any -- anything like DNA testing on

11:23:33AM 15   the duffle bag or DNA testing on any of the drug packaging?

16   A.   No, sir.

17   Q.   Okay. So you never did that with respect to those two

18   cases, right?

19   A.   Correct.

11:23:42AM 20   Q.   Then you also testified that there was activity going on

21   in this neighborhood and you applied for a pole camera in

22   2016, correct?

23   A.   Well, we didn't apply for it.  We just installed it.

24   Q.   You just installed it?

11:23:58AM 25   A.   Yes.

1   Q.   Okay. So when did you install that, do you remember?

2   A.   Some time around April of 2016.

3   Q.   All right.  And you indicated that there was some activity

4   on that street of Luis -- was it Luis Gargol --

11:24:16AM 5   A.   It was -- it was Caesar Quinones, also known as Gargola.

6   Q.   Okay. And he was murdered?

7   A.   He was murdered, sir, yes.

8   Q.   He was murdered and that served as one of the bases as to

9   why you wanted a pole camera installed?

11:24:32AM 10   A.   That was one of the bases, yes.

11   Q.   Okay. But was anybody charged with respect to that?

12   A.   To his murder?

13   Q.   Yes.

14   A.   No.

11:24:42AM 15   Q.   Okay. So no one was charged with respect to that murder?

16   A.   Correct.

17   Q.   And it was near North Clinton Avenue?

18   A.   Yes, it was on Burbank Street almost to North Clinton

19   Avenue.

11:24:53AM 20   Q.   Okay. And there's also an Obed Torres, 54 Miller Street,

21   2016?

22   A.   Yes.

23   Q.   Why don't you tell me about that?

24   A.   Do you want me to tell you the incident?

11:25:04AM 25   Q.   Yeah.

1  A.   Obed Torres arrived at 54 Miller Street and was shot

2  through the door as he approached the location by Axel Aponte

3  Camacho.

4  Q.   All right.  And no one was charged with that; is that

11:25:20AM 5  correct?

6  A.   Axel Aponte Camacho was charged.

7  Q.   He was charged with that, but my client wasn't charged

8  with it?

9  A.   No.

11:25:27AM 10  Q.   Okay. All right. Then there was something on Conkey

11  Avenue, a search warrant on 2/2/17?

12  A.   Yes, sir.

13  Q.   Tell me about that.

14  A.   There was a search warrant that was executed there for

11:25:38AM 15  narcotics and an individual was arrested during that search

16  warrant.

17  Q.   But not Carlos?

18  A.   Correct.

19  Q.   And what was found as a result of that search warrant?

11:25:55AM 20  A.   I believe it was 67 decks of heroin and 22 bags of

21  cocaine, there was .22 caliber ammunition, I think $348 in

22  cash and some drug ledgers.

23  Q.   Okay. And at that period of time -- that point in time had

24  you started using confidential sources?

11:26:21AM 25  A.   Yes.

1  Q.   What date did you start using confidential sources with

2  respect to the investigation of this matter we have here in

3  court today?

4  A.   I would say the beginning of 2015, the exact date I'm not

11:26:33AM 5  aware of, but it was during the very early months of 2015.

6  Q.   Okay. And the arrest took place on what?  1/29/18?

7  A.   Yes.

8  Q.   1/29/18, so three years -- this was an ongoing

9  investigation for three years?

11:26:48AM 10  A.   Yes, sir.

11  Q.   All right.  And how many agents or officers or inspectors

12  or investigators did you have appointed or working with your

13  team at that time?

14  A.   Throughout the investigation, I would say at least 40.

11:27:10AM 15  Q.   Okay. And there was not a takedown until you were into

16  this for approximately three years?

17  A.   That's correct.

18  Q.   Okay. And is it true that you could have made some arrests

19  with respect to this matter much earlier than that, but you

11:27:28AM 20  chose not to so that you could use confidential sources or

21  unindicted co-conspirators or indicted co-conspirators?

22  A.   I'm not sure I understand.

23  Q.   Well, what I'm basically asking you is you could have

24  started the investigation or the arrest or whatever with

11:27:52AM 25  respect to this matter much earlier than January of 2018?

1  A.   Well, there were individuals that were arrested during the

2  course of the investigation.

3  Q.   When did my client first become a suspect in this matter?

4  A.   Suspect in the matter, again, once the investigation

11:28:10AM 5  started.  When it originally started.

6  Q.   So in 2015?

7  A.   Yes.

8  Q.   Okay. And you knew -- you knew through your confidential

9  sources and other individuals that there were weapons and

11:28:24AM 10  drugs, et cetera, involved in this matter?

11  A.   We believed that there were.  We didn't know that.  I

12  mean, we didn't -- we didn't just rely on the information from

13  the informant.  We needed to investigate further.

14  Q.   Okay. And you just testified about the search warrant at

11:28:41AM 15  Conkey Avenue; is that correct?

16  A.   Yes, sir.

17  Q.   All right.  When did you first start wiretapping my

18  client's phone?

19  A.   The exact date I'm not certain, but it was in January of

11:28:59AM 20  2018.

21  Q.   January 2018?

22  A.   Yes, sir.

23  Q.   So that was right around the takedown?

24  A.   It was -- it was weeks before it, yes.

11:29:10AM 25  Q.   Okay. And how many phones did you tap?

