1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5    - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA              18-CR-6094(G)
6
     vs.
7                                          Rochester, New York
     CARLOS JAVIER FIGUEROA,               May 18, 2021
8              Defendant.                  8:30 a.m.
     - - - - - - - - - - - - -X
9

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11             UNITED STATES DISTRICT CHIEF JUDGE

12
                     JAMES P. KENNEDY, JR., ESQ.
13                   United States Attorney
                     BY: ROBERT A. MARANGOLA, ESQ.
14                      CASSIE M. KOCHER, ESQ.
                     Assistant United States Attorneys
15                   500 Federal Building
                     Rochester, New York 14614
16                   Appearing on behalf of the United States

17
                     PAUL J. VACCA, JR., ESQ.
18                   One East Main Street, Suite 1000
                     Rochester, New York 14614
19                   Appearing on behalf of the Defendant

20
     ALSO PRESENT:       Nicolas Penchaszadeh, Spanish Interpreter
21                       Barbara Considine, Spanish Interpreter
                         Besayda Soto Abbate, Spanish Interpreter
22
     COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
23                       Christimacri50@gmail.com
                         Kenneth B. Keating Federal Building
24                       100 State Street, Room 2640
                         Rochester, New York 14614
25

2

1                          **I N D E X**

2     **WITNESS FOR THE GOVERNMENT**

3     Axel Aponte Camacho
           Cross-examination by Mr. Vacca            Page  3
4          Redirect examination by Mr. Marangola      Page 35

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2                              \*     \*     \*

3              **(WHEREUPON**, the defendant is present).

4              **THE COURT:** Good morning.

08:15:09AM 5              **MR. MARANGOLA:** Good morning, Your Honor.

6              **MR. VACCA:** Good morning, Judge.  Ready to proceed?

7              **MR. MARANGOLA:** Yes, Your Honor.

8              **THE COURT:** Mr. Vacca?

9              **MR. VACCA:** Ready, Your Honor.

09:01:34AM10              **THE COURT:** Bring the jury out, please.

11              (**WHEREUPON**, the jury is present).

12              **THE COURT:** Good morning, members of the jury.

13  Mr. Vacca, you may proceed.

14              **MR. VACCA:** Thank you, Your Honor.

09:04:36AM15                         **CROSS-EXAMINATION**

16              **MR. VACCA:** Could we play the Miller Street

17  compilation, please?

18              **MR. MARANGOLA:** Judge, we've advised Mr. Vacca with

19  respect to videos, Ms. McCreedy has pulled them up for him so

09:04:47AM20  if he does need to use any of those on his examination of Mr.

21  Aponte Camacho, Ms. McCreedy will help him there.

22              **THE COURT:** Thank you very much.

23              **MR. VACCA:** Thank you.

24              **MR. MARANGOLA:** We have that here.

09:05:00AM25  **BY MR. VACCA:**

4

```
         1   Q.   Now, Mr. Camacho -- stop, please.  To the compilation
         2   here, do you see a vehicle in this compilation?
         3   A.   Yes.
         4   Q.   And do you know what kind of vehicle that is?
09:05:17AM 5 A.   Yes.
         6   Q.   What kind is it?
         7   A.   A Honda Accord.
         8   Q.   Whose car is that?
         9   A.   I'm not sure who the car is registered to, but Javi bought
09:05:39AM10 it.
        11   Q.   Javi bought it?
        12   A.   Yes.
        13   Q.   And do you know who is in that vehicle on that day?
        14   A.   Yes.
09:05:48AM15 Q.   Who is in that vehicle?
        16   A.   Cabra.
        17   Q.   Cabra?
        18   A.   Tapon and Obed.
        19            THE COURT:  Mr. Vacca, could you indicate the time
09:06:00AM20 on this?
        21            MR. VACCA:  The time on this is 10.32.35.
        22            THE COURT:  Thank you.
        23   BY MR. VACCA:
        24   Q.   Carlos was not in that vehicle, correct?
09:06:11AM25 A.   No.
```

1   Q.   Okay. Continue, please.  Now, what direction -- stop

2   please.  What direction is that vehicle traveling in?

3   A.   I don't understand the question.

4           **THE COURT:** I don't see anything.

09:06:27AM 5   **BY MR. VACCA:**

6   Q.   What street is that vehicle on?

7           **THE COURT:** Which vehicle?  There's nothing on the

8   screen.

9           **MR. VACCA:** I know, I need the screen.

09:06:39AM 10          **THE WITNESS:** Direction to Miller.

11  **BY MR. VACCA:**

12  Q.   Direction to Miller.  Okay.  And what street is that

13  vehicle traveling on as you see it in 10.32.35.64?

14  A.   Direction to Miller.

09:06:59AM 15  Q.   Direction to Miller.  Is it turning on to Miller Street?

16  A.   It looks like it's going straight to Miller.

17  Q.   Straight to Miller, but what street is it going down?

18  A.   If I'm not mistaken, on Portland.

19  Q.   So the vehicle is traveling on Portland.  And this is at

09:07:27AM 20  10:32:35.  So that vehicle is going down Portland?

21  A.   It looks like it's going in the direction to Miller.

22  Q.   Right.  But what road is it on as we see it in this clip?

23  A.   I think Portland.

24  Q.   You think Portland?

09:07:53AM 25  A.   I'm not sure.

1  Q.   You're not sure.  Okay, continue please.  Stop, please.

2  What does this photo show you?

3            **THE COURT:** Time?

4            **MR. VACCA:** 10:41.02.

09:08:09AM 5            **THE COURT:** Thank you.

6            **THE WITNESS:** Javi's truck in intersection.

7  **BY MR. VACCA:**

8  Q.   Okay.  What intersection is Javi's truck at?

9  A.   I honestly don't know.

09:08:21AM10  Q.   You don't know which street Javi is on in that photo or in

11  that clip?

12  A.   In this intersection, no.

13  Q.   Do you know what the intersection is?

14  A.   No.

09:08:36AM15  Q.   You don't know what the intersection is?  Okay, continue,

16  please.

17  A.   No.

18  Q.   Stop.  Now, at 10:41.05 what do you see there?

19  A.   That the truck turns.

09:08:54AM20  Q.   What street did it turn onto?

