```
1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5   - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA              18-CR-6094(G)
6
    vs.
7                                         Rochester, New York
    CARLOS JAVIER FIGUEROA,               June 8, 2021
8              Defendant.                 8:30 a.m.
    - - - - - - - - - - - - -X
9

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11              UNITED STATES DISTRICT CHIEF JUDGE

12

                        JAMES P. KENNEDY, JR., ESQ.
13                      United States Attorney
                        BY: ROBERT A. MARANGOLA, ESQ.
14                          CASSIE M. KOCHER, ESQ.
                        Assistant United States Attorneys
15                      500 Federal Building
                        Rochester, New York 14614
16                      Appearing on behalf of the United States

17
                        PAUL J. VACCA, JR., ESQ.
18                      One East Main Street, Suite 1000
                        Rochester, New York 14614
19                      Appearing on behalf of the Defendant

20
    ALSO PRESENT:       Gabriela Loncar, Spanish Interpreter
21                      Nicolas Penchaszadeh, Spanish Interpreter

22
    COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
23                      Christimacri50@gmail.com
                        Kenneth B. Keating Federal Building
24                      100 State Street, Room 2640
                        Rochester, New York 14614
25
```

1                              **I N D E X**

2    **WITNESS FOR THE GOVERNMENT**

3    Roberto Figueroa

         Direct examination by Mr. Marangola          Page   3
4        Cross-examination by Mr. Vacca               Page  28
         Redirect examination by Mr. Marangola        Page 108
5        Recross-examination by Mr. Vacca             Page 114

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

**\*    \*    \***

**(WHEREUPON**, the defendant is present).

**THE COURT:** Good morning.

**MR. MARANGOLA:** Good morning, Your Honor.

**MR. VACCA:** Good morning, Judge.

**THE COURT:**  Ready to proceed?

**MR. MARANGOLA:** Yes, Your Honor.

Judge, just in terms of scheduling, so that the Court know where we're at, we're going to finish very shortly with Mr. Figueroa this morning and then our next witness is Karina Lopez.

She'll take us through the end of today's session that ends early; and then we have a handful of witnesses for tomorrow and then we expect to end our proof on Monday.

**THE COURT:** Okay.

**MR. MARANGOLA:** Barring like any sort of lengthy unforeseen cross, but I expect on Monday we'll probably finish our proof.  I'll let Mr. Vacca know this morning, so just sort of for the Court's information in terms of scheduling like a charge conference and things like that, I know we're down Thursday and Friday, but we likely should be closed with the proof on Monday.

And then I don't believe there will be a defense case presented, but obviously that will be Mr. Vacca's call to

1  let you know that.  So maybe if there is no case, we'll be in

2  colloquy with the defendant that day and either have a charge

3  conference either that afternoon, and then I'm not sure what

4  the Court would consider -- if the Court would consider giving

09:06:42AM 5  us a few days until like Thursday to get ready, maybe close --

6  possible closings and charge on Thursday if that's -- at least

7  close that day.

8         THE COURT:  We'll see how things progress.  That

9  sounds reasonable.

09:06:54AM 10        MR. MARANGOLA:  That's where we are generally.

11        THE COURT:  Thank you.

12        (WHEREUPON, the jury is present).

13        THE COURT:  Good morning, members of the jury.

14  Ready to proceed.

09:09:39AM 15        Mr. Figueroa, I remind you you remain under oath.

16  Thank you.    You may continue.

17        MR. MARANGOLA:  Thank you, Your Honor.

18  BY MR. MARANGOLA:

19  Q.   Good morning, Mr. Figueroa.

09:09:49AM 20  A.   Good morning.

21  Q.   At the end of our session yesterday we had played the call

22  behind tab 1-186.  Is your binder at that location,

23  Mr. Figueroa?

24  A.   Yes.

09:10:13AM 25  Q.   All right.  Do you recall that was a call from Anthony

1  Williams, Leitscha's brother, to her 4661 personal phone; is
2  that right?
3  A.   Yes.
4  Q.   And in that call Leitscha said after Anthony said girl,
09:10:33AM 5  it's already here.  She later stated in the call all right,
6  I'm going over there now.  Do you remember that?
7  A.   Yes.
8  Q.   And then we showed pole camera clip of her leaving 6
9  Burbank and that was at approximately 11:15.  And then
09:11:02AM 10  eventually she makes her way back to -- if we could play the
11  pole camera clip from the same day January 29th, 2018.  Again,
12  that's the day of your arrest; is that right?
13  A.   Yes.
14  Q.   If we could play from Government's Exhibit 22, the pole
09:11:19AM 15  camera clip from Barrington at 11:31.  What did you see in the
16  beginning of this clip, Mr. Figueroa?
17  A.   Leitscha arrive at 292 Barrington.
18          THE JUROR: Our monitors don't even work.  Doesn't
19  even look like there's power on them.
09:12:25AM 20          THE COURT: Still not on?
21          THE JUROR: No, sir.
22          THE CLERK: I'll have to call IT.
23          THE COURT: Ladies and gentlemen, we'll take a short
24  recess to call IT down here to fix this situation.  In the
09:12:36AM 25  meantime please do not discuss the matter or allow anybody to

1 | discuss the matter with you.

2 | (**WHEREUPON**, there was a pause in the proceeding.)

3 | (**WHEREUPON**, the jury is present).

4 | **THE COURT:** We're ready to proceed.

09:25:05AM 5 | **MR. MARANGOLA:** Thank you, Your Honor.

6 | **BY MR. MARANGOLA:**

7 | Q.   Mr. Figueroa, we're back to January 29th, 2018.

8 | There's -- I'd like you to flip to the tab in the binder

9 | 1-187, which was received into evidence yesterday.  That's an

09:25:25AM 10 | incoming text message from USPS to Leitscha's 4661 phone.  Are

11 | you there?

12 | A.   Yes.

13 | Q.   And that indicates that a parcel with a tracking number

14 | ending in 05 was delivered and says front door/porch January

09:25:45AM 15 | 29th, 2018 at 11:07 a.m.; is that right?

16 | A.   Yes.

17 | Q.   Do you see the tracking number that's on this text message

18 | ending in 05 above the ruler on Government's 795 which is

19 | shown on your screen?

09:26:05AM 20 | A.   Yes.

21 | Q.   Delivery address of that package is 15 Harwood Street

22 | according to the Exhibit 795; is that right?

23 | A.   Yes.

24 | Q.   All right. If we could go back to the pole camera footage

09:26:20AM 25 | that we attempted to play at 11:31 at Barrington on the same

1  day January 29th, 2018.  You testified earlier that's

2  Leitscha's vehicle pulling into 292 Barrington; is that right?

3  A.   Yes.

4  Q.   We'll fast forward a little bit here.  All right, what

09:26:47AM 5  are we seeing here at approximately 47 seconds into this

6  clip?

7  A.   SWAT team going in to the house.

8  Q.   The SWAT team going into 292 Barrington?

9  A.   Yes.

09:27:04AM 10  Q.   All right.  Where are you at the time this happens?

11  A.   I was in the bathroom, I was inside the house.

12  Q.   Inside the house at 292 Barrington?

13  A.   Yes.

14  Q.   When the police entered?

09:27:14AM 15  A.   Yes.

16  Q.   All right. And this is at just shortly before 11:33 a.m.;

17  is that correct?

18  A.   Yes.

19  Q.   Okay. And who are we seeing in the white jacket be

09:27:31AM 20  escorted by the police?

21  A.   Leitscha.

22  Q.   All right. If you could turn -- if we could end the clip

23  there and if you could turn and look at the tabs 1-188 and

24  1-189.  Those are both text messages that were received

09:27:48AM 25  yesterday.  Do you see those two text messages?

1   A.   Yes.

2   Q.   All right. Mr. Figueroa, those are both state -- ADT pulse

3   alert; is that right?  Beginning of those text messages?

4   A.   Yes.

09:28:07AM 5   Q.   Was there an ADT alarm system at 292 Barrington?

6   A.   Yes.

7   Q.   Did you have any involvement with that system?

8   A.   No.

9   Q.   Did you pay for the system?

09:28:19AM 10   A.   No.

11   Q.   Did you have any contact information for the system?

12   A.   No.

13   Q.   Did you have anything to do with it at all?

14   A.   No.

09:28:29AM 15   Q.   Did you have anything to do with the ADT system at any

16   locations in January of 2018?

17   A.   No.

18   Q.   At either 292 Barrington or 60 Malling?

19   A.   No.

09:28:43AM 20   Q.   Okay. So --

21           THE COURT: Mr. Marangola, I got to stop you for a

22   second.  I don't have 187, 188 or 189 received.

23           MR. MARANGOLA: 188 or 189 you don't have received?

24           THE COURT: 187, 188 and 189 you referred to.

09:29:04AM 25           MR. MARANGOLA: I apologize then.  I would -- these

1   1-187, 1-188 and 1-189, each of those are text messages which

2   for which Investigator Briganti previously laid the foundation

3   for.  So I apologize, I thought I had offered those, but since

4   I have not, I would at this time offer 1-187, 1-188 and 1-189.

09:29:33AM 5          **MR. VACCA:** Objection, Your Honor.

6          **THE COURT:** Overruled.  They were previously

7   identified by Investigator Briganti.  1-187, 1-188 and 1-189

8   will be received.

9          (**WHEREUPON**, Government's Exhibits 1-187, 1-188 and

09:29:50AM 10  1-189 were received into evidence).

11         **MR. MARANGOLA:** Thank you, Judge, and I apologize

12   for that.

13   **BY MR. MARANGOLA:**

14   Q.   Mr. Figueroa, with respect to 1-188 and 1-189, those -- do

09:30:00AM 15  those appear to be the content of the text messages where --

16   after ADT pulse alert, do those appear to be the same text

17   messages?  The content appear to be the same?

18   A.   Yes.

19   Q.   And it says ADT pulse  Leitscha Poncedeleon home 1/29,

09:30:23AM 20  11:33 burglar alarm proceed with caution sensors; is that

21   correct?

22   A.   Yes.

23   Q.   Now, the first text message 1-188, is addressed to an

24   incoming text message addressed to the 766-8057 number; is

09:30:39AM 25  that right?

1  A.    Yes.

2  Q.    If we could pull up Government's Exhibit 10.  You

3  previously testified I believe the 766-8057 number was the

4  personal phone number for your brother Javi?

09:30:56AM 5  A.    Yes.

6  Q.    Is that right?

7  A.    Yes.

8  Q.    That's shown here on the top of Government's Exhibit 10?

9  A.    Yes.

09:31:07AM 10  Q.    And the second text message 1-189, the identical

11  text message from ADT sent to Leitscha Poncedeleon's 685-4661

12  personal number; is that correct?

13  A.    Yes.

14  Q.    So the same text message from ADT is sent to two different

09:31:28AM 15  numbers?  Is that the exact same time according to

16  Government's 1-188 and 1-189; is that right?

17  A.    Yes.

18  Q.    Did you get any text messages from ADT?

19  A.    No.

09:31:43AM 20  Q.    All right. If we could -- I believe Court's already

21  received 1-190 in to evidence, which that's a voicemail --

22            **THE COURT:** Yes, 1-190 has been received.

23            **MR. MARANGOLA:** Thank you.

24  **BY MR. MARANGOLA:**

09:32:03AM 25  Q.    I'd like to play that call.  All right, that was at 11:33

1  a.m.; is that right, Mr. Figueroa?

2  A.   Yes.

3  Q.   And it said 219 Barrington Street in the voicemail,

4  correct?

09:33:01AM 5  A.   Yes.

6  Q.   But your residence is 292?

7  A.   Yes.

8  Q.   All right. I'd like to ask you to flip to the next tab

9  1-191.  Can you tell us with respect to -- actually, 1-191 as

09:33:24AM 10  well as 1-192.  Are your initials on both of those

11  transcripts?

12  A.   Yes.

13  Q.   And did you listen to the calls corresponding to both of

14  those transcripts?

09:33:40AM 15  A.   Yes.

16  Q.   And who are the participants in those calls?

17  A.   My brother Carlos and Nisharya, his wife.

18  Q.   And there's a person from ADT security as well?

19  A.   Yes.

09:33:51AM 20  Q.   All right.

21        **MR. MARANGOLA:** At this time I'd offer Government's

22  1-192 and 1-193 -- I'm sorry, 191 and 192.  Apparently not my

23  day for numbers.

24        **MR. VACCA:** Objection, Your Honor.

09:34:06AM 25        **THE COURT:** Overruled.  Exhibits 1-191 and 1-192

1  will be received.

2          (**WHEREUPON**, Government's Exhibits 1-191 and 1-192

3  were received into evidence).

4  **BY MR. MARANGOLA:**

09:34:17AM 5  Q.   And this call 1-191 is approximately three minutes after

6  the pole camera clip we just saw at Barrington where the

7  police were entering that location; is that right,

8  Mr. Figueroa?

9  A.   Yes.

09:34:31AM 10  Q.   And I'd like to show if we could pole camera footage from

11  11:33 that same day at Burbank from the pole camera at Burbank

12  from Government's Exhibit 22.  All right, if we can pause it

13  here at approximately 11:34.

14          Now, Mr. Figueroa, the call behind tab 1-191 is at

09:35:21AM 15  11:36 a.m.  Do you see that?

16  A.   11:36, yes.

17  Q.   And that's an incoming call to your brother Javi's

18  personal phone ending in 8057; is that right?

19  A.   Yes.

09:35:35AM 20  Q.   At this time I'd like to play the call corresponding to

21  1-191.  Mr. Figueroa, in the beginning of this call the person

22  from ADT said we just received a burglar alarm at 60 Malling

23  Drive.  Who paid for the ADT system at 60 Malling Drive?

24          **MR. VACCA:** Objection, Your Honor, insufficient

09:37:44AM 25  foundation.

1              **THE COURT:** Sustained.

2    **BY MR. MARANGOLA:**

3    Q.   Mr. Figueroa, do you know who paid for the ADT security

4    system at 60 Malling Drive?

09:37:53AM 5    A.   Yes.

6              **MR. VACCA:** Objection, Your Honor.

7              **THE COURT:** Overruled.  Go ahead.

8    **BY MR. MARANGOLA:**

9    Q.   How do you know?

09:37:58AM 10    A.   Yes, my brother pay for it.

11    Q.   How do you know that your brother paid for it?

12    A.   Because my brother told me.  That's my mother house, my

13    mother stay there.

14    Q.   Did your brother tell you he paid for the ADT system at

09:38:08AM 15    your mom's house?

16              **MR. VACCA:** Objection, Your Honor.

17              **THE COURT:** Overruled.

18              **THE WITNESS:** Yes.

19    **BY MR. MARANGOLA:**

09:38:11AM 20    Q.   And what did your brother store at 292 Barrington and at

21    your mom's house at 60 Malling Drive?

22              **MR. VACCA:** Objection, Your Honor, insufficient

23    foundation.

24              **THE COURT:** No, overruled.

09:38:26AM 25    **BY MR. MARANGOLA:**

1   Q.   That means you can answer.

2   A.   Money.

3   Q.   What did he store at both locations?

4   A.   Money.

09:38:30AM 5   Q.   Now, your brother said in this call everyone okay, and

6   then he said we okay, and he said let me put my wife on the

7   phone.  Those words -- he spoke those in English, correct?

8   A.   Yes.

9   Q.   If we could go to 1-192.  This is another incoming call

09:39:01AM 10   from ADT to the 8057 personal number of your brother; is that

11   correct?

12   A.   Yes.

13   Q.   All right. If we could play 1-192.  Again, Mr. Figueroa,

14   the person who said yeah, yeah, everything okay, that was in

09:40:00AM 15   English and who said that?

16   A.   My brother Javi.

17   Q.   And the person who identified himself as Carlos Figueroa

18   in the call was who?

19   A.   My brother Javi.

09:40:10AM 20   Q.   All right.  And this call was at 11:44 that same morning

21   January 29th, 2018, correct?

22   A.   Yes.

23   Q.   Now, if we could go to 1-193, can you tell us are your

24   initials on that transcript?

09:40:30AM 25   A.   Yes.

1   Q.   And did you listen to the call corresponding to that

2   transcript?

3   A.   Yes.

4   Q.   And who are the participants in this call?

09:40:38AM 5   A.   That's my brother Javi and my niece Yiomara.

6   Q.   And whose -- you said Yiomara.  What's her last name?

7   A.   Figueroa.

8   Q.   Who is her mother?

9   A.   Ingrid Mercado.

09:40:51AM 10   Q.   Who is her brother?

11   A.   Jashua Figueroa.

12   Q.   All right.  And at the time of this call your brother

13   Jashua was working for who?  In January of 2018 was Yiomara's

14   brother Jashua involved in the operation?

