```
 1                    UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF NEW YORK

 3

 4

 5   - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA              18-CR-6094(G)
 6
     vs.
 7                                         Rochester, New York
     CARLOS JAVIER FIGUEROA,               May 20, 2021
 8              Defendant.                 8:30 a.m.
     - - - - - - - - - - - - -X
 9

10                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE FRANK P. GERACI, JR.
11               UNITED STATES DISTRICT CHIEF JUDGE

12

                     JAMES P. KENNEDY, JR., ESQ.
13                   United States Attorney
                     BY: ROBERT A. MARANGOLA, ESQ.
14                       CASSIE M. KOCHER, ESQ.
                     Assistant United States Attorneys
15                   500 Federal Building
                     Rochester, New York 14614
16                   Appearing on behalf of the United States

17

                     PAUL J. VACCA, JR., ESQ.
18                   One East Main Street, Suite 1000
                     Rochester, New York 14614
19                   Appearing on behalf of the Defendant

20
     ALSO PRESENT:       Nicolas Penchaszadeh, Spanish Interpreter
21                       Barbara Considine, Spanish Interpreter

22
     COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
23                       Christimacri50@gmail.com
                         Kenneth B. Keating Federal Building
24                       100 State Street, Room 2640
                         Rochester, New York 14614
25
```

2

1                        <u>I N D E X</u>

2    <u>**WITNESS FOR THE GOVERNMENT**</u>

3    William Reichard
         Direct examination by Ms. Kocher          Page   3
4        Cross-examination by Mr. Vacca            Page  79
         Redirect examination by Ms. Kocher        Page  96
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*     \*     \*

**(WHEREUPON**, the defendant is present; the jury is present).

09:05:49AM   <u>**GOVERNMENT'S WITNESS, WILLIAM REICHARD, SWORN**</u>

<u>**DIRECT EXAMINATION**</u>

**THE CLERK:** Please state your name and spell your last name for the record.

**THE WITNESS:** William Reichard, R-E-I-C-H-A-R-D.

09:06:21AM   **THE REPORTER:** Thank you.

**THE COURT:**  You may proceed.

**MS. KOCHER:** Thank you.

**BY MS. KOCHER:**

Q.   Good morning.

09:06:58AM   A.   Good morning.

Q.   Could you please introduce yourself to the jury?

A.   My name is William Reichard, I'm a special agent with the Drug Enforcement Administration.

Q.   How long have you been employed as a special agent with

09:07:10AM   the Drug Enforcement Administration?

A.   Just over 20 years.

Q.   And is the Drug Enforcement Administration commonly referred to as DEA?

A.   Correct.

09:07:19AM   Q.   What are some of your duties as a special agent with the

1  DEA?

2  A.   Conduct controlled substance investigations, basically

3  drug investigations.

4  Q.   And what are some of the things that you do to investigate

09:07:33AM 5  drug crimes?

6  A.   We conduct surveillance, we interview confidential

7  sources, we listen to wiretaps.

8  Q.   Okay. Can you describe some your training to become a

9  special agent?

09:07:49AM 10  A.   Spend four months at the DEA academy in Quantico,

11  Virginia.   Learn about conducting surveillance, drug

12  identification, legal training, firearms training, physical

13  fitness training.

14  Q.   Okay.  Now, you mentioned training in drug identification.

09:08:04AM 15  Can you explain what some of that training was?

16  A.   Just training on identifying specific drugs that we'll see

17  on the street such as cocaine, heroin, marijuana.

18  Q.   Okay. With regards to cocaine, what are some of the common

19  characteristics of cocaine?

09:08:20AM 20  A.   It comes in different forms: White, can be chunky; comes

21  in to the U.S. or into Rochester usually in bulk form, like

22  kilogram quantities.

23  Q.   Okay.  Have you had a chance to see cocaine as a part of

24  your job?

09:08:37AM 25  A.   Yes.

1  Q.    About how many times?

2  A.    Well over 50, probably closer to 100.

3  Q.    Just cocaine in general?

4  A.    I mean, I've seen.

09:08:51AM 5  Q.    In 20 years?

6  A.    I've seen a lot of other substances as well, yes.

7  Q.    Have you had a chance to conduct field tests on cocaine?

8  A.    Yes.

9       **MR. VACCA:** I'd object, Your Honor, we've been

09:09:02AM 10  through this multiple times already with various witnesses.

11       **THE COURT:** Not this witness.

12       **MR. VACCA:** Understand that, Your Honor.

13       **THE COURT:** Go ahead.

14       **MS. KOCHER:** Thank you.

09:09:08AM 15  **BY MS. KOCHER:**

16  Q.    Now, Special Agent Reichard, I'd like to direct your

17  attention back to September of 2017 and moving forward from

18  then.  Were you still working as a special agent with the DEA?

19  A.    Yes.

09:09:22AM 20  Q.    And were you assigned to a particular -- to assist with a

21  certain investigation?

22  A.    Yes.

23  Q.    What investigation was that?

24  A.    Investigation targeting Javier Figueroa and others.

09:09:34AM 25  Q.    Now, do you see Javier Figueroa in the courtroom?

A.    Yes.

Q.    Could you please identify him by an article of clothing he's wearing?

A.    Sitting at the defense table with a white shirt on.

09:09:46AM            MS. KOCHER: Your Honor, could you let the record reflect the witness has identified the defendant?

            THE COURT: Can you be a little more specific? There's a bunch of people with white shirts.

            THE WITNESS: White shirt with a blue mask on, 09:09:58AM headset.

            THE COURT: Okay, yes, the record will note the identification of the defendant Carlos Figueroa.

BY MS. KOCHER:

Q.    Who were some of the other individuals that you were 09:10:10AM investigating?

A.    Roberto Figueroa, Leitscha Poncedeleon, Nisharya Gutierrez.

Q.    If I could show you what's been received into evidence as Government's Exhibit 26.  Now, do you see any of the people 09:10:31AM that you just mentioned on this exhibit?

A.    I do, yes.

Q.    Okay. If you wouldn't mind pointing them out?  If you hit the monitor it will actually make a mark.

A.    Okay.  That's Javier Figueroa.

09:10:46AM Q.    Okay. Let me -- we'll go one at a time here.  You made a

1  mark on the top photograph for Javier Figueroa?

2  A.   Yes.

3  Q.   Now, you also just made a mark on the row beneath that,

4  the second row, the female in the left hand photo.  Who is

09:11:02AM 5  that?

6  A.   Leitscha Poncedeleon.

7  Q.   Okay. And who else do you recognize?

8  A.   Next to her is Roberto Figueroa.

9  Q.   Okay. You made a mark on the photo just to the right of

09:11:13AM 10  Ms. Poncedeleon?

11  A.   Yes.

12  Q.   Okay. Now, what were some of the ways that you assisted

13  with this investigation?

14  A.   Conducted surveillance, reviewed calls, watched camera,

09:11:30AM 15  talked regularly with the case agents.

16  Q.   And, Special Agent Reichard, you also mentioned one other

17  name of somebody that was involved in the investigation.  I'd

18  like to show you what's also been received into evidence as

19  Government's Exhibit 48.  If you wouldn't mind hitting that

09:11:54AM 20  clear button in the upper right corner?  That will remove your

21  marks at the bottom of that menu.  Great, thank you.

22         Do you recognize the individual depicted in

23  Government's Exhibit 48?

24  A.   I do, yes.

09:12:14AM 25  Q.   And who is that?

1   A.    Nisharya Gutierrez.

2   Q.    All right. Now, you mentioned there were several things

3   that you did to assist with the investigation, correct?

4   A.    Yes.

09:12:28AM 5   Q.    Did you have a confidential informant that you were

6   working with at that time?

7   A.    Yes.

8   Q.    And did you use that confidential informant to assist in

9   the investigation?

09:12:41AM 10   A.    Yes.

11   Q.    How did you do that?

12   A.    We used him to make controlled purchases from Roberto

13   Figueroa.

14   Q.    Okay. What is a controlled purchase?

09:12:50AM 15   A.    A controlled purchase is -- it's basically a buy we make

16   with one of our confidential informants.  We meet with him

17   before, talk about what we want to do, usually has a recording

18   device on him and then we give him money to actually go

19   purchase drugs from targets of investigations.

09:13:10AM 20   Q.    Do you also search the confidential informant before

21   conducting the controlled purchase?

22   A.    Yes.

23   Q.    And why is that?

24   A.    Search them before just to make sure -- search him or her

09:13:23AM 25   and their vehicle to make sure that they don't have any

1  illegal items on them or their vehicle so when they come back

2  we know that whatever they acquired was from the target.

3  Q.   Okay. And what type of narcotic was the controlled -- the

4  confidential informant purchasing from Roberto Figueroa?

09:13:45AM 5  A.   Cocaine.

6  Q.   How many controlled purchases did you use the confidential

7  informant for?

8  A.   Five.

9  Q.   Was that five purchases or five separate days?

09:13:59AM10  A.   Five separate days.

11  Q.   How many purchases were there?

12  A.   Six purchases total.

13  Q.   And how often did the controlled purchases occur?

14  A.   Monthly.

09:14:10AM15  Q.   So starting in September?

16  A.   Yes.

17  Q.   Was that the first one?

18  A.   Yes.

19  Q.   Okay. And what amounts of cocaine did the confidential

09:14:20AM20  informant purchase from Roberto Figueroa?

21  A.   Either 31 gram or 62 gram quantities.

22  Q.   Now, Special Agent, ask you to take a look to the left on

23  the floor there and see if you can see what's been marked as

24  Exhibits 327 through and including 332.

09:14:46AM25  A.   Yes.

1    Q.    Okay. Could you take a look at those items and let me know

2    if you recognize them?

3    A.    Yes, I do recognize them.

4    Q.    Okay. What do you recognize them to be?

09:14:55AM 5    A.    These are the amounts of cocaine we purchased on the

6    street from Roberto Figueroa.

7    Q.    Okay. If you don't mind picking those up?  Are all of

8    those in DEA exhibit bags?

9    A.    No.

09:15:17AM 10    Q.    How many of them -- are any of them in DEA evidence bags?

11    A.    Two.

12    Q.    And why were those two placed in DEA evidence bags?

13    A.    It was a joint case we were working with the city and ATF

14    task force.  These two instances we paid for the drugs from

09:15:37AM 15    our funds, so in this case we seize them, we send them to our

16    laboratory for analysis.

17    Q.    Which exhibits are the ones that are in the DEA evidence

18    bags?

19    A.    327 and 329.

09:15:50AM 20    Q.    And what was the date of those two controlled purchases?

21    A.    September 20, 2017, and November 20th, 2017.

22    Q.    Is Exhibit -- which date does Exhibit 327 correspond with?

23    A.    327 corresponds to September 20th, 2017.

24    Q.    Okay. And Exhibit 329 is for November 20th, 2017?

09:16:23AM 25    A.    Correct.

1  Q.    Okay. You mentioned that your confidential informant was

2  buying either 31 gram amount of cocaine or 62 gram amount of

3  cocaine?

4  A.    Correct.

09:16:39AM 5  Q.    And do those exhibits contain those amounts of cocaine?

6  A.    Yes.

7  Q.    Now, you also mentioned that you conducted surveillance

8  during this investigation?

9  A.    Yes.

09:16:55AM 10  Q.    I'd like to direct your attention to January 25th of 2018.

11  Were you assigned to conduct surveillance that day?

12  A.    Yes.

13  Q.    What area were you conducting surveillance on?

14  A.    In the area of 292 Barrington Street.

09:17:11AM 15  Q.    I'd like to show you what's been received into evidence as

16  Government's Exhibit 70.  Do you recognize this location?

17  A.    Yes.

18  Q.    And what is it?

19  A.    That's 292 Barrington Street.

09:17:23AM 20  Q.    And were you at that location at approximately noon that

21  day?

22  A.    Yes.

23  Q.    Now, when you were conducting surveillance on this house

24  were you parked in the driveway?

09:17:40AM 25  A.    No.

1  Q.    Why not?

2  A.    Because as long as -- it's one of our tougher tasks.  You

3  know, we're looking at these people for awhile and a lot of

4  these people are also looking for us, so you try to stay kind

09:17:55AM 5  of as far away as you can during different times.

6  Q.    Okay. Now, were you also aware that there was a pole

7  camera up on this location?

8  A.    Yes.

9  Q.    Okay. Now, did you end up conducting surveillance on any

09:18:08AM 10  particular individuals on January 25th, 2018?

11  A.    Yes.

12  Q.    And who was that?

13  A.    Javier Figueroa, Roberto Figueroa, Leitscha Poncedeleon,

14  and Nisharya Gutierrez.

09:18:26AM 15  Q.    All right. And where did you conduct the surveillance of

16  those people?

17  A.    Here at the residence and then once they left the

18  residence we followed them.

19  Q.    Where did you follow them to?

09:18:41AM 20  A.    Followed them to the U.S. Post Office on Howard Road in

21  Gates.

22  Q.    Do you recall what vehicle the defendant was in?

23  A.    Gray full size pick-up.

24  Q.    And you also mentioned Ms. Poncedeleon?

09:19:06AM 25  A.    Yes.

1  Q.   What vehicle was she in?

2  A.   She was in a -- I believe an Altima sedan.

3  Q.   All right. Now, you mentioned there was a pole camera up

4  on this location at the time?

09:19:19AM 5  A.   Yes.

6  Q.   Have you had a chance to review pole camera footage from

7  January 25th, 2018?

8  A.   Yes.

9        MS. KOCHER: Your Honor, at this time I'd ask to

09:19:30AM 10 publish from Exhibit 22, which is the pole camera compilation,

11 the clips for January 25th, 2018, starting at 12:22 hours.

12       MR. VACCA: I'd object, Your Honor, to that.  This

13 is bolstering, there's been multiple views of the pole camera

14 and I just don't see why it's needed.

09:19:52AM 15       THE COURT: Okay, thank you.  Objection is

16 overruled.  You may proceed.

17 BY MS. KOCHER:

18 Q.   All right. Special Agent Reichard, could you -- if you hit

19 that arrow in the upper right corner it will hide the menu.

09:20:14AM 20 You're close.  Great, thank you.

