1

1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5    - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA              18-CR-6094(G)
6
     vs.
7                                          Rochester, New York
     CARLOS JAVIER FIGUEROA,               May 13, 2021
8              Defendant.                  8:30 a.m.
     - - - - - - - - - - - - -X
9

10                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE FRANK P. GERACI, JR.
11               UNITED STATES DISTRICT CHIEF JUDGE

12
                       JAMES P. KENNEDY, JR., ESQ.
13                     United States Attorney
                       BY: ROBERT A. MARANGOLA, ESQ.
14                         CASSIE M. KOCHER, ESQ.
                       Assistant United States Attorneys
15                     500 Federal Building
                       Rochester, New York 14614
16                     Appearing on behalf of the United States

17
                       PAUL J. VACCA, JR., ESQ.
18                     One East Main Street, Suite 1000
                       Rochester, New York 14614
19                     Appearing on behalf of the Defendant

20
     ALSO PRESENT:       Nicolas Penchaszadeh, Spanish Interpreter
21                       Barbara Considine, Spanish Interpreter
                         Besayda Soto Abbate, Spanish Interpreter
22
     COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
23                       Christimacri50@gmail.com
                         Kenneth B. Keating Federal Building
24                       100 State Street, Room 2640
                         Rochester, New York 14614
25

2

1                         **I N D E X**

2    **WITNESS FOR THE GOVERNMENT**

3    Ryan Hickey
          Direct examination by Ms. Kocher          Page  3
4         Cross-examination by Mr. Vacca            Page 41

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*    \*    \*

**(WHEREUPON**, the defendant is present).

<u>**GOVERNMENT'S WITNESS, RYAN HICKEY, SWORN**</u>.

<u>**DIRECT EXAMINATION**</u>

**THE CLERK:** Please state your name and spell your last name for the record.

**THE WITNESS:** Ryan Hickey, H-I-C-K-E-Y.

**THE REPORTER:** Thank you.

**THE WITNESS:** Good morning, Your Honor.

**THE COURT:** Good morning.  Investigator, change the covers on the microphones, throw those away.  In the box to your right, you can put new ones on there.  In addition, you can remove your mask since you're behind plexiglas.

Thank you, you may proceed.

**MS. KOCHER:** Thank you.

BY MS. KOCHER:

Q.   Good morning.

A.   Good morning.

Q.   Could you please introduce yourself to the jury?

A.   My name is Investigator Ryan Hickey.  I work for the Rochester Police Department.

Q.   And you work for the Rochester Police Department as an investigator?

A.   Yes.

1   Q.    How long have you worked as an investigator?

2   A.    I've been an investigator for seven years, and a police

3   officer for 15 years.

4   Q.    What section or what assignment do you have as an

08:59:57AM 5   investigator currently?

6   A.    I'm currently assigned to the Special Investigation

7   Section.

8   Q.    And what do you do in the Special Investigation Section?

9   A.    Primarily narcotics investigations.

09:00:07AM 10   Q.    How long have you been in that section?

11   A.    Almost three years.

12   Q.    Now, prior to becoming an investigator in the Special

13   Investigation Section, where were you assigned?

14   A.    I was assigned as a -- what's called a section

09:00:23AM 15   investigator, meaning just a general investigator assigned to

16   one of the patrol sections and primarily I worked in

17   Clinton Section.

18   Q.    You said you were -- you've been an investigator for about

19   seven years?

09:00:36AM 20   A.    Yes, since 2014.

21   Q.    So were you in the Clinton Section as an investigator?

22   A.    Yes, I worked on the west side of the city for a little

23   bit, but most of my time was in Clinton Section.

24   Q.    Okay. And what were your duties as a section investigator?

09:00:55AM 25   A.    As a section investigator basically you would respond to

1  crimes that would occur during your shift if they were at a

2  certain level, whether it be an assault, shooting, robbery,

3  rape, other crimes like that.

4          And then if you responded to a crime during your

09:01:16AM 5  shift you obviously would conduct an investigation and be

6  assigned that case and you would be responsible for continuing

7  that investigation.

8          You'd also be assigned other cases by your

9  supervisor that may have come in not while you were working,

09:01:30AM10  but you'd be tasked with following up with interviewing

11  victims, witnesses, suspects, investigating crimes basically.

12  Q.   Now, in addition to being an investigator in the Special

13  Investigation Section, are there any other teams that you're a

14  part of with the Rochester Police Department?

09:01:50AM15  A.   Yes, I'm also a part of the SWAT team for the Rochester

16  Police Department.

17  Q.   And what are some of the things that you do with the SWAT

18  team?

19  A.   We execute or serve high-risk search warrants, we respond

09:02:03AM20  to other situations as needed like barricaded gunmen, hostage

21  situations, things of that nature.

22  Q.   Can you explain some of your training to become a police

23  investigator?

24  A.   Sure.  Just in general to become a police officer you go

09:02:19AM25  through a police academy which is approximately six months

1    long.  You then have a field training program where you're

2    working as a police officer, but you're assigned to senior

3    officers.  That's about four months typically.

4            And then obviously you receive lots of

09:02:37AM 5    on-the-job training as a police officer and in-service

6    training.

7            To become an investigator you have to take a Civil

8    Service exam and obviously score well enough on it to get

9    promoted; and then you attend various trainings for that as

09:02:50AM 10   well, whether it's like a basic criminal investigation school

11   and then in-service training, additional trainings somebody

12   may or may not put in for.

13           So you attend a lot of training throughout the

14   course of your career.

09:03:05AM 15  Q.    Okay. Have you received training on drug recognition?

16   A.    Yes.

17   Q.    What is some of that training?

18   A.    In the academy you receive training related to drug

19   recognition, how to identify narcotics and other controlled

09:03:18AM 20  substances, how to field test them.

21           Once you get out on the road and you're working as

22   a police officer again, you know, throughout the course of

23   your career there might be various in-service stuff you would

24   attend if there's updates in how to field test things, stuff

09:03:36AM 25  like that.  You have a lot of on-the-job training if you make

1  narcotics-related arrests if you're identifying those

2  substances, handling those substances.

3          And working in a Narcotics Unit you obviously deal

4  with narcotics quite a bit, whether it's recovering them in

09:03:51AM 5  search warrants, identifying them, field testing them,

6  purchasing them in an undercover capacity, stuff like that.

7  Q.   Okay. Since becoming a police officer have you had the

8  chance to see some controlled substances, including cocaine

9  and heroin?

09:04:06AM 10  A.   Yes.

11  Q.   About how many times?

12  A.   Throughout the course of my career I've -- ballpark

13  figure, I mean, probably hundreds of drug-related arrests.

14  Q.   Okay.  Can you explain some of the common characteristics

09:04:19AM 15  of cocaine?

16  A.   Sure.  Cocaine basically is a white powdery substance, you

17  know, for just powder cocaine.  And then obviously there's

18  crack cocaine, which is more of a -- like a chunky rock-like

19  substance, which is also usually white in color.

09:04:37AM 20  Q.   Okay. And what are some of the common characteristics of

21  heroin?

22  A.   Heroin is also a -- usually a powdery substance which is

23  usually tan in color.  The color can kind of vary, but usually

24  it's tan in color.

09:04:51AM 25  Q.   Now, are you also familiar with how cocaine and heroin are

1  commonly packaged for sale?

2  A.   Yes.

3  Q.   Typically how are they packaged for sale?

4  A.   Cocaine, powder cocaine, is usually packaged in small bags

09:05:07AM 5  usually like small ziplock style bags.  And depending on the

6  amount that's in that bag would be what it's referred to on

7  the street, whether it's a dime bag, which normally would be

8  like a $10 amount on the street; or a 20 bag, which would be

9  $20 worth of cocaine on the street.

