1

```
 1                  UNITED STATES DISTRICT COURT

 2                 WESTERN DISTRICT OF NEW YORK

 3

 4

 5  - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA            18-CR-6094(G)
 6
    vs.
 7                                      Rochester, New York
    CARLOS JAVIER FIGUEROA,             May 26, 2021
 8             Defendant.               9:06 a.m.
    - - - - - - - - - - - - -X
 9

10                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE FRANK P. GERACI, JR.
11             UNITED STATES DISTRICT CHIEF JUDGE

12

                   JAMES P. KENNEDY, JR., ESQ.
13                 United States Attorney
                   BY: ROBERT A. MARANGOLA, ESQ.
14                     CASSIE M. KOCHER, ESQ.
                   Assistant United States Attorneys
15                 500 Federal Building
                   Rochester, New York 14614
16                 Appearing on behalf of the United States

17
                   PAUL J. VACCA, JR., ESQ.
18                 One East Main Street, Suite 1000
                   Rochester, New York 14614
19                 Appearing on behalf of the Defendant

20
    ALSO PRESENT:       Gabriela Loncar, Spanish Interpreter
21                      Barbara Considine, Spanish Interpreter
                        Besayda Soto-Abbate, Spanish Interpreter
22

23  COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                        Christimacri50@gmail.com
24                      Kenneth B. Keating Federal Building
                        100 State Street, Room 2640
25                      Rochester, New York 14614
```

1                    **I N D E X**

2    **WITNESS FOR THE GOVERNMENT**

3    Myron Moses
          Direct examination by Ms. Kocher          Page  3
4         Cross-examination by Mr. Vacca             Page 29
          Redirect examination by Ms. Kocher         Page 48

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*     \*     \*

**(WHEREUPON**, the defendant is present; the jury is present).

THE COURT: Good morning, members of the jury. Investigator Moses, I remind you you remain under oath.

**THE WITNESS:** Yes, sir.

**THE COURT:** Ms. Kocher, you may proceed.

**MS. KOCHER:** Thank you.

**BY MS. KOCHER:**

Q.   Good morning.

A.   Good morning.

Q.   Now, Investigator, I believe where we left off yesterday we were discussing your search of bedroom number two, and is that depicted here in Exhibit 578?

A.   Yes, it is.

Q.   And that's the room where you recovered two handguns and walkie-talkies?

A.   That is correct.

Q.   Now, did you also search that closet area that's depicted in Exhibit 578?

A.   Yes, we did.

Q.   Okay. I'd like to show you Exhibit 579.  What is this a photograph of?

A.   The little crawl space that's located inside the closet of

1 the bedroom number two of 292 Barrington Street.

2 Q.   Okay. And looking at this photograph, is the orientation

3 of the photograph correct?  By that I mean the green suitcase

4 at the bottom of the photograph, was that below the shelves?

5 Above it?

6 A.   Yes, it was.

7 Q.   And what were some of the things you located in this crawl

8 space?

9 A.   A large amount of U.S. currency, suitcase that contained

10 drug paraphernalia.

11 Q.   How much U.S. currency was recovered from the crawl space?

12 A.   $230,060.

13 Q.   And how was that packaged?

14 A.   It was vacuum sealed in a bag.

15 Q.   I'd like to show you Exhibit 608.  What is this a

16 photograph of?

17 A.   A photograph of sparring gloves and inside the sparring

18 gloves were cut out little kilo compartments.

19 Q.   Within those compartments was there anything lining the

20 compartment?

21 A.   Styrofoam and carbon copy paper.

22 Q.   And could you please circle the sparring gloves you're

23 discussing?  So you've circled the white and gray object

24 that's in the box in the middle of the photograph?

25 A.   That is correct.

1  Q.   If you could hit the clear button, please?  Next I'd like

2  to show you Exhibit 609.  What is this a photograph of?

3  A.   A plastic bag containing paperwork.

4  Q.   And next I'd like to show you Exhibit 610.  Now this is

5  again a photograph of that crawl space we were looking at

6  earlier?

7  A.   That is correct.

8  Q.   And what is in this photograph?

9  A.   That is a closer picture of the box that contained the

10  $230,060.

11  Q.   Now, you mentioned that it was vacuum sealed?

12  A.   That is correct.

13  Q.   Were there any notes within the box?

14  A.   Yes, the one note with the 230 on it with the date of

15  1/24/18.

16  Q.   You've circled the white piece of paper on top of the

17  vacuum sealed money in the lower center of the photograph?

18  A.   Yes.

19  Q.   If you could clear your mark, please?  Next I'd like to

20  show you Exhibit 612.  What is this a photograph of?

21  A.   This is a closer picture of the black bag that contained

22  the drug paraphernalia.

23  Q.   Now, did you ultimately collect that item?

24  A.   Yes, I did.

25  Q.   And how did you go about collecting that?

1  A.   It was photographed and it was taken back to the Public

2  Safety Building.

3  Q.   Was it placed in an evidence bag?

4  A.   No, it was not, it was too big for an evidence bag.

5  Q.   Now, I'd ask you to take a look and see if Exhibit 678 is

6  to your left there?

7  A.   Yes, it is.

8  Q.   What is Exhibit 678?

9  A.   This is the black bag that was located at 292 Barrington

10 Street in the crawl space area in the upstairs second bedroom.

11 Q.   If you wouldn't mind opening Exhibit 678 and let me know

12 if the bag and its contents appear to be in the same or

13 substantially same condition as when you collected them that

14 day.

15 A.   Yes, they do.

16         **MS. KOCHER:** Your Honor, I'd offer Exhibit 678 and

17 its contents.

18         **MR. VACCA:** Objection, Your Honor.

19         **THE COURT:** Overruled.  Exhibit 678 will be

20 received.

21         (**WHEREUPON**, Government's Exhibit 678 was received

22 into evidence).

23 **BY MS. KOCHER:**

24 Q.   Investigator, you mentioned that the bag depicted in 612

25 and which is also marked as Exhibit 678 contained drug

1  paraphernalia?

2  A.    That is correct.

3  Q.    What sort of items were contained in the bag?

4  A.    Grinder, the plastic containers and like little small

5  packaging for the narcotics.

6  Q.    Would you mind opening Exhibit 678 and if you could remove

7  the grinder and the plastic container that you just described.

8  What are you holding up in your left hand right now?

9  A.    This is one of the grinders.

10  Q.    Okay. And what is in your right hand?

11  A.    Another grinder.

12  Q.    If you could pull out the plastic containers?  What are

13  you holding up for the jury right now?

14  A.    These are the small plastic containers that narcotics are

15  packaged in.

