```
 1                    UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF NEW YORK

 3

 4

 5   - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA              18-CR-6094(G)
 6
     vs.
 7                                         Rochester, New York
     CARLOS JAVIER FIGUEROA,               May 5, 2021
 8              Defendant.                 10:55 a.m.
     - - - - - - - - - - - - - -X
 9

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11              UNITED STATES DISTRICT CHIEF JUDGE

12
                      JAMES P. KENNEDY, JR., ESQ.
13                    United States Attorney
                      BY: ROBERT A. MARANGOLA, ESQ.
14                        CASSIE M. KOCHER, ESQ.
                      Assistant United States Attorneys
15                    500 Federal Building
                      Rochester, New York 14614
16                    Appearing on behalf of the United States

17
                      PAUL J. VACCA, JR., ESQ.
18                    One East Main Street, Suite 1000
                      Rochester, New York 14614
19                    Appearing on behalf of the Defendant

20
     ALSO PRESENT:      Nicolas Penchaszadeh, Spanish Interpreter
21                      Barbara Considine, Spanish Interpreter
                        Besayda Soto-Abbate, Spanish Interpreter
22
     COURT REPORTER:    Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
23                      Christimacri50@gmail.com
                        Kenneth B. Keating Federal Building
24                      100 State Street, Room 2640
                        Rochester, New York 14614
25
```

1                          **I N D E X**

2  **WITNESS FOR THE GOVERNMENT**

3

Thomas Luciano
4        Direct examination by Ms. Kocher          Page 3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*     \*     \*

     **(WHEREUPON**, the defendant is present; the jury is present).

<u>**GOVERNMENT'S WITNESS, THOMAS LUCIANO, SWORN**</u>

<u>**DIRECT EXAMINATION**</u>

     **THE CLERK:** Please state your name for the record and spell your last name.

     **THE WITNESS:** Thomas Luciano, L-U-C-I-A-N-O.

     **THE COURT:** You may proceed.

     **MS. KOCHER:** Thank you, Your Honor.

**BY MS. KOCHER:**

Q.    Good morning.

A.    Good morning.

Q.    Could you please introduce yourself to the jury?

A.    Tom Luciano, I'm an RPD investigator currently assigned to patrol section investigations.

Q.    Okay. And how long have you been employed as an investigator with the Rochester Police Department?

A.    As an investigator for approximately three years.

Q.    Before becoming an investigator what was -- did you work for the Rochester Police Department?

A.    Yes, I was an officer prior to becoming an investigator.

Q.    And how long were you a police officer with the Rochester Police Department?

1  A.    15 years before being promoted to investigator.

2  Q.    So you have about 18 years total with the Rochester Police

3  Department?

4  A.    Almost.

5  Q.    Okay. And before becoming an -- what are your duties as an

6  investigator?

7  A.    I respond to crimes that have just occurred or

8  in-progress; I also have a caseload of crimes that I follow-up

9  on.

10  Q.    Okay. And before becoming a police investigator what were

11  your duties as a police officer?

12  A.    I worked patrol and spent a few years in the Tactical

13  Unit.

14  Q.    Okay. While you were on patrol were you assigned to a

15  particular section of the city?

16  A.    Most of my career I was assigned to the Clinton Section.

17  Q.    And how long were you assigned to the Clinton Section?

18  A.    I would approximate at least 12 of my years on patrol.

19  Q.    Before joining the Rochester Police Department do you have

20  any prior law enforcement experience?

21  A.    I was a Monroe County sheriff's deputy assigned to the

22  jail.  I did that for approximately five years before working

23  for the Rochester Police Department.

24  Q.    And can you explain some of your training to become a

25  police officer?

1  A.   I attended the basic police academy.  I've since taken

2  training every year for in-service.  I've also attended

3  investigator schools and search warrant training, other things

4  that related to police work and investigations.

5  Q.   You mentioned that you worked in the Clinton Section for

6  about 12 years; is that correct?

7  A.   That's correct.

8  Q.   And did that include the area of North Clinton Avenue and

9  Burbank Street?

10  A.   It did.

11  Q.   So during your 12 years in the Clinton Section did you

12  become familiar with that intersection of the city?

13  A.   I did.

14  Q.   How often would you be at that intersection?

15  A.   I would drive by that location multiple times a day.

16  Q.   Were you also called to respond to crime scenes in that

17  area?