1   A.   Of Mr. Figueroa's or total?

2   Q.   Total.

3   A.   I believe there were seven cell phones.  Seven phones.

4   Q.   Seven phones?

11:29:40AM 5   A.   Yes.

6   Q.   Okay. And whose cell phone was tapped for the longest

7   period of time?

8   A.   Roberto Figueroa.

9   Q.   Roberto Figueroa?

11:29:55AM 10   A.   Yes, sir.

11   Q.   Okay. Now, he resided at 292 Barrington Street, correct?

12   A.   Yes, he did.

13   Q.   Who did he reside there with?

14   A.   He resided there with his girlfriend, their child and

11:30:08AM 15   Leitscha Poncedeleon.

16   Q.   Okay. All right. There was a search warrant executed there

17   on the 29th day of January 2018; is that correct?

18   A.   Yes, sir.

19   Q.   Those are -- those various items that were shown in the

11:30:26AM 20   exhibits, for example, you know, Home Depot bucket with some

21   white substance in there, what looked like some weapons, that

22   type of thing, were they there when they executed the search

23   warrant?

24   A.   Yes, they were.

11:30:41AM 25   Q.   And was Carlos Figueroa there when you executed the search

1   warrant?

2   A.   Not on the date of the search warrant, no, sir.

3   Q.   He was not there?

4   A.   No.

11:30:48AM 5   Q.   Where was he, do you know?

6   A.   Yes, he was at 6 Burbank Street.

7   Q.   Okay.  And as far as 6 Burbank Street is concerned, who

8   resided there?

9   A.   That was Carlos Figueroa, Nisharya Gutierrez, and their

11:31:03AM 10   children.

11   Q.   Did you execute a search warrant at Fernwood as well?

12   A.   No, sir.

13   Q.   Okay. They show in the photographs, we see pictures of big

14   boxes in the car and we also see boxes inside the house.  Did

11:31:20AM 15   you confiscate and take all that into evidence?

16   A.   At which location, sir?

17   Q.   At Barrington.

18   A.   Yes, it was confiscated.

19   Q.   It was all confiscated?

11:31:33AM 20   A.   Yes, sir.

21   Q.   Did you perform any tests on it?

22   A.   I didn't, no.

23   Q.   Do you know if anybody did?

24   A.   I know tests were performed on some of the items that were

11:31:45AM 25   taken from the location, yes.

1  Q.    DNA?

2  A.    No.

3  Q.    Fingerprints?

4  A.    I'm not certain if there was fingerprints, no.

11:31:54AM 5  Q.    Did you ever get any fingerprint reports on this matter?

6  A.    I can't recall if I reviewed any.

7  Q.    Okay.

8  A.    If I did there was no indication that there were any.

9  Q.    All right.  And then we just saw -- we saw a video of a

11:32:12AM 10 couple of individuals running in the parking lot on Culver

11 Road.  Okay, what's that all about?

12  A.    So you want me to explain to you why?

13  Q.    Yeah.

14  A.    Okay, okay.  So those two individuals were believed to

11:32:31AM 15 have entered an apartment at that residence -- at that

16 building and taken a quantity of drugs from the building and a

17 firearm and then fled the area.

18  Q.    Okay. And who did you get that information from that they

19 did this?

11:32:49AM 20  A.    The individual that did it.

21  Q.    Who was that individual?

22  A.    Axel Aponte Camacho.

23  Q.    That's the one you mentioned before as well?

24  A.    Yes, at 54 Miller Street, yes.

11:33:00AM 25  Q.    At 54 Miller Street?

1  A.    Yes.

2  Q.    And 820 East Main Street, okay?  How is it that 820 East

3  Main Street plays into this?

4  A.    I don't understand, sir.

11:33:15AM 5  Q.    Okay.  820 East Main Street, why is it in this case?  Why

6  are we talking about it?

7  A.    It was a location where we believed during the

8  investigation the drugs were being packaged for street level

9  distribution.  So packaged into smaller packages and then

11:33:34AM 10  taken to drug houses or to individuals who were selling on the

11  street.

12  Q.    Did you -- did you execute a search warrant at that

13  address?

14  A.    Yes, there was a search warrant executed there.

11:33:45AM 15  Q.    Okay.  What items did you obtain?

16  A.    Packaging materials, I'm not certain of the other items --

17  oh, there was cell phones and packaging materials that were

18  taken from that location.

19  Q.    Okay.  Who was arrested when that search warrant was

11:34:01AM 20  executed at that address?

21  A.    I don't believe there was anybody inside the residence

22  when the officers entered.

23  Q.    So no one was charged that was at 820 East Main Street?

24  A.    No, there was nobody in 820 East Main Street.

11:34:17AM 25  Q.    How about 59 Fernwood?  Was a search warrant executed

1   there?

2   A.   No, sir.

3   Q.   And Leo Street, was there any type of search warrant

4   executed at Leo Street?

11:34:33AM 5   A.   No.

6   Q.   Ritz Street?

7   A.   No, sir.

8   Q.   How about Rosedale Street?

9   A.   No.

11:34:36AM 10   Q.   How about St. Paul Street?   Front 360?

11   A.   No.

12   Q.   360 St. Paul back?

13   A.   No.

14   Q.   Lincoln apartments?

11:34:48AM 15   A.   No.