21  A.   I don't know.

22  Q.   You don't know what direction it is going?

23  A.   It turned to right-hand side.

24  Q.   But you don't know the street?

09:09:10AM25  A.   No.

1    Q.    Did you review this video with the U.S. Attorney's Office?

2    A.    This video, yes.

3    Q.    When did you review this video?

4    A.    Maybe a month, maybe three weeks ago.

09:09:32AM 5    Q.    How many times did you view this video?

6    A.    Maybe like three times.

7    Q.    Three times.  Were you transported up here in order to

8    view the video?

9    A.    If they bring me to the building?

09:09:55AM 10    Q.    Right.

11    A.    Yes.

12    Q.    How many times did they bring you to the building?

13    A.    In total or to watch the video?

14    Q.    To watch the video.

09:10:10AM 15    A.    To watch that video and to show me other stuff.

16    Q.    Yeah, but when did you view the video?

17    A.    Like three weeks or a month ago.

18    Q.    Okay.  How many times did you review it?

19    A.    Like three times.

09:10:36AM 20    Q.    Three times.  And who was present when you viewed this

21    video?

22    A.    The U.S. Attorney.

23    Q.    Right.  Who else?

24    A.    The agent and the interpreter.

09:10:48AM 25    Q.    How many agents?

```
 1  A.    And myself.
 2  Q.    How many agents?
 3  A.    Two.
 4  Q.    And who were the agents, do you recall?
 5  A.    Patrick and Joe.
 6  Q.    Patrick and Joe?
 7  A.    Yes.
 8  Q.    When you reviewed this video was it at the U.S. Attorney's
 9  Office here?
10  A.    I don't know.
11  Q.    Well, did they bring you back to this building?
12  A.    Yes.
13  Q.    Yes.  And how many times did they bring you to this
14  building?
15  A.    Maybe 40 times.
16  Q.    How many times did you just say?
17  A.    Maybe 40 times.
18  Q.    40 times?
19  A.    Yes.
20  Q.    Over what period of time?
21  A.    Since January of 2017.
22  Q.    January of 2017 you were brought back here about 40 times?
23  A.    Since that period of time until a few weeks before the
24  trial started --
25  Q.    Okay. And --
```

09:10:58AM (line 5)
09:11:14AM (line 10)
09:11:37AM (line 15)
09:11:43AM (line 20)
09:12:14AM (line 25)

1  A.    -- that I -- that I came to sit here.

2  Q.    -- And testify today, correct?

3  A.    Yes.

4  Q.   Did they prepare you, these individuals that you met with,

09:12:25AM 5  to testify in this trial?

6  A.   I don't understand what you're trying to say when they

7  prepare me.

8  Q.   When they talked to you about this case for 40 times,

9  okay?  They were preparing you to take the stand and testify,

09:12:41AM 10  correct?

11  A.   They were showing me to review the calls, the videos, the

12  pictures of people.

13  Q.   Did you listen to any phone calls?

14  A.   Yes.

09:13:09AM 15  Q.   How many phone calls did you listen to?

16  A.   I don't know exactly, maybe 50, maybe more.  I'm not sure.

17  Q.   When did you first talk to law enforcement about

18  testifying in this case?

19  A.   I'm not sure.

09:13:45AM 20  Q.   You're not sure when they first talked to you?

21  A.   I think it was in January of 2017.

22  Q.   Okay. And how did that come about?  Could you tell us?

23  A.   They took me from Monroe County to this building on the

24  sixth floor, the agent picked me up at Monroe, they took me to

09:14:20AM 25  the sixth floor and there they asked me questions of the

1  things that I knew and I told them the things that I knew.

2  Q.   Okay. And this is -- you were there about 40 times?

3  A.   Since the period of time of since January 2017 until

4  before I'm standing here.

09:14:52AM 5  Q.   When was the last time that you talked to them?

6  A.   Wednesday.  I came to sit here for first time on Thursday.

7  So Wednesday, the day before.

8  Q.   So Wednesday of last week?

9  A.   Yes.

09:15:18AM 10  Q.   Did they ever bring you into a courtroom before that?

11  A.   Well, I went to -- to see Marian Payson, the magistrate

12  judge --

13  Q.   Right.

14  A.   -- when the case was starting, but it wasn't the agent

09:15:40AM 15  that brought me.

16  Q.   Who brought you?

17  A.   When I was in Livingston, the police from Livingston.

18  When I was in Monroe, the police from Monroe.

19  Q.   And did you talk to all of these law enforcement people

09:15:59AM 20  about what you knew?

21          MR. MARANGOLA: Objection as to what law enforcement

22  people he's talking about.

23          THE COURT: Yes, sustained.  Be more specific.

24  BY MR. VACCA:

09:16:08AM 25  Q.   When you were brought over to the sixth floor of this

1   building did you talk to law enforcement?

2   A.   Which law enforcement?

3   Q.   Well, which ones did you talk to?

4   A.   With the federal that went and get me on the jail and they

09:16:28AM 5   brought me here.

6   Q.   About 40 times?

7           **MR. MARANGOLA:** Objection, Judge, I think he's asked

8   about 40 times whether it was 40 times.

9           **THE COURT:** Overruled.  The answer will stand.  Did

09:16:39AM 10  you answer that question?  Said about 40 times was the

11  question.

12          **THE WITNESS:** Since 2017 up until Wednesday last

13  week.

14  **BY MR. VACCA:**

09:16:54AM 15  Q.   Was it always in this building?

16  A.   Yes, but one time it was in Monroe in jail.

17  Q.   One time it was at the Monroe County Jail?

18  A.   Yes.

19  Q.   Who did you meet with there?

09:17:23AM 20  A.   With the agent.

21  Q.   What agents?  I know you mentioned a couple.

22  A.   The two federal agents and my attorney and an interpreter.

23  Q.   How many times did you meet with law enforcement?

24  A.   Which law enforcement?

09:17:47AM 25  Q.   Monroe County sheriffs.

 1  A.    I don't understand the question.  How many times I met

 2  with them?

 3  Q.    Yes.

 4  A.    Well, I was in jail in Monroe County.  I don't understand

09:18:10AM 5  what you're trying to say.  Like meeting with -- with the

 6  police officers in Monroe County?