09:41:08AM 15   A.   Yes.

16   Q.   And what was he doing?

17   A.   He was bagging up some coke for my brother.

18   Q.   All right.  And before the date of this call January 29th,

19   2018, had you spoken to your niece Yiomara Figueroa in person?

09:41:23AM 20   A.   Yes.

21   Q.   And had you seen her speak in person on multiple occasions

22   before the date of this call?

23   A.   Yes.

24   Q.   So you're familiar with her voice?

09:41:31AM 25   A.   Yes.

1  Q.   All right.

2          **MR. MARANGOLA:**  At this time I'd offer the call

3  corresponding to 1-193.

4          **MR. VACCA:** Objection, Your Honor.

09:41:37AM 5          **THE COURT:** Overruled.  Exhibit 1-193 will be

6  received.

7          (**WHEREUPON**, Government's Exhibit 1-193 was received

8  into evidence).

9  **BY MR. MARANGOLA:**

09:42:22AM 10 Q.   Mr. Figueroa, this call was at 11:48 that same morning,

11 correct?

12 A.   Yes.

13 Q.   All right. I'd like you to look now at the text message

14 behind -- well, let me double check.

09:42:35AM 15         **MR. MARANGOLA:** I thought these were in, but could

16 we offer 1-194 and 1-195, both of which are text messages

17 whose foundation has been laid by Investigator Briganti.

18         **THE COURT:** Mr. Vacca.

19         **MR. VACCA:** No objection, Your Honor.

09:43:00AM 20         **THE COURT:** Exhibits 1-194 and 1-195 will be

21 received.

22         (**WHEREUPON**, Government's Exhibits 1-194 and 1-195

23 were received into evidence).

24 **BY MR. MARANGOLA:**

09:43:12AM 25 Q.   If we could show Government's Exhibit 10.  Mr. Figueroa,

1    the text message at tab 1-194, that's the same date January

2    29th at 11:51 a.m. and that's an incoming message to

3    Leitscha's personal phone, the 4661; is that correct?

4    A.    Yes.

09:43:37AM 5    Q.    And that's from 491-4771; is that right?

6    A.    Yes.

7    Q.    And I'd like you to look at the bottom of the second --

8    the second to last line on Government's Exhibit 10.   Do you

9    see the phone number 491-4771 listed on that chart?   Second to

09:43:59AM 10   last line from the bottom.

11   A.    Yes.

12   Q.    And who is the user associated with that number as

13   reflected in Government's Exhibit 10?

14   A.    That's Anthony, Anthony Williams.

09:44:13AM 15   Q.    Who is that?

16   A.    That's Leitscha brother.

17   Q.    And the text message he texted her 11:51 is what?

18   A.    Call me ASAP.

19   Q.    All right. And then if we could flip to 1-195.   That's

09:44:31AM 20   another incoming text message as well; is that correct?

21   A.    Yes.

22   Q.    To Leitscha's personal phone; is that right?

23   A.    Yes.

24   Q.    And that's an incoming text message from 787-297-9357; is

09:44:46AM 25   that correct?

1  A.   Yes.

2  Q.   Do you see that number on the chart on your screen there

3  marked Government's Exhibit 10 in purple toward the bottom of

4  the page?

09:45:05AM 5  A.   Yes.

6  Q.   And who is the user associated with that number as

7  reflected on Government's Exhibit 10?

8  A.   Freddie Silva.

9  Q.   What does it also say?

09:45:15AM 10  A.   Tasha, Freddie Silva's wife.

11  Q.   And the English translation of this text message sent from

12  that number on January 29th, 2018 at 6:07 p.m. is what?

13  A.   The girls arrived from class.

14  Q.   All right. And based on your participation in this

09:45:37AM 15  operation and familiarity with the relationship between

16  Freddie and Javi and Leitscha, do you have an opinion

17  regarding the term the -- the meaning of the term the girls

18  arrived from class?

19  A.   The package --

09:45:52AM 20          MR. VACCA: Your Honor, objection.

21          THE COURT: Overruled.  Go ahead, you can finish

22  your answer.

23          THE WITNESS: The boxes arrived from Puerto Rico.

24  BY MR. MARANGOLA:

09:45:59AM 25  Q.   The boxes from Puerto Rico arrived?

19

```
 1   A.    Yes.
 2   Q.    To locations in Rochester?
 3   A.    Yes.
 4   Q.    All right. Now, as the events that we saw occurring around
 5   11:30 a.m. are happening on that day, January 29th, where are
 6   you that morning?
 7   A.    I was in 292 Barrington.
 8   Q.    All right. And you were taken into custody there?
 9   A.    Yes.
10   Q.    If we could show Government's Exhibit 567.  And is that
11   you in the white tank top and the red gym shorts?
12   A.    Yes.
13   Q.    And you're handcuffed?
14   A.    Yes.
15   Q.    What location is that?
16   A.    That's the living room.
17   Q.    At 292 Barrington?
18   A.    Yes.
19   Q.    On the day you were taken into custody?
20   A.    Yes.
21   Q.    All right. Now, you testified earlier about the *maraca*
22   that you used to call Javi's 8156 *maraca*.  Do you recall that
23   earlier in your testimony?
24   A.    Yes.
25   Q.    All right. And some of the examples of the calls that you
```

09:46:10AM (line 5)
09:46:23AM (line 10)
09:46:40AM (line 15)
09:46:50AM (line 20)
09:47:04AM (line 25)

1    used that number on -- and if you could flip to a couple of

2    these starting at the beginning, I just want to see -- just

3    want to confirm the number of that *maraca* that you had used

4    back in early to mid-January.  If you go to 1-15.  You see the

09:48:06AM 5    transcript behind 1-15?

6    A.    Yes.

7    Q.    All right. Does that reflect a call from your *maraca* to

8    Javi's 8156 *maraca*?

9    A.    Yes.

09:48:18AM10    Q.    All right. And can you look at tab 1-16?  Does that also

11    reflect a phone call from your *maraca* to Javi's 8156 *maraca*?

12    A.    Yes.

13    Q.    What was the number of your *maraca* in these two calls?

14    A.    My number is 9741.

09:48:42AM15    Q.    485-9741?

16    A.    Yes.

17    Q.    And that was the *maraca* that you had been using at that

18    time?

19    A.    Yes.

09:48:48AM20    Q.    If we could pull up Government's Exhibit 10.  Do you see

21    the number of your *maraca* here 485-9741 next to your name in

22    black on the chart?

23    A.    Yes.

24    Q.    All right. Now, there's -- was that the last *maraca* that

09:49:20AM25    you used before you were arrested?

1  A.    No.

2  Q.    All right. What did you do with -- you see next to the

3  9741 number in your name in the third column it's blank?  You

4  see that?  There's no exhibit number there?

09:49:37AM 5  A.    Yes.

6  Q.    What did you do with the 9741 *maraca* that you had

7  previously been using?

8  A.    I gave it to Leitscha; she collect the phones.

9  Q.    When you're done with it you give it to Leitscha?

09:49:53AM 10  A.    Yes, or my brother and they give me another one.

11  Q.    All right. Do you remember who gave you another one?

12  A.    Lei gave me another one.

13  Q.    Did you still have that *maraca* at the time of your arrest

14  on January 29th, 2018?

09:50:08AM 15  A.    Which one you talking about?  This one?

16  Q.    The new maraca?

17  A.    The new *maraca*, yes.

18  Q.    You didn't have the 9741 *maraca* anymore?

19  A.    No.

09:50:16AM 20  Q.    Where was the new *maraca* at the time of your arrest?

21  A.    It was on top of the table in the living room.

22  Q.    All right. If we could go back to 567, please.

23  Government's Exhibit 567.  Can you circle where your new

24  *maraca* was if you see it in this photograph 567?

09:50:38AM 25            All right, you've made a circle in the approximate

1   center of that photograph over an area on the table with a

2   small rectangular black object on it; is that right?

3   A.   Yes.

4   Q.   And what's in that circle that you made on Government's

09:50:53AM 5   567?

6   A.   That's the *maraca*, the flip phone.

7   Q.   That's your new *maraca*?

8   A.   Yes.

9   Q.   All right. Do you remember the number of that new *maraca*

09:51:02AM 10   that you got?

11   A.   No.

12   Q.   Do you remember about how long you had it before your

13   arrest?

14   A.   No.

09:51:10AM 15   Q.   All right. Was it like a long time or a short time

16   generally?

17   A.   Short time; could be a month or a few weeks.  I don't

18   know.

19   Q.   Okay. Well, we showed you earlier calls that -- from your

09:51:21AM 20   *maraca* from early January, was that right?

21   A.   Yes.

22   Q.   And you were arrested on what day?

23   A.   January 29.

24   Q.   Okay. You said you did not recall the number for the new

09:51:34AM 25   *maraca*?

```
 1  A.    No.
 2  Q.    If we could pull up the extraction for 674A, which is the
 3  extraction for the flip phone for the maraca recovered from
 4  that living room table.
 5  09:51:48AM          MR. VACCA: Your Honor, I would object.  We've been
 6  through this before.  He talked about what happened with the
 7  flip phone and they had to turn it into Leitscha.  Giving some
 8  leeway, he's going over things he's gone over a couple times
 9  already.
10  09:51:59AM          THE COURT: Overruled.  Go ahead.
11              MR. MARANGOLA: Thank you.
12  BY MR. MARANGOLA:
13  Q.    If you could clear your mark, Mr. Figueroa, on your
14  screen.  Go to the first page of the extraction for this
15  09:52:10AM phone, the flip phone that was recovered from the living room
16  at 292 Barrington.  If we could enlarge the portion next to
17  MSISDN.
18              You see the number of the phone number next to
19  MSISDN for that, Mr. Figueroa?
20  09:52:28AM A.    Yes.
21  Q.    And what is it?
22  A.    585-485-9472.
23  Q.    After the area code it's 485-9472?
24  A.    Yes.
25  09:52:39AM Q.    Is that right?
```

1   A.   Yes.

2   Q.   All right. Now, you testified earlier in the case that

3   Leitscha had a particular nickname that she used for you; is

4   that right?

09:52:50AM 5   A.   Yes.

6   Q.   And what was that?

7   A.   Princesa.

8   Q.   All right. If we could pull up the extraction Government's

9   669A and this is the extraction for the flip phone found in

09:53:06AM 10   the Nissan Altima, the extraction for 485-4879, and go to

11   contact number 11.

12           Mr. Figueroa, do you see the contact for Princesa

13   in this phone?

14   A.   Yes.

09:53:26AM 15   Q.   Is that number 485-9472 the same phone number for the flip

16   phone we just observed that was recovered from the living room

17   table at 292 Barrington?

18   A.   Yes.

19   Q.   And Princesa was the name that Leitscha used for you; is

09:53:43AM 20   that right?

21   A.   Yes.

22   Q.   All right. Now, can you tell the jury on the *maracas* that

23   you would receive from Leitscha or Javi, what phone -- what

24   contacts would be in that phone already preprogrammed for you?

09:54:02AM 25           **MR. VACCA:** Objection, Your Honor.

1          **THE COURT:** Overruled.  Go ahead.

2          **THE WITNESS:** It would be Leitscha name, or my

3    brother's name on it.

4    **BY MR. MARANGOLA:**

09:54:13AM 5    Q.   How many contacts?

6    A.   Two.

7    Q.   That would be for who?

8    A.   For my brother Javi and Lei.

9    Q.   Would there be other people, contacts in those phones or

09:54:21AM 10   just Javi and Lei's?

11   A.   Javi and Lei.

12   Q.   All right. If we could go to Exhibit 674A, this is the

13   extraction now for that -- for the *maraca* from the living room

14   table at 292 Barrington.  Go to the contacts.  Please look at

09:54:45AM 15   the contact 7.

16          What's the phone number for that contact?

17   A.   584-4879.

18   Q.   And that was the phone number that we just observed had

19   the contact for Princesa for you; is that right?

09:55:05AM 20   A.   Yes.

21   Q.   And what's the name of this contact?

22   A.   Li, L-I.

23   Q.   And that would be the contact that you would use to

24   contact who?

09:55:15AM 25   A.   Leitscha.

1   Q.   All right.  And if we could go to contact No. 1 in this

2   phone.  And what's the name of this contact?

3   A.   Brotha.

4   Q.   And the phone number for that contact Brotha?

09:55:33AM 5   A.   Yes.

6   Q.   Is what?

7   A.   635-7955.

8   Q.   And is that the number that you used -- that you contacted

9   Javi on after you received this new *maraca* from Leitscha?

09:55:47AM 10   A.   That's the contact that Lei put in in the *maraca*.

11   Q.   That's the contact that Lei put in?

12   A.   Yes.

13   Q.   What would be the number that you would use to contact

14   Javi?

09:55:58AM 15   A.   For the new *maraca*?

16   Q.   What number would you use?  Is it the number on the screen

17   to call your brother?

18   A.   Yes.

19   Q.   Okay. So the 635-7955 would be the number that you would

09:56:13AM 20   contact your brother at from this phone?

21   A.   Yes.

22   Q.   And the contact labeled Brotha?

23   A.   Yes.

24   Q.   Okay. If we could go now to the -- back to the 669A, the

09:56:24AM 25   extraction for the phone -- the flip phone found in Leitscha's

1 │ Nissan Altima, and go to contact No. 13.

2 │            Do you see the phone number that was in your phone

3 │ as Brotha 635-7955 as a contact in this phone?

4 │ A.   Yes.

09:56:48AM 5 │ Q.   What's the name of the contact for that number that was in

6 │ your phone under Brotha?  What's the name of that contact from

7 │ this phone that was in Leitscha's Nissan Altima at the time of

8 │ her arrest?

9 │ A.   *Viejo*.

09:57:01AM 10 │ Q.   And was *viejo,* was that a nickname that she used for

11 │ anyone?

12 │ A.   Yes.

13 │ Q.   Who was that?

14 │ A.   My brother Javi.

09:57:13AM 15 │ Q.   All right.

16 │            **MR. MARANGOLA:** Your Honor, at this time I would

17 │ move to remove the redaction from Government's Exhibit 10.  If

18 │ we could pull that up --

19 │            **MR. VACCA:** I would object to that, Your Honor.

09:57:34AM 20 │            **MR. MARANGOLA:** -- to reflect the user of the phone

21 │ based on the testimony of Mr. Figueroa regarding the phone

22 │ number 635-7955.

23 │            **MR. VACCA:** Objection, Your Honor.

24 │            **THE COURT:** Overruled.  That can be redacted,

09:57:46AM 25 │ Exhibit 10 redaction.

1       **MR. MARANGOLA:** All right.  We have redacted

2  Government's Exhibit 10 on the Trial Director to reflect that

3  the user of 635-7955 is Carlos Javier Figueroa, also known as

4  Javi, also known as Big Bro.  And on the hard copy of that

09:58:25AM 5  exhibit I'll place that next to the number under the user

6  column as well.

7       Your Honor, at this point I have no further

8  questions of Mr. Figueroa.  Thank you.

9       **THE COURT:** Thank you.

09:58:46AM 10       **MR. VACCA:** Thank you, Your Honor.

11                 <u>**CROSS-EXAMINATION**</u>

12  **BY MR. VACCA:**

13  Q.   Mr. Figueroa, you were arrested on January 29th, 2018,

14  correct?

09:58:53AM 15  A.   Yes.

16  Q.   And you were at Barrington when this took place?

17  A.   Yes.

18  Q.   Now, do you recall what you were charged with when you

19  were arrested on 1/29/18?

09:59:11AM 20  A.   Yes.

21  Q.   And what were you charged with?

22  A.   For conspiracy to sell drugs and gun charges.

23  Q.   Okay. How many counts were in that indictment or

24  complaint, do you know?

09:59:24AM 25  A.   I don't remember.

1    Q.    Were you charged with a complaint or an indictment?

2    A.    I was just charged.

3    Q.    Were other people charged with you?

4    A.    Yes.

09:59:35AM  5    Q.    All right. Now, there did come a point in time when you

6    made a bail application; is that correct?

7    A.    When I made a what?

8    Q.    Bail application to be released.

9    A.    Yes.

09:59:49AM 10    Q.    Okay. And were you released?

11    A.    No.

12    Q.    Did you post bail?

13    A.    No.

14    Q.    Okay. Was it determined that you were a danger to the

10:00:00AM 15    community?

16            MR. MARANGOLA: Objection, Judge, form of that

17    question.  Was it determined by who?

18            THE COURT: Sustained.

19    BY MR. VACCA:

10:00:08AM 20    Q.    Did you have a hearing in terms of your release?

21    A.    Yes.

22    Q.    And who was that hearing before?

23    A.    I don't remember the name of the judge.

24    Q.    Okay. And the purpose of that hearing was what?

10:00:25AM 25    A.    To see if they release me.