21       So we've pulled up the first clip where the time

22 stamp is 12:22:09 p.m. on January 25th, 2018.  Do you

23 recognize the location that we're looking at here?

24 A.   Yes.

09:20:33AM 25 Q.   And what location is that?

1  A.    292 Barrington Street.

2  Q.    Do you recognize either of the vehicles in the driveway?

3  A.    Yes.

4  Q.    What vehicles?

09:20:43AM 5  A.    The pick-up truck was the one normally driven by Javier,

6  and the sedan is one normally driven by Leitscha.

7  Q.    And in this frame the Altima sedan is closer to the

8  garage?

9  A.    Correct.

09:21:05AM 10            THE JUROR: Your Honor, I apologize for interrupting

11  the Court.

12            THE COURT: You need a break?

13            THE JUROR: Is there a way to get rid of the

14  courtroom scene on the monitor so that we can see the full

09:21:16AM 15  picture?

16            THE COURT: Get rid of the what?  I'm sorry?

17            THE JUROR: On the juror monitors we -- it's divided

18  into on one-half we're viewing the court proceeding and on

19  one-half we're reviewing the actual exhibit.

09:21:37AM 20            THE COURT: Has that been occurring throughout the

21  trial?

22            THE JUROR: Today.

23            THE COURT: Just today?  Okay, thank you.  That

24  should not be --

09:21:46AM 25            THE JUROR: Not a problem.

1        THE COURT: I appreciate you pointing that out.

2   Last thing you want to do is watch me all day.

3        THE JUROR: Not that you're not worth watching, Your

4   Honor.

09:22:17AM 5        THE CLERK:  Judge, I can't fix that.  I'll have to

6   call IT.

7        THE COURT: Let's take a short recess to fix that.

8   The jury may step down at this time.  Please do not discuss

9   the matter or allow anybody to discuss the matter with you.

09:22:27AM 10        (**WHEREUPON**, there was a pause in the proceeding).

11        (**WHEREUPON**, the defendant is present).

12        THE COURT: Bring the jury back.

13        (**WHEREUPON**, the jury is present).

14        THE COURT:  You may proceed.

09:37:08AM 15        MS. KOCHER: Thank you.

16   **BY MS. KOCHER:**

17   Q.   All right. Now, we have Government's Exhibit 22, the clip,

18   starting at 12:22 on January 25th, 2018 pulled up here.

19   Special Agent Reichard, you identified the vehicles in the

09:37:26AM 20   driveway before the jury had a full screen.  Could you please

21   identify them again?

22   A.   Yes.  The pick-up truck normally driven by Javier

23   Figueroa.  The sedan vehicle normally driven by Leitscha

24   Poncedeleon.

09:37:42AM 25   Q.   Okay. And are those two vehicles that you conducted

1  physical surveillance on later in the afternoon?

2  A.   Yes.

3  Q.   Now, if we could play this clip starting at 12:22:09 p.m.?

4  If we can pause it?  Now, we've paused it at about 12:22:26

09:38:18AM 5  p.m.  Special Agent Reichard, can you describe what we saw in

6  that brief clip?

7  A.   Three different individuals walking out of the residence,

8  two of them carrying boxes.

9  Q.   And those appear to be larger size boxes?

09:38:35AM 10  A.   Yes.

11  Q.   Okay. If we could let the video continue to play?  If we

12  can pause?  Actually, I'm sorry, could we let that play again?

13  If we can pause the clip now at time stamp 12:23:11 p.m.

14         What happened in that next portion of the clip?

09:39:34AM 15  A.   They walked back in the residence.

16  Q.   Okay. All three individuals?

17  A.   Yes.

18  Q.   And could you tell if the people are male or female?

19  A.   Two males and a female.

09:39:44AM 20  Q.   What did they do before walking back into the home?

21  A.   You mean in the video?  They put the boxes -- two of them

22  put the boxes in the truck, closed up the truck and walked

23  back in the house.

24  Q.   All right. Those were males on the video?

09:40:02AM 25  A.   Yes.

```
 1  Q.   Now, if we could go back to about 40 seconds into the
 2  clip?  And pause here.  Special Agent Reichard, you were
 3  involved in this investigation for several months?
 4  A.   Yes.
 5  Q.   And did you have the chance to see some of the targets of
 6  the investigation in person?
 7  A.   Yes.
 8  Q.   Did that include the defendant Carlos Javier Figueroa?
 9  A.   Yes.
10  Q.   Did you also have the chance to conduct video or see him
11  on pole camera footage or other surveillance footage --
12  A.   Yes.
13  Q.   -- during the investigation?
14  A.   Yes.
15  Q.   About how many times do you think you'd seen him in person
16  or on video during the investigation?
17  A.   More than ten, probably at least 15, 20 times.
18  Q.   And how about Roberto Figueroa?  Had you also had the
19  chance to see that individual in person?
20  A.   Yes.
21  Q.   And on surveillance footage?
22  A.   Yes.
23  Q.   About how many times?
24  A.   Probably about the same, 15, 20 times.
25  Q.   Okay. Now, Nisharya Gutierrez, did you also have the
```

09:40:21AM 5
09:40:31AM 10
09:40:41AM 15
09:40:59AM 20
09:41:09AM 25

1  chance to see her in person and on video surveillance footage

2  during the course of the investigation?

3  A.   Yes.

4  Q.   About how many times?

09:41:21AM 5  A.   Eight to ten times.

6  Q.   If we could let this play out a little bit longer.  And

7  pause again we've paused it at 12:22:51 p.m.  There appear to

8  be two individuals that you can see in this clip; is that

9  correct?

09:41:36AM 10  A.   Yes.

11  Q.   And do you recognize either of those individuals?

12  A.   Yes.

13  Q.   Who do you recognize them to be?

14  A.   The subject with his back to us carrying the box on his

09:41:46AM 15  shoulder is Roberto Figueroa.  The other subject standing at

16  the open door is Javier Figueroa.

17  Q.   Okay. Can you describe what they're wearing in the clip?

18  A.   Roberto is wearing a white tank top, red shorts.  Javier

19  is wearing dark colored pants and a dark colored sweatshirt.

09:42:08AM 20  Q.   If we could let the video play?  We've stopped it at

21  12:22:57 p.m.  Are you able to see the female in this screen

22  shot?

23  A.   Yes.

24  Q.   And do you recognize her?

09:42:28AM 25  A.   Yes.

```
 1  Q.    Who is that person?
 2  A.    Nisharya Gutierrez.
 3  Q.    And where is she in the freeze frame here?
 4  A.    At the rear of the truck.
 5  Q.    Okay. Can you describe what she's wearing?
 6  A.    Long sleeve flannel shirt and blue jeans.
 7  Q.    Okay. And if we could let this play?  Pause the clip
 8  please.  We've stopped it at 12:23:54 p.m.  At this point have
 9  Nisharya, the defendant, and Roberto Figueroa all gone into
10  the home?
11  A.    Yes.
12  Q.    I'd like to next show you the clip from January 25th,
13  2018, that is at 12:40 p.m. and this is again off of
14  Exhibit 22.  All right, if we could pause it -- I'm sorry, we
15  can let it play.  If we can pause it.  We've stopped the clip
16  at 12:41:30 p.m.  What are we looking at here, Special Agent
17  Reichard?
18  A.    Javier Figueroa just walked out of the residence.
19  Q.    Okay. And when you say the residence, that's 292
20  Barrington Street?
21  A.    Yes.
22  Q.    Is the camera zoomed in on the front door at this point?
23  A.    Yes.
24  Q.    Okay. And you're able to see his face?
25  A.    Yes.
```

09:42:37AM (line 5)
09:43:51AM (line 10)
09:44:16AM (line 15)
09:45:08AM (line 20)
09:45:15AM (line 25)

1  Q.   Okay. If we could continue to play the video?  If we could

2  pause it?  We've stopped it at 12:41:58 p.m.  Can you describe

3  what we watched in that brief clip?

4  A.   Up until this point?

09:45:58AM 5  Q.   Yes.

6  A.   Okay.  We watched Javier Figueroa walk out of the

7  residence, presumably somewhere over near the vehicle.

8  Q.   Were you able to see him get into the vehicle?

9  A.   I didn't -- I didn't catch that part.

09:46:12AM 10  Q.   If we could go back about 15 or 20 seconds?  We're

11  starting at 12:41:36 p.m.  We've paused the video at 12:41:55

12  p.m.  Special Agent Reichard, those two vehicles that you

13  described earlier, the gray truck and the Altima sedan,

14  they're still in the driveway?

09:47:00AM 15  A.   Yes.

16  Q.   It appears that the front passenger door is open on the

17  truck?

18  A.   Correct.

19  Q.   Okay.  We'll let the video play starting at 12:41:55 p.m.

09:47:15AM 20  If we could pause it?  We've paused it at 12:42:00 p.m.  Did

21  you see anybody get into the truck at that point?

22  A.   Yes.

23  Q.   And who was that?

24  A.   Javier Figueroa into the driver's seat of the truck.

09:47:30AM 25  Q.   Okay. Now, also in this freeze frame at 12:42:00 p.m. do

1   you see anybody else?

2   A.   Yes, I see Nisharya Gutierrez walking toward the truck.

3   Q.   Okay. If we could let it play?  If we could pause?  We've

4   stopped it at 12:42:33 p.m..  What happened in the clip we

09:48:22AM 5   just watched there?

6   A.   Nisharya Gutierrez got in the passenger seat of the truck.

7   Q.   Okay. It appears she's closing the door?

8   A.   Yes.

9   Q.   All right. And play, please.  Pause the clip please.

09:49:05AM10   We've paused at 12:43:03 p.m..  Special Agent Reichard, you

11   mentioned that Leitscha Poncedeleon was one of the individuals

12   involved in this investigation?

13   A.   Yes.

14   Q.   Had you had the chance to see her in person and on camera

09:49:20AM15   footage before January 28th -- I'm sorry, January 25th, 2018?

16   A.   Yes.

17   Q.   About how many times?

18   A.   At least ten.

19   Q.   Okay. And do you see individuals in this freeze frame at

09:49:33AM20   12:43:03 p.m.?

21   A.   Yes.

22   Q.   Who do you see in this clip?

23   A.   Leitscha Poncedeleon and a young child.

24   Q.   Would you mind circling which individual is

09:49:46AM25   Ms. Poncedeleon?  You've circled the female to the left of the

1  screen in a white jacket?

2  A.   Yes.

3  Q.   Okay. If you could clear your mark?  I think you have to

4  hit that little arrow for the menu to pop back up.  Thank you.

09:50:13AM 5          And she is the individual that you identified as

6  typically driving the gray Altima that was in the driveway?

7  A.   Yes.

8  Q.   If we could play, please?  We've paused the video at

9  12:43:53 p.m..  Special Agent Reichard, what's happening in

09:51:20AM 10  this freeze frame?

11  A.   The pick up is backing out of the driveway.

12  Q.   All right. And that's at about 12:43:53 p.m.?

13  A.   Yes.

14  Q.   If we could continue to play?  If we could stop the clip?

09:53:28AM 15  We've paused it at 12:45:46 p.m.  Special Agent Reichard, what

16  is occurring at this moment?

17  A.   Leitscha Poncedeleon got in the driver's seat of the

18  Altima and it's leaving the residence.

19  Q.   Okay. And who is in the car with her?

09:53:45AM 20  A.   The young child.

21  Q.   Okay. If we could hit play?  All right, now after the gray

22  pick-up truck left 292 Barrington Street what did you do?

23  A.   We followed it.

24  Q.   Did you in particular follow it?

09:54:13AM 25  A.   Yes.

```
 1   Q.   You were part -- when you say we, who else?
 2   A.   The surveillance team.
 3   Q.   Were you in a marked vehicle?
 4   A.   No.
 5   Q.   Unmarked car?
 6   A.   Yes.
 7   Q.   In plain clothes?
 8   A.   Yes.
 9   Q.   Was there anyone else in the car with you?
10   A.   No.
11   Q.   Okay. So there were other officers also in unmarked cars
12   assisting with the surveillance?
13   A.   Yes.
14   Q.   Okay. Where did you pick up following the pick-up truck?
15   A.   I was in the area of Canterbury Street and Monroe Avenue
16   near the residence.
17   Q.   And who was in that pick-up truck?
18   A.   Javier Figueroa and Nisharya Gutierrez.
19   Q.   And the defendant was operating the truck?
20   A.   Yes.
21   Q.   Where did the truck go after you began your physical
22   surveillance?
23   A.   To the U.S. Post Office on Howard Road in Gates.
24   Q.   And what was the general route it took to get there?
25   A.   490 West through the city.
```

09:54:22AM (line 5)
09:54:30AM (line 10)
09:54:42AM (line 15)
09:54:59AM (line 20)
09:55:15AM (line 25)

1   Q.   Now, I'd like to show you what's been received into

2   evidence as Government's Exhibit 109.   Do you recognize this

3   location?

4   A.   Yes.

09:55:27AM 5   Q.   What is that?

6   A.   The U.S. Post Office on Howard Road in Gates.

7   Q.   And is this the post office you followed the pick-up truck

8   to?

9   A.   Yes.

09:55:37AM 10   Q.   What happened when the pick up arrived at the post office?

11   A.   The -- it eventually -- the Altima also showed up at the

12   post office and the females removed boxes from the truck.

13   Q.   And where did they go with the boxes?

14   A.   Into the post office.

09:56:00AM 15   Q.   Do you recall about what time the pick-up truck arrived at

16   the post office on Howard Road?

17   A.   Approximately 12:57 p.m..

18   Q.   Okay. And about how long was it at the post office?

19   A.   I think around -- it was around eight minutes.  It was

09:56:19AM 20   less than ten minutes.

21   Q.   Do you know what time it left?

22   A.   It left I think approximately 1:05 p.m..

23   Q.   Okay. Now, Special Agent Reichard, there should be a hard

24   copy of this exhibit in front of you on the ledge there with a

09:56:32AM 25   pen?

1   A.   Yes.

2   Q.   Would you mind writing those times down in the lower left

3   corner with your initials the time that the truck arrived and

4   the time that it left?  Could you tell us what marks you made

09:56:55AM 5   on the page there?