09:05:26AM 10      Heroin typically is also -- it's packaged in

11  smaller amounts whether it's in a small ziplock style bag or

12  could be in what's called like a glassine envelope, which is

13  like a -- almost like a waxy looking envelope, and that also

14  is packaged, you know, in different amounts.

09:05:47AM 15      Normally it would be what's called a deck, which

16  would be like a single serving of it, if you will, which would

17  be anywhere from 10 to $5 depending on the amount or the price

18  of heroin at that time.  And then ten decks would make up

19  what's called a bundle.  So that's typically how it's sold at

09:06:06AM 20  the street level.

21  Q.   Okay.  So a bundle of heroin would essentially be ten

22  servings --

23  A.   Yes.

24  Q.   -- of heroin?

09:06:14AM 25  A.   Yes.

1    Q.    Now, Investigator, I'd like to direct your attention back

2    to December 8th of 2016.  Were you working as an investigator

3    with the Rochester Police Department on that day?

4    A.    Yes.

09:06:27AM 5    Q.    And what was your current assignment?

6    A.    At that time I was assigned as a section investigator in

7    the Clinton Section and I worked the day shift.

8    Q.    What was the day shift?

9    A.    Generally 7 a.m. to 3 in the afternoon.

09:06:43AM 10    Q.    Did you have a partner assigned to you at that time?

11    A.    Yes.

12    Q.    And who was that?

13    A.    Investigator Andy Mackenzie.

14    Q.    At about 11 a.m. on that day were you and your partner

09:06:56AM 15    called to assist with an investigation?

16    A.    Yes.

17    Q.    What was that for?

18    A.    We went to the area of 54 Miller Street to investigate the

19    report of a person shot at that location.

09:07:09AM 20    Q.    Okay. I'd like to show you what's been received into

21    evidence as Exhibit 246.  And there's a monitor to your left

22    that should pop up.  Okay, Investigator, you -- the area you

23    responded to, 54 Miller Street, is that on this map?

24    A.    Yes.

09:07:49AM 25    Q.    And if you wouldn't mind just circling the general area

1  where 54 Miller Street is located?

2  A.   Sure.

3  Q.   So you've placed a mark around the number 54 almost right

4  in the middle of the page?

09:08:09AM 5  A.   Yes.

6  Q.   And this is in the City of Rochester, Monroe County?

7  A.   Yes, it is.

8  Q.   Okay. Now, can you describe Miller Street?

9  A.   Sure.  Miller Street again is located in the City of

09:08:22AM 10  Rochester, the majority of the street is one way.  It runs

11  southbound between Clifford Avenue and Bay Street.

12  Q.   Okay.  So between Clifford Avenue and Bay Street it is a

13  one-way street?

14  A.   Yeah, it's a one-way street running southbound.

09:08:38AM 15  Q.   Okay. Now, you indicated that you responded to this area

16  for a person shot?

17  A.   Yes.

18  Q.   When you got to the location were there any victims or

19  anyone that had been injured?

09:08:49AM 20  A.   No.

21  Q.   Okay. Did you learn where they were?

22  A.   Yes.

23  Q.   Where was the individual?

24  A.   I learned that the individual that had been shot was

09:08:57AM 25  dropped off at Rochester General Hospital by a good Samaritan.

1  Basically a person drove them to the hospital.

2  Q.   Okay. Did you learn who that person was?

3  A.   Yes.

4  Q.   Who was that?

09:09:09AM 5  A.   I learned that the victim of the shooting on that day was

6  named Obed Torres.

7  Q.   Okay. I'd like to show you what's been received into

8  evidence as Government's Exhibit 26.  Investigator, there's a

9  clear button in the upper right corner of monitor.  If you

09:09:27AM 10  wouldn't mind hitting that for me?

11  A.   Which button?

12  Q.   It says clear.  It should clear your mark.  Okay.

13  A.   Okay, got it.

14  Q.   Now, Investigator, do you see the individual that you

09:09:42AM 15  identified as Obed Torres on this exhibit?

16  A.   Yes.

17  Q.   Would you mind circling his photograph?

18  A.   Sure.

19  Q.   Now, you've circled the photo in the third row to the very

09:09:58AM 20  left?

21  A.   Yes.

22  Q.   Okay. Now, Investigator, what did you observe when you got

23  to 54 Miller Street?

24  A.   When I got to 54 Miller Street, after speaking with the

09:10:11AM 25  supervisor and some of the officers on scene, I observed the

1   actual location 54 Miller Street, I could see that there was

2   clear evidence there that a shooting had occurred.

3              I could see bullet damage to the exterior of the

4   house, I could see some glass in the driveway which looked

09:10:32AM 5   like auto glass, so like glass from the window of a car that

6   was in the driveway.  Stuff like that.

7   Q.   Okay. Is -- what is at Miller Street?  Is it a house?  An

8   apartment?

9   A.   It's a multi-family house.  There were two apartments, a

09:10:48AM 10   downstairs apartment and an upstairs apartment.

11   Q.   Okay. Investigator, I'd like to show you what's been

12   received into evidence as Government's Exhibit 248.  And,

13   again, if you could hit that clear button?

14   A.   Sure.

09:11:01AM 15   Q.   Thank you.  What is depicted in Government's Exhibit 248?

16   A.   This is a picture of 54 Miller Street and it's mostly the

17   front of the house.  So the front side that you're looking at

18   there is what faces Miller Street.

19   Q.   Okay. If we can move on to the next Exhibit 249, also

09:11:25AM 20   already in evidence?  What is in this photograph?

21   A.   This is a picture of the driveway at 54 Miller Street and

22   then part of the front of the house and you can see -- I can

23   see the -- actually that auto glass I described before laying

24   in the driveway.

09:11:44AM 25   Q.   Could you circle the area where that auto glass is in the

1  driveway?

2  A.   Sure.

3  Q.   Okay. So you've made a circle certainly in the middle of

4  the photograph around what appears to be like green pieces of

09:12:01AM 5  glass?

6  A.   Yes.

7  Q.   If you can hit the clear button for me, please?  Thank

8  you.  Now, Investigator, I'd next like to show you what has

9  not been received into evidence, Exhibit 250, 251, and 252.

09:12:28AM 10  We'll flip through those and when you're done I'll ask you if

11  you recognize those photos?

12  A.   Sure.

13  Q.   Okay. Did you have a chance to see those three

14  photographs?

09:12:42AM 15  A.   Yes.

16  Q.   Okay. Investigator, what was depicted generally in those

17  three photos?

18  A.   Again it's the front of 54 Miller.  In this particular

19  photo right here Exhibit 250, some of the things that I can

09:12:55AM 20  see are in this front window, the window on the left-hand side

21  of the picture you can see bullet damage to the outside of the

22  window, both the glass and the framing or the trim around the

23  window.  You can also see partially the stairs and the porch

24  leading up to the front door of the downstairs apartment.

09:13:19AM 25  Q.   Do those three photographs -- Exhibit 250, 251 and

1  252 -- fairly and accurately depict the way that that location

2  on the exterior looked when you responded on December 8th,

3  2016?

4  A.   Yes.

09:13:35AM 5        **MS. KOCHER:** Your Honor, I'd offer Government's

6  Exhibit 250, 251 and 252.

7        **MR. VACCA:** No objection, Your Honor.

8        **THE COURT:** Exhibits 250, 251 and 252 will be

9  received.

09:13:45AM 10        (**WHEREUPON**, Government's Exhibits 250-252 were

11  received into evidence).

12        **MS. KOCHER:** Thank you.

13  **BY MS. KOCHER:**

14  Q.   Investigator, you mentioned in this photo 250 you could

09:14:01AM 15  see bullet damage?

16  A.   Yes.

17  Q.   Could you please circle the area where you saw that bullet

18  hole damage?