16  Q.    What type of containers are those?

17  A.    Little small plastic, little spiral-type containers.

18  Q.    Is it a bag?

19  A.    No, like little plastic tabs.

20  Q.    Like a little vial?

21  A.    Yes.

22  Q.    And you have two -- I don't know if those are quite gallon

23  size bags that you're holding right now, but you have two

24  large bags containing those vials?

25  A.    That is correct.

1   Q.   Approximately how many vials do you think are in those two

2   bags?

3   A.   A thousand in each bag.

4   Q.   Okay. And is the bag actually marked with a count?

5   A.   Yes, it is.

6   Q.   What is the count on the bag?

7   A.   A thousand.

8   Q.   So that would be 2,000 total that you're holding right

9   now?

10   A.   That is correct.

11   Q.   Okay. And, Investigator, based on your training and

12   experience what type of narcotics are commonly packaged in

13   those vials?

14           **MR. VACCA:** Objection, Your Honor.

15           **THE COURT:** Overruled.

16           **THE WITNESS:** Cocaine.

17   **BY MS. KOCHER:**

18   Q.   If you want to seal that suitcase back up?  I think we're

19   done with that.  All right, Investigator, I think I skipped

20   over Exhibit 611.  What is in this photograph?

21   A.   That is the box that contained the sparring gloves.

22   Q.   Okay. And are these the same sparring gloves that we

23   observed in a prior photo?

24   A.   Yes, they are.

25   Q.   Okay. Now, Investigator, before we move on from the house

1  I'd like to take you back to Exhibit 821.  Now, this was one

2  of the -- this is the photograph of one of the rifles you

3  recovered from underneath Ms. Poncedeleon's bed?

4  A.   That is correct.

5  Q.   Okay. And do you have Exhibit 661 up near you?

6  A.   Yes, I do.

7  Q.   Could you please hold that up?  And is that that same

8  rifle that's depicted in Exhibit 821?

9  A.   Yes, it is.

10  Q.   Now, you're holding the rifle right now, about how long is

11  it in, the one you're holding right now?

12  A.   Right now it's folded down, so right now it's about 18

13  inches; fully stocked it's almost like 36 inches.

14  Q.   Okay. Can you explain what the difference is between the

15  way the gun looks that you're holding versus the way it looks

16  in the photograph which is Exhibit 821?

17  A.   In the photograph it's fully -- it's not stocked right

18  now.  The way it's holding out, it's folded down with the tabs

19  and the tape over it.

20  Q.   Okay. So since it has been secured are you able to unfold

21  it so it would be the length that is shown in Exhibit 821?

22  A.   That is correct.

23  Q.   Can you demonstrate how it would be unfolded if it wasn't

24  rendered safe?

25  A.   The top part you would basically just fold it back and it

1  becomes the rifle that way.

2  Q.   Okay. And that would make it look extended the way that it

3  is in Exhibit 821?

4  A.   That is correct.

5  Q.   Okay, thank you.  Now, Investigator, I believe you

6  mentioned you also searched a vehicle at 292 Barrington

7  Street?

8  A.   That is correct.

9  Q.   I'd like to show you Exhibit 634.  What vehicle is

10  depicted in this photograph?

11  A.   The Nissan Altima.

12  Q.   And is that the vehicle that you searched that day?

13  A.   Yes, it is.

14  Q.   Is the Nissan Altima parked in front of 292 Barrington

15  Street in this photograph?

16  A.   Yes, it is.

17  Q.   And that was the same vehicle that Ms. Poncedeleon was in

18  when you arrived at the scene?

19  A.   That is correct.

20  Q.   What were some of the things you recovered when you

21  searched the Nissan Altima?

22  A.   2 kilograms of cocaine, cellular phone and paperwork.

23  Q.   Now, Investigator, I'd like to show you what's not yet

24  been received into evidence and we'll show you on your monitor

25  Exhibit 634 through and including 640.  I'm sorry, those are

1 | actually already in evidence.

2 |        Investigator, I'd like to show you Exhibit 635.

3 | What is depicted in this photo?

4 | A.   That is a U.S. Postal box.

5 | Q.   And was this in the trunk of that Nissan Altima?

6 | A.   Yes, it is.

7 | Q.   Is this the way the box looked when you opened the truck?

8 | A.   Yes, it was.

9 | Q.   Moving on to Exhibit 636, what is this a photograph of?

10 | A.   This is a close-up picture of the UPS tracking number for

11 | the box inside the Nissan Altima.

12 | Q.   What are the last few digits of that tracking number?

13 | A.   8024 1504 05.

14 | Q.   Next I'd like to show you Exhibit 637.  What is this a

15 | photograph of?

16 | A.   The mailing address on the box that was contained in the

17 | Nissan Altima.

18 | Q.   And are you able to make out the mailing address?

19 | A.   15 Harwood, apartment -- I can't see the apartment number,

20 | but the zip code of 14620.

21 | Q.   Okay. And what was the return address?

22 | A.   From David -- I'll spell it, D-E-N-I-Z-A-C, R-E-S, Manuel

23 | Hernandez Rosas, E-D-I-F 8, apartment 72, M-A-Y-A-G-U-E-Z,

24 | Puerto Rico 00680.

25 | Q.   Now, Investigator, I'd like to show you Exhibit 795.  This

1  is a Postal chart.  Do you see the tracking number and the

2  address of 15 Harwood Street on this chart?

3  A.   Yes, I do.

4  Q.   And where is it located?

5  A.   The second from the bottom.

6  Q.   Okay. And you've circled the entry second from the bottom,

7  the last few digits of the tracking number 1504 05 with the

8  address of 15 Harwood Street.  And what is the delivery date

9  for that package?

10 A.   January 29th, 2018.

11 Q.   Okay. Thank you.  If you could clear your mark?  Next I'd

12 like to show you Exhibit 638.  What is this a photograph of?

13 A.   The interior of the box that was located in the Nissan

14 Altima at 292 Barrington Street.

15 Q.   And what was inside that Postal box?

16 A.   2 kilograms of cocaine.

17 Q.   And how were they packaged within the box?

18 A.   They were packaged inside an M&M box and a Skittles box

19 with carbon paper covering it.

20 Q.   Now, was there also other candy covering those M&M and

21 Skittles boxes?

22 A.   Yes.

23 Q.   And are those depicted in Exhibit 638?

24 A.   Yes, they are.

25 Q.   I'd like to show you Exhibit 639.  What is this?

1   A.   That is one of the kilograms of cocaine inside the M&M's

2   box covered in the carbon paper.

3   Q.   And Exhibit 640.  Is this a photograph of the other

4   kilogram in the Skittles box?

5   A.   Yes, it is.

6   Q.   Now, Investigator, was the Postal box addressed to 15

7   Harwood Street that was recovered from the trunk collected as

8   evidence?