18  A.   A number of them, yes.

19  Q.   In your time patrolling that section were you able to make

20  observations of the area of North Clinton Avenue and Burbank

21  Street?

22  A.   Yes, ma'am.

23  Q.   Did you also make arrests in that area?

24  A.   Yes, ma'am.

25  Q.   What were some of those arrests for?

1  A.    That intersection is known for a lot of open air drug

2  sales.

3            **MR. VACCA:** Objection, Your Honor.

4            **THE COURT:** Overruled.  Go ahead.

5            **THE WITNESS:** I've made numerous arrests for drug

6  possession, weapons possession.  That's mainly what that

7  intersection is known for.

8  **BY MS. KOCHER:**

9  Q.    Now, based upon your observations and some of the arrests

10  that you've made in that area, are you familiar with what type

11  of drugs were typically sold there?

12  A.    Heroin, cocaine, as well as marijuana.

13  Q.    And were there specific areas where the drugs were sold in

14  that open air market that you described?

15  A.    The vacant lot that's between Burbank and Oscar Street was

16  a hot spot particularly back in 2016.

17  Q.    Now, do you see Government's Exhibit 237 on your monitor

18  there?

19  A.    I do.

20  Q.    Would you mind placing an X in that vacant lot that you

21  just described?  Okay, so you've placed an X on the north side

22  of Burbank Street so it's between Burbank and Oscar and it's

23  right above a black camera that's in that photo; is that

24  correct?

25  A.    That's correct.

1  Q.   Now, you described this area as an open air drug market.

2  What were some of the things that you observed to make you

3  come to that conclusion?

4  A.   I'd see vehicles pulling up both on Burbank and on

5  Clinton; people approaching the intersection on bike and on

6  foot; and hand-to-hand drug transactions taking place; that

7  coupled with the arrests I've made in that area for drugs

8  being sold and weapons being possessed, provide security for

9  that type of activity, led me to that conclusion.

10 Q.   During your time as a patrol officer would you be

11 operating a marked patrol vehicle?

12 A.   Yes, ma'am.

13 Q.   So you were -- it was clear that you were an officer if

14 you were in that area?

15 A.   Yes, ma'am.

16 Q.   Did you make any observations of people as you would

17 approach that area in your marked patrol vehicle?

18 A.   Yes.  Typically as you would approach the intersection

19 there would be lookouts, people on bikes, on foot and they

20 would yell or signal to others that the police were in the

21 area.

22 Q.   Now, Investigator, I'd like to direct your attention back

23 to September 12th of 2016.  Were you a police officer with the

24 Rochester Police Department assigned to the Clinton Section at

25 that time?

1  A.    I was.

2  Q.    Do you recall what your shift was that day?

3  A.    I was working the day shift, so it would be 7 a.m. to

4  approximately 3 p.m.

5  Q.    And were you operating a marked patrol vehicle that day?

6  A.    I was.

7  Q.    Were you wearing an RPD issued uniform?

8  A.    I was.

9  Q.    Now, at about 12:30 p.m. on September 12th, 2016, where

10  were you?

11  A.    I was on North Clinton Avenue traveling southbound from

12  the area of about Trenaman Street.

13  Q.    Okay. And is Trenaman Street depicted on the map that's in

14  Government's Exhibit 237?

15  A.    It is not.

16  Q.    Okay. Where would Trenaman Street be in relation to the

17  streets on this map?

18  A.    It would be more north.

19  Q.    North of Oscar Street?

20  A.    Correct.  Just above the top left-hand corner as I'm

21  looking at it.

22  Q.    You were traveling southbound?

23  A.    Correct.

24  Q.    You were heading towards Burbank Street?

25  A.    That's correct.

```
 1  Q.    During your time as a police officer have you had the
 2  chance to hear gunshots before?
 3  A.    Yes, ma'am.
 4  Q.    About how many times?
 5  A.    Over 100.
 6  Q.    Now, at about 12:30 p.m. on September 12th, 2016, as you
 7  traveled south on Clinton Avenue what, if anything, occurred?
 8  A.    I heard what I would approximate as about five gunshots in
 9  relatively close proximity.
10  Q.    Okay.  Could you tell what direction they were coming
11  from?
12  A.    I believe they were coming from the south.
13  Q.    What did you do when you heard those approximate five
14  gunshots?
15  A.    I continued to the area of where I thought the gunshots
16  had come from.
17  Q.    Okay. Could you draw an arrow on the map depicting what
18  area you traveled to?  You've drawn an arrow from the top of
19  North Clinton Avenue on the map all the way down to Burbank
20  Street pointing down?
21  A.    Yes, ma'am.
22  Q.    And as you traveled south and came to the area of Burbank
23  Street what, if anything, did you observe?
24  A.    I observed a white Ford parked in the roadway facing
25  northbound on Clinton Avenue on the eastern side of the
```

1 roadway.   I watched the door open on the Ford and initially I

2 first saw a male dressed in black fall to the ground in the

3 roadway, get up and then begin to run.