16   Q.   280 Garson Avenue?

17   A.   No.

18   Q.   604 Garson Avenue?

19   A.   No.

11:34:54AM 20   Q.   699 East Main Street?

21   A.   No.

22   Q.   899 Culver Road -- well, we already did that.   Let's do it

23   again.   899 Culver Road front?

24   A.   No.

11:35:06AM 25   Q.   How about back?

```
 1  A.    No, sir.

 2  Q.    157 Depew Street?

 3  A.    No.

 4  Q.    60 Malling Drive?

 5  A.    There was a search warrant conducted at Malling Drive.

 6  Q.    That's where my client's mother lives; is that correct?

 7  A.    Yes.

 8  Q.    And did you obtain anything from that?

 9  A.    Yes.

10  Q.    What did you get?

11  A.    There was approximately $400,000 in cash.

12  Q.    Okay. And the mother lived there, though, correct?

13  A.    Yes.

14  Q.    2519 Brighton Henrietta Townline Road?

15  A.    There was a search warrant conducted there, yes.

16  Q.    Was anything obtained, do you know?

17  A.    Yes.  There was cocaine and a firearm that were

18  confiscated from that location.

19  Q.    Were any individuals arrested?

20  A.    Yes.

21  Q.    Okay. Who was arrested there?

22  A.    Well, not there but in relation to that Orlando Yelder

23  resided at that residence.  He wasn't there at the time of the

24  search warrant.

25  Q.    Okay. All right.
```

1    A.    He was arrested in this case.

2    Q.    He's in the parking lot in the red Mustang, right?

3    A.    That is correct, sir.

4    Q.    How about 150 Van Aucker?

11:36:12AM 5    A.    There was not a search warrant executed at that location.

6    Q.    William Warfield apartments?

7    A.    No, sir.

8    Q.    That's where they found the car, correct?

9    A.    Yes.

11:36:21AM 10    Q.    736 Carter Street?

11    A.    No, sir.

12    Q.    How about 736 -- excuse me, how about Felix's barber shop,

13    1164 North Clinton Avenue?

14    A.    Correct, there was not a search warrant there.

11:36:36AM 15    Q.    Westgate post office?

16    A.    No.

17    Q.    All right.  So now, Investigator, with respect to the

18    intercepts or the wiretaps, tell us how you set that up.

19    A.    I'm not certain I understand, sir.

11:36:55AM 20    Q.    Tell me how you, you know, tapped the phones, how you

21    tapped the phones and how someone monitored it -- monitored

22    the tapping of the phones.

23    A.    Okay.  So once we received authorization to wiretap the

24    phones, that authorization was sent to whatever telephone

11:37:13AM 25    company it was and then that telephone company will receive

1    the order and then give us -- the data starts to come through

2    the system along with the call content.

3           So a mon -- there are monitors in the room and what

4    the monitors do is when a call comes up on the screen it

11:37:35AM 5   will -- and they're logged in, like a little bell will go off

6    and it will highlight the telephone number that's coming

7    through the system.

8           And then oftentimes a certain monitor is assigned

9    to a certain phone or certain phones.  So what will happen is

11:37:54AM 10  they will click onto that line, begin to listen to it; if

11   they're already listening to another line they will request

12   another monitor log on, click into that and listen to it.

13   Q.    Okay. Now, regarding wiretaps would you agree with me that

14   one of your purposes is to find coded conversations and

11:38:19AM 15  interpret coded conversations regarding, you know, anybody's

16   statement with another individual?

17   A.    I believe that's part of it, yes.

18   Q.    Okay.  Voice identification, right?  And coded -- coded

19   conversations?

11:38:35AM 20  A.    Yes, that's one of the reasons why we listen, yes.

21   Q.    What training or experience do you have with conversations

22   involving coded conversations?

23   A.    Only the previous wiretaps or phones that I've listened to

24   during the course of my career and attempting to understand

11:38:59AM 25  what is being said based on not only the conversation, but

1    what follows that and the investigation itself.  So attempting

2    to determine what those coded conversations mean.

3    Q.    Do you receive any special training in how to decipher

4    coded conversation?

11:39:23AM 5    A.    No, sir.

6    Q.    So there's no training or experience regarding that?

7    A.    No, sir.

8    Q.    Would you say that wiretaps are an important part of

9    investigations into narcotics activity?

11:39:38AM 10    A.    In some cases they are.  Not all, but some cases do.  I

11    mean, they do uncover a lot as far as the investigation goes,

12    but not in all cases.

13    Q.    You do go to training in terms of being an officer or

14    being an investigator in terms of how to handle a case or how

11:39:56AM 15    to deal with all of the things involved in a case, correct?

16    A.    Yes, sir.

17    Q.    All right.  And in this type of case, wouldn't you agree

18    that evidence of conversations involving an alleged coded

19    conversation was an important part of this case?

11:40:14AM 20    A.    Yes, I would agree that the conversations themselves are

21    important, yes.

22    Q.    Okay.  And is there ever any testing to see how well

23    you're doing at deciphering a coded conversation?

24    A.    Only -- no, there's no test, no.

11:40:32AM 25    Q.    There's no test?  How about training?

1   A.    No, I think that it's more having done it, just as

2   experience of having done it.  There's no formal training

3   that's -- that I've ever received.

4   Q.    Well, what -- you and Investigator Swain were in charge of

11:40:53AM 5   the whole program, right?