 7  Q.    Correct.

 8  A.    I didn't met with them.

 9  Q.    You just met with the federal agents?

09:18:30AM10  A.    Yes.

11  Q.    And when you met with the federal agents did they show you

12  pictures?

13  A.    What time are you asking me?

14  Q.    Any time.

09:18:46AM15  A.    Yes.

16  Q.    And how many times did you meet to review pictures?

17  A.    I don't remember exactly how many.

18  Q.    Now, with respect to this video compilation that we're

19  watching, how many times did you review this?

09:19:10AM20  A.    I can say like three times.

21  Q.    When did you first review it?

22  A.    Like Monday maybe of last week.

23  Q.    Monday of last week is the first time you've seen this

24  compilation?

09:19:34AM25  A.    I think so.

1    Q.    Okay. When is the last time you saw it?

2    A.    Wednesday of last week.

3    Q.    Did you review it with the agents?

4    A.    Yes, and with -- it was the interpreter and the

09:19:52AM 5    U.S. Attorney.

6    Q.    Okay. And when you reviewed this video did they stop it as

7    you viewed it?

8    A.    Yes.

9    Q.    They did stop it?  And how many times did they stop it the

09:20:16AM 10    first time that you saw it?

11    A.    I don't know.

12    Q.    You don't remember or you don't know?

13    A.    I don't remember how many times they stopped it.

14    Q.    The first time.  How about the second time you saw it?

09:20:36AM 15    A.    I don't remember how many times they stopped it.

16    Q.    How about the third time?

17    A.    I don't remember how many times they stopped it.

18    Q.    Okay. And this vehicle that you see that turned, do you

19    recognize that vehicle?

09:20:53AM 20    A.    Yes.

21    Q.    And did anybody tell you whose vehicle that was?

22    A.    No.

23    Q.    So you know that vehicle from when?  A long time ago?

24    A.    When I was working with Javi, that was the truck that he

09:21:12AM 25    was driving.

14

1   Q.   Okay. What kind of truck is it?

2   A.   A GMC.

3   Q.   GMC.  And have you ever seen other GMC vehicles on the

4   road?

09:21:27AM 5   A.   Yes.

6   Q.   Okay. And in viewing this pause right here that we're

7   looking at, how do you know it's Javi's vehicle?

8   A.   Because I recognize it for all the time that I was with

9   him.

09:21:46AM 10   Q.   But what is there specific about this silver GMC vehicle

11   that you know it's Javi's vehicle?

12   A.   The color, the height of the vehicle.

13   Q.   But this could be another GMC silver vehicle on the road,

14   correct?

09:22:15AM 15   A.   There could be other GMCs, but I recognize that that's

16   Javi's GMC.

17   Q.   But what is there unique about this vehicle that leads you

18   to believe that it's Javi's vehicle?

19          **MR. MARANGOLA:** Objection, Judge, asked and

09:22:32AM 20   answered.

21          **THE COURT:** Overruled.  Go ahead.

22          **THE WITNESS:** The height of the vehicle, the color

23   of the vehicle, the front of the vehicle.

24   **BY MR. VACCA:**

09:22:43AM 25   Q.   Well, you can't see --

1    A.    -- that's like -- like -- like four little lights small in

2    the front part.

3    Q.    If we could back this up a little bit, please?  Okay, go

4    again.  Stop.  Okay, now, we are at 10:41.03-062.  That

09:23:15AM 5    vehicle, what is there unique about that vehicle that you see

6    by sitting here leads you to believe that it's Javi's vehicle?

7    A.    Can you give it a little bit more to the back so I can

8    show you where it is?

9    Q.    Continue.  Stop.  We are at 10:41:05.  What is there

09:23:44AM10    unique about the back of that vehicle that leads you to think

11    that it's Javi's vehicle?

12    A.    It's in the front part what I said.

13    Q.    No, you said the back.  You said the front, then you said

14    the back.  You said could I see the back again.  What is there

09:24:04AM15    on the back there --

16    A.    No, I say if you can rewind it, go back.

17    Q.    Okay. Rewind, please.  Stop.  Okay, what is there unique

18    about this -- we're at 10:41.02.  What is there unique about

19    this vehicle?

09:24:35AM20    A.    The front part.

21    Q.    What in the front part?

22    A.    The way the light in the front are.

23    Q.    Why don't you describe those lights to me that you see.

24    A.    How can I describe them?

09:24:56AM25    Q.    Yeah, describe them, please.

1  A.    They're like square in here, the bottom, the truck has

2  like little lights.

3  Q.    Well, do you see those little lights there?

4  A.    I know this mark that is here in the bottom of the big

09:25:35AM 5  head light because I seen the truck many times.

6  Q.    Right, but --

7  A.    That mark that I see, I know that those are the lights.

8  Q.    But there's other GMC vehicles that can have those same

9  lights, wouldn't you agree?

09:25:54AM 10  A.    Maybe there is.

11  Q.    Okay. So you really don't know if this is Javi's vehicle;

12  is that correct?

13  A.    No, that's not correct.

14  Q.    That's not correct?  Did you ever discuss this vehicle

09:26:13AM 15  with any law enforcement people that you met with?

16  A.    Can you repeat the question?

17  Q.    Did you ever discuss with law enforcement about this

18  vehicle?

19  A.    Discuss about what?

09:26:33AM 20  Q.    What's that again?

21  A.    Discuss about what?

22  Q.    Discuss about Javi's vehicle.  Did you ever talk to any

23  law enforcement about Javi's vehicle?

24  A.    When they show me the video they asked me if I recognize

09:26:54AM 25  that vehicle.

1    Q.    Right.   And when was that?

2    A.    When I saw the video.

3    Q.    Okay. And you said that they had previously discussed the

4    vehicle with you?

09:27:09AM 5          **MR. MARANGOLA:** Objection, Judge, that's misstating

6    his testimony previously.

7            **THE COURT:** Sustained.   Rephrase the question.

8    **BY MR. VACCA:**

9    Q.    Before you saw this video compilation did you speak with

09:27:20AM 10   any law enforcement about this vehicle?

11   A.    Not before I saw the video.

12   Q.    Not before you saw the video?

13   A.    No.

14   Q.    Okay. When --

09:27:37AM 15   A.    They asked me --

16   Q.    -- when did you see this video?

17   A.    -- like Monday of last week.

18   Q.    And you saw this video and they asked you if this was

19   Javi's vehicle?

09:27:51AM 20   A.    No.