1  Q.   To see if they release you?

2  A.   Yes.

3  Q.   Were you released?

4  A.   No.

10:00:31AM 5  Q.   Okay.  Isn't it true you were found to be a flight risk?

6           **MR. MARANGOLA:** Objection, Judge, same basis.

7           **THE COURT:** Overruled.  If he knows.

8  **BY MR. VACCA:**

9  Q.   Flight risk?  You were a flight risk?

10:00:43AM 10  A.   That's what they said I was.

11  Q.   Okay.  And you were a danger to the community, correct?

12  A.   That's what they saying.

13  Q.   So that's what they said, right?

14  A.   That's what they said.

10:00:52AM 15  Q.   You were a flight risk and a danger to the community,

16  right?

17  A.   Yes.

18  Q.   Okay. And you've indicated five days or six days ago,

19  whenever we started with this, that you had a record, correct?

10:01:06AM 20  A.   Yes.

21  Q.   Okay. What record do you have?

22  A.   I had a manslaughter.

23  Q.   Where was that?

24  A.   That was in Jersey.

10:01:12AM 25  Q.   Jersey City?

1  A.    No.   In Jersey, New Jersey.

2  Q.    In New Jersey?

3  A.    Patterson, New Jersey.

4  Q.    Patterson, New Jersey?

10:01:21AM 5  A.    Yes.

6  Q.    Why don't you tell us what you were charged with and what

7  you were convicted of.

8  A.    Yes, we was going to a park, me and my friends, and I was

9  about to get robbed and we was into a fight and I took one of

10:01:36AM 10  the knife from the guys that we was fighting and I was 17

11  years old and I stab him twice.

12  Q.    You stabbed him twice?

13  A.    Yes.

14  Q.    And did he die?

10:01:44AM 15  A.    Yes, in the hospital, yes.

16  Q.    And were you convicted of that?

17  A.    Yes.

18  Q.    Did you plead guilty or did you go to trial?

19  A.    Plead guilty.

10:01:50AM 20  Q.    And did you make a deal?

21  A.    I plead guilty.

22  Q.    You pled guilty, but in terms of the sentence did you make

23  a deal?

24  A.    I don't understand.

10:02:01AM 25  Q.    What's not to understand about it?

1              **MR. MARANGOLA:** Objection, Judge.

2              **THE COURT:** Yes, sustained.

3   BY MR. VACCA:

4   Q.   Did you get a benefit for pleading guilty?

10:02:11AM 5   A.   No.  I got sentenced.  They gave me 30 with a 12 stip.

6   Q.   What is the max you could have received?

7   A.   30 years.

8   Q.   30 years?

9   A.   Yes.

10:02:19AM 10   Q.   In a state correctional facility?

11   A.   Yes.

12   Q.   And you also indicated what, 12 years?

13   A.   They gave me 30 with a 12 stip.

14   Q.   12 stip of being released after 12?

10:02:32AM 15   A.   30 with a 12 stip, yes.

16   Q.   So you were on parole from 12 to 30, correct?  You were on

17   parole 18 years?

18   A.   No.

19   Q.   No?

10:02:40AM 20   A.   They gave me 30 with a 12 stip.

21   Q.   They gave you 30 years?

22   A.   They gave me 30 with a 12 stip.

23   Q.   When did you start doing the 30?  You said you got 30

24   years.

10:02:53AM 25   A.   With a 12 stip.  That's how they do it in New Jersey.  I

1  got to do 12 years before I see parole.

2  Q.   Right.  And did you go to parole at some point in time?

3  A.   Yeah, yeah, 2004.

4         **THE COURT:** Wait for the next question before you

10:03:15AM 5  answer, okay?  Go ahead.

6  **BY MR. VACCA:**

7  Q.   So you did 12 years, correct?

8  A.   Yes.

9  Q.   And you were released in what year?

10:03:26AM 10  A.   I was released June 2013.

11  Q.   2013.  So you were on parole until 2013?

12  A.   I was never on parole.

13  Q.   Did you ever go before the parole board?

14  A.   I went to the parole board.  I was not released.  I was in

10:03:42AM 15  jail the whole time.

16  Q.   You were in jail the entire time?

17  A.   Yes.  I maxed out.

18  Q.   All right.  And then did you come to Rochester after that?

19  A.   Yes.

10:03:50AM 20  Q.   And when was that?

21  A.   2013.

22  Q.   Did you get a job?

23  A.   Yes.

24  Q.   Where did you get a job?

10:03:57AM 25  A.   I was working at Nordon, the factory.

1  Q.   What did you do there?

2  A.   Making guns and --

3  Q.   Making guns?

4  A.   Yes.

10:04:05AM 5  Q.   The fact that you were convicted of a manslaughter charge,

6  did you disclose to your employer about your conviction?

7  A.   They didn't ask me about my conviction.

8  Q.   They didn't ask about the conviction?

9  A.   No.

10:04:21AM 10  Q.   Okay.  So you entered into a plea agreement; is that

11  correct?

12  A.   Yes.

13  Q.   And at some point in time it must have come that you

14  talked to your attorney or the U.S. Attorney about this case;

10:04:39AM 15  is that correct?

16  A.   Yes.

17  Q.   And when did you first talk to your attorney about

18  entering into a cooperation agreement?

19          **MR. MARANGOLA:** Objection, Judge, that's privilege.

10:04:52AM 20  He's asking when he talked to his attorney about cooperating.

21          **THE COURT:** Sustained.

22  **BY MR. VACCA:**

23  Q.   Did there come a point in time when you spoke to the

24  U.S. Attorney about cooperation?

10:05:03AM 25  A.   Yes.

1    Q.    When was that?

2    A.    I can't remember when it was.   In the beginning.

3    Q.    Did you ever enter into or sign a proffer agreement?

4    A.    I don't remember signing a proffer.

10:05:20AM 5    Q.    Pardon?

6    A.    I don't remember signing a proffer.

7    Q.    You remember signing it?

8    A.    I don't remember signing it.

9    Q.    You don't.  Did there come a point in time when you met

10:05:29AM 10   with the U.S. Attorney?

11   A.    Yes.

12   Q.    What was the first time you met with the U.S. Attorney?

13   A.    I don't -- I don't understand the question.

14   Q.    Well, you indicated that you met with the U.S. Attorney

10:05:43AM 15   about this case, correct?

16   A.    Yes.

17   Q.    When was the first time that you met with him?

18   A.    I don't remember -- I don't remember the date, but when I

19   met with him we spoke about the phone calls, the people, the

10:05:59AM 20   pictures to identify people, translating phone calls to tell

21   them what was said in the phone calls.

22   Q.    Now, when you entered into this proffer agreement with the

23   U.S. Attorney's Office, did you indicate that you were looking

24   for any type of benefit?

10:06:21AM 25   A.    What you mean?

1   Q.   Did you expect to get a better deal because you would

2   cooperate?

3   A.   By saying the truth.

4   Q.   By just having -- having a cooperation agreement did you

10:06:35AM 5   expect to get a better deal?

6   A.   Not from them.

7   Q.   Not from them.   From who?

8   A.   From the judge.

9   Q.   From the judge?

10:06:44AM10   A.   Yes.

11   Q.   Okay. All right. And did there come a point in time when

12   you actually entered into a written plea agreement?

13   A.   Yes.

14   Q.   Okay.  And was that on May 7th of 2019?

10:06:59AM15   A.   I don't remember.

16   Q.   You don't remember?

17   A.   I don't remember, no.

18   Q.   Okay. And as far as the cooperation agreement is

19   concerned, did the U.S. Attorney indicate to you that you

10:07:14AM20   would be required to testify at time of trial?

21   A.   Yes.

22   Q.   And you agreed to do that, correct?

23   A.   Yes.

24   Q.   You haven't been sentenced yet, have you?

10:07:25AM25   A.   No.

1  Q.   And are you going to be sentenced after this trial is

2  over?

3  A.   I think so.

4  Q.   And the reason for that is because you feel you'll get a

10:07:41AM 5  better deal if you cooperate, correct?

6  A.   If I cooperate and saying the truth.

7  Q.   Right?

8  A.   That's -- I got to say the truth.

9  Q.   You have to say the truth?

10:07:52AM 10  A.   I have to say the truth.  And it's up to the judge and I'm

11  hoping for a lower sentence.

12  Q.   Now, did you review with the U.S. Attorney what you just

13  told me about it's up to the judge?

14  A.   No.

10:08:05AM 15  Q.   And you're going to tell the truth?

16  A.   Yes.

17  Q.   So the U.S. Attorney indicated to you that you have to

18  tell the truth?

19  A.   Yes.

10:08:14AM 20  Q.   Okay.  Now, when you entered into the plea agreement, you

21  also went into court at some point; is that correct?

22  A.   I think I did.

23  Q.   Well, did you plead guilty?

24  A.   Yes.

10:08:29AM 25  Q.   You signed a written plea agreement on May 7th, 2019,

1    correct?

2    A.    Yes.

3    Q.    And your lawyer was there, correct?

4    A.    Yes.

10:08:38AM 5    Q.    And the judge was there?

6    A.    Yes.

7    Q.    And the U.S. Attorney was there, correct?

8    A.    Yes.

9    Q.    And you pled guilty to two counts; is that correct?

10:08:48AM10    A.    Yes.

11    Q.    All right. And you know what the sentence range is on

12    those counts?

13    A.    Not really.

14    Q.    Well, you signed an agreement in which you pled guilty,

10:08:57AM15    correct?

16    A.    Yes.

17    Q.    And there's a cooperation clause in there, correct?

18    A.    Yes.

19    Q.    And there's also what your sentence would be if you did

10:09:13AM20    not cooperate, correct?

21    A.    Yes.

22    Q.    Okay. And there's two counts.  In the first count do you

23    recall the amount of time that you could receive?

24    A.    Yes.

10:09:32AM25    Q.    And what is the amount of time that you could receive?

1  A.    I don't recall.

2  Q.    You don't recall?

3  A.    No.

4  Q.    Was it 188 to 235 months?

10:09:45AM 5  A.    Could be.

6  Q.    Could be?

7  A.    Yes.

8  Q.    All right. So you're telling me you don't know exactly

9  what amount of time you were to receive prior to agreeing to

10:09:55AM 10  cooperate?

11              MR. MARANGOLA: Objection, Judge, to the form of the

12  question.

13              THE COURT: Overruled.  He can answer if he knows.

14  If he understands it.

10:10:05AM 15              THE WITNESS: I don't understand.

16  BY MR. VACCA:

17  Q.    Well, were you to receive between 188 and 235 months?

18  A.    I don't know how the federal system work, but they gonna

19  give me what they gonna give me if I found guilty.

10:10:20AM 20  Q.    No, but in the agreement it talks about the amount of time

21  that you're going to get, correct?

22  A.    Yes.

23  Q.    And for Count 1 it's 188 to 235 months, correct?

24  A.    Yes.

10:10:33AM 25  Q.    Okay. And that works out to approximately 20 years,

40

1    correct?

2    A.    Yes.

3    Q.    So also there's supervised release; is that correct?

4    A.    Yes.

10:10:45AM 5    Q.    Which is a version or a type of parole, correct?

6    A.    I don't know.

7    Q.    And that is not less than five years of parole after you

8    complete your sentence, correct?

9    A.    Yes.

10:11:01AM10    Q.    Of incarceration, correct?

11    A.    Yes.

12    Q.    And then there's a second count that you pled guilty to as

13    well and that would add another 60 months onto your sentence;

14    is that correct?

10:11:16AM15    A.    Yes.

16    Q.    So you would have 295 months or 25 years, right?

17    A.    I don't know.

18    Q.    You don't know?

19    A.    I don't know, no.

10:11:30AM20    Q.    Okay. But you do know that you have to serve sentences on

21    Count 1 and Count 2, correct?

22    A.    Yes.

23    Q.    The fine for Count 1, do you remember what the fine was?

24    A.    No.

10:11:43AM25    Q.    $40,000 to $1 million, does that refresh your

1  recollection?

2  A.   No.

3  Q.   No?

4  A.   No.

10:11:54AM 5  Q.   And with the second count, $250,000 plus supervised

6  release of up to five years?

7  A.   Yes.

8  Q.   And you are cooperating today -- and correct me if I'm

9  wrong -- so that you could receive a better deal from the

10:12:14AM 10  U.S. Attorney's Office and ultimately from the judge, correct?

11             MR. MARANGOLA: Objection to the form of that

12  question.  It's a compound question.

13             THE COURT: Sustained.

14  BY MR. VACCA:

10:12:24AM 15  Q.   So one of the reasons you're testifying today is you want

16  to get a better deal?

17  A.   I'm testifying hoping to get less time.

18  Q.   Now, I mentioned to you about a proffer.  You were

19  arrested on 1/29 of '18 and you signed the plea agreement on

10:12:49AM 20  5/7 of '19 -- excuse me, 1/29/18 and you entered into the plea

21  agreement and pled on 5/7/19; is that correct?

22  A.   Yes.

23  Q.   And that included a cooperation agreement?

24  A.   Yes.

10:13:06AM 25  Q.   So once you're done here today are you going to go before

```
     1  the judge or ask to go before the judge --
     2  A.    I don't know.
     3  Q.    -- to be sentenced?
     4  A.    I don't know how these work, but I got to get sentenced.
10:13:21AM 5  Q.    Right.   Okay.   Now, as far as your employment is
     6  concerned, were you employed at that company up to the point
     7  that you were arrested?
     8  A.    No.   I was working different places in Rochester.
     9  Q.    What type of places were you working?
10:13:46AM10  A.    I was doing factory work.   I was working Nordon, I was
    11  working at LiDestri, I work at my brother's house.
    12  Q.    Okay.
    13  A.    My brother houses.
    14  Q.    Okay. Now, you indicate your brother's houses.   Okay,
10:14:06AM15  these are houses that he owned?
    16  A.    Yes.
    17  Q.    And people lived in them, correct?
    18  A.    Yes, some of them, yes.
    19  Q.    A lot of these houses they lived in them, right?
10:14:17AM20  A.    In some of them.
    21  Q.    With their families, right?   Now, you lived at 292
    22  Barrington?
    23  A.    Yes.
    24  Q.    Who did you live there with?
10:14:28AM25  A.    With Leitscha.
```

```
 1   Q.   And who else?

 2   A.   And my girl -- my baby mom and my daughter.

 3   Q.   When did you move in to Barrington?

 4   A.   I moved in Barrington in August.

 5   Q.   Of what year?

 6   A.    '17.

 7   Q.   2017.  And who was living there at that time?

 8   A.   It was Leitscha living there.

 9   Q.   Just Leitscha?

10   A.   Yes.

11   Q.   Was there any drug activity going on at that time?

12   A.   When I move in there, yes.

13   Q.   Okay. Who was in charge of that?

14   A.   My brother Javi.

15   Q.   Well, he didn't live there, did he?

16   A.   Leitscha is his mistress and she rented the house for him.

17   That's my brother's stash home.

18   Q.   She rented a house from who?

19   A.   For my brother Javi.

20   Q.   She rented a house from him?

21   A.   Not from him.  For him, for him.

22   Q.   She rented it for him?

23   A.   Yes.

24   Q.   But he didn't rent that house, right?

25   A.   He paid.
```

1  Q.   She rented it?

2  A.   Yes, from under his orders.

3  Q.   You say under his orders, but were you involved in paying

4  the rent?

10:15:38AM 5  A.   Well, I was giving Leitscha money for staying there.

6  Q.   You were giving Leitscha money for staying there?

7  A.   Yes.

8  Q.   How about Carlos?  Did Carlos stay there?

9  A.   He come in and out.  I didn't have a key.

10:15:51AM 10  Q.   He never stayed there?

11  A.   He didn't stay.

12  Q.   You stayed there?

13  A.   Yes.

14  Q.   With Leitscha?

10:15:57AM 15  A.   Yes.

16  Q.   Right.  And you used that as a drug house?

17  A.   I use it as a drug house?  No.  That was my brother's drug

18  house.  I was staying there.

19  Q.   You were just staying there?

10:16:05AM 20  A.   I was staying there, I was working for my brother.

21  Q.   Right.  You were working for your brother?

22  A.   Yes.

23  Q.   Now, in terms of that, this is 2019 -- August 2017, excuse

24  me, and you were arrested January 29th of 2018.  So you lived

10:16:24AM 25  there what?  Five months?

1    A.   Yeah, like five, six months.

2    Q.   Where did you live before that?

3    A.   I was in St. Paul Street.

4    Q.   St. Paul Street?

10:16:33AM  5    A.   Yes.