6   A.   12:57 p.m. with my initials, 1:05 p.m. with my initials.

7            **MS. KOCHER:** Your Honor, at the end of the day we

8   will upload the exhibit with Special Agent Reichard's initials

9   into the Trial Director.

09:57:12AM 10           **THE COURT:** Thank you.

11  **BY MS. KOCHER:**

12  Q.   All right, Special Agent Reichard, I'd like to now show

13  you what's been received into evidence as Government's Exhibit

14  365, a Postal video.  If we can fast forward this clip to

09:57:48AM 15  about 1 minute and 5 seconds in?

16           Special Agent Reichard, do you recognize what we're

17  looking at here?

18  A.   Yes.

19  Q.   What is it?

09:58:05AM 20  A.   In the top right picture two females, the first one is

21  Nisharya Gutierrez, walking in with a large box; the second

22  one is Leitscha Poncedeleon with a large box and a young

23  child.

24  Q.   And what is the young child wearing?

09:58:25AM 25  A.   Looks like a winter coat and like pink hat.

1   Q.   If you wouldn't mind circling the individual you just

2   identified as Nisharya Gutierrez, please?  So you've circled

3   the individual in the upper right camera angle who is wearing

4   the flannel shirt?

09:58:50AM 5   A.   Yes.

6   Q.   And do you recognize what location this video is from?

7   A.   From the U.S. Post Office on Howard Road.

8   Q.   Okay.  This is interior footage of that post office?

9   A.   Yes.

09:59:05AM 10   Q.   Do you see that same individual that you just identified

11   as Nisharya Gutierrez in any other camera angles?

12   A.   Yes, bottom right.

13   Q.   Okay. Could you please circle her in that second angle?

14   A.   Yes.

09:59:19AM 15   Q.   You've placed a second circle in the lower right corner of

16   the screen again around an individual wearing the plaid shirt?

17   A.   Yes.

18   Q.   And carrying a large box?

19   A.   Yes.

09:59:30AM 20   Q.   Now, could you please place an X where Leitscha

21   Poncedeleon is in this video?

22   A.   Yes.

23   Q.   You've placed an X in the upper right camera angle over

24   the female carrying a large box in a white jacket?

09:59:53AM 25   A.   Yes.

1   Q.    Thank you.  If you could please clear your marks?  Now,

2   Special Agent Reichard, you indicated that the pick-up truck

3   arrived at the post office at about 12:57 p.m.; is that

4   correct?

10:00:08AM 5   A.    Yes.

6   Q.    Do you see the time stamp on this video as 14:03:06?

7   A.    Yes.

8   Q.    Okay. Does that appear to be an accurate time stamp?

9   A.    No.

10:00:20AM 10   Q.    About how far off would that time stamp be based upon the

11   surveillance you conducted that day?

12   A.    Approximately one hour.

13   Q.    That would be one hour ahead?

14   A.    Yes.

10:00:37AM 15   Q.    All right. If we could please let the clip play starting

16   at the time stamp 14:03:06.  If we can pause the clip here?

17   Special Agent Reichard, we've paused it about 2 minutes and 11

18   seconds into the video.  Can you describe what Ms. Poncedeleon

19   and Nisharya Gutierrez were doing in the second set we just

10:02:03AM 20   watched?

21          **MR. VACCA:** Objection, Your Honor.

22          **THE COURT:** Overruled.  Go ahead.

23          **THE WITNESS:** Looks -- in the top left photo, like

24   they were up toward the counter getting ready to ship them

10:02:20AM 25   out.

1          **MR. VACCA:** Objection.

2          **THE COURT:** Overruled.  Answer will stand.

3  BY MS. KOCHER:

4  Q.   Look at that lower left camera angle, it's delineated as

10:02:27AM 5  camera 3.  Can you see either of those individuals in that

6  camera angle?  We can let it play if that would help.

7  A.   Yes, on the top of it.

8  Q.   If we can pause?  We've paused it 2 minutes and 24 seconds

9  into the clip.  Referring to camera 3, which is the angle in

10:02:58AM 10  the lower left corner, where do you see the individuals that

11  you previously identified as either Leitscha Poncedeleon or

12  Nisharya Gutierrez?

13  A.   At the counter.

14  Q.   Okay. Could you make a circle around the general area?

10:03:18AM 15  All right, you've placed a circle in the upper center portion

16  of camera angle 3; is that correct?

17  A.   Yes.

18  Q.   Can you also see the two large boxes that they carried in

19  in that freeze frame?

10:03:30AM 20  A.   Yes.

21  Q.   And are they within the circle that you just made?

22  A.   Yes.

23  Q.   Okay. If you could clear your marks, please?  And if we

24  could play?  If we can please pause?  We've stopped the video

10:04:02AM 25  at about 2 minutes and 43 seconds into the clip.  Can you

1 | explain what we just watched there?

2 | A.    I just saw Nisharya walk out from the screen, the lower

3 | right.

4 | Q.    And do you see her in any of the camera angles at this

10:04:21AM 5 | freeze frame?

6 | A.    Yes, also the top right walking out.

7 | Q.    And that's the same door that the two came into?

8 | A.    Yes.

9 | Q.    Okay. If we could let that play?  Now, we've paused the

10:04:46AM 10 | video at 2 minutes and 53 seconds in.  At this point has

11 | Ms. Gutierrez left the post office?

12 | A.    Yes.

13 | Q.    And Ms. Poncedeleon is still inside?

14 | A.    Yes.

10:04:59AM 15 | Q.    Where is she?

16 | A.    She's still at the counter.

17 | Q.    That's that same counter that is captured on camera 3 in

18 | the lower left corner?

19 | A.    Yes.

10:05:10AM 20 | Q.    Okay. If we could fast forward to about 11 minutes and 25

21 | seconds into the clip?  If we could play?  Actually, I'm

22 | sorry, if we could go back to about 11 minutes in?  So we're

23 | starting the clip at 11 minutes in.  All right, we've paused

24 | it at 11 minutes and 10 seconds in.

10:06:02AM 25 |          Special Agent Reichard, do you see Ms. Poncedeleon

1 | in this clip?

2 | A.   I don't.

3 | Q.   I'll let this play.  We've paused it at 11 minutes and 22

4 | seconds.  Do you see her here?

10:06:26AM 5 | A.   I do.

6 | Q.   Where is she?

7 | A.   Top left.

8 | Q.   That would be camera angle 1?

9 | A.   Yes.

10:06:33AM 10 | Q.   Also see the little girl with the purple jacket on?

11 | A.   Yes.

12 | Q.   Are you able to see them in camera angle 3, the lower left

13 | where the counter was?

14 | A.   Yes.

10:06:47AM 15 | Q.   And where are they?

16 | A.   The top part.

17 | Q.   Okay. Could you please make a mark where Ms. Poncedeleon

18 | and the child are?  You've circled the upper -- at the very

19 | top in the middle of camera angle 3?

10:07:04AM 20 | A.   Yes.

21 | Q.   Okay. If you could clear your mark, please?  So at this

22 | point 11 minutes and 22 seconds into the video clip is

23 | Ms. Poncedeleon walking away from the counter she had been at?

24 | A.   Yes.

10:07:18AM 25 | Q.   Okay. If we could let it play?  We've paused it at 11

1 minutes and 33 seconds into the clip.  The time stamp is

2 14:13:35.  What are we looking at here?

3 A.   Ms. Poncedeleon and the young child are leaving the post

4 office.

10:07:45AM 5 Q.   And did Ms. Poncedeleon appear to have anything in her

6 hand as she was walked out?

7 A.   I didn't notice anything in her hand.

8 Q.   If we could go back just about 10 seconds?  We've paused

9 it at about 11 minutes and 28 seconds into the clip.  Does she

10:08:12AM 10 appear to be holding anything?

11 A.   Something, maybe a receipt.

12 Q.   Okay. And if we could let it play?  If we could pause it?

13 We've stopped it 11 minutes and 42 seconds into the clip.  At

14 this point has Ms. Poncedeleon left the post office with the

10:08:38AM 15 child?

16 A.   Yes.

17 Q.   Now, Special Agent Reichard, the two females you just

18 identified as Leitscha Poncedeleon and Nisharya Gutierrez on

19 the Postal camera footage, are those the same individuals that

10:08:55AM 20 we just observed on the camera footage from 292 Barrington

21 Street?

22 A.   Yes.

23 Q.   Do you know what happened to those two packages that

24 Ms. Poncedeleon and Ms. Gutierrez took to the post office on

10:09:14AM 25 Howard Road that day?

1  A.    Yes, they were seized by the U.S. Postal Service.

2  Q.    And were you there when those packages were searched by

3  Postal?

4  A.    Yes.

10:09:26AM 5  Q.    Okay. I'd like to show you what's been received into

6  evidence as Exhibit 346.  Do you recognize what's depicted in

7  this photograph?

8  A.    Yes.

9  Q.    What is this?

10:09:43AM 10  A.    Postal box.

11  Q.    Okay. And is this one of those packages that was seized on

12  January 25th, 2018 that Ms. Gutierrez and Ms. Poncedeleon had

13  taken to the Howard Road post office?

14  A.    Yes.

10:09:58AM 15  Q.    Could you describe the shipping address or who this

16  package was addressed to?

17  A.    Package was addressed to Freddie Silva, Calle Wilson F-8,

18  Parcelas Castillo, Mayaguez, PR, short for Puerto Rico, 00680.

19  Q.    And what is the return address?

10:10:27AM 20  A.    Alexis Torres, 229 Rugby Avenue, Rochester, New York

21  14619.

22  Q.    Does there also appear to be a tracking number on this

23  package?

24  A.    Yes.

10:10:40AM 25  Q.    If we could zoom in on the Postal sticker?  Special Agent

1  Reichard, what was the tracking number associated with this

2  package?

3  A.   9505 5134 3123 8025 1837 72.

4  Q.   Thank you. If we could go to Exhibit 360?  Is this a

10:11:18AM 5  photograph of the other package that was dropped off at the

6  post office by Ms. Gutierrez and Ms. Poncedeleon?

7  A.   Yes.

8  Q.   Okay. What is the mailing address on this package?

9  A.   Being sent to Freddie Silva, Calle Wilson F-8, Parcelas

10:11:38AM 10  Castillo, Mayaguez, PR, short for Puerto Rico, 00680.

11  Q.   Okay. Is that the same mailing address we just viewed in

12  Exhibit 346?

13  A.   Yes.

14  Q.   Okay. Does this package also have a tracking number

10:11:57AM 15  assigned to it?

16  A.   Yes.

17  Q.   We're zooming in on the Postal sticker on that package.

18  What was the tracking number on this package?

19  A.   9050 5134 3123 8025 1837 89.

10:12:17AM 20  Q.   Special Agent Reichard, in working with the DEA do you

21  often work with the Postal Service?

22  A.   Yes.

23  Q.   And why is that?

24  A.   There's a lot of contraband, drugs shipped through the

10:12:38AM 25  mail and also drug proceeds, currency that's shipped back to

1 | the source.

2 | Q.   Okay. About how many Postal investigations do you think

3 | you've assisted with during your 20 years as a DEA agent?

4 | A.   50 to 100; several.

10:12:55AM 5 | Q.   Have you -- in those cases that you've worked on are there

6 | certain common traits that you see in the Postal packages that

7 | contain drugs or drug proceeds being sent via the mail?

8 | A.   Yes.

9 | Q.   What are some of those techniques that you've seen?

10:13:18AM 10 | A.   They pay high postage, usually send it priority mail,

11 | they're trying to get it to the location as soon as possible.

12 | **MR. VACCA:** Objection, Your Honor.

13 | **THE COURT:** Overruled.

14 | **BY MS. KOCHER:**

10:13:28AM 15 | Q.   Are there any other techniques that drug dealers use when

16 | they ship narcotics or proceeds?

17 | A.   They like to conceal them.  They will use legitimate items

18 | in there and then conceal them within.

19 | Q.   Are there generally certain people that the drug dealers

10:13:48AM 20 | will use to mail packages that contain drugs or proceeds?

21 | A.   They will use their workers or significant others.

22 | Q.   And when you say significant others, what do you mean?

23 | A.   They could use a wife or a girlfriend.

24 | Q.   Why is that?

10:14:08AM 25 | A.   They're trying to -- they know that these places have

1 | cameras.

2 |       **MR. VACCA:** Objection, Your Honor.

3 |       **THE COURT:** Yes, sustained.

4 | **BY MS. KOCHER:**

10:14:20AM 5 | Q.   Now, you were there when these packages were opened?

6 | A.   Yes.

7 | Q.   And what was contained in the packages?

8 | A.   One of the packages had money that was --

9 |       **MR. VACCA:** Objection, Your Honor.  He ought to

10:14:36AM 10 | indicate which package he's talking about.  There's two

11 | packages.

12 |       **THE COURT:** He said one of them.  You can describe

13 | it further, but at this point the objection is overruled.  You

14 | may proceed.

10:14:52AM 15 |       **THE WITNESS:** One of the packages had money that was

16 | concealed within.

17 | **BY MS. KOCHER:**

18 | Q.   Do you know how much money?

19 | A.   $10,010.

10:15:00AM 20 | Q.   And how about the second package?

21 | A.   Second package had packaging materials, I believe carbon

22 | paper and I think it was bags.

23 | Q.   All right. If we could go to Exhibit 353 that's been

24 | received into evidence.  Special Agent Reichard, do you

10:15:26AM 25 | recognize what's in this photograph?

1  A.    Yes.

2  Q.    What is it?

3  A.    A large sum of currency, the $10,000 cash, $10,010 cash.

4  Q.    And that came out of one of the Postal packages that was

10:15:39AM 5  seized on January 25th, 2018?

6  A.    Yes.

7  Q.    Okay. And if we could go to Exhibit 363?  What is this a

8  photo of?

9  A.    FoodSaver bags, boxes, seven boxes.

10:16:00AM 10  Q.    Is that the packaging material that you described as being

11  in the second package that was seized that day?

12  A.    Yes.

13  Q.    Special Agent Reichard, you also indicated that during

14  your time with the DEA you've worked on eavesdropping or wire

10:16:23AM 15  investigations?