19  A.   Sure.

09:14:16AM 20  Q.   You've placed a mark in the middle of the photo on that

21  window to the left; is that correct?

22  A.   Yes.

23  Q.   Okay. And could you describe more specifically what it is

24  you saw that day?

09:14:32AM 25  A.   Sure.  I can see the glass is broken on that window; it's

1  probably better viewed in -- I think it was Exhibit 251.  You

2  can also see at least two bullet holes in the trim of the

3  window right there.

4  Q.    Okay. If we can move on to Exhibit 251?  If you wouldn't

09:14:49AM 5  mind clearing your marks?

6  A.    Yup.

7  Q.    Thank you.  Is Exhibit 251 a closer-up image of what we

8  just saw?

9  A.    Yes.

09:15:00AM 10  Q.    Okay. And does this also show those bullet holes that you

11  observed?

12  A.    Yes.

13  Q.    Investigator, based on your training and experience were

14  you able to make any determinations about what direction those

09:15:15AM 15  bullet holes were coming from?

16  A.    Yes.

17  Q.    What was that?

18  A.    So --

19          **MR. VACCA:** Objection, Your Honor.

09:15:21AM 20          **THE COURT:** Yes, sustained.

21  **BY MS. KOCHER:**

22  Q.    Investigator, if we can move on to Exhibit 252?  What is

23  depicted in this photo?

24  A.    This is the -- like the front porch of 54 Miller and that

09:15:37AM 25  open door you see is the front door to the downstairs

1 | apartment of 54 Miller Street.

2 | Q.   Okay. Now, you mentioned when you arrived you spoke with

3 | other officers and supervisors on scene?

4 | A.   Yes.

09:15:49AM 5 | Q.   Did you learn that the home had already been cleared?

6 | A.   Yes, I learned it had been cleared for people.

7 | Q.   What does that mean to clear a house for people?

8 | A.   Based on what the officer responded to, the nature of the

9 | call that they responded to, and they had learned that there

09:16:08AM 10 | was a person that had --

11 |             MR. VACCA: Objection, Your Honor, as to what they

12 | learned.

13 |             THE COURT: Overruled.  It's just fundamental stuff.

14 | Go ahead.

09:16:16AM 15 |             THE WITNESS: Based on what they responded to and

16 | the observations they made at that time, the officers I

17 | learned from them were concerned --

18 |             MR. VACCA: Objection, Your Honor.

19 |             THE COURT: Sustained.

09:16:27AM 20 |             MS. KOCHER: Effect on the listener, Your Honor.

21 |             THE COURT: What's that?

22 |             MS. KOCHER: Goes to the effect on the listener and

23 | what the investigator did next.

24 |             THE COURT: Reask the question.

09:16:38AM 25 | BY MS. KOCHER:

1   Q.   Sorry, I'm not sure I remember the exact words.  I believe

2   I asked you spoke with officers and supervisors when you

3   responded to the scene.  What did you learn?

4                   MR. VACCA: Objection, Your Honor.

09:16:50AM 5                   THE COURT: Go ahead.  Overruled.

6                   THE WITNESS: I learned that they conducted what we

7   call a protective sweep of the downstairs apartment in order

8   to make sure there were not any additional victims inside; and

9   also for safety purposes, to make sure there wasn't an armed

09:17:05AM10   suspect or individual that would cause a danger to the police

11   investigating the incident at that time.

12   **BY MS. KOCHER:**

13   Q.   Okay.  And did you learn how they made entry into the

14   location?

09:17:14AM15                   MR. VACCA: Objection, Your Honor.

16                   THE COURT: Overruled.  Go ahead.

17                   THE WITNESS: Yes, I did.

18   **BY MS. KOCHER:**

19   Q.   How was that?

09:17:20AM20                   MR. VACCA: Objection, Your Honor.

21                   THE COURT: Overruled.

22                   THE WITNESS: I learned that they knocked on the

23   front door, the door that is open in this picture, but was

24   closed at that time, they knocked on the door, identified

09:17:31AM25   themselves for a period of several minutes.

1          Hearing no response, they wound up forcing the door

2   open and then clearing the downstairs apartment.

3          MR. VACCA: Your Honor, I ask that all be stricken.

4          THE COURT: On what basis?

09:17:43AM 5          MR. VACCA: Your Honor, he's actually editorializing

6   what other officers told him with respect to how they gained

7   entry, what they did prior to gaining entry, and those

8   officers aren't here to testify.

9          THE COURT:  Okay, sustained, that will be stricken.

09:17:59AM10          MS. KOCHER: Again it goes to what the investigator

11  did based on that information.

12          THE COURT: Great, I made my ruling.  Thank you,

13  move on.

14          MS. KOCHER: Okay.

09:18:07AM15  BY MS. KOCHER:

16  Q.   Investigator, did you learn -- was anyone removed from the

17  home?

18  A.   Yes.

19  Q.   Who was removed from the home?

09:18:13AM20  A.   An individual who was identified as Axel Aponte Camacho.

21          MR. VACCA: Again, Your Honor, objection if that was

22  information that was obtained from the other officers.

23          THE COURT: Overruled.  That will stand.

24  BY MS. KOCHER:

09:18:24AM25  Q.   I'd like to go to Exhibit 26 that's been received into

1  evidence.  Investigator, did you have an opportunity to see

2  Axel Aponte Camacho that day?

3  A.   Yes.

4  Q.   And do you see the individual that you identified as Axel

09:18:40AM 5  Aponte Camacho on this exhibit?

6  A.   Yes, I do.

7  Q.   If you could circle his photograph, please?

8  A.   Sure.

9  Q.   You placed a circle on the third row, the photo second

09:18:58AM 10  from the left?

11  A.   Yes.

12  Q.   Thank you.  If you could hit the clear button?

13  A.   Sure.

14  Q.   Now, Investigator, based upon your observations at the

09:19:08AM 15  scene and your conversations with the officers and supervisors

16  on scene, what did you do?

17          MR. VACCA: Objection, Your Honor, conversations as

18  to officers and other individuals.

19          THE COURT: Yes, as to conversations.  What did you

09:19:23AM 20  do next?

21          THE WITNESS: What I did next while I was at the

22  scene, I made my own observations of the scene, some of which

23  I've described already regarding the bullet damage to the

24  house and the glass in the driveway.  I also interviewed a

09:19:37AM 25  witness or at least a partial witness of the event that

1    occurred and based on my observations and the interviews that

2    I conducted, I --

3                  **MR. VACCA:** Objection, Your Honor.

4                  **THE COURT:** No, overruled.  Go ahead.

09:19:52AM 5     **THE WITNESS:** -- I drafted a search warrant for the

6    downstairs apartment at 54 Miller Street.

7    **BY MS. KOCHER:**

8    Q.   Okay.  Did you draft that search warrant on the same day

9    December 8th, 2016?

09:20:03AM 10    A.   Yes.

11   Q.   And was that ultimately signed by a judge?

12   A.   Yes.

13   Q.   What judge signed the warrant?

14   A.   It was signed by Monroe County Court Judge Douglas

09:20:12AM 15   Randall.

16   Q.   Did that search warrant authorize you to make entry into

17   the home and perform a search?

18   A.   Yes, it did.

19   Q.   Now, later that day at about 3:15 did you, in fact,

09:20:24AM 20   execute that search warrant at 54 Miller Street?

21   A.   Yes.

22   Q.   Did others assist you?

23   A.   Yes.

24   Q.   Who were some of those other people?

09:20:33AM 25   A.   My partner on that day Investigator Mackenzie was with me,

1    Investigator Timothy Gourlay was there, there was a team of

2    people from the Special Investigation Section who assisted to

3    include Sergeant Mike Nicholls, there was a technician Eric

4    Ferguson who was also there with us to conduct photographs and

09:20:53AM 5    tech work.