9   A.   The top part of the box was.

10  Q.   Okay. I'd ask you to take a look at Exhibit 689.  That

11  should be in the box to your left.  You see 689?

12  A.   Yes, I do.

13  Q.   What is that?

14  A.   That is the top of the box that was located inside the

15  Nissan Altima at 292 Barrington Street.

16  Q.   And how do you know that is the top of the box recovered

17  from the trunk?

18  A.   It has the matching UPS tracking number on it along with

19  the CR number on the bag and the Government Exhibit on it.

20  Q.   Does that -- the top of the box appear to be in the same

21  or substantially the same condition as it was in when you

22  collected it that day?

23  A.   Yes, it does.

24         MS. KOCHER: Your Honor, I'd offer Exhibit 689.

25         MR. VACCA: No objection, Your Honor.

1          **THE COURT:** Exhibit 689 will be received.

2              (**WHEREUPON**, Government's Exhibit 689 was received

3    into evidence).

4    **BY MS. KOCHER:**

5    Q.   Now, were the kilos that were recovered from the M&M and

6    Skittles boxes also collected as evidence?

7    A.   Yes, they were.

8    Q.   How did you go about collecting those?

9    A.   They were secured in evidence bags.

10   Q.   Were they also marked with the crime report number for

11   this incident and the location and date they were seized?

12   A.   Yes.

13   Q.   All right. If you could take a look at Exhibit 649?  That

14   should be in the box to your left.  Do you recognize that

15   item?

16   A.   Yes, I do.

17   Q.   And what do you recognize that to be?

18   A.   The 2 kilograms of cocaine that was located in the box

19   located inside the Nissan Altima at 292 Barrington Street.

20   Q.   So the kilo from the Skittles box and the kilo from the

21   M&M box are both in the same bag?

22   A.   Yes, they are.

23   Q.   And do those 2 kilos appear to be in the same or

24   substantially the same condition as they were in when you

25   collected them?

1  A.   Yes, they do.

2  Q.   Okay. How about the packaging?  Does that appear to be the

3  same or -- does that appear to be in the same or substantially

4  the same condition when you sealed it and turned it into the

5  property clerk?

6  A.   Yes, it does.

7  Q.   Do you notice anything different about the packaging?

8  A.   It has the Monroe County Lab sticker on it and the blue

9  evidence tape from Monroe County Lab and the Government

10  Exhibit sticker on it.

11  Q.   Other than the lab sticker and the blue lab tape and the

12  Government Exhibit sticker, does it appear to be the same?

13  A.   Yes, it does.

14  Q.   Is your seal still intact?

15  A.   Yes, it is.

16  Q.   Now, Investigator, I'd like to show you what's not been

17  received in evidence as Exhibit 641 and 644.  If you could

18  take a look at those and let me know if you recognize -- I'm

19  sorry, 643 would be the last photo.

20          **THE COURT:** I'm sorry, which ones?

21         **MS. KOCHER:** 641 through and including 643.

22          **THE COURT:** Thank you.

23         **MS. KOCHER:** Sorry.

24  **BY MS. KOCHER:**

25  Q.   Did you have a chance to look at those three photographs?

1   A.    Yes, I did.

2   Q.    And do you recognize what those are?

3   A.    Paperwork and a cell phone that was located in the Nissan

4   Altima.

5   Q.    And those are photographs of those items?

6   A.    Yes, they are.

7   Q.    Do those photographs fairly and accurately depict the

8   paperwork and the cell phone that were located in the Nissan

9   Altima?

10  A.    Yes, they do.

11          **MS. KOCHER:** Your Honor, I'd offer Exhibit 641, 642

12  and 643.

13          **MR. VACCA:** No objection, Your Honor.

14          **THE COURT:** Exhibits 641, 642 and 643 will be

15  received.

16          (**WHEREUPON**, Government's Exhibits 641-643 were

17  received into evidence).

18  **BY MS. KOCHER:**

19  Q.    I'd like to show you what's been received into evidence as

20  Exhibit 641.   Ms. Rand, are the jurors' monitors on?

21          **THE CLERK:** No, they're not.   There we go.

22          **MS. KOCHER:** Thank you.

23  **BY MS. KOCHER:**

24  Q.    Investigator, what is depicted in Exhibit 641?

25  A.    Paperwork that was located in the trunk area of the Nissan

1  Altima at 292 Barrington Street.

2  Q.   And was some of that paperwork collected that day?

3  A.   Yes, it was.

4  Q.   I'd ask you to take a look in the box to your left for

5  Exhibit 684.  Do you recognize that item?

6  A.   Yes, I do.

7  Q.   And what do you recognize it to be?

8  A.   The paperwork that was located in the Nissan Altima.

9  Q.   In the trunk area of the car?

10  A.   That is correct.

11  Q.   I'd also ask you to take a look at what should be in the

12  front of that bag and marked Exhibit 684A, B, C, D, E, F, G,

13  and H.

14  A.   I have it.

15  Q.   Do you recognize those items as well?

16  A.   Yes.

17  Q.   Is that also paperwork that was received -- was recovered

18  from the trunk of the Altima on January 29th?

19  A.   Yes, it is.

20  Q.   Now, does Exhibit 684, the bag containing all of the

21  paperwork and those documents that are specifically marked --

22  some marked with letters, appear to be in the same or

23  substantially the same condition as when they were collected

24  on January 29th?

25  A.   Yes, they do.

1          **MS. KOCHER:** Your Honor, I'd offer Exhibit 684 and

2  its contents which include the exhibits that are sub marked A,

3  B, C, D, E, F, G, and H.

4          **MR. VACCA:** Objection, Your Honor.

5          **THE COURT:** Objection?

6          **MR. VACCA:** Objection, Your Honor.

7          **THE COURT:** Basis?

8          **MR. VACCA:** Relevancy.

9          **THE COURT:** Overruled.  Exhibit 684, 684A, 684B,

10  684C, 684D, 684E, 684F, 684G, 684H will be received.

11          (**WHEREUPON**, Government's Exhibits 684, 684A-684H

12  were received into evidence.)

13  **BY MS. KOCHER:**

14  Q.   Investigator, starting with Exhibit 684A -- and all of the

15  sub documents have been uploaded into our Trial Director, Your

16  Honor, for everyone to view.

17          Now, Investigator, does Exhibit 684A appear to be

18  the same copy or a fair and accurate copy of the document that

19  is physically marked Exhibit 684A?

20  A.   Yes, it does.

21  Q.   And what are we looking at here?

22  A.   A name with an address of Karina Lopez Del Valle of 286

23  Garson Avenue, Rochester, New York 14609.

24  Q.   And if we could move to the second page?  What are we

25  looking at here?