4 Q.   Okay. Now you described a white vehicle parked on Clinton.

5 What -- where was that on Clinton Avenue that it was parked?

6 A.   At the intersection of Clinton and Burbank on Clinton

7 Avenue.

8 Q.   The male that you saw get out of that white car, where did

9 he run to?

10 A.   He ran across Clinton Avenue westbound and then onto

11 Mazda.

12 Q.   Okay. And where is -- is Mazda on this map Government's

13 Exhibit 237?

14 A.   Yes, it is.

15 Q.   And where is Mazda Street?

16 A.   Would you like me to mark it on here?

17 Q.   Sure.

18 A.   I believe that is the intersection.

19 Q.   Okay. So now you've placed an arrow pointing to the left

20 of the screen and that would be just to the left of the blue

21 camera marked Clinton and Oscar?

22 A.   Correct.

23 Q.   Okay. And that's an arrow that you marked?

24 A.   That's correct.

25 Q.   Is that the approximate area where that male ran?

1  A.    It is.

2  Q.    Now, when you saw that man running down -- is it Mazda

3  Terrace?

4  A.    Yes.

5  Q.    When you saw that male running down Mazda Terrace what did

6  you do?

7  A.    I followed him in my patrol car.

8  Q.    How did you maneuver your vehicle to follow him?

9  A.    I did a K turn in the intersection of Clinton and Burbank.

10  Q.    So you were able to turn your vehicle around and head back

11  to Mazda Terrace?

12  A.    That's correct.

13  Q.    Did you ultimately locate that man?

14  A.    I did.

15  Q.    And did you come to learn his identity?

16  A.    Yes.

17  Q.    What was his name?

18  A.    Wayne McDaniels.

19  Q.    And what did you do after you located Mr. McDaniels?

20  A.    I placed him in my patrol car and then returned him back

21  to the scene.

22  Q.    Why did you place him in your patrol vehicle?

23  A.    At that time I didn't know his involvement in the shooting

24  that had just occurred as I was traveling down Clinton Avenue.

25  Q.    Okay. Now after you placed Mr. McDaniels in your patrol

1  vehicle what did you do?

2  A.    I returned back to the scene and then got out on foot and

3  responded to that white Ford that I described being parked at

4  the intersection earlier.

5  Q.    And what did you observe when you approached the white

6  Ford?

7  A.    I saw a male in the front passenger seat that had been

8  slumped over; he appeared to have been shot twice in the head.

9  And I also came in contact with a female who identified

10 herself as the driver who had been struck with a bullet to her

11 right leg.

12 Q.    Okay. Now, the male that you saw with the apparent gunshot

13 wounds in the vehicle, where was he seated?

14 A.    He was in the front passenger seat.

15 Q.    And the female that identified herself as the driver of

16 the car, where did you come into contact with her?

17 A.    I came into contact with her near the intersection of

18 Clinton and Burbank.  She was out of the vehicle at that

19 point.

20 Q.    Okay. Did you learn her identity?

21 A.    I did.

22 Q.    And who was that?

23 A.    Samantha Engebrecht.

24 Q.    And did she appear to be injured?

25 A.    She did.  She had a gunshot wound to her right leg.

1   Q.   All right.   Investigator, are you familiar with whether

2   there are blue light cameras in that area of the city?

3   A.   I am.

4   Q.   And what are blue light cameras?

5   A.   They are city owned cameras that are affixed to publicly

6   owned street lamps or power line poles that record

7   intersections, often intersections that are prone to violence.

8   Q.   Were you familiar with where the nearest blue light camera

9   was to the intersection of Burbank and Clinton?

10  A.   There was a blue light camera at the intersection of Oscar

11  and North Clinton Avenue.

12  Q.   Okay. And do you see that little blue camera on the map on

13  Government's Exhibit 237 that's marked Clinton and Oscar?

14  A.   I do.

15  Q.   Is that the camera that you're referring to?

16  A.   Yes, ma'am.

17  Q.   That's the approximate location of the camera?

18  A.   Yes, ma'am.

19  Q.   Now, have you had a chance to review blue light footage

20  from the incident that occurred on September 12th, 2016?