6   A.    And Special Agent Hoffmann, yes.

7   Q.    Special Agent Hoffmann, okay.  And then you got the

8   wiretaps, you got the wiretaps.  Who listened to the

9   conversations?

11:41:04AM10   A.    So it was personnel -- law enforcement personnel that were

11   authorized to listen to them that were part of the

12   investigation, they were assigned to it.

13         And then there were also interpreters that we --

14   because some of the conversations were in Spanish and law

11:41:18AM15   enforcement officers didn't speak Spanish.

16   Q.    All right. So you got -- you got a lot of the

17   conversations in Spanish.  So you go from the conversation in

18   Spanish, then the interpretation in English, correct?

19   A.    Yes.

11:41:29AM20   Q.    The interpretation to English, then you have to identify

21   the speaker?

22   A.    Yes, the -- yes.

23   Q.    So this is a three step process?

24   A.    It is a three step process.

11:41:44AM25   Q.    Three step process.  And what results out of that is this

1   huge book that we have here, okay?  That -- I think you have

2   it up there as well?

3   A.   Yes, sir.

4   Q.   Right?  That has to do with conversations?

11:41:57AM 5   A.   Yes.

6   Q.   Has to do with wiretaps?

7   A.   Yes.

8   Q.   Correct?

9   A.   Yes.

11:41:59AM 10   Q.   And did you help to prepare that book?

11   A.   Yes, I did.

12   Q.   Okay.  Now, in preparing that book -- you don't speak

13   Spanish, so how do you know that the interpretation or the

14   translation from Spanish to English is 100% accurate?

11:42:21AM 15               MR. MARANGOLA: Objection, Judge, the Investigator

16   has testified about the interpretation of a single call.  The

17   testimony has been that he authenticated the data for the

18   calls in there.  There's no interpretation.

19               THE COURT: Overruled.  It's a proper question.  He

11:42:35AM 20   can answer that.

21               THE WITNESS: I'm sorry, sir, could you repeat the

22   question?

23               MR. VACCA: Could I --

24               THE COURT: How do you know that the interpretation

11:42:42AM 25   or the translation from Spanish to English is 100% accurate?

1          **THE WITNESS:** I don't.

2    **BY MR. VACCA:**

3    Q.   Okay.  So would it be fair to say that there are errors in

4    the interpretation from Spanish to English?

11:42:56AM 5    A.   That I'm aware of, I don't know of any -- I don't know of

6    any.  I'm not aware of any.

7    Q.   Well, I'm just standing up here and I'm showing you what

8    we have, what the jurors have.  Are you telling me this

9    interpretation is 100% accurate?

11:43:15AM 10          **MR. MARANGOLA:** Objection, Judge, he's confusing

11   interpretation with --

12          **THE COURT:** Sustained, that's not what he said.

13   **BY MR. VACCA:**

14   Q.   Okay.  So did you help in preparing this book?

11:43:25AM 15   A.   Yes.

16   Q.   You helped.  And did you read the entries when you were

17   preparing that book?

18   A.   I read the data entries.  So the data portions at the top

19   that I put my initials next to --

11:43:37AM 20   Q.   Right.

21   A.   -- those I reviewed, yes.

22   Q.   How about the conversations that follow that?

23   A.   I reviewed them.  I reviewed them, yes.

24   Q.   Okay.  And had they been interpreted from Spanish to

11:43:47AM 25   English when you reviewed them?

1  A.    Yes.  I don't speak Spanish.

2  Q.    Do you have any -- do you have any type of test on it

3  where you have two interpreters look at it to make sure the

4  interpretation is correct?

11:44:01AM 5  A.    I think some of them had multiple people listen to it, but

6  I can't -- I can't tell you how many people listened to each

7  one.

8  Q.    And when these people listened to this, were you present?

9  A.    Yes.

11:44:13AM 10  Q.    All the time?

11  A.    To my recollection, yes, but there may have been times I

12  was not.

13  Q.    Was there ever any incident where someone spoke to you or

14  came to you because you're one of the persons in charge and

11:44:28AM 15  say, you know, I think there's a little something wrong with

16  this interpretation or I don't understand this, could we have

17  them take a look at it again?

18            **MR. MARANGOLA:** Objection, Judge, is he talking

19  about the binder or during the course of the wiretap?

11:44:40AM 20            **MR. VACCA:** During the course of the wiretap, then

21  I'll go to the binder.

22            **THE COURT:** Overruled.  You can answer that.

23            **THE WITNESS:** So during the course of the wiretap I

24  don't recall anybody telling me that the transcript was

11:44:58AM 25  incorrect.

1  BY MR. VACCA:

2  Q.    Okay.  But did you pursue opinion as to whether or not it

3  was correct?

4  A.    Only the person that actually prepared the transcript or

11:45:09AM 5  listened to the call and transcribed it, that it was the only

6  person I spoke to at the time of the wiretap in regards to

7  what the content of it was.

8  Q.    How many interpreters did you use that were Spanish

9  interpreters?

11:45:20AM 10  A.    There were several.  And I don't know the exact number.  I

11  would say at least -- over the course of it, I would say at

12  least seven or eight, maybe more.  But at least that amount.

13  Q.    Okay. What date did the -- did the -- was the tap

14  installed on the phones?