21   Q.    What did they ask you?

22   A.    That if I recognize who this vehicle belongs to.

23   Q.    Okay. Again, continue, please.   Okay, stop, please.

24   10:41.05.   What street did this vehicle turn onto?

09:28:18AM 25   A.    I don't know.

```
 1  Q.    You don't know which vehicle -- which road it was on?
 2  A.    No.
 3  Q.    Okay. Did anybody tell you at any point in time -- law
 4  enforcement -- what street that was?
 5  A.    No.
 6  Q.    Okay. Continue, please.  Okay, stop.  10:43.22.  Now, is
 7  this another vehicle or -- on the street, this street?
 8  A.    Well, there's other vehicles.
 9  Q.    All right. But were you ever shown this before?
10  A.    Yes.
11  Q.    Okay. And did anybody ask you any questions about this
12  when you were reviewing it?
13  A.    Yes.
14  Q.    Who asked you questions about it?
15  A.    The U.S. Attorney.
16  Q.    Okay. And what did you tell -- what did they ask you about
17  this?
18  A.    That if I recognize some of the vehicles in this video.
19  Q.    And what was your response?
20  A.    That yes.
21  Q.    Okay.
22  A.    The one.
23  Q.    Which one is that?
24  A.    The GMC.
25  Q.    Which one is that?
```

1  A.    The one that I marked.

2  Q.    As you look at that do you know what street that vehicle

3  is on?

4  A.    I seen watching the video and seen the other videos

09:30:24AM 5  forward, I knew that was Miller.

6  Q.    How did you know that that was Miller?

7  A.    Because I went there the night before I was arrested.

8          **THE COURT:** He marked the vehicle in the center of

9  that particular photograph -- video.  Go ahead, I'm sorry.

09:30:50AM 10  **BY MR. VACCA:**

11  Q.    So what question did the U.S. Attorney ask you when you

12  saw this portion of the video?

13  A.    That if I recognize any of the vehicles that is in this

14  video.

09:31:10AM 15  Q.    Okay. And you said?

16  A.    That yes, one of them.

17  Q.    Okay. Continue, please.  Pause, please.  10:43.35.  Now,

18  sir, looking at this picture what has the vehicle done?

19          **MR. MARANGOLA:** Objection, Judge, can we be more

09:31:43AM 20  specific as to the vehicle he's referring to?

21          **THE COURT:** Yes, which vehicle?

22  **BY MR. VACCA:**

23  Q.    The silver vehicle.

24  A.    The vehicle went over the ramp that -- that's like so you

09:32:06AM 25  don't go too fast.

20

1   Q.   The bump, bump in the road?

2   A.   Yes.

3   Q.   Okay. Continue, please.  Pause, please.  10:43:55.  Now,

4   you've testified this is Miller Street, correct?

09:32:47AM 5   A.   Yes.

6   Q.   Have you ever had opportunity to judge the speed of

7   vehicles?  Have you ever had the opportunity to judge the

8   speed -- judge the speed of vehicles?

9   A.   Not that I remember.

09:33:07AM 10   Q.   So you've never judged the speed of vehicles, correct?

11   A.   What?  I don't understand what -- I can say if a vehicle

12   is going very fast or is going slow?

13   Q.   Would you say that that silver vehicle was traveling slow?

14   A.   Yes.

09:33:38AM 15   Q.   Okay. Continue, please.  Pause.  10:44.35.  Do you

16   recognize that -- what is shown on the video compilation?

17   A.   Yes.

18   Q.   What do you recognize?

19   A.   The GMC truck.

09:34:01AM 20   Q.   This is at 10:44.35.  That's a GMC truck?

21   A.   Yes.

22   Q.   Okay. Continue, please.  Pause.  10:44.38.  And what

23   street is that vehicle traveling on if you know?

24   A.   On Miller.

09:34:25AM 25   Q.   It's on Miller Street.  Okay, continue, please.  Pause.

1  10:44:52.  What does that show?

2  A.    That the vehicle stopped, the GMC.

3  Q.    You weren't present to view this vehicle traveling up and

4  down the street; is that correct?

09:35:06AM 5  A.    That if I wasn't present when the vehicle was on the

6  street?

7  Q.    Yes.

8  A.    That was the day that I was arrested.

9  Q.    Right.

09:35:19AM 10  A.    But I wasn't present watching the vehicle on the street.

11  Q.    Right.  You did not see that on Miller Street that day,

12  correct?

13  A.    Correct.

14  Q.    All right. And there was a shootout, right?

09:35:37AM 15  A.    Yes.

16  Q.    And Javi was not there at the shootout, correct?

17  A.    I don't know his face -- I didn't see his face in the

18  shootout.

19  Q.    All right. You didn't see him there at the shootout,

09:35:55AM 20  correct?

21  A.    I didn't saw him face-to-face.

22  Q.    Right.  So you didn't see him that day, correct?

23  A.    Face-to-face, no.

24  Q.    Okay. And as far as speaking to him that day, you didn't

09:36:15AM 25  see him to speak to him that day, correct?

1          **MR. MARANGOLA:** Objection to the form.

2          **THE COURT:** Overruled.  You can answer that.

3          **THE WITNESS:** Can you repeat the question?

4    BY MR. VACCA:

09:36:25AM 5    Q.   You didn't see him face-to-face that day, correct?

6    A.   Correct.

7    Q.   Okay. And you didn't see his vehicle there that day,

8    correct?

9    A.   Correct.

09:36:39AM 10   Q.   All right. And you were -- you were in 54 Miller Street on

11   that day when the shootout happened, correct?

12   A.   Yes.

13   Q.   And you are at the window, correct?

14   A.   I was in the bedroom where the window was.  There were

09:36:58AM 15   windows.

16   Q.   There were windows.  And you were able to see out,

17   correct?

18   A.   Yes.

19   Q.   Okay. Who was there, if anybody?

09:37:10AM 20   A.   Are you saying inside the house?

21   Q.   Who was inside the house?

22   A.   Fat Gordo and myself.

23   Q.   Gordo and yourself.  And you were shooting out -- you were

24   firing from inside to outside; is that correct?