6    Q.   Who else lived there with you?

7    A.   My baby mom.  I was living with her sister.

8    Q.   You moved into Barrington after that?

9    A.   Yes.

10:16:40AM 10    Q.   Was Leitscha staying at Barrington?

11   A.   Yeah, Leitscha was there.  When I moved there Leitscha was

12   living there.

13   Q.   Do you know how long she had lived there?

14   A.   No.

10:16:49AM 15   Q.   Who else lived there with her before you lived there?

16   A.   Yankee.

17   Q.   And who else?

18   A.   And my niece and her boyfriend.

19   Q.   Who was your niece?

10:17:02AM 20   A.   My niece.  That's my brother Miguel daughter and her

21   boyfriend, they used to stay there.

22   Q.   And as far as Obed is concerned, did Obed ever stay there?

23   A.   Not that I know of.

24   Q.   Did you have the power of attorney over Obed?

10:17:18AM 25   A.   At one time, yes.

```
 1  Q.   When did you have power of attorney over Obed?
 2  A.   When I was living on Hawley on the west side he was -- I
 3  was living with Maddy and he was going to school with my
 4  stepson Jose and they was staying at my house and I talked to
 5  his mother and he was supposed to be going to school and stuff
 6  like that.
 7  Q.   But he didn't go to school, did he?
 8  A.   No, he went with my brother.  After he turn 18 he left
 9  with my brother.
10  Q.   He went with you too, correct?
11  A.   At first he was living with me.  Then when he turn 18 he
12  decided to go with my brother 6 Burbank.
13  Q.   Did you execute a power of attorney?
14  A.   I think I signed some papers.
15  Q.   You signed some papers.  Were they filed?
16  A.   I don't think they was filed, no, but I signed some
17  papers.
18  Q.   Saying that you're responsible for Obed?
19  A.   Yes.
20  Q.   How about anybody else, were you power of attorney for
21  anybody else?
22  A.   No.
23  Q.   Just Obed?
24  A.   Yeah.
25  Q.   If we could have up the Government's Exhibit 26, please.
```

10:17:30AM (line 5)
10:17:41AM (line 10)
10:17:54AM (line 15)
10:18:01AM (line 20)
10:18:09AM (line 25)

```
 1  Mr. Figueroa, are you familiar with Government's Exhibit 26?
 2  A.   Yes.
 3  Q.   You viewed it numerous times during this trial, correct?
 4  A.   Yes.
 5  Q.   All right. And it has you next to Leitscha, correct?
 6  A.   Yes.
 7  Q.   And you indicated that Leitscha rented Barrington?
 8  A.   Yes.
 9  Q.   And then you went and stayed at Barrington?
10  A.   Yes.
11  Q.   Were you ever threatened by anybody to do anything with
12  respect to this operation or whatever?  Were you ever
13  threatened?
14  A.   What do you mean threatened?
15  Q.   Threatened by anybody.
16  A.   No.
17  Q.   No one ever threatened you?  Did anybody ever point a gun
18  at you and tell you to do anything as far as this operation is
19  concerned?
20  A.   I don't understand the question, but --
21  Q.   Did anybody threaten you at any point in time?
22  A.   You say threatening me what aspect?  Like forcing me to
23  work for my brother?  Sell drugs for my brother?  I don't know
24  what you mean.
25  Q.   Anything, anything.  Forcing you to work for your brother.
```

10:18:47AM (line 5)
10:19:03AM (line 10)
10:19:16AM (line 15)
10:19:29AM (line 20)
10:19:40AM (line 25)

48

1   Were you forced to work for Carlos?

2   A.   No, I wasn't forced to work for him.

3   Q.   Were you forced to work for anybody?

4   A.   No.

10:19:49AM 5   Q.   Okay.  No one ever had a meeting and sat down with Carlos

6   and with you and said, Carlos (sic), you have to work in my

7   organization?

8   A.   No.  He ask me to work for him.

9   Q.   He asked you to work for him?

10:20:00AM 10   A.   Yes.

11   Q.   And when was that?

12   A.   That was in 2013.

13   Q.   So you were released from prison when?

14   A.   June or July.

10:20:11AM 15   Q.   Right before that, correct?  Right before that, correct?

16   A.   Right before what?

17   Q.   You were released right before you started working for

18   Carlos?

19   A.   I was released, yeah.  And then I went to Rochester 2013,

10:20:27AM 20   I came to Rochester like -- I think it was June or July, I

21   don't remember.  A few months later I start when my brother

22   ask me to work for him.

23   Q.   What did you say?

24   A.   I say yeah.

10:20:37AM 25   Q.   So you started working for him?

1  A.    Yes.

2  Q.    And there are a couple of these individuals that you

3  indicated that Carlos treated like his sons?

4  A.    Yes.

10:20:50AM 5  Q.    And which ones are those?

6  A.    That's -- can I --

7  Q.    Put the dot -- put the little dot there.

8  A.    That's Obed.

9  Q.    All right.  And that's the one you had power of attorney

10:21:04AM10  over, correct?

11  A.    Yes.

12  Q.    Okay. And you still have power of attorney over that,

13  don't you?

14  A.    When he turn 18, he went to live with my brother.

10:21:09AM15  Q.    Okay.

16  A.    So he turned 18 he left and live with my brother.

17  Q.    Which brother?

18  A.    My brother Javi.

19  Q.    You're testifying that Obed lived with Javi?

10:21:24AM20  A.    Yes.  At that time when -- at that time when I was living

21  on Hawley and he turn 18, he decided to go live with my

22  brother and my brother took him with him.  He went to 6

23  Burbank with him.

24  Q.    All right. One thing I want to talk about with the various

10:21:35AM25  pole cameras, there was a number of pole cameras that you

```
  1  looked at, correct?
  2  A.    Yes.
  3  Q.    And you identified people at night, correct?
  4  A.    Correct.
10:21:42AM 5  Q.    During the day, right?
  6  A.    Yes.
  7  Q.    All times day and night, correct?
  8  A.    Yes.
  9  Q.    And as far as that is concerned, wouldn't you agree that
10:21:53AM10  many, many, many of those pole camera videos were blurry?
 11  A.    Some of them is a little blurry.
 12  Q.    A little blurry?
 13  A.    Some of them.
 14  Q.    Reviewing the pole cameras, when is the first time that
10:22:06AM15  you were able to view the videos of the pole cameras?
 16  A.    What you mean what was the first time?
 17  Q.    When was the first time that you looked at the videos from
 18  the pole cameras?
 19  A.    Some of them upstairs when I was with Marangola.
10:22:23AM20  Q.    Right.  So you didn't see any of the videos until you
 21  started being debriefed by the U.S. Attorney, correct?
 22  A.    What you mean being debriefed?
 23  Q.    Them talking to you and getting ready for this trial,
 24  preparing you for this trial.
10:22:40AM25  A.    They was asking me who the people was, for me to identify
```

1   them people.

2   Q.   When did you first meet with the U.S. Attorney to take a

3   look at the videos?

4   A.   I don't remember.  I don't remember when.

10:22:51AM 5   Q.   Was it -- was it in 2018?  Was it in 2019?  2020?

6   A.   I don't remember.

7   Q.   2021?

8              **THE COURT:** Hang on.  You're interfering with each

9   other.  Wait until he finishes his question, then answer it.

10:23:07AM 10  Wait until he finishes his answer before you ask another

11   question.

12   **BY MR. VACCA:**

13   Q.   When is the first time that you saw any of the pole camera

14   videos?

10:23:16AM 15   A.   I don't remember the first time I saw them, but I saw the

16   videos.

17   Q.   You saw the videos, but was it last year?  Was it this

18   year?

19   A.   I don't recall.

10:23:26AM 20   Q.   So you don't recall ever seeing those videos --

21              **MR. MARANGOLA:** Objection.  That's not what he said.

22   **BY MR. VACCA:**

23   Q.   I'm not done --

24              **MR. MARANGOLA:** I'm sorry.

10:23:35AM 25   **BY MR. VACCA:**

1  Q.    -- until you were preparing for this trial?

2  A.    No.  I saw the videos before, but I don't remember the

3  dates.

4  Q.    This is the thing I don't understand, and correct me if

10:23:47AM 5  I'm wrong, you testified for five days in this court with

6  precise detail of wiretaps -- there's like 200 items in there,

7  of videos, of identifications of people, and you were very

8  sure of yourself.

9           You never said to the U.S. Attorney --

10:24:06AM 10           **MR. MARANGOLA:** Objection, Judge, he's misstating

11  the testimony and he's just going on a narrative.

12           **THE COURT:** Overruled.  You can rephrase the

13  question.

14  **BY MR. VACCA:**

10:24:15AM 15  Q.    Okay.  So as far as reviewing the videos go, you reviewed

16  them with the U.S. Attorney, correct?

17  A.    Yes.

18  Q.    And when you testified over the past week you were very

19  sure and precise about your testimony, correct?

10:24:35AM 20  A.    Not precise, but yes.

21  Q.    And now I'm asking you questions that require simple

22  answers and you say I don't remember, I don't remember, I

23  don't remember.

24           **MR. MARANGOLA:** Objection, Judge, that's not what

10:24:45AM 25  he's saying.

1          **THE COURT:** Overruled.  It's proper

2   cross-examination.  Go ahead.

3   **BY MR. VACCA:**

4   Q.   You're saying I don't remember, I don't remember, I don't

10:24:50AM 5   remember, right?

6   A.   I'm not saying I don't remember, I don't remember.  I

7   don't remember the date.  I told you I saw the videos.  I saw

8   the videos, but I don't remember the date.

9   Q.   I asked you what year.

10:24:59AM 10   A.   What year?

11   Q.   Would it be '19?

12   A.   I don't know.

13   Q.   You tell me.  You saw them.

14   A.   I don't know.

10:25:09AM 15   Q.   And there's a lot of stuff you don't remember, correct?

16   A.   You show me the ledger and the video pole camera and the

17   phone calls, it will refresh my memory.

18   Q.   But you just saw them all over the past week.

19   A.   Refresh my memory, yeah.

10:25:25AM 20   Q.   I'm asking you quite simply, give me a year in which you

21   saw the pole camera videos for the first time.

22          **MR. MARANGOLA:** Objection, asked and answered

23   repeatedly.

24          **THE COURT:** Overruled.  Go ahead.  If you know.

10:25:38AM 25          **THE WITNESS:** I don't know.

1  BY MR. VACCA:

2  Q.    Okay.  When you reviewed the pole camera videos for the

3  first time, where was it?

4  A.    It was in the office.

10:25:54AM 5  Q.    Whose office?

6  A.    Marangola office.

7  Q.    Who was there with him?

8  A.    Hoffmann and Briganti.

9  Q.    So was your lawyer there with you too?

10:26:07AM10  A.    Yes, sometime.

11  Q.    Sometimes?

12  A.    Yes.

13  Q.    How many times did you meet with the U.S. Attorney and

14  with Briganti?

10:26:15AM15  A.    I can't recall how many times.

16  Q.    Was it more than ten?

17  A.    Could be.

18  Q.    Was it more than 30?

19  A.    No.

10:26:22AM20  Q.    Was it more than ten?

21  A.    About ten time.

22  Q.    More than 15?

23  A.    I don't -- wasn't counting.

24  Q.    And let's talk about the first time you met with them.

10:26:37AM25  Did they show you pole camera videos?

1  A.    They show me videos, they show me phone calls -- I was

2  listening to some phone calls, they show me pictures, they

3  show me some stuff for me to identify and I identify the stuff

4  that I was supposed to identify that I know; and the phone

10:26:55AM 5  calls, I translate phone call because they was in Spanish and

6  tell them the codes and all the stuff and they told me -- like

7  he always say -- Marangola told me that tell the truth.

8  Q.    Well, there's the pole camera on Barrington, correct?

9  A.    Yes.

10:27:13AM 10  Q.    And you viewed that a number of times during your

11  testimony today or this week?

12  A.    Yes.

13  Q.    Last week?

14  A.    Yes.

10:27:21AM 15  Q.    All right. And when were you first shown that pole camera

16  video?

17  A.    When was I first shown?

18  Q.    Yes.

19  A.    I don't remember when I was first shown.  I was shown the

10:27:33AM 20  pole camera -- you show me, I can tell you.

21  Q.    When was the first time?  Do you recall?

22  A.    No.

23  Q.    Then there's the pole camera video on Burbank, correct?

24  A.    Yes.

10:27:48AM 25  Q.    And you identified a number of cars coming and going and

1   people walking around.  Wouldn't you agree with me that's

2   awfully blurry?

3            **MR. MARANGOLA:** Objection, Judge, form.  There's

4   different days --

10:28:01AM 5            **THE COURT:** Overruled.  He can answer the question.

6   **BY MR. VACCA:**

7   Q.   Wouldn't you agree with me the pole camera video is

8   blurry?

9   A.   You can see the people, you can recognize the people in

10:28:11AM 10  there.

11  Q.   When you were reviewing those pole camera videos you were

12  at the U.S. Attorney's Office, correct?

13  A.   Yes.

14  Q.   Did they ever bring you anywhere else?

10:28:23AM 15  A.   No.

16  Q.   So you're reviewing the pole camera video, was there ever

17  a time with the pole camera video on Burbank Street where you

18  said I can't identify that person?

19  A.   No.

10:28:39AM 20  Q.   Never?

21  A.   No, because I got to tell the truth.  If I don't know the

22  person, if I don't recognize the person, I'm gonna say -- I'm

23  gonna say the truth.

24  Q.   Obviously you want to get credit for cooperating, right?

10:28:51AM 25  A.   It's not getting credit.  I want to get some lower time --

1  hopefully get some lower time.

2  Q.   Tell me how that went with looking at the video, the pole

3  camera video.  Did the agent show it to you or the

4  investigator?

10:29:08AM 5  A.   No.  Marangola show it to me.

6  Q.   Did the investigators or whoever was reviewing the video

7  with you ever say who is that?  Do you know who that is?  Do

8  you know who that is?

9  A.   No.  They just let me tell them who it was.

10:29:21AM 10  Q.   So they asked you look at it and tell us who it is?

11  A.   Yes.

12  Q.   All right.  And did they ever say to you, well, are you

13  sure that that's that person?  Are you sure that that's this

14  person?  Did they ever say that?

10:29:36AM 15  A.   Yes.

16  Q.   Okay. So they're asking you who specific people are in the

17  videos and are they saying is that Javi?

18  A.   No.

19  Q.   Is that Obed?  Are they ever saying that?

10:29:53AM 20  A.   No.  They just asked me who was in the video, to identify

21  the people in the video.

22  Q.   How many times did they do that?

23  A.   When they show me the video.

24  Q.   Okay. And how about on Barrington?  We saw Barrington a

10:30:08AM 25  lot too.  Did they ever say to you who is this?  Who is that?

1  A.    I saw the videos.  So they say tell me who it was, who

2  that person, that person, who that person in the video.

3  Q.    They told you who it was?

4  A.    No, they ain't told me who it was.  They tell me to

10:30:23AM 5  identify the person that's in the video.

6  Q.    Did they ever say who is Leitscha?  Who is Obed?  Who's

7  Camacho?  Did they ever say that?

8  A.    No.  They just tell me who the people in the video --

9  identify the people in the video and I tell them who it was.

10:30:41AM 10  Q.    That was just based on the video because you weren't

11  there, correct?  As far as Burbank?

12  A.    Some of them I was there.

13  Q.    Like Barrington?

14  A.    Yes.

10:30:52AM 15  Q.    Let's talk about the boxes, okay?

16  A.    Yes.

17  Q.    The boxes -- how many boxes were shown by video when you

18  testified?

19  A.    How many boxes?

10:31:23AM 20  Q.    How many boxes?

21  A.    A few boxes.

22  Q.    A few boxes.  And where did they come from?

23  A.    They come -- the boxes come from Puerto Rico.

24  Q.    All right. As far as the boxes are concerned, were there

10:31:36AM 25  any in the house on Barrington when the search warrant was

1   executed?

2   A.   You talking about boxes or -- there was boxes in

3   Barrington.

4   Q.   Boxes on Barrington, okay.  Where were they?

10:31:50AM 5   A.   There was boxes in the basement.

6   Q.   How many?

7   A.   I don't know how many it was, but there was boxes in the

8   basement.

9   Q.   Did you bring them down there?

10:31:56AM 10   A.   No, I ain't bring them down there.

11   Q.   You never brought the boxes down in the basement, right?

12   A.   No.

13   Q.   So how many boxes were there in the basement?

14   A.   A few boxes.

10:32:08AM 15   Q.   A few boxes?

16   A.   Yes.

17   Q.   Okay.

18   A.   Of candy, yeah.

19   Q.   Of candy.  Was there anything else in them?

10:32:14AM 20   A.   Well, you asking me about the boxes with the coke that

21   come and my brother break them -- open them?  Or are you

22   talking about the boxes -- what happened afterwards we opened

23   the boxes?