16  A.    Yes.

17  Q.    Were you also aware that this investigation involved an

18  eavesdropping warrant?

19  A.    Yes.

10:16:29AM 20  Q.    And that law enforcement had tapped certain phone numbers?

21  A.    Yes.

22             **MS. KOCHER:** Your Honor, at this time I would ask

23  to -- I would offer into evidence and ask to publish to the

24  jury several text messages and data from one phone call.

10:16:52AM 25             The text messages are Exhibit 1-137.  For

1  efficiency sake, is it okay if I leave off the last three

2  numbers of the exhibit and just refer to them as 1-137?

3  **THE COURT:** Sure, go ahead.

4  **MS. KOCHER:** So it would be 1-137, 1-138, 1-142,

10:17:22AM 5  1-143, 1-144, 1-145, 1-146, 1-148, 1-149, 1-150, 1-151, 1-152,

6  1-153, 1-154 and 1-155.  Those are all text messages.

7  **THE COURT:** What was the last one, 155?

8  **MS. KOCHER:** Yes.

9  **THE COURT:** Mr. Vacca?

10:19:53AM 10  **MR. VACCA:** 1-137, Your Honor, objection on grounds

11  of relevance.

12  1-138 again relevance.

13  1-142 --

14  **MS. KOCHER:** Okay.

10:20:33AM 15  **MR. VACCA:** Wait.  1-142, right?

16  **MS. KOCHER:** Yes.

17  **MR. VACCA:** 1-142 again relevance.

18  1-143 again relevance.

19  And with respect to all two --

10:21:01AM 20  **THE COURT:** With respect to what?

21  **MR. VACCA:** With respect to these as well, there's

22  no proper foundation.  1-144 again foundation and relevancy.

23  1-145 again foundation and relevancy.

24  1-146 again foundation and relevancy.

10:21:48AM 25  I believe it's 1-148?

1          **MS. KOCHER:** Yes.

2          **MR. VACCA:** Actually there's a lot of numbers with

3   it, but it's just 1-148-1494, again foundation and relevancy.

4          1-151 --

10:22:21AM 5          **MS. KOCHER:** Also --

6          **MR. VACCA:** 1-149 that's the next one up, right?

7          **MS. KOCHER:** Yes.

8          **THE COURT:** Foundation and relevancy?

9          **MR. VACCA:** 1- --

10:22:43AM 10          **THE COURT:** 150.

11          **MR. VACCA:** 1-150 again foundation and relevancy.

12          1-151 again foundation and relevancy.

13          1-152 again relevancy.

14          1-153 again foundation and relevancy.

10:23:31AM 15          1-154 again foundation and relevancy.

16          1-155 again foundation and relevancy and also

17   immaterial.  I would object to the admission of all of these.

18          **THE COURT:** Ms. Kocher, I can see the relevancy

19   argument being overruled.  What about the foundation argument?

10:24:02AM 20          **MS. KOCHER:** Your Honor, I believe Officer Briganti

21   testified to that that the text messages are data and that he

22   reviewed and compared these transcripts to the data from the

23   SYTECH system and that they were accurate.  I believe

24   Investigator Briganti laid the foundation for these.

10:24:17AM 25          **THE COURT:** Yes, I do have indication that each of

1  these were initialed by Investigator Briganti.  Based upon

2  that the objection is overruled.

3          1-137, 1-138, 1-142, 1-143, 1-144, 1-145, 1-146,

4  1-148, 1-149, 1-150, 1-151, 1-152, 1-153, 1-154, and 1-1533

10:25:04AM 5  will be received.

6          (**WHEREUPON**, Government's Exhibits 1-137, 1-138,

7  1-142, 1-143, 1-144, 1-145, 1-146, 1-148, 1-149, 1-150, 1-151,

8  1-152, 1-153, 1-154 and 1-155 were received into evidence).

9          **MS. KOCHER:** Thank you, Your Honor.  There is one

10:25:08AM 10  other exhibit, it is 1-141 that is a phone call.  I would ask

11  to offer just the data portion from that exhibit.

12          **MR. VACCA:** 1-141?

13          **MS. KOCHER:** Yes.

14          **MR. VACCA:** I would object to that as well, Your

10:25:32AM 15  Honor, grounds of foundation, immaterial, irrelevant.

16          **THE COURT:** 1-141 will be received for the data

17  only.  Objection is overruled.

18          **MS. KOCHER:** Thank you.

19          (**WHEREUPON**, Government's Exhibit 1-141 was received

10:25:53AM 20  into evidence).

21          **MS. KOCHER:** Your Honor, may the jury be permitted

22  to pick up their binders and flip to tab 1-137?

23          **THE COURT:** Yes.

24          **MS. KOCHER:** Thank you.

10:26:02AM 25  **BY MS. KOCHER:**

1  Q.   Special Agent Reichard, you should also have a binder up
2  there marked Exhibit 1.  If you wouldn't mind flipping to tab
3  1-137?
4  A.   All set.
10:27:26AM 5  Q.   All right. Now, Special Agent Reichard, could you please
6  read the date and time of this text message?
7  A.   Date 1/24/2018, 5:19 and 30 seconds p.m..
8  Q.   All right.  So this would have been the day before you
9  conducted your surveillance of the defendant Nisharya
10:27:53AM 10  Gutierrez and Ms. Poncedeleon going to the post office on
11  Howard Road?
12  A.   Yes.
13  Q.   Could you please identify the target number and the
14  incoming text message phone number?
10:28:08AM 15  A.   Target number 585-766-8057.  Incoming text message number
16  787-297-9357.
17  Q.   Now, I'll ask you to take a look at Government's Exhibit
18  10 that should be on your monitor.  Do you see either of those
19  numbers listed on Government's Exhibit 10?
10:28:30AM 20  A.   Yes.
21  Q.   Could you please circle them?  You've circled the very top
22  number, the 766-8057, correct?
23  A.   Yes.
24  Q.   Who is the user associated with that phone number?
10:28:46AM 25  A.   Carlos Javier Figueroa.

1  Q.   Okay. And how about the other phone number with the area

2  code 787?  Do you see that on this as well?

3  A.   Yes.

4  Q.   Could you circle that?  You've circled the number --

10:29:10AM 5  A.   787-297-9357.

6  Q.   And that's in purple font, it is the sixth number from the

7  bottom?

8  A.   Yes.

9  Q.   Who is the user associated with that phone number on

10:29:26AM 10  Government's Exhibit 10?

11  A.   Freddie Silva.

12  Q.   And are there names under Freddie Silva as well?

13  A.   Yes, Tasha/Tacha.

14  Q.   So it's T-A-S-H-A/T-A-C-H-A?

10:29:45AM 15  A.   Yes.

16  Q.   Would you mind reading the content of the text message in

17  Government's Exhibit 1-137?

18  A.   Calle Wilson F-8, Parcelas Castillo, Mayaguez, PR 00680.

19  Q.   Okay. If you wouldn't mind clearing your marks, please, on

10:30:14AM 20  the monitor?  I'd ask you to take a look at Government's

21  Exhibit 346.  Is this a photograph of one of the parcels

22  dropped off by Ms. Gutierrez and Ms. Poncedeleon on January

23  25th, 2018 at the Howard Road post office?

24  A.   Yes.

10:30:41AM 25  Q.   What is the shipping address on this exhibit?

1  A.    Freddie Silva, Calle Wilson F-8, Parcelas Castillo,

2  Mayaguez, PR 00680.

3  Q.    Does that appear to be the same address that is contained

4  in the text message you just read that is marked as

10:31:10AM 5  Exhibit 1-137?

6  A.    Yes.

7  Q.    Now, you identified the target number as 766-8057,

8  correct?

9  A.    Yes.

10:31:24AM 10  Q.    Can you tell us the direction of this text message based

11  upon the data?

12  A.    It is an incoming text message.  He is receiving the

13  text message.

14  Q.    Okay. So Tasha or Freddie Silva, who was identified on

10:31:41AM 15  that Government's Exhibit 10 --

16  A.    Yes.

17  Q.    -- being associated with that phone number, would have

18  texted this address to Carlos Javier Figueroa?

19  A.    Yes.

10:31:49AM 20            **MR. VACCA:** Objection, Your Honor.

21            **THE COURT:** Overruled.

22  **BY MS. KOCHER:**

23  Q.    Now, if we could go to Government's Exhibit 360?  Again is

24  this a photograph of that second parcel that Ms. Gutierrez and

10:32:09AM 25  Ms. Poncedeleon dropped off at the Howard Road post office on

1   January 25th, 2018?

2   A.   Yes.

3   Q.   Does this package have the same mailing address as the

4   last?

10:32:22AM 5   A.   Yes.

6   Q.   And is the address also the same as the address contained

7   in the text message that is marked Exhibit 1-137?

8   A.   Yes.

9   Q.   Okay. If we can move on to the next text message that is

10:32:42AM 10   tab 1-138?  Special Agent Reichard, could you please identify

11   the date and time of this text message?

12   A.   Yes.  1/24/2018.  Time is 6:03:01 p.m..

13   Q.   Okay. That would be a little less than an hour after the

14   last text message that we viewed?

10:33:20AM 15   A.   Yes.

16   Q.   And can you identify the phone numbers involved in this

17   text message?

18   A.   585-766-8057.

19   Q.   And is that the same phone number that you identified in

10:33:35AM 20   the last text message as being the target number?

21   A.   Yes.

22   Q.   And that is the phone number associated with Carlos Javier

23   Figueroa on Government's Exhibit 10?

24   A.   Yes.

10:33:44AM 25   Q.   Now, what is the other number for this text message?

1   A.   787-297-9357.

2   Q.   And is that the same phone number that was identified in

3   the last text message?

4   A.   Yes.

10:34:03AM 5   Q.   That's also the same phone number identified on

6   Government's Exhibit 10 being associated with Freddie Silva or

7   Tasha/Tacha?

8   A.   Yes.

9   Q.   And what was the direction of this text message in

10:34:20AM 10   Government's Exhibit 1-138?

11   A.   It was an incoming text message.

12   Q.   Again so Freddie Silva, Tasha or Tacha, would have sent

13   this text message to Carlos Javier Figueroa?

14   A.   Yes.

10:34:36AM 15   Q.   And could you please read what was this text message sent

16   in English?

17   A.   No.

18   Q.   Do you know what language it was sent in?

19   A.   Spanish.

10:34:46AM 20   Q.   Could you please read the translation of the text message

21   for us?

22   A.   Did you receive it?

23   Q.   Now, again this was on January 24th, 2018?

24   A.   Yes.

10:35:01AM 25   Q.   That's the day before you conducted your surveillance of

1   the defendant going to the post on Howard Road?

2   A.   Yes.

3            **MS. KOCHER:** Your Honor, may I publish the data for

4   Exhibit 1-141, the phone call?

10:35:33AM 5            **THE COURT:** Yes.

6            **MS. KOCHER:** Thank you.

7   **BY MS. KOCHER:**

8   Q.   Special Agent Reichard, do you see the data for our next

9   exhibit that's 1-141 up on your monitor?

10:36:14AM 10   A.   Yes.

11   Q.   And what is the date and the time of this transaction?

12   A.   January 25th, 2018, 12:03:17 p.m.

13   Q.   Now, at this time were you in the area of Barrington

14   getting ready to conduct surveillance on the defendant and

10:36:32AM 15   others?

16   A.   Yes.

17   Q.   Now, are the -- is the target number the same target

18   number as those last two text messages that we looked at?

19   A.   Yes.

10:36:44AM 20   Q.   Okay. And that's the 766-8057 associated with the

21   defendant?

22   A.   Yes.

23   Q.   And what is the other phone number for this transaction?

24   A.   787-297-9357.

10:36:58AM 25   Q.   And that's the number that you've previously identified as

1 | being associated with Freddie Silva or Tasha?

2 | A.   Yes.

3 | Q.   What is the direction of this call?

4 | A.   Outgoing call.

10:37:14AM 5 | Q.   What does that mean?

6 | A.   The target number, the phone used by Javier Figueroa, is

7 | calling the 787 number.

8 | Q.   Thank you.

9 |         **MS. KOCHER:** Your Honor, may the jury be permitted

10:37:45AM 10 | to turn their tabs to 1-142?

11 |         **THE COURT:** Yes.

12 |         **MS. KOCHER:** Thank you.

13 | **BY MS. KOCHER:**

14 | Q.   Special Agent Reichard, can you tell us what the date and

10:38:06AM 15 | time is for the text message being behind Exhibit 1-142?

16 | A.   Yes.  The date is January 25th, 2018.  The time is

17 | 12:04:14 p.m..

18 | Q.   Okay. And is the target number that same 766-8057

19 | associated with the defendant?

10:38:33AM 20 | A.   Yes.

21 | Q.   And what is the other phone number associated with this

22 | text message?

23 | A.   787-297-9357.

24 | Q.   And that's the number for -- associated with Freddie Silva

10:38:46AM 25 | or Tasha?

```
 1  A.    Yes.
 2  Q.    What direction was this text message?
 3  A.    Incoming.
 4  Q.    And could you please read the content of this
 5  text message?
 6  A.    Freddie Silva.
 7  Q.    If we can go back to Exhibit 346?  Special Agent Reichard,
 8  this is one of the packages seized from the Howard Road post
 9  office, correct?
10  A.    Yes.
11  Q.    And who is the addressee name?
12  A.    Freddie Silva.
13  Q.    And Exhibit 360, please?  The second package is also
14  addressed to Freddie Silva?
15  A.    Yes.
16  Q.    Okay. Now, this -- you mentioned this was an incoming
17  text message?
18  A.    Yes.
19  Q.    So Tasha would have sent this text message to the
20  defendant?
21  A.    Correct.
22  Q.    And this was at 12:04 p.m. on January 25th?
23  A.    Yes.
24  Q.    At that time had the defendant, Ms. Gutierrez or
25  Ms. Poncedeleon left 292 Barrington Street?
```

1 A.   No.

2 Q.   Were they at 292 Barrington Street at the time this

3 text message would have been sent?

4 A.   Yes.

10:40:06AM 5 Q.   Next I'd ask you to flip to the next tab that is 1-143.