6    Q.    Okay. Can you generally describe the layout of the lower

7    apartment at 54 Miller Street?

8    A.    Sure.   Like I said, it's a downstairs apartment, so you

9    go in, there's a living room, there's a couple of bedrooms

09:21:10AM 10    that are off the living room, goes back to a kitchen, et

11    cetera.   So it's a -- it's just a downstairs of the residence.

12    Q.    Okay. And in doing that search of that downstairs

13    apartment what were some of the things that you located?

14    A.    Some of the evidence that was collected was there was a

09:21:30AM 15    backpack that was located in one of the bedrooms that was just

16    off the front living room, which contained a large amount of

17    heroin.

18              **MR. VACCA:** Objection, Your Honor.

19              **THE COURT:** Overruled.

09:21:43AM 20              **THE WITNESS:** And cocaine as well.  There was a

21    loaded .40 caliber semi-automatic handgun which was located in

22    the front living room of the downstairs apartment which was

23    found sort of underneath a mattress that was propped up

24    against the wall.

09:22:03AM 25              There were two spent .40 caliber shell casings

1 | which were located also in the front living room; I believe
2 | they were -- one was -- they were both in the vicinity of a
3 | couch in the front living room, underneath the couch and I
4 | think underneath the couch cushion.

09:22:17AM 5 | There was some paperwork and some other evidence
6 | that was also recovered.

7 | **BY MS. KOCHER:**
8 | Q.   Okay.  Now, did you collect any of that evidence you just
9 | identified?

09:22:31AM 10 | A.   All the evidence I just identified was collected, yes.
11 | Q.   Did you yourself collect any of it personally?
12 | A.   No.
13 | Q.   Okay. What about the narcotics or the backpack?
14 | A.   The narcotics were actually initially found by

09:22:47AM 15 | Investigator Mackenzie.

16 | **MR. VACCA:** Objection, Your Honor.

17 | **THE COURT:** Overruled.  Go ahead.

18 | **THE WITNESS:** After they were located they were
19 | photographed where they were found and then they were placed

09:22:55AM 20 | in a large brown paper evidence bag and Investigator Mackenzie
21 | took that bag, which I was with him the entire time.

22 | **BY MS. KOCHER:**
23 | Q.   Did the two of you travel to and from 54 Miller Street
24 | together?

09:23:11AM 25 | A.   Yes.

1  Q.   Okay.  Now, those narcotics, were those ultimately turned

2  into the Property Clerk's Office?

3  A.   Yes.

4  Q.   What condition were they turned into the Property Clerk's

09:23:24AM 5  Office?

6              **MR. VACCA:** Objection, Your Honor.

7              **THE COURT:** Overruled.

8              **THE WITNESS:** As I stated, the entire backpack and

9  all the contents were placed in a large brown paper, evidence

09:23:35AM 10  bag, which we annotated, you know, the CR number, specific

11  crime report number associated with this incident, date, time,

12  all the stuff we would normally put on an evidence bag, and

13  the bag was sealed and turned into the property clerk.

14  **BY MS. KOCHER:**

09:23:54AM 15  Q.   All right. So drugs were placed in a sealed bag and

16  submitted to property?

17  A.   Yes.

18  Q.   Okay. Now, you mentioned they would be marked with a crime

19  report or CR number?

09:24:05AM 20  A.   Yes.

21  Q.   Do you recall if the crime report for the items collected

22  during the search warrant was 16-316386?

23  A.   That sounds correct, yes.

24  Q.   Was there also a second CR associated with this case?

09:24:26AM 25  A.   Yes.

1  Q.    And why was there a second?

2  A.    There were two CRs because it was a crime report number

3  for the assault shooting that took place.  And then there was

4  a separate crime report number assigned to the execution of

09:24:39AM 5  the search warrant and narcotics and firearm related arrest

6  that we made that day.

7  Q.    Now, Investigator, I'd like you to take a look at what's

8  not been received into evidence as Exhibit 253, through and

9  including 270, and there's actually a binder in front of you.

09:25:06AM 10  Perhaps it might be easier if you flip in the binder through

11  those exhibits.

12  A.    Sure.

13  Q.    Please let me know when you've had a chance to review

14  them.

09:25:42AM 15  A.    I apologize.  253 through what number do you want me to

16  look at?

17  Q.    I believe it's 270.

18  A.    Okay.  Okay.

19  Q.    Now, do those photographs fairly and accurately depict the

09:27:21AM 20  interior of 54 Miller Street and the items that were seized

21  that day?

22  A.    Yes.

23  Q.    Now, with regards to Exhibit 264 and 266, do those

24  actually appear to be duplicate photos of one another?

09:27:44AM 25  A.    Yes, they appear to be the same picture.

1  Q.   Okay. Now, in those photographs do you notice anything

2  different or any additions from the items that you observed

3  that day?

4  A.   No.

09:28:01AM 5        **MS. KOCHER:** Your Honor, based on that testimony I

6  would offer Government's Exhibit 253 through 265, given that

7  there is a duplicate, I will not offer 266, and I would also

8  offer 267 through and including 270.  I also believe 258 has

9  actually already been received.

09:28:25AM 10       **THE COURT:** Yes, I have 258 as already received.

11       **MS. KOCHER:** Thank you.

12       **THE COURT:** Mr. Vacca?

13       **MR. VACCA:** *Voir dire*, Your Honor?

14       **THE COURT:** Go ahead.

09:28:39AM 15       **MR. VACCA:** Investigator, with respect to 253, did

16  you take that photo?

17       **THE WITNESS:** No.

18       **MR. VACCA:** Do you know who took the photo?

19       **THE WITNESS:** Yes.

09:28:49AM 20       **MR. VACCA:** Who took the photo?

21       **THE WITNESS:** Technician Eric Ferguson.

22       **MR. VACCA:** Does that show anything that you

23  confiscated and put into evidence bags?

24       **THE WITNESS:** No, I don't believe it does.

09:29:03AM 25       **MR. VACCA:** Okay.  As far as 254, what does that

1  show?

2          **THE WITNESS:** 254 shows a portion of the front

3  living room.  It also -- you can see on the floor there it

4  shows the .40 caliber semi-automatic handgun that was located

09:29:25AM 5  right where it's photographed.

6          **MR. VACCA:** So, to your knowledge, no one touched

7  that?

8          **THE WITNESS:** No.

9          **MR. VACCA:** Same with 255, correct?

09:29:35AM 10          **THE WITNESS:** Correct.

11          **MR. VACCA:** And 256 you took that into evidence?

12          **THE WITNESS:** Yes.

13          **MR. VACCA:** Same with 257?

14          **THE WITNESS:** Yes, sir.

09:29:50AM 15          **MR. VACCA:** 258?

16          **THE WITNESS:** Yes.

17          **MR. VACCA:** Is 258 a different angle of 259?

18          **THE WITNESS:** Yes, it looks like Exhibit 259 is a

19  close-up photograph of some of the items that are photographed

09:30:11AM 20  in Exhibit 258.

21          **MR. VACCA:** How about 260?  Does that show the same

22  as 258 and 259?

23          **THE WITNESS:** Again, yes, it shows a close-up image

24  of some of the items that are depicted in 258.

09:30:29AM 25          **MR. VACCA:** Same with 261?

1          **THE WITNESS:** Correct, sir.

2          **MR. VACCA:** Now 262, what does that show?

3          **THE WITNESS:** That's showing the top of the

4 mattress; and there's another bag and some clothing; and you

09:30:45AM 5 can see a digital scale that's on top of that one bag there.

6          **MR. VACCA:** Okay.  And did you take anything that's

7 shown in 262 into evidence?

8          **THE WITNESS:** Yes, I believe we took that digital

9 scale into evidence.

09:30:59AM 10          **MR. VACCA:** 263, is that the same picture of the

11 previous weapon that was shown?