A.    Two more mailing addresses addressed to Ingrid V. Mercado
of 59 Fernwood Avenue, Rochester, New York 14621; and Edgard
A. Rosario Alvarado of 157 Depew Street, Rochester, New York
14608.

Q.    Now, Investigator, is Exhibit 684A, the physical document
that you're holding, a two-page document or is it front and a
back?

A.    A front and a back.

Q.    Okay. Does the second page we're looking at in Trial
Director, is that a fair copy of the back of Exhibit 684A?

A.    Yes, it is.

Q.    Now, I'd like to go to Exhibit 795, our Postal chart.
Investigator, do you see those addresses listed on this chart?
That would be 286 Garson Avenue, 59 Fernwood, and 157 Depew
Street?

A.    Yes, I do.

Q.    You see all three of those listed?

A.    Yes, I do.

Q.    Where is 157 Depew listed?

A.    It is listed fourth from the bottom.

Q.    Okay. And that's in a purple font?

A.    That is correct.

Q.    Next I'd like to turn to Exhibit 684B.  Investigator, what
we have loaded up into the Trial Director, does that appear to
be a fair copy of the physical document you're holding that is

1 | marked 684B?

2 | A.    Yes, it is.

3 | Q.    And what is this document?

4 | A.    This is a MoneyGram.

5 | Q.    And who is the sender listed on this MoneyGram?

6 | A.    Nishayra Gutierrez of 6 Burbank Street, Rochester, New

7 | York 14621.

8 | Q.    And the first name is N-I-S-H-A-Y-R-A; is that correct?

9 | A.    Yes, it is.

10 | Q.    And Gutierrez is G-U-T-I-E-R-R-E-Z?

11 | A.    Yes, it is.

12 | Q.    And what was the expected destination address of this

13 | MoneyGram?

14 | A.    To a Joannette Silva D-U-M-E-N-G of Puerto Rico for $1500.

15 | Q.    Next I'd like to show you Exhibit 684C.  Is what we've

16 | uploaded into a Trial Director a fair and accurate copy of the

17 | physical document you're holding?

18 | A.    Yes.

19 | Q.    And is this also a MoneyGram?

20 | A.    Yes, it is.

21 | Q.    And is this the sender the same, that Nishayra Gutierrez?

22 | A.    Yes, it is.

23 | Q.    Of 6 Burbank Street?

24 | A.    That is correct.

25 | Q.    Who is the listed receiver on Exhibit 684C?

1  A.    I believe it's Cyndia, C-Y-N-D-I-A, Velez, V-E-L-E-Z,

2  Colon, C-O-L-O-N, of Puerto Rico.

3  Q.    Moving on to Exhibit 684D, is what we've uploaded into the

4  Trial Director a fair copy of the physical document you're

5  holding?

6  A.    Yes, it is.

7  Q.    All right. What is Exhibit 684D?

8  A.    It is a RG&E residential service application.

9  Q.    And who is the applicant name and the address for the

10 service listed on this document?

11 A.    Leitscha Poncedeleon of 292 Barrington Street, Rochester,

12 New York 14607.

13 Q.    And is there also a phone number listed here?

14 A.    Yes, it is area code 585-629-2665.

15 Q.    And what is the date of this RG&E application?

16 A.    4/21/2017.

17 Q.    All right. Is there also a date responsible for service

18 listed on the form?

19 A.    Yes.

20 Q.    What is that date?

21 A.    4/22 of '17.

22 Q.    Next I'd like to show you Exhibit 684E.  Now, is this a

23 fair and accurate copy of the physical document that you're

24 holding and that is marked 684E?

25 A.    Yes, it is.

1  Q.    Is this also an RG&E residential service application?

2  A.    Yes, it is.

3  Q.    And who is the billing name and the address of service for

4  this application?

5  A.    Leitscha Poncedeleon of 820 East Main Street, Apartment 4,

6  Rochester, New York 14605.  With a phone number of area code

7  585-685-4661.

8  Q.    Okay. I'm sorry, what was the apartment number on this

9  application?

10  A.    14.

11  Q.    All right. So this application is the same name as the

12  last application we viewed in Exhibit 684D?

13  A.    Yes, it is.

14  Q.    But a different address and a different phone number?  If

15  you need to go back to the other, let me know.

16  A.    Same name, different address and different phone number.

17  Q.    Now, if we could -- what is the date of service for this

18  residential application?

19  A.    Date of the application was signed was 1/10 of 2018.  The

20  date of service will be 1/12 of 2018.

21  Q.    Next I'd like to show you Exhibit 684F.  What is this

22  document?

23  A.    This is a New York State employer information sheet.

24  Q.    And is there an employee name on this document?

25  A.    It is Obed, O-B-E-D, Torres, T-O-R-R-E-S; Garcia,

1  G-A-R-C-I-A.

2  Q.   Is this exhibit that we've uploaded into Trial Director a

3  fair and accurate copy of the physical document you're

4  holding?

5  A.   Yes, it is.

6  Q.   Moving on to Exhibit 684G, is this document that's

7  uploaded into Trial Director also a fair and accurate copy of

8  the physical document you're holding?

9  A.   Yes, it is.

10  Q.   And why did you collect this item of evidence?

11  A.   This document has handwritten drug notes on it.

12  Q.   Okay. And it appears to have a date -- a column with a

13  date followed by a name and numbers?

14  A.   That is correct.

15  Q.   Do you see the subject line at the top of the page?

16  A.   Yes.

17  Q.   And what is written right next to subject?

18  A.   820 E M Street, which mean East Main Street.

19  Q.   Next I'd like to have you take a look at Exhibit 684H.

20  Investigator, the document we've uploaded in the Trial

21  Director, is that a fair and accurate copy of the physical

22  document you're holding?

23  A.   Yes, it is.

24  Q.   And what is this document?

25  A.   A Capital One letter addressed to Carlos Figueroa of 6

1  Burbank Street, Rochester, New York 14621.

2  Q.    All right. Investigator, I'd like to show you Exhibit 642.

3  What is this a photograph of?

4  A.    A weekly planner and notes that were located inside the

5  Nissan Altima at 292 Barrington Street.

6  Q.    And are we looking at the front passenger seat of the

7  vehicle here?

8  A.    Yes, we are.

9  Q.    Next I'd like to show you Exhibit 643.  What is depicted

10  in this photograph?

11  A.    A LG cellular flip phone that was located on the driver's

12  seat of the Nissan Altima at 292 Barrington Street.

13  Q.    Now, was that flip phone collected as evidence?

14  A.    Yes, it was.

15  Q.    And how did you go about collecting that item?

16  A.    It was photographed, collected and placed inside an

17  evidence bag.