21  A.   I have.

22  Q.   If we could pull up Government's Exhibit 241 that's been

23  received into evidence?  And forward it to about 9 minutes and

24  44 seconds?  Investigator, while we pull the video up there's

25  a little like reverse play symbol on that monitor there -- if

1   you wouldn't mind hitting that, it will pull up a tool bar

2   that will give you a clear option.

3   A.   I'm sorry, what am I looking for?

4   Q.   Up in the upper right corner of your monitor there's a

5   little button.

6   A.   Okay, I see it.

7   Q.   Then clear down at the bottom there.

8   A.   Gotcha.

9   Q.   Ms. Rand beat you to it.  Thank you.  Fast forwarding

10  Government's Exhibit 241 to about 9 minutes and 44 seconds

11  into the clip.  If you could pause it here?  We've paused it

12  at about 12:32:19 p.m.  Do you recognize what camera angle

13  we're looking at here?

14  A.   I do.

15  Q.   And what camera is this?

16  A.   This is that blue light camera at the intersection of

17  Oscar and Clinton that I just spoke of prior to pulling this

18  up.

19  Q.   Okay. And the time stamp on this also indicates this is

20  September 12th of 2016.  Does this appear to be a fair and

21  accurate depiction of the area on that day when you responded

22  to the shooting?

23  A.   It does.

24  Q.   What direction on Clinton are we looking at here?

25  A.   We're looking southbound and this is the direction I was

1  traveling as I approached the intersection of Burbank and

2  Clinton.

3  Q.    Okay. The vehicle -- that white vehicle that you

4  ultimately responded to, do you see that in this clip?

5  A.    I do.

6  Q.    And if you could just circle that vehicle for us?  All

7  right, so you've placed a circle in the upper left corner.

8  There appear to be several cars parked in a row and it would

9  be the last vehicle; is that correct?

10 A.    It appears to be the last vehicle, yes.

11 Q.    Okay. Do you also see Mazda Terrace in this freeze frame?

12 A.    I do.

13 Q.    And where is Mazda Terrace?

14 A.    Right here.

15 Q.    You've placed an arrow pointing to the right of the screen

16 and that would be the street going off to the right of the

17 freeze frame; is that correct?

18 A.    That's correct.

19 Q.    You wouldn't mind hitting that clear button again?  And if

20 we can let the video play starting at 12:32:19 p.m.  Now we've

21 paused the video about 10 minutes into the clip.  The time

22 stamp is 12:32:32 p.m..  Investigator, could you tell us what

23 just occurred there?

24 A.    Yes.  That is my patrol car that just came into view.  And

25 it -- just prior to my patrol car coming on to the screen you

1  could see a male fall to the ground as the door opened on it

2  the white vehicle that I circled.  That was what I described

3  earlier as what I first observed as I approached the

4  intersection after I had heard those gunshots.

5  Q.    So as you drove southbound on Clinton you were actually

6  able to see that individual exit the vehicle and run?

7  A.    I did.

8  Q.    And what direction did the male ultimately run?

9  A.    He ran westbound down Mazda Terrace.

10 Q.    If we can let the video continue to play?  If you could

11 pause again?  We stopped the video at 10 minutes and 22

12 seconds into the clip, this is time stamped 12:32:54.

13 Investigator, what happened in that portion of the video that

14 we just observed?

15 A.    I did a K turn near the intersection of Clinton and

16 Burbank and then headed northbound on Clinton and then again

17 westbound on Mazda and shortly thereafter is when I came into

18 contact with Mr. Daniels (sic) on Mazda Terrace.

19 Q.    All right.  Let the video play.  We've stopped at 11

20 minutes and 35 seconds into the clip at approximately 12:34:08

21 p.m.  Investigator, what are we looking at in this freeze

22 frame?

23 A.    That is me operating that patrol vehicle.  I have Mr.

24 McDaniels in the back seat of my patrol car and I'm now

25 returning to the scene.

1    Q.    If we could pull up Government's Exhibit 199 that's been
2    received into evidence?   Investigator, on your monitor you
3    should see Government's Exhibit 199 that's been received into
4    evidence.   Do you recognize what's depicted in this photo?
5    A.    Yes, that's the white Ford that I circled in the previous
6    exhibit.
7    Q.    Okay. And after Mr. McDaniels was placed in your patrol
8    vehicle and you returned to the scene, is this the vehicle
9    that you went to?
10   A.    It is.
11   Q.    Okay. And when you arrived at that vehicle what
12   observations did you make?
13   A.    I observed the back window shot out and the front
14   passenger of the vehicle slumped in the front passenger seat
15   and he appeared to be deceased.
16   Q.    Okay. If we could move forward to Exhibit 202 that's been
17   received into evidence.   All right, is this another photo from
18   the scene that you responded to that day?
19   A.    It is.
20   Q.    And you mentioned the back window was shot out.   Do you
21   see which window or the window that you described in this
22   photo?
23   A.    I do.
24   Q.    And which window is that?
25   A.    The rear passenger side window.