11:45:37AM 15  A.    The first date of the wiretap was December 21st of 2017.

16  Q.    All right.  So the tap was on the phone for about five

17  weeks?

18  A.    Totally, yes.

19  Q.    Totally about five weeks.  And you said you had hundreds

11:45:53AM 20  of people working on this?

21  A.    Well, there were hundreds of people that were involved in

22  the entire investigation, that includes the takedown, yes.

23  Q.    Did they do rough drafts of the interpretations?

24  A.    Well, there are synopses that are put into the system that

11:46:13AM 25  we would review in English, if that's what your question is,

1  yes.

2  Q.    Did you have any Spanish speaking officers as part of your

3  team?

4  A.    Yes.

11:46:23AM 5  Q.    Okay. How many?

6  A.    I believe there were two.

7  Q.    Two?

8  A.    Yes.

9  Q.    And when they were involved in the takedown did they

11:46:44AM 10  translate when the takedown took place?

11  A.    I don't understand, sir.

12  Q.    When the takedown took place?

13  A.    Yes.

14  Q.    You arrest people, correct?

11:46:54AM 15  A.    Yes.

16  Q.    You read them their rights?

17  A.    Yes.

18  Q.    All right.  Did you have a Spanish interpreter there to

19  read them their rights?

11:47:05AM 20  A.    I didn't interview, so I didn't need to do that.  So I

21  would say no.

22  Q.    All right.  So how many people were arrested on takedown

23  day?

24  A.    Let's see, I believe there were nine.

11:47:39AM 25  Q.    Nine?

1   A.   Nine.

2   Q.   Involved in takedown day?

3   A.   I believe it was nine, yes.

4   Q.   If you take a look at 292 Barrington Street there's like

11:47:51AM 5   10 or 15 running through the lawn on takedown day.

6   A.   I'm sorry?

7        **THE COURT:** The question was how many people were

8   arrested on takedown day.

9   **BY MR. VACCA:**

11:48:05AM 10   Q.   How many people arrested?

11   A.   I believe that got arrested, I believe it was nine.

12   Q.   Was there a Spanish interpreter there?

13        **MR. MARANGOLA:** Objection.  Where?

14        **THE COURT:** Sustained.

11:48:18AM 15   **BY MR. VACCA:**

16   Q.   Was there a Spanish interpreter at any of the locations

17   during the takedown?

18   A.   Not that I'm aware of.

19   Q.   Okay.  And you indicated you didn't need an interpreter

11:48:35AM 20   for takedown?

21   A.   Not on entry on the takedown, no.  I think if one was

22   required then we would have called one, we would have asked

23   for one.

24   Q.   So there wasn't a defendant in the takedown who had his or

11:48:48AM 25   her rights read to him?

1    A.    Not at the location, no.

2    Q.    Okay. On that day.  All right. Now, voice identification,

3    when did you start working towards identifying voices?

4    A.    From the beginning of the wiretap.

11:49:07AM 5    Q.    All right.  And did you have other individuals listen to

6    individuals speaking and render an opinion as to who that was?

7    A.    Yes.

8    Q.    On how many occasions?

9    A.    Every day.

11:49:21AM 10    Q.    Okay. A lot of those were confidential informants,

11    correct?

12    A.    No.  During the wiretap they were law enforcement officers

13    that were assigned to the investigation, or interpreters.

14    Q.    So did you at any point in time have individuals who were

11:49:36AM 15    co-conspirators -- unindicted co-conspirators, confidential

16    sources listen to the transcripts or listen to the

17    conversations or what was coming out as a tap, did you have

18    them listen to any of your interceptions?

19    A.    Yes.

11:49:52AM 20    Q.    And was that during this period of time from December of

21    2017 to January of 2018?

22    A.    No, it was after.

23    Q.    It was after?

24    A.    Yes.

11:50:06AM 25    Q.    Like when after?

A.   I mean, it was -- it was right from after the takedown

until right before we're here in court.

Q.   Okay. So have you talked to several of these individuals

who identified voices or who made other identifications,

11:50:35AM content with respect to this matter?  Have you talked to them

about it?

A.   Yes, I've been -- when conversations were -- when we've

had conversations with them, yes.

Q.   Have you been into the U.S. Attorney's Office with any of

11:50:48AM the individuals from the U.S. Attorney's Office to talk about

this case?

A.   Yes.

Q.   Have you gone over your testimony?

A.   Yes.

11:50:55AM Q.   Have you gone over all the documentation?

A.   Yes, sir.

Q.   Have you at any time gone to the U.S. Attorney's Office

and been there with an indicted co-conspirator?

A.   Yes, sir.

11:51:08AM Q.   Unindicted co-conspirator?

A.   Yes.

Q.   Okay. Who was the indicted co-conspirator?

A.   Roberto Figueroa, Orlando Yelder, Jonathan Carmona Cruz,

Axel Aponte Camacho, Victor Nunez.  I don't want to miss one,

11:51:46AM but I can't remember any others, but I believe that's it.