09:37:29AM 25   A.   If I was shooting from inside the house towards outside?

1    Q.    Yes.

2    A.    Yes.

3    Q.    Okay. And were you looking out the window?

4    A.    Yes.

09:37:42AM 5    Q.    But you don't know who was shooting at you?

6              MR. MARANGOLA: Objection, Judge, there's been no

7    testimony that anybody was shooting at him.

8              MR. VACCA: I'll rephrase it.

9              THE COURT: Okay.

09:37:53AM10    BY MR. VACCA:

11    Q.    I'll rephrase it.  Was anybody else shooting at the house?

12    A.    No.

13    Q.    No one else was shooting at the house?

14    A.    Shooting at the house?

09:38:08AM15    Q.    Shooting at the house?

16    A.    No.

17    Q.    Okay. Well, did anybody get shot that day?

18    A.    Yes.

19    Q.    Okay. But you say there was nobody else shooting at the

09:38:23AM20    house?

21    A.    No.

22    Q.    Okay. Okay, you can take this down now.  Sir, yesterday

23    the U.S. attorney asked you a lot of questions -- yesterday

24    the U.S. Attorney asked you a lot of questions about recorded

09:38:55AM25    conversations; is that correct?

24

1  A.    Yes.

2  Q.    And when they asked you the questions about it you

3  indicated that you listened to these various clips; is that

4  correct?

09:39:15AM 5  A.    The one that he showed me, yes.

6  Q.    And you also said in response to I believe Mr. Marangola's

7  direct examination if there were some conversations where you

8  didn't recognize voices?

9  A.    Yes.

09:39:32AM 10  Q.    Okay. And how many were there?

11  A.    I don't know.

12  Q.    Well, take a guess.

13  A.    Maybe ten.

14  Q.    Ten?

09:39:51AM 15  A.    Maybe less.  I'm not sure.

16  Q.    How about more?

17  A.    Maybe more.

18  Q.    Maybe more.  Now, when did they first -- the law

19  enforcement -- pick you up, bring you over here and ask you to

09:40:08AM 20  listen to wiretaps?

21  A.    I'm not sure of the wiretaps.

22  Q.    Well, did you listen to them here in this building?

23  A.    Yes.

24  Q.    Okay. With law enforcement, correct?

09:40:34AM 25  A.    What kind of law enforcement?

```
 1   Q.    Feds.

 2   A.    Yes.

 3   Q.    And how many times did you listen to wiretaps with the

 4   feds?

 5   A.    I'm not sure how many times.

 6   Q.    You're not sure how many times?

 7   A.    I'm not sure.  Many times I listen the recordings.

 8   Q.    50?  100?

 9   A.    Maybe -- maybe 30 times.

10   Q.    30 times?  Okay.  And I wasn't there, so why don't you

11   tell me how listening to these wiretaps came about.

12   A.    The U.S. Attorney, he played it on his computer with a

13   speaker that you can hear it loud so I was listening to what

14   was being said, and he will ask me if I recognize any of the

15   voices that was in the call.

16   Q.    Okay. What was your response?

17   A.    When I recognize a person I will tell him the name of the

18   person.

19   Q.    Would you say anything else about the voice that you had

20   heard?

21   A.    If he will ask me if I recognize a person, I will say yes.

22   And if he will ask me who, I will say the name of the person.

23   Q.    And how many times did this happen?

24   A.    Maybe 30 times.

25   Q.    Okay.
```

09:40:48AM (line 5)
09:41:14AM (line 10)
09:41:55AM (line 15)
09:42:18AM (line 20)
09:42:48AM (line 25)

```
 1  A.   I'm not sure how many times honestly.
 2  Q.   And as he played them for you, would you stop it?
 3  A.   Sometime he will stop them and he will rewind it.
 4  Q.   Now, before they started having you listen to the wiretaps
 5  were they talking to you about the case?
 6  A.   About what case?
 7  Q.   About this case.
 8  A.   You're talking about the defendant's case?
 9  Q.   Yes.
10  A.   They will ask me questions of the things that I knew about
11  the case.
12  Q.   How did they know what you knew about the case?
13           MR. MARANGOLA: Objection to the form.
14           THE COURT: Yes, sustained.
15  BY MR. VACCA:
16  Q.   You just indicated that they asked you questions about the
17  case?
18  A.   When I got together with them, yes.
19  Q.   Okay. And they asked you about the case.  Did they ask you
20  about specific people?
21  A.   Well, they will ask me like, example, when I was arrested
22  if I knew who the drug belongs to that I stole.  And I will
23  tell them of the person I stole it from.
24  Q.   Now, when were you arrested?
25  A.   December 8, 2016.
```

09:43:20AM (line 5)
09:43:39AM (line 10)
09:43:51AM (line 15)
09:44:05AM (line 20)
09:44:40AM (line 25)

```
 1  Q.    The day after Miller Street, correct?
 2  A.    No.  The day of the shooting on Miller Street.
 3  Q.    The day of the shooting on Miller Street you were
 4  arrested?
 5  A.    Yes.
 6  Q.    Now, when you were arrested what were you charged with, do
 7  you remember?
 8  A.    The federal -- when the federals arrested me?
 9  Q.    Correct.
10  A.    With possession of one kilogram or more of heroin with
11  intent to distribute and possession of a firearm and
12  discharging a firearm.
13  Q.    And that was for Miller Street, correct?
14  A.    In furtherance of a drug trafficking.  That's when I was
15  arrested on Miller Street that they caught me with that, but
16  those weren't the same charges that I have because the one
17  that arrested me on Miller, it was the Rochester Police.
18  Q.    So were you brought over to Rochester when you were
19  initially charged?
20  A.    I don't understand the question.
21  Q.    Were you first charged in Rochester and then were you
22  charged in federal court?
23  A.    Yes.
24  Q.    Then the case was brought over to federal court; is that
25  correct?
```

09:45:02AM (line 5)
09:45:27AM (line 10)
09:45:50AM (line 15)
09:46:24AM (line 20)
09:46:38AM (line 25)

1   A.    Yes.

2   Q.    Okay. And when you were charged in federal court did you

3   make a deal?  Did you make a deal?