24   Q.   Let's take it through.  Tell me about opening the boxes.

10:32:28AM 25   A.   Well, the boxes come from Puerto Rico to different

1   addresses in Rochester and me, my brother or Lei go pick them

2   up, we take them to 292 Barrington, and my brother is the one

3   that open the boxes because he's the boss of the group, and he

4   the one that open the boxes to take the kilos out of the box.

10:32:46AM 5   Q.   All right.  And you're speaking in general terms right

6   now, correct?

7   A.   I'm telling you --

8   Q.   You said this is what he usually does?

9           **MR. MARANGOLA:** Objection, Judge.  Mr. Vacca is

10:32:57AM 10   cutting off the witness when he's trying to answer.

11           **THE COURT:** Please let him finish his answer.

12   **BY MR. VACCA:**

13   Q.   I'm asking you what you just told me -- told me about the

14   boxes and how that goes.

10:33:06AM 15   A.   My brother take some of the boxes -- my brother take them

16   to Burbank and some of the boxes with the candy be in the

17   basement and some of the candy with the boxes after they take

18   the kilos out, some of the boxes be stored in 292 Barrington

19   in the little closet.

10:33:20AM 20   Q.   As far as the boxes are concerned, when they executed the

21   search warrant do you know how many boxes they recovered?

22   A.   No.

23   Q.   Do you know where the boxes were specifically located?

24   A.   What do you mean specifically located?

10:33:38AM 25   Q.   In the house.

1   A.   I don't understand the question.

2   Q.   Were the boxes in the basement?  Was the box in a closet?

3   A.   I got arrested.  I don't --

4   Q.   So you don't know?

10:33:52AM 5   A.   I got arrested.

6   Q.   But before you got arrested you knew that there were boxes

7   in the house, correct?

8   A.   Boxes with candy in them.

9   Q.   So in Barrington no box was recovered that had cocaine?

10:34:06AM 10   A.   There was cocaine before.

11   Q.   What I'm asking you is you said -- you said there was

12   boxes with candy in Barrington when you were arrested,

13   correct?

14   A.   Yes.

10:34:16AM 15   Q.   And where were those boxes located?

16   A.   The boxes with candy was in the basement.

17   Q.   Were there other boxes?

18   A.   Could be.  I don't --

19   Q.   So the only boxes that -- that you knew about during the

10:34:31AM 20   execution of the search warrant on 1/29 of '18 were the boxes

21   that were in the basement --

22   A.   After --

23   Q.   -- with candy?

24   A.   What you mean?  I don't understand.

10:34:47AM 25   Q.   Well, I just want to know at Barrington at the time they

1   executed the search warrant, how many boxes were in the house?

2   A.   How many boxes of the candy?  I don't count that.  It was

3   in the basement.  I'm talking about the one -- Leitscha got

4   arrested when they went to her car, she got arrested with a

10:35:06AM 5   box with cocaine in it.  But it ain't got to the house.

6   Q.   All right.  So they got the box out of Leitscha's trunk,

7   correct?

8   A.   Yes.

9   Q.   And had you opened that box yet?

10:35:18AM 10   A.   I don't open the boxes.

11   Q.   Right.  But where did that box in her trunk come from?

12   A.   From the addresses in Rochester.

13   Q.   Which addresses?

14   A.   Different addresses of Rochester.

10:35:28AM 15   Q.   That box that was in Leitscha's trunk, where did it come

16   from?

17   A.   Got to come from her brother or somebody that we know.

18   Q.   But you're guessing, right?

19   A.   Because it different -- different addresses.

10:35:43AM 20   Q.   You don't know where that box came from that was in --

21   A.   -- I know where the box came from.  The box came from

22   different addresses in Rochester.

23   Q.   What addresses?

24   A.   59 Fernwood; St. Paul; Leitscha's brother's -- I don't

10:36:03AM 25   remember the address -- and we used to go and pick them up;

1   and Garson Street.

2   Q.   You're speaking in general terms.  I'm asking you about

3   that night when you got arrested and they took the box out of

4   Leitscha's trunk, where did that box come from?

10:36:13AM 5   A.   That box came from address in Rochester.

6   Q.   Yeah, but what address?

7   A.   I don't know.  I don't know the address.  That box came

8   from Rochester -- from one of the address in Rochester.

9   Q.   All right. So you don't know what was in that box, though,

10:36:24AM10   correct?

11   A.   I do know what was in the box, yes.

12   Q.   The box had not been opened yet, right?

13   A.   The box wasn't opened yet, but I know what was coming in

14   the boxes.

10:36:37AM15   Q.   No, but the box hadn't been opened yet, right?

16   A.   The box wasn't opened yet.

17   Q.   And the only person you said that opens boxes is Javi,

18   right?

19   A.   Yes.

10:36:45AM20   Q.   And Javi was not there, right?

21   A.   No.

22   Q.   So that box was never opened with Javi there, right?

23   A.   The box that was in Leitscha trunk?

24   Q.   Right, the box was in her trunk, but you don't know if

10:36:58AM25   that box had cocaine or candy?

```
          1   A.    Yes, I know.

          2   Q.    Or guns or money?

          3   A.    Can I answer?

          4   Q.    Yeah.

10:37:07AM 5   A.    Yes, I know.  It got cocaine in it.

          6   Q.    You know it's got cocaine in it?

          7   A.    Yes.

          8   Q.    Why?  Did you put it there?

          9   A.    I ain't put it there.  Freddie Silva put it there.

10:37:14AM10   Q.    Who did?

         11   A.    Freddie Silva.

         12   Q.    He's the gentleman in Puerto Rico, correct?

         13   A.    Yes.

         14   Q.    But you really don't know what was in that box because

10:37:23AM15   Javi wasn't there to open the box?

         16   A.    I know what was in the boxes because Freddie Silva was

         17   sending the boxes to my brother to different address in

         18   Rochester that contain two or three kilos of cocaine inside

         19   with candy.

10:37:39AM20   Q.    All right.  And you reviewed this with the agents; is that

         21   correct?

         22   A.    What do you mean I reviewed?

         23   Q.    You reviewed the whole thing about the box in the trunk

         24   and everything with the agents working on this case, correct?

10:37:53AM25   A.    I don't understand what you mean review with them.
```

1  Q.   Did you talk to them about the box in Leitscha's trunk?

2  A.   I ain't told them about the box in Leitscha's trunk.

3  Q.   When they arrested you?

4  A.   When they arrested me, it's in the paper.

10:38:05AM 5  Q.   Did you give them a statement when you were arrested?

6            When you were arrested on January 29th, 2018, did

7  you give a statement to the agents or to the investigators or

8  to any law enforcement people?

9  A.   Statement about what?

10:38:25AM10  Q.   Did they question you about this whole incident?

11  A.   I talked to my lawyer, then I enter the plea agreement.

12  Q.   Right.  But I'm talking about the night you were arrested.

13  A.   The night I was arrested I wasn't talking about nothing.

14  I got arrested and they charged me with conspiracy.

10:38:39AM15  Q.   Did you talk to any agents or police at that time?

16  A.   No, not at first, no.

17  Q.   Not at first.  But when is -- when did you start talking

18  to the agents or the police or the investigators?

19  A.   I don't recall when I entered the cooperation.

10:38:55AM20  Q.   Before you signed the cooperation agreement how many times

21  had you spoken to Mr. Marangola or anybody from his office?

22  A.   I don't recall.

23  Q.   Okay.  Now, as far as the boxes are concerned, you

24  indicated -- and there's some indication that a box was

10:39:25AM25  delivered to 59 Fernwood; is that correct?

1  A.   Yes.

2  Q.   And there's a pole camera there, correct?

3  A.   Yes.

4  Q.   And that two boxes were delivered back-to-back?

10:39:36AM 5  A.   Yes.

6  Q.   One on one day and then another day, correct?

7  A.   I think so.

8  Q.   Now, the first one -- the first box, do you know what was

9  in that first box at Fernwood?

10:39:49AM 10  A.   I know what was in all the boxes that was coming from

11  Puerto Rico.

12  Q.   Let's talk about the box at Fernwood, okay?  The first box

13  from Fernwood?

14  A.   Yes.

10:39:58AM 15  Q.   Okay. The one that you saw the video on, correct?

16  A.   Yes.

17  Q.   Okay. That's one where there's an allegation that Carlos

18  goes up to the house after the mailman got there and brought

19  the box and picks a box up?

10:40:11AM 20           MR. MARANGOLA: Objection, Judge, there's no

21  allegation.  There's testimony.

22           THE COURT: Overruled.  You can answer the question.

23  BY MR. VACCA:

24  Q.   There's an allegation that Carlos picked the box up that

10:40:22AM 25  the mailman had just delivered, correct?

1  A.   It's not allegation.  It's on the pole camera.

2  Q.   It's on the -- right?

3  A.   It's the pole camera.  He went to Fernwood and got the

4  box.

10:40:30AM 5  Q.   That box, okay?  You don't know what's in that box,

6  correct?

7  A.   I know what's in the box.

8  Q.   You didn't see what was in the box, right?

9  A.   I know what's in the box.

10:40:42AM 10  Q.   But you didn't see what was in the box, correct?

11  A.   I don't understand the question.

12  Q.   Well, the box --

13  A.   At that moment?

14  Q.   The box is delivered.  You didn't look in the box at that

10:40:54AM 15  point in time?

16  A.   At that point in time when he got it, when this happened I

17  ain't look at the box.  I know the boxes was coming from

18  Puerto Rico; Freddie sending to us over here with cocaine in

19  them.  He wasn't sending plain candy.  It was going to

10:41:06AM 20  different addresses to go pick the box that contain two or

21  three kilos of cocaine.

22  Q.   But weren't there some boxes that came in without drugs in

23  them?

24  A.   No.

10:41:14AM 25  Q.   There were some?

```
 1  A.    No.

 2  Q.    No?

 3  A.    No.

 4  Q.    So you say that Carlos goes and picks it up according to

 5  the pole camera, correct?  Correct?

 6  A.    Yes.

 7  Q.    Do you know what happened to that box?

 8  A.    That box go to 292 Barrington, which he gonna open

 9  himself, or me and Lei go to different address and get the

10  boxes and take it to 292 Barrington, he the one that open it

11  because he want to make sure everything is right.

12          He's the boss of the group and he's the only one

13  that open them.  We cannot open them, we cannot touch that

14  until he say so.

15  Q.    Let's follow that box, okay?  That Carlos picked up, okay?

16  Brings it back to Barrington; is that correct?

17  A.    Yes.

18  Q.    But you weren't there when he opened the box?

19  A.    Sometime he open it without me be present, sometime he

20  open when I be present.

21  Q.    So you really don't know what's in the box?  You didn't

22  see it?  In other words, you didn't visualize it, correct?

23  A.    I know what was in the boxes.

24  Q.    But you didn't see what was in the boxes.  You know it

25  from what you heard, correct?
```

1  A.    No.  From what I'm seeing.  I'm seeing -- I'm there when

2  the boxes come, when they talking to Freddie, when I go with

3  Lei and pick the boxes up and he open them and it's two or

4  three kilos of cocaine inside M&M or the Skittle box.

10:42:34AM 5  Q.    But that particular box you weren't there when it was

6  opened, correct?

7  A.    I probably was not.

8  Q.    And you never saw what was in that box, correct?

9  A.    I don't understand the question.

10:42:48AM 10  Q.    You never saw what was in that box that Javi supposedly

11  brought -- that Javi brought back to 292 Barrington?

12  A.    If he open it and if he pass it to us and we sell it, I

13  saw it was cocaine.

14  Q.    But you didn't see what was in that box?

10:43:07AM 15  A.    The box that he got?

16  Q.    Yes.

17  A.    He open it, I see him open it, I see -- I know it was

18  cocaine in them.

19  Q.    You know it was cocaine, but you didn't see it?  You're

10:43:17AM 20  guessing.

21  A.    I'm not -- I'm not guessing.

22  Q.    You weren't there when that box was opened, correct?

23  A.    I probably was not there when the box was opened.

24  Q.    Okay. Then there's a second day, okay?  Where the truck

10:43:31AM 25  comes again -- it's on the pole camera and it's at

1  59 Fernwood, all right?  And it showed you and Lei pulling

2  into the driveway, you getting out and getting a box, correct?

3  A.   Yes.

4  Q.   Is that the box that ultimately is in the trunk when the

10:43:46AM 5  police execute the search warrant?

6  A.   I don't -- I don't know.

7  Q.   You don't know if that's the same box?

8  A.   I don't know if that's the same box.

9  Q.   And were you there when Javi opened that box?

10:43:58AM10  A.   Which box?

11  Q.   The one that you and Lei picked up.

12  A.   I don't recall, but he open -- a lot of them he opened in

13  front of me.

14  Q.   I'm asking about those particular boxes that came from

10:44:10AM15  Fernwood.

16  A.   I don't remember if he opened them in front of me.

17  Q.   Okay.  So you don't know what was in that box?

18  A.   I know what was in the box.

19  Q.   You never saw the contents of that box?

10:44:18AM20  A.   I saw -- specifically -- the specific box, the boxes that

21  come from Puerto Rico?

22  Q.   Right, that specific box.

23  A.   The boxes that come from -- the boxes that come from

24  Puerto Rico, they come from Puerto Rico from Freddie Silva,

10:44:30AM25  they contain two or three kilos of cocaine.  And that's why we

1 get the boxes to go to different addresses and we go pick them

2 up.  They contain cocaine.

3 Q.   So the box -- the box that -- that Carlos supposedly

4 picked up, you didn't see what was in there, nor did you see

10:44:47AM 5 what was in the box that you and Lei picked up, nor did you

6 see what was in the box in the trunk in her car, correct?  The

7 box inside the house --

8            **MR. MARANGOLA:** Objection, Judge.

9            **THE COURT:** There's like four questions there at

10:44:59AM 10 least.  How about one at a time?

11 **BY MR. VACCA:**

12 Q.   Okay.

13 A.   Can I answer the question?

14 Q.   Yeah, answer the question.

10:45:04AM 15            **THE COURT:** You can't answer the question, there's

16 four of them.

17            **THE WITNESS:** I'm answering -- I'm answering in

18 general.  I'm answer the question in general.  The only reason

19 we was receiving boxes with candy from Puerto Rico from

10:45:16AM 20 Freddie Silva was because my brother got a connect named Pablo

21 and he gave the kilos to Freddie Silva and he pack them up in

22 candy in the M&M and the Skittle boxes and that's the only

23 reason why we received them boxes at different addresses in

24 Rochester.  That's the only reason because it contain the

10:45:32AM 25 cocaine.  There was no candy -- we was not selling candy.  We

1  was selling cocaine.  That's why we was receiving them boxes.

2  **BY MR. VACCA:**

3  Q.   So the box at Fernwood, okay?  That Carlos picked up -- I

4  asked you, you don't know what was in there?

10:45:48AM 5  A.   I know what was in there.

6  Q.   You didn't see what was in there?

7  A.   I saw what was in them before from the boxes coming from

8  Puerto Rico (talking over each other) --

9  Q.   Other boxes (talking over each other) --

10:45:56AM 10  A.   -- (talking over each other) the same kind of boxes -- the

11  same kind of boxes.  Can I answer the question?

12  Q.   You can answer, sure.

13  A.   The same kind of boxes that come from Freddie Silva, they

14  all contain cocaine in them.  Candy with cocaine in them.

10:46:14AM 15  Q.   Yeah, but we're dealing just with the boxes on Fernwood

16  right now.

17  A.   That's the boxes that come to different addresses.  They

18  go to Fernwood, they go to Garson, they go to St. Paul Street,

19  all them boxes that come from Puerto Rico from Freddie Silva

10:46:26AM 20  contain two or three kilos of cocaine.

21  Q.   Yeah, but I'm talking specifically about three boxes.  I'm

22  talking about the two at Fernwood and the one in the trunk of

23  Lei's car.

24  A.   I don't know how to answer that to you because I've said

10:46:40AM 25  the same thing like four or five time, that the boxes come

1   with cocaine -- with candy in them, they come with cocaine.

2   That's the only reason why we receive the boxes to different

3   addresses.  We go and pick them up.  They contain cocaine.  He

4   go and put them in 292 Barrington, he open them, and they

10:46:58AM 5   contain cocaine, candy and cocaine.

6   Q.   I'm not talking about that.  I'm talking about those

7   specific boxes that were shown on the pole camera on Fernwood,

8   okay?  You really don't know what's in that box, do you?

9   Those two boxes?

10:47:12AM 10  A.   I know.  I just -- I know what's in them boxes.  I know

11  what's in the boxes:  Cocaine.