6 What is the date and time of this text message?

7 A.   January 25th, 2018.  12:04:18 p.m.

8 Q.   So it's just a few seconds after the text message we just

9 looked at in Exhibit 1-142?

10:40:44AM 10 A.   Yes.

11 Q.   The same target number associated with the defendant?

12 A.   Yes.

13 Q.   And this indicates this was an outgoing text message?

14 A.   Yes.

10:40:53AM 15 Q.   What does that mean?

16 A.   It means the target number was sending a message to the

17 787 number.

18 Q.   Is that 787 number the same number you previously

19 identified as being associated with Freddie Silva or Tasha?

10:41:10AM 20 A.   Yes.

21 Q.   Could you please -- again, was this text sent in English?

22 A.   No.

23 Q.   What language?

24 A.   Spanish.

10:41:19AM 25 Q.   And could you read the translation for us, please?

1  A.   Look, mom, the new numbers.

2  Q.   Moving on to the next tab which is 1-144.  What's the date

3  and time of this text message?

4  A.   January 25th, 2018.  12:04:29 p.m..

10:41:52AM 5  Q.   Okay. So that would be just a few seconds after the last

6  text message that we read at 1-143?

7  A.   Yes.

8  Q.   Is the target number the same -- that same number

9  associated with the defendant?

10:42:07AM 10  A.   Yes.

11  Q.   And what is the other phone number associated with this

12  text message?

13  A.   787-297-9357.

14  Q.   And that's the number associated with Freddie Silva or

10:42:20AM 15  Tasha?

16  A.   Yes.

17  Q.   Okay. What was the direction of this text message?

18  A.   Incoming.

19  Q.   What does that mean?

10:42:29AM 20  A.   Means the number was being sent from the 787 number to the

21  target number.

22  Q.   And what was the text of that text message?

23  A.   Okay.

24  Q.   Moving on to the next tab which is 1-145.  What is the

10:42:53AM 25  date and time of this text message?

1  A.   January 25th, 2018.  12:06:20 p.m.

2  Q.   Okay. So this was about two minutes after the last

3  text message that we just read?

4  A.   Yes.

10:43:12AM 5  Q.   Is the target number the same, that 766-8057 associated

6  with the defendant?

7  A.   Yes.

8  Q.   And is the other phone number the same one you've

9  identified as being associated with Freddie or Tasha?

10:43:29AM 10  A.   Yes.

11  Q.   That 787 area code?

12  A.   Yes.

13  Q.   And what was the direction of this text message?

14  A.   Incoming.

10:43:35AM 15  Q.   So that means that Tasha sent this text message to the

16  defendant?

17  A.   Yes.

18  Q.   Okay. And what is the content of the text message?

19  A.   A long number.  9505 5114 5412 8024 0945 68.

10:44:06AM 20  Q.   Okay. I'd like to have you take a look at Government's

21  Exhibit 795.  Does this appear to be a Postal chart?

22  A.   Yes.

23  Q.   Postal records chart?

24  A.   Yes.

10:44:20AM 25  Q.   If you wouldn't mind taking a look at that Exhibit 795 and

1  let me know if you see the numbers that you just read off

2  listed on the exhibit?

3  A.    Yes, I do, the last number listed.

4  Q.    Okay.  That's at the very bottom of the package label

10:44:38AM 5  number column?

6  A.    Yes.

7  Q.    Okay. And is there a delivery date associated with that

8  package?

9  A.    No.

10:44:44AM 10  Q.    Is there a delivery address?

11  A.    Yes.

12  Q.    What is the delivery address?

13  A.    4 Ritz Street.

14  Q.    Now, if we could move on to Exhibit -- the next tab, which

10:45:02AM 15  is 1-146.  What is the date and time of this text message?

16  A.    January 25th, 2018.  12:07:08 p.m..

17  Q.    Okay. And what is the target number?

18  A.    585-766-8057.

19  Q.    And that's the same number that you identified as being

10:45:31AM 20  associated with the defendant from Government's Exhibit 10?

21  A.    Yes.

22  Q.    And the other phone number associated with this

23  transaction, is that the same 787 number that you identified

24  as being associated with Freddie Silva or Tasha?

10:45:48AM 25  A.    Yes.

1  Q.   What was the direction of this text message?

2  A.   Incoming.

3  Q.   And so that means that Freddie Silva or Tasha sent this

4  text message to the defendant?

10:46:00AM 5  A.   Yes.

6  Q.   What is the content of this text message?

7  A.   Again a long number.  9505 5109 7716 8024 1504 05.

8  Q.   Okay. Special Agent Reichard, I'll ask you again to take a

9  look at Government's Exhibit 795.  Do you see the number you

10:46:28AM 10  just read off on that exhibit?

11  A.   Yes.

12  Q.   And where is that?

13  A.   Second from the bottom.

14  Q.   Okay. And that's in red font?

10:46:38AM 15  A.   Correct.

16  Q.   And the last two digits are 05?

17  A.   Yes.

18  Q.   Is there a delivery date associated with that tracking

19  number?

10:46:47AM 20  A.   Yes, January 29th, 2018.

21  Q.   And is there a delivery address associated with that

22  tracking number?

23  A.   Yes, 15 Harwood Street.

24  Q.   Now, if you could skip ahead to the tab 1-148?  It should

10:47:12AM 25  be another text message.

1          **MS. KOCHER:**  May the jury also turn to that, Your

2    Honor?

3          **THE COURT:** Yes.

4          **MS. KOCHER:** Thank you.

10:47:23AM 5   **BY MS. KOCHER:**

6    Q.   Special Agent Reichard, what is the date and time of this

7    text message?

8    A.   January 25th, 2018.  5:03:11 p.m.

9    Q.   Now, how much time had passed between the last

10:47:43AM 10   text message that we read behind tab 1-146 to this

11   text message?

12   A.   Just less than five hours.

13   Q.   And what is the target number associated with this

14   text message?

10:48:06AM 15   A.   585-685-4661.

16   Q.   So this is a different target number than we've been

17   looking at in the prior messages?

18   A.   Yes.

19   Q.   I'd ask you to take a look at Government's Exhibit 10.  Do

10:48:23AM 20   you see that target number 685-4661 listed?

21   A.   Yes.

22   Q.   Where is it listed?

23   A.   The fourth number down in purple font.

24   Q.   And who is the user associated with that phone number?

10:48:42AM 25   A.   Leitscha Poncedeleon.

1  Q.   Now, is there an asterisk by that phone number 685-4661 on

2  Government's Exhibit tab?

3  A.   Yes.

4  Q.   What does that delineate?

10:48:58AM 5  A.   That it was a phone that was wiretapped.

6  Q.   The prior text messages that we were looking at, the

7  target number was 766-8057.  That's the first number listed on

8  this chart, correct?

9  A.   Yes.

10:49:12AM 10  Q.   Does that also have an asterisk by it indicating that it

11  was a wiretapped phone?

12  A.   Yes.

13  Q.   Okay. Turning back to the text message which is

14  Exhibit 1-148, what is the other phone number associated with

10:49:29AM 15  this transaction?

16  A.   787-297-9357.

17  Q.   Okay. And that's the phone number with the user on

18  Government's Exhibit 10 as Freddie Silva or Tasha?

19  Q.   What direction was this text message?

10:49:49AM 20  A.   Outgoing.

21  Q.   And what does that mean?

22  A.   The message was being sent from the target phone to the

23  787 number.

24  Q.   So Ms. Poncedeleon would have sent this text message to

10:50:03AM 25  Freddie Silva or Tasha?

```
 1  A.    Yes.

 2  Q.    Was this message sent in English?

 3  A.    No.

 4  Q.    What language was it sent in?

 5  A.    Spanish.

 6  Q.    Could you please read the translation for us?

 7  A.    The numbers.

 8  Q.    Moving on to the next tab which is 1-149, what was the

 9  date and time of this text message?

10  A.    January 25th, 2018.  5:08:14 p.m.

11  Q.    So that's just about five minutes after the text

12  messages -- the text message you read the numbers --

13  A.    Yes.

14  Q.    -- was sent?

15  A.    Yes.

16  Q.    And what is the target number on the text message which is

17  Exhibit 1-149?

18  A.    585-685-4661.

19  Q.    And that's the same phone number in the last text message?

20  A.    Yes.

21  Q.    And the number associated with Leitscha Poncedeleon?

22  A.    Correct.

23  Q.    This indicates this is an outgoing text message as well?

24  A.    Yes.

25  Q.    And what was the outgoing text message number?
```

10:50:12AM (line 5)
10:50:33AM (line 10)
10:50:50AM (line 15)
10:51:10AM (line 20)
10:51:19AM (line 25)

1  A.   787-297-9357.

2  Q.   And that's the same number you've previously identified as

3  Freddie Silva or Tasha?

4  A.   Yes.

10:51:36AM 5  Q.   So Ms. Poncedeleon would have sent this message to Freddie

6  Silva or Tasha?

7  A.   Correct.

8  Q.   Was this also sent in Spanish?

9  A.   Yes.

10:51:44AM 10  Q.   And what is the transaction of the text message that

11  Ms. Poncedeleon sent to Tasha?

12  A.   Never send the numbers to the old man.

13  Q.   Next I'd ask you to turn to the next tab, which is 1-150.

14  What time was this text message sent?

10:52:11AM 15  A.   5:08:23 p.m.

16  Q.   So just a few seconds after the last message never send

17  the numbers to the old man?

18  A.   Yes.

19  Q.   And is this the same target number associated with

10:52:27AM 20  Ms. Poncedeleon and the other number the same that was

21  associated with Freddie Silva or Tasha?

22  A.   Yes.

23  Q.   Was what the direction of this text message?

24  A.   Outgoing.

10:52:41AM 25  Q.   All right. And this was sent in Spanish as well?

1   A.   Yes.

2   Q.   Could you please read the translation?

3   A.   Always send it here.

4   Q.   Being an outgoing text, Ms. Poncedeleon would have sent

10:52:54AM 5   the message always send it here to Freddie Silva or Tasha?

6   A.   Yes.

7   Q.   I'll ask you to turn to the next tab which is 1-151.  Was

8   this text message also sent on January 25th, 2018?

9   A.   Yes.

10:53:17AM10   Q.   And what time?

11   A.   5:09:58 p.m.

12   Q.   So a little over a minute after the last two messages that

13   we read, the never send the numbers to the old man and always

14   send it here?

10:53:32AM15   A.   Yes.

16   Q.   Are the phone numbers associated with this text message

17   the same?

18   A.   Yes.

19   Q.   So that's the number for Ms. Poncedeleon and Freddie Silva

10:53:42AM20   or Tasha?

21   A.   Yes.

22   Q.   And what was the direction of this text message?

23   A.   Incoming.

24   Q.   Was this sent in Spanish as well?

10:53:52AM25   A.   Yes.

1  Q.   Could you please read the translation for us?

2  A.   Yes, I already erased them.  It's because he asked for

3  them.

4  Q.   Okay. And being an incoming text message, that means that

10:54:09AM 5  Freddie Silva or Tasha sent yes I already erased them, it's

6  because he asked for them, to Ms. Poncedeleon?

7  A.   Yes.

8  Q.   Next I'll ask you to turn your page to Exhibit 1-152.  Is

9  this another text message over Ms. Poncedeleon's phone number

10:54:42AM 10  685-4661 on January 25th, 2018?

11  A.   Yes.

12  Q.   And what time was this text message received?

13  A.   5:12:20 p.m.

14  Q.   And this was an incoming message?

10:54:58AM 15  A.   Yes.

16  Q.   What is the incoming message number?

17  A.   28777.

18  Q.   And could you please read the content of that

19  text message?

10:55:12AM 20  A.   USPS, 9505 5114 5412 8024 0945 68: Request for package

21  delivered confirmed.

22  Q.   And if you could turn to the next tab that is 1-153?  Is

23  this another text message received by Ms. Poncedeleon over the

24  phone number 685-4661 on January 25th, 2018?

10:55:56AM 25  A.   Yes.

1  Q.   And was this received just a second after the last one

2  that we read?

3  A.   Yes.

4  Q.   That's at 5:12:21 p.m.?

10:56:06AM 5  A.   Correct.

6  Q.   What is the incoming text message number?

7  A.   28777.

8  Q.   And could you please read the content of that message?

9  A.   USPS 9505 5114 5412 8024 0945 68, expected delivery by

10:56:35AM 10  Saturday, January 27th, 2018 by 8 o'clock p.m.  Reply stop to

11  cancel.

12  Q.   All right. Now, Special Agent Reichard, could you take a

13  look at Government's Exhibit 795 that should be on your

14  monitor?  Do you see the numbers that you just listed off

10:57:01AM 15  ending in 68 on this exhibit?

16  A.   Yes.

17  Q.   And where are they?

18  A.   The last number listed in brown font.

19  Q.   Okay. If you can turn back to Exhibit 1-145?

10:57:23AM 20          THE COURT: 154 you mean?

21          MS. KOCHER: I'm sorry?

22          THE COURT: Do you mean 145 or 154?

23          MS. KOCHER: No, we've already gone over 1-145.

24          THE COURT: That's what you said.

10:57:38AM 25          MS. KOCHER: I'm sorry.  No, that's -- I would like

1    everyone to turn back to Exhibit 1-145.

2              **THE COURT:** Oh, okay.  I thought you made a mistake.

3              **MS. KOCHER:** Thank you.

4              **THE COURT:** No problem.

10:57:48AM 5  **BY MS. KOCHER:**

6    Q.   So 1-145.  Now, Special Agent Reichard, we reviewed this

7    text message just a little bit ago.  This was an incoming

8    message to the defendant's phone number 766-8057, correct?

9    A.   Yes.

10:58:10AM 10  Q.   And do the numbers in this text message appear to be the

11   same as the numbers in the text message behind 1-153 and

12   1-152?

13   A.   Yes.

14   Q.   Now, if you could skip ahead to Exhibit 1-154?  What was

10:58:50AM 15  the date and time of this text message?

16   A.   January 25th, 2018.  5:12:22 p.m.

17   Q.   And was this a text message that Ms. Poncedeleon received

18   over her phone number 685-4661?