12          **THE WITNESS:** No, it's not the same picture that was

13 previously shown, but it is a picture of the same weapon, yes.

14          **MR. VACCA:** 264, is that the same as several of the

09:31:18AM 15 items depicted in 258 to 264?

16          **THE WITNESS:** Yes, it's -- it is one of the same

17 items that's been previously depicted.  This photograph was

18 taken at the Technicians' Unit of the Rochester Police

19 Department.

09:31:33AM 20          **MR. VACCA:** How about 265?

21          **THE WITNESS:** Same.

22          **MR. VACCA:** 266?

23          **MS. KOCHER:** Your Honor, I'm not offering 266.  It

24 is a duplicate of 264.

09:31:47AM 25          **THE COURT:** Thank you.

1          **MR. VACCA:** 267, is that a photograph of items that

2    you confiscated?

3          **THE WITNESS:** Yes, sir.

4          **MR. VACCA:** And it's -- is it shown in previous

09:31:58AM 5    photographs?

6          **THE WITNESS:** Yes.

7          **MR. VACCA:** Same with 268?

8          **THE WITNESS:** Yes.

9          **MR. VACCA:** Same with 269?

09:32:09AM10          **THE WITNESS:**  Yes, sir.

11          **MR. VACCA:** Same with 270?

12          **THE WITNESS:** Yes.

13          **MR. VACCA:** Your Honor, going through these items,

14    as far as 253 is concerned on grounds of relevancy.

09:32:27AM15          On 254 and 255 they're photographs in the same

16    location of the same item, I would object to one or the other

17    of these items, but not allow both of them to come in because

18    they're the same picture.

19          **THE COURT:** The only ones are the same pictures is

09:32:55AM20    264 and 266.

21          **MR. VACCA:** 256.

22          **THE COURT:** Maybe the same items, it's different

23    pictures.

24          **MR. VACCA:** The pictures -- in terms of photographs,

09:34:10AM25    Your Honor, there are several duplications here.

1         **THE COURT:** Not the same photos.

2         **MR. VACCA:** Not the same photos.  Same item depicted

3 in the photo.

4         **THE COURT:** That's your objection?

09:34:10AM 5         **MR. VACCA:** That is my objection.

6         **THE COURT:** Overruled.  Exhibits 253, 254, 255, 256,

7 257, 259, 260, 261, 262, 263, 264, 265, 267, 268, 269 and 270

8 will be received.

9         (**WHEREUPON**, Government's Exhibits 253-257, 259-265,

09:34:10AM 10 267-270 were received into evidence).

11         **MR. VACCA:** Your Honor, just one additional item I'd

12 just like to place on the record, that it appears that this

13 would be bolstering in terms of multiple duplications of the

14 same item in the photographs.

09:34:10AM 15         **THE COURT:** Thank you.  Also overruled.

16 **BY MS. KOCHER:**

17 Q.   If we could publish 253 for the jury?  Investigator, can

18 you describe what we're looking at in Government's Exhibit

19 253?

09:34:11AM 20 A.   Yes.  We're looking at a photograph of the inside of the

21 downstairs apartment at 54 Miller Street.  You can see the

22 front living room.  On the right side of the front living room

23 depicted in the photograph you can see a mattress that's

24 propped up against the wall; and then looking straight back

09:34:30AM 25 you can see part of the kitchen of the downstairs apartment as

1  well.

2  Q.   Okay.

3          **MR. VACCA:** Your Honor, I'd ask that be stricken.

4  The photograph speaks for itself.

09:34:38AM 5          **THE COURT:** Overruled.

6  **BY MS. KOCHER:**

7  Q.   If we could go on to 254?  What is in this photograph?

8  A.   This photograph is also part of the living room of the

9  downstairs apartment at 54 Miller Street.  The mattress that

09:34:55AM 10  was depicted in the previous photo has been moved.  So you can

11  see on the floor of the living room there is that .40 caliber

12  semi-automatic handgun that was located during the search

13  warrant.

14  Q.   Could you please circle where that gun is located?

09:35:16AM 15  A.   Yes.

16  Q.   You've placed a circle just below the center of the photo

17  near a pack of water bottles around the gun on the floor?

18  A.   Yes.

19  Q.   Okay. Thank you.  If you don't mind clearing your mark

09:35:28AM 20  there?

21  A.   Yup.

22  Q.   Thank you.  If we can move on to 255?  What is in this

23  photograph?

24  A.   This is more of a close-up photograph of that

09:35:39AM 25  semi-automatic handgun that was found in the downstairs

1 apartment at 54 Miller Street.

2 Q.   Moving on to 256, is that a closer image of that same

3 firearm that was in the living room?

4 A.   Yes.

09:35:56AM 5 Q.   Okay. And are you able to make out any make or model of

6 the firearm in this photo?

7 A.   Yes, it's a Springfield Armory model XD and it's a .40

8 caliber.

9 Q.   Okay. If we can move on to 257.  What is in this

09:36:16AM10 photograph?

11 A.   This is a photograph of the backpack that was found in

12 that bedroom just off of the living room in the downstairs

13 apartment at 54 Miller Street.

14 Q.   And what was inside of the backpack when you located it in

09:36:30AM15 the bedroom?

16 A.   A large quantity of heroin, both loose heroin and heroin

17 that was packaged for sale and a quantity -- large quantity of

18 cocaine packaged for sale as well.

19 Q.   Move on to 258.  Can you describe this photograph?

09:36:49AM20 A.   Sure.  This photograph was again taken at 54 Miller

21 Street.  You can see it's just inside that bedroom where the

22 backpack was located.  At the top of the photograph you can

23 see a portion of that backpack; and then laid out on the floor

24 are the items that were found within the backpack.

09:37:11AM25 Q.   Okay. Can you describe some of those items that we can see

1  in this photograph that came out of the backpack?

2  A.   Sure.   You can see a number of large ziplock style bags.

3  There are some large ziplock bags that contain a large amount

4  of loose heroin.

09:37:31AM 5  Q.   Could you circle those bags that contain the large amount

6  of loose heroin?

7  A.   Sure.

8  Q.   You've placed two circles on the page just right of the

9  center and there are two kind of gallon size ziplock bags with

09:37:52AM 10  tan powdery substance?

11  A.   Yes.

12  Q.   If you could clear your mark, please?   There appear to be

13  some additional ziplock -- gallon ziplock style bags in this

14  photo as well?

09:38:04AM 15  A.   Yes.

16  Q.   What was inside those ziplock style gallon bags?

17  A.   Large amounts of heroin that was packaged for sale and an

18  amount --

19         **MR. VACCA:** Object, Your Honor, to the

09:38:16AM 20  editorialization of large amounts.

21         **THE COURT:** Overruled.   Go ahead.

22         **THE WITNESS:** And, again, a large amount of cocaine

23  packaged for sale.

24  **BY MS. KOCHER:**

09:38:26AM 25  Q.   If we could move on to Exhibit 259.   Can you describe

1  what's depicted in this photo?

2  A.   Again this is a close-up photograph of the items that were

3  found in the backpack or some of the items found in the

4  backpack and you can see this is heroin that's packaged for

09:38:45AM 5  sale.

6  Q.   Okay. And how is it packaged?

7  A.   So within those large ziplock bags there's some like

8  smaller sandwich style bags, and then in those sandwich bags

9  basically the heroin is packaged in bundles.  So again bundles

09:39:03AM 10  are like packets of ten decks or ten individual servings of

11  heroin.

12  Q.   If we could move on to Exhibit 260.  What is this a

13  photograph of?

14  A.   That's one of the larger bags of loose heroin; and then

09:39:25AM 15  you can also see some of the heroin that's packaged for sale,

16  and you can see some of the cocaine that's packaged for sale

17  as well.