18  Q.    I'd ask you to look in your box to the left there for

19  Exhibit 669.  Do you recognize that item?

20  A.    Yes, I do.

21  Q.    And what is it?

22  A.    This is the LG flip phone that was taken from the Nissan

23  Altima at 292 Barrington Street.

24  Q.    Is the physical item that you're holding and that's marked

25  Exhibit 669 the same phone that's depicted in Exhibit 643?

1  A.    Yes, it is.

2  Q.    And how do you know that's the same phone?

3  A.    It's in the evidence bag with my name, my initials and the

4  CR number.

5  Q.    Does that item appear to be in the same or substantially

6  the same condition as it was in when you collected it?

7  A.    Yes, it does.

8  Q.    Okay. Do you notice anything different about the phone

9  itself or the packaging that contains the phone?

10  A.    It has Scottie Ferro's initials on it along with

11  Government's Exhibit 669 on it.

12  Q.    Okay.  Does your seal appear to be intact?

13  A.    Yes, it does.

14  Q.    Other than the Government Exhibit sticker and Investigator

15  Ferro's initials, does it appear to be the same?

16  A.    Yes, it does.

17  Q.    Okay. Now, Investigator, I'd like to show you another

18  piece of paperwork that should be in the box to your left

19  marked Exhibit 690.  Do you recognize what that is?

20  A.    Yes, I do.

21  Q.    What is it?

22  A.    This is a United States Postal receipt.

23  Q.    And where was that recovered from?

24  A.    From Leitscha Poncedeleon.

25  Q.    And how do you recognize that Postal receipt?

1  A.   It is inside a evidence bag with my name and a CR number

2  on it.

3  Q.   So that's another piece of paperwork that you collected

4  that day?

5  A.   Yes, it is.

6  Q.   Does it appear to be in the same or substantially the same

7  condition as it was in when you collected it on January 29th?

8  A.   Yes, it does.

9          **MS. KOCHER:** Your Honor, I'd offer Exhibit 690.

10          **MR. VACCA:** Objection, Your Honor, foundation and

11  relevancy.

12          **THE COURT:** Overruled.  Exhibit 690 will be

13  received.

14          (**WHEREUPON**, Government's Exhibit 690 was received

15  into evidence).

16          **MS. KOCHER:** Your Honor, we have uploaded

17  Exhibit 690 into the Trial Director.

18          **THE COURT:** Thank you.

19  **BY MS. KOCHER:**

20  Q.   Investigator, does the document we uploaded appear to be a

21  fair and accurate copy of the physical document you were just

22  holding?

23  A.   Yes, it does.

24  Q.   Okay. We've zoomed in on the top third of Exhibit 690.

25  What is this document?

1  A.    This is a Postal receipt.

2  Q.    What is this a Postal receipt from?

3  A.    It is a receipt given from the post office when packages

4  are sent or are sent out and charged for.

5  Q.    Okay. And can you tell the date and the time that this

6  receipt was printed?

7  A.    January 25th, 2018 at 1:10 p.m.

8  Q.    And is the location of the post office also depicted on

9  this receipt?

10  A.    Westgate Plaza at 1485 Howard Road, Rochester, New York

11  14624.

12  Q.    Now, does this receipt also indicate what it was a receipt

13  for?

14  A.    For 3 day packages.

15  Q.    Okay. How many packages?

16  A.    Two packages.

17  Q.    Are there tracking numbers listed on the receipt?

18  A.    Yes, they are.

19  Q.    And what are those two tracking numbers?

20  A.    The one on the top is 9505 5134 3123 8025 1837 72.  And

21  the second one is 9505 5134 3123 8025 1837 89.

22  Q.    And would you mind circling where those tracking numbers

23  are located that you just read?  The monitor is not responding

24  to you?

25  A.    No, ma'am.

Q.   Okay. Now, are they both listed right under the words USPS
tracking number?

A.   Yes, they are.

Q.   One is about halfway down, the zoomed in section, and the
other is closer to the bottom?

A.   Yes.

Q.   Okay.  Now, Investigator, I'd like to have you take a look
at Exhibit 346 which has been received into evidence.  If we
can zoom in on the upper right portion of this photograph?
Investigator, does this appear to be a photograph of a Postal
package?

A.   Yes, it does.

Q.   Okay.  We've zoomed in on the upper right corner that
includes a tracking number.  Do you see either of those
tracking numbers from the Postal receipt that you recovered
from Ms. Poncedeleon on this photograph?

A.   Yes, I do.

Q.   Okay. And is that the tracking number that ends in 1837
72?

A.   That is correct.

Q.   Okay.  Now, we're looking at the full photograph of 346.
Investigator, where was this package addressed to and who was
the sender?

A.   The sender was Alexis Torres of 229 Rugby Avenue,
Rochester, New York 14619.  It was shipped to or addressed to

1   a Freddie Silva of Calle Wilson F-8 of P-A-R-C-E-L-A-S

2   C-A-S-T-I-L-L-O  to M-A-Y-A-G-U-E-Z, Puerto Rico 00680.

3   Q.    Next I'd like to show you Exhibit 360.  Is this also a

4   photograph of a Postal package with the same sender

5   information that Alexis Torres of 229 Rugby Avenue and the

6   recipient address is Freddie Silva of Puerto Rico?

7   A.    That is correct.

8   Q.    Okay. If we could zoom in on the upper right corner of the

9   photograph?  Do you see the tracking number associated with

10  this package?

11  A.    Yes, I do.

12  Q.    And does that tracking number also appear on the Postal

13  receipt that was marked Exhibit 690?

14  A.    Yes, it does.

15  Q.    And are the ending digits 1837 89?

16  A.    Yes, it is.

17          **MS. KOCHER:** Can I just have a moment, Your Honor?

18  Thank you, Investigator.  I don't have any further questions.

19                  **CROSS-EXAMINATION**

20  **BY MR. VACCA:**

21  Q.    Investigator, did you prepare a Rochester Police

22  Department incident report with respect to this matter?

23  A.    Yes, I did.

24  Q.    Did you review it prior to testifying today?

25  A.    Yes, I did.

1  Q.    Okay. Do you have that with you --

2  A.    No, I do not.

3  Q.    -- to refer to?  Okay.  But you did review the report,

4  correct?

5  A.    Yes, I did.

6  Q.    And did you review the search warrants prior to the

7  execution of the search warrants?

8  A.    Yes, I did.

9  Q.    There were three search warrants for this property,

10  correct?

11  A.    That I am unsure of.  I believe maybe two.

12  Q.    Well, you indicated you did review the -- you did review

13  the search warrants prior to the execution, correct?

14  A.    That is correct.

15  Q.    And the search warrants that I'm referring to were signed

16  by the Honorable Victoria Argento, County Court Judge,

17  1/27/18, correct?