1  Q.    Now, in addition to observing the deceased male and the
2  female that had injuries, did you observe any evidence at the
3  scene when you responded?
4  A.    Yes.  There were six 9 millimeter casings that were on the
5  sidewalk just next to that white Ford.
6  Q.    Okay. And does Government's Exhibit 202 depict those --
7  where those six casings were located?
8  A.    You can't see the casings, but the evidence markers are
9  positioned right next to them.
10 Q.    Okay. Now, the female that you also encountered at the
11 scene that had the gunshot wound to her leg, where was she
12 when you got to the location?
13 A.    She was just around the corner on Burbank Street but still
14 at that same intersection.
15 Q.    Okay. If we could go to Exhibit 213 that's been received
16 into evidence?  Investigator, what's depicted in Government's
17 213?
18 A.    That is the same building at 1264 North Clinton.  However,
19 this is a doorway on the Burbank side that enters that same
20 building.
21 Q.    Okay. And was this where you observed that female when you
22 got to the scene?
23 A.    Yes, ma'am.
24 Q.    All right.  Now, Investigator, moving on to December 8th
25 of 2016, were you continuing your work as a police officer

1  with the Rochester Police Department on that day?

2  A.    I was.

3  Q.    And were you also working that same shift 7 a.m. to 3 p.m.

4  on that day?

5  A.    That's correct.

6  Q.    And were you operating in a marked patrol car and wearing

7  an RPD issued uniform?

8  A.    I was.

9  Q.    Were you also equipped with a body worn camera?

10  A.    I was.

11  Q.    What is a body worn camera?

12  A.    It is a camera that connects to the upper portion of your

13  chest that records your interactions with witnesses, suspects

14  and also records your observations as you approach a scene.

15  Q.    Is that body worn camera always recording or do you have

16  to stop and start it?

17  A.    It must be manually activated and shut off.

18  Q.    And how do you activate your body worn camera?

19  A.    Just by pressing a button.

20  Q.    Button on the camera?

21  A.    That's correct.

22  Q.    Now, on December 8th of 2016, you were working that day?

23  A.    I was.

24  Q.    And did you receive a call for service at about 10:41 a.m.

25  that day?

1  A.    I did.

2  Q.    What was that for?

3  A.    It was for shots fired at the area of 54 Miller Street.

4  Q.    Okay. And when you received that call for shots fired in

5  the area of 54 Miller Street what did you do?

6  A.    I started to head in that direction until I heard another

7  officer call for assistance.

8  Q.    Okay. And who was that other officer?

9  A.    Officer Renz.

10  Q.    When Officer Renz called for assistance what did you do?

11  A.    I then responded to his location near the intersection of

12  Hudson Avenue and Weeger Street.

13  Q.    Why did he call for assistance?

14          **MR. VACCA:** Objection, Your Honor.

15          **THE COURT:** Overruled.  Go ahead.

16          **THE WITNESS:** He had observed a green Honda Accord

17  that was suspected of possibly being involved in the shooting

18  on Miller Street.

19  **BY MS. KOCHER:**

20  Q.    And what did you do to assist him?

21  A.    I assisted on the traffic stop and I approached that

22  vehicle from the passenger side and dealt primarily with the

23  front seat passenger.

24  Q.    Okay. And where was it that the vehicle was stopped?

25  A.    Hudson Avenue and Weeger Street.

1  Q.   Okay. Investigator, I'd like to show you what's not been

2  received into evidence as Exhibit 247.  Are you able to see

3  that on your monitor?

4  A.   Yes, ma'am.

5  Q.   And do you recognize what that is?

6  A.   Yes, this is a map of the area of Miller Street that I

7  described and also contains the area of Hudson and Weeger

8  where the stop was made.

9  Q.   Okay. Does Government Exhibit 247 fairly and accurately

10  depict the streets and buildings of the area of the city?

11  A.   It does.

12  Q.   Do you notice any deletions, additions or changes in that

13  exhibit?

14  A.   No, ma'am.

15         **MS. KOCHER:** Your Honor, I'd offer Government's

16  Exhibit 247.

17         **MR. VACCA:** No objection, Your Honor.