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
| 1      | Q. | How about Bernardino Burgos Morales?                     |
| 2      | A. | Yes, okay, Bernardino Burgos Morales.                    |
| 3      | Q. | Karina Lopez?                                             |
| 4      | A. | We did speak with her, yes.                              |
| 11:52:03AM 5 | Q. | Iris Carmona Osario?                              |
| 6      | A. | Yes, but she was not indicted.                           |
| 7      | Q. | Cassandra Dieter?                                        |
| 8      | A. | No, I was -- no.                                         |
| 9      | Q. | Angel Reyes Quinones?                                    |
| 11:52:21AM 10 | A. | No.                                             |
| 11     | Q. | Amy Aponte Camacho?                                      |
| 12     | A. | Axel Aponte Camacho, yes.                               |
| 13     | Q. | Elston Villanueva?                                       |
| 14     | A. | No, I don't recall that person.                         |
| 11:52:40AM 15 | Q. | Nisharya Gutierrez?                             |
| 16     | A. | I was there for that, yes, and she was not indicted.    |
| 17     | Q. | Ingrid Mercado?                                         |
| 18     | A. | Yes.                                                    |
| 19     | Q. | Jose Olivencia?                                         |
| 11:52:52AM 20 | A. | Yes.                                           |
| 21     | Q. | Leitscha Poncedeleon?                                   |
| 22     | A. | I'm sorry, sir?                                         |
| 23     | Q. | Leitscha Poncedeleon?                                   |
| 24     | A. | Leitscha Poncedeleon?                                   |
| 11:53:03AM 25 | Q. | Right.                                         |

1  A.   No, I was -- I never interviewed her.  She was never

2  interviewed with us.

3  Q.   Noel Figueroa?

4  A.   I was not present during that interview.

11:53:14AM 5  Q.   Okay. So these are all individuals who were interviewed at

6  the U.S. Attorney's Office, correct?

7  A.   Yes, some were indicted, but not all of those individuals

8  were indicted.

9  Q.   Were some of the individuals not indicted because of a

11:53:29AM 10  beneficial plea offer that was extended by the U.S. Attorney's

11  Office?

12  A.   Not that I'm aware of, no.

13  Q.   Okay. So nobody got a deal?

14  A.   I'm not sure what you mean, sir.

11:53:44AM 15  Q.   Well, no one was given consideration who spoke to you,

16  right?  Or did they just come in and say, I want to cleanse my

17  soul and come in and tell you all about this?

18           **MR. MARANGOLA:** Objection, Judge.

19           **THE COURT:** No, overruled.  He can answer that if he

11:53:59AM 20  knows.

21           **THE WITNESS:** No, the ones that were indicted, no.

22  I believe that there is a plea deal and a cooperation

23  agreement.

24  **BY MR. VACCA:**

11:54:09AM 25  Q.   What's your understanding of a cooperation agreement?

1          **MR. MARANGOLA:** Objection, Judge.

2          **THE COURT:** Overruled.

3          **MR. MARANGOLA:** Witness isn't testifying pursuant to

4    one.

11:54:17AM 5          **THE COURT:** He can explain what his understanding of

6    a cooperation agreement is based upon his experience.

7    Overruled.

8          **THE WITNESS:** My understanding of a cooperation

9    agreement is an individual enters into a cooperation agreement

11:54:29AM10   with the Government and agrees to tell the truth, the entire

11   truth and if -- and provides substantial assistance.

12          If substantial assistance is provided to the

13   Government based on their truthful testimony, then the

14   Government can request to have their sentence reduced, but

11:54:53AM15   there's no promise of a reduction of sentence.

16   **BY MR. VACCA:**

17   Q.   There's no promise, but there is -- with every one of

18   these there's conversation regarding what their sentence will

19   be if they cooperate?

11:55:07AM20          **MR. MARANGOLA:** Objection, Judge.

21          **THE WITNESS:** No.

22          **THE COURT:** Sustain the objection.

23          **MR. VACCA:** Okay.

24          **THE COURT:** Answer will be stricken.

11:55:17AM25   **BY MR. VACCA:**

1  Q.   Now, do you know what the plea deal was with Orlando

2  Yelder?

3  A.   I do not, sir.

4  Q.   How about Roberto Figueroa?

11:55:24AM 5  A.   No.

6  Q.   Which ones do you know what the deal was?

7  A.   I don't know any of them in specifics.  I don't know the

8  specifics behind any of them.  I know they all entered into a

9  cooperation agreement, but I don't know the specifics of it.

11:55:37AM 10  Q.   Okay. And you reviewed some of these, not reviewed some of

11  these.  You talked to some of these individuals in the

12  U.S. Attorney's Office, correct?

13  A.   Yes, sir.

14  Q.   All right.  And did you do any transporting of these

11:55:50AM 15  individuals to the U.S. Attorney's Office?

16  A.   Many times.

17  Q.   Okay. By transporting what do you mean?

18  A.   Picking them up from whatever jail they're being housed at

19  or prison, and bringing them to the U.S. Attorney's Office and

11:56:01AM 20  then returning them back.

21  Q.   Okay. And they usually don't get the deal until the case

22  is over, right?

23  A.   That's correct.

24          MR. MARANGOLA: Objection, Judge.

11:56:09AM 25          THE COURT: Sustained.  That will be stricken.

**BY MR. VACCA:**

Q.   Let's talk about the voice identification.  Did you bring individuals in to listen to some of these tapped statements and identify who was making the statement?

11:56:28AM A.   Yes, I believe identifications were made, yes, by co-conspirators, yes.

Q.   By co-conspirators?

A.   Yes, sir.

Q.   And could you -- could you give me a list of those

11:56:37AM individuals who came in and identified individuals?