4   A.    When the time -- as the time passed I took a plea

09:47:01AM 5   agreement.

6   Q.    All right. And what did that plea agreement involve?

7   A.    Cooperation.

8   Q.    Cooperation?

9   A.    Yes.

09:47:15AM 10   Q.    And what was your agreement in terms of how much time you

11   were going to be in prison?

12   A.    They charge me with possession of one kilogram or more of

13   heroin with intention to distribute, possession of firearm and

14   discharging a firearm in furtherance of a drug trafficking.

09:47:49AM 15   So the minimum for that charge -- for both charge it was 20

16   years.

17   Q.    240 months, correct?

18   A.    Yes.

19   Q.    A fine of $25,000 to $10,000 (sic), correct?

09:48:06AM 20   A.    About the fine, I don't remember.

21   Q.    And a supervised release, which is like parole, for five

22   years, correct?   Correct?

23   A.    I don't remember how many it was the parole.

24   Q.    And you haven't been sentenced yet, have you?

09:48:28AM 25   A.    No.

1  Q.   And the reason you haven't been sentenced is because of

2  your cooperation, right?

3  A.   Yes.

4  Q.   All right. And your cooperation is to help get a

09:48:39AM 5  conviction on Javi; is that correct?

6  A.   No.

7  Q.   No?  What is the purpose of cooperation?

8  A.   To tell the truth of what I know.

9  Q.   Are you going to get a lesser sentence if you do that?

09:49:04AM 10  A.   That's what I hope for.

11  Q.   Lesser time?

12  A.   But that's not up to -- that's not up to me.

13  Q.   Who is it up to?

14  A.   The Government, the U.S. Attorney.

09:49:18AM 15  Q.   Okay. So it's up to them as to what you get?

16  A.   It's up to the judge when he sentence me.

17  Q.   So you are hoping that you get a lesser sentence, right?

18  A.   Yes.

19  Q.   And that's because -- that's because as far as cooperation

09:49:42AM 20  goes, you want to help the Government as much as you can so

21  you can get less time?

22  A.   Can you repeat the question?

23  Q.   Withdraw it.  So if you go to Government's Exhibit 783?

24  A.   Are you telling me to go there?

09:50:31AM 25  Q.   Yes, go there.  And it's page 10.

```
 1  A.    7 what?
 2  Q.    783.
 3  A.    Page 10?
 4  Q.    Page 10.
09:53:01AM 5  A.    Yes, I'm there already.
 6  Q.    Okay. Go to page 15 now.
 7  A.    I'm there.
 8  Q.    Page 15 is your signature there?
 9  A.    Yes.
09:53:24AM10  Q.    Okay. And this is the plea agreement; is that correct?
11  A.    Yes.
12  Q.    Now, as part of your agreement was it indicated that you
13  will not be prosecuted by the Office of the U.S. Attorney for
14  the Western District of New York for any other federal crimes
09:53:46AM15  committed within the Western District of New York; is that
16  correct?
17  A.    I'm not sure what you're asking me.  Can you repeat the
18  question?
19  Q.    As part of the plea agreement at No. 24, in exchange for
09:54:03AM20  your guilty plea and cooperation, the defendant will not be
21  prosecuted by the Office of the U.S. Attorney for the Western
22  District of New York for any other federal criminal offenses
23  committed in the Western District of New York in any way
24  involving or related to the unlawful possession, manufacture,
09:54:28AM25  distribution or importation of controlled substances and the
```

1  unlawful possession of firearms committed up to the date of

2  the agreement on which you provide complete and truthful

3  information; is that correct?

4  A.   No.

09:54:50AM 5  Q.   That's not correct?

6  A.   No.

7  Q.   Look at page 10, No. 24.

8  A.   You just finished telling me if I committed any other

9  crime that I was not going to -- I was not going to be

09:55:13AM 10  charged?

11  Q.   Right.

12  A.   That's not correct.

13  Q.   Well, read No. 24 again.

14  A.   You want me to read it?

09:55:55AM 15  Q.   Yeah, read it.

16          **MR. MARANGOLA:** Judge, I'm going to just state for

17  the record this exhibit's not in evidence.  If Mr. Vacca

18  wishes to have the witness read the document a loud, he should

19  offer it into evidence.

09:56:07AM 20          **MR. VACCA:** I would offer this into evidence, Your

21  Honor.

22          **MR. MARANGOLA:** No objection, Judge.

23          **THE COURT:** Exhibit 783 will be received.

24          (**WHEREUPON**, Government Exhibit 783 was received

09:56:17AM 25  into evidence).

1          **THE COURT:** You've got to pull the microphone

2    closer.

3    **BY MR. VACCA:**

4    Q.    Page 10, No. 24.

09:57:01AM 5    A.    In exchange for the defendant's plea of guilty on

6    cooperation as set forth in this agreement the defendant will

7    not be prosecuted by the Offices of the United States Attorney

8    for the Western District of New York for any other crime

9    federal committed offenses -- committed in the Western

09:57:27AM 10   District of New York in any way involving or relate to the

11   unlawful possession, manufacture, distribution or importation

12   of controlled substances or unlawful possession of firearm

13   committed up to the day of this agreement on which the

14   defendant provide complete and truthful information.  Such

09:57:56AM 15   promise of no prosecution does not foreclose any prosecution

16   for -- not involving murder, intent murder or act of physical

17   violence against the person of another or conspiracy to commit

18   a act of violence.

19   Q.    Then if you look at No. 26, why don't you read that?

09:58:35AM 20          **THE COURT:** Before you do, can you put one of the

21   covers on that?  This little box here, put a cover on the

22   microphone.  The other one, that's right.  Thank you.

23   **BY MR. VACCA:**

24   Q.    Read No. 26 for us on page 10.  Thank you.

09:58:57AM 25   A.    Upon condition that the defendant has fully complied with

1    all terms and conditions of this agreement, should the

2    Government determine that the defendant has provided

3    substantial assistance in the investigation or prosecution of

4    other persons who have committed offenses, the Government will

09:59:22AM 5    move the Court at sentencing to depart downward from the

6    guidelines as provided for in guidelines 5K1.1 and the

7    imposition of a sentence below a mandatory minimum term of

8    imprisonment pursuant to Title 18, United States Code, Section

9    3553(e).  The defendant understands that the decision to make

10:00:04AM 10    such a motion is within the sole discretion of the Government

11    and that the decision to grant such a motion, and the extent

12    of any downward departure -- I don't know how to say that

13    word -- are matters solely within the discretion of the Court.