12  Q.   Based on what you had seen before?

13  A.   Yes, based on the whole operation.  I worked with my

14  brother -- me and Leitscha work with my brother, we was there

10:47:25AM 15  when he opened numerous boxes that contain two or three kilos

16  of cocaine, and those boxes come from the same person:

17  Freddie Silva from Puerto Rico.

18  Q.   But not these three boxes, correct?

19  A.   Them three boxes come from Puerto Rico.

10:47:37AM 20  Q.   Right.  And as far as the items that I referred to, the

21  ones that were over on Fernwood, all right?  You never saw the

22  contents of the boxes?

23  A.   What do you mean?

24  Q.   You never saw what was in those boxes?

10:47:59AM 25  A.   I probably did.

1   Q.    You just indicated you didn't.

2   A.    Talking about that day?

3   Q.    Yeah.

4   A.    That day when the boxes got back, he probably open them in

10:48:09AM 5   front of me, I don't remember, but it was kilos of cocaine.

6   Q.    So you don't remember?

7   A.    I don't remember if he opened them in front of me.

8   Q.    You don't remember what was in those boxes?

9   A.    I'm not saying I don't remember what was in the box.  I

10:48:19AM 10   know what was in the box:  It was cocaine with candy.

11   Q.    Okay. What other boxes?  Where else are there boxes?

12   A.    What else what?

13   Q.    Any other addresses where you saw those boxes?

14   A.    I went to Garson with my brother where Karina live, I went

10:48:38AM 15   there with him; I went to Fernwood; I went to St. Paul Street

16   where Tito live, Tito Bacalao live, I went with Lei to pick up

17   some boxes; I went to Lei brother Anthony and pick up some

18   boxes, but I don't remember his address, I just went there

19   with her and he came out with a box, put it in the trunk.

10:48:55AM 20   Q.    All those boxes you didn't see what was inside of them,

21   correct?

22   A.    Yes, I see what was inside of them, some of them.

23   Q.    Specifically what dates?

24   A.    In the one -- the one from her brother -- we always wait

10:49:09AM 25   for my brother to show up in Barrington and he open them in

1    front of us with Tito.

2    Q.    Those drugs, okay?  Strike that.

3             So let's talk about the -- let's talk about the

4    wiretaps.

10:49:30AM 5          **THE COURT:** Before we do that let's take a recess.

6    At this time, ladies and gentlemen, we'll take a recess.  In

7    the meantime, I'd ask you not discuss the matter or allow

8    anybody to discuss the matter with you.  The jury may step

9    down.  We'll stand in recess.

11:25:05AM 10            (**WHEREUPON**, there was a pause in the proceeding).

11            (**WHEREUPON**, the defendant is present).

12            (**WHEREUPON**, the jury is present).

13          **THE COURT:**  You may continue, Mr. Vacca.

14          **MR. VACCA:** Thank you very much, Your Honor.

11:32:24AM 15  **BY MR. VACCA:**

16    Q.    Mr. Figueroa, did you work in a restaurant business that

17    your brother owned?

18    A.    Can you repeat the question, please?

19    Q.    Yes.  Did you work in a business, a restaurant business

11:32:41AM 20   that your brother owned?

21    A.    Yes, at one time, yes.

22    Q.    When was that?

23    A.    That was years back.

24    Q.    Do you remember how many?

11:32:51AM 25   A.    No.

1  Q.    Do you remember where the restaurant was?

2  A.    It was Mt. Morris.

3  Q.    Mt. Morris?

4  A.    Yes.

11:32:58AM 5  Q.    How long did you work there?

6  A.    The same -- he got it open for like half a year, a year,

7  half a year.  That's it.

8  Q.    And you worked in that business with him, correct?

9  A.    Yes, I work in there.

11:33:11AM 10  Q.    How about an individual named Yankee?

11  A.    Yes.

12  Q.    He worked in that too?

13  A.    Yes.

14  Q.    How about Ms. Poncedeleon?

11:33:21AM 15  A.    Yes.

16  Q.    She worked there?

17  A.    Yes.

18  Q.    Anybody else?

19  A.    Yes, my brother's wife; Palito, *flaco*, he worked there

11:33:31AM 20  before; my brother Gordy worked there; my brother Gordy's wife

21  worked there; my ex Maddy worked there; his niece -- my niece,

22  my brother's daughter worked there, and some other local

23  people.

24  Q.    Okay. And you indicated it was open how long?

11:33:52AM 25  A.    For like a year or like a year, six months, yeah.

Q.    And did it go out of business or what happened, do you
remember?

A.    Yeah, there was no customers.  The place was a bad place.
There was no customers.

11:34:06AM 5   Q.    Okay.  All right.  Thank you, sir.  Now, sir, when did you
first start speaking to the investigators regarding the
wiretaps?

A.    The same time that I was meeting with them.

Q.    So do you recall when the first time is, though, that you
11:34:44AM 10  spoke to them about wiretaps?

A.    No.

Q.    How did that come about?  Did they approach you to listen
to the wiretaps?

A.    What you mean they approach me to listen to wiretap?

11:34:57AM 15  Q.    Did they say to you we want you to listen to some
recordings?

A.    Yeah.  We go up there, you got to listen to people
talking, show you photographs, show you people, you got to
listen to the people talking on the phone and stuff they was
11:35:10AM 20  seizing as evidence to identify -- identify the people who was
talking.

Q.    All right. How did you do that?  Did the agents or
investigators or Mr. Marangola meet with you and show you
certain photographs and ask you about the photographs?

11:35:28AM 25  A.    They show me the photograph and identify who it was.

1  Q.   Now, as far as photograph -- I'm talking about

2  photographs, not the transcript.   In other words, not the

3  transcription.   Just photographs in general, okay?   When did

4  they talk to you about photographs?

11:35:45AM 5  A.   When I was meeting up with them we was talking about

6  everything.

7  Q.   Did you look at photographs of alleged individuals

8  involved and vehicles and buildings?

9  A.   Yeah.   The photographs that I -- them photographs right

11:35:57AM 10  there and the buildings and, yeah.

11  Q.   They asked you to look at those photographs, correct?

12  A.   Yes.

13  Q.   All right. And did they ask you any questions when you

14  were looking at the photographs?

11:36:07AM 15  A.   Before -- I was -- I was asked a question before I was

16  looking at the photograph.

17  Q.   What were you asked?

18  A.   To identify -- to identify what I'm seeing.

19  Q.   Identify people or --

11:36:16AM 20  A.   Identify people, identify the place, yeah, the building,

21  the house, identify what was going on.

22  Q.   Okay. I'm going to have you look at Exhibit --

23  Government's Exhibit No. 592.   Now, you've identified this

24  before; is that correct?

11:36:48AM 25  A.   Yes.

1    Q.    Okay. And it's a Home Depot Homer's bucket, right?

2    A.    Yes.

3    Q.    You identified certain drugs with respect to that bucket

4    and the drugs being in the bucket?

11:37:00AM 5    A.    Yes.

6    Q.    Okay. Was that -- was this photograph taken, to your

7    knowledge, at the time they executed the search warrant?

8    A.    Yes.

9    Q.    Were you present when they photographed it?

11:37:13AM 10   A.    Well, I ain't see them photograph, but I guess when I was

11   arrested --

12   Q.    Okay.

13   A.    -- they photograph it.

14   Q.    Where was that bucket in relation to the house?

11:37:22AM 15   A.    That bucket was in the basement.

16   Q.    Where?

17   A.    292 Barrington.

18   Q.    292, but where in the basement?

19   A.    In the basement, in the shelves where it's at.

11:37:32AM 20   Q.    So it was in the basement with the shelves.  And do you

21   recall what was in the bucket?

22   A.    Yes.

23   Q.    What was in the bucket?

24   A.    Cocaine.

11:37:41AM 25   Q.    Okay. And did you put it there?

1   A.   Did I put it there?

2   Q.   Yes.

3   A.   Yes.

4   Q.   So you put the cocaine in that bucket?

11:37:48AM 5   A.   Yeah, I put some cocaine in there, my brother put some

6   cocaine in there, and Lei put some of that cocaine in there.

7   Q.   All right. Were you there when Lei put the cocaine in?

8   A.   I was there some of the times.

9   Q.   No, no, but I'm asking you were you there when Lei put

11:38:03AM 10   cocaine in that bucket?

11   A.   I don't understand the question.

12   Q.   Who put the cocaine in that bucket as seen in Exhibit No.

13   592?

14   A.   That bucket right there?

11:38:12AM 15   Q.   Yeah.

16   A.   It was used as a stash.  It could be my brother, could be

17   Lei because they was coming in and out.  And that's what we

18   stored the drugs in there, the coke.

19   Q.   You don't know who put the cocaine in that bucket as

11:38:30AM 20   photographed in this exhibit?

21   A.   What do you mean?

22   Q.   You're saying it could be you, it could be your brother,

23   or it could be Lei?

24   A.   Can I answer the question?

11:38:42AM 25   Q.   Yeah.

1  A.   Yeah, because when the kilos come from Puerto Rico, my

2  brother break them down into 62s.  That's where they go.  He

3  put them in there in that bucket, we go put it in the

4  basement.  Lei sometime put it in there and that's where we

11:38:55AM 5  store the coke in the bucket.

6  Q.   What you're answering is this is what we do sometimes,

7  this is what we usually do.  I'm asking about the bucket as is

8  shown in 592, who put the drugs in that bucket?

9  A.   I just say could be my brother or Lei that put the coke in

11:39:14AM 10  there; or could be me after they break it down, I put them in

11  there.

12  Q.   But you don't know who did, correct?

13  A.   Could be -- could be him, Lei or me.

14  Q.   But you don't know who put those drugs as shown in

11:39:27AM 15  Exhibit 592?  You don't know who put those drugs there,

16  correct?

17  A.   I don't understand your question.  We put drugs in there.

18  That bucket stores drugs, the drugs that we break down, the

19  kilo, the 62, that's where they go.

11:39:40AM 20           So if he break the kilo and he tell me or Lei to

21  put it down there or he put it there, that's where he put it,

22  in the bucket and we take it down to the basement.

23  Q.   You don't know who put that in that bucket as shown in

24  this exhibit?

11:39:56AM 25  A.   I don't understand the question.

1    Q.    The question is -- I don't want to know who put it there

2    sometimes, maybe me, Lei or my brother.  I want to know who

3    put it in that bucket as you see it right now in Exhibit 592?

4    A.    As I see it right now that date?

11:40:15AM 5    Q.    Yes.

6    A.    The date I got arrested?

7    Q.    Yeah.

8    A.    I ain't see nobody put it in the bucket the day I got

9    arrested.

11:40:20AM 10    Q.    Thank you.  As far as the wiretaps go, how did you first

11   come to listen to the wiretaps?

12   A.    When I was upstairs with Marangola, Briganti, Hoffmann and

13   I was listening to the phone call, a lot of them -- the

14   majority of them was in Spanish and I was translating them and

11:40:46AM 15   I was translating the phone calls and the calls the way that

16   we talk and the meanings and I told them what it was.

17   Q.    Was there an interpreter there?

18   A.    Yes.

19   Q.    Each and every time that you listened to these wiretaps?

11:41:04AM 20   A.    Not each and every time.

21   Q.    Just sometimes?

22   A.    Yes.

23   Q.    When did you start listening to those wiretaps with an

24   interpreter?

11:41:18AM 25   A.    They was already -- they came from -- I think they got a

1  company that translate them, they came translated already.

2  But they got some -- got the wrong meanings and I had to tell

3  them what it was, what it meant and to make sure the

4  translator and she went through all the phone calls -- the

11:41:36AM 5  Spanish lady, she went through all the phone calls and verify

6  that -- that it was right.

7  Q.   So there's like probably around what?  180, 190 phone

8  calls in evidence?

9  A.   A lot of them.

11:41:48AM 10  Q.   About that number, okay?

11  A.   Yes.

12  Q.   When you first started listening to them you're indicating

13  that you listened to it, but somebody had already translated

14  it?

11:41:58AM 15  A.   They got a company -- talking about on the paper.

16  Somebody got to listen to them first to translate them, but I

17  listen to them, tell them what it was.

18  Q.   So do you know if any corrections were made as a result of

19  your listening?

11:42:18AM 20  A.   Yeah, there was correction made.

21  Q.   How many corrections?

22  A.   Some -- in codes that we talk, the way they put in because

23  we Puerto Ricans -- so some of the people that translate this

24  thing, they can be from Columbia, Mexico and certain words

11:42:35AM 25  mean certain things for them.  But by me listening, being

1  around all Puerto Ricans, we got a lingo and I know what it

2  should be.

3  Q.   So your interpretation is based on the fact that the

4  Puerto Rican dialect, for lack of a better term, was used in

11:42:52AM 5  translating these wiretaps?

6  A.   Some of them.

7  Q.   Some of them.  Were some of them Columbia or Ecuador or

8  Guatemala, Spain?

9  A.   What do you mean?

11:43:03AM 10  Q.   The translations.

11  A.   I'm talking about the people -- the company they have that

12  translate that -- translate the calls --

13  Q.   Right.

14  A.   -- some of them they not Spanish.  Some of them Columbian,

11:43:15AM 15  some of them from South America.

16  Q.   So they translated these, correct?  The company hired

17  these people who may not have understood the Puerto Rican

18  dialect?

19  A.   Yes.  And words -- we use certain words different.

11:43:29AM 20  Q.   Okay. So different words have different meanings?

21  A.   Yes, but in this -- what I was listening to, we all be

22  around, my brother and everybody, I know what we was talking

23  about.

24  Q.   Okay. Well, what dialect was being used when you listened

11:43:45AM 25  to these tapes?

```
 1  A.    Spanish, Puerto Rican.
 2  Q.    But  --
 3  A.    Puerto Rican.
 4  Q.    -- were they -- were they first translated by this company
```
11:43:54AM `5` that was hired or were they translated by you or by another
```
 6  interpreter?
 7  A.    They were translated by the people that they have, the
 8  Government have, they got a company that translate it for
 9  them.
```
11:44:06AM`10` Q.    And this is the company that there were dialect problems
```
11  with?
12  A.    The people that they hire, it's different.
13  Q.    Give me an example of a problem with a dialect would
14  interfere with an accurate interpretation.
```
11:44:23AM`15` A.    They say -- we Puerto Ricans, we talk about the street
```
16  code, and I say corta, corta for us in the street it mean a
17  gun.  So for South American, corta can be corta, they stop
18  talking, corta, or something that you cut, corta.
19  Q.    Okay. So some of the words -- let me just get this -- for
```
11:44:49AM`20` example, corta, what does that mean?
```
21  A.    Gun, short gun, handgun.
22  Q.    What else could it mean?
23  A.    In they language can be something else, but for us it's
24  corta, it's a gun.  We use it --
```
11:45:05AM`25` Q.    It's a gun.  All right.  And it had been used inaccurately

1  on these interpretations?

2  A.   I'll give you example.

3  Q.   You give me an example in looking at --

4  A.   But I'm not saying they did it, but I'm saying -- I'm

11:45:19AM 5  using example.  That we use Puerto Rican -- we got different

6  dialect, like other countries they talk different --

7  Q.   Different dialects?

8  A.   -- different dialects.  If I go to Venezuela right now and

9  ask for a spoon, *cuchara*, that mean -- you referring to a

11:45:31AM 10  private part of a woman.

11          So if I go to Puerto Rico and ask for *cuchara*, they

12  gonna give me a spoon.  That's what I mean.

13  Q.   So did you -- were there a lot of corrections that you had

14  to make in these transcripts?

11:45:44AM 15  A.   Not really.  It was saying what it means.

16  Q.   Interpretation?

17  A.   Interpretation of the street code, the way we talk in the

18  street.  I was interpreting what we talk in the street.  We

19  don't talk the same.

11:46:02AM 20  Q.   Okay. So there's a lot of tapes of you and Yelder, okay?

21  A.   Yes.

22  Q.   Those are all in English, right?

23  A.   Yes.

24  Q.   And you spoke to him in English, correct?

11:46:18AM 25  A.   Yes.

1   Q.   So would you say that the interpretation between you and

2   Yelder, okay?  Is more accurate than a interpretation between

3   let's say you and Obed?

4   A.   No.  It's all backward.  It's all the same.

11:46:36AM 5   Q.   It's all the same?

6   A.   Yeah.  I speak English and Spanish, so we understand each

7   other.

8   Q.   Okay. How about -- how about Leitscha, okay?  How about

9   her?  Does she speak English at all?

11:46:48AM 10   A.   Leitscha?