19   A.   Yes.

10:59:11AM 20  Q.   And who sent the text message?

21   A.   Freddie Silva a/k/a Tasha.

22   Q.   And could you please read the content of this text message

23   behind Exhibit 1-154?

24   A.   9505 5114 5412 8024 0945 68.

10:59:40AM 25  Q.   And do you see those numbers on Government's Exhibit 795?

1  A.    Yes.

2  Q.    Those are the last ones listed under package label in

3  brown font?

4  A.    Yes.

10:59:52AM 5  Q.    And the delivery address is 4 Ritz Street?

6  A.    Yes.

7  Q.    All right.  Lastly, if you could turn to Exhibit 1-155?

8  What was the date and time of this message?

9  A.    January 25th, 2018.  5:13:16 p.m.

11:00:19AM 10  Q.    That was almost a minute after the last message we just

11  looked at?

12  A.    Yes.

13  Q.    Was this also an incoming text message that

14  Ms. Poncedeleon received over her phone number 685-4661 from

11:00:39AM 15  Freddie Silva or Tasha that 787 phone number?

16  A.    Yes.

17  Q.    And what was the content of this number or this message?

18  A.    9505 5109 7716 8024 1504 05.

19  Q.    And if you could turn to Government's Exhibit 795?  Do you

11:01:04AM 20  see that number listed on the Postal package chart?

21  A.    Yes.

22  Q.    Where is it?

23  A.    The second number from the bottom in red font.

24  Q.    And what was the delivery date and delivery address

11:01:16AM 25  associated with that tracking number?

1    A.    January 29th, 2018.   15 Harwood Street.

2    Q.    Now, turning back to Exhibit 146, you previously described

3    that as a text message the defendant received on January 25th,

4    the same day at about 12:07:08 p.m. from Freddie Silva or

11:01:48AM 5    Tasha, correct?

6    A.    Yes.

7    Q.    Is the content of that text message the same numbers for

8    the tracking number for the 15 Harwood Street package?

9    A.    Yes.

11:02:01AM 10            THE COURT: Members of the jury, I think it's a good

11   time to take a recess.  In the meantime, I'd ask you not

12   discuss the matter or allow anybody to discuss the matter with

13   you.  The jury may step down, we'll stand in recess.

14            (**WHEREUPON**, there was a pause in the proceeding).

11:35:08AM 15            (**WHEREUPON**, the defendant is present).

16            **THE COURT:** You can bring in the jury.

17            (**WHEREUPON**, the jury is present).

18            **THE COURT:** Ready to proceed, you may continue.

19            **MS. KOCHER:** Thank you, Your Honor.

11:38:44AM 20   BY MS. KOCHER:

21   Q.    All right, Special Agent Reichard, if you could turn to

22   tab 1-152 in your binder?  You there?

23   A.    Yes.

24   Q.    Now, you mentioned this was a text message, the incoming

11:39:14AM 25   text message number was 28777, correct?

1   A.    Yes.

2   Q.    And what does this message appear to be?

3   A.    It's a message -- an automated message from the U.S.

4   Postal Service.

11:39:27AM 5   Q.    And if you can flip to the next tab that's 1-153?  Does

6   that also appear to be an automated message from the U.S. Post

7   Office?

8   A.    Yes.

9   Q.    Now, while you have your binder opened, I'd ask you to

11:39:44AM 10   take a look at 1-138, 1-143, 1-148, 1-149, 1-150, and 1-151.

11   Did you have a chance to do that?

12   A.    Yes.

13   Q.    Now, did all of those numbers that I just listed off,

14   those were Spanish text messages?

11:40:18AM 15   A.    Yes.

16   Q.    And did you see the initials BSA in the lower left corner

17   of each of those transcripts?

18   A.    Yes.

19   Q.    Thank you.  Now, we'll move away from the Exhibit 1 and

11:40:46AM 20   that binder, if you want to put that away for now?

21          Special Agent Reichard, did you also assist with

22   this investigation on January 29th, 2018?

23   A.    Yes.

24   Q.    And what was happening on that day?

11:41:04AM 25   A.    That day was the takedown of this case essentially.

```
 1  Q.    Okay. And what does a takedown mean?
 2  A.    Takedown is arrest of co-conspirators and search warrants.
 3  Q.    Now, what was your assignment that day?
 4  A.    I was assigned to a surveillance team.
 5  Q.    You weren't assigned any particular location for a search
 6  warrant or arrest of any particular person?
 7  A.    Initially that's correct.
 8  Q.    Did there come a time that afternoon at about 1:40 p.m.
 9  that you did assist with arresting somebody?
10  A.    Yes.
11  Q.    Who was that?
12  A.    Orlando Yelder.
13  Q.    Now, I'd like to show you what's been received into
14  evidence as Government's Exhibit 35.  Do you recognize the
15  individual in this photograph?
16  A.    Yes.
17  Q.    Who is that?
18  A.    Orlando Yelder.
19  Q.    And where did you assist in taking Mr. Yelder into custody
20  that day?
21  A.    It was on Maple Street in the City of Rochester.
22  Q.    How did that arrest come about?
23  A.    He was initially stopped by a Rochester Police marked unit
24  and essentially responded to the scene.
25  Q.    Was that a traffic stop?
```

```
 1  A.    Yes.
 2  Q.    What vehicle was Mr. Yelder in?
 3  A.    He was in a Mustang, a red Mustang.
 4  Q.    Now, I'd like to show you also what's been received into
 5  evidence as Exhibit 753.  Do you recognize that vehicle?
 6  A.    Yes.
 7  Q.    What vehicle is that?
 8  A.    That's the Mustang, red Mustang that was driven by Orlando
 9  Yelder.
10  Q.    Okay. Was this photo taken where the vehicle was
11  ultimately stopped that day?
12  A.    Yes.
13  Q.    If we can move on to Exhibit 754 that's also in evidence?
14  Is this another angle of that same vehicle?
15  A.    Yes.
16  Q.    And what angle of the car we looking at here?
17  A.    From the rear.
18  Q.    Did there come a time you assisted in searching this red
19  Mustang?
20  A.    Yes.
21  Q.    And what were some of the things that you recovered from
22  the car?
23  A.    We recovered a cell phone, a flip style cell phone, and a
24  bag of pills.
25  Q.    Where was the flip style cell phone?
```

1  A.    In the center console.

2  Q.    Now, if I can show you what has not been received into

3  evidence as Exhibit 774.  Do you recognize what's depicted in

4  that photo?

11:43:53AM 5  A.    Yes.

6  Q.    What is it?

7  A.    It's the flip --

8             MR. VACCA: Objection, Your Honor, it's not in

9  evidence.

11:43:59AM 10             THE COURT: He can generally describe it.  Go ahead.

11             THE WITNESS: It's items that were in the center

12  console at the time of the search, cupholder.

13  BY MS. KOCHER:

14  Q.    Does that include the flip style cell phone that you

11:44:12AM 15  ultimately collected?

16  A.    Yes.

17  Q.    Does this photograph fairly and accurately depict the way

18  that that center cupholder looked when you searched the red

19  Mustang?

11:44:26AM 20  A.    Yes.

21             MS. KOCHER: Your Honor, I'd offer Government's

22  Exhibit 774.

23             MR. VACCA: Objection, Your Honor, grounds of

24  relevancy.

11:44:32AM 25             THE COURT: Overruled.  Exhibit 774 will be

1    received.

2              (**WHEREUPON**, Government's Exhibit 774 was received

3    into evidence).

4    **BY MS. KOCHER:**

11:44:44AM 5    Q.   Special Agent Reichard, this is the cupholder in the

6    center portion of the red Mustang?

7    A.   Yes.

8    Q.   Could you circle the area where the cell phone is?  You've

9    made a circle about -- on the right portion of the photograph,

11:45:08AM 10   it's the last item in the cupholder on the right; is that

11   correct?

12   A.   Yes.

13   Q.   That's a black flip phone?

14   A.   That's correct.

11:45:19AM 15   Q.   What did you do with that phone?

16   A.   Seized it at the time and then turned it over to

17   Investigator Swain.

18   Q.   Okay. Now I'd like you to take a look at Exhibit 782.

19   That might be on your ledge right in front of you or on the

11:45:37AM 20   floor behind you.  Did we hide it on you?

21   A.   I don't see it.  Okay, I actually got it right here.

22   Q.   Do you recognize what Exhibit 782 is?

23   A.   Yes.  It's the flip phone, black flip phone.

24   Q.   Is that the same phone that's depicted in Exhibit 774?

11:46:07AM 25   A.   Yes.

```
 1   Q.   And that's the phone you collected from the red Mustang?
 2   A.   Correct.
 3   Q.   How do you know that's the phone you collected from the
 4   red Mustang?
 5   A.   Based on the markings from Investigator Swain and it
 6   matches the phone in the picture.
 7   Q.   Okay. Now, you mentioned you gave it to Investigator
 8   Swain?
 9   A.   Correct.
10   Q.   Was he the one that ultimately turned it into property?
11   A.   Yes.
12   Q.   Is that a clear bag?
13   A.   Yes.
14   Q.   So are you able to actually see the phone inside the
15   evidence bag?
16   A.   Yes.
17   Q.   Does the phone itself appear to be in the same or
18   substantially the same condition as it was in when you
19   collected it on January 29th, 2018?
20   A.   Yes.
21   Q.   Do you notice anything different about the phone?
22   A.   No.
23   Q.   Now, did you continue to assist in this investigation on
24   January 31st of 2018?
25   A.   Yes.
```

11:46:20AM (line 5)
11:46:34AM (line 10)
11:46:44AM (line 15)
11:46:56AM (line 20)
11:47:12AM (line 25)

1    Q.    What did you do that day?

2    A.    I assisted the U.S. Postal Service with a search of a

3    package.

4    Q.    And what package was that?

11:47:22AM 5    A.    It was a package being sent to -- from Puerto Rico to

6    Rochester as part of this investigation.

7    Q.    And you mentioned you assisted the Postal Office with

8    doing that?

9    A.    That's correct.

11:47:34AM 10    Q.    Were you there when the search of the package occurred?

11    A.    Yes.

12    Q.    Did you actually obtain a search warrant before

13    executing -- before searching that package?

14    A.    I did not, but yes, the Postal Service obtained a search

11:47:50AM 15    warrant.

16    Q.    Now, once the warrant was obtained was it ultimately

17    searched?

18    A.    Yes.

19    Q.    And what was recovered from inside that package?

11:48:00AM 20    A.    Miscellaneous bags of candy and two boxes of candy and

21    then concealed in those boxes were two different kilogram

22    quantities of cocaine.

23    Q.    I'd like to have you take a look at what is not in

24    evidence as -- starting at Exhibit 375.  If you can watch your

11:48:25AM 25    monitor and we'll -- we'll flip through those photos and if

1   you could clear your mark as well?  Thank you.  Now we're

2   flipping through Exhibit 375 through and including 393.

3               Special Agent Reichard, did you have a chance to

4   look at all those photos?

11:50:07AM 5   A.   Yes.

6   Q.   And just generally what is depicted in those photographs?

7   A.   All the contents from the box, different boxes of candy

8   and then the two Skittles and M&M boxes that had what were

9   later determined to be the 2 kilograms of cocaine.

11:50:24AM 10   Q.   Do those photographs fairly and accurately depict the way

11   that the package and the content looked that day?

12   A.   Yes.

13   Q.   Did you notice any additions or changes?

14   A.   No.

11:50:37AM 15               **MS. KOCHER:** Your Honor, I'd offer Government's

16   Exhibit 375 through and including 393.

17               **MR. VACCA:** Objection, Your Honor.

18               **THE COURT:** Just objection?

19               **MR. VACCA:** Foundation, relevancy.

11:50:51AM 20               **THE COURT:** Overruled.

21               **MR. VACCA:** Chain.

22               **THE COURT:** Overruled.  Exhibits 375, 376, 377, 378,

23   379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 390,

24   391, 392 and 393 will be received.

11:51:15AM 25               (**WHEREUPON**, Government's Exhibits 375-393 were

1  received into evidence).

2  **BY MS. KOCHER:**

3  Q.   All right, starting with Exhibit 375, Special Agent

4  Reichard, do you recognize what this is?

11:51:27AM 5  A.   Yes.

6  Q.   What is it?

7  A.   A box shipped via U.S. Postal Service.

8  Q.   And is this the box that you observed the Postal inspector

9  search on January 31st, 2018?

11:51:41AM 10  A.   Yes.

11  Q.   If we could move on to the next photograph?  What are we

12  looking at here?

13  A.   The shipping label.

14  Q.   And who was this package addressed to?

11:51:57AM 15  A.   Mickael Grant, 4 Ritz Street, Rochester, New York 14605.

16  Q.   And the first name is that M-I-C-K-A-E-L?

17  A.   Yes.

18  Q.   What was the return address on this Postal package?

19  A.   Sara Smith, Calle Salvador Vilella, number 331, Barrio El

11:52:25AM 20  Liceo, Mayaguez, Puerto Rico 00680.

21  Q.   If we can move on to Exhibit 377?  What is in this

22  photograph?

23  A.   A label from the Postal Service indicating a tracking

24  number and the amount paid for postage.

11:52:47AM 25  Q.   Does this also indicate an expected delivery day?

1   A.   Yes.

2   Q.   What is that?

3   A.   January 27th, 2018.

4   Q.   And what was the tracking number associated with this

11:53:01AM 5   package?

6   A.   9505 5114 5412 8024 0945 68.

7   Q.   Okay. Now I'd like to flip back to Exhibit 795, the Postal

8   chart.  Special Agent Reichard, do you see that tracking

9   number listed on this exhibit?

11:53:28AM10   A.   Yes.

11   Q.   Where is it?

12   A.   The last number listed in brown font.

13   Q.   Okay. And the delivery address on this chart is 4 Ritz

14   Street?

11:53:37AM15   A.   Correct.

16   Q.   Now, referring back to the wire binder, specifically the

17   tab 1-145, is the tracking number in that text message from

18   Tasha sent to the defendant's number 766-8057 the same

19   tracking number that appears on Government's Exhibit 376?

11:54:27AM20   A.   Yes.