18  Q.   And, again, the heroin is packaged in the bundles that you

19  described?

09:39:39AM 20  A.   Yes.

21  Q.   Move on to 261.  What is this a photograph of?

22  A.   That's a photograph of approximately a kilo of loose

23  heroin.

24  Q.   Moving on to 262.  Can you describe what is in this

09:40:01AM 25  photograph?

1  A.   Yes, there's a digital scale which is commonly used to

2  weigh out narcotics, you know, when they're being prepared for

3  sale.   And then there's some other items on top of a mattress,

4  some hats, a bag, I'm sorry, and some clothing.

09:40:22AM 5  Q.   Okay. If you can please circle where that scale is in the

6  photograph?

7  A.   Sure.

8  Q.   You've placed a circle just about in the middle of the

9  photograph.   That scale appears to be in a black and green

09:40:36AM 10  bag?

11  A.   Yes.

12  Q.   Okay. So that's a different backpack than what the drugs

13  were in?

14  A.   Yes.

09:40:43AM 15  Q.   Okay. If you could clear your mark, please?   Moving on to

16  263, what is this a photograph of?

17  A.   This is a close-up photograph of the .40 caliber

18  semi-automatic handgun that was found in 54 Miller Street and

19  it's after it's been cleared, so you can see the weapon's

09:41:04AM 20  locked back, you can see that there's one round found loaded

21  in the gun, and you can see the magazine, which is removed.

22  Q.   Okay.   And moving on to 264, what is this a photograph of?

23  A.   This is another photograph of one of the larger ziplock

24  bags that contained loose heroin.

09:41:24AM 25  Q.   And moving on to 265, is this another close-up of that

1 loose heroin?

2 A.    Yeah, it's a close-up of one of the bags of loose heroin,

3 yes.

4 Q.    Moving on to 267, can you describe this photograph?

09:41:45AM 5 A.    That's a photograph of what appears to be heroin packaged

6 for sale --

7 Q.    Okay.

8 A.    -- which was found in that backpack in 54 Miller Street.

9 Q.    And 268, is this another close-up image of some of the

09:42:00AM10 heroin that was packaged for sale recovered from the backpack?

11 A.    Yes, and then the top right corner you can see some of the

12 cocaine that was found in there as well.

13 Q.    Okay.  Now, Investigator, did you have a chance to examine

14 the packaging materials that were used for the heroin and

09:42:16AM15 cocaine?

16 A.    Yes.

17 Q.    Did you notice any markings on any of the bags?

18 A.    Yes.

19 Q.    And what were some of those markings?

09:42:24AM20 A.    Some of the bags were marked or stamped blue magic, some

21 of them were marked with -- it said the king on them.

22 Q.    Moving on to 269, is this another close-up image of the

23 packaged narcotics?

24 A.    Yes.

09:42:43AM25 Q.    And finally Exhibit 270, can you describe this photo?

1  A.    Again that's a photograph of the narcotics, heroin and

2  cocaine, which were located within that backpack.

3  Q.    Now, Investigator, you indicated the narcotics and the

4  firearm were collected as evidence?

09:43:07AM 5  A.    Yes.

6  Q.    Did you also collect that scale that was in the black and

7  green bag?

8  A.    Yes.

9  Q.    Now, there should be a box to your left there.  If you

09:43:20AM 10  could take a look inside that box and pull out what is marked

11  as Exhibit 292 through and including 296.

12  A.    Okay.

13  Q.    Take a look at those and let me know generally do you

14  recognize what is in those five exhibits.  Maybe place the

09:44:01AM 15  binder on the ground there, make a little more room for

16  yourself.  Have you had a chance to view those five exhibits?

17  A.    Yes.

18  Q.    Do you generally recognize what those are?

19  A.    Yes, I do.

09:44:43AM 20  Q.    What do you recognize those to be?

21  A.    These were the items that were found within the backpack

22  in the downstairs apartment at 54 Miller Street.

23  Q.    The narcotics?

24  A.    Yes.  The heroin and cocaine.

09:44:52AM 25  Q.    And how do you recognize those items to be the heroin and

1 cocaine seized from the backpack at 54 Miller Street?

2 A.   I recognize them from memory; and then also they're marked

3 with the crime report number from that day and the other

4 information that was recorded on the bags when they were

09:45:13AM 5 recovered; and they're the same items that we viewed in the

6 photographs as well.

7 Q.   And that crime report number, is that 16-316386?

8 A.   Yes.

9 Q.   Let's start with Exhibit 292.  Can you more specifically

09:45:31AM 10 describe which exhibit that is?

11 A.   Sure.  This is a large ziplock bag which contains a large

12 amount of loose heroin.

13 Q.   Okay. And that was collected and turned into the Property

14 Clerk's Office?

09:45:47AM 15 A.   Yes.

16 Q.   In a sealed condition?

17 A.   Yes.

18 Q.   Does that item appear to be in the same or substantially

19 the same condition as when you turned it into the Property

09:45:57AM 20 Clerk's Office?

21 A.   Yes, there are some markings on it from the Monroe County

22 Lab, but other than that it appears to be in the same

23 condition as when we turned it in.

24 Q.   What are the markings from the lab?

09:46:07AM 25 A.   There's some evidence tape on the outside of the bag, blue

1 evidence tape, which is from the Monroe County Crime Lab.

2 Q.   Okay. Other than that blue crime lab tape is there

3 anything different about the packaging?

4 A.   There's some marker writing on the outside of the ziplock

09:46:24AM 5 bag in purple marker.

6 Q.   Okay. Does the substance within Exhibit 292 appear to be

7 in the same or substantially the same condition?

8 A.   Yes, it does.

9 Q.   How about Exhibit 293, what is that?

09:46:43AM 10 A.   293 is approximately a kilogram of loose heroin located in

11 a large ziplock bag.

12 Q.   Okay. And that was seized from the backpack at 54 Miller

13 Street?

14 A.   Yes.

09:46:55AM 15 Q.   Okay. How about Exhibit 294, what does that appear to be?

16 A.   This is a large amount of heroin which is packaged for

17 sale.

18 Q.   Okay. And that was heroin that was seized from the

19 backpack at 54 Miller Street?

09:47:17AM 20 A.   Yes.

21 Q.   Okay. How about 295?

22 A.   Inside 295 is the cocaine that was packaged for sale also

23 located in the backpack at 54 Miller Street.

24 Q.   Okay. And Exhibit 296, what is that item?

09:47:48AM 25 A.   Exhibit 296 is also a large amount of heroin which is

1  packaged for sale located in the backpack at 54 Miller Street.

2  Q.   Now, Exhibit 294, you described that as a large amount of

3  heroin packaged for sale?

4  A.   Yes.

09:48:08AM 5  Q.   And are those packaged in those bundles you described

6  earlier?

7  A.   Yes.

8  Q.   Prior to submitting those to the Property Clerk's Office,

9  did you have a chance to count approximately how many bags

09:48:19AM 10  were contained in Exhibit 294?

11  A.   Yes.

12  Q.   And approximately how many bags of heroin were in that?

13  A.   Approximately 2300.

14  Q.   Now, Investigator, Exhibits 293, 294, 295 and 296, does

09:48:42AM 15  the packaging for those items appear to be in the same or

16  substantially the same condition as it was in when you turned

17  it into the Property Clerk's Office?

18  A.   Yes.

19  Q.   Do you notice any additions or changes to those four

09:48:52AM 20  exhibits?

21  A.   No, other than again the tape from the crime lab and stuff

22  like that.

23  Q.   So those four exhibits also have the blue crime lab tape?

24  A.   Yes.

09:49:05AM 25  Q.   Okay. The contents of Exhibit 293, 294, 295 and 296, do

1    those -- the contents of those exhibits appear to be in the

2    same or substantially the same condition as when you recovered

3    them at 54 Miller Street?