18  A.    I'll have to see the document.

19          **MR. VACCA:** Your Honor, if I may approach?

20          **THE COURT:** Yes, yes, you can.

21          **MR. VACCA:** Thank you.

22          **THE COURT:** Is this marked?

23          **MR. VACCA:** It's not marked.

24          **THE COURT:** Let's mark it.

25          **MR. VACCA:** I have another package I want to show

1  him too, Judge, it's an incident report we just referred to.

2  Should I have that marked separately?

3          **THE COURT:** Sure.

4  **BY MR. VACCA:**

5  Q.   Investigator, I'm going to show you Defense Exhibit 1000

6  marked for identification and ask you if you can identify

7  that.

8  A.   This is the search warrant signed by Victoria Argento.

9  Q.   Could you tell how many there are?

10  A.   How many pages?

11  Q.   No, how many warrants there are?

12  A.   This is a search warrant for the -- this is for 292

13  Barrington Street and Roberto Figueroa.

14  Q.   Okay. And there should be a third one there too.

15  A.   Are these copies of the same warrant or different

16  warrants?

17  Q.   Let me see.  So there are three warrants there; is that

18  correct?

19  A.   Yes, I'm sorry, yes, sir.

20  Q.   There's one for Roberto Figueroa, correct?

21  A.   That is correct.

22  Q.   That's for his person, correct?

23  A.   That is correct.

24  Q.   And there is one for Roberto Figueroa; is that correct?

25  A.   That is correct.

1  Q.   And there's one for 292 Barrington; is that correct?

2  A.   That is correct.

3  Q.   Now, is there a search warrant for the person of Carlos

4  Figueroa there?

5  A.   No, sir.

6  Q.   Do you know if you were presented one prior to the

7  execution of the search warrant?

8  A.   I don't believe I was presented with one, no.

9  Q.   So Carlos Figueroa was never named on these three search

10  warrants, correct?

11  A.   May in the body of the search warrant.  Those are just the

12  front pages of the search warrant.

13  Q.   Talks about the body of the search warrant?

14  A.   Right.

15  Q.   Body of the individual?

16  A.   The name may have been in the affidavit.  That's just the

17  search warrant.

18  Q.   Right.  But Carlos Figueroa is not named in any of these

19  three search warrants, correct?

20  A.   The front copies of the search warrants, no.

21  Q.   There's no front copy here?

22  A.   That's -- there's an affidavit and that's just the search

23  warrant.

24  Q.   As far as the actual search warrant goes, there is no

25  search warrant that authorizes search of Carlos; is that

1  correct?

2  A.   That is correct.

3  Q.   That's correct.  And I'm going to show you and ask you

4  what this is -- this is Defense 1001 -- and ask you if you can

5  identify that?

6            MS. KOCHER: Objection, Your Honor.

7            THE COURT: He can generally say what it is.  What

8  is it, 1001?

9            MR. VACCA: This is 1001A.  1001A.

10            MS. KOCHER: I'm sorry, 1001A?

11            THE COURT: There is no 1001; is that right?

12            MR. VACCA: There is 1000 and 1001A.

13            THE COURT: Okay, thank you.

14  BY MR. VACCA:

15  Q.   Is that the report that you filled out --

16  A.   This is 1001.

17  Q.   -- right?  Okay.  The report is 1001?

18            THE COURT: I'm sorry, I'm really confused now.  The

19  report is 1001?

20            MR. VACCA: The report is 1001 and 1001A because I'm

21  giving him one to refresh his recollection.

22            MS. KOCHER: Judge, I don't believe he needed his

23  recollection refreshed.  I believe he needed his recollection

24  refreshed on the date that the warrants were signed and that

25  question wasn't even asked by Mr. Vacca.

1          **THE COURT:** Okay.  Let's get this clear first,

2    though. What is 1001?

3          **MR. VACCA:** 1000 is the search warrant.

4          **THE COURT:** 1001?

5          **MR. VACCA:** 1001 is his incident report as well as

6    his report regarding the evidence.

7          **THE COURT:** Okay.  What is 1001A?

8          **MR. VACCA:** 1001A is the same document.

9          **THE COURT:** Why are we marking it 1001A then?

10          **MR. VACCA:**  Because he has a copy and I have a

11   copy.  So I didn't know if you needed him -- you don't mark

12   that way?  You want to do just 1001 and just keep that --

13          **THE COURT:** It's the same document?

14          **MR. VACCA:** It is the same document.

15          **THE COURT:** Only mark it once.

16          **MR. VACCA:** It's the same document.

17          **THE COURT:** Okay.

18          **MR. VACCA:** Okay.  You got it, right ?

19          **THE WITNESS:** Yes, sir.

20          **MR. VACCA:** Hang on to it.

21   **BY MR. VACCA:**

22   Q.   Okay.  Sir, now with respect to the incident report do you

23   have that in front of you?

24   A.   I'm sorry, I couldn't hear.

25   Q.   The incident report, do you have that in front of you?

1  A.   Yes, I do.

2  Q.   Okay. I'm going to ask you how many pages is this incident

3  report?

4  A.   12 pages.

5  Q.   12 pages.  Is there also a report that you prepared

6  regarding your listing of the evidence that was taken from the

7  home?

8  A.   Yes, it is.

9  Q.   Okay. And how many pages is that?

10  A.   Seven pages.

11  Q.   Seven pages, okay.  Now, with respect to the first page of

12  the incident report, what property does it list?

13            **MS. KOCHER:** Objection.

14            **THE COURT:** Sustained.

15            **MR. VACCA:** Your Honor, I couldn't hear.

16            **THE COURT:** Sustained.  He can't just read from the

17  report.

18            **MR. VACCA:** Right.

19  **BY MR. VACCA:**

20  Q.   Okay.  So do you remember what address this incident

21  related to?

22  A.   292 Barrington Street.

23  Q.   Okay. And did you fill out the form of the incident

24  report?

25  A.   Yes, I did.

1    Q.   Okay. And whose name is listed on that incident report?

2         MS. KOCHER: Objection.

3         THE COURT: I'll overrule the objection.  You can

4    answer that.

5         THE WITNESS: Me.  My name is on the report.

6    BY MR. VACCA:

7    Q.   When did you fill this report out?

8    A.   It was done on the day of January 29th, 2018.

9    Q.   Okay. At the bottom of the page it has your name and

10   January 31st of 2018?

11   A.   That is correct.

12   Q.   And what date does that reflect?

13   A.   January 31st, that's the date it was printed.

14   Q.   Okay. So you filled it out and then you sent it out for

15   printing?

16   A.   Well, once you -- we do the report, then it's printed out,

17   they're printed out.