18         **THE COURT:** Exhibit 247 will be received.

19         (**WHEREUPON**, Government's Exhibit 247 was received

20  into evidence).

21  **BY MS. KOCHER:**

22  Q.   Investigator, looking at Exhibit 247, is 54 Miller Street

23  depicted on this map?

24  A.   It is.

25  Q.   And if you wouldn't mind circling the general area where

1   54 Miller Street appears?  You've placed a circle around the

2   words 54 Miller Street and there's a little red marker there?

3   A.   That's correct.

4   Q.   Okay. Now, is the intersection of Hudson and Weeger Street

5   also on this map?

6   A.   It is.

7   Q.   And the approximate area where you assisted Officer Renz

8   in stopping that vehicle?

9   A.   It is.

10  Q.   Okay. If you wouldn't mind placing an X in the approximate

11  area where you assisted Officer Renz with the vehicle stop?

12  So you've placed an X right at the corner there of Hudson and

13  Weeger Street?

14  A.   That's correct.

15  Q.   Okay. Thank you.  If you wouldn't mind pressing that clear

16  button?  You were on the passenger side as you approached the

17  vehicle?

18  A.   Yes, ma'am.

19  Q.   Could you tell how many occupants were in the car?

20  A.   It was two male Hispanic occupants; one was the driver,

21  the other was the front seat passenger.

22  Q.   And did you address the front seat passenger?

23  A.   I did.

24  Q.   Did you ultimately identify who that person was?

25  A.   I did.

1  Q.    And who was that?

2  A.    Jonathan Cruz-Carmona.

3  Q.    Now, did you also learn the identity of the driver of the

4  vehicle?

5  A.    I did.

6  Q.    What was that person's name?

7  A.    Jesus Rosario Munoz.

8  Q.    Did you have any interaction with the driver of the

9  vehicle?

10  A.    No, ma'am.

11  Q.    Now, I'd like to show you what's been not received into

12  evidence as Exhibit 271.  Do you recognize the individual

13  depicted in this photograph?

14  A.    I do.

15  Q.    And who is that?

16  A.    That was the front seat passenger of the vehicle, Jonathan

17  Cruz.

18  Q.    And does that photograph fairly and accurately depict the

19  way he looked on December 8th of 2016?

20  A.    It does.

21  Q.    Next I'd like to show you Exhibit 272 that's also not

22  received into evidence.  Do you recognize who is depicted in

23  this photograph?

24  A.    Yes, that was Jesus, the driver.

25  Q.    Now, does this photograph also fairly and accurately

1  depict the way that the driver looked on December 8th, 2016?

2  A.   It does.

3  Q.   Okay. There are actually two people in this photograph; is

4  that correct?

5  A.   That's correct.

6  Q.   And which one is the driver of the vehicle?

7  A.   The male with the camouflage-style pants and the red

8  shoes.

9          **MS. KOCHER:** Your Honor, at this time I offer

10  Government's Exhibit 271 and 272.

11          **MR. VACCA:** No objection, Your Honor.

12          **THE COURT:** Exhibit 271 and 272 will be received.

13          (**WHEREUPON**, Government's Exhibits 271-272 were

14  received into evidence).

15  **BY MS. KOCHER:**

16  Q.   Starting with Exhibit 271, Investigator, again who is

17  depicted in this photograph?

18  A.   Jonathan Cruz-Carmona.

19  Q.   Okay. And next Exhibit 272, who is in this photograph?

20  A.   Jesus Rosario Munoz.

21  Q.   He's the individual with the camou-style pants on?

22  A.   Yes, ma'am.

23  Q.   All right. Now you indicated that you were wearing a body

24  worn camera that day.  Did you turn that on during the traffic

25  stop?

1  A.   I did.

2  Q.   And what type of vehicle was it that you were involved

3  with in the stop?

4  A.   It was a green 2005 Honda Accord with license plate HJB

5  4323, New York registration.

6  Q.   Okay. And you did have your body worn camera for this

7  incident?

8  A.   Yes, ma'am.

9  Q.   Have you had a chance to review your body worn camera from

10  the traffic stop on December 8th, 2016?

11  A.   I have.

12  Q.   There should be a disk up on that podium there marked

13  Government's Exhibit 276.  Do you see that?

14  A.   I do.

15  Q.   And do you recognize that disk?

16  A.   Yes.  This is the disk that contains the body worn camera

17  footage that was recorded the day of the shooting on Miller

18  Street and I recognize this disk because I see my initials and

19  IBM.

20  Q.   Okay. And you placed your initials and IBM number on the

21  disk?