A.   Again Axel Aponte Camacho, Roberto Figueroa, Orlando Yelder, Bernardino Burgos, Jonathan Cruz Carmona, Victor Nunez, Karina Lopez, Ingrid Mercado.  These aren't all indicted, these are individuals that made identifications.  I

11:57:18AM can't recall any others.

Q.   By identifications you mean from photographic arrays or from listening to them with a voice identification or both?

A.   I don't recall all of them with photo identifications, but I do recall those individuals with voice identifications --

11:57:43AM not all of the calls, but a portion of some of them.

Q.   Do you know how many?

A.   How many?

Q.   Voice identification?

A.   I'm not certain.  I don't know exactly.

11:57:56AM Q.   Were you there when they did it?

A.    Some of them I was, yes.

      **MR. VACCA:** If I could just have a moment please, Your Honor?

      **THE COURT:** Sure.

11:58:24AM **BY MR. VACCA:**

Q.    So would it be fair to say that fingerprints and DNA were really not utilized or used in this takedown?

A.    DNA I don't believe was.  There were incidents of DNA throughout the investigation.  We did collect DNA throughout 11:58:52AM the investigation at different times during the investigation.

Q.    Was that more for an identification purpose?

A.    I'm not certain what your question is, sir.

Q.    Was it like you didn't know who an individual was or whatever and you wanted to look at the DNA and see who did it 11:59:11AM or who it was?

A.    The items -- some of the items that were recovered in the case we did ask for DNA analysis on just to determine, you know, who had the item, who may have touched the item.

Q.    Is it true to say that you never had any DNA evidence 11:59:28AM against my client?

A.    I don't recall any DNA evidence, no.

Q.    Okay. No fingerprints?

A.    Not that I can recall, no.

Q.    Okay.

11:59:45AM       **MR. VACCA:** Just one more moment, Your Honor.

**BY MR. VACCA:**

Q.   Investigator, there was a point in time when you indicated that at Fernwood, 59 Fernwood you were surveilling the premises there and there was a Postal truck that pulled in front and that Mr. Figueroa was there and that he was carrying a box; is that accurate?

A.   Yes.

Q.   Okay. And isn't it true that you do not know what was in that box?

A.   I don't know what you mean by know.

Q.   Did you at that point in time -- is it your allegation that Mr. Figueroa at that point in time picked up the box from the premises and brought it over to Fernwood?

A.   That's what surveillance shows, yes.

Q.   That's what it shows.  But you don't -- you didn't know at that point in time what was in the box?

A.   I didn't see what was in the box, but we believed what was in the box.

Q.   You believed, but you don't know for sure?

A.   I didn't see it, I didn't see the contents of that box.

Q.   Okay.  All right. Very good.

          **MR. VACCA:** Thank you very much.

          **THE COURT:** Mr. Marangola?

          **MR. MARANGOLA:** Thank you, Judge.

                    **REDIRECT EXAMINATION**

**BY MR. MARANGOLA:**

Q.   Investigator, Mr. Vacca was just asking you questions about Fernwood.  The pole camera footage we saw was not the defendant bringing the box to Fernwood, correct?

12:02:16PM A.   No.

Q.   He brought the box out of Fernwood?

A.   Yes.

Q.   And then where did -- where was the defendant vehicle seen after he brought the box out of Fernwood?  Where was the next

12:02:30PM pole camera that captured the defendant's vehicle that day?

A.   292 Barrington Street.

Q.   The same place that you just testified you observed the guns, the white powder, the packaging material, the $230,000; is that right?

12:02:47PM A.   Yes, sir.

Q.   Mr. Vacca asked you if the defendant was present at the search of 292 Barrington Street.  Do you recall that?

A.   I do.

Q.   And he was not present there at the time of the search

12:03:01PM warrant, correct?

A.   That's correct.

Q.   Did you ever see the defendant either live or on pole camera at 292 Barrington Street during the course of your investigation?

12:03:10PM A.   Yes.

1  Q.   Can you give the jury an estimate of the number of times

2  you saw him either enter or exit 292 Barrington Street during

3  the course of your investigation?

4  A.   I would say at least 40 times.

12:03:27PM 5  Q.   And the -- Mr. Vacca asked you a number of questions about

6  interpreting codes.  Do you recall those?

7  A.   Yes.

8  Q.   Have you been asked to interpret one code for this jury?

9  A.   No.

12:03:44PM 10  Q.   But in the course of your wiretap investigation

11  experience, do you decipher codes based on your investigation?

12  A.   Yes.

13  Q.   Tell the jury what are some of the ways that you identify

14  codes that are being used during the course of a wiretap.

12:04:04PM 15  A.   So if there's a code being used maybe for a location that

16  they're going to meet, surveillance may follow these

17  individuals in an attempt to determine what that code means if

18  they're consistently using it.

19  Q.   Let's talk about that.  Was there ever a particular code

12:04:18PM 20  that you heard over this wiretap for a location?

21  A.   Yes.

22  Q.   What was one of the codes for locations you heard over the

23  wiretap?

24  A.   Wendy's.

12:04:28PM 25  Q.   All right.  When you heard Wendy's, were there members of

1 surveillance that went and followed individuals to see where

2 they were going after referring to a location as Wendy's?