14    Q.   Sir, did you sign this agreement?

10:00:36AM 15    A.   Yes.

16    Q.   If you look at page 15?

17    A.   I'm there.

18    Q.   Is your signature there?

19    A.   Yes.

10:00:51AM 20    Q.   And what's the date on that?  February 23rd, 2018?

21    A.   Yes.

22    Q.   Okay. So, sir, when did you start cooperating?

23    A.   I signed the plea on February 23rd, 2018.  That was when I

24    took the cooperation agreement.

10:01:25AM 25    Q.   Okay. So you were arrested on December 7th or 8th of 2016,

1  correct?

2  A.   December 8, 2016.

3  Q.   Okay. And from that date until February 23rd had you been

4  cooperating?

10:01:45AM 5  A.   No.

6  Q.   So then there was a plea agreement, correct?

7  A.   On the time -- after a time that I was arrested there was

8  a plea agreement.

9  Q.   There was a plea agreement.  But you entered into that

10:02:08AM 10  plea agreement a couple years after you were arrested,

11  correct?

12  A.   Yes.

13  Q.   And that's because you were -- you and your lawyer were

14  negotiating a cooperation agreement with the Government,

10:02:17AM 15  correct?

16  A.   Can you repeat the question?

17  Q.   That's because you were working on a deal, plea agreement,

18  with a cooperation clause in it to cooperate, correct?

19  A.   I'm not sure.

10:02:44AM 20  Q.   You're not sure?

21  A.   No.

22  Q.   You didn't sign the cooperation -- you didn't sign the

23  plea agreement without the cooperation clause in there, right?

24  A.   When I sign it the cooperation was there.

10:03:02AM 25  Q.   Okay. And that's when you started cooperating, right?

1  A.   Yes.

2  Q.   But you didn't start cooperating until that agreement was

3  in there signed by the U.S. Attorney and you and your lawyer,

4  correct?

10:03:19AM 5  A.   Yes.

6  Q.   Okay. And is that when you started meeting with the

7  federal authorities about this case?

8  A.   No.

9  Q.   When did you start meeting with the federal authorities

10:03:33AM 10  regarding this case?

11  A.   Like in January of 2017.

12  Q.   So there was no cooperation agreement in place before you

13  started cooperating?

14  A.   Before I sign the plea there was no cooperation agreement.

10:04:07AM 15  Q.   Okay. So you didn't start cooperating until there was a

16  cooperation agreement?

17          **MR. MARANGOLA:** Objection, Judge, asked and

18  answered.

19          **THE COURT:** Sustained.

10:04:15AM 20          **MR. VACCA:** Thank you, Mr. Camacho.

21          **MR. MARANGOLA:** May I proceed, Your Honor?

22          **THE COURT:** Yes.

23                    **REDIRECT EXAMINATION**

24  **BY MR. MARANGOLA:**

10:04:43AM 25  Q.   All right. Mr. Aponte Camacho, Mr. Vacca just asked you a

1    number of questions about your plea agreement?

2    A.   Yes.

3    Q.   I guess let's go back.  We're going to pull up the plea

4    agreement, Government's 783.  Mr. Vacca asked you some

10:05:12AM 5    questions about paragraph 24, which is on page 10, I believe.

6    You see it there?

7    A.   Yes.

8    Q.   And that starts off with in exchange for the defendant's

9    guilty plea -- I'm sorry, the defendant's pleas of guilty and

10:05:35AM 10    cooperation; is that correct?

11    A.   Yes.

12    Q.   So in exchange for you pleading guilty to the two charges

13    that you were charged with, correct?

14    A.   Yes.

10:05:49AM 15    Q.   And that would be the narcotics felony and the firearms

16    felony, correct?

17    A.   Yes.

18    Q.   As well as your cooperation?

19    A.   Yes.

10:06:01AM 20    Q.   Then you weren't going to be further prosecuted for crimes

21    that you had committed -- that were committed before you

22    signed the plea agreement; is that correct?

23    A.   Yes.

24    Q.   That related to the drug trafficking and firearms

10:06:18AM 25    possession; is that correct?

1   A.   Yes.

2   Q.   And that was conditioned upon you -- those crimes being

3   committed up to the date of the agreement?

4               MR. VACCA: Objection, Your Honor.

10:06:31AM 5               THE COURT: What's the objection?

6               MR. VACCA: Well, that's not really what it says.

7               MR. MARANGOLA: That is what it says.

8               THE COURT: Well, why don't you rephrase your

9   question?

10:06:41AM 10               MR. MARANGOLA: Sure.

11   BY MR. MARANGOLA:

12   Q.   Why don't you go down to the one, two, three, four, five,

13   sixth line and tell me does it say committed up to the date of

14   this agreement?

10:07:04AM 15   A.   I see it.

16   Q.   And does it say committed up to the date of this

17   agreement?

18   A.   Yes.

19   Q.   And then does it say and about which the defendant

10:07:16AM 20   provides complete and truthful information?

21   A.   Yes.

22   Q.   So have you been charged with selling drugs out of LaForce

23   Street after pleading guilty?

24   A.   No.

10:07:31AM 25   Q.   And that occurred before this plea agreement, correct?

38

1   A.   Yes.

2   Q.   And have you provided complete and truthful information

3   about that activity?

4   A.   Yes.

10:07:55AM 5   Q.   All right. Mr. Vacca asked you questions about when you

6   began cooperating.  Tell the jury when you first sat down with

7   an attorney and agents from law enforcement and discussed your

8   involvement in selling drugs with the defendant.

9   A.   When it was?

10:08:15AM 10   Q.   Yes.

11   A.   You're asking me to tell you when it was?

12   Q.   Yes.

13   A.   I think like in January of 2017.

14   Q.   Okay. And you were interviewed by agents before you signed

10:08:33AM 15   the plea agreement in February of 2018, right?

16   A.   Yes.

17   Q.   Okay. And, by the way, if we go to the last page of this

18   document does that reflect an interpreter's affirmation?