11   Q.   Leitscha.

12   A.   Yeah, she speak English and Spanish.

13   Q.   She speaks both of them?

14   A.   Yeah, English and Spanish.

11:46:54AM 15   Q.   As you were going through the wiretaps did you have to

16   make any corrections based on the interpretation between

17   Leitscha and let's say Carlos?

18   A.   No.

19   Q.   How about between Carlos and you?

11:47:12AM 20   A.   No.

21   Q.   Who did you make the corrections with then?

22   A.   It was -- it was not really a correction.  It's about the

23   way that we talk in the street code.  Like, for example, bring

24   me a 62-year-old-lady.  You not really gonna go get a

11:47:29AM 25   62-year-old lady for somebody.  We referring to 62 grams of

1    coke.  So you got to tell them what that mean, what that code

2    mean.  That's what I mean by correction.

3    Q.   Okay. Could we see 693, the ledger?

4            **MR. MARANGOLA:** Judge, Mr. Vacca has asked for

11:48:20AM 5    Government's 692, which is a hard copy of the ledger.

6    Ms. Kocher is going to get it for him.

7            **THE COURT:** Great, thank you.

8            **MR. VACCA:** Thank you.

9    **BY MR. VACCA:**

11:48:32AM 10   Q.   Were you ever not able to identify the voice of any of the

11   individuals in the wiretaps that you listened to?

12   A.   Yes, there was one my brother was talking to, a guy from

13   Puerto Rico that I never heard him talk.

14   Q.   So you --

11:48:51AM 15   A.   I identify my brother voice, but not the person.

16   Q.   Okay. So that is the only one?

17   A.   I think -- I'm not sure.  I think it was.

18   Q.   Okay. All right.  Now, sir, in your plea agreement --

19           **MR. VACCA:**  -- oh, by the way, Judge, I would like

11:49:21AM 20   to move the plea agreement into evidence.  Mr. Marangola and I

21   spoke about this.

22           **THE COURT:** What exhibit is it?

23           **MR. VACCA:** 784.

24           **MR. MARANGOLA:** No objection, Your Honor.

11:49:28AM 25   **BY MR. VACCA:**

1  Q.   So Mr. Figueroa --

2            **THE COURT:** Hang on, hang on.  Exhibit 784 will be

3  received.

4            (**WHEREUPON**, Government's Exhibit 784 was received

11:49:43AM 5  into evidence).

6  **BY MR. VACCA:**

7  Q.   Mr. Figueroa, if you could turn to Government's Exhibit

8  784.  It should be in one of those big books up there that

9  says photos.  Now, sir, if you could go to the plea agreement,

11:50:26AM 10  it's 9(a), Roman numeral VI(a), it says cooperation.

11            Now, sir, under cooperation clause 22(a), are you

12  there?

13  A.   Yes.

14  Q.   Okay. It talks about you providing truthful testimony

11:50:58AM 15  along with grand jury testimony.  Were you required to testify

16  before the grand jury on this matter?

17  A.   Yes.

18  Q.   And when did you testify before the grand jury?

19  A.   About when I -- I don't understand that question.

11:51:21AM 20  Q.   When did you testify before the grand jury?

21  A.   I don't remember.  I don't remember when.

22  Q.   Was it a long time ago?

23  A.   Yes.

24  Q.   Like two years ago?

11:51:37AM 25  A.   I don't remember.

1   Q.    Now, in the cooperation agreement did you review that with

2   the Assistant U.S. Attorney?

3   A.    Yes.

4   Q.    Okay. And were you led to understand that if you provided

11:51:52AM 5   truthful information and cooperated fully that you would be

6   given a benefit for it?

7   A.    No.

8   Q.    Sir, are you just doing this today out of the goodness of

9   your heart?

11:52:04AM 10   A.    No.  I'm doing this so hopefully get a lower sentence.

11   Q.    Okay.  Now, you were arrested on 1/29/18 and you signed

12   this agreement on 5/7/19.  If you go to the end there of the

13   plea agreement, take a look at it, is that your signature?

14   It's on page 13.

11:52:30AM 15   A.    Yes.

16   Q.    And you signed that on May 7th, 2019, correct?

17   A.    April.

18   Q.    Well, no, take a look at that.  There's April.  And what's

19   above April?

11:52:46AM 20   A.    May.

21   Q.    May, okay.  So it was in May, correct?

22   A.    Yes.

23   Q.    Did you start cooperating right then and there?

24   A.    Yes.

11:52:54AM 25   Q.    And you had done a little cooperating before that,

1    correct?

2    A.    What?

3    Q.    You did a little cooperating before that, right?

4    A.    I don't remember.

11:53:03AM 5    Q.    You had to be debriefed, right?  As a proffer statement?

6    A.    Yes.

7    Q.    Okay. And how many times were you debriefed with the

8    proffer statement?

9    A.    I don't remember how many times total.

11:53:13AM 10    Q.    Now, sir, let's talk about guns.

11    A.    Yes.

12    Q.    Throughout your testimony you talked about a number of

13    guns, correct?

14    A.    Yes.

11:53:27AM 15    Q.    Talked about a number of guns.  How many -- how many in

16    general did you talk about?

17    A.    About the two guns that was found in my room, 292

18    Barrington.

19    Q.    292 Barrington they found what?  Two guns?

11:53:40AM 20    A.    Yes.

21    Q.    Which bedroom?

22    A.    In my bedroom.

23    Q.    And were those your guns?

24    A.    I plead guilty for possessing them, but my brother's gun.

11:53:52AM 25    Q.    You pled guilty for possessing those guns?

1  A.   Yes.

2  Q.   But they're your brother's guns?

3  A.   Yes.

4  Q.   Okay. How long had you had those guns?

11:54:01AM 5  A.   The guns was in there after the situation that happened in

6  Barrington.  Something happened at Barrington, somebody tried

7  to break in.  After that I found them guns in there.

8  Q.   When did someone try to break into Barrington?

9  A.   That was way before I got locked up.

11:54:20AM 10  Q.   Well, was it in -- so must have been 2016 or 2017?

11  A.   Like, yeah.

12  Q.   Tell me what happened.

13  A.   Somebody tried to break into the house.  And my brother --

14  Leitscha was talking to my brother, my brother was coming, the

11:54:36AM 15  police came and searched the whole house.

16         And after that I found the guns in my drawer, in my

17  dresser.  I asked my brother and my brother said leave them

18  there.  And I ain't leave them there, I put one under the

19  Christmas tree.

11:54:48AM 20  Q.   So those are your guns?

21  A.   They my brother's gun.

22  Q.   You had the use of those guns?

23  A.   I know they was there.  I know I can touch them.

24  Q.   How did they get there?

11:54:57AM 25  A.   I don't know how they got there.

```
 1   Q.    Your brother didn't come in the house, correct?
 2   A.    My brother come in the house, in and out any time he
 3   wants.
 4   Q.    The police were there when someone tried to break --
 5   A.    When somebody tried to break in, but he was on his way.
 6   Q.    They searched the house?
 7   A.    Yes.
 8   Q.    Was the gun in the house at that time?
 9   A.    No.
10   Q.    So you went out and got a gun afterwards?
11   A.    I ain't went and got no gun afterwards.
12   Q.    When did you get the gun, before or after?
13   A.    I don't know where the guns come from.
14   Q.    They were in your drawer?
15   A.    They was in the drawer, both of them inside the drawer.
16   Q.    Did you call the police to come and pick them up, the
17   guns?
18   A.    No, because I ain't seen them the same day.  I seen them
19   days later.
20   Q.    I mean, you know it's illegal to have a gun unless you had
21   a permit?
22   A.    Yes.
23   Q.    So did you call the police up, tell them that, hey, I just
24   found a couple guns in my house here, come and get them, I
25   don't want them?
```

11:55:08AM (line 5)
11:55:14AM (line 10)
11:55:25AM (line 15)
11:55:34AM (line 20)
11:55:45AM (line 25)

1  A.   I didn't call the police because I know why the gun was

2  put there for.

3  Q.   You know why the gun was put there for?

4  A.   To protect my brother's money and drugs.

11:55:53AM 5  Q.   But if the police investigated the house because there was

6  supposedly a burglary and then right after that, okay?  You

7  say you went and got some guns; is that correct?

8  A.   I ain't say I went and got some guns.

9  Q.   Who went and got some guns?

11:56:10AM 10  A.   I don't know how the guns got there.  My brother was

11  coming in this way, he tell Leitscha to push the alarm, and

12  the police came because he got the alarm.

13  Q.   All right.  So you don't know whose guns these are?

14  A.   They my brother's guns.  That's my brother's stash house.

11:56:21AM 15  He got the key for the house.  And then I found out they found

16  some rifles under Leitscha's bed.

17  Q.   And it's just like I don't know where this came from,

18  right?  Did you call the police up on the rifles too and ask

19  them to pick them up?

11:56:35AM 20  A.   They found the rifles after -- they was searching the

21  house, they were in the house.

22  Q.   When there was supposedly a burglary?

23  A.   No, when they came arrest us.

24  Q.   They came and arrest you on January 28th or January 29th?

11:56:52AM 25  A.   Yeah.

1  Q.    2018?

2  A.    Yes.

3  Q.    That's when they found the rifles?

4  A.    And the guns in my room.

11:56:56AM 5  Q.    How many rifles were there?

6  A.    I don't know how many rifles was in there.

7  Q.    Okay. They weren't your rifles?

8  A.    No.

9  Q.    Were they Leitscha's?

11:57:05AM 10  A.    My brother's rifle.

11  Q.    But you don't know that?

12  A.    I know that.

13  Q.    You don't know it?

14          **MR. MARANGOLA:** Objection, Judge.

11:57:12AM 15          **THE WITNESS:** I know it.

16          **THE COURT:** Overruled.  The answer will stand.

17  **BY MR. VACCA:**

18  Q.  So as far as these handguns go, okay?  Would they be

19  called *corta*?

11:57:22AM 20  A.  Rifles is called *palo*.

21  Q.  *Corta*?

22  A.  *Corta* is a handgun.

23  Q.  Handgun.  So *corta* in the dresser, right?  You say you

24  found two guns?

11:57:33AM 25  A.  Yeah, in the dresser, yeah.

1  Q.   In the dresser.  You took one out and put it somewhere

2  else?

3  A.   Put it right on under the Christmas tree.

4  Q.   You put it under the Christmas tree?

11:57:43AM 5  A.   It was a small Christmas tree in my nightstand.

6  Q.   So just put it like right next to it?

7  A.   Underneath, hiding underneath.

8  Q.   Okay. How long was it there hiding underneath?

9  A.   Until I got arrested.

11:57:54AM 10  Q.   You don't know when you first found the gun in the house?

11  A.   I don't know when I first found it.  It was after the

12  incident -- it was weeks after the incident, then we got

13  arrested.

14  Q.   Any other weapons of yours?

11:58:13AM 15  A.   That was not my weapon.  I got access to them.  They was

16  my brother's gun.

17  Q.   But any other guns in any other houses?

18  A.   I don't understand your question.

19  Q.   Did you know of any other guns at any other houses?

11:58:28AM 20  A.   Yes.

21  Q.   Which other gun?

22  A.   When I first start working with my brother in 2013 I saw

23  some rifles there.

24  Q.   What property?  Which house?

11:58:41AM 25  A.   699, the building, it's a building.

1   Q.    You found what there?

2   A.    Where we use to work in one of the apartments, in the

3   closet I saw the rifles there.

4   Q.    You don't know whose those were, though, do you?

11:58:51AM 5   A.    That was my brother's guns.

6   Q.    How do you know that?

7   A.    Because my brother show them to me.  They're his guns.

8   Q.    They were where?  In the closet?

9   A.    Yes, it was in the closet.  The closet where we go get the

11:59:02AM 10   stuff to bag up the coke and the dope, it was right there

11   laying -- laying there.

12   Q.    They were just laying there?

13   A.    They was laying there in the closet.

14   Q.    Would your brother come and stick his head in and look and

11:59:11AM 15   say oh, those are my guns?

16   A.    He was there.  We go to the apartment and he told me that

17   was his guns.

18   Q.    Just for the heck of it he said those are my guns?

19   A.    Those are his guns. He just told me those are his guns.

11:59:19AM 20   Q.    How many guns were there?

21   A.    I saw three of them laying there.

22   Q.    What kind?

23   A.    There was rifles.

24   Q.    Rifles?

11:59:27AM 25   A.    Yes.

1   Q.   So rifles are legal, right?

2   A.   What?

3   Q.   Rifles are legal?

4   A.   I don't know. I think they illegal you don't got no

11:59:37AM 5   license.

6   Q.   So they're legal.  So your brother showed you legal

7   weapons?

8           **MR. MARANGOLA:** Objection, Judge.

9           **THE COURT:** Sustained.

11:59:44AM 10  **BY MR. VACCA:**

11  Q.   So your brother showed you what?  Three rifles?

12  A.   They was laying there.  He showed me the gun, it was his

13  gun.

14  Q.   What did he say, it's my gun?

11:59:55AM 15  A.   It was his guns.  He said those were his gun.

16  Q.   Any others?

17  A.   In Culver.

18  Q.   Where?

19  A.   On Culver.

12:00:02PM 20  Q.   Culver, okay.  What about on Culver?

21  A.   It was two baby TEC-9, and I think it was a .40 or .45.

22  Q.   What were they?

23  A.   They was in the apartment.

24  Q.   Which apartment?

12:00:16PM 25  A.   An apartment on Culver.

1  Q.   Right.  But who lived in the apartment?

2  A.   Obed stayed in that apartment before.

3  Q.   Who?

4  A.   Axel stayed in the apartment before.  Obed stayed in that

12:00:27PM 5  apartment before.  That apartment we use to -- use it to bag

6  up some heroin and coke.

7  Q.   All right. So those weapons you really don't know whose

8  weapons they are?

9  A.   They are my brother's weapons.

12:00:39PM 10  Q.   But you don't know?

11  A.   I just told you my brother told me that's his guns.

12  Q.   In that place as well?

13  A.   Yes, that's his place that he use -- that's the building

14  he use to bag some coke and dope, cook some crack.

12:00:51PM 15  Q.   What did he say to you?  This is my gun?

16  A.   He just say they -- talking to period of time, he showed

17  me the guns.  He showed me the baby TECs.

18  Q.   Okay.

19          **MR. VACCA:** Just give me a minute, Judge, please.

12:01:22PM 20          **THE COURT:** Sure.

21  **BY MR. VACCA:**

22  Q.   Now, Mr. Figueroa, were you familiar with Government's

23  Exhibit 693, which is like a ledger or a notebook?

24  A.   Yes.

12:01:51PM 25  Q.   Did you ever have access to this ledger or notebook?

1  A.   What did you mean access?

2  Q.   Access.  Were you able to look at it or were you able to

3  write in it?

4  A.   I wasn't able to write in it.  I look when Leitscha was

12:02:04PM 5  writing in it.

6  Q.   You were standing there watching her write in it?

7  A.   See her write something in there, yes.

8  Q.   Okay.  And in that -- in that book does it at any point or

9  anyplace mention Carlos?

12:02:21PM 10  A.   Yes.

11  Q.   Where?

12  A.   When it say J.

13  Q.   What's that?

14  A.   When it say J.  When it have the -- when I was testifying

12:02:32PM 15  few days ago that I went to see Yelder, he say J kept 4,000,

16  referring to my brother Javi, J.

17  Q.   No, but I'm asking if anything is written in here relevant

18  to Javi?

19  A.   I just told you.

12:02:50PM 20          **MR. VACCA:** Judge, may I approach him and ask him to

21  show me?

22          **THE COURT:** Yes.  Exhibit 693.

23          **MR. VACCA:** 693, Judge, Government Exhibit 693.

24          **THE WITNESS:** This one of them.  This is one of them.

12:04:29PM 25  I'll show you another one right there.  J got.

**BY MR. VACCA:**

Q.   I'm sorry, I don't see.

A.   Right there, J got.

Q.   Let's see.  So that little thing that says J got?

A.   Yeah, J got.

Q.   J got?

A.   Referring to my brother.

Q.   Okay. Is there another thing he got -- J got?

A.   Not J.

Q.   J got?

A.   J for Javi.

Q.   Find me something else too, please.

      **MR. MARANGOLA:** Judge, if we could have the date or some identifying information with respect to the part of the ledger?

      **THE COURT:** Yes, show that on the visualizer.

      **THE WITNESS:** 12/15.

      **MR. VACCA:** Let me put it on there.

**BY MR. VACCA:**

Q.   J got, okay.

A.   Can I look through the other ones?

Q.   Yeah, I just wanted to -- it seems like, Judge, it's -- date of 4/13 starts, and ends at 12/19 and --

      **THE COURT:** There are no page numbers on this document, is there?

1                MR. VACCA: No.

2                MR. MARANGOLA: No, they're not.  The entry shown

3    was next to -- what was the date?