21   Q.   I'm sorry, 377.

22   A.   Yes.

23   Q.   If you turn to -- in the wire binder, the tab 1-154?  That

24   was the text message from Freddie Silva or Tasha sent to

11:54:58AM25   Leitscha Poncedeleon at 685-4661.  Is that tracking number the

1  same tracking number as on the package that you searched on

2  January 31st, 2018?

3  A.   Yes.

4  Q.   Next I'd like to move on to Exhibit 378.  What's depicted

11:55:24AM 5  in this photograph?

6  A.   The box as it's being opened.

7  Q.   So this shows the initial stages of the box being opened?

8  A.   Correct.

9  Q.   And it appears to be the box is full and topped with

11:55:39AM 10  bubble wrap?

11  A.   Yes.

12  Q.   Moving on to the next photo, Exhibit 379.  What's in this

13  photograph?

14  A.   Full bags of candy on top of the rest of the contents.

11:55:55AM 15  Q.   Okay. If we can move on to Exhibit 380.  Can you describe

16  this photograph?

17  A.   The contents that were under those full bags once they

18  were removed, also shows the two boxes that were later found

19  to contain the kilos of cocaine.

11:56:14AM 20  Q.   And which two boxes were later found to contain the kilos

21  of cocaine?

22  A.   The M&M's and Skittles box.

23  Q.   If we can move on to Exhibit 381?  What's in this

24  photograph?

11:56:29AM 25  A.   The boxes opened from the top and you can see partial view

1  of the kilograms of cocaine.

2  Q.   And where are the kilograms in this photograph?

3  A.   They're in the black tape under the M&M's and the

4  Skittles.

11:56:46AM 5  Q.   Okay.  Would you place an X on where those objects are in

6  the photograph, please?

7  A.   Yes.

8  Q.   You've placed an X -- one X just left of center, and a

9  second X right of center in the photograph over the black

11:57:05AM 10  objects within the Skittles and M&M boxes?

11  A.   Yes.

12  Q.   Thank you.  If you could clear your marks and we'll move

13  on to Exhibit 382.  What is in this photo?

14  A.   This is just the Skittles box with a more complete picture

11:57:23AM 15  of the kilogram of cocaine wrapped in black.

16  Q.   And next 383.  What's this a photo of?

17  A.   That's the same kilogram with the outer layer of black

18  paper removed.

19  Q.   Okay. What type of paper was that?

11:57:45AM 20  A.   Carbon paper.

21  Q.   It appears that the kilogram is still wrapped in another

22  layer of paper in this photograph?

23  A.   Correct.

24  Q.   Moving on to Exhibit 384.  Can you describe this photo?

11:58:04AM 25  A.   Another picture as -- another layer of the carbon paper

1  was removed and the clear plastic.

2  Q.   Okay. So once the kilo was removed from that carbon paper,

3  it was wrapped in plastic?

4  A.   Yes.

11:58:16AM 5  Q.   Moving on to Exhibit 385.  Is this that same kilogram we

6  were just looking at?

7  A.   Yes.

8  Q.   And can you describe the packaging that we see in this

9  photo?

11:58:31AM 10  A.   This is wrapped in cellophane and with a marking Hermes

11  Paris.

12  Q.   Okay. Exhibit 386, what is in this photo?

13  A.   This is the other kilogram once the box of M&M's was

14  opened, the top portion of it also again wrapped in carbon

11:58:56AM 15  paper.

16  Q.   So this kilogram that was in the M&M's box appears to be

17  similarly packaged to the M&M -- to the kilos that were in the

18  Skittles box?

19  A.   Correct.

11:59:09AM 20  Q.   All right. Moving on to 387.  Can you describe this photo?

21  A.   Same kilogram with the outer layer of the carbon paper

22  removed.

23  Q.   Okay. So this is the kilogram from the M&M's box?

24  A.   Yes.

11:59:24AM 25  Q.   All right. Next 388.  What is in this photo?

1    A.    This is another picture of the same kilogram once the rest

2    of the carbon paper was removed, wrapped in plastic again,

3    with the same logo Hermes Paris.

4    Q.    All right.  If we can move on to Exhibit 389.  Is this

11:59:44AM 5    another photograph of that same kilo removed from the M&M box?

6    A.    Yes.

7    Q.    And this appears to be another layer of plastic removed

8    from it?

9    A.    Yes.

11:59:53AM 10    Q.    So you can see the Hermes Paris label better?

11    A.    Correct.

12    Q.    Moving on to Exhibit 390.  What's in this photo?

13    A.    Both kilograms together.

14    Q.    Now, there appears to be some handwriting in black

12:00:13PM 15    permanent marker on one of the kilos?

16    A.    Yes.

17    Q.    Who put that there?

18    A.    The Postal inspectors.

19    Q.    Okay. Why did they do that?

12:00:20PM 20              **MR. VACCA:** Objection, Your Honor.

21              **THE COURT:** Sustained.

22    **BY MS. KOCHER:**

23    Q.    Did you observe them place those markings on the kilogram?

24    A.    Yes.

12:00:28PM 25    Q.    And when did they do it?

1    A.    As we were processing the kilograms.

2    Q.    Do they perform any tests on the kilos?

3    A.    Yes.

4    Q.    What was that?

12:00:37PM  5    A.    It was a field test.

6    Q.    Would they have placed those markings on that kilo after

7    the field test was done?

8    A.    Yes, the markings are put there to indicate why it was

9    opened.  It was opened to get a sample of it to field test it.

12:00:52PM 10    Q.    If you could move on to Exhibit 391?  What's in this

11   photograph?

12   A.    The kilograms on the scale being weighed.

13   Q.    Now, both kilograms are on the scale in this photo?

14   A.    Yes.

12:01:08PM 15    Q.    And what was the total weight of both of those kilos?

16   A.    5 pounds 1.05 ounces.

17   Q.    And about how many pounds are in a kilogram?

18   A.    2.2.

19   Q.    If we can move on to Exhibit 392?  Can you explain this

12:01:30PM 20   photograph?

21   A.    Just a general photo of everything that was in the box

22   minus the -- I don't see the M&M's box, but the other contents

23   of the package.

24   Q.    Okay. So this includes all the candy that was in the

12:01:44PM 25   package surrounding the 2 kilograms of cocaine?

1   A.   Yes.

2   Q.   And finally I'd like to show you Exhibit 393.  What's in

3   this photograph?

4   A.   Again just another picture of both of the kilograms

12:01:59PM 5   together with the markings.

6   Q.   Were those kilos ultimately collected as evidence?

7   A.   Yes.

8   Q.   If you don't mind taking a look at what should be to your

9   left and marked Exhibit 397 on the floor behind you, I think.

12:02:24PM 10   Do you recognize what that item is?

11   A.   Yes.

12   Q.   What do you recognize that to be?

13   A.   These are the 2 kilograms of cocaine that were depicted in

14   the pictures.

12:02:33PM 15   Q.   And how do you know those are the kilos that were seized

16   from the 4 Ritz Street package on January 31st, 2018?

17   A.   I can see the markings and also an evidence label from

18   Investigator Swain.

19   Q.   And does the evidence label indicate when and where those

12:02:54PM 20   items were collected?

21   A.   Yes.

22   Q.   Now, what did you do when you collected those 2 kilos of

23   cocaine?

24   A.   Took them from the post office over to the RPD to

12:03:06PM 25   Investigator Swain.

1  Q.   While you transported the kilograms were they in your

2  possession the entire time?

3  A.   Yes.

4  Q.   Did you tamper or alter them in any way?

12:03:17PM 5  A.   No.

6  Q.   And did you, in fact, give them to Investigator Swain once

7  you arrived at the Public Safety Building?

8  A.   Yes.

9  Q.   Did he take custody of them from there?

12:03:26PM 10  A.   Yes.

11  Q.   Do the kilograms in Exhibit 397 appear to be in the same

12  or substantially the same condition as they were in when you

13  collected them on January 31st, 2018?

14  A.   Yes.

12:03:56PM 15          **MS. KOCHER:** Thank you, Special Agent Reichard.  I

16  don't have anymore questions for you.

17                        <u>**CROSS-EXAMINATION**</u>

18  **BY MR. VACCA:**

19  Q.   Agent Reichard, you testified that you did a series of

12:04:05PM 20  controlled buys with Roberto Figueroa; is that correct?

21  A.   Yes.

22  Q.   When did you do those buys?

23  A.   They started in September of 2017.

24  Q.   How many controlled buys were there?

12:04:24PM 25  A.   There were five different dates, six different controlled

1 | purchases.

2 | Q.    Okay. When was the first date?

3 | A.    I believe it was September 20th, 2017.

4 | Q.    And under what circumstances?

12:04:40PM 5 | A.    Information we had from a confidential source that he

6 | could buy cocaine from Roberto Figueroa.

7 | Q.    Who was the confidential source?

8 |          **MS. KOCHER:** Objection.

9 |          **THE COURT:** Sustained.

12:04:49PM 10 | **BY MR. VACCA:**

11 | Q.    Who was the confidential source?

12 |          **MS. KOCHER:** That was sustained.

13 |          **THE COURT:** Yes, it was sustained.

14 |          **MR. VACCA:** Sorry, I didn't hear, Your Honor.

12:05:23PM 15 | **BY MR. VACCA:**

16 | Q.    You arranged for some controlled buys; is that correct?

17 | A.    Yes.

18 | Q.    Where was the first controlled buy?

19 | A.    In the City of Rochester.

12:05:29PM 20 | Q.    All right. And how much money did it involve?

21 | A.    Over $1,000.  I don't remember the exact amount.

22 | Q.    Were you part of the team that was working on that first

23 | controlled buy?

24 | A.    Yes.

12:05:44PM 25 | Q.    Then there was a second controlled buy as well?

1   A.   Yes.

2   Q.   When was that?

3   A.   October 2017.

4   Q.   And was there another controlled buy after that?

12:05:52PM 5   A.   Yes.

6   Q.   And when was that?

7   A.   November 2017.

8   Q.   And was there another one after that?

9   A.   Yes.

12:05:58PM 10   Q.   And when was that?

11   A.   December 2017.

12   Q.   Two more after that?

13   A.   One more date, two purchases.

14   Q.   On the same day?

12:06:07PM 15   A.   Yes.

16   Q.   When was that?

17   A.   January 2018.

18   Q.   Okay. And do you recall when in January 2018?

19   A.   I believe it was January 2nd, 2018.

12:06:18PM 20   Q.   Okay. Now, you saw a video this morning at the post

21   office, the Westgate post office in the Town of Gates; is that

22   correct?

23   A.   Yes.

24   Q.   And in that video you see two women walk in with big

12:06:39PM 25   boxes, correct?

1  A.    Yes.

2  Q.    We don't see a video from outside.  We just see the inside

3  video?

4  A.    Yes.

12:06:46PM 5  Q.    Was there any outside video or any outside cameras or pole

6  cameras outside of that post office?

7  A.    I don't know.

8  Q.    Well, is that something that you checked into?

9  A.    I did not check into.  That would be something the Postal

12:07:04PM 10  inspector would handle.

11  Q.    Okay. So you don't know if there were cameras to the

12  outside of that premise, correct?

13  A.    Correct.

14  Q.    Okay. And you don't know what time the vehicle -- I

12:07:20PM 15  believe you said you think there were two vehicles that went

16  to the post office?

17  A.    Yes.

18  Q.    Okay. What were the vehicles?

19  A.    The pick-up truck, the silver pick-up truck, and the

12:07:29PM 20  Nissan Altima car.

21  Q.    Did you follow the pick-up truck there?

22  A.    Yes.

23  Q.    Did you follow the Nissan car?

24  A.    No.

12:07:35PM 25  Q.    You did not?

1    A.    No.

2    Q.    Which vehicle arrived at the post office first?

3    A.    I believe the pick-up truck.

4    Q.    The pick-up truck?

12:07:47PM 5    A.    Yes.

6    Q.    And were you behind the pick-up truck?

7    A.    I wasn't right behind it.  I was part of the team.

8    Q.    But did you go into the parking lot?  Did you drive into

9    the parking lot of the post office at Westgate plaza?

12:08:01PM 10    A.    No.

11    Q.    Okay. Did you see the individuals exit that vehicle at

12    Westgate plaza?

13    A.    No.

14    Q.    So you didn't see from the outside who was there or who

12:08:17PM 15    brought items into the post office, correct?

16    A.    Correct.

17    Q.    And you said that you thought that the black car got there

18    first?

19            MS. KOCHER: Objection.  I don't believe that was

12:08:31PM 20    the testimony.

21            THE COURT: That's not what he said.

22    BY MR. VACCA:

23    Q.    Which car arrived first again?

24    A.    I think it was the pick-up.

12:08:36PM 25    Q.    You think it was the pick-up, but you're not sure on that,

1  right?

2  A.   Correct.

3  Q.   Then the black car, correct?

4  A.   It was -- I don't know if it was black.  It was a sedan,

12:08:48PM 5  lighter colored.

6  Q.   Did you see that vehicle pull in the parking lot?

7  A.   No.

8  Q.   So you don't know who exited each of the vehicles,

9  correct?

12:08:57PM 10  A.   In the parking lot?

11  Q.   Yes.

12  A.   No.

13  Q.   Okay. Did you see these individuals -- did you see anybody

14  get back into the pick-up truck?

12:09:06PM 15  A.   No.

16  Q.   Did you see anybody get back into the dark colored car?

17  A.   No.

18  Q.   Okay.  Nor did you see them leave, correct?  To go inside?

19  A.   No.

12:09:17PM 20  Q.   So the only thing you've seen regarding this at the post

21  office is what you saw on -- I believe it's Exhibit 22 -- the

22  compilation from the post office?

23  A.   The video, yes.

24  Q.   The video, okay.  As far as the video is concerned, where

12:09:39PM 25  were you when these individuals were allegedly walking into

1   the post office?

2   A.   I was in the area.  I wasn't real close.  Somebody else

3   was close that had the eyeball on it.  That was calling, you

4   know, who was getting out of the cars and things like that.

12:09:55PM 5   So trying to stay away.