4    A.    Yes.

09:49:22AM 5    Q.    Do you notice anything different about the contents of

6    those exhibits?

7    A.    Again, just some markings on the bags with -- looks like

8    Sharpie marker writing.  Other than that they look the same as

9    when we collected them.

09:49:47AM 10    Q.    Okay. Now, Investigator, did you continue your

11    investigation in the days after December 8th, 2016?

12    A.    Yes.

13    Q.    And did that include going to -- attempting to visit the

14    shooting victim?

09:50:00AM 15    A.    Yes.

16    Q.    Where did you attempt to meet with the shooting victim?

17    A.    At Rochester General Hospital.

18    Q.    And that was Obed Torres?

19    A.    Yes.

09:50:08AM 20    Q.    What happened when you went to Rochester General Hospital?

21    A.    I went there, I had another officer with me who spoke

22    Spanish to translate for me, and as we were walking to Mr.

23    Torres' room I observed an individual coming out of the

24    hospital room who I did recognize, and then I went in and

09:50:29AM 25    talked to Mr. Torres.

1   Q.    The individual that was leaving the hospital room, who did

2   you recognize that to be?

3   A.    Jonathan Cruz-Carmona.

4   Q.    If we can go to Exhibit 26, please?  Investigator Hickey,

09:50:45AM 5   do you see Jonathan Cruz-Carmona on this exhibit?

6   A.    Yes.

7   Q.    If you could please circle his photograph?  You've drawn a

8   circle in the third row, the individual that is to the far

9   right; is that correct?

09:51:02AM 10   A.    Yes.

11   Q.    Okay, thank you.  If you don't mind clearing your mark?

12   Investigator, did Mr. Torres Garcia survive his injuries from

13   the 54 Miller Street incident?

14   A.    Yes.

09:51:29AM 15           **MS. KOCHER:** Thank you, Investigator.  I don't have

16   anymore questions.

17           **THE WITNESS:** Thank you.

18           **THE COURT:** Mr. Vacca?

19                     **CROSS-EXAMINATION**

09:51:37AM 20   BY MR. VACCA:

21   Q.    Investigator, at what time were you dispatched to 54

22   Miller Street?

23   A.    I think we went there around 11 a.m.

24   Q.    Who did you go with?

09:51:49AM 25   A.    My partner that day was Investigator Andy Mackenzie.

1  Q.   What was the purpose of going to that residence?

2  A.   There was a report of a person shot outside of that

3  residence or at that residence.

4  Q.   Where were you prior to going to 54 Miller Street?

09:52:05AM 5  A.   Where was I prior?  I was, I believe, at my office.

6  Q.   Okay. And you were dispatched by whom?

7  A.   We heard a call for -- I believe at first there was a

8  report of shots heard on Miller Street, and we then heard as

9  officers were going to that location to investigate that there

09:52:27AM 10  was a report of a person who had been dropped off at the

11  hospital that was shot and, again, based on the preliminary

12  investigation we learned that it was likely the person who was

13  shot -- at the hospital was shot on Miller Street, so my

14  partner and I went.

09:52:43AM 15  Q.   You went to Miller Street?

16  A.   Correct.

17  Q.   Okay. Was anybody there upon your arrival?

18  A.   Yes.

19  Q.   Who was there?

09:52:50AM 20  A.   There were numerous police officers there, there was --

21  there were already police officers on scene when I showed up.

22  Q.   About how many?

23  A.   Probably around -- maybe a little less than ten.

24  Q.   Okay. And what time of the day was that again?

09:53:13AM 25  A.   It was during the day, it was 11 a.m.

1  Q.    11 a.m.?

2  A.    Around that time, yes, sir.

3  Q.    Upon your arrival did you go into the house?

4  A.    Upon my arrival, no.

09:53:25AM 5  Q.    Okay. Did you at any time go into the house before you

6  made the application to Judge Randall for a search warrant?

7  A.    Yes, I did step into the threshold of the house just to

8  get an idea of what the officers walked into when they did

9  that protective sweep.  So I did look inside the apartment,

09:53:44AM 10  but I did not search anything inside the apartment.

11  Q.    And in this -- there were two apartments, correct?  One on

12  the first floor, one on the second floor?

13  A.    Yes.

14  Q.    And the one you identified with the front door, that was

09:53:55AM 15  access to the first floor, correct?

16  A.    Yes, sir, that's correct.

17  Q.    How far in did you go?

18  A.    I believe I walked through the threshold of the door and

19  just inside in that living room and looked around and then

09:54:09AM 20  left.

21  Q.    Was anybody else inside the house?

22  A.    There were officers that were securing the apartment at

23  the doorway.

24  Q.    The apartment on the first floor or second floor?

09:54:18AM 25  A.    First floor.

1  Q.   Did you go up to the second floor at all?

2  A.   No.  We did speak to the resident of the second floor.

3  Q.   What was the name of the resident of the second floor?

4         **MS. KOCHER:** Objection.

09:54:29AM 5         **THE COURT:** Overruled.  If he knows.

6         **THE WITNESS:** I believe her name was Tonia Murray.

7  **BY MR. VACCA:**

8  Q.   Tonia Murray?

9  A.   I may not be pronouncing it right, but yes.

09:54:41AM 10  Q.   You said that several officers were there.  Had they

11  secured the premises do you know?

12  A.   The downstairs apartment and the residence outside the

13  residence was secured by officers, yes, sir.

14  Q.   All right.  And so officers were walking in and out of the

09:54:56AM 15  first floor; is that correct?

16  A.   After the protective sweep was complete so they knew that

17  there were no other people that were inside there, then they

18  were just securing it at the doorway in the anticipation of us

19  getting a search warrant for the location.

09:55:09AM 20  Q.   When time did you get the search warrant?

21  A.   I would have to review the search warrant to see what time

22  the judge signed it.  He would have written the time on the

23  warrant.  So I don't want to -- I don't want to give you the

24  wrong information.

09:55:21AM 25  Q.   When did you go back to the premises to execute the search

1  warrant?

2  A.   It was some time after 3 p.m.

3  Q.   All right.  So your arrival was around 11.  How long did

4  you stay there?

09:55:34AM 5  A.   As I said, I was making my own observations there, I spoke

6  to a witness, I talked to officers that were there, I was

7  probably there for at least an hour, if not longer, before we

8  left to go draft the search warrant.

9  Q.   And the photographs that were taken, 253 to approximately

09:55:57AM 10  270, with the exception of one, I believe, they were all taken

11  of the first floor?

12  A.   Hang on one second, sir. 253?

13  Q.   253 through 270?

14  A.   253 is inside the downstairs apartment on the first floor.

09:56:30AM 15       254 same thing, also inside the downstairs on the

16  first floor.

17       255 as well.

18       256 again is a close-up, but it's also taken on the

19  first floor.

09:56:46AM 20       257 was actually taken, that's inside the

21  Technicians' Office at the Rochester Police Department.  So

22  that's not inside 54 Miller Street.

23       258 that is inside 54 Miller Street in the

24  downstairs apartment.

09:57:19AM 25       Same with 259, 260, 261, 262.

1          263 is taken again at the Property Clerk's Office.

2  I'm sorry, the Technicians' Office at the Rochester Police

3  Department.  If you go to 263, that particular photograph was

4  not taken -- I believe that was taken in the Technicians'

09:58:06AM 5  Office.

6          **THE COURT:** That's 263?

7          **THE WITNESS:** Yes, Your Honor.

8          **THE COURT:** Thank you.

9          **THE WITNESS:** 264 that's also at the Technicians'

09:58:22AM10  Office.

11          265 is at the Technicians' Office.

12          266, 267, 268, 269 and 270 are all photographs that

13  were taken inside the Technicians' Office.