18   Q.   Okay. So that report was dated 1/29/18?

19   A.   The date I did the report was 1/29/18.  The date I printed

20   it out from the computer was 1/31/2018.

21   Q.   Who was the suspect in that report?

22         MS. KOCHER: Objection.

23         THE COURT: Overruled.  Go ahead.

24         THE WITNESS: Roberto Figueroa.

25   BY MR. VACCA:

1  Q.   Okay.  Then we go to the next page and is it the same

2  thing with that?  That it was filled out on the 29th and then

3  it was printed out on the 31st?

4  A.   That is correct.

5  Q.   Okay. So if you continue with the report and go to the

6  report relating to the evidence, which is one of seven, what

7  property is listed?

8           MS. KOCHER: Objection.

9           THE COURT: Yes, sustained.  That's not the proper

10  way to ask the question.  You can ask him what property is

11  listed.  If he doesn't remember, then you can refresh his

12  recollection.

13  BY MR. VACCA:

14  Q.   Do you remember what property this related to?

15  A.   I guess I don't understand what you're asking.

16  Q.   What property did this relate to?  The items that you

17  confiscated?

18  A.   Located at 292 Barrington Street.

19  Q.   Okay. And that report that you filled out, does that list

20  all the items that you confiscated?

21  A.   Yes, it does.

22  Q.   Okay. And in the report you listed -- did you list a Felix

23  Figueroa?

24           MS. KOCHER: Objection.

25           THE COURT: Overruled.

```
 1                THE WITNESS: Yes, on page 1 and 2 and 3.
 2    BY MR. VACCA:
 3    Q.   Okay.  Did you list a Leitscha Poncedeleon?
 4                MS. KOCHER: Objection.
 5                THE COURT: Overruled.
 6                THE WITNESS: Yes, I did.
 7    BY MR. VACCA:
 8    Q.   Did you list a Roberto Figueroa?
 9                MS. KOCHER: Objection.
10                THE COURT: Overruled.
11                THE WITNESS: Yes, I did.
12    BY MR. VACCA:
13    Q.   Did you list a Carlos Figueroa at any point?
14                MS. KOCHER: Objection.
15                THE COURT: Overruled.
16                THE WITNESS: No, I did not -- I'm sorry, yes.
17    BY MR. VACCA:
18    Q.   Where was that?
19    A.   The second from the last page.
20    Q.   Okay. And it looks like you wrote over something there?
21    A.   That is correct.
22                MS. KOCHER: Objection.  Your Honor, this document's
23    not in evidence.
24                THE COURT: Yes, sustain the objection, form of the
25    question.
```

1   BY MR. VACCA:

2   Q.   Okay.  Investigator, do you remember all the contents of

3   your incident report that you prepared with respect to this

4   matter?

5   A.   Yes, sir.

6   Q.   You remember all of them?

7   A.   By reviewing my report, yes.

8   Q.   By reviewing your report.  And does it refresh your

9   recollection when you review the report?

10               MS. KOCHER: Objection.

11               THE COURT: As to what?

12               MR. VACCA:  As to the contents of the evidence

13   list.

14               THE COURT: That's not proper.  Sustain the

15   objection.

16   BY MR. VACCA:

17   Q.   Did you also execute a search warrant with respect to any

18   vehicles?

19   A.   Yes, we searched the Nissan Altima.

20   Q.   And was Carlos Figueroa at this premise when you executed

21   the search warrant?

22   A.   No, he was not.

23   Q.   Okay. And was Leitscha Poncedeleon there?

24   A.   Yes, she was.

25   Q.   And how about Roberto Figueroa?

1  A.    Yes, he was.

2  Q.    And how about a Felix Figueroa?

3  A.    I don't believe so.

4  Q.    Where did you get the name Felix Figueroa?

5          **MS. KOCHER:** Objection.

6          **THE COURT:** Overruled.

7          **THE WITNESS:** From one of the case agents.

8  **BY MR. VACCA:**

9  Q.    They told you the name was Felix Figueroa?

10 A.    I think we talked about the name and we were going back

11 and forth what the name was.

12 Q.    Okay. So you weren't sure of the name?

13 A.    That is correct.

14 Q.    Okay.  And how many weapons did you confiscate?

15 A.    Eight total.

16 Q.    Eight weapons total?

17 A.    That is correct.

18 Q.    Okay.  And they were where?  In the house?

19 A.    In the bedroom number one, in Leitscha's bedroom.

20 Q.    Under the bed?

21 A.    That is correct.  And also the bedroom -- the second

22 bedroom.

23 Q.    When you entered the premises where was Roberto Figueroa

24 located?

25 A.    He was coming out of the bathroom.

1  Q.    Okay. And where was Leitscha Poncedeleon?

2  A.    She was secured as she was coming out of the Nissan

3  Altima.

4  Q.    So she was outside?

5  A.    That is correct.

6  Q.    All right. And Carlos Figueroa was not there?

7  A.    No, sir.

8  Q.    Okay. Now, with respect to the weapons, did you secure all

9  the weapons?

10  A.    Yes, I did.

11  Q.    Okay. And were you the one that put the tie on it to make

12  it safe?

13  A.    No I believe that was done at the Technicians' Office.

14  Q.    Did you turn this evidence in to the Property Clerk's

15  Office?

16  A.    Yes.

17  Q.    What day did you turn in the weapons?

18  A.    The same day that we confiscated them.

19  Q.    Okay. Now, did you dust for fingerprints with respect to

20  that search warrant?

21  A.    The technician did.  Not me.

22  Q.    Do you know where the technician dusted for fingerprints?

23  A.    At -- at the Technicians' Office.

24  Q.    Okay. So it was brought back to the Technicians' Office?

25  A.    That is correct.

1  Q.   Do you know if anything of value was obtained from the

2  fingerprint?

3  A.   No, sir.

4  Q.   Okay. And was there any -- also any type of swabbing for

5  DNA?

6  A.   Yes, there was.

7  Q.   And what did you do with the swabbing for the DNA?

8  A.   I didn't do it.  Officer Carbonel submits it.

9  Q.   Okay. Do you remember where in the office she swabbed for

10  DNA?

11  A.   It was not done at the house.

12  Q.   It was done at the property -- at the fourth floor?

13  A.   Technicians' Office.

14  Q.   The Technicians' Office.  Okay.  Were you present when

15  that was done?

16  A.   Yes, I was.

17  Q.   And do you know what was swabbed?

18  A.   She swabbed the weapons for DNA and fingerprints.  That

19  was it.

20  Q.   Okay. And you don't know what the results were, correct?

21  A.   It didn't come back of any value.

22  Q.   So you know it came back nothing of value?

23  A.   That is correct.

24  Q.   How about in the house?  Did you dust anything in the

25  kitchen?