22  A.   I did.

23  Q.   After viewing it?

24  A.   That's correct.

25  Q.   Now, does that disk contain a fair and accurate copy of

1    the events that happened during that traffic stop at Hudson

2    and Weeger Street?

3    A.   Yes, ma'am.

4    Q.   Any additions or deletions on that clip?

5    A.   No, ma'am.

6              **MS. KOCHER:** Your Honor, I'd offer Government's

7    Exhibit 276.

8              **MR. VACCA:** No objection, Your Honor.

9              **THE COURT:** Exhibit 276 will be received.

10             (**WHEREUPON**, Government's Exhibit 276 was received

11   into evidence).

12             **MS. KOCHER:** Your Honor, we have uploaded

13   Exhibit 276 onto our laptop so it will play with the Court's

14   equipment.

15             **THE COURT:**  You may proceed.

16             **MS. KOCHER:** Thank you.

17   **BY MS. KOCHER:**

18   Q.   All right, Investigator, we have the video queued up.  Can

19   you tell what the time stamp is on the body worn camera?

20   A.   It is 10:50 and 25 seconds.

21   Q.   Okay. And the date would be December 8th, 2016?

22   A.   That's correct.

23   Q.   Now, to the left of the time stamp appears letters and

24   numbers TL 1599.  What is that?

25   A.   Those are my initials for Thomas Luciano and the 1599 is

my IBM number.  That is the number that is assigned to me and unique to me to track my body worn camera as well as any reports that I would generate.

Q.   Okay. And can you explain what we're looking at in this still image?

A.   This is near the intersection of Weeger Street and Hudson Avenue.  This particular view is looking westbound down Weeger Street.  Hudson Avenue would be to my back as I approached this Honda.

Q.   Okay. So Hudson Avenue would be behind you?

A.   Correct.

Q.   And so the vehicle was actually stopped on Weeger Street?

A.   That's correct.

Q.   Okay. And this is, in fact, the vehicle that you stopped that day, that green Honda?

A.   Correct.

Q.   If we could hit play?  So we've stopped it at about 1 minute and 20 seconds in.  Investigator, can you describe what we observed in that video clip?

A.   Yes.  That was the recording as I approached the green Honda from the passenger side.  Officer Renz removed the driver.  I stood by with the passenger for him to secure the driver.  Once the driver was secured, I removed the passenger from the front passenger seat and identified him as Jonathan Cruz-Carmona.

1  Q.   Okay. Now, you indicated in that clip that you recognized
2  Mr. Cruz-Carmona; is that correct?
3  A.   Correct.
4  Q.   Where did you recognize him from?
5  A.   I had arrested him previously on North Clinton Avenue near
6  that same intersection of Burbank.
7  Q.   Okay. I'd like to start the clip again at about 20 seconds
8  in.  We've stopped at 30 seconds into the clip.  Could you
9  explain what we've just watched in that 10 second clip there?
10 A.   Yes.  As I was standing outside of the front passenger
11 door I was calling out on the radio what I was doing and I
12 heard the cell phone on the dashboard go off.  And although
13 it's inaudible in here, I surmised what Jonathan was asking me
14 to do was to answer his phone that was ringing on the dash.
15 Q.   You said that was inaudible, you mean you can't make out
16 what he's saying?
17 A.   Right.
18 Q.   Okay.  Are you able to actually hear him say something,
19 though?
20 A.   Maybe if you play it again I might be able to hear what he
21 said.
22 Q.   Starting again at 20 seconds.  Now we've stopped it at 29
23 seconds.  Does he seem to be trying to communicate with you
24 during that clip?
25 A.   He does.

1  Q.   And based upon your observations of him you believed he

2  was asking to get the phone?

3  A.   I believe he said *mi* phone, the best --

4  Q.   What was your response?

5  A.   No.

6  Q.   You also had a chance to review body cam footage from

7  other officers at the scene that day?

8  A.   I have.

9  Q.   I'd like to show you what's not been received into

10 evidence as Exhibit 277 and 278.  Do you have 277 on your

11 monitor there, Investigator?

12 A.   I do.

13 Q.   And can you describe what's in this photograph?

14 A.   That is the Honda Accord that was on Weeger Street and

15 this is the same traffic stop that was recorded on my body

16 worn camera.  However, this is another recording from a

17 different angle from another officer who was at the scene.

18 Q.   Okay.  Now, does that still image fairly and accurately

19 depict the scene that day?