3 A.   Yes.

4 Q.   And did they go to a Wendy's restaurant?

12:04:43PM 5 A.   No.

6 Q.   Where did they go?

7 A.   820 East Main Street.

8 Q.   And is there a Wendy's restaurant in the vicinity of 820

9 East Main Street?

12:04:52PM 10 A.   Yes, about 100 yards away on Main Street.

11 Q.   And so would that be one of the ways during the course of

12 your wiretap you would be able to decipher codes that are

13 being used by co-conspirators?

14 A.   Yes.

12:05:09PM 15 Q.   And, by the way, in your experience listening to wiretap

16 conversations, who uses codes?

17          **MR. VACCA:** Objection, Your Honor, too broad.

18          **THE COURT:** Sustained.

19 **BY MR. MARANGOLA:**

12:05:28PM 20 Q.   Let met ask it this way: You heard the call we played from

21 ADT, right?

22 A.   Yes.

23 Q.   Any codes utilized by the representative from ADT in that

24 call?

12:05:40PM 25          **MR. VACCA:** Objection, Your Honor.

1          **THE COURT:** Overruled.

2          **THE WITNESS:** No, it didn't appear to be, no.

3     **BY MR. MARANGOLA:**

4     Q.   Okay.  Are there other ways that you were able to in the

12:05:52PM 5     course of an investigation decipher what codes are being used

6     by individuals talking about criminal activity?

7     A.   Yes.

8     Q.   Can you describe some of those other ways in which you're

9     able to decipher codes being utilized by individuals

12:06:09PM10    attempting to conceal criminal activity?

11    A.   Yes.  There was a telephone conversation where there was

12    an indication to cousins.

13          **MR. VACCA:** Objection, Your Honor.  He's using

14    general terms.

12:06:24PM15          **THE COURT:** Overruled.  Go ahead.

16          **THE WITNESS:** Generally that the cousins had

17    arrived.  And it was after that conversation where images were

18    picked up from 59 Fernwood Avenue, so we deciphered cousins

19    was the packages.

12:06:52PM20    **BY MR. MARANGOLA:**

21    Q.   All right.  Mr. Vacca asked you about if you had talked to

22    co-conspirators during the course of this investigation?

23    A.   Yes.

24    Q.   Do you recall that?

12:07:05PM25    A.   Yes, I do.

1   Q.   And did they identify who they were co-conspirators with

2   in those meetings?

3   A.   Yes.

4   Q.   And are any of the individuals they identified as

12:07:17PM 5   co-conspirators in this courtroom right now?

6   A.   I'm sorry, I didn't understand the question.  I didn't

7   hear the question.

8   Q.   Are any of the individuals that you sat with and

9   identified others as co-conspirators, are individuals they

12:07:33PM 10   identified as co-conspirators in the courtroom right now?

11   A.   Yes.

12   Q.   Can you point to any and describe what they're wearing?

13   A.   Yes, sitting at the table over there with the white dress

14   shirt on and the blue paper mask.

12:07:49PM 15   Q.   All right.  And Mr. Vacca asked you about sitting down

16   with individuals and them identifying participants in the

17   wiretap calls.  Do you recall that?

18   A.   Yes.

19   Q.   Did these individuals identify both their own voice as

12:08:04PM 20   well as other voices on other calls?

21   A.   Yes.

22   Q.   And did those voices include the defendant's voice?

23            **MR. VACCA:** Objection, Your Honor.

24            **THE COURT:** Sustained.

12:08:15PM 25   **BY MR. MARANGOLA:**

1  Q.  Mr. Vacca asked you if you had gone over I think was the

2  words he used, gone over your testimony and documentation.  Do

3  you recall those questions?

4  A.  Yes.

12:08:27PM 5  Q.  And did you ever -- what did you understand him to mean by

6  that question?

7  A.  Did I ever -- I don't know, did I ever kind of know what I

8  was -- did I ever know what I was testifying to.

9  Q.  Did you -- did I tell the questions I was going to ask you

12:08:50PM 10  before you testified?

11  A.  The exact questions, no.

12  Q.  Did we review subject areas of what I anticipated asking

13  you at trial?

14  A.  Yes, the general idea, yes.

12:09:01PM 15  Q.  Now, did we do that in the presence of other witnesses?

16  A.  No.

17  Q.  Did we ever discuss questions I would ask you in front of

18  any cooperating or otherwise witnesses in this case?

19  A.  No.

12:09:18PM 20  Q.  Did you in the course of meeting with other witnesses ever

21  tell any of those witnesses what a different witness had said?

22  A.  No.

23       **MR. MARANGOLA:** Nothing further.  Thank you,

24  Investigator.

12:09:50PM 25       **THE COURT:** Mr. Vacca?

1          **MR. VACCA:** Nothing, Your Honor.

2          **THE COURT:** Thank you, you may step down.

3          **THE WITNESS:** Thank you, Your Honor.

4          (**WHEREUPON**, the witness was excused).

5                         *    *    *

6                  <u>**CERTIFICATE OF REPORTER**</u>

7

8          In accordance with 28, U.S.C., 753(b), I certify that

9    these original notes are a true and correct record of

10   proceedings in the United States District Court for the

11   Western District of New York before the Honorable Frank P.

12   Geraci, Jr. on May 3rd, 2021.

13

14   <u>S/ Christi A. Macri</u>

15   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter
16