19   A.   Yes.

10:09:04AM 20   Q.   And was this plea agreement interpreted for you before you

21   signed it?

22   A.   Yes.

23   Q.   Okay. So let's talk about some of these meetings Mr. Vacca

24   asked you questions about.  The meetings where you sat down

10:09:32AM 25   with law enforcement as well as myself, did I ever tell you

1  who was speaking in a particular call that you listened to?

2  A.   No.

3  Q.   One time -- did I ever tell you even one time who was

4  speaking?

10:09:49AM 5  A.   No.

6  Q.   Did I ever tell you -- when you didn't know who somebody

7  was in the call, did I ever identify that person to you?

8  A.   No.

9  Q.   Did I ever tell you the name of a single photo of -- a

10:10:09AM 10  single person of any photo I showed you?

11  A.   No.

12  Q.   In the time you listened to the wiretap calls, did myself

13  or anyone in the room with you ever tell you what the meaning

14  of words in those calls were?

10:10:36AM 15  A.   No.

16  Q.   And there were some questions about the shooting at 54

17  Miller Street by Mr. Vacca?

18  A.   Yes.

19  Q.   Can you tell the jury why you shot from inside 54 Miller

10:11:10AM 20  Street outside of it?  Why did you shoot?

21  A.   Because I saw Tapon, Cabra and Obed.  Tapon and Obed, that

22  they got out with two pistols and I thought that they were

23  gonna kill me for stealing Javi's drug.

24  Q.   You didn't think they were coming over to pay you a social

10:11:38AM 25  visit?

1          **MR. VACCA:** Objection, Your Honor.

2          **THE COURT:** Sustained, that will be stricken.

3    **BY MR. MARANGOLA:**

4    Q.   Mr. Vacca asked you -- Mr. Vacca asked you a number of

10:12:00AM 5  questions about how you recognized Javi's truck in the Miller

6    Street compilation which we have -- we've begun to play here.

7    And at approximately 13 seconds here you see that truck in the

8    blue square?

9    A.   Yes.

10:12:25AM 10 Q.   And can you tell the jury do you have any doubt as to

11   whose truck you believe that to be?

12          **MR. VACCA:** Objection, Your Honor.

13          **THE COURT:** Overruled.

14          **THE WITNESS:** I have no doubt.

10:12:37AM 15 **BY MR. MARANGOLA:**

16   Q.   All right. And who did you see driving that truck during

17   the time that you worked for the defendant?

18   A.   Javi.

19   Q.   All right. And if we could go to -- from the pole camera

10:12:54AM 20 compilation DVD on January 19th?

21          **THE COURT:** What exhibit is this?

22          **MR. MARANGOLA:** The pole camera compilation is 22,

23   Judge.

24          **THE COURT:** Thank you.

10:13:04AM 25 **BY MR. MARANGOLA:**

1  Q.   And on January 19th, the clip starting at 12:10.  If we

2  can pause it here at 5 seconds into the clip.  Mr. Aponte

3  Camacho, is that the same or different vehicle than you just

4  saw in the Miller Street compilation DVD that Mr. Vacca was

10:13:33AM 5  asking you questions about?

6  A.   The same.

7  Q.   All right. And if we could go to the pole camera clip on

8  the next one on January 19th at 12:25 p.m.?

9          **THE COURT:** Same exhibit?

10:13:56AM 10          **MR. MARANGOLA:** I'm sorry, yes, Judge, compilation

11  Exhibit 22.

12  **BY MR. MARANGOLA:**

13  Q.   If we can pause it here at approximately 3 seconds into

14  the clip on January 19th, 2018.  Mr. Aponte Camacho, can you

10:14:10AM 15  tell us is that the same or different truck than you observed

16  on the other two clips that you've seen today?

17          **MR. VACCA:** Objection, Your Honor.

18          **THE COURT:** Overruled.

19          **THE WITNESS:** The same.

10:14:19AM 20  **BY MR. MARANGOLA:**

21  Q.   All right. And I think we won't do anymore clips of the

22  truck for now.

23          Can we go -- Mr. Aponte Camacho, Mr. Vacca asked

24  you if you had been brought to court before coming here today.

10:14:49AM 25  Have you testified in any other proceeding in connection with

1    this case?

2    A.   I testify in front of the grand jury.

3    Q.   All right. And then you've testified for the last few days

4    here; is that correct?

10:15:07AM 5    A.   Yes.

6    Q.   Any other time you testified in connection with this case?

7    A.   Testifying -- like I talk to the agents, but not testify

8    like -- like in front of a jury or anything.

9    Q.   Right.  And by testify I mean place your hand on a Bible,

10:15:37AM 10    swear to tell the truth and be in a courtroom and having a

11    courtroom stenographer take down what you say.

12    A.   Okay.

13    Q.   So you did that only with grand jury and in this trial; is

14    that correct?

10:15:53AM 15    A.   Yes.

16    Q.   Mr. Aponte Camacho, did I tell you the streets' names in

17    any of the videos that I showed you?

18    A.   No.

19    Q.   Did I tell you whether you were right or wrong if you

10:16:16AM 20    identified a particular street?

21    A.   No.

22    Q.   Have I told you what any other witness has told the

23    Government?

24    A.   No.

10:16:27AM 25    Q.   What's the one thing I asked of you from the day I met

1  you?

2  A.   To tell the truth.

3  Q.   What's your one obligation under the plea agreement?

4  A.   Tell the truth.

10:16:43AM 5  Q.   Have you done that since you've testified in this trial?

6             **MR. VACCA:** Objection, Your Honor.

7             **THE COURT:** Sustained.

8             **MR. MARANGOLA:** No further questions, Judge.   Thank

9  you.

10:16:52AM 10            **MR. VACCA:** No recross, Your Honor.

11            **THE COURT:** Thank you very much.   You may step down.

12            (**WHEREUPON**, the witness was excused).

13                       *    *    *

14            **CERTIFICATE OF REPORTER**

15

16         In accordance with 28, U.S.C., 753(b), I certify that

17  these original notes are a true and correct record of

18  proceedings in the United States District Court for the

19  Western District of New York before the Honorable Frank P.

20  Geraci, Jr. on May 18th, 2021.

21

22  S/ Christi A. Macri

23  Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter
24

25