4                MR. VACCA: The date was 2/15 -- no, 12/15, 12/15.

12:06:32PM 5                THE WITNESS: Right here.  *Viejo*, that's another

6    one.  *Viejo*, that's my brother nickname.

7    BY MR. VACCA:

8    Q.   Where does it say that?

9    A.   Right here, *viejo*, right there in parentheses.  That's

12:06:51PM 10   1/21.

11   Q.   V-I-E-J-O?

12   A.   *Viejo tiene*.

13   Q.   This is next -- looks like 1/21.  Is there anymore or is

14   that it?

12:07:32PM 15   A.   There's more.  *J tiene*, this is another one, 12,000, the

16   4,000, January 5th.

17   Q.   Where is the name?

18   A.   Right there, *J tiene*, J have.

19   Q.   *J tiene*?

12:08:10PM 20   A.   *J tiene*.

21   Q.   *J tiene*?

22   A.   Yeah.

23                MR. VACCA: Judge, it's next to --

24                THE COURT: Show it on the visualizer.

12:08:19PM 25   BY MR. VACCA:

1  Q.   It looks like 1/5...anymore?

2  A.   *Viejo lo puso.*

3  Q.   What is it?

4  A.   *Viejo lo puso.*

12:09:19PM 5  Q.   That's another name?

6  A.   Yes.  He put $180, *viejo lo puso*.  That's what it mean in

7  Spanish.

8  Q.   Let me see.  Where is it?

9  A.   Right there on top, *viejo lo puso*.

12:09:42PM 10  Q.   *Lo puso?*

11  A.   Yeah, *viejo lo puso* right there on the top, it say *viejo*

12  *lo puso*, he put $180.

13            **THE COURT:** What's the date?

14            **MR. VACCA:** Date on this, Judge, is 1/8.

12:10:31PM 15            **THE WITNESS:** Right in the bottom here it say J

16  *tiene*, another one 4,000, J *tiene*.

17  **BY MR. VACCA:**

18  Q.   J *tiene*.  It doesn't say Carlos?  It doesn't say Javi,

19  right?

12:10:41PM 20  A.   That's for J, Javi, that's referring to him Javi, J.

21  Q.   *Viejo lo puso?*

22  A.   That's the one on top *viejo*.  That's his nickname *viejo*.

23  And the one on the bottom J for Javi.

24  Q.   Where?  Show me.

12:10:56PM 25  A.   The one right here on the bottom.  Right there.  4,000.

1  Q.   It says G.

2  A.   J.

3  Q.   G, Javi?

4  A.   J.  Right there J *tiene*.

12:11:25PM 5          **THE COURT:** Is there a date on that one?

6          **MR. VACCA:** 1/11.

7          **THE COURT:** Thank you.

8          **THE WITNESS:** You want all of them?

9  **BY MR. VACCA:**

12:11:39PM 10  Q.   I think we're near the end here.  I think we're near the

11  end.

12  A.   Right here, *viejo tiene*.

13  Q.   What?

14  A.   January 25th, *viejo tiene* right there.

12:12:42PM 15          **MR. VACCA:** This is right next to 1/25, Judge.

16          **THE COURT:** Thank you.

17  **BY MR. VACCA:**

18  Q.   Is that it?  Okay.  So your statements indicate that Javi

19  or Carlos went by some other additional names; is that

12:13:04PM 20  correct?

21  A.   Yes.

22  Q.   What names are those?

23  A.   Javi --

24  Q.   There's no Javi --

12:13:10PM 25          **MR. MARANGOLA:** Objection, Judge, Mr. Vacca didn't

1  let him finish his answer.

2              **THE COURT:** Let him finish the answer.  You can

3  answer -- finish your answer.

4              **THE WITNESS:** Javi; you can use J for short, we know

12:13:23PM 5  it's him; Javi; *viejo*; Big Bro; *matatan*.

6              **THE COURT:** What was the last one?  Can you spell

7  that?

8              **THE WITNESS:** M-A-T-A-T-A-N.

9              **THE COURT:** Thank you.

12:13:43PM 10  **BY MR. VACCA:**

11  Q.   Anymore?  We have something like Viero (sic)?

12  A.   *Viejo*.

13  Q.   *Viejo*?

14  A.   *Viejo*, old man.

12:13:52PM 15  Q.   You got old man, you got Javi?

16  A.   Yeah.

17  Q.   You got J?

18  A.   Yes.

19  Q.   You got *matatan*?

12:14:01PM 20  A.   Yes.

21  Q.   *Viejo*.  What else?  There's another one?

22  A.   Big Bro.

23  Q.   Big Bro.  Now, the only -- the only names that are entered

24  in that book looks like *viejo*, *viejo*?

12:14:21PM 25  A.   *Viejo*, old man, *viejo*.

1  Q.   V-I-E-R-O?

2  A.   V-I-E-J-O, *viejo*.

3  Q.   *Viejo*, that means old man?

4  A.   Yes.

12:14:33PM 5  Q.   As far as that book goes, that's a ledger that Leitscha

6  kept with respect to money going out, money coming in,

7  correct?

8  A.   Yeah, the drugs.

9  Q.   Drugs going out?

12:14:50PM 10  A.   People that sell drugs for my brother, yes.

11  Q.   She kept the ledger?

12  A.   Yes.

13  Q.   Javi had no control over that ledger, correct?

14  A.   Yes, he did.

12:14:57PM 15  Q.   There's no entry from him in there?

16  A.   He got control over it.  She worked for him.  Everything

17  that she write down she got to tell my brother.

18  Q.   Hang on one second, Judge, interpretation issue.  Does

19  *viejo* mean something old?  Something that happened in the

12:15:45PM 20  past?

21  A.   Old man.

22  Q.   It means old man?

23  A.   Yes.

24  Q.   Okay. So Javi -- you indicate that Javi's in charge of the

12:15:55PM 25  whole operation, he's got control over this book --

1  A.    Yes.

2  Q.    -- correct?  But he doesn't keep the book, right?

3  A.    He looked at it.

4  Q.    He doesn't -- when were you there that he looked at the

12:16:08PM 5  book?

6  A.    I was there plenty time when he got in argument with Lei

7  she got something written down wrong and they got in a

8  argument over the notebook.

9  Q.    She still kept the notebook?

12:16:18PM 10  A.    That was her job.  She used to keep -- that was her job.

11  Q.    She keeps the notebook, right?  Carlos does not keep the

12  notebook, correct?

13  A.    Mm-hmm.

14  Q.    She keeps it and she keeps track of all the money going in

12:16:33PM 15  and all the drugs going out, correct?

16  A.    Yes, for my brother Javi.

17  Q.    She lives in Barrington, right?

18  A.    Yes.

19  Q.    You lived there with her?

12:16:42PM 20  A.    Yes.

21  Q.    Okay. With another woman and your child, right?

22  A.    Yes.

23  Q.    Javi does not live there?

24  A.    No.  That's his stash house.

12:16:48PM 25  Q.    That's his stash house?

1  A.   That's his stash house.

2  Q.   I thought you told me somewhere else was his stash house.

3  A.   That's his stash house.  You asked me about different

4  addresses that I told you.

12:17:06PM 5  Q.   Right.

6            MR. VACCA: I have nothing further, Your Honor.

7            THE COURT: Mr. Marangola?

8            MR. MARANGOLA: Thank you, Your Honor.

9                   **REDIRECT EXAMINATION**

12:17:39PM 10 BY MR. MARANGOLA:

11  Q.   Mr. Figueroa, the ledger that Mr. Vacca was just asking

12  you about, those were records of drug transactions for drugs

13  that belonged to who?

14  A.   To my brother Javi.

12:17:58PM 15  Q.   You testified earlier the handguns you found in your

16  nightstand drawer, that they were found by you after there had

17  been a break-in to 292; is that right?

18  A.   Yes.

19  Q.   And you testified that your brother came and went from 292

12:18:24PM 20  when he pleased; is that right?

21  A.   Yes.

22  Q.   And Leitscha and Yankee you said had been living there

23  before you; is that right?

24  A.   Yes.

12:18:34PM 25  Q.   When you saw the two handguns in your nightstand drawer

1  who did you reach out to?

2  A.   To my brother Javi.

3  Q.   Why did you reach out to your brother Javi after you found

4  two handguns in your nightstand drawer?

12:18:50PM 5  A.   Because he's the boss and that's his stash house and I

6  asked him what they was doing there.

7  Q.   Why did you ask Javi what those guns were doing there?

8  A.   Because I know I saw -- previous time I saw him with guns.

9  He told me he got guns and I tell him what they was doing

12:19:09PM10  there.

11  Q.   What did Javi tell you when you called him about the guns

12  that you found in your nightstand drawer?

13  A.   When I talked to him he said don't touch them, leave them

14  there.

12:19:18PM15  Q.   And you testified earlier that you did, in fact, touch

16  them?

17  A.   Yeah, I touched them.  I check them, make sure they was

18  loaded and everything.  I put one under the Christmas tree.

19  Q.   The Christmas tree you're talking about, where was the

12:19:31PM20  Christmas tree?

21  A.   Top of the small nightstand.

22  Q.   So like a little Christmas tree put on the nightstand?

23  A.   Yes, little Christmas tree, under there.

24  Q.   Why did you put it there?

12:19:42PM25  A.   To protect my brother's drugs and protect myself.

110

1    Q.   All right.  And that was after the break-in?

2    A.   Yes.

3    Q.   Mr. Vacca asked you about this restaurant that Javi owned

4    for a brief time.  Do you recall that?

12:20:02PM 5    A.   Yes.

6    Q.   And you said there weren't -- there had been no customers

7    at it?

8    A.   No.

9    Q.   Was that restaurant working in 2018 at the time of your

12:20:14PM 10    arrest?

11    A.   No.

12    Q.   Was it in 2017?

13    A.   No.

14    Q.   2016?

12:20:21PM 15    A.   No.  It was long time ago.

16    Q.   All right. So it was even before 2016?

17    A.   Yes, long time ago.

18    Q.   Way before you were at 292 Barrington?

19    A.   Yes.

12:20:30PM 20    Q.   And Mr. Vacca asked you a number of questions regarding

21    whether you saw individuals in pole camera videos and listened

22    to people on wiretap calls.  Do you remember those questions?

23    A.   Yes.

24    Q.   Now, fair to say that some of those videos are clearer

12:20:58PM 25    than others?

1   A.   Yes.

2   Q.   Some times it was easier to identify people for you than

3   others?

4   A.   Yes.

12:21:04PM 5   Q.   Tell the jury are you familiar with the size and

6   appearance and the walk of your brother Javi?

7   A.   Yes.

8   Q.   Any doubt about the days you testified that you observed

9   him on various pole camera footage?

12:21:21PM 10   A.   No doubt.

11   Q.   In those meetings that you had with myself and

12   Investigator Briganti, Agent Hoffmann, did we ever tell you

13   the names of people in videos?

14   A.   No.

12:21:35PM 15   Q.   Did we ever tell you the name of a person on a wiretap

16   call?

17   A.   No.

18   Q.   Did we ever tell you the name of a person in a photograph?

19   A.   No.

12:21:45PM 20   Q.   Did we ever tell you somebody else gave us information

21   about such and such?

22   A.   No.

23   Q.   What did we tell you we wanted from you?

24   A.   I got it write down on the wall: Tell the truth.

12:22:01PM 25   Q.   Right, tell the truth.  That's the only thing I ever asked

1  of you, didn't I?

2  A.   Yes, tell the truth.  That's what I'm doing today, saying

3  the truth.

4  Q.   That's what you're doing here?

12:22:10PM 5  A.   Yes.

6  Q.   Have you done that here over the last six days?

7  A.   Yes.

8          **MR. MARANGOLA:** Thank you, Mr. Figueroa.  Nothing

9  further, Judge.

12:22:18PM 10          **THE WITNESS:** You're welcome.

11          **MR. VACCA:** Just a moment please, Your Honor.  Thank

12  you.

13          **MR. MARANGOLA:** I'm sorry, Judge, I did have one --

14  a couple more questions if I can, Judge.

12:22:36PM 15          **THE COURT:** Sure, go ahead.

16          **MR. MARANGOLA:**  Mr. Vacca, give me one minute.

17          **MR. VACCA:** No problem.

18          **MR. MARANGOLA:** Thank you.

19  **BY MR. MARANGOLA:**

12:22:43PM 20  Q.   Mr. Figueroa, Mr. Vacca had asked you about a previous

21  time when you had signed papers regarding a power of attorney

22  for Obed?

23  A.   Yes.

24  Q.   And you said that was when you were living on Hawley?

12:22:53PM 25  A.   Yes.

1   Q.   And how do you spell Hawley, do you know?

2   A.   No.  H-O-L-L-Y.

3   Q.   What side of the city is that on?

4   A.   That's west side.

12:23:02PM 5   Q.   The west side of the City of Rochester?

6   A.   Yes.  Jefferson -- off Jefferson.

7   Q.   All right.  Was that in 2018?

8   A.   No.

9   Q.   Was that in 2017?

12:23:12PM 10   A.   No.

11   Q.   Was that in 2016?

12   A.   No.

13   Q.   It was some time before that?

14   A.   Yes.

12:23:19PM 15   Q.   All right.  You said that was when Obed -- that was before

16   Obed was 18?

17   A.   Yes.  Obed was going to school with my stepson.

18   Q.   When you say going to school --

19   A.   He was going to school with him and all that stuff.

12:23:30PM 20   Q.   What kind of school?

21   A.   He was going to high school.

22   Q.   All right.  And then what happened after Obed turned 18?

23   A.   My brother went over there and spoke to him and he left

24   and start living with my brother Javi at 6 Burbank.

12:23:44PM 25   Q.   Obed started living with your brother?

```
          1  A.    Yes.

          2  Q.    At 6 Burbank?

          3  A.    Yes.

          4  Q.    Did he live with your brother the entire time?

12:23:51PM 5  A.    Not the entire time.  He was living with my brother for a

          6  long time.

          7  Q.    Okay.  Then he began working for your brother?

          8  A.    Yes.

          9  Q.    In what business?

12:24:00PM 10 A.    Drug business.

         11          MR. MARANGOLA: All right, thank you, Mr. Figueroa.

         12  No further questions, Your Honor.

         13          THE WITNESS: You're welcome.

         14          MR. VACCA: I have a couple.

12:24:07PM 15             RECROSS-EXAMINATION

         16  BY MR. VACCA:

         17  Q.    Mr. Figueroa, you indicated that Barrington is a stash

         18  house and you also indicated that the guns are your brother's,

         19  not yours, correct?

12:24:17PM 20 A.    Yes.

         21  Q.    Okay. Sir, do you remember in November of 2017 doing a buy

         22  from a confidential source?  Drug buy?

         23  A.    What?

         24  Q.    A buy?  A drug buy.

12:24:35PM 25 A.    A drug buy?
```

1  Q.    Yeah.

2  A.    A drug buy?  No.

3  Q.    Isn't it true that you indicated to the confidential

4  source that you could buy guns?  You could get guns?

12:24:52PM 5  November 20th, 2017.

6  A.    I probably did.  I don't remember.

7  Q.    You don't remember?

8  A.    I probably did, but I don't remember.

9  Q.    You probably did, but you don't remember?

12:25:01PM 10  A.    Yes.

11  Q.    Okay. So you were -- were you also selling guns?

12  A.    Selling guns, no.

13            MR. VACCA: Thank you very much, sir.

14            MR. MARANGOLA: Nothing further.

12:25:12PM 15            THE COURT: Nothing further?  Thank you very much,

16  you may step down.

17            THE WITNESS: Thank you.

18            (WHEREUPON, the witness was excused).

19            THE COURT: Members of the jury, since we're going

12:25:24PM 20  to quit early today anyways, I think we're going to take a

21  recess today until 8:30 tomorrow morning.

22            Tomorrow again we'll be in session only from 8:30

23  until noon, okay?  With that understanding the jury may step

24  down until tomorrow morning at 8:30.  In the meantime, I'd ask

12:25:52PM 25  you not discuss the matter or allow anybody to discuss the

1   matter with you.  Just wait a second.

2              Thank you.  Jury may step down.

3              **MR. MARANGOLA:**  Thank you, Judge.

4              (**WHEREUPON**, proceedings adjourned at 12:26 p.m.)

5                        *   *   *

6

7              <u>**CERTIFICATE OF REPORTER**</u>

8

9         In accordance with 28, U.S.C., 753(b), I certify that

10  these original notes are a true and correct record of

11  proceedings in the United States District Court for the

12  Western District of New York before the Honorable Frank P.

13  Geraci, Jr. on June 8th, 2021.

14

15  <u>S/ Christi A. Macri</u>

16  Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter

17

18

19

20

21

22

23

24

25