6   Q.   So there was somebody who was monitoring this?

7   A.   No.

8   Q.   Was there an agent or part of the team?

9   A.   Yes, somebody on the team.

12:10:09PM 10   Q.   Somebody on the team was monitoring it, correct?

11   A.   Somebody was closer to make the observations.

12   Q.   All right. And do you remember who that was?

13   A.   Yes.

14   Q.   Who was that?

12:10:17PM 15   A.   Teresa Lloyd.

16   Q.   Okay. These individuals that brought the boxes in to the

17   post office, okay?  Did you already have a warrant at that

18   time to search those boxes?

19   A.   No.

12:10:41PM 20   Q.   Okay. So what was done, to your knowledge, with those

21   boxes when they were brought into the post office?

22   A.   They were in the hands of the Postal Service and from

23   there it was -- the Postal inspector was notified and then I'm

24   not sure from there.

12:11:01PM 25   Q.   Okay. You're not sure if they got a warrant?

1  A.    I am sure they got a warrant.

2  Q.    You're sure they got a warrant?

3  A.    Yes.

4  Q.    Okay. Then with respect to those packages, there were two

12:11:13PM 5  of them, right?

6  A.    Yes.

7  Q.    And with respect to the packages, where were they

8  inspected by the Postal authorities?

9  A.    At the Postal Office.

12:11:23PM 10  Q.    Were you present when that was done?

11  A.    Yes.

12  Q.    Okay. And you just testified to the contents of both boxes

13  or one box?

14  A.    Both boxes.

12:11:33PM 15  Q.    Both boxes.  Where was the cash found?

16  A.    In one of the boxes.

17  Q.    Do you recall which box?

18  A.    No.

19  Q.    Okay. And where were the drugs recovered?

12:11:47PM 20  A.    The drugs?

21  Q.    The drugs.

22  A.    Those were a separate box.

23  Q.    In another box, correct?

24  A.    It wasn't one of those two.  The drugs were a whole

12:11:56PM 25  separate transaction.

1  Q.   So it wasn't one of those two?

2  A.   No.

3  Q.   So the Hermes box, they were not in one of those two

4  boxes?

12:12:06PM 5         MS. KOCHER: Objection.   What day are we talking

6  about?

7             THE COURT: What was the question again?   Can you

8  rephrase the question?   I didn't understand it.

9  BY MR. VACCA:

12:12:15PM 10 Q.   Yeah.   The Hermes packages here, right?   That is cocaine,

11 correct?

12 A.   Correct.

13 Q.   That was cocaine.   What box was that in?

14 A.   That was a box, an incoming packages -- incoming package a

12:12:32PM 15 few days after those two packages in question.

16 Q.   So the cocaine, one in the black -- wrapped in the carbon

17 paper?

18 A.   Yes.

19 Q.   That's the one wrapped -- and it's in one of the boxes,

12:12:41PM 20 correct?

21 A.   No.   It's not in one of the two that day at the post

22 office.

23 Q.   It's not in one of those two at the post office?

24 A.   No.

12:12:54PM 25 Q.   Let's talk about the two boxes at the post office, okay?

1  Did the Postal Service have a warrant to search those two

2  boxes?

3  A.   Eventually, yes.

4  Q.   Eventually.  But were you present when they searched the

12:13:12PM 5  two boxes at the post office?

6  A.   Yes.

7  Q.   And did that -- was there a warrant at that time to search

8  the boxes at the post office?

9  A.   Yes.

12:13:22PM 10  Q.   Okay. And were you contacted to come and help search or

11  how did that develop that you were there to search the Postal

12  box?

13  A.   Yes, I was contacted.

14  Q.   You were contacted.  So are the two boxes that these two

12:13:35PM 15  women supposedly brought into the post office, are those the

16  boxes that you searched?

17  A.   Yes.

18  Q.   And in one of the boxes -- in one of the boxes did you

19  find any drugs?

12:13:48PM 20  A.   No.

21  Q.   So those two boxes -- as far as those two boxes are

22  concerned, there were no drugs found in those two boxes?

23  A.   Correct.

24  Q.   All right. So the individuals that walked in with those

12:14:02PM 25  boxes did not have boxes with any drugs in them, correct?

1  A.    Correct.

2  Q.    All right. So the videos that we watched, those are just

3  two women walking in to the post office with boxes that don't

4  have drugs, right?

12:14:19PM 5  A.    Right.

6  Q.    Now, did one of those boxes have money?

7  A.    Yes.

8  Q.    Which one had money?

9  A.    One of the two boxes.

12:14:26PM 10  Q.    One of the two boxes.  So those two boxes at the post

11  office, one of them you received money, right?

12  A.    Yes.

13  Q.    Okay. Now, the other one here with the Hermes, what box

14  was that in?

12:14:38PM 15  A.    That was a whole separate box.  That was an incoming

16  package.

17  Q.    An incoming package?

18  A.    Yes.

19  Q.    Okay. And were you present when you confiscated that box?

12:14:48PM 20  A.    No.  I was present for the search.

21  Q.    What was the box confiscated from?

22  A.    From the Postal Service.

23  Q.    From the Postal Service?

24  A.    Yes.

12:14:56PM 25  Q.    Or by the Postal Service?

1   A.   By the Postal Service.

2   Q.   From who?

3   A.   From the -- they got it from the shipments of boxes that

4   come in.

12:15:06PM 5   Q.   Okay. But when did this come in?

6   A.   I'm not sure of the exact date.  Sometime before the day

7   we searched it.

8   Q.   Okay. What day did you search it?

9   A.   We searched it on the 31st.

12:15:19PM 10   Q.   The 31st of January.  That was after the takedown?

11   A.   Correct.

12   Q.   Okay. So you don't know where the box came from, right?

13   A.   It came from the Postal Service.

14   Q.   Came from the Postal Service.  But do you know -- do you

12:15:39PM 15   know if that box -- there was one box, right?

16   A.   Right.

17   Q.   Do you know if that box was searched at the post office?

18   A.   Yes.

19   Q.   And this Hermes, okay?  It looks like it was wrapped

12:15:57PM 20   multiple times with different things; am I right?

21   A.   Yes.

22   Q.   Okay. What was the first layer of wrap?  I mean, was it

23   carbon paper?  Was it tissue?  What was it?

24   A.   The outer layer?

12:16:10PM 25   Q.   Yeah, the outer layer?

1  A.   It was carbon paper.

2  Q.   Carbon paper.  So you took the carbon paper off, right?

3  A.   Yes.

4  Q.   And how many -- how many bricks are there, two?

12:16:20PM 5  A.   Two bricks.

6  Q.   Two bricks, okay.  So they take off carbon paper on both

7  bricks, correct?

8  A.   Correct.

9  Q.   And what's under that when you take the carbon paper off?

12:16:29PM 10  A.   Plastic wrap.

11  Q.   Plastic wrap.  And then did you take the plastic wrap off?

12  A.   Yes.

13  Q.   Okay. What was under the plastic wrap?

14  A.   I believe then it was the label.

12:16:38PM 15  Q.   The label of Hermes?

16  A.   Yes.

17  Q.   Did you take the label of Hermes off?

18  A.   No.

19  Q.   You just left it on?

12:16:49PM 20  A.   I don't recall specifically.

21  Q.   Okay. What ultimately happened with those two bricks?

22  A.   They were turned over to the RPD.

23  Q.   All right. If you take a look at 393, it's already up on

24  the screen here, you take a look at the bottom and it's got an

12:17:11PM 25  M and an F, correct?

1  A.    Yes.

2  Q.    2406-20, number 1.  Do you know what that meant?

3  A.    No, I don't.

4  Q.    Do you know who wrote that?

12:17:26PM 5  A.    No.

6  Q.    Then there's 11/19/20 - as received 3.  Do you know what

7  that means?

8  A.    It says 11/9/20.

9  Q.    11/9/20.  Then it says what?  As received?

12:17:43PM 10  A.    3, yes.

11  Q.    Then 3, the number 3, right?

12  A.    Yes.

13  Q.    What does that mean?

14  A.    I don't know.

12:17:51PM 15  Q.    Okay. Then on one of the bricks it looks like there's

16  written BR 1/31/18, then the second one is 1/31/18, correct?

17  A.    Yes.

18  Q.    Do you know what that means?

19  A.    Yes.

12:18:05PM 20  Q.    What is it?

21  A.    That's the initials for the Postal inspectors.  They

22  sealed it back up after conducting the field test.

23  Q.    Okay. And the photos that we've seen on this with the

24  candy and everything, when did those boxes come in?

12:18:26PM 25          **MS. KOCHER:** Objection.  We're talking about

1   multiple boxes over different days that all had candy.

2          **THE COURT:** Yes, do you want to rephrase the

3   question?  Sustain the objection.

4   **BY MR. VACCA:**

12:18:36PM 5   Q.   Okay.  Let's go through -- if you can put 375 back up?

6   375, you see that, correct?

7   A.   Yes.

8   Q.   What is that a box of?

9   A.   The box that was later found to contain the 2 kilos.

12:19:14PM 10  Q.   Okay. Next number, 376.  So this box right here, this is

11  the one -- this is like 375 except it has writing on it,

12  right?  Like an address?

13  A.   The shipping label, yes.

14  Q.   But it's on that box, right?

12:19:38PM 15  A.   Yes.

16  Q.   Okay. Next, please.  What's 377?

17  A.   It's another sticker from the Postal Service with the

18  amount paid, the delivery day and the tracking number.

19  Q.   Okay. Was that delivered?

12:19:58PM 20  A.   No.

21  Q.   No.  It was confiscated, right?

22  A.   Right.

23  Q.   And that box -- is that a box that you found the cocaine

24  in?

12:20:08PM 25  A.   Yes.

1  Q.   That box right there?

2  A.   Yes.

3  Q.   So it was never shipped?

4  A.   It was shipped.  It was never delivered to the addressee.

12:20:19PM 5  Q.   Okay. All right. So then let's look at 378.  What's this?

6  A.   This is the box just being opened initially, the top part.

7  Q.   All right. Then there's candy in there, right?

8  A.   Right.

9  Q.   Then there's the -- there's the two bricks, the 2 kilos?

12:20:40PM 10  A.   Correct.

11  Q.   Okay. In that box is a Skittles box and an M&M's box,

12  right?

13  A.   Yes.

14  Q.   All right.  379, please.  Let me ask you this: 375 to 393,

12:20:57PM 15  those are all -- everything there comes from that one box,

16  right?

17  A.   Yes.

18  Q.   That was never shipped?

19         **MS. KOCHER:** Objection.

12:21:05PM 20         **THE COURT:** Yes, sustained.

21  **BY MR. VACCA:**

22  Q.   That box -- was that box brought in by any of the two

23  women?

24  A.   No.

12:21:14PM 25  Q.   No?

1  A.   No.

2  Q.   How did the Postal Service come in -- in contact with that

3  box?

4  A.   Based on intelligence from us regarding tracking number.

12:21:33PM 5  Q.   So that box where the drugs were located, you watched the

6  video where you describe Mr. Figueroa getting in and out of

7  his vehicle going places, backing out of the driveway, then

8  leave on Barrington, correct?

9  A.   Correct.

12:22:03PM 10  Q.   This box that you're talking about where you found the two

11  bricks, that's not one of those two boxes that were on the

12  video on Barrington, correct?

13  A.   Correct.

14  Q.   All right. So the boxes on Barrington one had no drugs, no

12:22:19PM 15  money in it, right?

16  A.   Right.

17  Q.   And the other one had some money in it?

18  A.   Correct.

19  Q.   Correct?

12:22:26PM 20  A.   Yes.

21  Q.   Did you perform any field test on the money?

22  A.   No.

23  Q.   So that money could be argued to be legitimate money,

24  correct?

12:22:40PM 25         **MS. KOCHER:** Objection.

1            **THE COURT:** Overruled.  You can answer that.

2    **BY MR. VACCA:**

3    Q.   Be legitimate money, correct?

4    A.   Could be.

12:22:47PM 5    Q.   Yeah.  All right.

6            **MR. VACCA:** I have nothing further, Your Honor.

7    Thank you.

8            <u>**REDIRECT EXAMINATION**</u>

9    **BY MS. KOCHER:**

12:22:55PM 10   Q.   Agent Reichard, the day January 25th, that was the day you

11   did the surveillance from Barrington to the post office on

12   Howard Road?

13   A.   Yes.

14   Q.   Did you see the defendant's gray pick-up truck pull into

12:23:09PM 15   the parking lot of the post office on Howard Road?

16   A.   Yes.

17   Q.   And that was I believe you testified about 12:57 p.m.?

18   A.   That's correct.

19   Q.   Now, on that day there were two packages seized by the

12:23:24PM 20   Postal Department or Postal Office?

21   A.   Yes.

22   Q.   One had money, one had packaging materials?

23   A.   Correct.

24   Q.   And then a few days later on January 31st, is that where

12:23:36PM 25   you came into contact with what is depicted in Government's

1 Exhibit 379, the box that had the 2 kilograms of cocaine?

2 A.   Yes.

3 Q.   When you first -- can we go to 377?  Looking at

4 Exhibit 377 -- sorry, 375.  I'm sorry, we're going to pull up

12:24:05PM 5 Exhibit 375.  This is the box that contained the 2 kilograms

6 of cocaine on January 31st?

7 A.   Yes.

8 Q.   When you first came into contact with this box was it in a

9 sealed condition?

12:24:18PM10 A.   Yes.

11 Q.   Hadn't been opened yet?

12 A.   No.

13          **MS. KOCHER:** Thank you.  Nothing further.

14          **MR. VACCA:** Nothing further, Your Honor.

12:24:28PM15          **THE COURT:** Thank you.  You may step down.  Thank

16 you very much.

17          **THE WITNESS:** Yes, Judge.

18          (**WHEREUPON**, the witness was excused).

19                    *    *    *

20

21

22

23

24

25

1          **CERTIFICATE OF REPORTER**

2

3          In accordance with 28, U.S.C., 753(b), I certify that

4  these original notes are a true and correct record of

5  proceedings in the United States District Court for the

6  Western District of New York before the Honorable Frank P.

7  Geraci, Jr. on May 5th, 2021.

8

9  S/ Christi A. Macri

10 Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25