14  **BY MR. VACCA:**

09:58:47AM15  Q.   All right. So you entered the premises around 3 o'clock in

16  the afternoon and you had previously been there at 11 in the

17  morning, correct?

18  A.   Yes.

19  Q.   Okay. And did you -- did you see any weapons when you were

09:59:02AM20  there at 11 o'clock in the morning?

21  A.   No.

22  Q.   Did you see any drugs?

23  A.   No.

24  Q.   Did you see the duffle bag?

09:59:11AM25  A.   Not that I recall, no.

1  Q.   Okay. Did you see any of the baggies, the various baggies

2  of alleged heroin and cocaine upon your entry at 11 o'clock in

3  the morning?

4  A.   No.

09:59:24AM 5  Q.   But when you went back at 3 o'clock in the morning, okay?

6  Or 3 o'clock in the afternoon, where was the weapon located?

7  A.   In the living room, but it was behind a mattress that was

8  propped up against the wall.

9  Q.   All right. So did you look behind that mattress when you

09:59:40AM 10  went in at 11 o'clock?

11  A.   No, I just said I didn't search anything.  Just looked in

12  through the doorway.

13  Q.   But there were other officers inside; is that correct?

14  A.   They were securing the apartment at the doorway at that

09:59:52AM 15  time.

16  Q.   Okay, but they were inside the apartment?

17  A.   They had been inside the apartment.

18  Q.   They had been inside the apartment where the gun was,

19  correct?

10:00:02AM 20  A.   Officers had been inside that apartment during the

21  protective sweep where the gun was located, yes, sir.  After

22  the protective sweep was done the location was secured with

23  the anticipation of writing a search warrant for the location.

24  Q.   So the premises was secured, correct?

10:00:17AM 25  A.   Yes.

1  Q.   It was secured from at least 11 o'clock until the

2  execution of the search warrant at 3 o'clock?

3  A.   That's correct, sir.

4  Q.   Officers stayed there?  No one else had access to that

10:00:27AM 5  except officers, correct?

6  A.   Yes.

7  Q.   All right.  And as far as the duffle bag is concerned, as

8  far as the duffle bag is concerned, did you see that upon your

9  entry at approximately 11 o'clock in the morning?

10:00:41AM 10 A.   I don't recall seeing -- I recall a backpack, not a duffle

11 bag, but no, I don't recall seeing that at 11 in the morning,

12 but I did not go through and the search the entire apartment

13 as I said.  I literally made observations and after speaking

14 with the officers, again officers were instructed to secure

10:00:58AM 15 the apartment, we told them we were going to get a search

16 warrant.

17 Q.   Did any of the officers mention anything to you about the

18 backpack?

19 A.   Not that I recall, no.

10:01:10AM 20 Q.   Okay. Is it possible that they did?

21 A.   I don't recall anybody saying anything about a backpack.

22 Q.   Who found the backpack upon entry into the premises?

23 A.   When we executed the search warrant?

24 Q.   Yes.

10:01:26AM 25 A.   Investigator Andy Mackenzie found the backpack.

1  Q.   He found it.  And were you with him when he found it?

2  A.   Yes.

3  Q.   And where was it?

4  A.   It was located in a bedroom which is just off the living

10:01:36AM 5  room.

6  Q.   Okay. And were there officers securing the entire premises

7  on the first floor?

8  A.   Yes, officers were ensuring that nobody had access to the

9  interior of that apartment until a search warrant was gained.

10:01:53AM 10  Q.   Was that bag -- was that backpack found in the bedroom

11  where the digital scale was located?

12  A.   I can't recall for sure if it was the same bedroom where

13  the digital scale was located.  I'd have to review some

14  paperwork.

10:02:11AM 15  Q.   So it's possible that that duffle bag was in the bedroom

16  where you also found the digital scale, correct?

17  A.   It's possible they were in the same room, but I'm not sure

18  if the digital scale was located in the same room as the

19  backpack with the narcotics.

10:02:27AM 20  Q.   If you could take a look at Government's Exhibit 262?  Do

21  you see the digital scale?

22  A.   Yes, I do.

23  Q.   Is that the backpack?

24  A.   It is in a backpack.  That is not the backpack we've been

10:02:57AM 25  talking about that has all the narcotics in it, no.

1  Q.   Where was the backpack with all the narcotics?  Where was

2  that located?

3  A.   It was on the floor of a bedroom which was just off of the

4  living room.

10:03:12AM 5  Q.   Is it the bedroom where there's the digital scale?

6  A.   As I already said, sir, I'm not 100% positive if the

7  digital scale was in the same bedroom, but it's in a different

8  bag and where this digital scale is right now is on top of a

9  bed.  The backpack that had the narcotics was on the floor of

10:03:30AM 10  a bedroom.

11  Q.   Now, did you learn who lived in this apartment?

12  A.   Yes.

13  Q.   Who was it?

14  A.   It was an individual by the name of Elston Villanueva.

10:03:42AM 15  Q.   Elston Villanueva?

16  A.   Yes, sir.

17  Q.   And the weapon, were you able to determine if the

18  weapon -- where did you find the weapon?

19  A.   I'm sorry, where was it found?

10:03:57AM 20  Q.   Where was it found?

21  A.   It was in the front living room.  One of the pictures we

22  viewed you could see a mattress that was like propped up

23  against the wall in the front living room.  When that mattress

24  was moved the handgun was located basically like behind and

10:04:10AM 25  underneath where that mattress was.

1  Q.   Were you able to determine whether or not that weapon had

2  been recently fired?

3  A.   Personally?

4  Q.   Personally?

10:04:18AM 5  A.   No.

6  Q.   Okay. But was anybody who was there able to determine if

7  it had been fired?

8  A.   Not at that time.  What I would say is we did find -- that

9  is a .40 caliber weapon.  We did find .40 caliber spent shell

10:04:34AM 10  casings inside the apartment and obviously we had recent

11  bullet damage on the exterior.  So I'm not trained in being

12  able to look at something and say that is the gun that was

13  particularly recently fired, no.

14  Q.   But there were -- was it the projectile or was it the

10:04:52AM 15  casing that you found inside?

16  A.   Casings, two casings.

17  Q.   Did you take pictures of them?

18  A.   I did not take pictures personally.  I believe a

19  technician, Eric Ferguson, would have photographed those

10:05:03AM 20  before they were collected, yes.

21  Q.   Okay, and that would seem to indicate that someone fired

22  the gun from inside to out?

23  A.   Yes.

24  Q.   Okay. And there was a -- there were holes around the

10:05:18AM 25  window from somebody who was outside shooting in, correct?

1           **MS. KOCHER:** Objection.

2           **THE COURT:** Yes, sustained.

3   **BY MR. VACCA:**

4   Q.    So who came and bagged the gun?

10:05:33AM 5   A.    The gun was collected by a technician, Eric Ferguson.

6   Q.    Okay. So, to your knowledge, did anybody other than law

7   enforcement have access to that first floor unit between 11

8   and 3?

9   A.    No.

10:05:50AM 10   Q.    Had this house been under surveillance?

11   A.    Not to my knowledge.

12           **MR. VACCA:** Thank you.

13           **THE WITNESS:** You're welcome.

14           **MS. KOCHER:** Thank you, Investigator.  I don't have

10:06:10AM 15   any redirect, Your Honor.

16           **THE COURT:** Thank you very much.  You may step down.

17   Thank you very much.

18           **THE WITNESS:** Thank you.

19           (**WHEREUPON**, the witness was excused).

20                          *    *    *

21

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2

3            In accordance with 28, U.S.C., 753(b), I certify that

4    these original notes are a true and correct record of

5    proceedings in the United States District Court for the

6    Western District of New York before the Honorable Frank P.

7    Geraci, Jr. on May 13th, 2021.

8

9    S/ Christi A. Macri

10   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25