1   A.    No, we did not.

2   Q.    How about the bathroom?

3   A.    No, we did not.

4   Q.    How about Leitscha Poncedeleon's bedroom?

5   A.    No, we did not.

6   Q.    Okay. So it was just the weapons that were swabbed?

7   A.    That is correct.

8   Q.    Now, did you take -- did you take anyone yourself into

9   custody?

10  A.    No, I did not.

11  Q.    Any of the items that you listed, such as the large Postal

12  boxes, the boxes of candy, did you do any testing on them?

13  A.    No, we did not.

14  Q.    Now, were there closed boxes in the property?  I believe

15  you said there were -- I think on direct you said there were

16  four boxes?

17  A.    Postal boxes.

18  Q.    Four Postal boxes?

19  A.    In the basement.

20  Q.    In the basement, right.  How many were closed up or

21  sealed?

22  A.    They were closed.  Not sealed.

23  Q.    Okay.  Did you open them up?

24  A.    Yes, we did.

25  Q.    And for lack of a better situation, what did the first box

1   show, if anything?

2              **MS. KOCHER:** Objection.  I don't know how we're

3   determining which is the first box.

4              **THE COURT:** Yes, sustained.

5              **MR. VACCA:** That was going to be my next question.

6   **BY MR. VACCA:**

7   Q.   How did you organize the boxes and decide which was which?

8              **MS. KOCHER:** Objection.

9              **THE COURT:** Overruled.  You can answer that.

10             **THE WITNESS:** I don't think I can answer that.

11             **THE COURT:** Okay.  That's fine.  That's the answer.

12  **BY MR. VACCA:**

13  Q.   Okay.  Now, what did you find in the boxes?

14  A.   Boxes of candy that were consistent with the box in the

15  Nissan Altima that contained the 2 kilos of cocaine.

16  Q.   All right. Now, the box in the Nissan, is that a fifth

17  box?

18  A.   That is correct.

19  Q.   A fifth box.  And what was done with the box in the

20  Nissan?

21  A.   We just took the top for the address, the mailing address.

22  Q.   Okay. Did you open the box up?

23  A.   Yes, we did.

24  Q.   What did you find inside the box that was in the trunk of

25  the car of the Nissan Altima?

1  A.    2 kilograms of cocaine.

2  Q.    And where was that located?  Was it in another box or

3  anything?

4  A.    Which box are we talking about?

5  Q.    We're talking about the box in the trunk of the car.

6  A.    The cocaine came from the box in the trunk.

7  Q.    Did you look in that box while you were at 292 Barrington

8  Street or did you take it back to the police department?

9  A.    No, while at 292 Barrington Street.

10  Q.    You put that in evidence?

11  A.    Yes, we did.

12  Q.    Do you know if any tests were performed on that big box

13  that was in the trunk?

14  A.    No testing was done.

15  Q.    And there was tape on it, right?

16  A.    That is correct.

17  Q.    That is tape.  And did you test the tape for fingerprints?

18  A.    No, we did not.

19  Q.    You know sometimes on a piece of paper you can leave a

20  fingerprint?

21  A.    I'm not a technician, so I don't know.

22  Q.    Do you know if it was dusted for that?

23  A.    No, sir.

24  Q.    Okay. So then there's four other boxes, correct?

25  A.    That is correct.

Q.    And where are they located?

A.    In the basement of the location.

Q.    And all four of them in the basement?

A.    That is correct.  I'm sorry, there was another box in the garage, but we didn't take that box.

Q.    So that would make six boxes.  One in the trunk of the car?

A.    That is correct.

Q.    Okay. One in the garage and you didn't take the one in the garage?

A.    No, we did not.

Q.    Do you know if any tests were performed on that?

A.    No, there was not.

Q.    Okay.  Then there's four in the basement?

A.    That is correct.

Q.    Where are they in the basement?

A.    Like what --

Q.    Are they next to each other?

A.    Three were stacked and one was like off to the side.

Q.    Okay.  The three that were stacked, okay?  Did you open them up?

A.    Yes, we did.

Q.    Okay. Which one did you open first?

A.    I don't know which one we opened first.

Q.    Okay.  Did you find anything in those boxes that were in

1  the basement?

2  A.   Other than the boxes of candy with the M&M's and the

3  Skittles and the marshmallow candy that was consistent with

4  the candy inside the box that was inside the Nissan Altima.

5  Q.   Did you find any drugs or any weapons in the box?

6  A.   No, we -- not in the basement, no.

7  Q.   Not in the basement, just the one that was in the trunk of

8  the Altima?

9  A.   That is correct.

10  Q.   When you arrested Ms. Poncedeleon you indicated it was an

11  outside arrest, correct?

12  A.   It was during the execution of a search warrant.

13  Q.   Right.  Did you put her in custody while she was outside?

14  A.   I didn't.  The uniform officer took her into custody.

15  Q.   They took her in custody outside?

16  A.   That is correct.

17  Q.   She was searched?

18  A.   I didn't search her, so I don't know who searched her.

19  Q.   Were any additional tests performed with those boxes?

20           **MS. KOCHER:** Objection.  Which boxes?

21  **BY MR. VACCA:**

22  Q.   Boxes in the basement?

23  A.   No, sir.

24  Q.   Did you turn all these weapons in for testing?

25  A.   Yes, we did.

1  Q.   Were you involved in that process at all?  The testing of

2  the weapons?

3  A.   At the lab, no, sir.

4  Q.   Okay.

5          **MR. VACCA:** Thank you very much, Agent.

6                    **REDIRECT EXAMINATION**

7  **BY MS. KOCHER:**

8  Q.   Investigator Moses, Mr. Vacca asked you what documents you

9  reviewed before testifying today and you mentioned search

10  warrants?

11  A.   That is correct.

12  Q.   Were those the search warrants associated with your search

13  at 292 Barrington Street on January 29th, 2018?

14  A.   That is correct.

15  Q.   Were there other teams that were assigned to execute

16  warrants at other locations that day?

17  A.   That is correct.

18  Q.   Do you know about how many other locations were searched?

19  A.   Several other locations.

20          **MS. KOCHER:** Thank you, Investigator.  Nothing

21  further.

22          **THE COURT:** Anything further?

23          **MR. VACCA:** Nothing further, Judge.

24          **THE COURT:** Thank you very much.  You may step down.

25  Thank you.

1          (**WHEREUPON**, the witness was excused).

2                         *   *   *

3              **CERTIFICATE OF REPORTER**

4

5          In accordance with 28, U.S.C., 753(b), I certify that

6   these original notes are a true and correct record of

7   proceedings in the United States District Court for the

8   Western District of New York before the Honorable Frank P.

9   Geraci, Jr. on May 26th, 2021.

10

11  S/ Christi A. Macri

12  Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25