20 A.   It does.

21 Q.   And the vehicle?

22 A.   It does.

23 Q.   Next I'd like to have you take a look at Exhibit 278 also

24 not in evidence.  And what is this a photograph of?

25 A.   It's the same vehicle at the same traffic stop.

Q.   Okay. And does this also fairly and accurately depict the

scene of the traffic stop on December 8th, 2016?

A.   It does.

Q.   Any changes, deletions or additions in either of these

exhibits?

A.   No, ma'am.

          **MS. KOCHER:** Your Honor, I'd offer Government's

Exhibit 277 and 278.

          **MR. VACCA:** No objection, Your Honor.

          **THE COURT:** Exhibit 277 and 278 will be received.

          (**WHEREUPON**, Government's Exhibits 277-278 were

received into evidence).

          **MS. KOCHER:** If we could publish those for the jury?

Oh, thank you.

**BY MS. KOCHER:**

Q.   Investigator, looking at 277, can you describe for the

jury what's in this photograph?

A.   That's the Honda Accord --

Q.   Okay.

A.   -- on Weeger Street.  That is myself in uniform on the far

side of the vehicle and you can see the driver sticking his

arms out of the driver's side front window.

Q.   Okay. And now Exhibit 278.  What's in this photograph?

A.   Again that's the same vehicle on Weeger Street.  Myself at

the front passenger door.  And just to the left side of the

1  photo you can see the shoulder of Jesus Rosario Munoz.

2  Q.   That was the driver of the vehicle?

3  A.   That's correct.

4  Q.   And in this photograph are you also able to make out the

5  license plate of the green Honda?

6  A.   Yes, you can see HJB 4323 clearly on the license plate of

7  the vehicle.

8  Q.   All right.

9          **MS. KOCHER:** Your Honor, at this time I would ask to

10  publish Government's Exhibit 279.  It is a certified DMV

11  record of registration for the license plate HJB 4323.

12          **MR. VACCA:** No objection, Your Honor.

13          **THE COURT:** Exhibit 279 will be received.

14          (**WHEREUPON**, Government's Exhibit 279 was received

15  into evidence).

16  **BY MS. KOCHER:**

17  Q.   Investigator, are you able to read Exhibit 279 -- or maybe

18  we can zoom in a bit on the wording?

19  A.   I can read it.

20  Q.   Okay.  Can you explain to the jury what this document is?

21  A.   This is a registration record for the 2005 green Honda.

22  License plate Henry John Baker 4323.  This is the same vehicle

23  that I stopped and that was on the body worn camera on Hudson

24  and Weeger.

25  Q.   Okay. So on this document it says at the top the license

1   plate HJB 4323, correct?

2   A.   Correct.

3   Q.   And then below that it has 2007 Toyota tan.  Can you

4   explain why that vehicle is listed on the document?

5   A.   Yes.  If you scroll down a little bit further you'll see

6   an '05 Honda green listed.  And it shows that that vehicle was

7   valid on August the 22nd of 2016 and that plate for that

8   vehicle was voluntary surrendered on May 25th of 2018.

9   Q.   So the license plate HJB 4323, although it may be on a

10  Toyota vehicle now, it was previously on a 2005 green Honda?

11  A.   That is correct.

12  Q.   Now, as of December 8th, 2016, are you able to tell what

13  vehicle the license plate HJB 4323 was on?

14  A.   The same 2005 green Honda that was depicted in the video

15  and that we stopped at the intersection of Hudson and Weeger.

16  Q.   Okay.  Does this document also indicate who that license

17  plate is registered to?

18  A.   It does.

19  Q.   Who is that?

20  A.   Nisharya Gutierrez with the date of birth 5/31 of '91, a

21  female who lives at 6 Burbank Street.

22  Q.   And that's in Rochester, New York?

23  A.   That's correct.

24  Q.   All right.  Thank you, Investigator.  I have no further

25  question.

1          **MR. VACCA:** No questions, Your Honor.

2          **THE COURT:**  You may step down.  Thank you very

3   much.

4          **THE WITNESS:** Thank you, Your Honor.

5          (**WHEREUPON**, the witness was excused).

6                    *   *   *

7                 <u>**CERTIFICATE OF REPORTER**</u>

8

9          In accordance with 28, U.S.C., 753(b), I certify that

10  these original notes are a true and correct record of

11  proceedings in the United States District Court for the

12  Western District of New York before the Honorable Frank P.

13  Geraci, Jr. on May 5th, 2021.

14

15  <u>S/ Christi A. Macri</u>

16  Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter

17

18

19

20

21

22

23

24

25